# EXHIBIT 2

# DEPOSITION OF RICHARDS

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA AT ROME

---

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -vs- | : | NO. |
| | : | 4:22-CV-00179 |
| K-VAT-FOOD STORES, INC., d/b/a | : | |
| FOOD CITY, | : | |
| | : | |
| | : | |
| Defendant. | : | |

---

THE VIDEOTAPED DEPOSITION OF
GARY RICHARDS
January 12, 2023

---

Whitney A. Vaughn, TN LCR# 418
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

INDEX OF EXAMINATION


| | Page |
|---|---|
| Examination By Mr. Hargraves............. | 6 |
| Examination By Mr. Jackson............... | 76 |


INDEX OF EXHIBITS


| | | |
|---|---|---|
| 1 | Associate Handbook.................. | 15 |
| 2 | Statement sent 11/30/21............ | 30 |
| 3 | Certificate paperwork.............. | 36 |
| 4 | Email Chain dated 7/23/21.......... | 43 |
| 5 | Statement dated 8/6/21............. | 44 |
| 6 | Statement dated 8/12/21............ | 50 |
| 7 | Email Chain dated 9/8/21........... | 58 |
| 8 | Email Chain dated 9/9/22........... | 63 |
| 9 | Email Chain dated 3/11/22.......... | 66 |

APPEARANCES:

Appearing for Plaintiff:

R. ETHAN HARGRAVES, ESQUIRE
ethan@masseyattorneys.com
Massey & Associates, P.C.
6400 Lee Highway, Suite 101
Chattanooga, Tennessee 37421
(423) 697-4529

Appearing for Defendant:

HOWARD B. JACKSON, ESQUIRE
hjackson@wimberlylawson.com
Wimberly, Lawson, Wright, Daves & Jones, PLLC
550 Main Avenue, Suite 900
Knoxville, Tennessee 37901
(865) 546-1000

ALSO PRESENT: Videographer, Patrick Black

---

The videotaped deposition of GARY RICHARDS, called as a witness at the instance of the Plaintiff, for purposes of discovery, pursuant to the Federal Rules of Civil Procedure, taken pursuant to agreement on January 12, 2023, at the law offices of Massey & Associates, P.C., 6400 Lee Highway, Suite 101, Chattanooga, Tennessee 37421, commencing at 10:38 a.m., before Whitney A. Vaughn, Court Reporter and Notary Public.

S T I P U L A T I O N

It being agreed between counsel for the respective parties that Whitney A. Vaughn, Court Reporter and Notary Public, may swear the witness, take his deposition in machine shorthand, afterwards reducing the same to typewriting.

All objections, except as to the form of the question and responsiveness of the answer, are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., are expressly waived. Signature waived.

//

THE VIDEOGRAPHER: We are now on the record. It is Thursday, the 12th of January 2023. The time is 10:38 a.m.

This is the video deposition of Gary Richards in the matter of Christopher Matthew Batten versus K-VA-T Food Stores, Incorporated, doing business as Food City. This is case number 4:22-cv-00179.

This deposition is being held today at the law offices of Massey & Associates, located at 6400 Lee Highway, Suite 101, in Chattanooga, Tennessee.

My name is Patrick Black, the videographer. Our court reporter is Whitney Vaughn.

Will counsel please introduce yourselves and state who you represent?

MR. HARGRAVES: Ethan Hargraves on behalf of the plaintiff, Matthew Batten.

MR. JACKSON: Howard Jackson for Food City.

THE VIDEOGRAPHER: I'll ask Ms. Vaughn to swear in the witness.

//

//

//

GARY RICHARDS,

called at the instance of the Plaintiff, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HARGRAVES:

**Q Mr. Richards, could you please state your full name for us?**

A Gary Richards.

**Q Okay. Mr. Richards, my name is Ethan Hargraves, and I work for Massey & Associates. I'm the attorney representing Mr. Batten in this case.**

**Have you ever testified in a deposition before?**

A No, I have not.

**Q Okay. The first thing I want to do is go over a few, kind of, ground rules so that you can understand the process, and hopefully it will go smoothly.**

**The first thing is we have a court reporter. She is writing everything down that we say. We can make her job a little bit easier by doing a couple things. If you will, try to let me finish my question before you start to answer so that we're not talking over each other. And I'll do my**

best to not interrupt you and let you finish your answer before I start asking another question. Does that sound fair?

A Fair.

Q Another thing that we can do is try to make our discussions clear. If you can try to answer verbally versus head nods, those are difficult to put in a transcript. She can do it, but it's difficult. Also, things like uh-huh and huh-uh, real easy to slip into that, but they look very similar on a transcript. So if that happens at some point -- and it might; that's okay -- I may just ask you to clarify is that a yes or is that a no. I'm not trying to be mean to you. I just want to make sure that we understand what your answer is. Okay?

A Gotcha.

Q Okay. If you don't understand a question that I've asked you, please do not answer it. All you got to do is tell me that you don't understand it, and I will do my best to rephrase it so that you can understand it. Okay?

A Yes.

Q And finally, I'm not going to take all day, but we will be going for a little while. If you need a break at any point, all you got to do is ask

**and we'll take a break. The only thing that I will say on that is that if I have asked you a question, I will want an answer before we take the break. Does that make sense?**

A Yes.

**Q Okay. What -- where do you live, Mr. Richards?**

A Rocky Face, Georgia.

**Q How long have you lived there?**

A Nine months.

**Q Okay. Where did you live before that?**

A Dalton.

**Q Okay. Were you in Dalton for a while?**

A I was there about five years.

**Q Did you attend high school?**

A I did.

**Q Where at?**

A Gilmer County.

**Q Gilmore?**

A Gilmer.

**Q Gilmer County?**

A Yes.

**Q And when did you graduate?**

A '93.

**Q Any college?**

A No.
Q Okay. Do you have any professional licenses or certifications?
A No.
Q Okay. Any -- any other professional training?
A No.
Q Okay. Are you a member of any professional organizations or clubs?
A No.
Q And have you ever been convicted of a crime?
A No.
Q Okay. You work for K-VA-T Food Stores, Inc.; is that right?
A Yes.
Q That's commonly known as Food City?
A Yes.
Q What is your current position with Food City?
A Store manager.
Q Okay. And what store do you manage -- store number, rather?
A Store number 214.
Q And that's the -- that's the Food City

**in Ringgold?**

A Yes.

**Q Okay. When did you first start with Food City?**

A In 2015.

**Q Okay. And what was your starting position?**

A Assistant manager.

**Q Okay. And which store was that at?**

A 239.

**Q Which one is that?**

A Dalton.

**Q Dalton. So at what point did you transfer from the Dalton store to the Ringgold store?**

A I went into the training program in 2018. 2019.

**Q Okay. Was that the training program to become a store manager?**

A Correct.

**Q Okay. So they trained you up to be the store manager for the Ringgold store number 214?**

A Well, I was first at 239.

**Q Okay.**

A Then transferred to 214.

