# EXHIBIT 3

# DEPOSITION OF ELLISON

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
AT ROME

---

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | No. 4:22-cv-00179 |
| | * | |
| K-VAT-FOOD STORES, INC., | * | |
| d/b/a FOOD CITY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

---

THE VIDEOTAPED DEPOSITION OF
DAVID GARY ELLISON
January 11, 2023

---

Diane R. Angel, RPR, TN LCR #246
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

APPEARANCES:

R. ETHAN HARGRAVES, ESQUIRE
ethan@masseyattorneys.com
Massey & Associates, PC
6400 Lee Highway, Suite 101
Chattanooga, Tennessee 37421
(423)697-4529
Appearing for the Plaintiff

HOWARD B. JACKSON, ESQUIRE
hjackson@wimberlylawson.com
Wimberly, Lawson, Wright,
Daves & Jones, PLLC
P.O. Box 2231
550 W. Main Avenue, Suite 900
Knoxville, Tennessee 37902
(865)546-1000
Appearing for the Defendant

VIDEOGRAPHER: Patrick Black

---

INDEX OF EXAMINATION

DAVID GARY ELLISON
Examination by Mr. Hargraves ....................... 6
Examination by Mr. Jackson ........................ 80

INDEX OF EXHIBITS

1 - Associate Handbook for K-VA-T Food Stores, Inc. ......... 16
2 - Written Statement ......................... 32
3 - Written Statement ......................... 34
4 - Written Statement ......................... 39
5 - Written Statement ......................... 41
6 - Written Statement ......................... 51
7 - Written Statement ......................... 53
8 - Termination Information ................... 62
9 - Email String .............................. 63
10 - Email String ............................. 67
11 - Email String ............................. 69
12 - Email String ............................. 71
13 - Email String ............................. 73
14 - Email String ............................. 77

The videotaped deposition of DAVID GARY ELLIS, called as a witness at the instance of the Plaintiff, for any and all purposes allowed pursuant to the Federal Rules of Civil Procedure, taken pursuant to notice and agreement on January 11, 2023, at the law offices of Massey & Associates, P.C., 6400 Lee Highway, Suite 101, Chattanooga, Tennessee 37421, commencing at 1:10 p.m., before Diane R. Angel, Registered Professional Reporter and Notary Public.

S T I P U L A T I O N

It being agreed between counsel for the respective parties that Diane R. Angel, Notary Public and Registered Professional Reporter, may swear the witness, take his deposition in machine shorthand, afterwards reducing the same to typewriting.

All objections, except as to the form of the question and responsiveness of the answer, are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., are expressly waived. Signature reserved.

THE VIDEOGRAPHER: Okay. We are now on the record. Today is Wednesday, the 11th of January, 2023. The time is 1:11 p.m.

This is the video deposition of David Ellison in the matter of Christopher Matthew Batten versus K-VAT Food Stores, Incorporated, doing business as Food City. This is case number 4:22-CV-00179.

This deposition is being held today at the law offices of Massey & Associates located at 6400 Lee Highway, Suite 101, in Chattanooga, Tennessee.

My name is Patrick Black, the videographer. Our court reporter is Diane Angel, both in association with Elite/Brentwood Reporting Services {sic}.

Will counsel please introduce themselves and state who you represent.

MR. HARGRAVES: Ethan Hargraves, on behalf of the plaintiff, Matthew Batten.

MR. JACKSON: Howard Jackson, on behalf of Food City.

THE VIDEOGRAPHER: And I'll ask the court reporter to swear in the witness.

//

DAVID GARY ELLISON,

called at the instance of the Plaintiff, having been first duly sworn, was examined and testified as follows:

MR. HARGRAVES: Before we begin, I would like say on the record that this deposition is taken pursuant to notice and agreement of counsel. It is being taken for discovery purposes under the Federal Rules of Civil Procedure.

Counsel, are we agreed to reserve all objections except as to form of the question and responsiveness of the answer?

MR. JACKSON: Sure.

MR. HARGRAVES: Okay.

EXAMINATION

BY MR. HARGRAVES:

**Q Mr. Ellison, if you would, just state your full name for us.**

A David Gary Ellison.

**Q All right. Mr. Ellison, you've seen me today. My name is Ethan Hargraves. I am the attorney for the plaintiff in this case, Mr. Matthew Batten.**

**Have you ever testified in a deposition before?**

A I have not.

Q Okay. Well, then, the first thing that I would like to do is go over a couple basic ground rules. They will probably sound a little bit familiar from this morning, but just so you can understand the process.

First, we're trying to make a clear record of everything that's said here. That's what the court reporter is doing. There are a couple things we can do to make her job a little bit easier. I would ask that, to the best of your ability, you would try to let me finish my question before you start to answer. You'll probably see where I'm going with something, but just hang on until I finish the question. And by the same token, I will do my best to not interrupt you, to let you finish your answer before I ask another question. Does that sound fair?

A Yes, sir.

Q Okay. Also, you're doing great so far. Verbal answers, as in out loud, are best. Head nods are difficult to pick up on a transcript. But even things like uh-huh and huh-uh, which we can all fall into, those come up pretty similar on a transcript. So there may come a time where I need

to clarify, like is that a yes or is that a no. And I'm not trying to be a jerk. I just want to make sure that we understand what your answer is. Does that make sense?

A Yes, sir.

Q All right. If I ask a question that you don't understand, please do not answer it. Just let me know that you don't understand it. I promise you won't hurt my feelings, much, and I'll rephrase the question so that you can answer it. Okay?

A Yes, sir.

Q And, finally, I don't plan on taking all day, but if at any point you need a break just let us know and we can take a break. The only thing I'll ask is that if I have asked a question I will want to get a quick answer to that question before we take the break. Does that make sense?

A Yes, sir.

Q Okay. Where do you live, Mr. Ellison?

A I live in Ooltewah, Tennessee.

Q And how long have you lived there?

A I have lived in Ooltewah since 2006.

Q Okay. Where did you live before that?

A Chattanooga, Tennessee.

**Q Have you always been pretty much local to Chattanooga?**

A Yes, sir.

**Q Okay. Did you attend high school?**

A Yes, sir.

**Q Where at?**

A Ooltewah High School.

**Q Okay. Did you graduate?**

A I did.

**Q Did you have any college after that?**

A Yes, sir.

**Q Where at?**

A I attended the University of Tennessee in Knoxville and then finished up at the University of Tennessee in Chattanooga.

**Q Okay. What was your major -- or your degree, rather?**

A I have a double degree in general business management and human resources management.

**Q Okay. Do you have any other degrees?**

A No, sir.

**Q Okay. Do you have any professional licenses?**

A No, sir.

Q Okay. Any other professional certifications or training?
A No, sir.
Q Okay. Are you a member of any professional organizations or clubs?
A No, sir.
Q And I know this is kind of a weird question, but it's standard. Have you ever been convicted of a crime?
A No, sir.
Q Okay. And you work for K-VA-T Food Stores, Inc.; is that right?
A Yes, sir.
Q Is that -- I know it's commonly referred to...
A K-VA-T is the parent company name, doing business as Food City.
Q Okay. What is your current position with Food City?
A Senior human resources specialist.
Q And how long have you been in that position?
A Almost two years. February will mark two years.
Q All right. What was -- let me ask

**this: When did you first start working for Food City?**

A So I worked for Bi-Lo here in Chattanooga and Food City bought out the Chattanooga division of the Bi-Lo stores back in September of 2015. So it was really a conversion from Bi-Lo into the Food City organization.

**Q Okay. I miss Bi-Lo. How long did you work for Bi-Lo prior to the conversion over to Food City?**

A I started with Bi-Lo in 1999. I did leave for six months once, and then my hire date now is 2007.

