# EXHIBIT 4

# DEPOSITION OF LYON

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA AT ROME

---

CHRISTOPHER MATTHEW BATTEN, :
:
:
Plaintiff, :
:
-vs- : NO.
: 4:22-CV-00179
K-VAT-FOOD STORES, INC., d/b/a :
FOOD CITY, :
:
:
Defendant. :

---

THE VIDEOTAPED DEPOSITION OF
SHERRELL LYON, JR.
January 12, 2023

---

Whitney A. Vaughn, TN LCR# 418
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

INDEX OF EXAMINATION


| | Page |
|---|---|
| Examination By Mr. Hargraves............ | 6 |


INDEX OF EXHIBITS


| | | |
|---|---|---|
| 1 | Email Chain starting with 7/26/21.. | 32 |
| 2 | Email Chain starting with 9/8/21... | 34 |

APPEARANCES:

Appearing for Plaintiff:

R. ETHAN HARGRAVES, ESQUIRE
ethan@masseyattorneys.com
Massey & Associates, P.C.
6400 Lee Highway, Suite 101
Chattanooga, Tennessee 37421
(423) 697-4529

Appearing for Defendant:

HOWARD B. JACKSON, ESQUIRE
hjackson@wimberlylawson.com
Wimberly, Lawson, Wright, Daves & Jones, PLLC
550 Main Avenue, Suite 900
Knoxville, Tennessee 37901
(865) 546-1000

ALSO PRESENT: Videographer, Patrick Black

-----------------------------------------------------

The videotaped deposition of SHERRELL LYON, JR., called as a witness at the instance of the Plaintiff, for purposes of discovery, pursuant to the Federal Rules of Civil Procedure, taken pursuant to agreement on January 12, 2023, at the law offices of Massey & Associates, P.C., 6400 Lee Highway, Suite 101, Chattanooga, Tennessee 37421, commencing at 12:57 p.m., before Whitney A. Vaughn, Court Reporter and Notary Public.

S T I P U L A T I O N

It being agreed between counsel for the respective parties that Whitney A. Vaughn, Court Reporter and Notary Public, may swear the witness, take his deposition in machine shorthand, afterwards reducing the same to typewriting.

All objections, except as to the form of the question and responsiveness of the answer, are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., are expressly waived. Signature waived.

//

THE VIDEOGRAPHER: We are now on the record. Today is Thursday, the 12th of January, 2023. The time is 12:57 p.m.

This is the video deposition of Sherrell Lyon in the matter of Christopher Matthew Batten versus K-VA-T Food Stores, Incorporated, doing business as Food City. This is case number 4:22-cv-00179.

This deposition is being held today at the law offices of Massey & Associates, located at 6400 Lee Highway, Suite 101, in Chattanooga, Tennessee.

My name is Patrick Black, the videographer. Our court reporter is Whitney Vaughn.

I'll ask counsel to please introduce yourselves and state whom you represent.

MR. HARGRAVES: Ethan Hargraves on behalf of the plaintiff Matthew Batten.

MR. JACKSON: Howard Jackson on behalf of Food City.

THE VIDEOGRAPHER: I'll ask the court reporter to swear in the witness.

//

//

//

SHERRELL LYON, JR.,

called at the instance of the Plaintiff, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HARGRAVES:

**Q Mr. Lyon, could you just state your full name for the record?**

A My name is Sherrell Edward Lyon, Jr.

**Q Mr. Lyon, my name is Ethan Hargraves. I'm the attorney with Massey & Associates. We represent Mr. Batten in this case. Have you ever testified in a deposition before?**

A I believe so, yes.

**Q Do you remember when that was?**

A Many, many, many years ago.

**Q Okay. Since it's been a little while, the first thing I like to do is kind of go over a few ground rules for how it's going to go so you can hopefully understand the process a little bit better.**

**As you can tell, we're trying to make a clear record --**

A Sure.

**Q -- of everything that everybody says today. That's what the court reporter is doing. And**

one thing we can do to make her job easier is not talk over each other, which it can happen very naturally.

So if you would, do your best to let me finish my full question before you start to answer, and I'll do my best to let you finish your full answer before I ask another question. Sound fair?

A Sure.

Q And another thing that we can do is keep the answers verbal. Head nods and gestures are difficult to write down in a transcript. Things like uh-huh and huh-uh can also get confused.