**Q Okay. So you took over as the store**

manager at 239, the Dalton store --
A Correct.
Q -- is that right? And then shortly thereafter you moved over to the Ringgold store?
A Yes.
Q Okay. Do you remember when that was?
A 2019.
Q Okay. And that's where you are currently?
A Yes.
Q Okay. What are your job duties as a store manager?
A Oversee all the ins and outs of the store, daily operations, staffing, conditions, maintenance.
Q Okay. I know it's kind of a broad question. You manage the store; is that --
A Yes.
Q Food City has certain human resources -- or as they call them, human relations -- positions that work in each individual store; is that right?
A Correct.
Q Those are human relations coordinators; is that right?

A Correct.

**Q How many human relations coordinators does each store have, in your experience?**

A One.

**Q Okay. Are there any other human relations employees that work on site at each individual store?**

A No.

**Q Okay. Who do you -- I got to ask this, but I assume that everybody at the store answers directly to you?**

A Not directly, no.

**Q Okay. Which -- are there employees at 214 who do not report directly to you?**

A We -- it's broken down into department heads. So if there is any issues or concerns, they go to their direct supervisors.

**Q And then those direct supervisors --**

A If it comes to me. If it goes and they can't handle the situation, then it comes to me.

**Q Okay. Who do you -- who are you directly accountable to?**

A Currently, Daryl Massey.

**Q Who is Daryl Massey?**

A District manager.

Q Okay. Are you accountable in any way to the human resources director or the human relations director?
A No, sir.
Q Okay. As the store manager, do you make decisions about human relations issues?
A It depends on the situation.
Q We're here specifically talking about situations involving the ADA. As the store manager, are you authorized to make decisions for the store regarding ADA accommodations?
A No.
Q Is that something you got to pass up the chain?
A I do.
Q Who would you pass that up to?
A David Ellison.
Q Him being the senior human resources specialist?
A Correct.
Q And he was the senior human resources -- or human relations specialist as of August 2021; is that right?
A Yes.
Q Who was responsible for making sure

**that store number 214 complied with federal laws and regulations?**

A That would be myself and along with people from corporate.

**Q Okay. Who from corporate?**

A Again, it depends on the laws and the regulations. If you're talking about this particular incident, it would be David Ellison and his superiors.

**Q Okay. When it comes to complying with the ADA, the Americans with Disabilities Act, does the company provide you any training?**

A No, sir.

**Q Okay. Are you aware if the company provides any training with regard to ADA compliance?**

A I'm not aware.

**Q Okay. Does Food City have policies or procedures on disability accommodation?**

A Yes.

**Q Do you know where those policies or procedures would be?**

A In the employee handbook, I think, and it's on a hard drive that's stored in the computers. Store files -- store reports, I believe.

MR. HARGRAVES: Let's mark that as

Exhibit 1.
(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 1.)
BY MR. HARGRAVES:
**Q I'm showing you what's been marked Exhibit 1 with the Bates number K-VA-T 1 through 63. Do you recognize that document?**
A Well --
**Q Take your time.**
A Where are we at?
**Q I was just stating the page numbers. Do you recognize that document?**
A Yes.
**Q And that's the -- is that the associate handbook for Food City?**
A Correct.
**Q Is that the -- excuse me. I got something in my throat. Is that the document that you spoke of just a moment ago that would contain the policies or procedures on disability accommodation?**
A Yes.
**Q Okay. Now, this isn't a test, but do you think you can point us to where in this handbook the policies or procedures on disability are located?**

A I would if I had my glasses. I do not have my glasses.

**Q Okay. Fair enough. Do you remember what particular policy those would be under?**

A I guess it would be under the discrimination.

**Q Is that the no-harassment policy?**

A I don't know.

**Q Okay. But you expect that there are policies or procedures in there regarding the how to provide disability accommodations? Is that what you're saying?**

A There is nothing in here how to provide. It's just we do not discriminate against anyone with disabilities.

**Q Okay. Okay. To your knowledge, are there any -- does Food City have any policies or procedures about -- specifically about providing or not providing disability accommodations?**

A I don't know.

**Q Okay. Are you aware if Food City has any policies or procedures on service animals?**

A I don't know.

**Q Are you aware if Food City has any training that they offer on the ADA and service**

**animals?**

A I don't know.

**Q As the store manager, would you have had access to your associates' respective training files?**

A No.

**Q Okay. Who would have access to those documents?**

A Corporate office.

**Q Okay. Did you have any part in ensuring that individual associates had completed all required training?**

A I'm sorry. Repeat, please.

**Q Sure. Did you have any -- did you play any part in ensuring that individual associates had completed the required training?**

A Required training for what?

**Q For their position.**

A Yes.

**Q Okay. What was that role?**

A That's kind of a broad question. You're going to have to narrow it down for me, please.

**Q What did you do to ensure that individual associates had completed the required**

**training?**

A My role would be to follow up, follow through. And we also have computer-based training that they do. We make sure -- ensure they take that and sign off on it.

**Q Is that the Fast Track training?**

A Correct.

**Q And that's purely electronic training?**

A Yes.

**Q The resources that are attached to that training are purely electronic; is that your understanding?**

A The Fast Tracks, yes.

**Q Okay. There aren't physical --**

A We do hands-on training as well, yes.

**Q Okay. But with the Fast Track training, that's all on the computer?**

A Correct.

**Q All right. Are you aware of any Fast Track training for management positions that covers ADA accommodations?**

A I'm not aware.

**Q Okay. You -- did you -- did you, yourself, go through any Fast Track training?**

A No.

**Q Okay. Is that not something that managers do?**

A I'm not aware, no. I don't know.

**Q Are you -- do you have any responsibility regarding the hiring and firing of employees at your store?**

A Yes.

**Q Is that solely within your discretion or does corporate have any guidance on that?**

A Depends on the situation.

**Q Okay. Does corporate Food City encourage you to hire certain kinds of employees?**

A No.

**Q Are there any incentives, for example, for hiring employees who have disabilities?**

A No.

**Q Okay. Is it Food City's policy to provide a healthy and wholesome atmosphere for their associates?**

A Is it policy?

**Q Yes.**

A No.

**Q Okay. Is it Food City's policy to recognize the rights of each individual?**

A Yes.

Q Okay. Does that extend to their associates as well?
A Yes.
Q Prior to Mr. Batten, had you ever had to handle an employee request for disability accommodation?
A No.
Q So Mr. Batten was the first?
A Correct.
Q Had you had any training on that issue before?
A No.
Q Have you since?
A No.
Q When did you first meet Mr. Batten?
A I can't remember.
Q Okay. You can ballpark it if you want.
A 2000 -- I'm going to say 2020, maybe, thereabout.
Q Was that when he was transferred to the 214 store?
A Yes.
Q Okay. So that would have been the first time that you met him?

A Yes.