**Q What was your position with Bi-Lo?**

A My ending position was store manager.

**Q Okay. And which store did you manage?**

A I managed two different locations in the Chattanooga area: East Ridge, Tennessee, and Ooltewah, Tennessee.

**Q When the conversion happened is that when you moved into the HR position?**

A No, sir. I was still a store manager after conversion from 2015 up until February of 2021, when I moved into this role.

**Q This role being the senior HR specialist?**

A Correct.

**Q Okay. At the risk of asking a dumb question, what does K-VA-T Food Stores, Inc. do?**

A We are a retail supermarket grocery store.

**Q Okay. Are they -- is there a whole operation, the Food City franchise?**

A There are a couple of other banners that we operate as supermarkets, and there are a couple of other units of the business as well. We own our own water company, for instance.

**Q Okay. Do you know how many Food City locations K-VA-T operates?**

A Roughly 145.

**Q Okay. Do you know where K-VA-T is headquartered?**

A Abington, Virginia.

**Q During the time that you've worked for K-VA-T or Food City you've worked exclusively in the Chattanooga area?**

A Yes, sir.

**Q Okay. I want to focus in a little bit on your responsibilities as the senior HR**

specialist and how you fit in with the other employees of K-VA-T. How many -- I assume your position is a managerial position?

A It's more of an advising role. Zero people directly report to me.

Q That was going to be my next question. Who do you directly report to?

A I report to the director of human resources.

Q And as of August of 2021, would that have been Donnie Meadows?

A Yes, sir.

Q Okay. Who is that now?

A Sherrell Lyon.

Q Okay. Do you have any other immediate supervisors that you report to?

A No, sir.

Q Okay. So the director of HR is your boss?

A Yes, sir.

Q Okay. Are you familiar with Donnie Meadows' qualifications in HR?

A No, sir.

Q Okay. Ultimately, as of August 2021, who was responsible for making sure that K-VA-T

**complied with federal laws and regulations?**

A Ultimately, Donnie Meadows.

**Q Okay. And now that would be Sherrell Lyon?**

A Correct.

**Q Okay. Do you have any insight into how the director of human resources was trained for that task?**

A No, sir.

**Q Okay. When it comes to complying with the Americans with Disabilities Act, does the company provide any training that you're aware of?**

A For what level of associates?

**Q Well, I guess let me ask you this: Does the company provide any training with regard to compliance with the ADA, that you're aware of?**

A Not that I'm aware of.

**Q Okay. Does Food City have policies and procedures on disability accommodations?**

A Yes, sir. We have, you know, obviously an ADA policy in place to not discriminate against anyone based on any kind of disability or limitations that are out there.

And then going through interactive exchange processes, if something is brought up by an

associate, to try to navigate through those challenges.

**Q Okay. And that was going to be my next question, is about equal employment or harassment policies. But I guess the question I want to focus in on is are you aware of any policies or procedures on accommodation of disabilities?**

A Am I aware of?

**Q Of K-VA-T having any policies or procedures for the accommodation of disabilities?**

A Once again, we go through an interactive exchange process to try to come up with ideas on both sides of the equation to be able to arrive at a situation to where, you know, an associate -- we can accommodate for anything that they are requesting.

**Q Is there anything written at Food City that memorializes that interactive exchange that you're talking about?**

A I am not sure.

**Q Okay. Food City does have an associate handbook; is that right?**

A That is correct.

**Q Of course, it's sitting right here in front of me. But --**

MR. HARGRAVES: Let's go ahead and mark that as Exhibit 1. Howard, I don't have an extra copy but I just want to --

MR. JACKSON: That's all right.

MR. HARGRAVES: It's what was provided in discovery.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 1.)

BY MR. HARGRAVES:

**Q Mr. Ellison, if you could just take a minute, however long you need, just take a look at that. I'll represent to you that this is the associate handbook that was provided by Food City's attorneys in the context of this litigation, and my question will be just whether you recognize that?**

A Yes, sir.

**Q Does that appear to be the associate handbook of Food City?**

A Yes, sir.

**Q And would that have been applicable to the associates and other employees of Food City as of August 2021? Take your time.**

A (Witness perusing document.) Yes, sir. I will say this has an October 2021 revision.

**Q Okay. Do you know what that revision was?**

A I do not.

**Q Okay. And you had mentioned the ADA policy. Do you happen to know where that is?**

A I'm not certain without flipping through every page, looking specifically in the associate handbook.

**Q Flip to page --**

A I see equal employment.

**Q Yes, sir. Looking at page 4, there's the Equal Employment Opportunity section.**

A Uh-huh.

**Q It says, "It is Food City's policy to grant equal employment opportunities to all qualified persons without regard to race, color, sex, religion, age, national origin, disability, veteran's status, or any other protected status." Is that what it says?**

A Correct.

**Q Is that the equal employment opportunity policy you were talking about?**

A Yes.

**Q If you want to flip over to page 24 -- I'm sorry. Not page 24 -- page 28, are**

**you familiar with the personal leave of absence policy?**

A I am.

**Q What is that policy in a nutshell? I'm not asking you to quote it, but just kind of explain it to us.**

A An associate can request a personal leave of absence once they have been with the company at least 90 days. Associates are eligible for up to two personal leaves of absences within a 365-day calendar year for up to 90 days apiece.

**Q Okay. So that's a leave that an employee can request?**

A Yes. It is for personal reasons. It is an unpaid leave.

**Q Okay. At the end of that leave -- pardon me. Unlike with like, for example, FMLA, with a personal leave of absence there's not necessarily a guarantee of re-employment at the time of the completion of the leave; is that right?**

A It is not a job-protected leave.

**Q Right. Is that something that Food City can force an employee to take?**

A Can force an employee to take?

**Q (Moves head up and down.)**

A It's something that's offered for associates to be able to take.

**Q Okay. So an employee gets to choose whether to take a leave of absence?**

A That is correct.

**Q All right. Looking at -- let me ask you this: You had mentioned an ADA policy. Is that ADA policy that you mentioned contained in Exhibit 1?**

A (Witness perusing document.) To the best of my looking, I don't believe that it's specifically in this handbook presented, no.

**Q Okay. Do you have any insight as to where one might find that ADA policy?**

A I can't speculate.

**Q Okay. But you've seen that policy before?**

A We do have ADA. It could potentially be a Fast Track training, but once again, I can't specifically tell you exactly --

**Q Sure.**

A -- this is what it is and this is where it is.

**Q And I don't want you to guess. That's fine. But Fast Track training, is that an**

**electronic resource?**

A Yes, computer based.

**Q Okay. So it might be something that's contained within the training materials, is what you're saying?**

A Correct.

**Q Okay.**

A Potentially.

**Q You had also mentioned a procedure with regard to interactive exchange in the context of disability accommodations. Would you expect to find that same procedure in the ADA policy that you're discussing?**

A I can't necessarily tell you yes or no.

**Q Okay. Are you aware of where we might find that policy and procedure?**

A As far as how we exactly go about handling the interactive exchange?

**Q Yes, sir.**

A I cannot specifically tell you.

**Q Okay. Have you ever received any training from Food City on disability accommodation?**

A On how to have those conversations with associates?

**Q Any training related to disability accommodations.**

A Outside of having conversations with my supervisor, not specific.

**Q Okay. What supervisor would that be?**

A Donnie Meadows.

**Q Okay. Can you recall any specific conversations that y'all have had about that topic?**

A When going through the process of having discussions he would advise, you know, as far as gathering information, what questions to ask, how to -- what accommodations to be able to offer, really just being that go-between of, you know, gathering information from an associate, bringing it back to him, and allowing him to kind of make those decisions.