So there may come a time when I just ask to clarify is that a yes or is that no. And I'm not trying to be mean to you or call you out. I just want to make sure that we understand what it is you're saying. Does that make sense?

A It does.

Q Okay. And if I ask you a question that you don't understand, whether there is a word in the question you don't understand or I just asked you a bad question, which absolutely can happen, if you don't understand it, just let me know and I will do my best to rephrase it so that you can understand it.

**Okay?**

A Okay.

**Q And if you need a break at any point, all you got to do is ask and we can take a break. The only caveat I have is if I have asked a question, I will want to get an answer to that question before we take the break. Does that make sense?**

A It does.

**Q Mr. Lyon, where do you currently live?**

A Jonesborough, Tennessee.

**Q How long have you lived there?**

A Sixteen, seventeen years.

**Q That's up around Tri-Cities, isn't it?**

A It is.

**Q Okay. That's a little bit of a drive?**

A It is.

**Q Well, I appreciate you coming down. Did you attend high school?**

A I did.

**Q Where at?**

A Sullivan East High School in Sullivan County, Tennessee.

**Q Sullivan?**

A Sullivan.

**Q Did you graduate?**

A I did.
**Q And what -- did you have any college after that?**
A I did.
**Q What was that?**
A East Tennessee State University.
**Q Okay. Did you get a degree?**
A I did.
**Q And what was that in?**
A Business.
**Q Okay. Do you have any other degrees?**
A I do not.
**Q All right. Do you have any professional licenses or certifications?**
A I do not.
**Q Okay. Do you have any other professional training?**
A I do not.
**Q Okay. Are you a member of any professional clubs or organizations?**
A No.
**Q Have you ever been convicted of a crime?**
A No.
**Q You work for K-VA-T Food Stores, Inc.;**

**is that right?**

A Yes.

**Q And that's commonly referred to as Food City?**

A Yes.

**Q What is your current position with Food City?**

A Well, it hasn't been announced yet, but right now I'm the vice president of human resources effective the 25th.

**Q Okay. So before moving into that position, which I guess hasn't been formalized yet, what was your position before that?**

A Director of human resources.

**Q And in the hierarchy, where do those two positions fall?**

A The vice president would be higher than the director.

**Q Okay. Assuming -- is there a president of human resources?**

A There is not.

**Q Okay. So is that the -- is that the tiptop of the human resources chain?**

A It would be, yes.

**Q Well, congratulations.**

A Thank you.
**Q Most of what we'll be talking about today will have to do with your job as the director of HR since that was what you -- the position you were in for at least most of the case that we're here about today.**
**Did you have -- as the director of HR, I assume that was over all of the human resources operations at all of the Food City locations?**
A That's correct.
**Q All right. And who were the employees directly beneath you who answered to you?**
A In what time period?
**Q As the director of HR.**
A I have -- I have several direct reports. I have an admin. Her name is Kim Bateman. Do you want the entire list or do you want --
**Q Is that feasible?**
A Yeah, I'll try. Some of it has changed.
**Q Sure.**
A Kathy Jones, IS analyst; Levi Tignor, HR generalist; Randy Rotten, benefits manager; Sarah Spahr, division HR specialist; David Ellison, division HR specialist; Donny Rector, division HR

specialist; Rickie Estep, office manager; three clerks, Natalie, Jenna, and Becky. Let's see. Junior clerk, Angie Botts; director of healthy initiatives, Laurie Hamilton. And I think that's all.

**Q Well, thank you for that. You mentioned one position in there, the division HR specialist, and you mentioned a couple of those. How many division HR specialists are there?**

A There is one for each division.

**Q And how many divisions are there?**

A Three.

**Q At the time of this case, which primarily is around August 2021, would the -- would two of those HR specialists have been David Ellison and Donny Rector?**

A Yes.

**Q Do you know who the third one would have been at that time?**

A It would still be Sarah Spahr.

**Q As the director of HR, would you be directly involved in requests for accommodation by employees?**

A Not necessarily all requests for accommodations, no.

**Q Is that something that the HR specialist could resolve on their own?**

A They absolutely could.

**Q So they didn't necessarily need to pass all of those requests for accommodation up the chain to you?**

A They would not.

**Q Okay. And I forgot to ask you this, but you were in a little bit of a transition around the time that this happened. So when exactly, if you can recall, did you step into the HR director position?**

A That would have been in the spring of 2021, I believe. There was a transitional period when Donnie -- our previous vice president of human resources -- where we kind of overlapped, but I didn't really -- I was there more for observation than anything, so I didn't really spend a lot of direct time with Donnie. It was more time in the departments.