**Q Did you have any -- were you aware of him prior to him transferring to your store?**

A Prior to the transfer, we did do a conversation. He did come by the store because he was wanting to transfer there. We spoke, we met. Good guy. I spoke with the store manager, and then we made the transfer happen.

**Q Okay. After he transferred to 214, did you have any opportunity to observe his work?**

A Yeah. I went to the kiosk several times and everything was fine.

**Q Were you responsible for evaluating his performance?**

A No.

**Q Who was -- who was responsible for that?**

A The coordinator, the fuel coordinator.

**Q Okay. Who would that have been at that time?**

A At that time, I think it was Bailey Hamby.

**Q Okay. Can you spell that last name?**

A H-A-M-B-Y.

**Q Was the title of her position, was**

that fuel clerk coordinator?

A Correct.

Q And what was that person's job?

A To oversee the operations of the fuel center.

Q Did they work from inside the store?

A No. They work at the fuel center.

Q Okay. And is the fuel center the gas station?

A Yes.

Q Does the fuel clerk coordinator have an office on site?

A No.

Q Okay. So where does the -- where would -- if I was going to Food City, where would I find the fuel clerk coordinator?

A At the fuel center.

Q So they would be just standing around the pumps?

A No. There is a kiosk.

Q Okay. That's a separate position from the fuel clerk?

A Yes.

Q So the fuel clerk and the fuel clerk coordinator both work in the kiosk?

A Yes.

**Q Are there any other employees who work in the fuel kiosk?**

A Only designated ones when we -- because, obviously, the associates have to take breaks. We'll send people down to give breaks and lunches.

**Q Will that typically be one of the cashiers?**

A Yes.

**Q But, otherwise, it's just the fuel clerk and the fuel clerk coordinator in the kiosk?**

A Yes.

**Q Are they both there typically at the same time?**

A No.

**Q Why is that?**

A They just have overlapping -- not really overlapping shifts. Just you have one to 3:00, and then the other one will relieve.

**Q Okay. So one is a supervisory position. That is the fuel clerk coordinator is a supervisory position over the fuel clerk; is that right?**

A Yes.

Q But they both will work the kiosk not at the same time, but they will take shifts on it?
A Correct.
Q All right. Thank you for clearing that up. Did you ever discuss with Ms. Hamby Mr. Batten's performance as the fuel clerk?
A We have, yes.
Q And what -- tell us what you remember about those conversations.
A Performance was good.
Q Did Ms. Hamby have any complaints or concerns about Mr. Batten?
A Not that I'm aware.
Q So Mr. Batten was a good employee?
A Yes.
Q To your knowledge, was he ever written up?
A Not to my knowledge.
Q Okay. I know this may seem like a silly question, but were you aware of his disabilities?
A Yes.
Q At least one being pretty obvious, he didn't have a right arm; is that fair?
A Yes.

**Q Did y'all talk about that at all?**

A No.

**Q Okay. When he first came to transfer to your store, did he explain what his situation was?**

A He did.

**Q And what did he tell you?**

A He told me he was in an accident, you know, lost his arm and a couple other issues that he had -- he made me aware of.

**Q Do you remember what those other issues were?**

A Not off the top of my head I can't, no.

**Q Do you remember him telling you about the metal in the right side of his body?**

A No.

**Q Okay. Did you see the difficulties that he had at work because of his condition?**

A I saw no difficulties.

**Q Okay. Did anybody report any difficulties to you?**

A No.

**Q Were you familiar with an employee named Vince?**

A I don't remember.

Q Okay. Do you remember an incident where an employee made a joke about Mr. Batten's amputated arm?
A No, sir.
Q When did you first learn that Mr. Batten had requested an accommodation in the form of a service animal?
A The day he showed up to work.
Q Okay. Do you remember what day that was?
A No.
Q Okay. Could it have been around July 23rd of 2021?
A I don't know.
Q So he had -- he didn't call you in advance of that? He just showed up with the dog?
A Correct.
Q Okay. How did you learn that he had showed -- that he had just showed up with the dog? Did you see him just show up?
A I was paged to the office. When I went to the office, he was up there. He was in the office with the dog.
Q Who paged you?
A Emily -- Emily Hobbs.

**Q Did y'all have any discussion at that point?**
A We did.
**Q Now, I want to be clear. Did you and Ms. Hobbs have any discussion at that point?**
A No. No.
**Q So you went down to the office or up to the office?**
A Upstairs to the office, yes.
**Q And what did you do when you got there?**
A I asked him what -- you know, why was -- why was I paged to the office, and that's when he told me that he had a service dog and was going to bring it to work.
**Q Okay. What else did y'all talk about?**
A Well, I told him I couldn't authorize it, that I would have to reach out to the powers that be, which would be David Ellison, but he was on vacation that week. And I contacted Donnie Meadows.
**Q Okay. Donnie Meadows was the human relations director?**
MR. JACKSON: Donny Rector?
THE WITNESS: Or Donny Rector. I'm sorry.

BY MR. HARGRAVES:

**Q That's fine.**

A Donny Rector.

MR. JACKSON: Too many Donnies.

MR. HARGRAVES: Yeah, right.

BY MR. HARGRAVES:

**Q So you reached out to Donny Rector?**

A Correct.

**Q Donny, Donnie, David. I've done the same thing. So it's all right.**

**Donny Rector was over the Knoxville division and he was covering for Mr. Ellison at that point?**

A Yes.

**Q So you reached out -- did you call Mr. Rector?**

A We sent an email. Mr. Batten came by several hours before his shift. Then I reached out to get -- to find out if it was allowed, what we'd do, policies and procedures, just to get advice.

**Q Okay. Did you get any response from Mr. Rector?**

A I did.

**Q And what was that?**

A What kind of service animal it was, I

think is what he asked me.
Q Do you know why he asked that?
A I don't know.
Q Okay. But that was not -- that response you received, that wasn't on July 23rd? That wasn't the same day, was it?
A It was the same day -- I couldn't tell you the date. Just the day that Mr. Batten came in.
Q Was Mr. Batten sitting there waiting while you were trying to sort all this out?
A We waited for a little bit. We waited for a response. Then he went home because, like I said, he was there before his shift started.
Q Did he ultimately get to work his shift that day?
A He did.
Q I'm going to -- we want to talk about the details a little bit more, but ultimately did you make the decision to at least temporarily allow Mr. Batten to use his service animal?
A I did.
Q Do you think that was a reasonable decision to make?
A I think so at the time, yes.
Q At that time, could you think of any

**reason why it would be a problem for Mr. Batten, as the fuel clerk, to have his service animal in the kiosk?**

A Not at the time, no.

**Q Sitting here today, have you changed your mind on that?**

A I have not.

MR. HARGRAVES: Okay. All right. I want to show you another document. Let's mark this Exhibit 2.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 2.)

BY MR. HARGRAVES:

**Q All right. Looking at Exhibit 2, Bates number 000132, do you recognize this document?**

A Yes.

**Q What is it?**

A It's a statement that I made.

**Q Did you draft this?**

A I did.