**Q Okay. Was Donnie Meadows ultimately the one who would make a decision with regard to an employee's disability accommodation request?**

A Yes, sir.

**Q Did you have the ability to make any recommendations?**

A He and I would discuss the facts but really, you know, he would be the one to make that determination or, you know, what accommodation we

might be able to offer or ultimately implement.

Q Okay. And we'll talk about Mr. Batten specifically here in a little bit, but prior to Mr. Batten had you ever had to engage in that interactive exchange with an associate at Food City?

A No, sir.

Q Okay. Was Mr. Batten the first time you ever had to engage in that process for determining a disability accommodation request?

A Yes, sir.

Q All right. In your conversations with Donnie Meadows did you discuss there being a certain obligation that Food City had with regard to an employee disability accommodation request?

A Can you repeat the question?

Q Probably not. So what I'll do is I'll ask the court reporter to read it back to us.

(Whereupon, the requested question was read back by the court reporter as follows:

Question: In your conversations with Donnie Meadows did you discuss there being a certain obligation that Food City had with regard to an employee disability accommodation request?)

A No, sir.

BY MR. HARGRAVES:

**Q All right. Do you think it's important for businesses to treat disabled employees fairly?**

A Yes, sir.

**Q Why do you think that's important?**

A Everyone should be treated equally and fairly without regards to any other factors.

**Q Are you aware if it's Food City's policy to treat disabled employees fairly?**

A Absolutely. We don't, you know, treat anybody any differently. We simply worry about being able to perform essential functions of a job.

**Q Are you aware of Food City ever having approved an employee disability accommodation request prior to Mr. Batten?**

A Approving an accommodation prior to him of any type?

**Q Of any type (moves head up and down).**

A I'm not specifically involved in that, knowing everything going on throughout the entire organization, but I'm going to say I'm certain that there has been, but once again, I'm not

involved in every conversation throughout the company and --

Q **Okay.**

A -- those requests.

Q **The person to ask about that would be Donnie Meadows; is that fair?**

A Yes, sir.

Q **Or with regard to those prior accommodations, now Sherrell Lyon; is that right?**

A Correct.

Q **All right. When did you first meet Matthew Batten?**

A That would have been May of 2019.

Q **What was your impression of Mr. Batten?**

A Mr. Batten was a, you know, capable young man being able to perform the essential functions of the job that he was hired for in the fuel station.

Q **Was he a good employee?**

A Yes, sir.

Q **To your knowledge, was he ever written up?**

A Under the time that I was his direct supervisor I never had any procedural issues with

him, never had to document or sit him down or anything.

Q **To your knowledge, did he ever receive any negative performance reviews?**

A Not that I'm aware of, no.

Q **Okay. When you first met Mr. Batten would you say that his disability was apparent?**

A Yes, sir.

Q **Did y'all have any discussion at that time about his condition?**

A Yes. I mean, obviously, I mean, you know, it's apparent that, you know, he doesn't have use of one of his arms. Talked about, you know, the duties within the fuel station and, you know, he stated that, you know, he felt he could perform all duties outlined for the position and, you know, went over the entire operational area, and he was very thankful to be able to gain employment with us.

Q **Were you a decision-maker in the hiring process for Mr. Batten in 2019?**

A Yes, sir.

Q **All right. Who else was a decision-maker on that?**

A Ultimately, myself as the store manager. He had an interview with a human relations

coordinator, Frances Harris, there at the store that facilitates the interviewing and onboarding processes, but ultimately it's for the store manager to be able to offer employment and make those hiring decisions.

**Q Okay. Were you present for the interview with Ms. Harris?**

A For Ms. Harris?

**Q With Ms. --**

A With Ms. Harris.

**Q Mr. Batten's interview with Ms. Harris.**

A Yes.

**Q Okay. Was there any interview between Ms. Harris and Mr. Batten that you were not present for?**

A Yes. Typically, what happens is an HRC will bring that associate in, be able to sit down with them, and then the store manager will do a final interview and ask any additional questions and make an employment offer.

**Q Okay. Do you know what was discussed between Ms. Harris and Mr. Batten with regard to any limitations on Mr. Batten's ability to do the job?**

A I was not present, so I cannot speak

to that.

**Q Okay. Would you say that given Mr. Batten's condition of having one of his arms amputated very clearly there were certain things that he simply would not be able to do?**

A Sure.

**Q But he was hired for the position; is that right?**

A That is correct.

**Q Did you ever supervise Mr. Batten closely during the time that he worked for Food City?**

A Closely, no. I mean, as the store manager there's other people below me that help supervise individual departments. His direct supervisor would have been the fuel coordinator within the fuel department there.

**Q So you would not have had -- necessarily had daily interaction with Mr. Batten?**

A Not necessarily.

**Q Okay. And what store were you the store manager of at that time?**

A 774, Ooltewah, Tennessee.

**Q Okay. Did you have any involvement in any of Mr. Batten's transfers between Food City**

**locations?**

A When he transferred from Ooltewah 774 to East Brainerd 701 I was involved in that transfer request, as he came to me and requested to transfer to the East Brainerd Road location, stated that it was closer to his home where he lived and would be a better fit for him and, you know, I approved that request -- anybody to be closer to home.

**Q Did you have any problems with that request?**

A Have any problems with him requesting to get closer to home, to transfer?

**Q Yes.**

A No, sir.

**Q Did you oppose that transfer in any way?**

A No, sir. I thought it was better for him.

**Q Prior to today were you aware of an employee named Vince making a joke about Mr. Batten's amputated arm?**

A No, sir.

**Q Do you know who Vince is?**

A No, sir.

**Q Okay. When did you first learn that**

**Mr. Batten had requested an accommodation in the form of a service dog?**

A The end of July of 2021. I was actually on vacation that week and Gary Richards had sent a message to Donny Rector, who is my counterpart in the Knoxville division, asking for advice basically, you know, what -- how do I need to handle this situation.

**Q Was Donny Rector kind of covering for you while you were on vacation?**

A Yes, sir.

**Q Do you know if Mr. Rector did anything with regard to that inquiry?**

A I do not know specifically.

**Q Okay.**

A I know I was aware of that when I got back the following week.

**Q How specifically did you become aware of it?**

A Donny Rector sent me an email. I can't remember the specifics of it. Basically, you know, follow up on that one. I'm not sure if he had made contact with Donnie Meadows at that point or not. I know I directly spoke with Donnie Meadows upon my return.

**Q Okay. Was that the first thing that you did upon learning of the request from Donny Rector?**

A Going to Donnie Meadows?

**Q Yes.**

A Yes, sir.

**Q Okay. Did you talk to anybody else before that?**

A No, sir.

**Q All right. When you went to Donnie Meadows was that a phone call? Was it an email?**

A I'm going to say a phone call.

**Q Okay. Do you remember anything about that phone call?**

A Basically, presenting it to him, asking him, you know, how to handle that situation, and I know at that point he was talking with Archie Skeens and Charlie Fugate to gain additional advice at that point.

**Q Okay. And just so we're clear, Charlie Fugate is general counsel --**

A Correct.

**Q -- for Food City? Who is Archie Skeens?**

A He was the safety manager --

Q Okay.
A -- for Food City.
Q Now, I don't -- I want to ask -- I have to ask some questions but I don't want to intrude on any attorney-client privilege, so assume that I'm not asking about communications with the in-house counsel. Okay?
Do you know -- or what was -- anything else you can remember about your conversation with Donnie Meadows?
A No.
Q Okay. Do you know what Mr. Meadows did next?
A Not specifically, no, sir.
Q Okay. Were you privy to any communications that Mr. Meadows had regarding this request from Mr. Batten?
A No, sir.
Q Okay. What did you do next?
A I awaited instruction from Mr. Meadows, and he advised that I meet with Mr. Batten to gain some additional information regarding his situation and request for the service dog.
And so that meeting was set up with

Gary Richards, the store manager, and myself, meeting with him in August of 2021.