**Q Okay. So there was a transition period where you were working alongside or underneath Donnie Meadows to observe?**

A Departments, not necessarily Donnie.

**Q Oh, okay. Sure.**

A So spend time in benefits, time in -- with all those different departments under HR.

**Q During that time, did you take part in any actual decision-making related to the director's duties?**

A I did not.

**Q Did Donnie Meadows loop you in on any decision-making during that time?**

A He did not.

**Q Didn't allow you to observe any particular decision-making?**

A My time was to be spent in the departments. I had to learn those before he exited.

**Q Sure. Okay. So as of August 2021, Donnie Meadows would have been the one in charge of HR or rather he would have been the director of HR?**

A He would be the VP of HR at that time.

**Q Oh, okay. He was the VP?**

A Yes.

**Q So he actually was the head honcho over HR --**

A Yes.

**Q -- at that time?**

A Uh-huh.

**Q Who was the director of HR at that**

**time?**

A We -- I don't believe we had one at that time. I don't remember exactly when I went in the role, but prior to the transition of me taking Donnie's place, there was not a director. So it was kind of a steppingstone to prepare me before Donnie left.

**Q So prior to that transition, there was one head HR position?**

A That's correct.

**Q After the transition, Donnie Meadows assumed the -- I guess the VP of HR?**

A He remained the VP. He was already a VP, and we didn't have a director.

**Q Okay. I think I got it now. They essentially created this new position, director of HR, for you?**

A Correct.

**Q What were your responsibilities as the director of HR and specifically as distinguished from the VP of HR?**

A Like I said, I was there to learn the different departments. I spent time with benefits because benefits is a huge piece of resources. I spent time with the office manager. I spent time

with the clerks. I spent time with the scanner person. I spent time with the admin. I spent time with everyone in HR.

**Q All right.**

A And prior to that I was a division HR specialist.

**Q Okay. So you would have been one of those three division positions?**

A Correct.

**Q Okay. How long had you been in that position?**

A I guess about five and a half years.

**Q Okay. I don't know if I asked you, but when did you first start with Food City?**

A 1988.

**Q Okay. What was your starting position?**

A Courtesy clerk, a bagger.

**Q And you worked all the way up?**

A A good number of years, yes.

**Q When did you -- do you remember when you stepped into an HR role with Food City?**

A I do not remember exactly. I would have to check.

**Q Okay. That's fine.**

A Maybe seven years ago, something like that, eight years ago.

**Q Okay. Would that have been the division HR specialist position?**

A Yes. I think it was 2015-ish, somewhere around there.

**Q Okay. As of August 2021, who was responsible for making sure that Food City complied with federal laws and regulations?**

A That would be Donnie Meadows.

**Q Okay. Is that a duty that he retained as the VP or is that a duty that passed to you as the director of HR?**

A He was the vice president of human resources, so that would be his responsibility.

**Q Did you have any role in that?**

A Any role in...

**Q In ensuring Food City's compliance with federal laws and regulations.**

A I would -- for anything that was presented to me, absolutely.

**Q Okay. Does Food City provide any training on compliance with the ADA?**

A We do.

**Q Okay. Are you familiar with that**

**training?**

A We have a training class that the specialists train all of our managers on when they assume a manager role. When I say managers, that's store managers.

**Q Is that an in-person class?**

A It is.

**Q Okay. So that's a class that one of the three division HR specialists teaches to store managers?**

A Recently-promoted store managers or assistant managers and oftentimes even department managers.

**Q Okay. Is that just a training that occurs at the transition point into that management position?**

A Typically, yes.

**Q So it's like, for lack of a better term, onboarding for that position?**

A Typically, yes.

**Q Okay. Do you know what's in that training, specifically the ADA compliance training?**

A Not specifically word for word what's in that training, no.

**Q Sure. Have you gone through that**

**specific training?**

A I have.

**Q Do you remember when the last time was that you went through that specific training?**

A Many, many, many years ago.

**Q So it's a one-time thing; is that what you're saying?**

A That's correct.

**Q It's not a -- it's not like an annual thing that managers have to re-up?**

A It is not.

**Q And does that training course cover disability accommodations?**

A To the best of my recollection, yes.

**Q Okay. Does that training course cover the interactive exchange?**

A To my knowledge, yes. Again, this is based on memory.