**Q Do you remember when you drafted it?**

A I'm assuming on November 30th.

**Q Okay. And this at least initially describes the events that occurred on July 23rd of**

2021; is that right?

A Yes.

Q So this was written approximately four months after those events occurred; is that right?

A Yes.

Q Is this -- is Exhibit 2 a fair and accurate copy of that statement that you wrote?

A Now, this -- this is in my drafts at work. So if I printed this off, it's going to have that date on it, I believe, that this was typed up beforehand. I'm not sure. I'm sorry.

Q No, that's fine. I'll represent to you this is what Food City's attorneys provided to us.

A Okay.

Q Does this appear to be a fair and accurate copy of the statement that you wrote?

A Yes.

Q And is this a complete and truthful account of what's contained herein?

A Yes.

Q It says at the top "sent Tuesday, November 30, 2021." Do you know what that is?

A Yeah. I sent the -- sent the email, I guess.

Q Okay. Do you know who you sent this to?

A If I sent it, it probably would have been to David Ellison.

Q Okay. All right. I just kind of want to walk through it a little bit. So it notes that on July 23rd of 2021 Mr. Batten came in around 10 a.m.; is that right?

A Yes.

Q Okay. And that's when he told you about the service dog?

A Yes.

Q "I told Matt that I had never dealt with this before and didn't know what the protocol was in allowing service animals at work." Did I read that correctly?

A Yes.

Q Did you find out what the protocols were?

A I did not.

Q Okay. To your knowledge, were there any protocols?

A I don't know.

Q Okay. But you reached out to find out about any protocols; is that right?

A Yes.
Q Did you get an answer about whether there are any protocols?
A No.
Q So to this day, are you aware of any protocols that Food City has with regard to employees using service animals at work?
A No.
Q Okay. You told Mr. Batten that you would get advice from human resources and that you would have an answer for him before he started his shift at 2; is that right?
A Yes.
Q You note that you emailed Mr. Rector and that Mr. Rector responded, asking about -- asking if it was a service or emotional support dog. Do you see that?
A I can't see it because I don't have any glasses.
Q Oh, I apologize. Your attorney is following along. And if I mess anything up, I'm sure he will let us know.
Is that what you recall with regard to what happened? You emailed Mr. Rector; he responded back and asked if it was a service animal or

emotional support animal?

A Correct.

Q Did you ever have any further discussion with Mr. Rector about why that matters?

A No.

Q Okay. But you replied back at 11:57 letting Donny know that Matt was claiming the dog was both service and emotional. And when I received certification/documents for the animal, I would email. Does that sound like what happened?

A Yes.

Q So Mr. Batten had indicated to you at least that it wasn't just an emotional support animal, it was also a service animal; is that right?

A Yes.

Q You said about two-thirds of the way down: As I have never dealt with this situation, knowing the sensitivity of the subject of service animals and never receiving -- never receiving an answer from HR, I advised Matt that he could bring the animal to work with the understanding that may change based on review from the company. Does that sound right?

A Yes.

Q How did you know -- or what did you

**mean by "knowing the sensitivity of the subject of service animals"?**

A I just know the sensitivity of when customers bring service animals in the store.

**Q Okay. That can be a deeply personal issue?**

A Exactly. I mean, yes.

**Q Does -- or did Food City have training on customers who had service animals?**

A No.

**Q But you had interacted, I guess, with some?**

A Yes. We've -- yes. You have customers bring dogs.

**Q Was Mr. Batten's dog, was he wearing anything special?**

A Yes.

**Q Was he wearing like a service animal vest?**

A Yes.

**Q Did it have patches on it?**

A I don't recall.

**Q Do you recall if it said service animal on the back?**

A I don't recall.

**Q Okay. You remember that Mr. Batten gave you some paperwork; is that right?**

A Yes.

(Whereupon, the document, as referred to below, was marked and subsequently attached hereto as Exhibit No. 3.)

MR. HARGRAVES: Are we on 3?

THE COURT REPORTER: Uh-huh.

BY MR. HARGRAVES:

**Q Looking at what has been marked Exhibit 3, Bates numbers 000134 through 137, do you recognize these documents?**

A I remember this one, the photo. That's the one that stands out to me.

**Q When you say "this one," which one is that?**

A The one with his photo.

**Q Do you recognize these as the photos that you and Ms. Hobbs took of the documentation that Mr. Batten provided to you on July 23rd?**

A If it's the ones that we sent, then we actually scanned these in and sent them to Donny.

**Q So you recognize page 3, which has Mr. Batten's picture with his dog?**

A Yeah.

**Q But you don't recognize the other pages?**

A It was over a year ago. Sorry.

**Q That's fine. To your recollection, did Mr. Batten give you any other paperwork?**

A I can't remember.

**Q During the period of time -- let me ask you this: How long was Mr. Batten permitted to work with his service animal?**

A I can't remember.

**Q Okay. Was it approximately a week?**

A Probably about that. It was -- because David was on vacation. When he got back.

**Q During that week were there any issues with Mr. Batten using his service animal?**

A Not that I'm aware.

**Q Have you since become aware of any issues during that period of time --**

A No.

**Q -- of Mr. Batten using his service animal?**

A No.

**Q You got a call from David Ellison on this issue on July 30th at around 4:00; is that right?**

A I guess.
Q Okay. I'll represent that's what you indicate in your statement on Exhibit 2. You say that Mr. Ellison asked -- he called at 4 asking that I update him on the situation at which time I did and informed that I did allow Matt to work. Does that sound right?
A Yes.
Q What else was said in that conversation?
A I can't remember.
Q Okay. Do you remember if you communicated to Mr. Ellison that Mr. Batten was not having any issues working with his service animal?
A I can't remember.
Q Do you remember if Mr. Ellison asked you if there were any issues at that point with Mr. Batten using his service animal?
A I don't remember.
Q But certainly you wouldn't have told him that there were any issues, because there weren't; is that right?
A Probably not.
Q "David told me he would communicate with corporate and would get back with me. David

contacted me on 8/2/21 to discuss the matter further and again on 8/5/21 to set up a meeting with Matt on 8/6/21 at 1."

I want to break that down. So you initially spoke with Mr. Ellison on July 30th. Do you remember anything about your conversation with Mr. Ellison on -- when he called you back on August 2nd?

A No, sir.

Q Do you remember anything from your discussion with Mr. Ellison when he called you again on August 5th?

A No, sir.

Q So you had three conversations -- at least three conversations with Mr. Ellison prior to the August 6th meeting between you, Mr. Ellison, and Mr. Batten; is that right?

A If it's noted, yes.

Q Do you remember if you had any other meetings or conversations with Mr. Ellison that are not included here?

A No.

Q And do you remember anything about any of those conversations with Mr. Ellison that we haven't already talked about?