**Q Okay. Is that the August 6th meeting?**

A Yes, sir.

**Q Okay. Do you remember anything else about what Mr. Meadows said regarding the 8/4 {sic} meeting with Mr. Batten?**

A Just to gain additional information as to, you know, the request and, you know, just to see kind of what was going on.

**Q Okay. What was the goal of getting more information?**

A I assume to be able to allow him to make the best decision.

**Q Did you have any recommendation for Mr. Meadows?**

A No, sir.

**Q Okay. I want to go through some written statements that you've produced.**

MR. HARGRAVES: Let's mark that as Exhibit 2.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 2.)

BY MR. HARGRAVES:

**Q Looking at what's been marked Exhibit 2, the Bates number at the bottom is K-VA-T 000138. Do you recognize this document?**

A Yes, sir.

**Q Is this a written statement that you produced regarding the meeting on August 6th, 2021, with Mr. Batten and Mr. Richards?**

A Yes, sir.

**Q Okay. Now, I've said that you produced it, but I don't want to assume that. Did you draft this statement?**

A Yes, sir.

**Q Okay. Do you remember when you drafted it?**

A Immediately following our conversation on that day.

**Q Okay. Would you say that this is an accurate account of the meeting on August 6th, 2021?**

A Yes, sir.

**Q Would you say it's a complete account of what occurred on August 6th, 2021, at that meeting?**

A To the best of my recollection, yes, sir.

**Q Okay. Did you write multiple drafts of this document?**

A Write multiple drafts of that particular document?

**Q Yes.**

A Not that I'm aware of. I mean, I know there were three separate meetings.

MR. HARGRAVES: I'm going to hand you another document. We'll mark that as Exhibit 3.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 3.)

BY MR. HARGRAVES:

**Q All right. Looking at what's been marked Exhibit 3, the Bates number at the bottom is 001060. Do you recognize this document?**

A Yes, sir.

**Q What is it?**

A A version of the document, the same document, potentially few less details there, before I finished and printed it out, maybe autosave something. I don't -- I'm not sure.

**Q Okay.**

A The signed written -- or the signed document there is the true and accurate account of

the conversation.

Q Okay. So do you have any idea why there would be a second draft of this document?

A Once again, maybe, I mean, autosave on the computer. I'm not sure.

Q Okay. So nobody else was drafting this document for you?

A No, sir.

Q Okay. Looking at it, it does appear that the signed version, which is Exhibit 2, has one additional sentence at the end; is that fair?

A That is fair.

Q All right. Do you -- does that refresh your recollection as to why there would be two different drafts?

A Once again, I cannot speak to the computer functions of autosaving or anything.

Q That's fine. I'm not asking you to make anything up. I just wanted to see if that jogs your memory in any way.

A No, sir.

Q Now, I want to go through this. Looking at Exhibit 2, the signed version -- and that is your signature; is that right?

A Yes, sir.

**Q Okay. In this meeting that you had with Mr. Batten and Mr. Richards did Mr. Batten mention that he needed the dog for help with companionship, anxiety, and isolation?**

A Yes, sir.

**Q Okay. To your recollection, are those the only three things that he mentioned?**

A He did also mention about how he had previously fallen and could help with -- help him steady on his feet, but, yes.

**Q Okay. So he did mention stability or being a fall risk?**

A Uh-huh.

**Q Is that a yes?**

A Yes, sir.

**Q That's fine. All right. See, I told you it would happen. That's okay.**

**Do you recall him telling you that the dog would assist with stability?**

A He may have mentioned that that could be a function of the dog. I'm -- I can't exactly recall that, yes, he specifically stated those exact words.

**Q Okay. Looking at the, if you count that last word, the fourth line up from the bottom**

**starting with, "He also stated," do you see where I'm at on the right side?**

A Yes, sir.

**Q "He also stated that he has fallen about five times and the dog helps him steady on his feet." Is that what you wrote?**

A Yes, sir.

**Q All right. So he did indicate that the dog helped him steady on his feet?**

A Could help him, yes.

**Q Okay. Was it your understanding that that was at least in part because of the many surgeries that he had had related to his accident?**

A I'm sure that's what he would revert to, but I can't specifically state that, yes, that is why.

**Q Okay. Did he indicate that that was why?**

A He did make mention of the car accident and the multiple surgeries that he had had.

**Q Okay. Now, at one point you asked him if there had been any change in anything -- and just looking at the third line down from the top.**

A Uh-huh.

**Q "During this exchange I asked Batten**

if there had been a change in anything, as he has worked for us for two years." Did I read that correctly?

A Yes, sir.

Q And the next sentence says, "He stated that nothing had changed." Is that what it says?

A Yes, sir.

Q And, again, you said that this is a truthful and accurate document?

A Yes, sir.

Q You also asked him if he was able to perform all essential functions of the job; is that right?

A Yes, sir.

Q And in your written statement you say he responded that he could do so without question. That's the middle of the paragraph. Do you see that?

A Yes, sir.

Q Okay. Was that all he said on that topic?

A To the best of my recollection, that he could do so without question as he had been doing since he began with Food City, and he had been

working with us for approximately two years at that point.

Q So you don't recall him telling you that, I still do everything I've done since day one but there are issues that do come up. I fall. Do you recall that?

A I do not.

Q Okay.

A I know he made mention that he had fallen about five times in the past.

Q Okay. But your recollection of this meeting is that he indicated he could do his job without question?

A Correct.

MR. HARGRAVES: Okay. I'm going to move on to the next statement. Let's mark this Exhibit 4.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 4.)

BY MR. HARGRAVES:

Q All right. I've handed you what's been marked as Exhibit 4. The Bates number is K-VA-T 00140. Do you recognize this document?

A Yes, sir.

**Q And what is it?**
A It's a written summary of my meeting with Mr. Batten on August the 12th, 2021, with Gary Richards there as well.
**Q And, again, who drafted this document?**
A That would be myself.
**Q Okay. Do you remember when?**
A Immediately following our discussion on August the 12th.
**Q Okay. And is that your signature on the document?**
A Yes, sir.
**Q Did you sign the document immediately after drafting it?**
A Yes, soon after. I mean, I don't know specifically --
**Q Okay.**
A -- but, yes.
**Q And would you say that this is a complete and accurate account of the meeting that occurred on August 12th, 2021, between you, Matthew Batten, and Gary Richards?**
A Yes, sir.
**Q Do you know why there would be a**

**second draft of this statement as well?**

A Once again, potentially autosaving within the office program, I'm not sure, as I continued to draft it.

MR. HARGRAVES: Let's mark that as Exhibit 5.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 5.)

BY MR. HARGRAVES:

**Q All right. Looking at Exhibit 5, Bates number K-VA-T 001061, do you recognize this document?**

A Yes, sir.

**Q Does it appear to be an exact copy of Exhibit 4, minus your signature? And take your time.**

A (Witness perusing document.) I believe it's exactly the same.

**Q Okay. Looking at this statement that you drafted, is there any mention of Mr. Batten stating that he had fallen in the past?**

A On this particular statement?

**Q Yeah. Well, looking at Exhibit 4, the signed version --**

A Yeah.

**Q -- is there any reference in that statement regarding the meeting on August 12th, 2021, that Mr. Batten indicated he had fallen in the past?**

A No, sir, I don't believe there is.

**Q Okay. Do you recall Mr. Batten telling you that he had fallen before in this meeting?**

A I do not recall that.

**Q Do you recall him stating, the last time I fell I knocked myself out?**

A No, sir.