**Q Sure. Is there anything else you remember about that specific training course?**

A Different rules, regulations, policies, procedures, laws. I mean, ADA Title VII. I mean, the whole gamut of information.

**Q Do you know where division HR specialists get the materials for that training?**

A They have a -- I guess a library of training materials.

**Q Is that a physical library?**

A To some degree, yes. There is a manual that they use. Like I said, I can't say that I know everything that's inside of that manual, but --

**Q Sure.**

A -- that's the guide that they use to conduct those classes.

**Q What I'm trying to figure out is if we need to find that manual or if we need to find those materials, I'm trying to figure out where we should start to look. Like, who would be the person to ask about those?**

A I mean, I could definitely obtain a copy of those materials, I guess, if that's what you're asking.

**Q Okay.**

A But, again, most of the training comes from their experience of being an HR specialist. So when they conduct a classroom training, they are -- they have a guide that they utilize, but then there is also -- like I said, it's a classroom, so it's a lecture-type presentation.

**Q Okay.**

A It's not necessarily a book with a test or anything like that.

**Q Okay. And is that -- is that a group setting or do the division HR specialists do that training one-on-one?**

A It's typically a group setting like a classroom style.

**Q Okay. As a division HR specialist, would you expect that David Ellison would have conducted that course at some point?**

A Yes.

**Q Okay. Does Food City, to your knowledge, have any policies or procedures on disability accommodation?**

A Our policy is not to discriminate against anyone, that if someone has a disability and they need help with performing their job, that it's our responsibility to conduct interactive process to see if there is something that we can provide to help make it work.

**Q Okay. Do you know if that's part of the written policy to try to work to find an accommodation that works?**

A I'm not aware of a written policy.

**Q Okay. Do you know if Food City has any policies or procedures on employee use of service animals?**
A To my knowledge, I'm not aware of one.
**Q And does Food City have any training, to your knowledge, on the ADA and specifically the use of service animals?**
A Not that -- not that I'm aware of.
**Q As the -- as the director of HR, would you have access to or be able to familiarize yourself with individual associates' training files?**
A Restate the question.
**Q Sure.**
A Or just repeat the question.
**Q Sure. My question is, as the director of HR, would you have access to individual associate training files?**
A Indirect access, but certainly not direct access.
**Q It's not something that you would be reviewing in the normal course of your job?**
A No.
**Q So you wouldn't be familiar necessarily with Mr. Matthew Batten's training file?**
A No, I would not.

**Q Okay. Do you have any direct knowledge of Mr. David Ellison being trained on ADA compliance?**

A I would assume David attended the training class. Keep in mind, we teach numerous training classes. We have 18,000 associates. So it's really hard to remember exactly who went through what training class.

**Q Sure.**

A I mean, I've taught many training classes --

**Q Sure.**

A -- but I can't tell you who all attended my training classes.

**Q Sure. That's fair enough. Mr. Ellison being one of the -- one of the division HR specialists, I think you said that you would expect him to have taught this ADA course; is that right?**

A Taught the leadership training course. It's not necessarily an ADA-specific course. It's generalized material for HR.

**Q Does that course include ADA compliance?**

A To my -- to my knowledge, there is a

section on ADA accommodations and items like that, yes.

**Q So you would expect that Mr. Ellison at some point has taught that course?**

A Absolutely.

**Q I guess my question is, who taught the teachers? How did the division HR specialists -- how were they trained on those topics?**

A They would have attended another training class held by a division HR specialist.

**Q So would that have been part of their onboarding into the division HR specialist?**

A That's correct.

**Q Okay. That makes sense. So you would expect that Mr. Ellison would have had that training?**

A Correct.

**Q Do you know -- I'll ask it a couple different ways. Offhand, do you know if Mr. Gary Richards has had that specific training?**

A I have -- I do not know.

**Q And now more generally, Mr. Richards being a store manager, would you expect that he would have had that training?**

A I would expect, yes.

**Q Does Food City have any incentives for**

**hiring employees who have disabilities?**

A Incentives? Not that I'm aware of.

**Q Are there any tax benefits that the company claims through that?**

A Not that I'm aware of. But we work with many organizations throughout the company, but not that -- I'm not aware of any tax benefits.

**Q Are you familiar with Food City's policy on personal leaves of absence?**

A I'm familiar with personal leaves of absences, yes.