A No.
Q **Okay. Do you know why you would have had those two additional phone calls on August 2nd and August 5th?**
A I don't know.
Q **Is there any record of those phone calls anywhere?**
A Not that I'm aware.
Q **Ultimately, you set up a meeting with Mr. Batten on August 6th; is that right?**
A If that's what it states, then yes.
Q **Do you remember how that was communicated to Mr. Batten?**
A I don't remember.
Q **Okay. Do you remember if Mr. Batten was told ahead of time that David Ellison, the senior HR specialist, was going to be there?**
A I can't remember.
Q **Is there any reason you would not tell Mr. Batten --**
A No.
Q **-- that Mr. Ellison was going to be there?**
A No.
Q **And you indicated that Mr. Batten**

worked July 23rd, 24th, 25th, 27th, 30th, 31st, and August 1st. Does that sound right?

A Yes.

Q That's one, two, three, four, five, six -- that's seven days. So that's the week we talked about.

A Okay.

Q So he worked all of those days, as far as you know, with his service animal?

A Yes.

Q Before we get into the August 6th meeting, was there anything else about the July 23rd meeting between you and Mr. Batten that is significant that you remember?

A Not that I can remember.

Q Do you remember talking with Amber Grindle on that day?

A No.

Q Do you remember who Amber --

A I know who Amber is, but --

Q She didn't come into your office to make a complaint?

A I can't remember.

Q Do you remember Mr. -- when Mr. Batten came to see you, he had a service animal with him?

A Correct.

**Q Did that service animal act inappropriately that you saw?**

A I can't remember.

**Q Did it jump on you?**

A On me? No.

**Q Yes, sir. No?**

A Not that -- I can't remember if he did, no.

**Q Did the dog jump on anybody that you saw?**

A I can't remember.

**Q Did the dog attack anybody?**

A Attack, no.

**Q Certainly you would remember that?**

A Yes, I would remember attack.

**Q So you don't remember Amber Grindle coming to you and telling you that that damn dog jumped on me or something to that effect?**

A I can't remember.

MR. HARGRAVES: That's fine. All right. I'm going to show you another document. Let's mark that Exhibit 4.

//

//

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 4.)

BY MR. HARGRAVES:

**Q This is marked Exhibit 4, Bates number 000133. Do you recognize this?**

A Again, I can't read it.

**Q Okay. I keep forgetting. I'm just in autopilot here. I'll represent to you this is an email chain between you and Donny Rector on July 23rd, 2021. Okay? Is that the day that you emailed Mr. Rector regarding the request for Mr. Batten to use a service animal?**

A On July 23rd?

**Q Yes, sir.**

A Yes.

**Q Okay. It says, "Good morning, Donny. I have a Gas 'N Go associate that recently acquired a service dog to help with balance and emotional support. The associate wants to bring the dog to work. Please advise." Does that sound like what you said?**

A Yes.

**Q Mr. Rector responded about an hour later, quote, "Is it a service animal or an emotional**

support dog?" Does that sound about right?

A Yes.

Q It looks like you responded at 11:57. "He claims it's both, service animal to help maintain balance and emotional support. Matt was in a very bad motorcycle accident which resulted in the loss of an arm, head trauma that has affected his vision among other things. I asked that he bring in the certification for the animal. When I receive, I will email to you." Does that sound right?

A Yes.

Q Ultimately, you set up a meeting between Mr. Batten, yourself, and David Ellison; is that right?

A Yes.

Q And that was August 6th of 2021?

A I don't remember.

Q Okay. Do you remember who set that up?

A I don't remember.

MR. HARGRAVES: Are we on 5?

THE COURT REPORTER: Yes.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 5.)

BY MR. HARGRAVES:

Q Looking at what's marked Exhibit 5, Bates number 001063, I'll represent this is a copy of a note that you made regarding the August 6th meeting. Do you recall drafting a note --

A Yes.

Q -- or statement regarding that meeting?

A Yes.

Q Do you have any reason to believe that what your attorney has provided us is not the statement that you wrote?

A No.

Q It says on -- and would this be a document you drafted alone?

A Yes.

Q And do you remember when you drafted it?

A I do not.

Q Now, it's got a signature on it. Can you recognize that signature?

A Yes.

Q Is that yours?

A That's my signature.

Q And I'll represent the date is 8/6/21

below the signature. Would that be the day that you signed it?

A Yes.

Q Okay. And that being the day that this occurred, is that the day that you drafted this statement?

A Yes.

Q Okay. It's -- "On August 6th, David Ellison met with Matt Batten with myself as a witness to discuss the request of a service animal.
Mr. Ellison asked Matt if there was any aspect of the job that he could not perform that required the assistance of a service animal. Matt replied that he was able to perform all duties that were required without question and had been doing so since his employment with Food City without the help from a service animal. Matt stated that the purpose of the service animal was to provide companionship and help with anxiety, isolation." As best you can tell, did I read that correctly?

A Yes.

Q Is that what you wrote?

A Yes.

Q And is that a complete and accurate and truthful account of what happened in that

August 6th meeting?

A From what I -- yes.

Q Okay. Did you provide this note to David Ellison?

A Yes.

Q Did you provide it to anyone else?

A No.

Q The last sentence of this note says, "Matt stated that the purpose of the service animal was to provide companionship and help with anxiety and isolation." That's what you wrote, right?

A If it's on there, that's what I wrote.

Q It doesn't mention stability, does it?

A No.

Q Mr. Batten actually said in that meeting that he needed the dog for stability, didn't he?

A In that meeting, I don't remember.

Q Okay. If Mr. Batten says that he did mention in that meeting that he needed the dog for stability, would you say that's incorrect?

A I'm sorry. Repeat.

Q If Mr. Batten claims that he did mention stability in that August 6th meeting, do you have any reason to think that's incorrect?

A Well, I -- I don't know.

Q Okay. Do you recall Mr. Batten mentioning in that meeting that he had a history of falls?

A I don't remember.

Q Do you recall Mr. Batten mentioning in that meeting that the dog helped him with his stability?

A I do not remember.

Q Okay. None of those things are in your statement, are they?

A No.

Q But looking back at Exhibit 4, your email to Mr. Rector, you told Mr. Rector that "I have a Gas 'N Go associate that recently acquired a service dog to help with balance and emotional support;" is that right?

A Yes.

Q Okay. So you were aware that Mr. Batten needed the dog at least in part for balance?

A That's what he told me the dog was for.

Q Okay. Did you have any reason to believe that was not true?

A None.

Q **Okay. There is nothing in your written statement about Mr. Batten mentioning a history of falls; is that right?**

A If it's not in there, then no.

Q **Also in your written statement, you say that -- you say that "Mr. Ellison asked Matt if there was any aspect of the job that he could not perform that required the assistance of a service animal." You say, "Matt replied that he was able to perform all duties that were required without question." Are those your words or Mr. Batten's words?**

A I don't remember.

Q **Okay. Do you remember if Mr. Batten said the words "without question"?**

A I don't remember.

Q **Okay. Do you remember where you got those words?**

A I don't remember.

Q **Okay. Do you remember Mr. Batten telling you that he did have issues doing his job?**

A Not that I'm aware, no. You talking about the meeting or in general?