**Q Now, in this meeting you informed Mr. Batten that the decision had been made that the service dog would not be approved; is that right?**

A That is correct.

**Q When had that decision been made?**

A I cannot give you an exact date. I know I met with Mr. Batten the first time on August the 6th. I would have taken that information back to Donnie Meadows on that particular day, and it would have been sometime before the 12th but I cannot give you an exact date.

**Q Okay. Forgetting about an exact**

**date, do you remember how the decision was made or how it was communicated to you?**

A It would have been communicated to me via telephone conversation.

**Q With Donnie Meadows?**

A Correct.

**Q Do you remember anything about that conversation?**

A Outside of him, you know, stating that, you know, we would not be able to approve that specific accommodation and to, you know, offer a potential job reassignment and, you know, potentially gather ideas from him as well as to, you know, what other accommodations may be available that he might be able to come up with as well.

**Q Okay. Did you ask any questions of Mr. Meadows?**

A As far as?

**Q In that conversation.**

A No, sir. I was basically taking information from him, once again, and taking it back to the meeting with Mr. Batten.

**Q Okay. Did Mr. Meadows indicate why Food City had decided not to provide the accommodation of the service dog?**

A I can't speak specifically. I can only, you know, speculate.

**Q Okay. Well, I'm not asking you to speculate. I want to be very clear. My question is, in that conversation, that phone conversation with Mr. Meadows, did he communicate to you what the reason was?**

A No, sir.

**Q Okay. Did Mr. Meadows come up with the idea to offer the USCAN position to Mr. Batten?**

A Yes, sir.

**Q Okay. Did he mention any other positions that should be offered to Mr. Batten?**

A No, sir.

**Q Okay. What is the USCAN position?**

A That is a person who oversees the self checkout stations at the front of the store instead of a traditional cashier register. It's where customers basically check themselves out and one person would oversee a set of stations and assist with any issues that a customer may have.

**Q Okay. Is that that associate that we'll see in the grocery store that's kind of just milling about between the self checkouts and if you have an issue with your checkout or you need a code**

**or something they'll come over and help you out?**

A Yes, sir.

**Q Okay. It's fair to say that's a job that has that associate on their feet?**

A Yes, sir.

**Q Okay. Do you remember what Mr. Batten said when you floated the idea of him working the USCAN position?**

A He immediately stated that he could not do that because he could not stand for prolonged periods of time. When trying to ask him as to, you know, gauge how long he might be able to sit or stand, he could not give me any definite time frame to even try to, you know, accommodate that matter. He just immediately shot it down and said, no, I can't do that.

**Q Okay. Well, did you advise Mr. Batten that he might be able to sit down for some period of time in that position?**

A Unfortunately, we never got to that --

**Q Okay. So you never --**

A -- discussion.

**Q Okay. You never offered, hey, we can give you a stool, we can give you a chair?**

A No, sir.

**Q Okay.**

A Outside of him just, you know, immediately shooting it down.

**Q Okay. Was it your intent to offer him a chair?**

A No. I mean, we can't speculate as to, you know, what other accommodations could have been offered.

**Q Okay. Well, let me just ask you this: At the time you what were meeting with Mr. Batten on August 12th, 2021, you say he shot the USCAN position down. At the time you had the meeting did you intend to offer him the accommodation of a chair in the USCAN position?**

A That would have been a discussion that I would have had to have with Donnie Meadows at that point.

**Q Okay. So you did not intend at that time to offer him the use of a chair in the USCAN position?**

A I am not saying that I did or did not.

**Q Was there --**

A I would have to, you know, converse

with Donnie Meadows again on all accommodations or actions being offered.

Q Okay. Fair enough. You couldn't just offer it without first talking to Donnie Meadows?

A That is correct.

Q Did you talk to Donnie Meadows about potentially offering Mr. Batten a chair for the USCAN position?

A After the fact of having this conversation with him, I advised Donnie that, you know, he had turned down that position and there was really no further discussion surrounding that.

Q Did you inform Mr. Meadows of Mr. Batten's reason for turning down the USCAN position?

A Yes, sir.

Q That it -- because it was a fully standing position?

A Because he stated he could not be on his feet for prolonged periods of time and he could not give us an accurate, you know, time frame as to how long he felt he might be able to be on his feet.

Q Okay. Did you and Mr. Meadows have any discussion at that point about whether to supply

**Mr. Batten with a chair or a stool or something to sit on in the USCAN position?**

A No, sir. Once again, after he had turned down that accommodation request there was really no further communication surrounding ideas around that.

**Q Did you at any point have any discussion with anyone outside of privileged communications about potentially offering Mr. Batten a chair or a stool in the USCAN position?**

A No, sir.

**Q Okay. Don't you think that might have been something that could have made a difference?**

A If we had gotten to that point to be able to discuss the specifics of the position, we can only speculate.

**Q All right. Was Mr. Batten preventing you from having that discussion?**

A Preventing me from talking with him?

**Q Yes.**

A No. Once again, I mean, all of my communication was coming from Donnie Meadows as far as, you know, the accommodations and the communication with him.

**Q And Mr. Batten wasn't stopping you from going to Mr. Meadows and asking Mr. Meadows if perhaps Food City could provide a chair for the USCAN position?**

A No. Mr. Batten never asked for that accommodation, you are correct.

**Q Well, that's not my question.**

**Mr. Batten didn't do anything to prevent you from asking Mr. Meadows about possibly providing a chair, did he?**

A No, that is correct. I simply reported back to Mr. Meadows what the conversations were based upon what accommodations were presented to him.

**Q Now, the USCAN cashier position, that was offered specifically to accommodate Mr. Batten with regards to his isolation and anxiety; is that right?**

A It was an accommodation for his entire position of employment.

**Q Okay. But, specifically, the two things that it was meant to address was isolation and anxiety; is that right?**

A It could potentially help with those.

**Q Well, I'm just reading your words.**

**The middle of the paragraph on Exhibit 5 -- it may be Exhibit 4, the signed version, Bates number 000140. "I suggested" -- this is the middle of the paragraph on the right side. "I suggested that we could reassign him to a USCAN cashier position, as this would help aid in his battle of isolation and anxiety of working alone at the fuel center kiosk." Is that what it says?**

A That is correct.

**Q So that's what it was intended to help with; is that right?**

A That it could, yes.

**Q Okay. The USCAN cashier position was never intended to accommodate Mr. Batten with regard to his gait instability, was it?**

MR. JACKSON: Objection. Go ahead and answer.

A That was a position to be able to allow him to, you know, continue employment inside of the store.

**Q (By Mr. Hargraves) I'll repeat my question. The offer of the USCAN cashier position was never intended to accommodate Mr. Batten with regard to his gait instability; is that right?**

MR. JACKSON: Same objection. Go

ahead and answer.

A I'm not sure -- I mean, he had been performing all essential functions of that job for two years, so, I mean, it was an accommodation to be able to allow him to continue employment.

**Q (By Mr. Hargraves) Let me ask it this way: It was never communicated to Mr. Batten that the offer of the USCAN position was intended as an accommodation of his gait instability; is that fair?**

A I'm not sure that that was discussed, no.

**Q Okay. It's certainly not mentioned here in your signed statement, is it?**

A No, sir.

**Q Okay. And Mr. Batten declined the USCAN position; is that right?**

A That is correct.

**Q He told you he couldn't physically do it; is that right?**

A That is correct.

MR. HARGRAVES: I believe this will be Exhibit 6.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 6.)

BY MR. HARGRAVES:

Q I'm handing you what's been marked Exhibit 6, Bates number K-VA-T 000142. Do you recognize this document?

A Yes, sir.