**Q To your understanding, is that a provision in Food City's handbook that allows employees to request up to two 90-day slots of time for personal reasons?**

A Yes.

**Q That's not a -- that's not an FMLA-type leave, is it?**

A It is not.

**Q So it's not -- it's not job protection?**

A It is not.

**Q But it's something that an employee can request?**

A That's correct.

**Q In your experience, is that something that the company can force an employee to take?**

A To force? I don't know about forcing one, but I know of folks that have been placed on a personal LOA.

**Q And why is that?**

A Either something -- some part of their employment has not been resolved in hopes of resolving it. Instead of inactivating their status, leaving them active as on a leave, as opposed to terminating their employment with deactivating them.

**Q Okay. Is it Food City's policy to provide a healthy and wholesome atmosphere?**

A I would say yes.

**Q Would you say it's Food City's policy to recognize the rights of each individual?**

A Yes.

**Q Would that include their associates?**

A I would say yes.

**Q Would you say that it's important for businesses to treat disabled employees fairly?**

A Yes.

**Q Was it Food City's policy to treat disabled employees fairly?**

A I would say yes. We want to treat

everyone as fair and consistent as we possibly can.

**Q Sure. To your knowledge, is it Food City's policy to provide a reasonable accommodation to disabled employees when it doesn't cause any undue burden on the company?**

A Absolutely.

**Q Do you recall if you ever met Mr. Matthew Batten?**

A Many times.

**Q Okay. Do you remember when you first met him?**

A Sometime after 2015. I don't know exactly because that's when I came -- I was in the Chattanooga division for a while. He was -- I think he worked at the Ooltewah store.

**Q Do you remember anything about your first meeting?**

A I think the first time he was in an office with the HRC. It was more of a hello, welcome aboard. I think it was like an introduction type of a meeting.

**Q Okay. At any point did you get to have any more extensive conversations with him?**

A Not really. Just in passing, whether he was going out to the fuel center or returning from

fuel center, if I happened to be in the lobby or at the front side of the store or even purchasing fuel. I mean, he was in the kiosk. So if you're there and you're buying fuel, you certainly speak, try to speak.

**Q Yeah. It was probably obvious to you from when you met him that he had some physical limitations; is that fair?**

A I don't remember exactly. It seems like, again, maybe a limp or something. Again, it's been a long time.

**Q Sure. Do you recall that he -- he is missing his right arm?**

A I honestly don't recall, but, I mean, that's not something I really -- is going to stand out to me. I mean, obviously, if someone is missing a limb -- but he was more of just an associate, someone that I would speak to as I walked by and just happy to have him as part of our family.

**Q Okay.**

A I try not to judge folks.

**Q Sure. Did you and he ever have a conversation about his wreck?**

A We did not.

**Q Okay. Did you ever learn from anyone**

**else about the circumstances of Mr. Batten's injuries?**

A Only from I guess the -- I guess it wasn't an EEOC charge, but I guess in speaking with, I guess, Mr. Ellison.

**Q Okay. Did you have the opportunity to evaluate Mr. Batten's performance as an employee?**

A Just from interactions of being a customer and being there in that store. From what I could tell, he did a great job.

**Q Okay. Did you ever have any reason to think that he wasn't a good employee?**

A No, not at all.

**Q To your knowledge, was he ever written up?**

A To my knowledge, no.

**Q I know you said that you noticed he had a limp. Did you ever notice any other issues that he had?**

A I really did not. From the best of my memory, that's really all I can remember.

**Q Sure. When did you first learn that Mr. Batten had requested an accommodation in the form of a service dog?**

A I don't -- I really don't remember.

Like I said, I really wasn't involved in any of that. I'm sure David maybe mentioned it, but I really -- I really don't remember when.

**Q Okay.**

A Because like I said, at that time, I was really -- my responsibilities were more to learn than anything.

**Q Okay. So you think maybe you had some discussions with Mr. Meadows about that -- sorry -- Mr. Ellison about that?**

A Typically at that time, like I said, anything that would have been brought to me, I would have taken to Donnie.

**Q Okay. So if this -- if this came to you, you would expect that you would have taken that to Mr. Meadows to discuss?**

A At that time, yes.

**Q Okay. And this would have been around July/August of 2021?**

A Yes.

**Q Do you recall having any part in the decision-making with regard to denying Mr. Batten's request for the use of a service dog?**

A I did not have any part in that.

**Q And by any part, I mean, either direct**

**involvement in making the decision or you were privy to communications involving it.**

A I was not privy to communications.