Q **In the meeting, yes.**

A No.

**Q We're talking about the August 6th meeting between you, David Ellison, and Mr. Batten.**

A No, I don't remember.

**Q If Mr. Batten says that he did tell you and Mr. Ellison that he had issues doing his job, do you have any reason to contradict that?**

A No.

**Q Do you recall Mr. Ellison asking Mr. Batten if he could perform the job with or without accommodation?**

A I don't remember.

**Q Okay. So you don't remember Mr. Batten responding that he could do the job with accommodation?**

A No, sir.

**Q And that exchange is not in your written statement?**

A If it's not in it, then it's not in there.

MR. HARGRAVES: Let's mark this Exhibit 6.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 6.)

BY MR. HARGRAVES:

Q Looking at what's been marked Exhibit 6, Bates number 000141, do you recognize this document?

A I recognize the signature, yes.

Q Okay. And do you recognize the date as 8/12/21?

A I do not.

Q Okay. I'll represent to you that this is what was provided us as the statement that you wrote and -- regarding the meeting that occurred between you, Mr. Ellison, and Mr. Batten on August 12, 2021. Do you remember writing that statement?

A Yes.

Q And does this appear to be that statement?

A It does.

Q Okay. Is that -- that is your signature?

A Yes.

Q Okay. And as best you can tell us today, is that a complete -- or is that a fair and accurate copy of that statement?

A Yes.

**Q And is it -- as you drafted it, is it a truthful account of the meeting that occurred on August 12, 2021?**

A Yes.

**Q Had you had any discussion with Mr. Ellison between the August 6th meeting and this August 12 meeting?**

A I don't remember.

**Q Okay. Do you remember what was discussed in the August 12 meeting?**

A I can't remember.

**Q Do you remember Mr. Ellison informing Mr. Batten that the service -- that the request for the service animal was being denied?**

A I remember that, yes.

**Q What do you remember about that conversation?**

A Well, that's why we write them down, so I don't have to remember. Again, this was -- you know, a refresher, if I could read this, I mean, it might bring back something, but --

**Q I tell you what. I'll read it to you. If I mess something up, your attorney will let us know.**

**It says: On August -- on 8/12/21,**

Matt Batten met with David Ellison for a follow meeting regarding Mr. Batten having a service animal at the workplace. Mr. Ellison informed Mr. Batten that after review, the decision was made that at this point in time the request for the service animal has been denied.

Mr. Ellison asked if there were any jobs within the store to better accommodate his current needs, suggesting the USCAN -- suggesting USCAN attendant as it would allow him to be around others. Mr. Batten stated that there wasn't any position in the store that he would be able to perform his duties as he wasn't able to stand for short/long periods of time, that Gas 'N Go was the only position that was suitable as it allowed him to sit and stand as needed and that he was not leaving his dog with anyone, that where he goes, she goes.

Does it sound like I read that correctly?

A Yes.

Q And is that what you recall from that meeting?

A Yes.

Q So this is the meeting where Mr. Batten's request for the service animal was

**formally denied; is that right?**

A If that's in the statement, then yes.

**Q And that was after he had -- Mr. Batten had already worked for a week with the service animal without incident; is that right?**

A Yes.

**Q Do you have any idea when the decision to deny the request for a service animal was made?**

A I do not.

**Q Okay. So this was -- was this the first time that you were hearing about the result of the decision?**

A I don't remember.

**Q Okay. Had you had any discussion with anyone prior to this meeting regarding the offer of the USCAN position to Mr. Batten?**

A I don't remember.

**Q What is the USCAN position?**

A The USCAN attendant?

**Q Yes, sir.**

A They oversee self-check.

**Q That's the -- if you're at the self-checkout, that's the associate who is kind of hanging around in the middle, will help you if you have any issues?**

A Correct.

**Q In your experience, that's a standing and moving position; is that right?**

A Correct.

**Q That's not a "you can sit down" position?**

A Correct.

**Q Do you have any idea of why the USCAN position was offered to Mr. Batten?**

A From what you read, it was to provide so he wouldn't be alone. Is that what the statement said?

**Q "Suggesting USCAN attendant as it would allow him to be around others." Is that -- was that your understanding of why that was being offered to him?**

A Yes.

**Q Did you have any understanding of how the USCAN position was going to accommodate Mr. Batten's stability issues?**

A I didn't make the decision.

**Q Okay. And I understand that, but my question is, did you have any idea or insight into --**

A No.

**Q -- how or why the USCAN position would**

accommodate his stability issues?

A No.

Q Sitting here today, can you think of any ways that the USCAN position would have accommodated Mr. Batten's stability issues?

A No.

Q As you wrote, the Gas 'N Go position was the only position that allowed him to sit and stand as needed; is that fair?

A Fair.

Q Do you recall that although Mr. Batten was offered the USCAN attendant position, he -- he was told that he would not be allowed to bring the dog into the store with him in that position?

A I don't remember.

Q Okay. Do you remember if Mr. Ellison offered Mr. Batten the use of a stool or a chair in the USCAN position?

A I don't remember.

Q Would the -- would the use of a stool or a chair in the USCAN position potentially cause a safety hazard?

A No.

Q No. It wouldn't -- it couldn't potentially be a tripping hazard for customers?

A Not that I -- I don't see one.
Q Okay. But nevertheless, the USCAN attendant position is not one that utilizes a chair or a stool?
A No.
Q In the narrative that you wrote regarding your meeting on August 12, 2021, as I read it to you, there was nothing in there about Mr. Batten talking about his history of falls, correct?
A Correct.
Q Do you remember Mr. Batten in that meeting talking about his history of falls?
A I don't remember.
Q You don't remember Mr. Batten saying that the last time I fell, I knocked myself out?
A I do not.
Q Do you understand how a service animal can help someone who has gait instability or difficulty maintaining --
A I do not.
Q -- balance? You don't understand that?
A No.
Q Do you remember Mr. Batten at any

**point communicating that his service animal helped him with those issues?**

A I don't remember.

MR. HARGRAVES: We've been going for about an hour. Do y'all need a break?

THE WITNESS: I would like some water, please.

MR. HARGRAVES: Let's go off the record.

THE VIDEOGRAPHER: The time is 11:36, and we are off the record.

(Whereupon, a short break was had.)

THE VIDEOGRAPHER: The time is 11:39, and we are back on the record.

MR. HARGRAVES: Let's mark this Exhibit 7.

(Whereupon, the document, as referred to below, was marked and subsequently attached hereto as Exhibit No. 7.)

BY MR. HARGRAVES:

**Q All right. Mr. Richards, again, as best you can, we're looking at what's been marked Exhibit 7, Bates number 001084 through 1085. On page 2 begins with an email from you on August 23rd of 2021 to Mr. David Ellison. Do you remember**

sending that email to Mr. Ellison?

A I don't remember.