Q All right. This is the statement that you drafted and signed regarding the August 18, 2021, meeting between you, Matthew Batten, and witnessed by Brian Wattenbarger?

A Yes, sir.

Q And this is a statement that you drafted; is that right?

A Yes, sir.

Q Would this have been immediately following the August 18, 2021, meeting?

A Yes, sir.

Q And is this a complete and accurate statement with regard to what happened in the August 18, 2021, meeting?

A Yes, sir.

Q And with regard to all of these statements that you drafted, are these statements truthful?

A Yes, sir.

MR. HARGRAVES: And just for the sake

of being complete, let's mark this Exhibit 7.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 7.)

BY MR. HARGRAVES:

**Q Look at what's been marked as Exhibit 7, Bates number K-VA-T 001062, do you recognize this document?**

A Yes, sir.

**Q Does this appear to be an unsigned draft of Exhibit 6?**

A (Witness perusing document.) Yes, sir, I believe so.

**Q Okay. Just looking at the -- just the amount of text, it's evident that there is some difference between these two versions; is that fair?**

A (Witness perusing document.) Maybe slight verbiage, without going word for word for word here.

**Q Sure. And I'm not asking you to.**

A Maybe a slight verbiage here and there, once again, potential autosaving on the computer, but, I mean, the gist of the conversation is exactly the same.

**Q Okay. So sitting here today, you**

**can't tell us why there would be two versions of this document?**

A No, sir. Once again, I mean...

**Q But Exhibit 6 bears your signature; is that right?**

A That is correct.

**Q Now, in this meeting you confirmed to Mr. Batten, again, that his request for the service dog had been denied; is that fair?**

A That is correct.

**Q You offered or you mentioned the offer of the USCAN position again; is that right?**

A That is correct.

**Q And you also at this time offered Mr. Batten a leave of absence or FMLA; is that fair?**

A That is correct.

**Q Whose idea was it to offer -- well, let me ask you this: Was it your idea to offer a leave of absence or FMLA?**

A I got that direction from Donnie Meadows.

**Q Okay. Did Mr. Meadows explain to you why that was to be offered to Mr. Batten?**

A To be able to allow him time to potentially, you know, be able to see if he might be

able to return to work without the service animal.

**Q Okay. Did you discuss with Mr. Meadows why a leave of absence might change Mr. Batten's situation?**

A Did I discuss why a leave of absence might change his situation?

**Q Yes.**

A No, I did not.

**Q Did Mr. Meadows indicate why he thought the leave of absence was appropriate?**

A Once again, to potentially allow Mr. Batten to be able to return to work, you know, without the service animal present.

**Q Okay. Did you have any indication that Mr. Batten's physical condition was going to change during a leave of absence?**

A I mean, I can't speculate on all the particulars of his medical condition.

**Q Well, I'm not asking you that. I'm asking did you have any indication that his condition was going to change?**

A I did not know.

**Q Okay. He didn't tell you, hey, if I'm out for two weeks I might recover and be able to come back without the dog?**

A No, he never stated that.
**Q So you don't know why a leave of absence would have addressed Mr. Batten's need for accommodation?**
A Once again, to be able to potentially allow him time to be able to return to work without the service animal present.
**Q I guess my question is what was the time supposed to accomplish that would allow him to return without the service animal?**
A To potentially allow him, you know, to be able to return without needing that accommodation.
**Q Did Mr. Batten indicate there was something that was going to happen that would make it so he wouldn't need a service animal?**
A No, he did not.
**Q And did you and Mr. Meadows discuss what might happen that would eliminate Mr. Batten's need for a service animal?**
A No, we did not.
**Q Did Mr. Batten -- sorry. I didn't mean to cut you off.**
A I was just going to say, I don't know all the particulars of his, you know, entire medical

condition.

**Q Did Mr. Batten make it clear that nothing was going to change and that he was still going to need the service animal?**

A Yes. He made it clear that, you know, he would not return to work without having his service dog present regardless of any position.

**Q Okay. Were you aware that Mr. Batten had put in his application for the service dog prior to even coming to work for Food City in 2019?**

A No, sir.

**Q You told Mr. Batten that you were not able -- that is Food City was not able to accommodate having a service animal present while he was working; is that right?**

A That is correct.

**Q Do you know why Food City could not accommodate having a service animal present?**

A I cannot speak to that. That was a decision made by Donnie Meadows, and I don't know the specifics or particulars of that decision-making.

**Q Okay. You don't know why it would have been a problem to have a service animal in the kiosk?**

A Once again, I don't make those decisions, so I --

**Q Okay.**

A -- I cannot answer that.

**Q Okay. The fuel clerk works alone in the kiosk; is that right?**

A That is correct.

**Q That's that little shack in the middle of the gas station, for lack of a better term?**

A That is correct.

**Q Is that area locked?**

A Yes, sir.

**Q So, in other words, customers can't just walk into the kiosk?**

A Exactly, yes.

**Q So the only person in there is the fuel clerk; is that right?**

A That is correct.

**Q Sitting here today, can you think of any reason why it would have been a burden on Food City to have a service dog in the kiosk with a fuel clerk?**

A I cannot speculate on that.

**Q Okay. We've been going for a little**

**over an hour. Would this be a good time for a break?**

MR. JACKSON: Sure.

MR. HARGRAVES: I mean, I can keep trucking.

MR. JACKSON: How much more do you have to go?

MR. HARGRAVES: Not an awful lot, but...

MR. JACKSON: Just whatever you want.

THE WITNESS: Give me a water, I'm good.

MR. HARGRAVES: All right. Well, I'll keep trucking. If you change your mind and need a break, just let me know.

THE WITNESS: Okay. Thank you.

BY MR. HARGRAVES:

**Q Were you involved in the ultimate termination of Mr. Batten's employment?**

A Was I involved in it?

**Q Yes, sir.**

A Not directly, no.

**Q All right. Indirectly?**

A Indirectly, I had a conversation with Mr. Lyon where, once again, an associate can be on

leave, a personal leave for up to -- two personal leaves back to back up to 90 days apiece. Once those leaves are, you know, exhausted and someone does not return to work they are, you know, terminated. And so, Mr. Lyon advised me to get with Gary Richards and go ahead and have him terminated in the system.

**Q Were you aware that Mr. Batten had reached out to Gary Richards following the August 18 meeting?**

A Following our last conversation where he called Mr. Richards on the phone and asked him if he could return to work at that point, yes.

**Q Were you aware of that phone call?**

A Yes. After the fact, yes.

**Q Did Mr. Richards come speak to you about that?**

A He called me on the phone, I believe.

**Q All right. What do you remember about that conversation?**

A Him just stating that Mr. Batten had called him asking him if he could return to work, you know, with his service animal and Mr. Richards says that he told him no, and that's all that I was aware of.

**Q Okay. Do you recall Mr. Richards communicating to you that Mr. Batten had declined to use a personal leave of absence?**

A He never returned the paperwork to Mr. Richards, so in essence he did not.

**Q So he didn't take advantage of the personal leave of absence policy that allows employees to request it?**

A Correct. He didn't specifically request it by filling out paperwork.

**Q Okay. But Food City placed him on a leave of absence anyway; is that right?**

A That is correct.

**Q Isn't that a bit unusual?**

A That was a decision made by Donnie Meadows.

**Q Had you ever seen that happen before?**

A No, I have not.

**Q Typically, it's the employee who requests the personal leave of absence, yes?**

A That is correct.

**Q Okay. Do you know if Mr. Batten was ultimately terminated?**

A Yes, he was terminated.

MR. HARGRAVES: Let's mark that as

Exhibit 8.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 8.)

BY MR. HARGRAVES:

**Q Do you recognize this document marked Exhibit 8?**

A Yes.