**Q So you would -- would you say you had no role whatsoever in the decision to deny his use of his service dog?**

A I had no role whatsoever in that decision.

**Q To your knowledge, was that all Donnie Meadows' decision?**

A I would assume, but -- because at that time he was the vice president. So I would assume it would be his decision.

**Q Do you have any knowledge of what, if anything, Mr. Meadows reviewed in making that decision?**

A I do not.

**Q Okay. Did you review any witness statements related to Mr. Batten's request for the use of his service dog?**

A I was the one that prepared the EEOC response, because at that time Mr. Meadows had already retired. So in preparation of that response, I, of course, collected witness statements.

**Q Was that the first time that you had**

**reviewed those witness statements?**

A Yes.

**Q Okay. Do you remember any of your conversations with Mr. Meadows about Mr. Batten's request for the use of his service animal?**

A I do not.

MR. HARGRAVES: Let's mark this Exhibit 1. She'll put a sticker on that for us.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 1.)

BY MR. HARGRAVES:

**Q All right. Looking at what's marked Exhibit 1, the Bates numbers 001078 through 1079, do you recognize this document? And take your time and look at both pages.**

A I don't necessarily recognize the document, but it appears to be an email.

**Q This is an email chain beginning July 23rd, 2021, ending July 26, 2021. It looks like you're included. It looks like you're cc'd on the last few emails in this chain. Does that appear correct?**

A Yes.

**Q Do you have any recollection of**

**receiving this email chain?**

A I do not.

**Q Okay.**

A It's my email address, so I'm sure I did, but I get a lot of emails.

**Q This was -- the subject is regarding Christopher Batten. Do you know who that is?**

A Yes.

**Q Is that Matthew Batten?**

A Yes.

**Q This is at least the last -- the email from David Ellison on July 26, 2021, states, "Please advise on associate requesting to bring service dog to work at Gas 'N Go at 214." That's to Donnie Meadows and you; is that right?**

A Yes.

**Q Did Mr. Meadows handle that -- handle this issue or did he bring you in on this at all?**

A To the best of my knowledge, Mr. Meadows handled all this. I don't remember. I mean, if we spoke about it, I honestly can't remember.

**Q Do you think you were included here as more of a courtesy since you were in that transition?**

A As a cc, more than likely, yes. Like

I said, I wasn't necessarily working with Donnie hand in hand.

MR. HARGRAVES: Let's make that Exhibit 2.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 2.)

BY MR. HARGRAVES:

**Q All right. Looking at Exhibit 2, Bates number 001084 through 1085, do you recognize this document?**

A I do.

**Q Is this an email chain between you, Rickie Estep, and David Ellison?**

A Yes.

**Q Does this appear to be a fair and accurate copy of that email chain?**

A It does.

**Q And that does include an email from -- at the beginning from Gary Richards as well; is that right?**

A Yes.

**Q Okay. The second email from the top on the first page is from David Ellison, and it says, "Sherrell, where do we stand with this associate? He**

**never turned in paperwork. Donnie had stated we would assume him to be on a personal LOA should he fail to do so." And it looks like you responded, "Please call me;" is that right?**

A Yes.

**Q What is this -- what is this about?**

A At -- I guess he was on a personal leave of absence. And typically we can -- we have two personal leaves at 90 days each for a total of 180 days. But after 180 days, then we have to decide whether that person remains on active payroll. And typically if you have exhausted your leaves, then you move from active status to an inactive status.

**Q Is that the same thing as termination?**

A You're terminated in the system, yes.

**Q In response to the email from Mr. Ellison, you instructed Mr. Estep to call you; is that right?**

MR. JACKSON: It's Ms. Estep.

MR. HARGRAVES: Ms. Estep. My apologies.

MR. JACKSON: Rickie is confusing.

THE WITNESS: She is the office manager.

//

BY MR. HARGRAVES:

**Q Did Ms. Estep call you?**

A I'm assuming she did. Again, I'm sure I asked her to give me the rundown as to what -- you know, all of this information and as to decide whether he remained active or inactive.

**Q Do you remember anything about that conversation?**

A Other than making a decision to remove him from active status.

**Q Do you think you made that decision around September 8, 2021?**

A I'm assuming, but quite honestly, I'm not sure about the exact date.

**Q Were you aware that Mr. Batten had not requested a personal leave of absence?**

A Yes.