Q Okay. I tell you what. I'll read it to you, and you let me know if that jogs your memory. On August 23rd, 2021 -- sorry. "On 8/23/21, Matt Batten called me at the store and told me that Mr. Ellison had given him two different documents for leave of absence, FMLA and personal LOA. Matt stated that he was not going to submit the FMLA documents nor was he going to submit the personal LOA documents. Matt told me he wanted to come to work with his service animal and then asked if I would allow him to do so and accommodate his service animal."

"I asked Matt what decision was told to him by Mr. Ellison regarding him bringing his service animal to work. Matt replied that the decision was -- that the request to bring his service animal to work was denied. I then told Matt that he already had his answer. Matt hung up. Gary."

Does that sound like what you wrote?

A It does.

Q Okay. Were you -- there is some follow-up emails here that occurred between various other management persons. Were you privy to any of

those communications?

A I'm sorry?

Q Were you -- did you have any involvement in any of the follow-up emails on this?

A Not that I'm aware.

Q Okay. It looks like you sent that to David Ellison, Mr. Ellison forwarded it to Mr. Meadows and Mr. Lyon. Did any of those individuals -- did Mr. Lyon, Mr. Ellison, or Mr. Meadows reach out to you by phone to discuss this email that you sent?

A I do not remember.

Q Okay. Do you remember anything else from your phone call with Mr. Batten on August 23rd, 2021, that is not included in your email?

A I do not.

Q Is this a truthful account of what happened in that phone call?

A To my knowledge, yes.

Q Prior to this phone call, did you know that Mr. Batten had been offered FMLA or a personal leave of absence?

A Yes.

Q And do you remember how you became aware of that?

A I just remember -- I think it was -- I can't say. So I'm not going to name. I just remember that we were waiting on that paperwork to come back.

**Q Okay.**

A That it was given and it should be brought back.

**Q So you knew at some point that paperwork had been given to Mr. Batten?**

A Right.

**Q Do you remember how you learned about that?**

A No.

**Q Okay. Would that have been a conversation between you and Mr. Ellison?**

A Yes.

**Q Do you remember anything about the why, that is why Mr. Batten was given those particular options?**

A No.

**Q Sitting here today, can you think of any reason why those two options would be appropriate for somebody in Mr. Batten's position?**

A No.

**Q The leave of absence, that's something**

in -- the personal leave of absence is something in Food City's policies and procedures; is that right?
A I'm -- I think so.
Q To your understanding, there are -- are there two 90-day personal leaves of absence that an employee --
A Yes.
Q -- can take?
A Yes.
Q It's not an FMLA job guarantee, but it's a leave that an employee can request --
A Yes.
Q -- is that fair?
A Yes.
Q To your understanding, is that something that the employee requests?
A Yes.
Q Okay. And if the employee requests it, they can submit the paperwork and the management can either grant or deny that request?
A Human resources will, yes.
Q Okay. In your experience, is a personal leave of absence something that human resources simply imposes on an employee?
A No.

**Q Okay. It's something the employee has to request?**

A Yes.

**Q Mr. Batten made it clear to you, at least in this phone call, that he didn't want a personal leave of absence; is that right?**

A Yes.

**Q Are you aware that Mr. Batten was thereafter placed on a personal leave of absence?**

A No.

**Q You didn't hear anything about that?**

A He was placed on a personal leave of absence?

**Q Yes.**

A No.

MR. HARGRAVES: Let's mark this as Exhibit 8.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 8.)

BY MR. HARGRAVES:

**Q Looking at Exhibit 8, that's Bates number 001064. Again, I don't usually do it this way, but to help you out, I'll represent this is an email chain between you and Jenna Johnston on**

September 9 of 2022. Does that ring any bells?

A Yes.

Q Okay. It says the first email is from Ms. Johnston. "Christopher's leave ended on 2/14/2022. Since he has not returned to work, please remove him from payroll effective 2/14/2022." Does that sound right?

A Yes.

Q And you responded about six minutes later, "Hey, Jenna, I believe there may be a hold on his status. David, would you please give Jenna and myself an update? Thanks. Gary." Looks like you cc'd David Ellison.

A Yes.

Q Is that what you responded to Ms. Johnston?

A Yes.

Q What did you mean by "I believe there may be a hold on his status"?

A Well, he hadn't been -- he didn't return to work. We were waiting on the FMLA papers, but I knew he -- I didn't know what to do.

Q Okay. So you knew that the paperwork had been given to Mr. Batten, but -- is that right?

A Correct.

**Q But you also knew that Mr. Batten had no interest in completing that paperwork?**

A According to this. But at this -- at this point, I wasn't in the loop on what was going on.

**Q Okay. The last thing you knew was you had talked to Mr. Batten and he was not requesting FMLA or a personal leave of absence; is that fair?**

A Correct, yes.

**Q So what is a hold?**

A That's just a term I used because I wasn't sure of the situation, to be honest with you.

**Q Okay. So then you just asked David to give you and Jenna an update?**

A Correct.

**Q Did you get that update from Mr. Ellison?**

A Yes.

**Q Did he -- was that an email, a phone call?**

A I don't remember.

**Q What was the substance of the update?**

A For me to term.

**Q To terminate Mr. Batten?**

A Yes.

**Q Do you -- was that to be effective February 14, 2022, as Ms. Johnston indicated?**

A It would have been, to my knowledge, yes.

**Q Do you remember anything else from that conversation --**

A No.

**Q -- with Mr. Ellison?**

A No, sir.

**Q Did you ask him, you know, why are we terminating?**

A I did not.

MR. HARGRAVES: Let's mark this Exhibit 9.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 9.)

BY MR. HARGRAVES:

**Q Looking at Exhibit 9, Bates number 001057. And I'll represent to you this is an email chain from earlier in 2022 between you, Mr. Ellison, and Ms. Johnston among others. Do you recall corresponding with those two people specifically regarding Mr. Batten?**

A No, I don't remember.

Q Okay. You don't remember having any knowledge about Mr. Batten being on a personal leave of absence; is that right?

A Correct.

Q The email from Ms. Johnston to you is March 11, 2022. Subject, Christopher Batten personal leave. It says, "Christopher's leave ended on 11/16/2021. Have you heard from him?" Does that sound right?

A Please repeat.

Q "Christopher's leave ended on 11/16/2021. Have you heard from him?" Does that sound right?

A I guess.

Q Okay. That was to you and also to 214HRC@FoodCity.com. Would that be the official email for whoever was in the human relations coordinator position at store 214?

A Yes.

Q Would that have been Emily Hobbs at that point?

A Yes.

Q So you then forwarded that onto David Ellison and said, "David, do we have an update?" Does that sound right?

A Yes.

**Q David responded to you and cc'd Jenna as well as Desirea Douglass, quote, "Jenna, please speak to Sherrell regarding this associate's status. I believe we will leave him on LOA at this time." Does that sound right?**

A I suppose -- I guess. I am confused about the -- what date was this?