**Q What is this?**

A Just a summary of the termination information for Mr. Batten.

**Q And this indicates -- on status it says "terminated;" is that right?**

A That is correct.

**Q It says terminated February 14, 2022; is that right?**

A That is correct.

**Q It also has that as the last day worked; is that right?**

A I'm going to say that would not be his last physical day worked but that would be his last day in our system.

**Q Is the last day worked just the last day they're employed?**

A Typically, yes.

**Q Isn't that the same as their termination date?**

A Typically, yes.

**Q All right. He wasn't physically at Food City on February 14, 2022?**

A No, sir.

**Q The termination reason is "Failed to return from leave;" is that right?**

A That is correct.

**Q And, again, that's the leave that Mr. Batten never requested, Food City just placed him on; is that right?**

A That is correct.

**Q And so he was terminated for failing to return from that leave?**

A That is correct.

**Q Okay.**

MR. HARGRAVES: Let's mark that Exhibit 9.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 9.)

BY MR. HARGRAVES:

**Q All right. You've been handed what's marked as Exhibit 9. Do you recognize this**

**document?**

A Yes.

**Q What is it?**

A An email chain of communication from Jenna Johnston to the store regarding Mr. Batten's leave ending, Gary asking me if we have an update, and then me communicating back to Jenna to speak to Sherrell regarding the associate status.

**Q Okay. Who is Jenna Johnston?**

A She's an HR clerk in the department up in Abington.

**Q Okay. Is this a fair and accurate copy of this email chain?**

A As far as I know, yes.

**Q Okay. And it has -- Ms. Johnston's first email indicates that Mr. Batten's leave, that is the personal leave of absence, ended on November 16, 2021; is that right?**

A Yes. Looks like that had been the first leave.

**Q Okay. And then at the top you said, "Jenna, please speak to Sherrell regarding this associate's status. I believe we will leave him on LOA at this time;" is that right?**

A Yes.

**Q Is that you saying that you believe you'll leave him on the leave of absence?**

A Yeah. He was on LOA. Looks like his second LOA had already expired at that point.

**Q So the second leave of absence had expired as of November 16, 2021?**

A No. That would have been the first one --

**Q Okay.**

A -- from August to November.

**Q Okay.**

A And then November to February.

**Q Okay.**

A I don't have all those dates in my particular rolling system. That's what Jenna does up in the office.

**Q Got you. So were you saying -- were you essentially acknowledging the first leave of absence had expired but you wanted to leave him on leave of absence?**

A He was on LOA at the time. Once again, I was not aware that the second one had expired at that point.

**Q Oh, okay. What was the purpose of leaving him on LOA?**

A Once again, we had placed him on LOA, assuming him to be on a leave of absence when he did not return the paperwork back to the company.

**Q That's even though Mr. Batten told the store manager, Gary Richards, that he did not want to take a leave of absence?**

A Donnie Meadows still made the decision to place him on leave of absence in the system.

**Q Why not just fire him?**

A I can't speculate those decisions. Once again, that came -- that communication came from Donnie Meadows.

**Q Did you have any advisory role in terminating employees?**

A I advise based on company policies to store managers across the division.

**Q Okay. Did you not think that you should advise just terminate Mr. Batten's employment?**

A That was not communication advised to me from Donnie Meadows, no.

**Q Okay. Did y'all discuss termination?**

A No, we did not.

MR. HARGRAVES: I believe this is

Exhibit 10?

THE COURT REPORTER: Yes.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 10.)

BY MR. HARGRAVES:

**Q All right. Looking at what's been marked Exhibit 10, Bates number K-VA-T 001058 through 1059, do you recognize this document?**

A Looks like an email chain of communication.

**Q Okay. And you are included on at least some of these communications; is that right?**

A That is correct.

**Q Looking at the first email in the chain on the second page, that's from Gary Richards; is that right?**

A That is correct.

**Q So Mr. Richards indicated to you on August 23rd that Mr. Batten had called him at the store and told him that he -- that you had given him the option of a leave of absence or the FMLA; is that right?**

A That is correct.

**Q And in this email Mr. Richards says,**

**"Matt told me" -- "Matt stated that he was not going to submit the FMLA documents, nor was he going to submit the personal LOA documents;" is that right?**

A That is correct.

**Q You then forwarded that email to Donnie Meadows and Sherrell Lyon; is that right?**

A That is correct.

**Q What was Sherrell Lyon's position at that time?**

A He was working alongside Donnie Meadows to take over as director of human resources.

**Q Okay. Sherrell Lyon responded to you, asking you to keep a copy -- or to email him a copy of all your notes and recaps from your exchanges with Mr. Batten; is that right?**

A Uh-huh.

**Q And did you do that?**

A Send a copy of my notes to Sherrell?

**Q Yes.**

A I'm sure I did.

**Q Is that what the next email is, "please see attached"?**

A I'm sure it is. I'm not for certain. I mean, I'm sure it is.

**Q Do you have any way of confirming**

**what was attached to that email?**

A I'm not sure at this point.

MR. HARGRAVES: This will be Exhibit 11.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 11.)

BY MR. HARGRAVES:

**Q Looking at Exhibit 11, Bates number K-VA-T 001064, do you recognize this?**

A Yes. Looks to be an email chain of communication once again.

**Q Okay. Is this a fair and accurate copy of that email chain?**

A I believe so.

**Q Okay. The first email is on September 9th from Jenna Johnston to Gary Richards, CCing Rickie Estep; is that right?**

A That is correct.

**Q Who is Rickie Estep?**

A She is the office manager in Abington that handles leave of absences and short-term disability, all those types of claims for the company.

**Q It looks like Gary Richards responded**

**and also added you to the email chain; is that right?**

A Yes, sir.

Q **Okay. Ms. Johnston indicated that Mr. Batten should be removed from payroll effective February 14, 2022; is that right?**

A That is correct.

Q **So Mr. Batten's leave of absence expired, his first one expired on November 16, 2021. Are you aware of what his status was between November 16, 2021, and being removed from payroll on February 14, 2022?**

A That would have been a second personal LOA of 90 days. Associates are eligible for up to two of 90 days apiece within a 365-day calendar year, so he was placed on back-to-back personal LOAs.

Q **And that second LOA would have ended on February 14?**

A That is correct.

Q **And just to be clear, Mr. Batten also did not request this second LOA; is that right?**

A That is correct.

Q **Okay.**

MR. HARGRAVES: Let's mark this

Exhibit 12.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 12.)

BY MR. HARGRAVES:

**Q All right. Looking at what's been marked Exhibit 12, do you recognize this document?**

A It looks to be similar to Exhibit 10.

**Q That was going to be my next question. Does this appear to be a portion of what has already been introduced as Exhibit 10?**

A I believe so.

**Q All right. Did you have any verbal communications related to these emails?**

A With who? I mean, yes, I talked with Donnie Meadows, you know, throughout the course of, you know, our interactions and conversations.

At the end of August Donnie Meadows retired from the company and Sherrell Lyon was basically, you know, wanting to recap and, you know, kind of know where we stood with, you know, Mr. Batten at that point, as he was assuming reigns of the position.

**Q Okay. Do you remember Mr. Gary Richards calling you in regard to Mr. Batten?**

A Calling me when?

**Q Do you remember a phone call -- this would have been back around the time of the initial request. Do you remember a phone call on July 30th, 2021?**

A I'm not sure.

**Q Okay. Do you remember a phone call on August 2nd, 2021?**

A With who?

**Q With Gary Richards.**

A I can't specifically recall. I'm sure maybe we did have conversation after I got back from vacation prior to meeting with the associate, setting up a time to be able to meet with Mr. Batten.