**Q Were you aware that he had asked to simply be allowed to work with his service dog?**

A No. This was -- this was simply around his ending his -- removing his status from active to inactive. I didn't dig into the details as to anything else other than Rickie, her -- her responsibility is leaves. So I would have asked her why he was on leave, how he got on leave, and was his

leave up. And if it was, should it be termed in the system or not.

**Q Do you remember if you learned at that time why Mr. Batten was on leave?**

A From the best of my memory, Rickie said that Donnie had asked her to place him on a personal leave of status because at that time no -- nothing had been resolved. And so she placed him on personal leave of status and then -- for I believe 180 days.

**Q And when you say nothing had been resolved, are you referring to the fact that he wanted to use the service dog and that had been denied?**

A Nothing had been resolved because there had been no further communications with him from the time he was placed on leave.

**Q Did you understand that his request for the use of his service animal had been denied?**

A At that time, I was aware that it was denied, yes.

**Q So if he wanted to return to work, he couldn't do that with the service animal?**

A His leave was already up. So the question to me was whether he could be termed in the

system and removed from active status. My response to Rickie was yes.

**Q To your understanding, could he have come back at that point with his service animal?**

A I'm not sure, because I didn't have -- I didn't review that because there was no contact made with him after, I guess, August the 23rd.

**Q Okay. At that time were you aware that his request for the use of his service animal had been denied?**

MR. JACKSON: At what time? I'm sorry.

BY MR. HARGRAVES:

**Q As of the date on that email, September 8, 2021.**

A What --

**Q As of the date on this email, September 8, 2021, were you aware that Mr. Batten's request for the use of his service dog had been denied?**

A I don't know on 8/23 of 2021.

**Q September 8 of 2021.**

A On September of 2021?

**Q Yes.**

A I would say September, yes.

Q Okay. To your knowledge, had that decision changed?
A To my knowledge, no.
Q Okay. So as of -- as of the date that you were speaking with Ms. Estep, you were aware that Mr. Batten could not return with his service animal?
A I was aware of the decision that had been made.
Q And he -- and had been communicated to Mr. Batten that he could not return with his service animal?
A At that time, yes.
Q Do you know now when the decision was made to deny Mr. Batten's request for the use of his service dog?
A Do I know when? I do not know when.
Q Sitting here today, can you think of any reason why it would have been an undue burden on Food City to allow Mr. Batten to work as a fuel clerk with his service dog?
A From my -- from reading the documents, there was options that were offered to Mr. Batten that would have been considered a reasonable accommodation including self-checkout operator inside the store, even potentially with a cane, with a

stool, but I don't think that was ever reached because it -- from me reading the documents, there was kind of a line drawn in the sand as to if I don't have this, I'm not going to work. If I don't have a service dog, I'm not going to work. So I think once that line was drawn in the sand, there was no further communication. He refused to work.

**Q Okay. Mr. Batten indicated that he was not able to work without his service animal; is that correct?**

A Not the way I understand it. From the way I understand -- from my interactions with David and writing the EEOC response, it was if I don't have the dog, I'm not going to work.

**Q Did you understand that the dog helped Mr. Batten with stability issues?**

A From the EEOC response, that Mr. Batten said that he had a need for an accommodation for stability, which could have been provided in many ways including a cart, a cane. There is many ways to accommodate that, but it never got to that point.

**Q In response to Mr. Batten's request for the use of his service animal, did Food City offer Mr. Batten a cart?**

A Again, I think the line was drawn in the sand with Mr. Batten saying if I do not have the dog, I'm not going to work, from the way I understood Mr. Ellison's --

**Q I appreciate that, but I need to know if Food City ever offered Mr. Batten the use of a cart.**

A To my knowledge, no.

**Q Did Food City ever offer Mr. Batten the use of a cane?**

A To my knowledge, no.

**Q Now, you did mention the USCAN attendant position. That's the self-checkout attendant?**

A Uh-huh.

**Q So that is something that Food City offered to Mr. Batten; is that right?**

A To my knowledge, yes.

**Q Now, you did mention -- you mentioned a stool or a chair; is that right?**

A Yes.

**Q Food City never offered Mr. Batten the use of a stool in the USCAN position, did it?**

A I don't think they had the opportunity to.

**Q Did Mr. Batten prevent them from offering that to him?**

A I wasn't at all those meetings during the exchange, but from the way I understand David's statement, no, we didn't have the opportunity to.