**Q This was March 20, 2022. So this is prior to the exhibit we just looked at.**

A Then back to your question when you asked me about the HRC, it being Emily, at that point it probably wasn't Emily. It was probably Desirea since --

**Q Okay. And that would explain why she is then included up there?**

A Yes.

**Q Okay. Do you know if Ms. -- well, Ms. Douglass was not involved in any of the initial communications with Mr. Batten, to your knowledge, about the request for a service animal?**

A No.

**Q Okay. So you agree that Mr. Ellison indicates that Mr. Batten was on an LOA at that time; is that right? He says, "I believe we will leave him**

on LOA at this time;" is that right?

A If that's what is in the email.

Q Okay. So would you understand that to mean that Mr. Batten was on a personal leave of absence?

A Was I aware?

Q No. Would you take that to mean that at that time, at least as Mr. Ellison was saying, Mr. Batten was on a personal leave of absence? Is that what that means?

A That's the way I would take it, yes.

Q Okay. If Mr. Batten was on a personal leave of absence at that time, would you expect that Mr. Batten had completed the personal leave of absence paperwork?

A I have -- I have no idea.

Q Is that the typical procedure for an employee to go on a personal leave of absence?

A I'm sorry?

Q Is that the typical procedure for an employee to go on a personal leave of absence, to complete a personal leave of absence form?

A Are you asking me is it -- should an associate do the personal leave of absence form and submit them to take a personal leave of absence?

Q Yes.

A Then, yes, they do fill out the forms and submit them.

Q So if, as Mr. Ellison said, Mr. Batten was on a personal leave of absence at this time, you would expect that Mr. Batten had completed that paperwork?

A Yes.

Q Now, I may have already asked you this. Forgive me if I have. But do you know exactly when the decision was made to deny Mr. Batten's accommodation request for a service animal?

A I can't remember.

Q Do you know who ultimately made that decision?

A I do not.

Q Do you know if anyone else was hired to fill the fuel clerk position after Mr. Batten was terminated?

A After he was terminated?

Q Yes, sir.

A I can't remember.

Q After Mr. Batten was no longer coming into work, did somebody else fill in for that position?

A Yes. We had to fill the position, but I don't think there was anybody hired.

**Q Outside of communications with Food City's attorney, are there any other communications that you had with anyone regarding Mr. Batten's request for the use of his service animal that we haven't already talked about?**

A None that I'm aware.

**Q Okay. When Mr. Batten -- this is going back to July 2021. When was the first time you became aware of Mr. Batten's desire to go to a training camp for his service animal?**

A I think he had actually went on vacation, and they told me -- I was informed that the reason he was going, he was getting a dog. I didn't know it was a service dog.

**Q Do you remember when you were informed of that?**

A I couldn't tell you.

**Q Do you remember who informed you of that?**

A No, I do not.

**Q Mr. Batten was part time at that time, correct?**

A I don't remember.

**Q If he was part time at that time, were part-time employees, did they get vacation days?**

A Without pay, yes. They can take vacation.

**Q So it's called vacation, but it's without pay?**

A Time off, yes.

**Q Was that considered just personal leave?**

A No. It's just taking time off. I mean, you wouldn't call it personal leave.

**Q Are you aware of a policy at Food City that if an employee wanted to take two weeks or more off, they needed to formally request a personal leave of absence?**

A Yes.

**Q So if Mr. Batten was to be out for two weeks or more for this camp, you would expect that he would have submitted a request for a personal leave of absence?**

A Correct.

**Q And would that form -- would that completed form have come to you?**

A Yes.

**Q Okay. So do you remember Mr. Batten**

submitting a personal leave of absence request?
A I do not.
Q Okay. Would you have had to approve Mr. Batten taking those what you call vacation days?
A Not necessarily.
Q Who could approve that?
A The coordinator. She makes her -- she makes his schedules.
Q Okay. Would the -- I want to make sure I'm understanding. The fuel clerk coordinator or the HRC?
A Fuel clerk.
Q Okay. So Bailey was the fuel clerk coordinator? What was her last name?
A Hamby.
Q Hamby. So you would expect that if the fuel clerk coordinator had approved it, it would have been Bailey Hamby at that time?
A Yes.
Q Did Ms. Hobbs ever come to you about Mr. Batten's request to be out for this service dog training camp?
A I don't remember.
Q But somebody at some point did tell you, hey, he was -- he is out for this service dog

**training camp; is that right?**

A No.

**Q Okay.**

A I was just told he was getting a dog. That's all I was told. I didn't know what -- where it was at.

**Q Okay. Do you remember in the sequence of events when you were told that he is getting a dog?**

A No, I don't remember.

**Q Was that in the lead-up to him going to the camp?**

A No, I don't remember.

**Q Was it -- was it while he was out on vacation for the camp?**

A Honestly, I don't remember.

**Q I think you said -- and correct me if I'm wrong. I think you said that somebody told you he is getting a dog --**

A Yes.

**Q -- is that right?**

A Yes.

**Q So that would seem to indicate he is in the process of getting a dog; is that fair?**

A That's fair.

Q So it sounds like that might be something that somebody would have said while he is in the process of being at the camp getting the dog; is that fair?

A I don't know.

Q Would that make sense?

A I guess.

Q Would it surprise you to learn that Mr. Batten says that he had told people before that he was going -- at Food City that he was going to the camp to get a dog?

A Would I be surprised by it?

Q Yes, sir.

A No.

Q Had you ever had any discussion with Mr. Batten about his need for a service animal prior to the camp?

A None that -- none that I can recall.

Q Okay. Has everything you have said here today been true?

A To the best of my knowledge, yes.

Q Okay. Were any of my questions confusing to the point that you did not understand them?

A Only when I asked you to repeat, yes.

**Q Okay. When that happened, did I clarify all of those questions to your satisfaction?**

A Yes, you did.

MR. HARGRAVES: Okay. I don't have any further questions at this time, but Mr. Jackson might.

MR. JACKSON: Yeah. Just mainly one.

EXAMINATION

BY MR. JACKSON:

**Q You had some discussion of the USCAN coordinator position. Do you remember that with counsel?**

A Yes.

**Q And normally there is not a chair at that station. That's fair to say?**

A Yes.

**Q Would there be anything that would absolutely prevent the company from letting somebody have a chair there?**

A Not to my knowledge.

MR. JACKSON: That's all.

MR. HARGRAVES: Nothing further.

THE VIDEOGRAPHER: This concludes this deposition. One media file was used. The time is 11:59. We are off the record.

FURTHER THE DEPONENT SAITH NOT.

(Signature waived.)

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :
COUNTY OF HAMILTON :

I, Whitney A. Vaughn, Court Reporter and Notary Public, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. GARY RICHARDS was duly sworn by me; that pages 1 to 78, inclusive, were reduced to typewriting under my direction and supervision, and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This is the 23rd day of January, 2023.

Whitney Vaughn

Whitney Vaughn, TN LCR #418
Court Reporter and Notary Public
My Commission Expires 07/30/25