**Q If Mr. Richards indicates that you and he had three phone calls related to this between July 30th, 2021, and August 5th, 2021, does that sound right?**

A I'm sure that's very possible.

**Q Okay. Do you remember any of those conversations?**

A Not specifically, no, sir.

**Q Do you know why you would have had a phone conversation with Mr. Richards the day before**

**the scheduled meeting with Mr. Batten on August 6th?**

A To potentially confirm the meeting and ensure that, you know, Mr. Batten was aware to be there. Once again, I can't specifically speak to the specifics of it.

**Q You don't remember if you and Mr. Richards talked about how you would handle the meeting?**

A No. I mean, he knew that I was coming to, you know, speak with Mr. Batten to, you know, gain additional information.

MR. HARGRAVES: Thirteen.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 13.)

BY MR. HARGRAVES:

**Q Looking at Exhibit 13, Bates number K-VA-T 001076 through 001077, do you recognize this document?**

A Yes, sir.

**Q And what is it?**

A An email communication from Donny Rector to myself that he received while I was on vacation, and I forwarded it to Donny and Sherrell at that point.

Q Is this a fair and accurate copy of that email chain?

A I believe so.

Q Okay. The first email at the bottom is from Emily Hobbs; is that right?

A Yes, sir.

Q She is an HRC, a human relations coordinator?

A She was at this point, yes.

Q Okay. That email appears to be blank and sent to Gary Richards; is that right?

A There was an email from Emily to Gary, yes.

Q Okay. Do you know if there was anything attached to that email from Ms. Hobbs to Mr. Richards?

A I mean, I can't specifically speculate or state what may have been attached to that.

Q Okay. The next email is from Donny Rector to you. That's July 26, 2021. It says, "Welcome back. I got this one late last week. Associate with a service animal. I thought you might want to take a look at it." Is that right?

A That is correct.

**Q Did you follow up with Mr. Rector about that email?**

A I did.

**Q Did you have a phone conversation?**

A Yes.

**Q Is that something we've already discussed or...**

A I'm not certain.

**Q Okay.**

A I mean, basically just calling him to see, you know, what the situation was, what action he may have taken. And, like I said, I went ahead and got with Donnie Meadows at that point, as you can see, within five minutes of me receiving it.

**Q Johnny on the spot. Did Mr. Rector indicate that he had done anything on the situation at that point?**

A You know, I don't remember exactly if he had gone to Donnie Meadows at that point or not.

**Q Do you remember what, if anything, he told you in that conversation?**

A No, sir. Other than, you know, there was a request for a service animal there at the fuel kiosk.

**Q Okay. Well, five minutes after you**

got that email from Mr. Rector you forwarded it on to Donnie Meadows asking him to please advise on an associate requesting to bring service dog to work at Gas N Go at 214; is that right?

A That is correct.

Q Did Mr. Meadows reach out to you in response to that request?

A Yes.

Q Was that by phone?

A Yeah. I know we had a phone conversation afterwards, him trying to find out more information about it, and after that I know is when he had further discussion, once again, with Archie and Charlie at the office.

Q Were you present for any of those conversations?

A I was not.

Q Okay. Did Mr. Meadows respond by email to your request to advise on this issue?

A I think it was done via telephone.

Q Okay. Did he send any text messages regarding this issue to you?

A Not that I remember.

Q Okay.

MR. HARGRAVES: Fourteen.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 14.)

BY MR. HARGRAVES:

**Q Looking at what's been marked Exhibit 14, Bates number K-VA-T 001078 through 1079, do you recognize this document?**

A Yes, sir.

**Q It looks to be just -- does it appear to be the same chain that we were just looking at in Exhibit 13 with just a couple more emails on it?**

A Yes, sir.

**Q Okay. Those additional emails, the first one is from Donnie Meadows to Archie Skeens and Charlie Fugate, and the next one is Archie Skeens to Donnie Meadows; is that fair?**

A Yes.

**Q Okay. Do you know why Donnie Meadows would be asking Archie Skeens to advise on the service dog request?**

A I am not for certain. Archie was the safety manager of the company.

**Q Okay. Do -- are disability accommodation requests considered a safety issue?**

A I guess they could be. Once again, I

don't -- I can't speculate as to exactly why Archie was brought into the loop.

**Q Okay. You wouldn't have thought to bring Mr. Skeens in on this particular type of request, would you?**

A No. I just went to my immediate supervisor, Donnie Meadows, at that point.

**Q Did Mr. Skeens ever communicate to you regarding any advice or guidance on the service dog request?**

A I don't remember ever specifically speaking to Archie regarding this entire situation, only Donnie Meadows.

**Q Okay. Do you know who ultimately made the decision to deny Mr. Batten's accommodation? Was that Mr. Meadows?**

A Yes.

**Q Do you know if anybody else participated in that decision?**

A I'm not for certain.

**Q Okay. Are you aware if anyone was hired to fill the fuel clerk position at that store after Mr. Batten left?**

A I cannot speak to that specifically. I mean, once again, we're always, you know, hiring

and staffing positions around the store.

**Q Are you aware of Food City eliminating the fuel clerk position after Mr. Batten left?**

A Eliminating the position?

**Q (Moves head up and down.)**

A No, sir. It still stands today.

**Q Okay. So at some point somebody filled the position?**

A That's fair to say.

**Q Okay. Do you know who that would be?**

A No, sir.

**Q Certainly, the position wasn't left vacant?**

A No. I mean, we can't -- we have to have people to operate the fuel station out there.

**Q All right. Outside of Food City's attorney, obviously, are there any other communications that you had with anyone else regarding Mr. Batten's request for the use of a service dog that we have not discussed today?**

A No, sir.

**Q All right. Is everything that you said here today true?**

A Yes, sir.

Q Okay. Were any of my questions -- did any of my questions need clarification?
A No, sir.
Q Do you feel that you understood all of the questions that I asked you?
A Yes, sir.
MR. HARGRAVES: Okay. I don't have any further questions at this time.
MR. JACKSON: I just have about one or two.

EXAMINATION

BY MR. JACKSON:
Q Let's look at Exhibit 4.
A Okay.
Q I'm looking at the last line there. "He stated" -- in that case you're saying Mr. Batten?
A Yes.
Q "-- that he could only work with the service dog present at this time, as he was not going to leave the dog with anyone else." Did I read that right?
A That is correct.
Q Was that a -- not a word for word, but a fair representation of the statement that

**Mr. Batten made?**

A Yes, sir.

**Q Did you communicate that statement or the gist of it to Mr. Meadows when you and he were speaking?**

A Yes, sir.

MR. JACKSON: That's all.

MR. HARGRAVES: Nothing further. Thank you, Mr. Ellison.

THE VIDEOGRAPHER: This marks the end of this deposition. One media file was used. The time is 2:43. We're off the record.

MR. JACKSON: And we'll read and sign too.

FURTHER THIS DEPONENT SAITH NOT.

(Signature reserved.)

# E R R A T A P A G E

I, DAVID GARY ELLISON, the witness herein, have read the transcript of my testimony and the same is true and correct, to the best of my knowledge, with the exception of the following changes noted below, if any:

Page / Line / Change / Reason

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________ _______________________________________

_______________________________
DAVID GARY ELLISON

Sworn to and subscribed before me, this the ______ day of ____________, 2023.

_______________________________
Notary Public
My commission expires:____________

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :
:
COUNTY OF HAMILTON :

I, Diane R. Angel, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. DAVID GARY ELLISON was duly sworn by me; that pages 1 to 83, inclusive, were reduced to typewriting under my direction and supervision and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This the 17th day of January, 2023.

DIANE R. ANGEL, RPR, TN LCR #246
Registered Professional Reporter
and Notary Public.
My Commission Expires: 3/10/2025