**Q What do you mean he didn't have an opportunity to?**

A From the -- from my recollection of the statement from David was that when he -- when he had his discussion with Mr. Batten, that Mr. Batten said that he was not going to work without the dog.

**Q Okay.**

A And that kind of ended the exchange.

**Q Do you know if it was ever Food City's intent to offer Mr. Batten the use of a stool in the USCAN position?**

A I would hope so. Our intent is always to try to provide an accommodation for someone to help them perform their job if it's reasonable.

**Q And I'm not trying to be picky, and I understand what you're saying. But I got to know if it, in fact, was Food City's -- to your knowledge, if it was, in fact, Food City's intent to offer Mr. Batten the use of a stool in the USCAN attendant position.**

A I was not part of that decision, so I can't speak to that.

**Q You're not aware of it ever being Food City's intent to do that?**

A I'm not aware.

**Q And that's fair. Did you understand, at least from your review of the records, that Mr. Batten asserted that his service dog helped in part with his stability issues?**

A Will you repeat the question?

**Q Sure. Did you understand, at least from your review of the records, that Mr. Batten's position was that the service dog in part helped with his stability issues?**

A I read that in some of the information that was presented to me, yes.

**Q The USCAN attendant position is, generally speaking, a standing position; is that fair?**

A Generally speaking, yes. There are many -- there are folks inside the company, even folks in a wheelchair, that operate the USCAN. We have one in Sevierville.

**Q That's the attendant who kind of hangs out near the self-checkout to help anybody that needs**

**help?**

A Yes.

**Q So when Mr. Batten said that he couldn't do that job without his dog, don't you think it would have been reasonable at that point to offer him the use of a stool or other assistive device?**

MR. JACKSON: Objection. Go ahead and answer.

A I wasn't there during the conversation. If someone draws a line in the sand and says I'm not going to work without my dog, it kind of -- it kind of stops the conversation.

BY MR. HARGRAVES:

**Q So is it your position that at that point Food City could not have offered him anything else?**

A No. I think that further discussion should have been had, but I don't think that opportunity happened either. I think the exchange should have continued, but I don't think Mr. Batten wanted to continue the exchange.

**Q Do you think it was clear that Mr. Batten wanted some allowance for his stability issues?**

A I think he wanted his dog.

**Q You would agree that the USCAN attendant position, generally speaking, is -- it's more standing and walking than the fuel clerk position?**

A In most cases, yes, depending upon the accommodation.

**Q Sure. The fuel clerk position, generally speaking, that person is sitting in the kiosk in the center of the gas station?**

A Not always. They are supposed to go out and clean the pumps and maintain the pumps and empty the trash and straighten the drinks. There is some responsibilities other than just inside the fuel center.

**Q Sure. That person has sitting duties and standing duties; is that fair?**

A That's correct.

**Q So they have the opportunity to sit and stand during their shift?**

A Yes.

**Q You would agree that's somewhat different, generally speaking, from the USCAN attendant position?**

A Generally, if there is not an accommodation.

MR. HARGRAVES: Okay. Let's go ahead and take a break.

THE VIDEOGRAPHER: The time is 1:45, and we are off the record.

(Whereupon, a short break was had.)

THE VIDEOGRAPHER: The time is 1:48, and we are back on the record.

BY MR. HARGRAVES:

**Q Mr. Lyon, outside of communications with Food City's attorneys, are there any communications that you had with anyone regarding Mr. Batten's request for the use of a service dog that we haven't already talked about?**

A To my memory, no.

**Q Has everything you have said here today been true?**

A Yes.

**Q Have you -- were any of my questions confusing to the point that you didn't understand them?**

A I don't think so, no.

MR. HARGRAVES: All right. Well, that's all I have for now, but Mr. Jackson may have some questions.

MR. JACKSON: No.

THE VIDEOGRAPHER: This concludes this deposition. One media file was used. The time is 1:49, and we are off the record.

FURTHER THE DEPONENT SAITH NOT.

(Signature waived.)

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :
COUNTY OF HAMILTON :

I, Whitney A. Vaughn, Court Reporter and Notary Public, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. SHERRELL LYON, JR., was duly sworn by me; that pages 1 to 48, inclusive, were reduced to typewriting under my direction and supervision, and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This is the 23rd day of January, 2023.

Whitney Vaughn

Whitney Vaughn, TN LCR #418
Court Reporter and Notary Public
My Commission Expires 07/30/25