# EXHIBIT 5

# DEPOSITION OF MEADOWS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN, Plaintiff, vs. K-VA-T FOOD STORES, INC. d/b/a FOOD CITY, Defendant. | ) | CIVIL ACTION FILE NO. 4:22-CV-00179 |

JANUARY 27, 2023

**ZOOM DEPOSITION OF DONNIE MEADOWS**

APPEARING FOR THE PLAINTIFF:

R. ETHAN HARGRAVES, ESQUIRE
MASSEY & ASSOCIATES
6400 LEE HIGHWAY, SUITE 101
CHATTANOOGA, TENNESSEE 37421

APPEARING FOR THE DEFENDANT:

HOWARD B. JACKSON, ESQUIRE
WIMBERLY LAWSON WRIGHT DAVES & JONES
550 MAIN STREET, SUITE 900
KNOXVILLE, TENNESSEE 37902

ALSO PRESENT: CHRISTOPHER BATTEN

**CATHY H. KERLEY, RPR**
**HALL & ASSOCIATES**
**POST OFFICE BOX 428**
**CHATTANOOGA, TENNESSEE 37401**
**423-267-4328**

# I N D E X


| | Page |
|---|---|
| Deposition of DONNIE MEADOWS<br>Direct Examination by Mr. Hargraves | 4 |


## EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | K-VA-T Food Stores Associate Handbook | 25 |
| 2 | Equal Employment Opportunity Document | 29 |
| 3 | Statement of Emily Hobbs 11/29/21 | 48 |
| 4. | Statement of Gary Richards 11/30/21 | 50 |
| 5 | Statement of David Ellison 8/6/21 | 57 |
| 6 | Statement of Gary Richards 8/6/21 | 58 |
| 7 | Statement by David Ellison 8/12/21 | 61 |
| 8 | Statement of Gary Richards 8/12/21 | 74 |
| 9 | Statement by David Ellison 8/18/21 | 81 |
| 10 | Canine Assistants, Inc. Documents | 87 |
| 11 | Email Chain 7/26/21 | 95 |

The deposition of DONNIE MEADOWS, called as a witness at the instance of the Plaintiff, for use pursuant to the Federal Rules of Civil Procedure, taken by notice and agreement on the 27th day of January, 2023, via Zoom.

S T I P U L A T I O N S

Deposition is being taken by agreement of counsel for the plaintiff and the defendant. It is agreed that the deposition shall be taken in machine shorthand by Cathy H. Kerley, Notary Public and Court Reporter, that the signature of the witness to the completed deposition is waived, and that the witness may be sworn by the said Notary Public.

It is further agreed that all formalities as to caption, notice, certificate and mode of transmission are waived, and that the deposition is taken subject to the usual exceptions as to irrelevancy, incompetency and immateriality, which are reserved to the hearing of the cause, except as to the form of the question.

DONNIE MEADOWS,

called as a witness at the instance of the Plaintiff, having been first duly sworn, was examined and deposed as follows:

DIRECT EXAMINATION

BY MR. HARGRAVES:

Q All right. I just want to state on the record that this deposition is being taken pursuant to notice and agreement of counsel and for all purposes or for discovery purposes under the Georgia Civil Practice Act.

Mr. Meadows, could you please state your full name for the record.

A Donnie L. Meadows.

Q Thank you, Mr. Meadows. My name is Ethan Hargraves. I am the attorney for the plaintiff in this case, Mr. Matthew Batten. Have you ever testified in a deposition before?

A Yes, I have.

Q When was the last time you testified in a deposition, if you don't mind?

A I can't give you an exact date. It's been a few years. I'm going to say at least two or three.

Q Okay. Do you remember what kind of

case it was that you testified in?
A I think it was an EEOC related case.
Q Did it relate to disability accommodation?
A Honestly I don't recall that. I just remember that it was an EEOC case. I'm sorry.
Q That's fine. And have you ever testified in a deposition with regard to a case involving ADA accommodation?
A Not that I recall, no, sir.
Q Okay. Well, since it's been a few years, what I'd like to do first is go over a couple of ground rules so that hopefully the process can be smooth and we can get through it.
We have a court reporter, Cathy, who is taking down everything that we say, but there are a couple of things that we can do to make her job a little bit easier, especially with this being by Zoom.
The first is if you would do your best to allow me to finish my full question before you start to answer so we're not talking over each other and I will do my best to make sure that I let you finish your answer before I start to ask another question. Does that make sense?

A Yes.
Q Okay. And the next thing, and you're doing great so far, is verbal answers are best, yes and no where appropriate. Head nods can be difficult to put on the record, especially on Zoom, and even things like uh-huh and huh-uh, which we can all kind of fall into, those can look very similar on a transcript. So there may come a time where I just ask to clarify is that a yes or is that a no. And I promise you I'm not trying to be a jerk. I just want to make sure that we understand what your answer is. Does that make sense?
A Yes.
Q And if I ask you a question at some point that you don't understand for whatever reason, please don't answer it. Just let me know that. If you don't understand it, whether it's a word in the question or whether I've just asked you a bad question, which will almost certainly happen, just let me know you don't understand it and I will rephrase it so that you can understand it. Okay?
A Sure.
Q Okay. And this is not an endurance

contest. So if at any point you need a break, all you've got to do is let me know and we'll take a break. That's perfectly normal. The only caveat I have for that is if I have asked a question, I'm going to want to make sure I get an answer to the question before we take a break. Okay?

A Yes.

Q Okay. Mr. Meadows, where do you currently live?

A I live in Abingdon, Virginia.

Q How long have you lived there?

A 21 years total.

Q All right. Did you attend high school?

A Yes, I did.

Q Where was that?

A In Bluefield, Virginia.

Q Did you graduate?

A Yes, I did.

Q Did you have any further education after that?

A Yes. I have a bachelor's and a graduate degree.

Q What are those degrees in?

A So my graduate degree is in

industrial relations.
Q Industry relations?
A Industrial relations.
Q Okay. What is that?
A Primarily a focus on labor.
Q Does that have any crossover with like human resources?
A Yes, it would certainly.
Q Okay. Is there a human resources degree?
A There probably is a human resources degree. My degree is industrial relations.
Q Do you know like what the main distinction is between those two?
A The primary focus more specialized on industrial relations or at least my program was more specialized on the labor issue.
Q Like what?
A Primarily dealing with labor unions, negotiating of contracts and the compliance of those.
Q Okay. Do you have any other professional licenses or certifications?
A I no longer have certifications or licenses. I did have a certification under SHRM

and I also had a license for life, health, and annuity insurance products.
Q What is SHRM?
A SHRM is a human resource organization. S-H-R-M is the abbreviation for it.
Q Did you receive any special training to get that certification?
A Early on training wasn't a requirement. It was more education based and experience based. Later I think they instituted a program requiring testing to receive the certification.
Q So did you -- did your certification stem from the education and experience based model?
A Yes.
Q What type of education did you receive for that certification?
A It was based off of my graduate degree.
Q Okay. So you had to have a certain level of education before you could be eligible for the certification?
A Or experience or a combination of the two.

Q Okay. But SHRM didn't provide any training or extra training or education to you as part of that certification?

A Not as a part of that. SHRM as a resource provides information about policies and compliance.

Q Okay. Did you ever take advantage of any of those resources from SHRM?

A Absolutely.

Q All right. Can you tell us -- give us an example of that.

A No. I can't give you anything specific today. That's been a very long time.

Q Okay. Do you recall if you ever had any training or education from SHRM related to ADA compliance?

A Not training, but information.

Q Okay. Do you remember anything about the information from SHRM?

A Not specifics, no.

Q Okay. Do you remember when that would have been that you had that training or information?

A Well, as I said, SHRM is also a resource much like Cornell Library to tap into

current guidelines and practices and so I've utilized that product on a sporadic basis over my entire HR career.
Q Okay. And we'll -- we'll get into more specifics a little bit later on, but do you recall if you utilized any SHRM resources in the context of this case involving Mr. Batten?
A No, sir, I don't recall that.
Q Okay. Are you presently a member of any professional clubs or organizations?
A I am not.
Q And this is just a standard question. Have you ever been convicted of a crime?
A No, sir.
Q Congratulations. Now, you used to work for K-VA-T Food Stores, Inc.; is that right?
A That's correct, yes.
Q And that's doing business as Food City; right?
A Yes, sir.
Q And so if I refer to them as Food City, you'll know who I'm talking about; right?
A Yes, sir.
Q Okay. Your latest position with Food City was VP of human resources; is that right?

A Yes, sir.
Q Okay. And let me ask you, I want to kind of get an outline of your job history with Food City. Do you remember when you first started with Food City?
A I started there in 2001.
Q All right. Do you remember what your starting position was?
A Vice president human resources.
Q Oh, okay. Had you had any prior experience in that area?
A Yes, I had.
Q All right. Well, let's -- let's back up, then, a little bit and go back to after you graduated with your bachelor's and your graduate degree in industrial relations, where did you first land career-wise?
A Initially I was with another supermarket chain. And once I completed my graduate degree, I was there first in a human resources capacity. Later I merged over into overseeing the operations.
After that service I was employed at Walmart corporate on they're -- in their people division on a labor team. And from there I joined

Food City.
Q What was that first supermarket chain you started with?
A Acme Supermarkets.
Q Acme?
A A-c-m-e.
Q Do you remember when that was when you first started?
A I worked for them two times. I started there early on while I was still in high school. I left for a few years and then I rejoined after receiving my graduate degree. So I'm sorry. I can't give you the year that I rejoined them for the HR.
Q That's fine. And I'll ask you a lot of questions that you may not remember the answer to and that's okay. I've just got to ask the questions.
Okay. What -- when you worked with Acme Supermarkets in the -- after you completed your graduate degree, what kinds of things were you doing for Acme Supermarkets?
A So it was a smaller company than Food City. So I wore multiple hats. I had responsibility for HR, the payroll, as well as

oversaw marketing and advertising for them initially.
Q Did you have any responsibilities for ensuring compliance with state and federal regulations?
A Yes, I did. That certainly fell under the HR hat.
Q As part of that job, were you -- I assume you were responsible for overseeing compliance with ADA regulations?
A In relationship to associates, yes.
Q In that position did you ever have to deal with an employee request for ADA accommodation?
A I can't give you a specific one, but I'll say yes, I did. It's fairly common.
Q Okay. Do you remember if you granted the accommodation or if it was denied?
A Over the course of my career probably granted hundreds of them, accommodations.
Q Okay. Do you know how many you denied?
A No. It's very rare to have one that you can't find some common ground.
Q Okay. All right. And then after

Acme Supermarkets, you said you moved to did you say Hallmark?
A I worked for Walmart.
Q Walmart. Very different. Okay. And what did you do for Walmart?
A So Walmart I was in the people division, specifically labor division, dealing primarily with labor union organization efforts.
Q What was essentially your job in that position?
A Education.
Q Education for management?
A Yes.
Q Okay. In your role with Walmart, did you have to deal with ADA compliance?
A I did not.
Q Prior to starting as the VP of human resources at Food City, was Acme Supermarkets the last time you had any responsibilities related to ADA compliance?
A Yes.
Q I want to talk to you a little bit about where you fit in kind of the corporate structure at Food City. As the VP of HR, how many employees were direct reports to you?

A It varied. There was a max of probably 21, 22 when I at one point had responsibility for the training department as well.
Q What department was that?
A Training, that fell under the HR department initially.
Q Oh, okay. Did you oversee all training or any specific aspects of training?
A The director of training reported to me.
Q Did you have any say in what types of materials or subjects were used or taught in the training?
A In a general sense, yes.
Q Did the -- I know there wasn't always a director of HR. Actually let me ask you this. During the time that you served as the VP of HR, was there ever a director of HR position?
A Only near my exit.
Q Okay. And did that -- did the director of HR position answer directly to the VP of HR?
A Yes, sir.
Q What about the division HR

specialists, did they directly report to you?
A Yes, they did until we created the director position.
Q Okay. What about store managers?
A Store managers fell under the operations division. They did not report to me.
Q Okay. Any other positions we haven't talked about that directly reported to you?
MR. JACKSON: Do you want to focus a time frame a little bit? I mean, he was in the job for 21 years.
Q Mr. Meadows, let's say as of -- as of 2021, any other positions that reported directly to you?
A So I had a nurse who reported to me and then, of course, benefits was part of human resources.
Q And who were you directly accountable to?
A Steve Smith, CEO.
Q Okay. Anybody else?
A No, sir, not directly accountable to. I worked directly with a number of the vice presidents.
Q If you can, walk us through what your

job duties were as the VP of HR.
A So in general to lead the HR department to make sure HR is contributing to the overall goals of the company, but under HR specifically, the organizational policy, recruitment, retention, compliance of labor laws such as Department of Labor laws and OSHA and EEO, employee relations, compensation and benefits. In general that would be the primary responsibilities.
Q With regard to labor law compliance, did that include the Americans with Disabilities Act?
A Certainly, yes.
Q And were you ever tasked with making individual employee -- individual decisions related to specific employees in that regard?
A I certainly reviewed those requests and advised.
Q Okay. Were any other management level employees of Food City authorized to make ADA accommodation decisions without your approval?
A Routinely those would flow through HR. I can't say that an operations VP or district manager didn't ever handle those on their own.

I'm not sure.
Q Okay. It's at least possible that those decisions could have been made without your direct involvement. Is that what you're saying?
A Yes. That's possible.
Q Okay. But on some occasions you would be asked to advise on those?
A Yes.
Q Okay. And then on some, correct me if I'm wrong, you would -- you would actually make the final decision.
A Yes. That's correct on some.
Q Can you give us any insight into what would -- what would make an ADA compliance question, what would necessitate your direct involvement on one of those versus one that you could let someone in operations decide?
A The nature of the accommodation requested I think would be the best way to describe that.
Q Right. Can you flesh that out a little.
A No. I can't give you a specific one, no.
Q In August of 2021, I know that's

close to the transition period, but in August of 2021, were you the one in charge of the HR department at Food City?

A I was until August 27th. That's -- that was my retirement day.

Q Okay. So as of -- at least up until August 27, 2021, would you have been the one responsible for making sure that Food City is in compliance with federal laws and regulations?

A Yes, sir. I would have reviewed those requests.

Q All right. Did Food City ever provide you with any training or education on how to ensure compliance with federal laws and regulations?

A So Food City provided me an opportunity to -- to have resources for that education. So I've over the years attended a number of WA conferences, several of those provided by Howard's organization. I also attended some of the more regional or local firms.

As well I attended EEO compliance training and I believe that was in Charlotte, North Carolina, a couple of times. I completed online courses or more like a Zoom-type of

conference with SHRM under that.
As well from to time to time we would -- probably not an annual basis, Howard himself would come to our organization and conduct various labor law training for our -- our team.
Q Okay. Any of those things you've just listed, did any of them ever involve ADA compliance?
A Yes.
Q And of those that involved ADA compliance, did any involve the issue of disability accommodation?
A Yes.
Q And did you receive any training materials related to ADA accommodations?
A Do I have those? No. Were they part of the presentation? Yes.
Q Would those be -- would you expect that's something that would still be in Food City's possession?
A I don't know.
Q Okay. Do you remember -- prior to August of 2021, do you remember the last time you had an ADA compliance-related training or education course?

A I'm sorry. I don't.
Q Do you remember anything about the substance of any of the training related to ADA accommodation?
A Effectively covering the standards and the process to make a determination for those accommodations.
Q And I'm not -- you know, I know you don't have it in front of you, but do you remember anything about like what the standard was for ADA accommodation?
A I don't want to speak to it without refreshing and I did not do that. So no.
Q Okay. Do you remember who taught any of the courses that you had related to ADA accommodation?
A So as I mentioned, Howard has conducted various labor law training with our team and in Wimberly Lawson conferences and I think it's Baker Donelson was the local conferences that some of my team attended and myself. And then the EEO I believe was taught by the director when I attended in -- director of EEO at Charlotte.
Q Okay. In making the decision in this case related to Mr. Batten, did you consult any of

the educational or training materials from any of those courses or events that you just listed?
A I'm not sure. I certainly would have used additional resources, SHRM being one of those, as well as the EEO. And then any time I bounced up against a legal issue that I didn't have prior experience with, I consulted with our general counsel, which I specifically did in this instance.
Q Okay. And I'm not going to ask you about the communications that you had with counsel, those privileged communications, but is there any chance that you still have access to or could figure out what resources you consulted in making this decision with regard to Mr. Batten?
A No.
Q Would you expect that Food City would have a record of it?
A I would not.
Q To your knowledge, does Food City have policies or procedures on disability accommodation?
A I don't think we have a written policy outside of just our employment statement on discrimination would include disability, but not

ADA compliance, no.
Q I'm going to share my screen real quick.
A Just remember I'm on a mobile phone, so.
Q Oh, okay. Well, I will Zoom in as much as I can and we'll do our best.
All right. Mr. Meadows, do you see the screen that I've just shared?
A Yes.
Q Does that appear to be -- and I'm happy to scroll through it. It's 63 pages. Does that appear to be the Food City Associate Handbook?
A Based off the cover page I see, yes, it appears to be.
Q Okay. And the policy that you just mentioned related to I think you said equal employment, was that what you said?
A Yes, sir.
Q Is this where you would expect to find that policy?
A I'm sorry. I can't -- okay. I see at the bottom of that page that says equal employment opportunity. I can tell you this,

the -- well, I didn't write the response to this letter, but I reviewed Sherrell's letter and I believe that section is cited in the EEO response.

Q Okay. And all I'm trying to figure out is the policy that you remember. Is this the one that you remember or there was some other policy?

A I'm not aware of another policy.

Q Okay. So to your knowledge, did Food City have an ADA specific policy aside from what is or was in the associate handbook?

A Not a Food City specific policy, but certainly follow compliance of any federal or state laws. So not Food City specific.

Q Okay. You would expect that the associate handbook would at least have some guidance that says we're to follow state and federal laws?

A Yes.

MR. HARGRAVES: Okay. Let's mark that as Exhibit 1.

(Thereupon, Exhibit No. 1, K-VA-T Food Stores Associate Handbook, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q To your knowledge, does Food City or did Food City have any policies or procedures on employee use of service animals?

A Not that I'm aware.

Q Okay. And I think I know the answer to this question, but to your knowledge, did Food City have any training related to the ADA and specifically service animals?

A Not that I'm aware.

Q Okay. In the time that you served as the VP of HR, did Food City have any training on employee disability accommodation?

A Beyond the HR department?

Q Any training.

A Certainly the sources that I've already made mention of includes the HR team. So the specialists were directly involved in those various resources, but then specialists also taught to management level a course called Megastar and a portion of Megastar did a -- included a review of labor law compliance. So yes.

Q Okay. The Megastar training, was that -- I think you said that that was offered to

management level employees; is that right?
A Yes.
Q Would that include store managers?
A Yes.
Q Would that include division HR specialists?
A Yes.
Q Okay. Do you remember what, if any, materials were used in those trainings?
A Yes. We had a teaching guide.
Q Do you remember if that teaching guide covered ADA accommodation?
A No. I don't remember.
Q Do you remember if it covered the ADA at all?
A I'm not positive, no.
Q But it covered labor law compliance. Is that what you're saying?
A Yes.
Q Okay. All right. I'm going to show you another document and hopefully you can see it. Let me Zoom in here for you. All right. Do you recognize this? This document has three pages and I can scroll through it for you. Do you recognize it?

A I recognize it. I don't know where it's included, but I -- I am familiar with it, yes.
Q Is this -- is this part of the Megastar teaching guide?
A I'm not positive.
Q Okay.
A It should be.
Q Okay. Can you think of any other -- any other place that this particular document might be found in Food City's records?
A Outside Megastar, possibly. We had a learning management system. So it was all electronic called Fast Track. It could reside there. I'm not certain.
Q Okay. But whatever this -- whatever packet this document is part of, do you recognize it as a policy and a procedures document of Food City?
A I recognize that as a document we would have utilized in training and I think that training would have been Megastar.
Q Okay. Would you expect that this would -- to the extent it speaks to Food City's policies, would you expect that this is an

accurate statement of Food City's policies?

MR. JACKSON: I'm going to object to the form of the question, but go ahead and answer.

A I see it as a teaching document, not necessarily Food City's policy. And remember, once again, I'm on my mobile phone. So it's very difficult to see what you're presenting here.

Q Sure. And I'm sorry. I'm trying to make it as legible as I can for you. Let me blow it up. Maybe that's a little bit better.

Let's mark this Exhibit 2.

(Thereupon, Exhibit No. 2, Equal Employment Opportunity Document, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q So the first line here, if you can see it, says, "It is Food City's policy to grant equal employment opportunities to all qualified persons without regard to race, color, sex, religion, age, national origin, disability or veteran's status." Can you see that good enough to say whether I read that right?

A Yes.

Q Okay. So is that a -- is that a

statement of Food City's policy on this issue?
A Without comparing, that sounds like the same policy stated in the handbook.
Q Okay. So would you -- would you expect this document to the extent it states a specific Food City policy, that this is an accurate statement of Food City's policy?
A It appears to be.
Q Okay. I'm going to scroll down.
All right. We're on the page related to the ADA. Do you see where it says, "A qualified employee or applicant with a disability"? Do you see that?
A I do.
Q "Is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question." Is that an accurate statement of Food City's policy?
A "A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job." So that -- yes, that seems reasonable.
Q Okay. As the VP of HR, would you have been familiar with Mr. Batten's training

file?
A No, sir.
Q Okay. Does Food City have a policy or procedure related to the hiring of persons with disabilities?
A As far as written, what you have already quoted from the handbook in --
Q Okay. Sorry. Go ahead. I didn't mean to cut you off.
A I think that was labeled under employment.
Q Would that be the equal employment opportunity policy?
A Yes.
Q Do you know -- sorry. Go ahead.
A Disability was included inside of that; correct?
Q Yes. I believe that's -- I believe that's what I read. Do you know if Food City had any incentives to hire or retain people with disabilities?
A Clarify what you mean by incentives.
Q Were there any tax incentives to hiring or retaining persons with disabilities?
A There were hiring incentives for

various different classes and we managed those tax incentives through Maximus and any new hire was presented for their evaluation.
Q Maximus's evaluation?
A Yes. Maximus ran it through their database to see if that hire, whether veteran status or etc., if that qualified for any tax credit.
Q What is Maximus?
A I'm sorry?
Q What is Maximus?
A For us Maximus -- to my knowledge that's the only function they performed for us. They're just an organization that did review of our new hire database to make determinations whether or not that individual fell into a class that was eligible for any type of tax credit.
Q And do you know if that was done with regard to Mr. Batten?
A Not specifically. It should have included all new hires.
Q Okay. So you would expect that his name would have been run through that system at least?
A As a new hire, yes.

Q Okay. Are you familiar with Food City's policy on personal leaves of absence?
A Yes.
Q If you could summarize that policy in a nutshell.
A So when someone needed time off that didn't fall under Family Medical Leave or other paid leave such as vacation or a holiday, they could make a request for a personal leave.
Q Is that the only way to get a personal leave of absence, to request it?
A No. Sometimes leaves were assigned when someone had -- had expired their other leaves, such as under -- someone is out on a -- for a disability claim and they expired their disability, but wished to continue their employment status, they would be converted to a personal leave for up to two 90-day periods.
Q Okay. To your knowledge, when a disabled employee of Food City needed an accommodation and Food City made the determination that it could provide it without any undue burden on the company, was it Food City's policy to provide that accommodation?
A You're going to have to clarify. Are

you just saying in general?
Q Yes. In general when a disabled employee needed an accommodation and Food City determined that it could provide an accommodation without undue burden, was it Food City's policy to provide it?
A Yes. We provided a lot of accommodations. If the accommodation met all the work requirement standards, if there was truly a need and we could meet that accommodation, yes.
Q Okay. So Food City would make a determination about whether there was truly a need for it?
A So one of the standards is reviewing the functions of the job.
Q And if they -- if they can perform it without accommodation, would it be Food City's policy to not provide the accommodation?
A If there's not a need to perform the job, there wouldn't be a need for the accommodation.
Q In your mind is that the same thing as being able to perform the job without accommodation?
A Yes.

Q So if an employee demonstrated that they could perform the job without accommodation, then it was Food City's policy to not provide the requested accommodation?
A In general I don't recall a lot of accommodation -- I don't recall other accommodation requests where they were able to perform the job without it.
Q I'm going to look back at Exhibit 2 real quick.
A Okay.
Q You can see it. It says, "A qualified employee or applicant" -- and again this is under the ADA policy. "A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question." Did I read that right?
A Yes.
Q So does that mean that an employee is qualified if they can do the job with or without accommodations?
A That's what it says, yes.
Q So then an employee who can do the job without accommodation is still a qualified

employee under the ADA policy; is that right?
A Yes.
Q All right. The next sentence in the policy is, "A reasonable accommodation is the requirement that employers take steps that are not an undue hardship to make employment possible for persons with disabilities." Did I read that right?
A Yes.
Q And it says, "An undue hardship is an action requiring significant difficulty or expense when considered in the light of the factors such as employer's size, financial resources, and the nature and structure of the employer's operation." Did I read that right?
A Yes.
Q Are those the things that Food City would consider in determining whether a accommodation, a specific accommodation, would be an undue hardship?
A Certainly that would be part of the process, but if they're performing without accommodation, those are moot points.
Q Okay. Well, but isn't the policy that even if they are performing without

accommodation, they're still a qualified employee?

MR. JACKSON: Objection. Go ahead and answer.

A I don't follow your -- what you're looking for here. This is -- if they're qualified in performing the job without an accommodation, end of statement.

Q So if somebody is -- if somebody has a medical condition and they're performing their job, but it causes them great pain physically because of the disability, they're not eligible for accommodation because they're doing their job?

MR. JACKSON: Objection. Go ahead and answer.

A Certainly they would be.

Q Just because somebody is fighting through the pain or the symptoms of their disability doesn't mean they don't need accommodation; is that right?

MR. JACKSON: Objection. Go ahead and answer.

A I don't disagree.

Q All right. Have you ever met Mr. Matthew Batten?

A No, sir.

Q Okay. Do you have any knowledge about his employment record with Food City specifically or generally?
A Today, no.
Q Okay. Do you have any reason to suspect that he was a bad employee?
A Based on conversations with the HR specialist, David Ellison, no. He was a satisfactory employee.
Q When did you first learn that Mr. Batten had requested an accommodation in the form of a service dog?
A I'm not sure. That information would have come through the specialist.
Q Okay. Would that -- at the time would that have been David Ellison?
A Yes.
Q All right. Disregarding the specific date on which you learned, do you remember the context of when you first learned that Mr. Batten had requested the use of a service dog?
A No. All I remember is the note recapping the meeting David had and that's included in the review of the response.
Q Do you remember who you first spoke

with regarding Mr. Batten's request for accommodation?

A You're going to have to clarify. In terms of after I had the information or receiving the information?

Q Whenever you first learned that Mr. Batten had requested an accommodation in the form of being allowed to use a service dog, do you remember who you first spoke to about that requested accommodation?

A Once I had the information, this was new for me. I consulted with the general counsel.

Q You had never had an accommodation request related to a service dog before?

A Not that I recall.

Q Okay. Aside from general counsel, do you remember speaking to anybody else about Mr. Batten's request for the use of the service dog?

A Well, clarification, David Ellison. None other.

Q Okay. Ultimately did you make the decision to deny Mr. Batten's request for the use of a service dog?

A At the time that I made the

recommendation that we place him on leave after he refused to consider the accommodation that we served up.

Q Okay. Who made the decision to deny Mr. Batten's request for the use of a service dog?

A That would have been -- I made the decision to Mr. Ellison. My recommendation was that we not move forward with the service dog, but we move forward with a different accommodation.

Q Okay. I'm not trying to -- I'm not trying to beat a dead horse. I just want to make sure I understand who the decision-makers were. Did you make the decision and relay that to Mr. Ellison or did you and Mr. Ellison make the decision together?

A I made the decision based off of information provided to me from Mr. Ellison.

Q Okay. Did anyone else provide information to assist in your making that decision?

A General counsel.

Q Okay. Do you remember, if you can, when the decision was made to deny Mr. Batten's request?

A No. I don't remember.

Q Okay. And can you tell us what were the reasons -- reason or reasons for your decision to deny the requests for the use of his service dog.

A So based off of the statements that were given to Mr. -- let's see, Mr. Batten told Mr. Ellison that he could perform the job and Mr. Ellison acknowledged that he had been performing the job, I believe, for a couple of years.

The main thing that he was requesting was provide some stability. And I don't believe he was -- he would even allow us to further discuss that during our informal exchange with him when we talked about an alternative accommodation being a similar type job, but allowing him to move to inside the store from the fuel kiosk as a Uscan cashier.

And Mr. Batten was just not open to any solution other than the service animal and effectively, as I recall, gave us an ultimatum. He either brings his service animal to work or he wouldn't be at work.

And that led to granting him personal leave just honestly to provide an opportunity to

save his job, give him a chance to reconsider either going the current role or accepting the assignment as the Uscan cashier.

Q Based off of the training material in Exhibit 2, would you agree that it would have been Food City's position that Mr. Batten was a qualified employee?

A Mr. Batten was a satisfactory employee performing essential functions of his job without any accommodation and we were willing to give him an accommodation, but different than his request.

Q Let me ask a better question. Referring to Exhibit 2, specifically the definition of qualified employee, since you've said Mr. Batten was able to perform the essential functions of his job without accommodation, would he still be considered a qualified employee?

A Yes. There was no question about whether he was a qualified employee.

Q Okay. And I mean a qualified employee specifically with regard to Food City's ADA compliance.

A I'm not sure I follow the clarification you're seeking there.

Q Well, what I'm referring to is the ADA training material in Exhibit 2 where it says that "A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question." And what I'm trying to understand is if, to your knowledge, it was Food City's position that Mr. Batten was a qualified employee because he could do the job without reasonable accommodation?
A He certainly was a qualified employee, yes.
Q And to your knowledge, was a qualified employee who could perform the job without reasonable accommodation, were they ineligible for reasonable accommodation?
A Any qualified employee would be eligible for a reasonable accommodation if there was a need. That's part of the process to determine the need being requested and if there's another way to satisfy that need.
Q Okay. We'll talk some more and I want to look at some statements and emails regarding the conversations with Mr. Batten, but with regard to your decision to deny the use of

the service dog and instead suggest the alternate position in the store, did you do that because you made the determination that the allowance of the service dog would be an undue burden on Food City?
A I did not. I just was trying to find an accommodation.
Q What was the reason for denying the use of the service dog, then?
A We could meet the need that Mr. Batten had requested assistance to through another accommodation.
Q Okay. But if you could meet the need with the requested accommodation and it wasn't an undue burden, then why not just provide that requested accommodation?
A We were in our informal discussion and exchange. Isn't that the purpose to -- to explore alternatives? And that's as we did.
Q Okay.
A So we felt we had a reasonable alternative assignment that would meet his need without the specific accommodation he requested.
Q Did you in your capacity of the VP of HR, did you have some problem with the use -- with Mr. Batten's use of his service dog?

A Absolutely not.
Q Then what I'm trying to understand is if you didn't have a problem with it, why would you suggest an alternative?
A How -- just simply exploring how could we meet the need as he requested for the stability. So that's the only reason.
Q Did you believe that Mr. Batten's use of the service dog would not meet his need?
A I did not make any assessment of that.
Q Did you or anyone else at Food City ever make the determination that Mr. Batten's use of the service dog would constitute an undue burden on Food City?
A No, sir.
Q Did you think it would constitute any type of burden on Food City?
A No, sir.
Q Can you tell me anything else to explain why, then, you would have offered an alternative instead of just granting the requested accommodation?
A Simply trying to meet his need for stability and the job that was proposed to him

allowed for that, but it was simply, you know, an open discussion that he was very close-minded to.
Q He would only accept the use of the service dog as an accommodation; is that right?
A That's what was conveyed to me that he -- he served it up as an ultimatum, dog or not work.
Q Did Food City not give him an ultimatum, Uscan position or not work?
A That's not true. We served that up. He did not accept it and did not explore further with us what other type of accommodation might make it feasible for him. So no, sir.
Q All right. Well, Food City didn't accept his request for the use of a service dog; did they?
A We had not fully explored alternatives.
Q Why didn't Food City further explore the use of his service dog?
A Mr. Batten -- Mr. Batten wouldn't engage in discussion with us for any other alternatives.
Q After Mr. Batten left Food City's employment, do you know if anyone filled the fuel

clerk position that he left?
A I'm not knowledgeable of that, no.
Q Okay. Do you remember what you reviewed in making the decision to deny Mr. Batten's request for the use of a service dog?
A That -- that was all reviewed with general counsel.
Q Okay. I'm going to go over a few documents. Let me blow these up real quick. All right. Can you see my screen?
A Yes.
Q Do you recognize this particular document?
A I do. That's -- without comparing, I believe that's one of the exhibits included from a meeting that Mr. Ellison had with Mr. Batten.
Q Okay. Do you recall if you reviewed this particular document prior to making your decision?
A This specific -- I was under the impression I reviewed all the discussions between Mr. Ellison and Mr. Batten.
MR. JACKSON: Just for clarity on the record, this statement is from Emily Hobbs.
Q Do you remember reading a statement

by Ms. Emily Hobbs, Mr. Meadows?
A Not until I did a review of this EEO response by Mr. Lyon.
Q Okay. So you don't recall if you read this prior to making your decision to deny the use of a service dog?
A I do not recall that.
Q Let's mark that as Exhibit 3.
A So this is not Mr. Ellison's statement as Howard said? This is Emily's statement?
Q This is a statement of Emily Hobbs.
A Okay.

(Thereupon, Exhibit No. 3, Statement of Emily Hobbs 11/29/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q Was it part of your decision to deny Mr. Batten's use of his service dog that there had been any kind of complaints about the behavior of his dog?
A I had no prior knowledge of Mr. Batten's dog other -- I wasn't even aware he had the dog. I thought he was -- the request was

around a dog he was receiving. So maybe my recall is not clear there, but no.
Q Okay. You don't recall there being a report, an allegation, that Mr. Batten's dog jumped on somebody?
A I don't recall any reports about Mr. Batten's dog prior to making -- during the course of our exchange and making a decision, no.
Q Okay. Fair to say, then, that would not have constituted something on which you based your decision?
A That's correct.
Q Okay. All right. Do you see this next document?
A Barely. I see Gary Richards's name at the top.
Q Okay. This is a statement signed by Gary Richards regarding what happened on July 23rd, 2021. Do you happen to recognize this document?
A I've read this document. Is it -- it may be part of the response, but only as a recent review did I recall this document.
Q Okay. You don't recall one way or the other whether you read this in the context of

making the decision?
A I do not.
Q Okay. Do you know why -- if I didn't already say it, let's mark that as Exhibit 4.

(Thereupon, Exhibit No. 4, Statement of Gary Richards 11/30/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q Do you know why an HR specialist would want to clarify whether a service dog was an emotional support dog or a service dog?
A Well, I think we'd want to -- no.
Q To your knowledge, was it part of Food City's policies or procedures to make that distinction?
A Not to my knowledge.
Q Okay. When you made your decision to deny the use of Mr. Batten's service dog, were you aware that Mr. Batten had been allowed to work for approximately a week while using his service dog?
A I don't believe I had any knowledge of that until I reviewed this document recently. No, sir.
Q Okay. So now you are aware that Gary

Richards, the store manager, in the absence of specific guidance from HR made the decision to allow Mr. Batten to use his service dog for about a week. Is that your understanding?
A Based off of that document.
Q Do you think that was a reasonable decision by Mr. Richards?
A I think Mr. Richards took some -- he had to be knowledgeable of the conversations that had taken place between the specialist and Mr. Batten. In fact, I thought he was witness to at least one of those, but may be bad recall. I don't think he acted fair in terms of the latitude to make that decision without going back to the specialist who had been engaged in trying to reach an accommodation with Mr. Batten.
So, no, sir, I wouldn't support his decision to do that unless he was advised to do that either by his district manager or the specialist.
Q All right. I'm going to share another document with you. Okay. Do you recognize this document? And I can blow it up some more if you need it.
A No. I'm reading through. I am

familiar with that document. This is -- this is David's document; correct?
Q This is the -- do you recognize this as the document signed by David Ellison concerning the events on August 6th, 2021?
A I do and I don't know if that's as a result of reviewing the EEO response or if that was something presented to me, but that aligns with my recall of information from David.
Q Okay. So you think you remember that you would have had this at the time of making your decision?
A I believe so.
Q Okay.
A That's not an affirmative yes.
Q Sure. If you had it, would it have been emailed to you, do you think?
A Likely. Possibly email and followed with a hard copy or vice versa.
Q Okay. Is that an email that you might still have access to?
A I have no access to my former files from work.
Q Okay. Would you expect that Food City would have access to that record?

A I don't know what Food City did with my files. Keep in mind I've been gone about a year and a half now. So I don't know.
Q Okay.
A Only if -- only if that was a part of the -- of the file. I don't know about the email.
Q Okay. All right. I just want to go through this. It says, "On 8/6/21, I met with Matthew Batten at Food City 214 with Gary Richards as my witness. Matthew has recently turned in documents and a request for an accommodation for a service dog to be present with him as he works his shifts at the fuel center.

"During this exchange, I asked Batten if there had been a change in anything as he has worked for us for two years. He stated that nothing had changed. He stated that he had been waiting for a service dog for over four years.

"I asked him if he was able to perform all essential functions of the job.

"And he stated he could do so without question as he had been doing them since he began his employment with Food City. He stated that he needed the service animal to help him in his battle with anxiety, panic attacks, and feeling of

isolation. He also stated that he has fallen about five times and the dog helps him steady on his feet.

"At the end of the meeting, I reiterated that I was gathering information during out exchange meeting and I would be back in contact with him again soon." As best you can tell, did I read that correctly?

A As best I can tell.

Q So if you had this at the time you made your decision, you would have been aware that Mr. Batten needed the service dog not only in relation to anxiety, panic attacks, and isolation, but also stability; is that right?

A Stability is certainly the -- was the key component that I recall that he needed assistance with at work. And the isolation was also a discussion and thus the accommodation to allow him to move inside the facility rather than only at the fuel kiosk so he would be around coworkers and additional people. So that led to the offering of the accommodation for the Uscan, I believe.

Q Okay. So when an employee is able to perform the job, but they've got a disability that

makes them fall down and renders them a fall risk to some level, clearly that's somebody who is -- who would benefit from an accommodation, yes?
A Would benefit from a accommodation.
Q And under that circumstance, it wouldn't be Food City's policy that that employee is ineligible for an accommodation just because they've been doing the job; is that right?
A So we did offer an accommodation. That seems to be the key point there. We discussed this accommodation and offered an alternative accommodation that would have met his needs it appears.
Q Okay. This may be a dumb question, but I've got to ask it. So because Food City made some offer of an accommodation, was it your position as VP of HR that Mr. Batten was eligible for some accommodation?
A We were simply engaging in arriving at a solution for Mr. Batten. And so, yes, we're trying to solve the accommodation request.
Q Okay. You decided he was eligible for an accommodation. It was just a dispute as to what that accommodation would be. Is that fair?
A No. I think you're overlooking the

part that he's able to perform the job without any accommodation.

Q Okay. Well, I want to understand Food City's position as you understood it as the VP of HR. Was it your position as the VP of HR that Mr. Batten was not eligible for accommodation?

MR. JACKSON: Objection. Go ahead and answer.

A No.

Q Was it your position as VP of HR that Mr. Batten was eligible for some accommodation?

A Undetermined. We were -- I think that was the purpose of discussion, what was needed and what would satisfy what he defined as a need, which was basically stability. So he already had in his role a stool available and, likewise, I don't believe we got to the point because he -- he shut down the discussion of talking about what aids would be needed for the Uscan position. Keep in mind the Uscan position would address his -- his feeling of isolation.

Q All right. We will talk a little bit more about that, but I want to get through some of these statements first.

REPORTER: Did you want that to be 5?

MR. HARGRAVES: Yes. Thank you.

(Thereupon, Exhibit No. 5, Statement of David Ellison 8/6/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q All right. Mr. Meadows, can you see my screen?

A Yes. I'm able to see Gary Richards at the top and Gary Richards's signature.

Q Yes, sir. Do you recognize this document?

A I've read this document recently. Had I read this document previously, I'm uncertain.

Q Is it possible that this is -- that this is -- that this is a document that you reviewed in the context of making your decision?

A It is possible, but I'm uncertain.

Q That's fair. And I've been referencing the decision. When I say that, do you understand that I'm referring to the decision that you made around August of 2021 to deny the use of a service dog?

A That's my interpretation.
Q Okay. I just want to make sure that I'm being clear.
Okay. So let's mark this as Exhibit 6 before I forget again.

(Thereupon, Exhibit No. 6, Statement of Gary Richards 8/6/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q All right. So it says, "On August 6th David Ellison met with Matt Batten with myself as a witness to discuss the request of a service animal. Mr. Ellison asked Matt if there was any aspect of the job that he could not perform that required the assistance of a service animal.

"Matt replied that he was able to perform all duties that were required without question and had been doing so since his employment with Food City without the help from a service animal. Matt stated that the purpose of the service animal was to provide companionship and help with anxiety, isolation." Did I read that correctly as best you can tell?

A As best I can see, yes.
Q And that appears to be signed by Gary Richards. Is that what you see?
A Yes.
Q Would you agree that this relates to the same meeting, the August 6 meeting, that Exhibit 5, Mr. Ellison's statement, pertains to?
A It appears to be, yes.
Q Okay. Mr. Ellison referenced Mr. Batten's need related to stability and falls; is that right?
A Yes.
Q Mr. Richards makes no mention of that; is that right?
A Not in this note.
Q Do you know why he didn't make mention of it?
A I do not.
Q Okay. Did you ever discuss this August 6 meeting with Mr. Ellison or Mr. Richards?
A I don't recall discussing it with Mr. Richards. I do -- I'm fairly certain I had discussion with Mr. Ellison.
Q Do you know -- can you say when that discussion took place?

A I can't, no.
Q That's fine. Do you remember if Mr. Ellison told you in that conversation that he had specifically asked Matthew Batten in this meeting if he could perform the job with or without accommodation? Do you remember if Mr. Ellison told you about that?
A I don't.
Q Okay. Did Mr. Ellison tell you that Mr. Batten said in that meeting that he could perform the job with accommodation?
A I don't recall that.
Q Okay. I'm showing you another document. Do you see this one? It says on 8/12/21.
A Yes.
Q And it appears to be signed by David Ellison?
A Yes.
Q Do you recognize this document?
A I do recall this, yes.
Q And as best you can recollect, do you recall this from your review of documents in making the decision?
A Uncertain.

Q Okay. It's possible you reviewed it then, but you may have also reviewed it in the context of reviewing the EEOC position statement?
A Yes.
Q Okay. Is the EEOC position statement the only thing you reviewed in preparation for today's deposition?
A The statement and the attachments.
Q Okay. Okay. Were you aware that Mr. Ellison had had a meeting with Matthew Batten and again Mr. Richards on August 12th of 2021?
A Uncertain, but I knew there were multiple meetings between Mr. Batten and Mr. Ellison.
MR. HARGRAVES: Okay. Let's mark this Exhibit 7.

(Thereupon, Exhibit No. 7, Statement by David Ellison 8/12/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:
Q All right. I just want to go through it. Let's finish up with this and maybe we can talk about a break after this. We've been going a little while.

"On 8/12/21, I met with Matthew Batten at Food City 214 with Gary Richards as my witness. I informed Batten that his request for a service animal in the workplace had been reviewed and denied at this time. I stated that he had been performing the job for over two years without any accommodations. I asked him for his ideas or suggestions of any other possible accommodations that may be available for him.

"He stated that he did not know of anything else that could accommodate him.

"I suggested that we could reassign him to a Uscan cashier position as this would help aid in his battle of isolation and anxiety of working alone at the fuel center kiosk.

"He stated he could not work any position that mandated that he stand for prolonged periods of time as he as complex regional pain syndrome, CRPS. He stated that the fuel center allowed him to stand when needed and sit when needed. When asked how long he thought he could stand, he was unable to give any exact time. He stated that he could only work with the service dog present at this time as he was not going to leave the dog with anyone else." As best you can

tell, did I read that correctly?
A Yes.
Q So this was the meeting where the Uscan cashier position was first offered to Mr. Batten. Is that fair?
A To the best of my knowledge.
Q Okay. Was it your idea to offer Mr. Batten the Uscan cashier position as an alternative accommodation?
A I'm uncertain of that. It was -- it would have been as a result of discussion between Mr. Ellison and myself on what else could we explore that might accommodate him. So it could have been his suggestion. Honestly I don't -- do not recall at this point.
Q Okay. To your knowledge, is there any record of the conversations between you and Mr. Ellison that you referenced?
A Beyond these statements, I do not recall any records of our discussions.
Q To your -- to your recollection would those discussions have been all verbal?
A Other than Mr. Ellison forwarding an email to me of something such as this, that's -- keep in mind, he is in Chattanooga. I was in

Abingdon. So normally if he had a document of that nature, he would probably scan it and email it as an attachment. He may have mailed it to me. I'm unsure at this point.

Q Okay. Did you have phone calls with Mr. Ellison regarding this case?

A I'm sure I spoke with him either face to face or by phone.

Q Do you know if Food City recorded employee phone calls at that time?

A Not to my knowledge.

Q Okay. In Mr. Ellison's statement here, Exhibit 7, he indicates that he told Mr. Batten that this would help aid in his battle of isolation and anxiety of working alone at the fuel center kiosk. Is that what it says?

A Yes.

Q He doesn't say that it would aid Mr. Batten with regard to his stability issues; does he?

A It doesn't appear that got that deep in the discussion based off of effectively Mr. Batten's statement that he would only work with the service dog. So it looks like he shut the discussion short.

Q Okay. Does it say anywhere in this statement that Mr. Batten interrupted Mr. Ellison and prevented him from talking about how this accommodation would aid with stability?
A It doesn't say that. Mr. Ellison did convey to me that Mr. Batten wasn't open-minded and effectively was just giving him an ultimatum that service dog or I'm not going to work. So I do think that was a factor based off of Mr. Ellison's discussions with me, yes.
Q Okay. I don't want to -- I don't want to put words in your mouth. So tell me if I'm wrong on this. Do I remember correctly that you said a little while ago that you thought the Uscan position would at least in part aid in the stability issues?
A Yes. I think we could have -- we could have -- this position that was served up or other similar positions that could have been explored, certainly there could have been an accommodation to aid with the stability issue. There's -- the Uscan component itself is in a podium form or was at that time. So that would certainly -- would have aided in his stability, as well as I don't know if Mr. Batten uses a cane or

walker or if he needed a stool as he had in the fuel center. All of those were possibilities to address the stability issue, but obviously that that wasn't part -- didn't get that deep in the discussion.

Q Okay. Does anybody need a break at this time? We've been going about an hour and a half.

A So how long do you anticipate?

Q I mean, I'm getting a little bit close, but I may have another hour.

MR. JACKSON: Really? Okay. Take a bathroom break, then.

MR. HARGRAVES: Yeah. That's fine. Let's say eight minutes. Come back at 11:15.

(Thereupon, a brief recess was taken.)

BY MR. HARGRAVES:

Q Okay. Mr. Meadows, we were talking about Exhibit 7. I want to ask you about the interactive exchange. Are you familiar with that phrase?

A Yes. We -- I would call it informal exchange, but, yes, I am.

Q In the context of ADA accommodation, what is that?

A In the context of the ADA accommodation?
Q Yes.
A It's just an open exchange to explore accommodations that meet a person's needs would be my interpretation.
Q Okay. Does it typically involve the employer and the employee having a conversation back and forth about the -- about the accommodations?
A Yes.
Q Okay. Looking at Mr. Ellison's statement, he initially tells Mr. Batten that the request for the service animal has been reviewed and denied. That's on the second line. Is that fair?
A It did say that, yes.
Q And then it looks like Mr. Ellison asked Mr. Batten if he had any ideas or suggestions of any other possible accommodations, and that's line four. Is that right?
A The document is not up, but, of course, I read it.
Q Oh, I'm sorry. I thought I still had screen sharing.

A That's okay. Remember, I'm on an iPhone and it's difficult to see these documents anyhow, so.
Q Well, Mr. Jackson is looking at the same thing and if I screw something up, I'm sure he'll let us know. So line four says that Mr. Ellison asked Mr. Batten for ideas or suggestions of any other possible accommodations. Is that right?
A Yes.
Q So then he effectively put the ball in Mr. Batten's court.
A Well, he's asking for his input and if you were to have an exchange, isn't that what you would expect? I would.
Q Sure. Mr. Batten responded that he didn't know of anything else that could accommodate him. Is that fair or is that what it says?
A That's what it says.
Q So Mr. Ellison asked for ideas. Mr. Batten said I don't have any. And then it's at that point that Mr. Ellison offered the Uscan position. Is that right?
A It appears according to this

document, yes.
Q Okay. Which begs a response from Mr. Batten. And Mr. Batten responded that he couldn't work in a position that required him to stand for prolonged periods of time. Is that right?
A It does.
Q Right. According to this statement, did Mr. Ellison offer any type of solution for that problem?
A According to the statement, no. I think the statement maybe isn't the full context of discussion based off of my recall of my discussion with Mr. Ellison. Mr. Batten effectively wouldn't consider anything other than the service animal, so.
Q Well, but he did consider the Uscan position; didn't he?
MR. JACKSON: Objection. Go ahead and answer.
A I don't think he did.
Q Well, he says -- I mean, he says I can't do that position because it require -- it would require him to stand for prolonged periods of time. Isn't that what it says?

A That's what it says.
Q And you tell me. Is the Uscan position a standing position?
A It normally is, as well as, you know, the fuel center would include a lot of standing, but the difference is the fuel center I believe has a stool available.
Q The fuel center -- sorry. Go ahead. I didn't mean to cut you off.
A That's okay. Go ahead.
Q The fuel center has a kiosk in the middle. Is that right?
A The fuel center is a kiosk, an enclosed kiosk. The Uscan is -- also has a podium or stand that includes display and a keyboard that the Uscan operator stands by.
Q Okay. The fuel center kiosk position has a chair; is that right?
A A stool or a chair.
Q Okay. Something to sit on; is that right?
A Yes.
Q And the desk area that's in the fuel center, that's at a level where somebody could sit and still do their job; right?

A Yes.
Q Whereas, the Uscan position has a podium; is that right?
A It does. It could still have a stool or, you know, some other aid, whether that would be a wheelchair or a cane or walker, whatever appropriate for the individual to be able to provide the stability needed to perform the job.
Q Okay. But we've got to be clear. The Uscan position without any modification is a standing only position, yes?
A Routinely it's without a stool or a chair.
Q Okay. Now, you mentioned a few things that could be done to change that, stool, wheelchair, cane. None of those things were ever suggested or even offered to Mr. Batten; were they?
A According to this document that was not discussed, but, again, my call with Mr. Ellison, Mr. Batten wasn't open to discuss it any further, so.
Q Well, let me ask you this. When Mr. Batten said I can't do the Uscan position because that's a standing position, don't you

think that would have been the time for Mr. Ellison to say, oh, well, we can -- we can fix that, we can give you a stool?

MR. JACKSON: Objection. Go ahead and answer.

A Based on this document only. Not necessarily based on the actual discussion.

Q Were you aware of any plan by Food City to offer Mr. Batten the use of a stool or other assistive device in the Uscan position?

A Sir, it wasn't a plan. It was a discussion to explore what -- what other assignments would make this work.

Q Okay. Were you aware of any discussions with anyone about potentially offering Mr. Batten the use of a stool or other assistive device in the Uscan position?

A I don't think the discussion got that far. There would have been other alternative positions to discuss, though. There's a -- as a fuel cashier, it's the same function as not only the Uscan cashier, but bakery/deli cashier or pharmacy cashier. So there's still other options that could have been discussed that were not.

Q Okay. The Uscan position was the

only position that was ever offered to Mr. Batten as a proposed accommodation; is that right?
A Based on this document.
Q Okay. Well, would you have been aware of any -- if another position had been offered as an accommodation to Mr. Batten?
A I was only aware of the information that was provided to me by Mr. Ellison. So I'm not aware that they got that far in their discussion of exploring other accommodations.
Q Okay. Did you do anything to apprise yourself of the specific functions that would have been served by Mr. Batten's service dog?
A Did I do anything to apprise myself? Only in relation to the performance of the job and I believe the earlier document stated the stability was one of those factors and then isolation was another component, if I remember correctly.
Q You would agree that at least based on Mr. Batten's statement, that he needed to be able to sit and stand as needed. Now, the Uscan position without any modification would not address that stability issue; would it?
A Would have with additional

accommodation.
Q Which were not offered to Mr. Batten; correct?
A Apparently not, not based off of this document.
Q I'm going to show you another document.
A Okay.
Q Can you see the page Gary Richards at the top?
A I do.
Q Okay. Do you recognize this?
A I have read this document.
Q Okay. And same question, do you know if you read this in the context of making the decision or was this something that you read solely in your review in preparation for this deposition?
A For certain in preparation. I can't say for certain prior to that.
MR. HARGRAVES: Okay. Let's make this Exhibit 8.
(Thereupon, Exhibit No. 8, Statement of Gary Richards 8/12/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q I just want to go through it. "On 8/12/21 Matt Batten met with David Ellison for a follow meeting regarding Mr. Batten having a service animal at the workplace. Mr. Ellison informed Mr. Batten that after review the decision was made that at this point in time the request for the service animal has been denied.
Mr. Ellison asked if there were any jobs within the store to better accommodate his current needs, suggesting Uscan attendant as it would allow him to be around others.
"Mr. Batten stated that there wasn't any position in the store that he would be able to perform his duties as he wasn't able to stand for short/long periods of time, that Gas N Go was the only position that he was suitable as it allowed him to sit and stand as needed and that he was not leaving his dog with anyone, that where he goes, she goes." To the best of your ability did I read that correctly?
A Yes.
Q Okay. Did you have any understanding as to why Mr. Batten asserted that he needed to be

able to sit and stand as needed?
A I don't have any recall of that, no.
Q Were you aware of what Mr. Batten's specific disabilities were?
A I knew Mr. Batten had some physical disabilities, but as -- I think Mr. Ellison had shared with me as a result of some kind of an accident, but that occurred prior to coming to work for Food City. And if I recall correctly, I think he had -- that accident included loss of an arm. Outside of that, no. That's all I was aware of.
Q Did you have any reason to doubt the truthfulness of Mr. Batten asserting that he needed to be able to sit and stand as needed?
A None.
Q Okay. At least in Mr. Richards's statement, he indicates that Mr. Ellison characterized the Uscan attendant as allowing Mr. Batten to "be around others". Is that right?
A Yes. That's what it says.
Q So this is another statement from another person that indicates Mr. Ellison did not characterize the Uscan position as an accommodation that would address Mr. Batten's

stability issues.
A It doesn't say that there -- anything about stability. So I agree with that.
Q All right. Can you tell us in what way the Uscan position without any modification would have addressed Mr. Batten's stability issues?
A It's a podium that he could -- he would be able to lean against if he needed to, but based off of what he's saying here just to the job in the fuel center, they're essentially the same, but to your point earlier, the fuel center did include a stool, but this -- if stability -- stability of a podium I think would be equal to or greater than what a dog can provide as far as stability.
Q You mentioned that those positions had some similarities. I kind of want to walk through those. So in the fuel clerk's position, kind of the home base would be the kiosk. Is that fair?
A Yes.
Q But the fuel clerk would have the occasional responsibility of going out to the various pumps; is that right?

A There would be a need for that occasionally, yes.
Q Okay. So the fuel clerk position would involve some standing and walking; is that right?
A Yes, normally.
Q The Uscan position, similarly there's home base at the podium; right?
A Yes.
Q But that attendant or that associate would on occasion have to go to the various self-checkout stations. Is that fair?
A Yes.
Q Okay. So in those ways they are similar. They both involve some level of walking; right?
A Some level, yes.
Q You'd agree that during the time that Mr. Batten would be walking in the Uscan position, he wouldn't have the benefit of the podium; is that right?
A He would not, is that what you said?
Q Yes, sir.
A It would be no different than he didn't have the benefit of the stool at the fuel

center. So they're equivalent jobs.
Q Well, except at the fuel center, he would be able to sit in the kiosk as needed; right?
A That wasn't your question.
Q Yes, sir.
A Your question was when he was assisting a customer. So at the fuel center if he walked to the pump, he didn't have the benefit of the stool or the podium. No different than at Uscan, when he walked away from the podium to assist a customer, he wouldn't have the benefit of a stool or podium.
Q So at least while he's walking in the Uscan position, there would be nothing different that would address his stability issues; correct?
A It was equivalent unless Mr. Batten used another tool.
Q A service animal is or can be an assistive device with regards to stability, yes?
A Possible, but it seems, you know, use of a cane or walker to be I would think more effective, but I'm not the physician, so.
Q I don't mean to be sarcastic, but just so we're clear on the record, you aren't a

physician; right?
A I am not.
Q And you don't have any medical expertise that would qualify you to say whether someone needs a cane versus a service animal; correct?
A So we were looking for a stability solution. That was the purpose of my statement there. So that's all.
Q Okay. All right. I'm going to share another document with you. Do you recognize this document?
A I can't see the top of that document, so.
Q I think that's it. It begins on 8/18/21 and there's a signature at the bottom.
A And I don't see the signature at the bottom.
Q Is that -- is that better?
A Okay. It's a statement from David.
Q Do you recognize this document?
A I do, yes. I recently reviewed that document.
Q Can you say whether you reviewed this document in the context of making your decision?

A I can't say that I saw that document. I can say I had a similar discussion with David.
Q Okay. Similar in what way?
A A discussion about offering Mr. Batten the option of a leave of absence.
MR. HARGRAVES: Okay. Let's mark that Exhibit 9.

(Thereupon, Exhibit No. 9, Statement by David Ellison 8/18/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:
Q I don't think we necessarily need to read through this whole thing, but do you recognize this as Mr. Ellison's statement regarding the meeting wherein he offered the leave of absence to Mr. Batten?
A I recognize it, yes.
Q Okay. And I think you testified earlier that that was -- that had been your recommendation; is that right?
A It was my recommendation rather than Mr. Batten leaving his employment to place him on leave to keep the door open for him, yes.
Q Okay. Did you have any -- did you

anticipate in any way that Mr. Batten's physical condition might change during the course of the leave of absence?

A That wasn't the purpose.

Q Okay. Well, fair enough, but my question is did you have any reason to believe that his physical condition, specifically his need for accommodation, would change during the course of a leave of absence?

A Again, the purpose of this was to leave the door open to have further discussion about an accommodation and to avoid Mr. Batten from leaving his employment.

Q Okay.

A He did a satisfactory job.

Q Okay. If Mr. Batten had a legitimate need for the service animal, did you expect that he would still have that need at the end of his leave of absence if he took it?

A That's just speculation.

Q Okay.

A I don't have a comment.

Q Was there anything that indicated to you that he would not need the service dog at the end of a leave of absence?

A Again, that wasn't the purpose.
Q Well, sir, I'm not asking you about the purpose. I'm asking you if there was anything, any facts, any statement, anything at all that gave you the impression that Mr. Batten would not need the service dog at the end of a leave of absence?
A If Mr. Batten had given further consideration to alternative accommodations, maybe that would have satisfied the need for his initial request, so.
Q Okay. So was it at least part of the purpose behind the leave of absence to allow Mr. Batten the time to reconsider and accept the Uscan position?
A To reconsider and engage in further discussion if there were other alternatives that would meet his needs.
Q Okay. You would agree that he had kind of said the last word on Uscan position, right, that he couldn't do it because it was a standing position?
A According to the document.
Q Okay. And the leave of absence was at least in part so that that exchange could

perhaps continue.
A Yes.
Q Did anybody at any point during this leave of absence that Mr. Batten was placed on reach out to Mr. Batten and say, hey, we know you said you couldn't stand in the Uscan position, well, we can offer you a stool?
A So you remember I retired and I don't know what took place after Mr. Batten took the leave of absence. So I can't speak to that.
Q Okay. As far as you're aware, did that happen?
A Again, I retired. So I don't have any knowledge of it.
Q Okay. That answers my question.
All right. I'm going to share my screen again. All right. I'm going to ask you if you recognize this document and there's a signature down below. So I'm going to scroll down to it. Do you recognize this document?
A I don't. I'm not going to declare it wasn't an exhibit, but I don't recall a document from the assistant manager.
Q Okay. Do you recall whether you reviewed this particular document in the context

of making the decision?
A I don't recall.
Q Okay. Do you recognize this document at least as a document that you reviewed in the EEOC packet?
A I don't. It doesn't mean I didn't, but I don't.
Q Okay. That's fine.
All right. Do you see the document I've shared that says David Ellison at the top?
A Yes.
Q Do you recognize this document?
A I don't believe I've read this document before. You may tell me it's part of the exhibits, but I don't recall reading this.
Q Okay. And just for belt and suspenders, do you have any recollection of reviewing this document in the context of making your decision?
A This appears after the fact of the -- this is all about completing the paperwork for the leave of absence. So this does not have any bearing on making a decision about the accommodation.
Q Okay. Do you have any recollection

of whether you reviewed this document prior to your retirement?

A I don't recall this document.

Q Okay. All right. Do you see the document I've just shared? It should be a picture.

A It's turned sideways. I can tell it says certificate or something to that. It says something certificate.

Q Here we go. And there's a few pages to this. I'll scroll down slowly. Well, now that one is sideways. Sorry.

All right. Do you recognize these documents or these pictures rather?

A I definitely recognize that certificate and the picture with the dog. I think those must have been included in the exhibit packet, but I know I saw that certificate somewhere.

Q Okay. Do you know if you reviewed these pictures or these documents that are in the pictures in the context of making your decision?

A Honestly I don't recall that. I recall seeing at least the picture and this certificate you have on the screen. Did I see

those prior to -- or you keep saying made the decision, but the discussion about the accommodation, I don't recall this.

Q Okay.

A I knew that there was a -- he was seeking a service animal.

Q Are you aware that Mr. Batten provided these documents to Gary Richards in the context of asking for the approval of the use of a service dog?

A I can't recall that.

Q Okay. You don't recall if Gary Richards ever forwarded you these documents?

A He maybe did. I don't recall that. I remember seeing the document as an exhibit, but as far as someone forwarding it to me, I don't recall that.

Q Do you understand that these documents pertain to Mr. Batten and his service dog?

A I do.

MR. HARGRAVES: Let's make that Exhibit 10.

(Thereupon, Exhibit No. 10, Canine Assistants, Inc. Documents, was marked to the deposition

of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q All right. Do you see the document I've just shared? It's two pages. It's an email chain.

A I cannot. Is it legible to me? No. Is there any way you can enlarge that?

Q Yes, sir.

A Okay. So, yes, I see that it's a -- I guess an email from Archie Skeens to myself.

Q Okay. Let me scroll down to the beginning of the chain or to the end. So it begins with Emily Hobbs to Gary Richards. Do you see that?

A Yes.

Q And then from Gary Richards to Donny Rector. Do you see that?

A I did.

Q And then from Donny Rector to David Ellison and CC'd Sarah Spahr; is that right?

A Yes.

Q And then David Ellison to you and Sherrell Lyon. Do you recognize this email chain?

A I -- I don't, but it clearly has my

name on it.
Q So you don't remember if you reviewed this email chain or any attachments in the context of making your decision?
A Can you show me the attachment?
Q I can't. I can only show you what's here on the document. Do you have any recollection of reviewing this email chain or any attachments to it?
A I don't recall reviewing this email. I can't say. I don't recall.
Q Okay. Who is Archie Skeens?
A Archie Skeens is a safety director.
Q All right. Let me take -- well, the start of the email chain begins with Emily Hobbs. It looks like a blank email to Gary Richards; is that right?
A That's what it appears to be, yes.
Q And then Gary Richards forwarded that to Donny Rector. Do you know why Gary Richards would have forwarded this to Donny Rector?
A Donny Rector is an HR specialist at that time in the Knoxville division and maybe the division's specialist was out for some reason. That would have been Sherrell Lyon at that time

unless this was already -- unless David Ellison was already in the position. So I assume it's so close to August that David was in the position. So maybe he was -- Donny was covering for him. That would be my speculation only.
Q Okay. The subject of the email, the beginning of the email change, is Christopher Batten; is that right?
A That's what it says, yes.
Q Do you understand that to be Matthew Batten?
A I would make that assumption, yes.
Q The email from Donny Rector to David Ellison on July 26, 2021, says, "Welcome back. Got this one late last week, associate with a service animal I thought you might want to take a look at." Is that right?
A Yes.
Q And then David Ellison forwarded it to you and said, "Please advise on associate requesting to bring service dog to work at Gas n Go at 214." Did I read that right?
A Yes.
Q So it looks like he emailed that to you on Monday, July 26, and then it looks like ten

minutes later you forward it to Archie; is that right?
A That's what it indicates, yes.
Q Okay. Why -- help me understand. Since you were the VP of HR, why would you be forwarding this question to a safety director?
A Mr. Skeens had dealt with a service animal at store level in the past. I had not.
Q How did you become aware that Mr. Skeens had had that prior experience with service animals?
A I don't recall.
Q Is it fair to say that you already had that knowledge at the time that you got this email?
A I had that knowledge or I made that assumption.
Q Okay. What -- tell us what you do remember about Mr. Skeens's prior experience with the service animal issue at store level.
A Mr. Skeens -- I don't -- I'm sorry. I don't recall how I had knowledge about that or if I had knowledge about that. I made some assumption when I forwarded this to him that he had some background about service dogs, but I

don't recall why now.
Q Okay. Do you know if your understanding at the time was that he had dealt with the request by an employee for the use of a service dog?
A No. No. I don't think that would be the case unless it was just an informal discussion he had with an employee.
Q So what was the service dog issue that you were under the impression Mr. Skeens had dealt with before?
A Just service dogs in general. That's all I can recall.
Q Okay. But at the store level?
A Yes.
Q Okay. Would that indicate either an employee or a customer?
A Sir, thinking back I have to make the assumption at this point that it was -- it would be customer based.
Q Okay.
A So I don't have any recall beyond that.
Q Okay. So after you emailed Mr. Skeens, it looks like he fairly quickly

responded that I will as soon as I can speak to Charlie about this issue; is that right?
A That's what it says, yes.
Q And Charlie Fugate is who he's referring to?
A Yeah. That's who is copied and Mr. Skeens reported to Charlie and Charlie is general counsel.
Q So that's Food City's lawyer?
A Yes.
Q After this email did Mr. Skeens get back with you to, as you say, advise you on this request?
A Honestly I'm surprised by this email. I don't think Mr. Skeens and I had any discussion. My discussions would have been with Mr. Fugate, the general counsel.
Q Okay. So as far as you know, you didn't have any other discussions with Mr. Skeens outside of this email?
A To my recall, my discussions were with Charlie, not with -- not with Archie.
Q Okay. Does safety director -- under normal circumstances does a safety director get involved in ADA accommodation requests?

A Typically, no. If it were -- if it were any type of safety issue involved in the request as far as need for a piece of equipment or etc., then would possibly consult with them, but routinely, no.
Q Okay. Is an employee who is a fall risk, is that a potential safety issue?
A Well, absolutely.
Q I know these sound like dumb questions, but I've got to ask them. Can an employee who falls down, can that prevent that employee from doing their job?
A As a result of an injury from falling down might prevent them, but no. We all fall from time to time, I think, so no.
Q Well, during the context of the fall, can that interfere with your ability to do your job?
A Short of an injury, no.
Q If you're injured when you fall, can that interfere with your ability to do your job?
A Certainly.
REPORTER: Did you want that to be 11?
MR. HARGRAVES: I thought that was

10.

MR. JACKSON: 10 was the dog documents, certification.

MR. HARGRAVES: So, yes, I do want that to be 11.

(Thereupon, Exhibit No. 11, Email Chain 7/26/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q In your time as the VP of HR, do you recall other employees at Food City requesting accommodations for disabilities?

A It's very routine or a high-frequency basis to receive accommodation requests, yes.

Q Can you recall ever denying requests?

A I can recall having discussions that look for alternative solutions to the request, just as we did with Mr. Batten. So I think denying the request is framed a little differently than what I would say. We were looking for a solution other than what was served up that would meet his needs. So that would be routine in requests to explore solutions.

Q Was it a policy or a procedure of

Food City to always reject the initial proposed accommodation?
A Always reject, no.
Q If the initial proposed accommodation did not cause an undue burden, would there be any reason for Food City to propose an alternative accommodation?
A Just looking for the best accommodation.
Q Right. And assuming that the initial proposed accommodation was the best accommodation and Food City had no issues with it, would there be any reason for Food City to offer a proposed alternative accommodation?
A You don't know until you explore that; do you?
Q Well, how would you explore if there -- if Food City had no reasons at the outset to oppose an initial request for accommodation, how would Food City explore whether they needed to propose an alternative?
A Through the informal discussion process. How else might we do -- meet the need of the request?
Q And if through the course of that

discussion Food City found out that the proposed request or the proposed accommodation caused no burden on Food City and the alternative accommodation would require modification, would there be any reason to reject that initial requested accommodation?

MR. JACKSON: Objection. Go ahead and answer.

A I don't have a response to that.

Q Did you understand my question?

A No. You need to clarify, I guess.

Q All right. I'm asking you a hypothetical. And in the hypothetical you have a proposed accommodation from an employee and you had made the determination that that proposed accommodation causes no burden, undue or otherwise, to Food City and you know that an alternative accommodation would require some modification. Okay. In that scenario can you think of any reason why Food City would reject the initial requested accommodation?

MR. JACKSON: Same objection. Go ahead and answer.

A The need for a modification doesn't necessarily make it a bad accommodation. Just

trying to arrive at the best solution.
Q What would be the best solution?
MR. JACKSON: Objection.
Q What characterizes the best solution?
A Meeting the -- meeting the defined needs, not necessarily the wants. So it's clear on this one specific, not the hypothetical, but the preference is -- the preference is not necessarily the only solution available, so.
Q Okay.
A There's no sin in exploring for alternative approaches.
Q Okay. Did you have reason to believe that Mr. Batten's request for the use of a service dog was a want and not a need?
A A preference.
Q Okay. So you believed that he -- it was a preference for him to have the service dog, not necessarily a need. Is that what you're saying?
A No.
Q Okay.
A It was his preference. He had a need for the stability and isolation and the dog appears to be one solution and that was his

preferred solution. It doesn't mean it's the only solution.

Q Did you understand that the service dog was specifically trained to meet multiple of Mr. Batten's needs?

A I don't recall. No, I don't recall that.

Q Did you or anybody else at your direction ever ask Mr. Batten what it was about the service dog that he needed?

A I believe that's in one of the discussions that he and Mr. Ellison had.

Q And Mr. Batten indicated that the dog helped with anxiety, isolation, and stability; right?

A Yes.

Q So Mr. Batten maintained that the dog helped with all three of those. Is that fair?

A According to the statement.

Q Right. Did you have any reason to doubt that?

A No.

Q Okay. And was Mr. Batten ever offered any accommodation that similarly addressed all three: Anxiety, isolation and stability?

A I think the discussion for alternative accommodations was cut short by Mr. Batten.
Q So it's Mr. Batten's fault that Food City didn't offer him a more appropriate accommodation. Is that what you're saying?
MR. JACKSON: Objection. Go ahead and answer.
A It's a dual responsibility to explore those alternatives. He wasn't willing to do so.
Q Did he say that?
A When he ended the session.
Q Oh, how did Mr. Batten end the session?
A I'm going to work with my dog or I'm not going to work. I'm paraphrasing, but in essence, that was his ultimatum.
Q Well, he responded to the proposal of the Uscan position; didn't he?
A According to the document.
Q He responded that the Uscan position wasn't appropriate because it made him stand and he physically couldn't stand all the time; isn't that right?
A Yes. That's what the document said.

Q And nobody ever responded to that by offering any solution that would allow Mr. Batten to address that aspect of his disability; is that right?
A I think the discussions were cut short before we got to that level, yes.
Q Is it your testimony that Mr. Batten prevented Food City from offering him a modification to the Uscan position?
A Prevented him?
Q Is it your testimony that Mr. Batten prevented Food City from offering him a modification to the Uscan position that would address his stated stability concerns?
A No.
MR. HARGRAVES: I think I'm done, but can we just take a brief recess, about five minutes, and let me just look over my notes and then we can come back.
MR. JACKSON: Sure.
(Thereupon, a brief recess was taken.)
BY MR. HARGRAVES:
Q Mr. Meadows, has everything you've said here today been true to the best of your abilities?

A It has.

Q Okay. And I know there were a couple of times I asked you a question that I had to rephrase. Did I rephrase those questions that you didn't understand to your satisfaction?

A I believe so.

Q Okay. Is there any question that you didn't understand that I did not rephrase for you?

A No.

Q Okay. All right. Well, I don't have any further questions for you. Mr. Jackson might, but thank you.

MR. JACKSON: No. I don't have any questions.

MR. HARGRAVES: Okay. Mr. Meadows, I appreciate your time. Thank you, sir.

FURTHER THIS DEPONENT SAITH NOT.

(Signature waived.)

REPORTER'S CERTIFICATION

STATE OF TENNESSEE :
:
COUNTY OF HAMILTON :

I, Cathy H. Kerley, LCR No. 95, RPR, licensed court reporter and notary public, in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing 102 pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 13th day of February, 2023.

CATHY H. KERLEY STATE OF TENNESSEE NOTARY PUBLIC COUNTY OF HAMILTON

Cathy H. Kerley

CATHY H. KERLEY, RPR, LCR #95
Expiration Date 6/30/2024
Notary Public in and for the State of Tennessee.
My commission expires June 7, 2026

**#**

**#95** [1] - 103:21

**1**

**1** [3] - 2:6, 25:21, 25:22
**10** [5] - 2:17, 87:23, 87:24, 95:1, 95:2
**101** [1] - 1:14
**102** [1] - 103:8
**11** [4] - 2:18, 94:24, 95:5, 95:6
**11/29/21** [2] - 2:9, 48:15
**11/30/21** [2] - 2:11, 50:6
**11:15** [1] - 66:15
**12th** [1] - 61:11
**13th** [1] - 103:16

**2**

**2** [7] - 2:8, 29:11, 29:12, 35:9, 42:5, 42:14, 43:2
**2001** [1] - 12:6
**2021** [10] - 17:13, 19:25, 20:2, 20:7, 21:23, 49:19, 52:5, 57:24, 61:11, 90:14
**2023** [3] - 1:10, 3:5, 103:17
**2026** [1] - 103:24
**21** [3] - 7:12, 16:2, 17:11
**214** [3] - 53:9, 62:2, 90:22
**22** [1] - 16:2
**23rd** [1] - 49:19
**25** [1] - 2:7
**26** [2] - 90:14, 90:25
**27** [2] - 1:10, 20:7
**27th** [2] - 3:5, 20:4
**29** [1] - 2:8

**3**

**3** [3] - 2:9, 48:8, 48:14
**37401** [1] - 1:24
**37421** [1] - 1:15
**37902** [1] - 1:18

**4**

**4** [4] - 2:3, 2:10, 50:4, 50:5
**423-267-4328** [1] - 1:25
**428** [1] - 1:24
**48** [1] - 2:9
**4:22-CV-00179** [1] - 1:6

**5**

**5** [4] - 2:12, 57:1, 57:3, 59:7
**50** [1] - 2:11
**550** [1] - 1:18
**57** [1] - 2:12
**58** [1] - 2:13

**6**

**6** [5] - 2:13, 58:5, 58:6, 59:6, 59:20
**6/30/2024** [1] - 103:22
**61** [1] - 2:14
**63** [1] - 24:12
**6400** [1] - 1:14
**6th** [2] - 52:5, 58:12

**7**

**7** [6] - 2:14, 61:16, 61:17, 64:13, 66:19, 103:24
**7/26/21** [2] - 2:18, 95:6
**74** [1] - 2:15

**8**

**8** [3] - 2:15, 74:22, 74:23
**8/12/21** [7] - 2:14, 2:15, 60:15, 61:18, 62:1, 74:24, 75:4
**8/18/21** [3] - 2:16, 80:16, 81:9
**8/6/21** [5] - 2:12, 2:13, 53:8, 57:4, 58:7
**81** [1] - 2:16
**87** [1] - 2:17

**9**

**9** [3] - 2:16, 81:7, 81:8
**90-day** [1] - 33:18
**900** [1] - 1:18
**95** [2] - 2:18, 103:6

**A**

**a-c-m-e** [1] - 13:6
**abbreviation** [1] - 9:5
**abilities** [1] - 101:25
**ability** [4] - 75:21, 94:17, 94:21, 103:9
**Abingdon** [2] - 7:10, 64:1
**able** [16] - 34:23, 35:7, 42:16, 53:19, 54:24, 56:1, 57:10, 58:18, 71:7, 73:22, 75:15, 75:16, 76:1, 76:15, 77:9, 79:3
**about** [47] - 10:5, 10:18, 11:22, 15:23, 16:25, 17:4, 17:8, 22:2, 22:10, 23:11, 34:12, 38:2, 39:9, 39:17, 41:15, 42:19, 48:21, 49:6, 51:3, 53:2, 53:6, 54:2, 56:20, 56:24, 60:7, 61:24, 65:3, 66:7, 66:19, 67:9, 72:15, 77:3, 81:4, 82:12, 83:2, 85:21, 85:23, 87:2, 91:19, 91:22, 91:23, 91:25, 93:2, 99:9, 101:17
**above** [1] - 103:7
**absence** [15] - 33:2, 33:11, 51:1, 81:5, 81:17, 82:3, 82:9, 82:19, 82:25, 83:7, 83:13, 83:24, 84:4, 84:10, 85:22
**absolutely** [3] - 10:9, 45:1, 94:8
**accept** [4] - 46:3, 46:11, 46:15, 83:14
**accepting** [1] - 42:2
**access** [4] - 23:13, 52:21, 52:22, 52:25
**accident** [2] - 76:8, 76:10
**accommodate** [4] - 62:11, 63:13, 68:18, 75:11
**accommodation** [116] - 5:4, 5:9, 14:14, 14:18, 18:22, 19:18, 21:12, 22:4, 22:11, 22:16, 23:22, 26:13, 27:12, 30:16, 30:21, 33:21, 33:24, 34:3, 34:4, 34:8, 34:10, 34:17, 34:18, 34:21, 34:24, 35:2, 35:4, 35:6, 35:7, 35:16, 35:25, 36:4, 36:19, 36:23, 37:1, 37:6, 37:12, 37:19, 38:11, 39:2, 39:7, 39:10, 39:13, 40:2, 40:9, 41:15, 42:10, 42:11, 42:17, 43:5, 43:10, 43:15, 43:16, 43:18, 44:6, 44:11, 44:13, 44:15, 44:22, 45:23, 46:4, 46:12, 51:16, 53:11, 54:18, 54:22, 55:3, 55:4, 55:7, 55:9, 55:11, 55:12, 55:16, 55:18, 55:21, 55:23, 55:24, 56:2, 56:7, 56:12, 60:6, 60:11, 63:9, 65:4, 65:21, 66:24, 67:2, 73:2, 73:6, 74:1, 76:25, 82:8, 82:12, 85:24, 87:3, 93:25, 95:15, 96:2, 96:4, 96:7, 96:9, 96:11, 96:14, 96:19, 97:2, 97:4, 97:6, 97:14, 97:16, 97:18, 97:21, 97:25, 99:24, 100:6
**accommodations** [15] - 14:20, 21:15, 22:7, 34:8, 35:22, 62:7, 62:8, 67:5, 67:10, 67:20, 68:8, 73:10, 83:9, 95:13, 100:2
**according** [7] - 68:25, 69:8, 69:11, 71:19, 83:23, 99:19, 100:20
**accountable** [2] - 17:18, 17:22
**accurate** [4] - 29:1, 30:7, 30:18, 103:8
**acknowledged** [1] - 41:8
**Acme** [6] - 13:4, 13:5, 13:20, 13:22, 15:1, 15:18
**Act** [2] - 4:11, 18:13
**acted** [1] - 51:13
**action** [2] - 36:11, 103:11
**ACTION** [1] - 1:6
**actual** [1] - 72:7
**actually** [2] - 16:17, 19:10
**ADA** [28] - 5:9, 10:15, 14:10, 14:13, 15:15, 15:20, 18:22, 19:14, 21:7, 21:10, 21:15, 21:24, 22:3, 22:10, 22:15, 24:1, 25:10, 26:8, 27:12, 27:14, 30:11, 35:14, 36:1, 42:23, 43:2, 66:24, 67:1, 93:25
**additional** [3] - 23:4, 54:21, 73:25
**address** [7] - 56:22, 66:3, 73:24, 76:25, 79:16, 101:3, 101:14
**addressed** [2] - 77:6, 99:24
**advantage** [1] - 10:7
**advertising** [1] - 14:1
**advise** [3] - 19:7, 90:20, 93:12
**advised** [2] - 18:19, 51:18
**affirmative** [1] - 52:15
**affixed** [1] - 103:16
**after** [15] - 7:21, 12:14, 12:23, 13:12, 13:20, 14:25, 39:4, 40:1, 46:24, 61:24, 75:7, 84:9, 85:20, 92:24, 93:11
**again** [10] - 29:6, 35:13, 54:7, 58:5, 61:11, 71:20, 82:10, 83:1, 84:13, 84:17
**against** [2] - 23:6, 77:9
**age** [1] - 29:21
**ago** [1] - 65:14
**agree** [6] - 42:5, 59:5, 73:20, 77:3, 78:18, 83:19
**agreed** [2] - 3:9, 3:15
**agreement** [3] - 3:4, 3:7, 4:9
**ahead** [14] - 29:3, 31:8, 31:15, 37:2, 37:13, 37:20, 56:8, 69:19, 70:8, 70:10, 72:4, 97:7, 97:23, 100:7
**aid** [7] - 62:14, 64:14, 64:18, 65:4, 65:15, 65:21, 71:5
**aided** [1] - 65:24
**aids** [1] - 56:20
**aligns** [1] - 52:8
**allegation** [1] - 49:4
**allow** [7] - 5:21, 41:13, 51:3, 54:19, 75:12, 83:13, 101:2
**allowance** [1] - 44:3
**allowed** [5] - 39:8, 46:1, 50:20, 62:20, 75:18
**allowing** [2] - 41:16, 76:19
**almost** [1] - 6:20
**alone** [2] - 62:15, 64:15
**already** [7] - 26:17, 31:7, 50:4, 56:17, 90:1, 90:2, 91:13
**ALSO** [1] - 1:19
**alternate** [1] - 44:1
**alternative** [16] -

41:15, 44:21, 45:4, 45:22, 55:12, 63:9, 72:19, 83:9, 95:18, 96:6, 96:14, 96:21, 97:3, 97:18, 98:12, 100:2
**alternatives** [5] - 44:18, 46:18, 46:23, 83:17, 100:10
**Americans** [1] - 18:12
**animal** [19] - 41:20, 41:22, 53:24, 58:14, 58:17, 58:22, 58:23, 62:4, 67:14, 69:16, 75:6, 75:9, 79:19, 80:5, 82:17, 87:6, 90:16, 91:8, 91:20
**animals** [3] - 26:4, 26:9, 91:11
**annual** [1] - 21:3
**annuity** [1] - 9:2
**answer** [18] - 5:22, 5:24, 6:12, 6:17, 7:5, 13:16, 16:22, 26:6, 29:3, 37:3, 37:14, 37:21, 56:9, 69:20, 72:5, 97:8, 97:23, 100:8
**answers** [2] - 6:3, 84:15
**anticipate** [2] - 66:9, 82:1
**anxiety** [7] - 53:25, 54:13, 58:24, 62:14, 64:15, 99:14, 99:25
**anybody** [5] - 17:21, 39:17, 66:6, 84:3, 99:8
**anyhow** [1] - 68:3
**anyone** [6] - 40:18, 45:12, 46:25, 62:25, 72:15, 75:20
**anything** [15] - 10:12, 10:18, 22:2, 22:10, 45:20, 53:15, 62:11, 68:17, 69:15, 73:11, 73:14, 77:2, 82:23, 83:4
**anywhere** [1] - 65:1
**apparently** [1] - 74:4
**appear** [3] - 24:11, 24:13, 64:21
**APPEARING** [2] - 1:12, 1:16
**appears** [10] - 24:16, 30:8, 55:13, 59:2, 59:8, 60:17, 68:25, 85:20, 89:18, 98:25
**applicant** [5] - 30:12, 30:19, 35:13, 35:15, 43:3
**appreciate** [1] - 102:16
**apprise** [2] - 73:11, 73:14
**approaches** [1] - 98:12
**appropriate** [4] - 6:4, 71:7, 100:5, 100:22
**approval** [2] - 18:22, 87:9
**approximately** [1] - 50:21
**Archie** [5] - 88:11, 89:12, 89:13, 91:1, 93:22
**area** [2] - 12:11, 70:23
**arm** [1] - 76:11
**arrive** [1] - 98:1
**arriving** [1] - 55:19
**aside** [2] - 25:10, 39:16
**ask** [15] - 5:24, 6:9, 6:15, 12:2, 13:15, 13:17, 16:17, 23:10, 42:13, 55:15, 66:19, 71:23, 84:17, 94:10, 99:9
**asked** [14] - 6:19, 7:4, 19:7, 53:14, 53:19, 58:14, 60:4, 62:7, 62:21, 67:19, 68:7, 68:21, 75:10, 102:3
**asking** [5] - 68:13, 83:2, 83:3, 87:9, 97:12
**aspect** [2] - 58:15, 101:3
**aspects** [1] - 16:9
**asserted** [1] - 75:25
**asserting** [1] - 76:14
**assessment** [1] - 45:10
**assigned** [1] - 33:12
**assignment** [2] - 42:3, 44:21
**assignments** [1] - 72:13
**assist** [2] - 40:19, 79:12
**assistance** [3] - 44:10, 54:17, 58:16
**assistant** [1] - 84:23
**Assistants** [2] - 2:17, 87:24
**assisting** [1] - 79:8
**assistive** [3] - 72:10, 72:16, 79:20
**Associate** [3] - 2:6, 24:13, 25:23
**associate** [5] - 25:11, 25:16, 78:10, 90:15, 90:20
**ASSOCIATES** [2] - 1:14, 1:23
**associates** [1] - 14:11
**assume** [2] - 14:9, 90:2
**assuming** [1] - 96:10
**assumption** [4] - 90:12, 91:17, 91:24, 92:19
**attachment** [2] - 64:3, 89:5
**attachments** [3] - 61:8, 89:3, 89:9
**attacks** [2] - 53:25, 54:13
**attend** [1] - 7:13
**attendant** [3] - 75:12, 76:19, 78:10
**attended** [5] - 20:18, 20:21, 20:22, 22:21, 22:23
**attorney** [1] - 4:16
**August** [12] - 19:25, 20:1, 20:4, 20:7, 21:23, 52:5, 57:24, 58:12, 59:6, 59:20, 61:11, 90:3
**authorized** [1] - 18:21
**available** [4] - 56:17, 62:9, 70:7, 98:9
**avoid** [1] - 82:12
**aware** [18] - 25:8, 26:5, 26:10, 48:24, 50:20, 50:25, 54:11, 61:9, 72:8, 72:14, 73:5, 73:7, 73:9, 76:3, 76:11, 84:11, 87:7, 91:9

**B**

**bachelor's** [2] - 7:22, 12:15
**back** [11] - 12:13, 12:14, 35:9, 51:14, 54:6, 66:15, 67:9, 90:14, 92:18, 93:12, 101:19
**background** [1] - 91:25
**bad** [4] - 6:20, 38:6, 51:12, 97:25
**Baker** [1] - 22:20
**bakery/deli** [1] - 72:22
**ball** [1] - 68:11
**barely** [1] - 49:15
**base** [2] - 77:20, 78:8
**based** [21] - 9:9, 9:10, 9:14, 9:19, 24:15, 38:7, 40:16, 41:5, 42:4, 49:10, 51:5, 64:22, 65:9, 69:13, 72:6, 72:7, 73:3, 73:20, 74:4, 77:10, 92:20
**basically** [1] - 56:16
**basis** [3] - 11:2, 21:3, 95:15
**bathroom** [1] - 66:13
**Batten** [97] - 4:17, 11:7, 22:25, 23:15, 32:19, 37:24, 38:11, 38:20, 39:7, 41:6, 41:19, 42:6, 42:8, 42:16, 43:9, 43:24, 44:10, 46:21, 46:24, 47:16, 50:20, 51:3, 51:11, 51:16, 53:9, 53:14, 54:12, 55:17, 55:20, 56:6, 56:12, 58:12, 60:4, 60:10, 61:10, 61:13, 62:2, 62:3, 63:5, 63:8, 64:14, 64:19, 65:2, 65:6, 65:25, 67:13, 67:19, 68:7, 68:16, 68:22, 69:3, 69:14, 71:17, 71:21, 71:24, 72:9, 72:16, 73:1, 73:6, 74:2, 75:4, 75:5, 75:7, 75:14, 75:25, 76:5, 76:14, 76:20, 78:19, 79:17, 81:5, 81:17, 81:23, 82:12, 82:16, 83:5, 83:8, 83:14, 84:4, 84:5, 84:9, 87:7, 87:19, 90:8, 90:11, 95:19, 99:9, 99:13, 99:17, 99:23, 100:3, 100:13, 101:2, 101:7, 101:11
**batten** [1] - 47:22
**BATTEN** [2] - 1:4, 1:19
**Batten's** [27] - 30:25, 39:1, 39:18, 39:23, 40:5, 40:23, 44:25, 45:8, 45:13, 47:5, 48:20, 48:24, 49:4, 49:7, 50:19, 59:10, 64:23, 68:12, 73:13, 73:21, 76:3, 76:25, 77:6, 82:1, 98:14, 99:5, 100:4
**battle** [3] - 53:25, 62:14, 64:14
**bearing** [1] - 85:23
**beat** [1] - 40:11
**become** [1] - 91:9
**before** [10] - 4:18, 5:21, 5:24, 7:6, 9:22, 39:14, 58:5, 85:14, 92:11, 101:6
**began** [1] - 53:22
**beginning** [2] - 88:13, 90:7
**begins** [3] - 80:15, 88:14, 89:15
**begs** [1] - 69:2
**behavior** [1] - 48:21
**behind** [1] - 83:13
**being** [10] - 3:7, 4:8, 5:19, 23:4, 34:23, 39:8, 41:16, 43:20, 49:3, 58:3
**believe** [20] - 20:23, 22:22, 25:3, 31:18, 41:9, 41:12, 45:8, 47:15, 50:22, 52:13, 54:23, 56:18, 70:6, 73:16, 82:6, 85:13, 98:13, 99:11, 102:6
**believed** [1] - 98:17
**below** [2] - 84:19, 103:15
**belt** [1] - 85:16
**benefit** [6] - 55:3, 55:4, 78:20, 78:25, 79:9, 79:12
**benefits** [2] - 17:16, 18:8
**best** [20] - 5:21, 5:23, 6:3, 19:19, 24:7, 54:7, 54:9, 58:25, 59:1, 60:22, 62:25, 63:6, 75:21, 96:8, 96:11, 98:1, 98:2, 98:4, 101:24, 103:8
**better** [4] - 29:10, 42:13, 75:11, 80:19
**between** [6] - 8:14, 47:21, 51:10, 61:13, 63:11, 63:17
**beyond** [3] - 26:14, 63:19, 92:22
**bit** [8] - 5:18, 11:5, 12:14, 15:22, 17:10, 29:10, 56:23, 66:10
**blank** [1] - 89:16
**blow** [3] - 29:9, 47:9, 51:23
**Bluefield** [1] - 7:17
**Board** [1] - 103:13
**both** [1] - 78:15
**bottom** [3] - 24:24, 80:16, 80:18
**bounced** [1] - 23:6
**BOX** [1] - 1:24
**break** [6] - 7:1, 7:3, 7:6, 61:24, 66:6, 66:13
**brief** [3] - 66:16, 101:17, 101:21
**bring** [1] - 90:21
**brings** [1] - 41:22
**burden** [9] - 33:22, 34:5, 44:4, 44:14, 45:15, 45:18, 96:5, 97:3, 97:16
**business** [1] - 11:18

**BY** [14] - 4:6, 26:1, 29:16, 48:18, 50:9, 57:7, 58:10, 61:21, 66:17, 75:2, 81:12, 88:3, 95:10, 101:22

## C

**call** [2] - 66:22, 71:20
**called** [4] - 3:1, 4:2, 26:20, 28:14
**calls** [2] - 64:5, 64:10
**can** [66] - 5:14, 5:17, 6:4, 6:7, 6:22, 10:10, 17:25, 19:13, 19:21, 24:7, 24:25, 27:21, 27:24, 28:9, 29:9, 29:17, 29:22, 30:16, 30:21, 34:16, 35:12, 35:16, 35:21, 35:24, 40:22, 41:1, 43:5, 45:20, 47:10, 51:23, 54:7, 54:9, 57:8, 58:25, 59:1, 59:24, 60:22, 61:23, 62:25, 72:2, 72:3, 74:9, 77:4, 77:15, 79:19, 80:24, 81:2, 84:7, 86:7, 88:8, 89:5, 89:6, 92:13, 93:1, 94:10, 94:11, 94:17, 94:20, 95:16, 95:17, 97:19, 101:17, 101:19
**can't** [18] - 4:22, 10:12, 13:13, 14:15, 14:24, 18:24, 19:23, 24:23, 60:1, 69:23, 71:24, 74:19, 80:13, 81:1, 84:10, 87:11, 89:6, 89:11
**cane** [5] - 65:25, 71:6, 71:16, 79:22, 80:5
**Canine** [2] - 2:17, 87:24
**cannot** [1] - 88:7
**capacity** [2] - 12:21, 44:23
**caption** [1] - 3:16
**career** [3] - 11:3, 12:17, 14:19
**career-wise** [1] - 12:17
**Carolina** [1] - 20:24
**case** [10] - 4:17, 5:1, 5:2, 5:6, 5:8, 11:7, 22:25, 64:6, 92:7, 103:12
**cashier** [9] - 41:18, 42:3, 62:13, 63:4, 63:8, 72:21, 72:22, 72:23
**Cathy** [3] - 3:10, 5:15, 103:6
**CATHY** [2] - 1:23, 103:21
**cause** [2] - 3:21, 96:5
**caused** [1] - 97:2
**causes** [2] - 37:10, 97:16
**caveat** [1] - 7:3
**CC'd** [1] - 88:21
**center** [17] - 53:13, 62:15, 62:19, 64:16, 66:2, 70:5, 70:6, 70:8, 70:11, 70:13, 70:17, 70:24, 77:11, 77:13, 79:1, 79:2, 79:8
**CEO** [1] - 17:20
**certain** [5] - 9:21, 28:15, 59:22, 74:19, 74:20
**certainly** [15] - 6:20, 8:8, 14:6, 18:14, 18:18, 23:3, 25:13, 26:16, 36:21, 37:15, 43:11, 54:15, 65:20, 65:24, 94:22
**certificate** [6] - 3:16, 86:8, 86:9, 86:16, 86:18, 86:25
**CERTIFICATION** [1] - 103:1
**certification** [8] - 8:25, 9:7, 9:12, 9:13, 9:18, 9:23, 10:3, 95:3
**certifications** [2] - 8:23, 8:24
**certify** [3] - 103:7, 103:10, 103:13
**Chain** [2] - 2:18, 95:6
**chain** [8] - 12:19, 13:2, 88:6, 88:13, 88:24, 89:3, 89:8, 89:15
**chair** [3] - 70:18, 70:19, 71:13
**chance** [2] - 23:13, 42:1
**change** [5] - 53:15, 71:15, 82:2, 82:8, 90:7
**changed** [1] - 53:17
**characterize** [1] - 76:24
**characterized** [1] - 76:19
**characterizes** [1] - 98:4
**charge** [1] - 20:2
**Charlie** [5] - 93:2, 93:4, 93:7, 93:22
**Charlotte** [2] - 20:23, 22:23
**CHATTANOOGA** [2] - 1:15, 1:24
**Chattanooga** [1] - 63:25
**checkout** [1] - 78:12
**Christopher** [1] - 90:7
**CHRISTOPHER** [2] - 1:4, 1:19
**circumstance** [1] - 55:5
**circumstances** [1] - 93:24
**cited** [1] - 25:3
**City** [65] - 11:19, 11:22, 11:25, 12:4, 12:5, 13:1, 13:24, 15:18, 15:24, 18:21, 20:3, 20:8, 20:12, 20:16, 23:17, 23:20, 24:13, 25:10, 25:12, 25:14, 26:2, 26:3, 26:8, 26:12, 28:19, 30:6, 31:3, 31:19, 33:20, 33:21, 34:3, 34:11, 36:17, 38:2, 44:4, 45:12, 45:15, 45:18, 46:8, 46:14, 46:19, 52:25, 53:1, 53:9, 53:23, 55:15, 58:21, 62:2, 64:9, 72:9, 76:9, 95:12, 96:1, 96:6, 96:12, 96:13, 96:18, 96:20, 97:1, 97:3, 97:17, 97:20, 100:5, 101:8, 101:12
**CITY** [1] - 1:8
**City's** [22] - 21:20, 28:11, 28:24, 29:1, 29:5, 29:18, 30:1, 30:7, 30:18, 33:2, 33:23, 34:5, 34:17, 35:3, 42:6, 42:22, 43:8, 46:24, 50:15, 55:6, 56:4, 93:9
**CIVIL** [1] - 1:6
**Civil** [2] - 3:3, 4:11
**claim** [1] - 33:15
**clarification** [2] - 39:20, 42:25
**clarify** [6] - 6:9, 31:22, 33:25, 39:3, 50:11, 97:11
**clarity** [1] - 47:23
**class** [1] - 32:16
**classes** [1] - 32:1
**clear** [5] - 49:2, 58:3, 71:9, 79:25, 98:6
**clearly** [2] - 55:2, 88:25
**clerk** [3] - 47:1, 77:23, 78:3
**clerk's** [1] - 77:19
**close** [4] - 20:1, 46:2, 66:11, 90:3
**close-minded** [1] - 46:2
**clubs** [1] - 11:10
**color** [1] - 29:20
**combination** [1] - 9:24
**come** [5] - 6:8, 21:4, 38:14, 66:15, 101:19
**coming** [1] - 76:8
**comment** [1] - 82:22
**commission** [1] - 103:23
**common** [2] - 14:16, 14:24
**communications** [2] - 23:11, 23:12
**companionship** [1] - 58:23
**company** [3] - 13:23, 18:4, 33:23
**comparing** [2] - 30:2, 47:14
**compensation** [1] - 18:8
**complaints** [1] - 48:21
**completed** [4] - 3:12, 12:19, 13:20, 20:24
**completing** [1] - 85:21
**complex** [1] - 62:18
**compliance** [21] - 8:20, 10:6, 10:16, 14:4, 14:10, 15:15, 15:20, 18:6, 18:11, 19:14, 20:9, 20:14, 20:22, 21:8, 21:11, 21:24, 24:1, 25:13, 26:22, 27:17, 42:23
**compliance-related** [1] - 21:24
**component** [3] - 54:16, 65:22, 73:18
**concerning** [1] - 52:4
**concerns** [1] - 101:14
**condition** [3] - 37:9, 82:2, 82:7
**conduct** [1] - 21:4
**conducted** [1] - 22:18
**conference** [1] - 21:1
**conferences** [3] - 20:19, 22:19, 22:20
**congratulations** [1] - 11:15
**consider** [4] - 36:18, 40:2, 69:15, 69:17
**consideration** [1] - 83:9
**considered** [2] - 36:12, 42:18
**constitute** [2] - 45:14, 45:17
**constituted** [1] - 49:10
**consult** [2] - 22:25, 94:4
**consulted** [3] - 23:7, 23:14, 39:12
**contact** [1] - 54:7
**contest** [1] - 7:1
**context** [16] - 11:7, 38:20, 49:25, 57:19, 61:3, 66:24, 67:1, 69:12, 74:15, 80:25, 84:25, 85:18, 86:22, 87:9, 89:3, 94:16
**continue** [2] - 33:16, 84:1
**contracts** [1] - 8:20
**contributing** [1] - 18:3
**conversation** [2] - 60:3, 67:8
**conversations** [4] - 38:7, 43:24, 51:9, 63:17
**converted** [1] - 33:17
**convey** [1] - 65:6
**conveyed** [1] - 46:5
**convicted** [1] - 11:13
**copied** [1] - 93:6
**copy** [1] - 52:19
**Cornell** [1] - 10:25
**corporate** [2] - 12:24, 15:23
**correct** [9] - 11:17, 19:9, 19:12, 31:17, 49:12, 52:2, 74:3, 79:16, 80:6
**correctly** [7] - 54:8, 58:25, 63:1, 65:13, 73:19, 75:22, 76:9
**could** [40] - 4:12, 9:22, 19:3, 19:17, 23:14, 28:14, 33:4, 33:9, 33:22, 34:4, 34:10, 35:2, 41:7, 43:10, 43:14, 44:9, 44:12, 45:6, 53:21, 58:15, 60:5, 60:10, 62:11, 62:12, 62:16, 62:21, 62:23, 63:12, 63:13, 65:17, 65:18, 65:19, 65:20, 68:17, 70:24, 71:4, 71:15, 72:24, 77:8, 83:25
**couldn't** [4] - 69:4, 83:21, 84:6, 100:23
**counsel** [11] - 3:8, 4:9, 23:8, 23:12, 39:12, 39:16, 40:21, 47:7, 93:8, 93:17, 103:10
**COUNTY** [1] - 103:4
**couple** [5] - 5:13, 5:17, 20:24, 41:9, 102:2

course [9] - 14:19, 17:16, 21:25, 26:20, 49:8, 67:23, 82:2, 82:8, 96:25
courses [3] - 20:25, 22:15, 23:2
Court [3] - 3:11, 103:13, 103:14
court [3] - 5:15, 68:12, 103:6
COURT [1] - 1:1
cover [1] - 24:15
covered [3] - 27:12, 27:14, 27:17
covering [2] - 22:5, 90:4
coworkers [1] - 54:21
created [1] - 17:2
credit [2] - 32:8, 32:17
crime [1] - 11:13
crossover [1] - 8:6
CRPS [1] - 62:19
current [3] - 11:1, 42:2, 75:11
currently [1] - 7:9
customer [4] - 79:8, 79:12, 92:17, 92:20
cut [4] - 31:9, 70:9, 100:2, 101:5

D

d/b/a [1] - 1:8
database [2] - 32:6, 32:15
Date [1] - 103:22
date [3] - 4:22, 38:19, 103:14
DAVES [1] - 1:17
David [24] - 2:12, 2:14, 2:16, 38:8, 38:16, 38:23, 39:20, 52:4, 52:9, 57:3, 58:12, 60:17, 61:17, 75:4, 80:20, 81:2, 81:8, 85:10, 88:20, 88:23, 90:1, 90:3, 90:13, 90:19
David's [1] - 52:2
day [3] - 3:5, 20:5, 103:17
dead [1] - 40:11
deal [2] - 14:13, 15:15
dealing [2] - 8:19, 15:7
dealt [3] - 91:7, 92:3, 92:11
decide [1] - 19:17
decided [1] - 55:22
decision [41] - 19:11, 22:24, 23:15, 39:23, 40:4, 40:7, 40:12, 40:13, 40:15, 40:16, 40:20, 40:23, 41:2, 43:25, 47:4, 47:19, 48:5, 48:19, 49:8, 49:11, 50:1, 50:18, 51:2, 51:7, 51:14, 51:18, 52:12, 54:11, 57:19, 57:22, 57:23, 60:24, 74:16, 75:7, 80:25, 85:1, 85:19, 85:23, 86:22, 87:2, 89:4
decision-makers [1] - 40:12
decisions [3] - 18:16, 18:22, 19:3
declare [1] - 84:21
deep [2] - 64:21, 66:4
defendant [2] - 1:9, 3:8
DEFENDANT [1] - 1:16
defined [2] - 56:15, 98:5
definitely [1] - 86:15
definition [1] - 42:15
degree [10] - 7:23, 7:25, 8:10, 8:12, 9:20, 12:16, 12:20, 13:12, 13:21
degrees [1] - 7:24
demonstrated [1] - 35:1
denied [5] - 14:18, 14:22, 62:5, 67:15, 75:9
deny [10] - 39:23, 40:4, 40:23, 41:3, 43:25, 47:4, 48:5, 48:19, 50:19, 57:24
denying [3] - 44:7, 95:16, 95:20
department [6] - 16:3, 16:5, 16:7, 18:3, 20:3, 26:14
Department [1] - 18:7
DEPONENT [1] - 102:17
deposed [1] - 4:4
DEPOSITION [1] - 1:11
Deposition [2] - 2:3, 3:7
deposition [22] - 3:1, 3:9, 3:12, 3:18, 4:8, 4:18, 4:21, 5:8, 25:23, 29:13, 48:15, 50:6, 57:4, 58:7, 61:7, 61:18, 74:18, 74:24, 81:9, 87:25, 95:7, 103:7
describe [1] - 19:20
Description [1] - 2:5
desk [1] - 70:23
determination [6] - 22:6, 33:21, 34:12, 44:3, 45:13, 97:15
determinations [1] - 32:15
determine [1] - 43:20
determined [1] - 34:4
determining [1] - 36:18
device [3] - 72:10, 72:17, 79:20
did [112] - 5:3, 7:13, 7:15, 7:18, 7:19, 7:20, 8:25, 9:6, 9:13, 9:17, 10:7, 12:16, 14:3, 14:6, 14:12, 14:16, 15:1, 15:5, 15:14, 15:16, 16:8, 16:12, 16:16, 16:21, 17:1, 17:2, 17:6, 18:12, 20:12, 21:7, 21:11, 21:14, 22:13, 22:25, 23:8, 25:9, 26:3, 26:7, 26:12, 26:21, 32:14, 35:18, 36:7, 36:15, 38:10, 39:22, 40:13, 40:14, 40:18, 44:2, 44:5, 44:18, 44:23, 44:24, 45:8, 45:10, 45:12, 45:17, 46:8, 46:11, 46:16, 48:2, 49:23, 53:1, 54:8, 55:9, 57:1, 58:24, 59:19, 60:9, 62:10, 63:1, 64:5, 65:5, 67:17, 69:9, 69:17, 69:21, 73:11, 73:14, 75:21, 75:24, 76:13, 76:23, 77:13, 81:25, 82:6, 82:15, 82:17, 84:3, 84:11, 86:25, 87:14, 88:19, 90:22, 91:9, 93:11, 95:19, 96:5, 97:10, 98:13, 99:3, 99:8, 99:20, 100:11, 100:13, 102:4, 102:8
Did [1] - 94:23
didn't [23] - 10:1, 18:25, 23:6, 25:1, 31:8, 33:7, 45:3, 46:14, 46:19, 50:3, 59:16, 66:4, 68:17, 69:18, 70:9, 78:25, 79:9, 85:6, 93:19, 100:5, 100:19, 102:5, 102:8
difference [1] - 70:6
different [7] - 15:4, 32:1, 40:9, 42:11, 78:24, 79:10, 79:15
differently [1] - 95:20
difficult [3] - 6:5, 29:7, 68:2
difficulty [1] - 36:11
Direct [1] - 2:3
direct [3] - 15:25, 19:4, 19:15
DIRECT [1] - 4:5
direction [1] - 99:9
directly [8] - 16:22, 17:1, 17:8, 17:13, 17:18, 17:22, 17:23, 26:18
director [11] - 16:10, 16:17, 16:19, 16:22, 17:3, 22:22, 22:23, 89:13, 91:6, 93:23, 93:24
disabilities [7] - 31:5, 31:21, 31:24, 36:7, 76:4, 76:6, 95:13
Disabilities [1] - 18:12
disability [17] - 5:3, 21:12, 23:21, 23:25, 26:13, 29:21, 30:13, 30:20, 31:16, 33:15, 33:16, 35:15, 37:11, 37:18, 43:4, 54:25, 101:3
disabled [2] - 33:20, 34:2
disagree [1] - 37:22
discovery [1] - 4:10
discrimination [1] - 23:25
discuss [5] - 41:14, 58:13, 59:19, 71:21, 72:20
discussed [3] - 55:11, 71:20, 72:24
discussing [1] - 59:21
discussion [28] - 44:16, 46:2, 46:22, 54:18, 56:14, 56:19, 59:23, 59:25, 63:11, 64:22, 64:25, 66:5, 69:13, 69:14, 72:7, 72:12, 72:18, 73:10, 81:2, 81:4, 82:11, 83:17, 87:2, 92:7, 93:15, 96:22, 97:1, 100:1
discussions [11] - 47:21, 63:20, 63:22, 65:10, 72:15, 93:16, 93:19, 93:21, 95:17, 99:12, 101:5
display [1] - 70:15
dispute [1] - 55:23 4
disregarding [1] - 38:18
distinction [2] - 8:14, 50:16
district [2] - 18:24, 51:19
DISTRICT [2] - 1:1, 1:1
division [7] - 12:25, 15:7, 16:25, 17:6, 27:5, 89:23
DIVISION [1] - 1:2
division's [1] - 89:24
do [132] - 4:25, 5:12, 5:17, 5:20, 5:23, 7:2, 7:8, 8:13, 8:22, 10:14, 10:18, 10:21, 11:5, 12:4, 12:7, 13:7, 14:17, 14:21, 15:5, 17:9, 21:16, 21:22, 21:23, 22:2, 22:9, 22:13, 22:14, 24:7, 24:8, 27:8, 27:11, 27:14, 27:22, 27:24, 28:17, 30:11, 30:13, 30:14, 31:15, 31:19, 32:18, 35:21, 35:24, 38:1, 38:5, 38:19, 38:25, 39:8, 39:16, 40:22, 43:10, 44:2, 46:25, 47:3, 47:12, 47:14, 47:17, 47:25, 48:7, 49:13, 49:19, 50:2, 50:3, 50:10, 51:6, 51:18, 51:22, 52:3, 52:6, 52:17, 53:21, 57:12, 57:22, 59:16, 59:18, 59:22, 59:24, 60:2, 60:6, 60:14, 60:20, 60:21, 60:22, 63:14, 63:19, 64:9, 65:9, 65:13, 66:9, 69:23, 70:25, 71:24, 73:11, 73:14, 74:11, 74:12, 74:14, 80:11, 80:21, 80:22, 81:14, 83:21, 84:20, 84:24, 85:3, 85:9, 85:12, 85:17, 85:25, 86:4, 86:13, 86:20, 87:18, 87:21, 88:4, 88:14, 88:18, 88:24, 89:7, 89:20, 90:10, 91:18, 92:2, 94:17, 94:21, 95:4, 95:11, 96:16, 96:23, 100:10, 103:7
Document [2] - 2:8, 29:13
document [63] - 27:21, 27:23, 28:10, 28:17, 28:18, 28:20, 29:4, 30:5, 47:13, 47:18, 49:14, 49:20,

49:21, 49:23, 50:23, 51:5, 51:22, 51:23, 52:1, 52:2, 52:4, 57:13, 57:14, 57:15, 57:18, 60:14, 60:20, 64:1, 67:22, 69:1, 71:19, 72:6, 73:3, 73:16, 74:5, 74:7, 74:13, 80:11, 80:12, 80:13, 80:21, 80:23, 80:25, 81:1, 83:23, 84:18, 84:20, 84:22, 84:25, 85:3, 85:4, 85:9, 85:12, 85:14, 85:18, 86:1, 86:3, 86:5, 87:15, 88:4, 89:7, 100:20, 100:25

**Documents** [2] - 2:17, 87:25

**documents** [10] - 47:9, 53:11, 60:23, 68:2, 86:14, 86:21, 87:8, 87:13, 87:19, 95:3

**does** [18] - 5:25, 6:12, 8:6, 23:20, 24:11, 24:12, 26:2, 31:3, 35:20, 64:20, 65:1, 66:6, 67:7, 69:7, 71:4, 85:22, 93:23, 93:24

**doesn't** [8] - 37:18, 64:18, 64:21, 65:5, 77:2, 85:6, 97:24, 99:1

**dog** [63] - 38:12, 38:21, 39:8, 39:14, 39:19, 39:24, 40:5, 40:8, 41:4, 44:1, 44:4, 44:8, 44:25, 45:9, 45:14, 46:4, 46:6, 46:15, 46:20, 47:5, 48:6, 48:20, 48:22, 48:24, 48:25, 49:1, 49:4, 49:7, 50:11, 50:12, 50:19, 50:21, 51:3, 53:12, 53:18, 54:2, 54:12, 57:25, 62:24, 62:25, 64:24, 65:8, 73:13, 75:20, 77:15, 82:24, 83:6, 86:16, 87:10, 87:20, 90:21, 92:5, 92:9, 95:2, 98:15, 98:18, 98:24, 99:4, 99:10, 99:13, 99:17, 100:15

**dogs** [2] - 91:25, 92:12

**doing** [8] - 6:3, 11:18, 13:22, 37:12, 53:22, 55:8, 58:20, 94:12

**don't** [81] - 4:21, 5:5, 6:16, 6:17, 6:18, 6:21, 11:8, 21:21, 22:1, 22:9, 22:12, 23:23, 27:13, 28:1, 35:5, 35:6, 37:4, 37:18, 37:22, 40:25, 41:12, 48:4, 49:3, 49:6, 49:24, 50:22, 51:13, 52:6, 53:1, 53:3, 53:6, 56:18, 59:21, 60:8, 60:12, 63:14, 65:11, 65:25, 68:22, 69:21, 71:25, 72:18, 76:2, 79:24, 80:3, 80:17, 81:13, 82:22, 84:8, 84:13, 84:21, 84:22, 85:2, 85:6, 85:7, 85:13, 85:15, 86:3, 86:23, 87:3, 87:12, 87:14, 87:16, 88:25, 89:2, 89:10, 89:11, 91:12, 91:21, 91:22, 92:1, 92:6, 92:22, 93:15, 96:15, 97:9, 99:6, 102:10, 102:13

**done** [3] - 32:18, 71:15, 101:16

**Donelson** [1] - 22:20

**Donnie** [12] - 4:14, 25:24, 29:14, 48:16, 50:7, 57:5, 58:8, 61:19, 74:25, 81:10, 88:1, 95:7

**DONNIE** [4] - 1:11, 2:3, 3:1, 4:1

**Donny** [7] - 88:17, 88:20, 89:20, 89:21, 89:22, 90:4, 90:13

**door** [2] - 81:24, 82:11

**doubt** [2] - 76:13, 99:21

**down** [10] - 5:16, 30:9, 55:1, 56:19, 84:19, 86:11, 88:12, 94:11, 94:14

**dual** [1] - 100:9

**duly** [2] - 4:3, 103:13

**dumb** [2] - 55:14, 94:9

**during** [10] - 16:18, 41:14, 49:7, 53:14, 54:5, 78:18, 82:2, 82:8, 84:3, 94:16

**duties** [3] - 18:1, 58:19, 75:16

## E

**each** [1] - 5:22

**earlier** [3] - 73:16, 77:12, 81:20

**early** [2] - 9:8, 13:10

**easier** [1] - 5:18

**education** [12] - 7:20, 9:9, 9:14, 9:17, 9:22, 10:2, 10:15, 15:11, 15:12, 20:13, 20:18, 21:25

**educational** [1] - 23:1

**EEO** [8] - 18:7, 20:22, 22:22, 22:23, 23:5, 25:3, 48:2, 52:7

**EEOC** [5] - 5:2, 5:6, 61:3, 61:5, 85:5

**effective** [1] - 79:23

**effectively** [6] - 22:5, 41:21, 64:22, 65:7, 68:11, 69:15

**efforts** [1] - 15:8

**eight** [1] - 66:15

**either** [5] - 41:22, 42:2, 51:19, 64:7, 92:16

**electronic** [1] - 28:14

**eligible** [8] - 9:22, 32:17, 37:11, 43:18, 55:17, 55:22, 56:6, 56:12

**Ellison** [57] - 2:12, 2:14, 2:16, 38:8, 38:16, 39:20, 40:7, 40:14, 40:17, 41:7, 41:8, 47:16, 47:22, 52:4, 57:4, 58:12, 58:14, 59:9, 59:20, 59:23, 60:3, 60:7, 60:9, 60:18, 61:10, 61:14, 61:18, 63:12, 63:18, 63:23, 64:6, 65:2, 65:5, 67:18, 68:7, 68:21, 68:23, 69:9, 69:14, 71:21, 72:2, 73:8, 75:4, 75:6, 75:10, 76:6, 76:18, 76:23, 81:9, 85:10, 88:21, 88:23, 90:1, 90:14, 90:19, 99:12

**Ellison's** [6] - 48:9, 59:7, 64:12, 65:10, 67:12, 81:15

**else** [11] - 17:21, 39:17, 40:18, 45:12, 45:20, 62:11, 62:25, 63:12, 68:17, 96:23, 99:8

**Email** [2] - 2:18, 95:6

**email** [20] - 52:18, 52:20, 53:6, 63:24, 64:2, 88:5, 88:11, 88:24, 89:3, 89:8, 89:10, 89:15, 89:16, 90:6, 90:7, 90:13, 91:15, 93:11, 93:14, 93:20

**emailed** [3] - 52:17, 90:24, 92:24

**emails** [1] - 43:23

**Emily** [7] - 2:9, 47:24, 48:1, 48:12, 48:14, 88:14, 89:15

**Emily's** [1] - 48:10

**emotional** [1] - 50:12

**employed** [1] - 12:23

**employee** [41] - 14:13, 18:8, 18:16, 26:4, 26:13, 30:12, 30:19, 33:20, 34:3, 35:1, 35:13, 35:14, 35:20, 35:24, 36:1, 37:1, 38:6, 38:9, 42:7, 42:9, 42:15, 42:18, 42:20, 42:22, 43:3, 43:9, 43:12, 43:14, 43:17, 54:24, 55:6, 64:10, 67:8, 92:4, 92:8, 92:17, 94:6, 94:11, 94:12, 97:14, 103:10

**employees** [5] - 15:25, 18:17, 18:21, 27:1, 95:12

**employer** [1] - 67:8

**employer's** [2] - 36:13, 36:14

**employers** [1] - 36:5

**Employment** [2] - 2:8, 29:12

**employment** [14] - 23:24, 24:19, 24:25, 29:19, 31:11, 31:12, 33:17, 36:6, 38:2, 46:25, 53:23, 58:21, 81:23, 82:13

**enclosed** [1] - 70:14

**end** [7] - 37:7, 54:4, 82:18, 82:25, 83:6, 88:13, 100:13

**ended** [1] - 100:12

**endurance** [1] - 6:25

**engage** [2] - 46:22, 83:16

**engaged** [1] - 51:15

**engaging** [1] - 55:19

**enlarge** [1] - 88:8

**enough** [2] - 29:22, 82:5

**ensure** [1] - 20:14

**ensuring** [1] - 14:4

**entire** [1] - 11:3

**Equal** [2] - 2:8, 29:12

**equal** [5] - 24:18, 24:24, 29:19, 31:12, 77:15

**equipment** [1] - 94:3

**equivalent** [2] - 79:1, 79:17

**especially** [2] - 5:18, 6:5

**ESQUIRE** [2] - 1:13, 1:17

**essence** [1] - 100:17

**essential** [7] - 30:17, 30:22, 35:17, 42:9, 42:16, 43:6, 53:20

**essentially** [2] - 15:9, 77:11

**etc** [2] - 32:7, 94:4

**ETHAN** [1] - 1:13

**Ethan** [1] - 4:16

**evaluation** [2] - 32:3, 32:4

**even** [5] - 6:6, 36:25, 41:13, 48:24, 71:17

**events** [2] - 23:2, 52:5

**ever** [21] - 4:18, 5:7, 10:7, 10:14, 11:13, 14:12, 16:19, 18:15, 18:25, 20:12, 21:7, 37:23, 45:13, 59:19, 71:16, 73:1, 87:13, 95:16, 99:9, 99:23, 101:1

**everything** [2] - 5:16, 101:23

**evidenced** [1] - 103:14

**exact** [2] - 4:22, 62:22

**Examination** [1] - 2:3

**EXAMINATION** [1] - 4:5

**examined** [1] - 4:4

**example** [1] - 10:11

**except** [2] - 3:21, 79:2

**exceptions** [1] - 3:19

**exchange** [10] - 41:14, 44:17, 49:8, 53:14, 54:6, 66:20, 66:23, 67:4, 68:14, 83:25

**exhibit** [3] - 84:22, 86:17, 87:15

**Exhibit** [27] - 25:21, 25:22, 29:11, 29:12, 35:9, 42:5, 42:14, 43:2, 48:8, 48:14, 50:4, 50:5, 57:3, 58:5, 58:6, 59:7, 61:16, 61:17, 64:13, 66:19, 74:22, 74:23, 81:7, 81:8, 87:23, 87:24, 95:6

**exhibits** [2] - 47:15, 85:15

**EXHIBITS** [1] - 2:4

**exit** [1] - 16:20

**expect** [11] - 21:18, 23:17, 24:21, 25:15, 28:23, 28:25, 30:5, 32:22, 52:24, 68:15, 82:17

**expense** [1] - 36:11

**experience** [7] -

9:10, 9:14, 9:24, 12:11, 23:7, 91:10, 91:19
**expertise** [1] - 80:4
**expiration** [1] - 103:14
**Expiration** [1] - 103:22
**expired** [2] - 33:13, 33:15
**expires** [1] - 103:23
**explain** [1] - 45:21
**explore** [11] - 44:18, 46:11, 46:19, 63:13, 67:4, 72:12, 95:24, 96:15, 96:17, 96:20, 100:9
**explored** [2] - 46:17, 65:20
**exploring** [3] - 45:5, 73:10, 98:11
**extent** [2] - 28:24, 30:5
**extra** [1] - 10:2

## F

**face** [2] - 64:7, 64:8
**facility** [1] - 54:19
**fact** [2] - 51:11, 85:20
**factor** [1] - 65:9
**factors** [2] - 36:12, 73:17
**facts** [1] - 83:4
**fair** [12] - 49:9, 51:13, 55:24, 57:21, 63:5, 67:16, 68:18, 77:21, 78:12, 82:5, 91:13, 99:18
**fairly** [3] - 14:16, 59:22, 92:25
**fall** [8] - 6:7, 33:7, 55:1, 94:6, 94:14, 94:16, 94:20
**fallen** [1] - 54:1
**falling** [1] - 94:13
**falls** [2] - 59:10, 94:11
**familiar** [5] - 28:2, 30:25, 33:1, 52:1, 66:20
**Family** [1] - 33:7
**far** [9] - 6:3, 31:6, 72:19, 73:9, 77:16, 84:11, 87:16, 93:18, 94:3
**Fast** [1] - 28:14
**fault** [1] - 100:4
**feasible** [1] - 46:13
**February** [1] - 103:17
**Federal** [1] - 3:3
**federal** [5] - 14:4, 20:9, 20:14, 25:13, 25:18
**feeling** [2] - 53:25, 56:22
**feet** [1] - 54:3
**fell** [4] - 14:6, 16:6, 17:5, 32:16
**felt** [1] - 44:20
**few** [6] - 4:23, 5:11, 13:11, 47:8, 71:14, 86:10
**fighting** [1] - 37:16
**figure** [2] - 23:14, 25:4
**file** [2] - 31:1, 53:6
**FILE** [1] - 1:6
**filed** [11] - 25:24, 29:14, 48:16, 50:7, 57:5, 58:8, 61:19, 74:25, 81:10, 88:1, 95:8
**files** [2] - 52:22, 53:2
**filled** [1] - 46:25
**final** [1] - 19:11
**financial** [1] - 36:13
**financially** [1] - 103:11
**find** [3] - 14:24, 24:22, 44:5
**fine** [5] - 5:7, 13:15, 60:2, 66:14, 85:8
**finish** [3] - 5:21, 5:24, 61:23
**firms** [1] - 20:21
**first** [16] - 4:3, 5:12, 5:20, 12:4, 12:17, 12:20, 13:2, 13:8, 29:17, 38:10, 38:20, 38:25, 39:6, 39:9, 56:25, 63:4
**fit** [1] - 15:23
**five** [2] - 54:2, 101:17
**fix** [1] - 72:2
**flesh** [1] - 19:21
**flow** [1] - 18:23
**focus** [3] - 8:5, 8:15, 17:9
**follow** [5] - 25:13, 25:17, 37:4, 42:24, 75:5
**followed** [1] - 52:18
**following** [1] - 103:14
**follows** [1] - 4:4
**FOOD** [2] - 1:7, 1:8
**Food** [90] - 2:6, 11:16, 11:18, 11:21, 11:24, 12:4, 12:5, 13:1, 13:23, 15:18, 15:24, 18:21, 20:3, 20:8, 20:12, 20:16, 21:19, 23:17, 23:20, 24:13, 25:9, 25:12, 25:14, 25:22, 26:2, 26:3, 26:7, 26:12, 28:11, 28:18, 28:24, 29:1, 29:5, 29:18, 30:1, 30:6, 30:7, 30:18, 31:3, 31:19, 33:1, 33:20, 33:21, 33:23, 34:3, 34:5, 34:11, 34:17, 35:3, 36:17, 38:2, 42:6, 42:22, 43:8, 44:4, 45:12, 45:15, 45:18, 46:8, 46:14, 46:19, 46:24, 50:15, 52:24, 53:1, 53:9, 53:23, 55:6, 55:15, 56:4, 58:21, 62:2, 64:9, 72:8, 76:9, 93:9, 95:12, 96:1, 96:6, 96:12, 96:13, 96:18, 96:20, 97:1, 97:3, 97:17, 97:20, 100:4, 101:8, 101:12
**for** [136] - 3:2, 3:8, 4:10, 4:13, 4:16, 6:16, 7:4, 9:1, 9:5, 9:18, 9:23, 11:16, 13:9, 13:11, 13:14, 13:22, 13:25, 14:1, 14:3, 14:9, 14:13, 15:3, 15:5, 15:12, 16:3, 17:11, 20:8, 20:17, 21:5, 22:6, 22:10, 27:22, 27:24, 29:9, 31:25, 32:3, 32:7, 32:12, 32:13, 32:17, 33:9, 33:15, 33:18, 34:13, 34:20, 36:6, 37:5, 37:12, 39:1, 39:12, 39:18, 39:23, 40:5, 41:2, 41:3, 41:9, 43:16, 43:18, 44:7, 45:6, 45:24, 46:1, 46:13, 46:15, 46:22, 47:5, 47:23, 50:20, 51:3, 53:11, 53:16, 53:18, 54:22, 55:7, 55:18, 55:20, 55:23, 56:6, 56:12, 56:20, 61:6, 62:3, 62:6, 62:7, 62:9, 62:17, 67:14, 68:7, 68:13, 68:21, 69:5, 69:9, 69:24, 71:7, 72:1, 74:17, 74:19, 74:20, 75:4, 75:9, 75:16, 76:9, 78:1, 80:7, 81:24, 82:8, 82:17, 83:10, 85:16, 85:21, 87:9, 89:24, 90:4, 92:4, 94:3, 95:13, 95:18, 95:21, 96:6, 96:8, 96:13, 96:19, 97:24, 98:11, 98:14, 98:18, 98:24, 100:1, 102:8, 102:11, 103:7, 103:22
**FOR** [2] - 1:12, 1:16
**foregoing** [1] - 103:8
**forget** [1] - 58:5
**form** [5] - 3:21, 29:3, 38:12, 39:8, 65:23
**formalities** [1] - 3:16
**former** [1] - 52:22
**forth** [1] - 67:9
**forward** [3] - 40:8, 40:9, 91:1
**forwarded** [5] - 87:13, 89:19, 89:21, 90:19, 91:24
**forwarding** [3] - 63:23, 87:16, 91:6
**found** [2] - 28:11, 97:1
**four** [3] - 53:18, 67:21, 68:6
**frame** [1] - 17:10
**framed** [1] - 95:20
**frequency** [1] - 95:14
**front** [1] - 22:9
**fuel** [24] - 41:17, 46:25, 53:13, 54:20, 62:15, 62:19, 64:16, 66:2, 70:5, 70:6, 70:8, 70:11, 70:13, 70:17, 70:23, 72:21, 77:11, 77:12, 77:19, 77:23, 78:3, 78:25, 79:2, 79:8
**Fugate** [2] - 93:4, 93:16
**full** [3] - 4:13, 5:21, 69:12
**fully** [1] - 46:17
**function** [2] - 32:13, 72:21
**functions** [9] - 30:17, 30:22, 34:15, 35:17, 42:9, 42:17, 43:6, 53:20, 73:12
**further** [12] - 3:15, 7:20, 41:13, 46:11, 46:19, 71:22, 82:11, 83:8, 83:16, 102:11, 103:10, 103:13
**FURTHER** [1] - 102:17

## G

**Gary** [22] - 2:10, 2:13, 2:15, 49:15, 49:18, 50:5, 50:25, 53:9, 57:10, 57:11, 58:6, 59:2, 62:2, 74:9, 74:23, 87:8, 87:12, 88:14, 88:17, 89:16, 89:19, 89:20
**Gas** [2] - 75:17, 90:21
**gathering** [1] - 54:5
**gave** [2] - 41:21, 83:5
**general** [14] - 16:15, 18:2, 18:9, 23:8, 34:1, 34:2, 35:5, 39:12, 39:16, 40:21, 47:7, 92:12, 93:8, 93:17
**generally** [1] - 38:3
**Georgia** [1] - 4:11
**GEORGIA** [1] - 1:1
**get** [10] - 5:14, 7:5, 9:7, 11:4, 12:3, 33:10, 56:24, 66:4, 93:11, 93:24
**getting** [1] - 66:10
**give** [12] - 4:22, 10:10, 10:12, 13:13, 14:15, 19:13, 19:23, 42:1, 42:11, 46:8, 62:22, 72:3
**given** [2] - 41:6, 83:8
**giving** [1] - 65:7
**Go** [2] - 75:17, 90:22
**go** [22] - 5:12, 12:14, 29:3, 31:8, 31:15, 37:2, 37:13, 37:20, 47:8, 53:7, 56:8, 61:22, 69:19, 70:8, 70:10, 72:4, 75:3, 78:11, 86:10, 97:7, 97:22, 100:7
**goals** [1] - 18:4
**goes** [2] - 75:20, 75:21
**going** [27] - 4:23, 7:5, 23:10, 24:2, 27:20, 29:2, 30:9, 33:25, 35:9, 39:3, 42:2, 47:8, 51:14, 51:21, 61:24, 62:24, 65:8, 66:7, 74:6, 77:24, 80:10, 84:16, 84:17, 84:19, 84:21, 100:15, 100:16
**gone** [1] - 53:2
**good** [1] - 29:22
**got** [13] - 7:2, 13:17, 54:25, 55:15, 56:18, 64:21, 71:9, 72:18, 73:9, 90:15, 91:14, 94:10, 101:6
**graduate** [8] - 7:18, 7:23, 7:25, 9:19, 12:15, 12:20, 13:12, 13:21
**graduated** [1] - 12:15
**grant** [1] - 29:18
**granted** [2] - 14:17, 14:20
**granting** [2] - 41:24, 45:22
**great** [2] - 6:3, 37:10
**greater** [1] - 77:15

ground [2] - 5:13, 14:24
guess [2] - 88:11, 97:11
guidance [2] - 25:17, 51:2
guide [3] - 27:10, 27:12, 28:5
guidelines [1] - 11:1

## H

had [88] - 9:1, 9:21, 10:14, 10:22, 12:10, 12:12, 13:24, 15:19, 16:2, 17:15, 21:24, 22:15, 23:11, 27:10, 28:12, 31:19, 33:13, 38:11, 38:21, 38:23, 39:4, 39:7, 39:11, 39:13, 41:8, 44:10, 44:20, 46:17, 47:16, 48:20, 48:23, 48:25, 50:20, 50:22, 51:9, 51:10, 51:15, 52:11, 52:16, 53:15, 53:17, 53:22, 54:10, 56:17, 57:15, 58:20, 59:22, 60:4, 61:10, 62:4, 62:5, 64:1, 66:1, 67:19, 67:24, 73:5, 76:5, 76:6, 76:10, 77:18, 81:2, 81:20, 82:16, 83:8, 83:19, 91:7, 91:8, 91:10, 91:14, 91:16, 91:22, 91:23, 91:25, 92:3, 92:8, 92:10, 93:15, 96:12, 96:18, 97:15, 98:23, 99:12, 102:3
had you [1] - 12:10
half [2] - 53:3, 66:8
HALL [1] - 1:23
Hallmark [1] - 15:2
HAMILTON [1] - 103:4
hand [1] - 103:16
Handbook [3] - 2:7, 24:14, 25:23
handbook [4] - 25:11, 25:16, 30:3, 31:7
handle [1] - 18:25
happen [3] - 6:21, 49:19, 84:12
happened [1] - 49:18
happy [1] - 24:12
hard [1] - 52:19
hardship [3] - 36:6, 36:10, 36:20
HARGRAVES [26] - 1:13, 4:6, 25:20, 26:1, 29:16, 48:18, 50:9, 57:2, 57:7, 58:10, 61:15, 61:21, 66:14, 66:17, 74:21, 75:2, 81:6, 81:12, 87:22, 88:3, 94:25, 95:4, 95:10, 101:16, 101:22, 102:15
Hargraves [2] - 2:3, 4:16
has [16] - 22:17, 27:23, 37:8, 53:10, 53:15, 54:1, 67:14, 70:7, 70:11, 70:14, 70:18, 71:2, 75:9, 88:25, 101:23, 102:1
hat [1] - 14:7
hats [1] - 13:24
have [125] - 4:17, 4:19, 5:7, 5:15, 7:4, 7:11, 7:20, 7:22, 8:6, 8:22, 8:24, 8:25, 9:21, 10:22, 11:13, 14:3, 14:12, 14:23, 15:15, 16:12, 19:3, 20:7, 20:10, 20:17, 21:16, 22:9, 23:3, 23:7, 23:13, 23:18, 23:21, 23:23, 25:10, 25:16, 26:3, 26:8, 26:12, 28:21, 28:22, 30:25, 31:3, 31:6, 32:20, 32:23, 33:25, 37:23, 38:1, 38:5, 38:14, 38:16, 39:3, 40:6, 42:5, 44:24, 45:3, 45:21, 49:10, 52:11, 52:16, 52:21, 52:22, 52:25, 54:11, 55:12, 61:2, 63:11, 63:14, 63:22, 64:3, 64:5, 65:17, 65:18, 65:19, 65:20, 65:24, 66:11, 68:14, 68:22, 71:4, 72:1, 72:19, 72:24, 73:4, 73:12, 73:25, 74:13, 75:24, 76:2, 76:13, 77:6, 77:23, 78:11, 78:20, 78:25, 79:9, 79:12, 80:3, 81:25, 82:6, 82:11, 82:18, 82:22, 83:10, 84:13, 85:17, 85:22, 85:25, 86:17, 86:25, 89:7, 89:21, 89:25, 92:18, 92:22, 93:16, 93:19, 97:9, 97:13, 98:13, 98:18, 99:20, 102:10, 102:13, 103:16
haven't [1] - 17:7
having [4] - 4:3, 67:8, 75:5, 95:17
he he [2] - 46:6, 56:19
head [1] - 6:4
health [1] - 9:1
hearing [1] - 3:20
help [6] - 53:24, 58:21, 58:24, 62:13, 64:14, 91:4
helped [2] - 99:14, 99:18
helps [1] - 54:2
hereby [1] - 103:7
herein [11] - 25:24, 29:14, 48:16, 50:7, 57:5, 58:8, 61:19, 74:25, 81:10, 88:1, 95:8
hereunto [1] - 103:16
high [3] - 7:13, 13:10, 95:14
high-frequency [1] - 95:14
HIGHWAY [1] - 1:14
himself [1] - 21:4
hire [5] - 31:20, 32:2, 32:6, 32:15, 32:25
hires [1] - 32:21
hiring [3] - 31:4, 31:24, 31:25
history [1] - 12:3
Hobbs [7] - 2:9, 47:24, 48:1, 48:12, 48:15, 88:14, 89:15
holiday [1] - 33:8
home [2] - 77:20, 78:8
honestly [5] - 5:5, 41:25, 63:14, 86:23, 93:14
hopefully [2] - 5:13, 27:21
horse [1] - 40:11
hour [2] - 66:7, 66:11
Howard [3] - 21:3, 22:17, 48:10
HOWARD [1] - 1:17
Howard's [1] - 20:20
HR [34] - 11:3, 13:14, 13:25, 14:7, 15:24, 16:6, 16:17, 16:18, 16:19, 16:22, 16:23, 16:25, 18:1, 18:2, 18:3, 18:4, 18:24, 20:2, 26:12, 26:14, 26:17, 27:5, 30:24, 38:7, 44:24, 50:10, 51:2, 55:17, 56:5, 56:11, 89:22, 91:5, 95:11
huh-uh [1] - 6:6
human [9] - 8:7, 8:9, 8:11, 9:4, 11:25, 12:9, 12:20, 15:17, 17:16
hundreds [1] - 14:20
hypothetical [3] - 97:13, 98:7

## I

idea [1] - 63:7
ideas [4] - 62:7, 67:19, 68:7, 68:21
immateriality [1] - 3:20
impression [3] - 47:21, 83:5, 92:10
IN [1] - 103:16
INC [1] - 1:7
Inc [3] - 2:17, 11:16, 87:25
incentives [5] - 31:20, 31:22, 31:23, 31:25, 32:2
include [6] - 18:12, 23:25, 27:3, 27:5, 70:5, 77:13
included [8] - 26:22, 28:2, 31:16, 32:21, 38:24, 47:15, 76:10, 86:17
includes [2] - 26:17, 70:15
incompetency [1] - 3:19
indicate [1] - 92:16
indicated [2] - 82:23, 99:13
indicates [4] - 64:13, 76:18, 76:23, 91:3
individual [8] - 18:16, 30:15, 30:20, 32:16, 35:15, 43:4, 71:7
industrial [5] - 8:1, 8:3, 8:12, 8:16, 12:16
industry [1] - 8:2
ineligible [2] - 43:16, 55:7
informal [5] - 41:14, 44:16, 66:22, 92:7, 96:22
information [13] - 10:5, 10:17, 10:19, 10:23, 38:13, 39:4, 39:5, 39:11, 40:17, 40:19, 52:9, 54:5, 73:7
informed [2] - 62:3, 75:7
initial [7] - 83:10, 96:1, 96:4, 96:10, 96:19, 97:5, 97:21
initially [4] - 12:18, 14:2, 16:7, 67:13
injured [1] - 94:20
injury [2] - 94:13, 94:19
input [1] - 68:13
inside [3] - 31:16, 41:17, 54:19
insight [1] - 19:13 7
instance [3] - 3:2, 4:2, 23:9
instead [2] - 44:1, 45:22
instituted [1] - 9:10
insurance [1] - 9:2
interactive [1] - 66:20
interested [1] - 103:11
interfere [2] - 94:17, 94:21
interpretation [2] - 58:1, 67:6
interrupted [1] - 65:2
into [6] - 6:7, 10:25, 11:4, 12:21, 19:13, 32:16
involve [5] - 21:7, 21:11, 67:7, 78:4, 78:15
involved [4] - 21:10, 26:18, 93:25, 94:2
involvement [2] - 19:4, 19:16
involving [2] - 5:9, 11:7
iPhone [1] - 68:2
irrelevancy [1] - 3:19
isn't [6] - 36:24, 44:17, 68:14, 69:12, 69:25, 100:23
isolation [11] - 54:1, 54:13, 54:17, 56:22, 58:24, 62:14, 64:15, 73:18, 98:24, 99:14, 99:25
issue [12] - 8:17, 21:11, 23:6, 30:1, 65:21, 66:3, 73:24, 91:20, 92:9, 93:2, 94:2, 94:7
issues [6] - 64:19, 65:16, 77:1, 77:7, 79:16, 96:12
itself [1] - 65:22

## J

JACKSON [18] - 1:17, 17:9, 29:2, 37:2, 37:13, 37:20, 47:23, 56:8, 66:12, 69:19, 72:4, 95:2, 97:7, 97:22, 98:3, 100:7, 101:20, 102:13
Jackson [2] - 68:4, 102:11
January [1] - 3:5
JANUARY [1] - 1:10
jerk [1] - 6:11
job [45] - 5:18, 12:3,

14:8, 15:9, 17:11, 18:1, 30:17, 30:22, 34:15, 34:20, 34:23, 35:2, 35:8, 35:17, 35:21, 35:25, 37:6, 37:10, 37:12, 41:7, 41:9, 41:16, 42:1, 42:9, 42:17, 43:6, 43:10, 43:14, 45:25, 53:20, 54:25, 55:8, 56:1, 58:15, 60:5, 60:11, 62:6, 70:25, 71:8, 73:15, 77:11, 82:15, 94:12, 94:18, 94:21
**jobs** [2] - 75:10, 79:1
**joined** [1] - 12:25
**JONES** [1] - 1:17
**July** [3] - 49:19, 90:14, 90:25
**jumped** [1] - 49:5
**June** [1] - 103:24

## K

**K-VA-T** [4] - 1:7, 2:6, 11:16, 25:22
**keep** [5] - 53:2, 56:21, 63:25, 81:24, 87:1
**Kerley** [2] - 3:10, 103:6
**KERLEY** [2] - 1:23, 103:21
**key** [2] - 54:16, 55:10
**keyboard** [1] - 70:15
**kind** [9] - 4:25, 6:7, 12:3, 15:23, 48:21, 76:7, 77:18, 77:20, 83:20
**kinds** [1] - 13:21
**kiosk** [10] - 41:17, 54:20, 62:15, 64:16, 70:11, 70:13, 70:14, 70:17, 77:20, 79:3
**knew** [3] - 61:12, 76:5, 87:5
**know** [46] - 6:17, 6:21, 7:2, 8:13, 11:22, 14:21, 16:16, 19:25, 21:21, 22:8, 26:6, 28:1, 31:15, 31:19, 32:18, 46:1, 46:25, 50:3, 50:10, 52:6, 53:1, 53:3, 53:6, 59:16, 59:24, 62:10, 64:9, 65:25, 68:6, 68:17, 70:4, 71:5, 74:14, 79:21, 84:5, 84:9, 86:18, 86:20, 89:20, 92:2, 93:18, 94:9, 96:15, 97:17, 102:2
**knowledge** [22] - 23:20, 25:9, 26:2, 26:7, 32:12, 33:19, 38:1, 43:8, 43:13, 48:23, 50:14, 50:17, 50:22, 63:6, 63:16, 64:11, 84:14, 91:14, 91:16, 91:22, 91:23, 103:9
**knowledgeable** [2] - 47:2, 51:9
**KNOXVILLE** [1] - 1:18
**Knoxville** [1] - 89:23

## L

**labeled** [1] - 31:10
**labor** [12] - 8:5, 8:17, 8:19, 12:25, 15:7, 15:8, 18:6, 18:11, 21:5, 22:18, 26:22, 27:17
**Labor** [1] - 18:7
**land** [1] - 12:17
**last** [5] - 4:20, 15:19, 21:23, 83:20, 90:15
**late** [1] - 90:15
**later** [4] - 9:10, 11:5, 12:21, 91:1
**latest** [1] - 11:24
**latitude** [1] - 51:13
**law** [5] - 18:11, 21:5, 22:18, 26:22, 27:17
**laws** [6] - 18:6, 18:7, 20:9, 20:14, 25:14, 25:18
**Lawson** [1] - 22:19
**LAWSON** [1] - 1:17
**lawyer** [1] - 93:9
**LCR** [3] - 103:6, 103:14, 103:21
**lead** [1] - 18:2
**lean** [1] - 77:9
**learn** [1] - 38:10
**learned** [3] - 38:19, 38:20, 39:6
**learning** [1] - 28:13
**least** [15] - 4:23, 8:16, 19:2, 20:6, 25:16, 32:24, 51:12, 65:15, 73:20, 76:17, 79:14, 83:12, 83:25, 85:4, 86:24
**Leave** [1] - 33:7
**leave** [21] - 33:8, 33:9, 33:11, 33:18, 40:1, 41:25, 62:25, 81:5, 81:16, 81:24, 82:3, 82:9, 82:11, 82:19, 82:25, 83:7, 83:13, 83:24, 84:4, 84:10, 85:22
**leaves** [3] - 33:2, 33:12, 33:14
**leaving** [3] - 75:20, 81:23, 82:13
**led** [2] - 41:24, 54:21
**LEE** [1] - 1:14
**left** [3] - 13:11, 46:24, 47:1
**legal** [1] - 23:6
**legible** [2] - 29:9, 88:7
**legitimate** [1] - 82:16
**letter** [2] - 25:2
**level** [12] - 9:22, 18:21, 26:20, 27:1, 55:2, 70:24, 78:15, 78:17, 91:8, 91:20, 92:14, 101:6
**Library** [1] - 10:25
**license** [1] - 9:1
**licensed** [2] - 103:6, 103:13
**Licensed** [1] - 103:14
**licenses** [2] - 8:23, 8:25
**life** [1] - 9:1
**light** [1] - 36:12
**like** [16] - 5:12, 6:6, 8:7, 8:13, 8:18, 10:25, 20:25, 22:10, 30:2, 64:24, 67:18, 89:16, 90:24, 90:25, 92:25, 94:9
**likely** [1] - 52:18
**likewise** [1] - 56:18
**line** [4] - 29:17, 67:15, 67:21, 68:6
**listed** [2] - 21:7, 23:2
**little** [12] - 5:18, 11:5, 12:14, 15:22, 17:10, 19:22, 29:10, 56:23, 61:25, 65:14, 66:10, 95:20
**live** [2] - 7:9, 7:10
**lived** [1] - 7:11
**local** [2] - 20:21, 22:20
**long** [4] - 7:11, 10:13, 62:21, 66:9
**longer** [1] - 8:24
**look** [6] - 6:7, 35:9, 43:23, 90:17, 95:18, 101:18
**looking** [6] - 37:5, 67:12, 68:4, 80:7, 95:21, 96:8
**looks** [6] - 64:24, 67:18, 89:16, 90:24, 90:25, 92:25
**loss** [1] - 76:10
**Lyon** [3] - 48:3, 88:24, 89:25

## M

**machine** [1] - 3:10
**mailed** [1] - 64:3
**MAIN** [1] - 1:18
**main** [2] - 8:13, 41:11
**maintained** [1] - 99:17
**make** [33] - 5:17, 5:23, 5:25, 6:11, 6:12, 7:5, 18:3, 18:21, 19:10, 19:14, 22:6, 29:9, 32:15, 33:9, 34:11, 36:6, 39:22, 40:11, 40:13, 40:14, 45:10, 45:13, 46:13, 50:15, 51:14, 58:2, 59:16, 72:13, 74:21, 87:22, 90:12, 92:18, 97:25
**makers** [1] - 40:12
**makes** [2] - 55:1, 59:13
**making** [21] - 18:15, 20:8, 22:24, 23:15, 40:19, 47:4, 47:18, 48:5, 49:7, 49:8, 50:1, 52:11, 57:19, 60:24, 74:15, 80:25, 85:1, 85:18, 85:23, 86:22, 89:4
**managed** [1] - 32:1
**management** [5] - 15:12, 18:20, 26:20, 27:1, 28:13
**manager** [4] - 18:25, 51:1, 51:19, 84:23
**managers** [3] - 17:4, 17:5, 27:3
**mandated** [1] - 62:17
**many** [2] - 14:21, 15:24
**mark** [7] - 25:20, 29:11, 48:8, 50:4, 58:4, 61:15, 81:6
**marked** [11] - 25:23, 29:13, 48:15, 50:6, 57:4, 58:7, 61:18, 74:24, 81:9, 87:25, 95:7
**marketing** [1] - 14:1
**MASSEY** [1] - 1:14
**material** [2] - 42:4, 43:2
**materials** [4] - 16:13, 21:15, 23:1, 27:9
**Matt** [3] - 58:12, 58:14, 75:4
**matt** [2] - 58:18, 58:22
**Matthew** [8] - 4:17, 37:24, 53:9, 53:10, 60:4, 61:10, 62:1, 90:10
**MATTHEW** [1] - 1:4
**max** [1] - 16:1
**Maximus** [5] - 32:2, 32:5, 32:9, 32:11, 32:12
**Maximus's** [1] - 32:4
**maybe** [8] - 29:10, 49:1, 61:23, 69:12, 83:9, 87:14, 89:23, 90:4
**MEADOWS** [4] - 1:11, 2:3, 3:1, 4:1
**Meadows** [22] - 4:12, 4:14, 4:15, 7:8, 17:12, 24:8, 25:24, 29:14, 48:1, 48:16, 50:7, 57:5, 57:8, 58:8, 61:19, 66:18, 74:25, 81:10, 88:1, 95:8, 101:23, 102:15
**mean** [12] - 17:10, 31:9, 31:22, 35:20, 37:18, 42:21, 66:10, 69:22, 70:9, 79:24, 85:6, 99:1
**medical** [2] - 37:9, 80:3
**Medical** [1] - 33:7
**meet** [12] - 34:10, 44:9, 44:12, 44:21, 45:6, 45:9, 45:24, 67:5, 83:18, 95:23, 96:23, 99:4
**meeting** [15] - 38:23, 47:16, 54:4, 54:6, 59:6, 59:20, 60:5, 60:10, 61:10, 63:3, 75:5, 81:16, 98:5
**meetings** [1] - 61:13
**Megastar** [6] - 26:21, 26:24, 28:5, 28:12, 28:22
**member** [1] - 11:9
**mention** [3] - 26:17, 59:13, 59:17
**mentioned** [4] - 22:17, 24:18, 71:14, 77:17
**merged** [1] - 12:21
**met** [7] - 34:8, 37:23, 53:8, 55:12, 58:12, 62:1, 75:4
**middle** [1] - 70:12
**might** [9] - 28:11, 46:12, 52:21, 63:13, 82:2, 90:16, 94:14, 96:23, 102:11
**mind** [5] - 4:21, 34:22, 53:2, 56:21, 63:25
**minded** [2] - 46:2, 65:6

minutes [3] - 66:15, 91:1, 101:18
mobile [2] - 24:4, 29:6
mode [1] - 3:17
model [1] - 9:15
modification [8] - 71:10, 73:23, 77:5, 97:4, 97:19, 97:24, 101:9, 101:13
Monday [1] - 90:25
moot [1] - 36:23
mouth [1] - 65:12
move [4] - 40:8, 40:9, 41:16, 54:19
moved [1] - 15:1
MR [42] - 4:6, 17:9, 25:20, 26:1, 29:2, 29:16, 37:2, 37:13, 37:20, 47:23, 48:18, 50:9, 56:8, 57:2, 57:7, 58:10, 61:15, 61:21, 66:12, 66:14, 66:17, 69:19, 72:4, 74:21, 75:2, 81:6, 81:12, 87:22, 88:3, 94:25, 95:2, 95:4, 95:10, 97:7, 97:22, 98:3, 100:7, 101:16, 101:20, 101:22, 102:13, 102:15
multiple [3] - 13:24, 61:13, 99:4
must [1] - 86:17

N

name [6] - 4:13, 4:15, 32:23, 49:15, 89:1, 103:14
national [1] - 29:21
nature [3] - 19:18, 36:14, 64:2
near [1] - 16:20
necessarily [7] - 29:5, 72:7, 81:13, 97:25, 98:6, 98:9, 98:19
necessitate [1] - 19:15
need [34] - 7:1, 34:10, 34:12, 34:19, 34:20, 37:18, 43:19, 43:20, 43:21, 44:9, 44:12, 44:21, 45:6, 45:9, 45:24, 51:24, 56:16, 59:10, 66:6, 78:1, 81:13, 82:7, 82:17, 82:18, 82:24, 83:6, 83:10, 94:3, 96:23, 97:11, 97:24, 98:15, 98:19, 98:23
needed [23] - 33:6, 33:20, 34:3, 53:24, 54:12, 54:16, 56:15, 56:20, 62:20, 62:21, 66:1, 71:8, 73:21, 73:22, 75:19, 75:25, 76:1, 76:15, 77:9, 79:3, 96:20, 99:10
needs [8] - 55:13, 67:5, 75:11, 80:5, 83:18, 95:23, 98:6, 99:5
negotiating [1] - 8:20
never [1] - 39:13
new [6] - 32:2, 32:15, 32:21, 32:25, 39:12
next [3] - 6:2, 36:3, 49:14
No [13] - 2:5, 25:22, 29:12, 48:14, 50:5, 57:3, 58:6, 61:17, 74:23, 81:8, 87:24, 95:6, 103:6
no [68] - 5:10, 6:4, 6:10, 8:24, 10:12, 10:20, 11:8, 11:14, 14:23, 17:22, 19:23, 19:24, 21:16, 22:13, 23:16, 24:1, 27:13, 27:16, 31:2, 33:12, 37:25, 38:4, 38:8, 38:22, 40:25, 42:19, 45:16, 45:19, 46:13, 47:2, 48:23, 49:2, 49:8, 50:13, 50:24, 51:17, 51:25, 52:22, 55:25, 56:10, 59:13, 60:1, 69:11, 76:2, 76:11, 78:24, 79:10, 88:7, 92:6, 94:1, 94:5, 94:14, 94:15, 94:19, 96:3, 96:12, 96:18, 97:2, 97:11, 97:16, 98:11, 98:21, 99:6, 99:22, 101:15, 102:9, 102:13
NO [1] - 1:6
nobody [1] - 101:1
nods [1] - 6:4
none [3] - 39:21, 71:16, 76:16
normal [2] - 7:3, 93:24
normally [3] - 64:1, 70:4, 78:6
North [1] - 20:24
NORTHERN [1] - 1:1
NOT [1] - 102:17
notarial [1] - 103:16
Notary [3] - 3:10, 3:14, 103:22
notary [1] - 103:6
note [2] - 38:22, 59:15
notes [1] - 101:18
nothing [2] - 53:17, 79:15
notice [3] - 3:4, 3:16, 4:9
number [3] - 17:23, 20:19, 103:14
nurse [1] - 17:15
nutshell [1] - 33:5

O

object [1] - 29:2
objection [10] - 37:2, 37:13, 37:20, 56:8, 69:19, 72:4, 97:7, 97:22, 98:3, 100:7
obviously [1] - 66:3
occasion [1] - 78:11
occasional [1] - 77:24
occasionally [1] - 78:2
occasions [1] - 19:6
occurred [1] - 76:8
OF [4] - 1:1, 1:11, 103:3, 103:4
off [14] - 9:19, 24:15, 31:9, 33:6, 40:16, 41:5, 42:4, 51:5, 64:22, 65:9, 69:13, 70:9, 74:4, 77:10
offer [8] - 55:9, 55:16, 63:7, 69:9, 72:9, 84:7, 96:13, 100:5
offered [11] - 26:25, 45:21, 55:11, 63:4, 68:23, 71:17, 73:1, 73:6, 74:2, 81:16, 99:24
offering [6] - 54:22, 72:15, 81:4, 101:2, 101:8, 101:12
OFFICE [1] - 1:24
okay [198] - 4:25, 5:11, 6:2, 6:23, 6:25, 7:6, 7:8, 8:4, 8:9, 8:22, 9:21, 10:1, 10:7, 10:14, 10:18, 10:21, 11:4, 11:9, 11:24, 12:2, 12:10, 13:17, 13:19, 14:17, 14:21, 14:25, 15:4, 15:14, 16:8, 16:21, 17:4, 17:7, 17:21, 18:20, 19:2, 19:6, 19:9, 20:6, 21:6, 21:22, 22:14, 22:24, 23:10, 24:6, 24:17, 24:23, 25:4, 25:9, 25:15, 25:20, 26:6, 26:11, 26:24, 27:8, 27:20, 28:7, 28:9, 28:16, 28:23, 29:25, 30:4, 30:9, 30:24, 31:3, 31:8, 32:22, 33:1, 33:19, 34:11, 35:11, 36:24, 38:1, 38:5, 38:15, 39:16, 39:22, 40:4, 40:10, 40:18, 40:22, 41:1, 42:21, 43:22, 44:12, 44:19, 47:3, 47:8, 47:17, 48:4, 48:13, 49:3, 49:9, 49:13, 49:17, 49:24, 50:3, 50:18, 50:25, 51:22, 52:10, 52:14, 52:20, 52:24, 53:4, 53:7, 54:24, 55:14, 55:22, 56:3, 58:2, 58:4, 59:9, 59:19, 60:9, 60:13, 61:1, 61:5, 61:9, 61:15, 63:7, 63:16, 64:5, 64:12, 65:1, 65:11, 66:6, 66:12, 66:18, 67:7, 67:12, 68:1, 69:2, 70:10, 70:17, 70:20, 71:9, 71:14, 72:14, 72:25, 73:4, 73:11, 74:8, 74:12, 74:14, 74:21, 75:24, 76:17, 78:3, 78:14, 80:10, 80:20, 81:3, 81:6, 81:19, 81:25, 82:5, 82:14, 82:16, 82:21, 83:12, 83:19, 83:24, 84:11, 84:15, 84:24, 85:3, 85:8, 85:16, 85:25, 86:4, 86:20, 87:4, 87:12, 88:10, 88:12, 89:12, 90:6, 91:4, 91:18, 92:2, 92:14, 92:16, 92:21, 92:24, 93:18, 93:23, 94:6, 97:19, 98:10, 98:13, 98:17, 98:22, 99:23, 102:2, 102:7, 102:10, 102:15
once [3] - 12:19, 29:6, 39:11
one [21] - 14:15, 14:23, 16:2, 19:16, 19:23, 20:2, 20:7, 23:4, 25:6, 34:14, 47:15, 49:24, 51:12, 60:14, 73:17, 86:12, 90:15, 98:7, 98:25, 99:11
online [1] - 20:25
open [7] - 41:19, 46:2, 65:6, 67:4, 71:21, 81:24, 82:11
open-minded [1] - 65:6
operation [1] - 36:14
operations [4] - 12:22, 17:6, 18:24, 19:17
operator [1] - 70:16
opportunities [1] - 29:19
opportunity [4] - 20:17, 24:25, 31:13, 41:25
Opportunity [2] - 2:8, 29:13
oppose [1] - 96:19
option [1] - 81:5
options [1] - 72:23
organization [5] - 9:5, 15:8, 20:20, 21:4, 32:14
organizational [1] - 18:5
organizations [1] - 11:10
origin [1] - 29:21
OSHA [1] - 18:7
others [1] - 75:13
others" [1] - 76:20
otherwise [1] - 97:17
outcome [1] - 103:11
outline [1] - 12:3
outset [1] - 96:18
outside [4] - 23:24, 28:12, 76:11, 93:20
overall [1] - 18:4
overlooking [1] - 55:25
oversaw [1] - 14:1
oversee [1] - 16:8
overseeing [2] - 12:22, 14:9
own [1] - 18:25

P

packet [3] - 28:17, 85:5, 86:18
Page [2] - 2:2, 2:5
page [4] - 24:15, 24:24, 30:10, 74:9
pages [5] - 24:12, 27:23, 86:10, 88:5, 103:8
paid [1] - 33:8
pain [3] - 37:10, 37:17, 62:18
panic [2] - 53:25, 54:13
paperwork [1] - 85:21
paraphrasing [1] - 100:16
part [19] - 10:3, 10:4, 14:8, 17:16, 21:16, 28:4, 28:17, 36:21, 43:19, 48:19, 49:22, 50:14, 53:5, 56:1, 65:15, 66:4, 83:12, 83:25, 85:14

particular [4] - 28:10, 47:12, 47:18, 84:25
parties [1] - 103:11
past [1] - 91:8
payroll [1] - 13:25
people [4] - 12:24, 15:6, 31:20, 54:21
perfectly [1] - 7:3
perform [21] - 30:16, 30:21, 34:16, 34:19, 34:23, 35:2, 35:8, 35:17, 41:7, 42:16, 43:5, 43:14, 53:20, 54:25, 56:1, 58:16, 58:19, 60:5, 60:11, 71:8, 75:16
performance [1] - 73:15
performed [1] - 32:13
performing [7] - 36:22, 36:25, 37:6, 37:9, 41:9, 42:9, 62:6
perhaps [1] - 84:1
period [1] - 20:1
periods [5] - 33:18, 62:18, 69:5, 69:24, 75:17
person [1] - 76:23
person's [1] - 67:5
personal [5] - 33:2, 33:9, 33:11, 33:18, 41:24
persons [4] - 29:20, 31:4, 31:24, 36:7
pertain [1] - 87:19
pertains [1] - 59:7
pharmacy [1] - 72:23
phone [5] - 24:4, 29:6, 64:5, 64:8, 64:10
phrase [1] - 66:21
physical [3] - 76:5, 82:1, 82:7
physically [2] - 37:10, 100:23
physician [2] - 79:23, 80:1
picture [3] - 86:6, 86:16, 86:24
pictures [3] - 86:14, 86:21, 86:22
piece [1] - 94:3
place [6] - 28:10, 40:1, 51:10, 59:25, 81:23, 84:9
placed [1] - 84:4
plaintiff [3] - 1:5, 3:8, 4:17
Plaintiff [2] - 3:2, 4:3
PLAINTIFF [1] - 1:12
plan [2] - 72:8, 72:11
Please [1] - 90:20
please [2] - 4:12, 6:17
podium [10] - 65:23, 70:14, 71:3, 77:8, 77:14, 78:8, 78:20, 79:10, 79:11, 79:13
point [12] - 6:16, 7:1, 16:2, 55:10, 56:18, 63:15, 64:4, 68:23, 75:8, 77:12, 84:3, 92:19
points [1] - 36:23
policies [6] - 10:5, 23:21, 26:3, 28:25, 29:1, 50:15
policy [31] - 18:5, 23:24, 24:17, 24:22, 25:5, 25:7, 25:8, 25:10, 25:12, 28:18, 29:5, 29:18, 30:1, 30:3, 30:6, 30:7, 30:18, 31:3, 31:13, 33:2, 33:4, 33:23, 34:5, 34:18, 35:3, 35:14, 36:1, 36:4, 36:24, 55:6, 95:25
portion [1] - 26:21
position [63] - 11:24, 12:8, 14:12, 15:10, 16:19, 16:22, 17:3, 42:6, 43:8, 44:2, 46:9, 47:1, 55:17, 56:4, 56:5, 56:11, 56:21, 61:3, 61:5, 62:13, 62:17, 63:4, 63:8, 65:15, 65:18, 68:24, 69:4, 69:18, 69:23, 70:3, 70:17, 71:2, 71:10, 71:11, 71:24, 71:25, 72:10, 72:17, 72:25, 73:1, 73:5, 73:23, 75:15, 75:18, 76:24, 77:5, 77:19, 78:3, 78:7, 78:19, 79:15, 83:15, 83:20, 83:22, 84:6, 90:2, 90:3, 100:19, 100:21, 101:9, 101:13
positions [5] - 17:7, 17:13, 65:19, 72:20, 77:17
positive [2] - 27:16, 28:6
possession [1] - 21:20
possibilities [1] - 66:2
possible [10] - 19:2, 19:5, 36:6, 57:17, 57:20, 61:1, 62:8, 67:20, 68:8, 79:21
possibly [3] - 28:12, 52:18, 94:4
POST [1] - 1:24
potential [1] - 94:7
potentially [1] - 72:15
Practice [1] - 4:11
practices [1] - 11:1
preference [5] - 98:8, 98:16, 98:18, 98:23
preferred [1] - 99:1
preparation [3] - 61:6, 74:17, 74:19
present [2] - 53:12, 62:24
PRESENT [1] - 1:19
presentation [1] - 21:17
presented [2] - 32:3, 52:8
presenting [1] - 29:7
presently [1] - 11:9
president [1] - 12:9
presidents [1] - 17:24
prevent [2] - 94:11, 94:14
prevented [4] - 65:3, 101:8, 101:10, 101:12
previously [1] - 57:15
primarily [3] - 8:5, 8:19, 15:8
primary [2] - 8:15, 18:9
privileged [1] - 23:12
probably [5] - 8:11, 14:19, 16:2, 21:3, 64:2
problem [3] - 44:24, 45:3, 69:10
procedure [2] - 31:4, 95:25
Procedure [1] - 3:4
procedures [4] - 23:21, 26:3, 28:18, 50:15
process [5] - 5:14, 22:6, 36:22, 43:19, 96:23
product [1] - 11:2
products [1] - 9:2
professional [2] - 8:23, 11:10
program [2] - 8:16, 9:11
prolonged [3] - 62:17, 69:5, 69:24
promise [1] - 6:10
proposal [1] - 100:18
propose [2] - 96:6, 96:21
proposed [10] - 45:25, 73:2, 96:1, 96:4, 96:11, 96:13, 97:1, 97:2, 97:14, 97:15
provide [15] - 10:1, 20:13, 33:22, 33:24, 34:4, 34:6, 34:18, 35:3, 40:18, 41:12, 41:25, 44:14, 58:23, 71:8, 77:15
provided [6] - 20:16, 20:20, 34:7, 40:17, 73:8, 87:8
provides [1] - 10:5
Public [3] - 3:11, 3:14, 103:22
public [1] - 103:6
pump [1] - 79:9
pumps [1] - 77:25
purpose [9] - 44:17, 56:14, 58:22, 80:8, 82:4, 82:10, 83:1, 83:3, 83:13
purposes [2] - 4:10
pursuant [2] - 3:3, 4:9
put [3] - 6:5, 65:12, 68:11

## Q

qualified [20] - 29:19, 30:12, 30:19, 32:7, 35:13, 35:14, 35:21, 35:25, 37:1, 37:5, 42:7, 42:15, 42:18, 42:20, 42:21, 43:3, 43:9, 43:11, 43:14, 43:17
qualify [1] - 80:4
questions [6] - 13:16, 13:18, 94:10, 102:4, 102:11, 102:14
quick [3] - 24:3, 35:10, 47:9
quickly [1] - 92:25
quoted [1] - 31:7

## R

race [1] - 29:20
ran [1] - 32:5
rare [1] - 14:23
rather [3] - 54:19, 81:22, 86:14
reach [2] - 51:15, 84:5
read [21] - 29:23, 31:19, 35:18, 36:7, 36:15, 48:5, 49:21, 49:25, 54:8, 57:14, 57:15, 58:24, 63:1, 67:23, 74:13, 74:15, 74:16, 75:21, 81:14, 85:13, 90:22
reading [3] - 47:25, 51:25, 85:15
real [3] - 24:2, 35:10, 47:9
really [1] - 66:12
reason [14] - 6:17, 38:5, 41:2, 44:7, 45:7, 76:13, 82:6, 89:24, 96:6, 96:13, 97:5, 97:20, 98:13, 99:20
reasonable [12] - 30:16, 30:21, 30:23, 35:16, 36:4, 43:5, 43:10, 43:15, 43:16, 43:18, 44:20, 51:6
reasons [3] - 41:2, 96:18
reassign [1] - 62:12
recall [54] - 5:5, 5:10, 10:14, 11:6, 11:8, 35:5, 35:6, 39:15, 41:21, 47:17, 48:4, 48:7, 49:1, 49:3, 49:6, 49:23, 49:24, 51:12, 52:9, 54:16, 59:21, 60:12, 60:21, 60:23, 63:15, 63:20, 69:13, 76:2, 76:9, 84:22, 84:24, 85:2, 85:15, 86:3, 86:23, 86:24, 87:3, 87:11, 87:12, 87:14, 87:17, 89:10, 89:11, 91:12, 91:22, 92:1, 92:13, 92:22, 93:21, 95:12, 95:16, 95:17, 99:6
recapping [1] - 38:23
receive [5] - 9:6, 9:11, 9:18, 21:14, 95:15
receiving [3] - 13:12, 39:4, 49:1
recent [1] - 49:22
recently [4] - 50:23, 53:10, 57:14, 80:22
recess [3] - 66:16, 101:17, 101:21
recognize [23] - 27:23, 27:24, 28:1, 28:17, 28:20, 47:12, 49:19, 51:23, 52:3, 57:12, 60:20, 74:12, 80:11, 80:21, 81:15, 81:18, 84:18, 84:20, 85:3, 85:12, 86:13, 86:15, 88:24
recollect [1] - 60:22
recollection [4] - 63:21, 85:17, 85:25, 89:8
recommendation [4] - 40:1, 40:7, 81:21, 81:22
reconsider [3] - 42:1, 83:14, 83:16

**record** [10] - 4:8, 4:13, 6:5, 23:18, 38:2, 47:24, 52:25, 63:17, 79:25, 103:8
**recorded** [1] - 64:9
**records** [2] - 28:11, 63:20
**recruitment** [1] - 18:6
**Rector** [6] - 88:18, 88:20, 89:20, 89:21, 89:22, 90:13
**refer** [1] - 11:21
**referenced** [2] - 59:9, 63:18
**referencing** [1] - 57:22
**referring** [4] - 42:14, 43:1, 57:23, 93:5
**refreshing** [1] - 22:13
**refused** [1] - 40:2
**regard** [9] - 5:8, 18:11, 18:17, 23:15, 29:20, 32:19, 42:22, 43:25, 64:19
**regarding** [6] - 39:1, 43:24, 49:18, 64:6, 75:5, 81:16
**regards** [1] - 79:20
**regional** [2] - 20:21, 62:18
**regulations** [4] - 14:5, 14:10, 20:9, 20:15
**reiterated** [1] - 54:5
**reject** [4] - 96:1, 96:3, 97:5, 97:20
**rejoined** [2] - 13:12, 13:14
**relate** [1] - 5:3
**related** [16] - 5:2, 10:15, 15:19, 18:17, 21:15, 21:24, 22:3, 22:15, 22:25, 24:18, 26:8, 30:10, 31:4, 39:14, 59:10, 103:10
**relates** [1] - 59:5
**relation** [2] - 54:13, 73:15
**relations** [7] - 8:1, 8:2, 8:3, 8:12, 8:16, 12:16, 18:8
**relationship** [1] - 14:11
**relay** [1] - 40:13
**religion** [1] - 29:21
**remember** [41] - 4:25, 5:6, 10:18, 10:21, 12:4, 12:7, 13:7, 13:16, 14:17, 21:22, 21:23, 22:2, 22:9, 22:14, 24:4, 25:5, 25:6, 27:8, 27:11, 27:13, 27:14, 29:5, 38:19, 38:22, 38:25, 39:9, 39:17, 40:22, 40:25, 47:3, 47:25, 52:10, 60:2, 60:6, 65:13, 68:1, 73:18, 84:8, 87:15, 89:2, 91:19
**renders** [1] - 55:1
**rephrase** [4] - 6:22, 102:4, 102:8
**replied** [1] - 58:18
**report** [3] - 17:1, 17:6, 49:4
**reported** [6] - 16:10, 17:8, 17:13, 17:15, 93:7, 103:7
**Reporter** [2] - 3:11, 103:14
**REPORTER** [2] - 57:1, 94:23
**reporter** [2] - 5:15, 103:6
**REPORTER'S** [1] - 103:1
**Reporting** [1] - 103:13
**reports** [2] - 15:25, 49:6
**request** [29] - 14:13, 33:9, 33:11, 39:1, 39:14, 39:18, 39:23, 40:5, 40:24, 42:12, 46:15, 47:5, 48:25, 53:11, 55:21, 58:13, 62:3, 67:14, 75:8, 83:11, 92:4, 93:13, 94:3, 95:18, 95:20, 96:19, 96:24, 97:2, 98:14
**requested** [15] - 19:19, 35:4, 38:11, 38:21, 39:7, 39:10, 43:20, 44:10, 44:13, 44:15, 44:22, 45:6, 45:22, 97:6, 97:21
**requesting** [3] - 41:11, 90:21, 95:12
**requests** [8] - 18:18, 20:11, 35:7, 41:3, 93:25, 95:15, 95:16, 95:24
**require** [4] - 69:23, 69:24, 97:4, 97:18
**required** [3] - 58:16, 58:19, 69:4
**requirement** [3] - 9:9, 34:9, 36:5
**requiring** [2] - 9:11, 36:11
**reserved** [1] - 3:20
**reside** [1] - 28:14
**resource** [3] - 9:4, 10:5, 10:25
**resources** [15] - 8:7, 8:9, 8:11, 10:8, 11:6, 11:25, 12:9, 12:21, 15:18, 17:17, 20:17, 23:4, 23:14, 26:19, 36:13
**responded** [6] - 68:16, 69:3, 93:1, 100:18, 100:21, 101:1
**response** [8] - 25:1, 25:3, 38:24, 48:3, 49:22, 52:7, 69:2, 97:9
**responsibilities** [3] - 14:3, 15:19, 18:10
**responsibility** [4] - 13:25, 16:3, 77:24, 100:9
**responsible** [2] - 14:9, 20:8
**result** [4] - 52:7, 63:11, 76:7, 94:13
**retain** [1] - 31:20
**retaining** [1] - 31:24
**retention** [1] - 18:6
**retired** [2] - 84:8, 84:13
**retirement** [2] - 20:5, 86:2
**review** [8] - 26:22, 32:14, 38:24, 48:2, 49:23, 60:23, 74:17, 75:7
**reviewed** [21] - 18:18, 20:10, 25:2, 47:4, 47:6, 47:17, 47:21, 50:23, 57:19, 61:1, 61:2, 61:6, 62:4, 67:14, 80:22, 80:24, 84:25, 85:4, 86:1, 86:20, 89:2
**reviewing** [6] - 34:14, 52:7, 61:3, 85:18, 89:8, 89:10
**Richards** [26] - 2:10, 2:13, 2:15, 49:18, 50:6, 51:1, 51:7, 51:8, 53:9, 57:10, 58:7, 59:3, 59:13, 59:20, 59:22, 61:11, 62:2, 74:9, 74:24, 87:8, 87:13, 88:14, 88:17, 89:16, 89:19, 89:20
**Richards's** [3] - 49:15, 57:11, 76:17
**right** [84] - 4:7, 7:13, 10:10, 11:16, 11:19, 11:22, 11:25, 12:7, 12:13, 14:25, 19:21, 20:12, 24:8, 27:1, 27:20, 27:22, 29:23, 30:10, 35:18, 36:1, 36:3, 36:8, 36:15, 37:19, 37:23, 38:18, 46:4, 46:14, 47:10, 49:13, 51:21, 53:7, 54:14, 55:8, 56:23, 57:8, 58:11, 59:11, 59:14, 61:22, 67:21, 68:9, 68:24, 69:6, 69:8, 70:12, 70:18, 70:21, 70:25, 71:3, 73:2, 76:20, 77:4, 77:25, 78:5, 78:8, 78:16, 78:21, 79:4, 80:1, 80:10, 81:21, 83:21, 84:16, 84:17, 85:9, 86:4, 86:13, 88:4, 88:21, 89:14, 89:17, 90:8, 90:17, 90:22, 91:2, 93:2, 96:10, 97:12, 99:15, 99:20, 100:24, 101:4, 102:10
**risk** [2] - 55:1, 94:7
**role** [3] - 15:14, 42:2, 56:17
**ROME** [1] - 1:2
**routine** [2] - 95:14, 95:23
**routinely** [3] - 18:23, 71:12, 94:5
**RPR** [3] - 1:23, 103:6, 103:21
**Rules** [1] - 3:3
**rules** [1] - 5:13
**run** [1] - 32:23

## S

**safety** [6] - 89:13, 91:6, 93:23, 93:24, 94:2, 94:7
**SAITH** [1] - 102:17
**Sarah** [1] - 88:21
**sarcastic** [1] - 79:24
**satisfaction** [1] - 102:5
**satisfactory** [3] - 38:9, 42:8, 82:15
**satisfied** [1] - 83:10
**satisfy** [2] - 43:21, 56:15
**save** [1] - 42:1
**saw** [2] - 81:1, 86:18
**scan** [1] - 64:2
**scenario** [1] - 97:19
**school** [2] - 7:14, 13:11
**screen** [7] - 24:2, 24:9, 47:10, 57:9, 67:25, 84:17, 86:25
**screw** [1] - 68:5
**scroll** [6] - 24:12, 27:24, 30:9, 84:19, 86:11, 88:12
**seal** [1] - 103:16
**second** [1] - 67:15
**section** [1] - 25:3
**see** [32] - 24:8, 24:15, 24:23, 27:21, 29:4, 29:7, 29:18, 29:22, 30:11, 30:13, 32:6, 35:12, 41:6, 47:10, 49:13, 49:15, 57:8, 57:10, 59:1, 59:3, 60:14, 68:2, 74:9, 80:13, 80:17, 85:9, 86:4, 86:25, 88:4, 88:10, 88:15, 88:18
**seeing** [2] - 86:24, 87:15
**seeking** [2] - 42:25, 87:6
**self** [1] - 78:12
**self-checkout** [1] - 78:12
**sense** [3] - 5:25, 6:13, 16:15
**sentence** [1] - 36:3
**served** [8] - 16:18, 26:11, 40:3, 46:6, 46:10, 65:18, 73:13, 95:22
**service** [70] - 12:23, 26:4, 26:9, 38:12, 38:21, 39:8, 39:14, 39:18, 39:24, 40:5, 40:8, 41:3, 41:20, 41:22, 44:1, 44:4, 44:8, 44:25, 45:9, 45:14, 46:4, 46:15, 46:20, 47:5, 48:6, 48:20, 50:11, 50:12, 50:19, 50:21, 51:3, 53:12, 53:18, 53:24, 54:12, 57:25, 58:14, 58:16, 58:22, 58:23, 62:4, 62:23, 64:24, 65:8, 67:14, 69:16, 73:13, 75:6, 75:9, 79:19, 80:5, 82:17, 82:24, 83:6, 87:6, 87:10, 87:19, 90:16, 90:21, 91:7, 91:11, 91:20, 91:25, 92:5, 92:9, 92:12, 98:14, 98:18, 99:3, 99:10
**session** [2] - 100:12, 100:14
**set** [1] - 103:16
**several** [1] - 20:19
**sex** [1] - 29:20
**shall** [1] - 3:9
**share** [4] - 24:2, 51:21, 80:10, 84:16
**shared** [5] - 24:9, 76:7, 85:10, 86:5, 88:5
**sharing** [1] - 67:25

**Sherrell** [2] - 88:24, 89:25
**Sherrell's** [1] - 25:2
**shifts** [1] - 53:13
**short** [4] - 64:25, 94:19, 100:2, 101:6
**short/long** [1] - 75:17
**shorthand** [1] - 3:10
**should** [3] - 28:8, 32:20, 86:5
**show** [4] - 27:20, 74:6, 89:5, 89:6
**showing** [1] - 60:13
**SHRM** [13] - 8:25, 9:3, 9:4, 9:5, 10:1, 10:4, 10:8, 10:15, 10:19, 10:24, 11:6, 21:1, 23:4
**shut** [2] - 56:19, 64:24
**sideways** [2] - 86:7, 86:12
**Signature** [1] - 102:18
**signature** [5] - 3:11, 57:11, 80:16, 80:17, 84:19
**signed** [4] - 49:17, 52:4, 59:2, 60:17
**significant** [1] - 36:11
**similar** [6] - 6:8, 41:16, 65:19, 78:15, 81:2, 81:3
**similarities** [1] - 77:18
**similarly** [2] - 78:7, 99:24
**simply** [4] - 45:5, 45:24, 46:1, 55:19
**sin** [1] - 98:11
**sir** [25] - 5:10, 11:8, 11:14, 11:20, 11:23, 12:1, 16:24, 17:22, 20:10, 24:20, 31:2, 37:25, 45:16, 45:19, 46:13, 50:24, 51:17, 57:12, 72:11, 78:23, 79:6, 83:2, 88:9, 92:18, 102:16
**sit** [8] - 62:20, 70:20, 70:24, 73:22, 75:19, 76:1, 76:15, 79:3
**size** [1] - 36:13
**Skeens** [12] - 88:11, 89:12, 89:13, 91:7, 91:10, 91:21, 92:10, 92:25, 93:7, 93:11, 93:15, 93:19
**Skeens's** [1] - 91:19
**skills** [1] - 103:9
**slowly** [1] - 86:11
**smaller** [1] - 13:23
**Smith** [1] - 17:20
**smooth** [1] - 5:14
**solely** [1] - 74:17
**solution** [13] - 41:20, 55:20, 69:9, 80:8, 95:22, 98:1, 98:2, 98:4, 98:9, 98:25, 99:1, 99:2, 101:2
**solutions** [2] - 95:18, 95:24
**solve** [1] - 55:21
**somebody** [6] - 37:8, 37:16, 49:5, 55:2, 70:24
**someone** [6] - 19:17, 33:6, 33:13, 33:14, 80:5, 87:16
**something** [9] - 21:19, 49:10, 52:8, 63:24, 68:5, 70:20, 74:16, 86:8, 86:9
**sometimes** [1] - 33:12
**somewhere** [1] - 86:19
**soon** [2] - 54:7, 93:1
**sorry** [12] - 5:6, 13:13, 22:1, 24:23, 29:8, 31:8, 31:15, 32:10, 67:24, 70:8, 86:12, 91:21
**sound** [1] - 94:9
**sounds** [1] - 30:2
**sources** [1] - 26:16
**Spahr** [1] - 88:21
**speak** [3] - 22:12, 84:10, 93:1
**speaking** [1] - 39:17
**speaks** [1] - 28:24
**special** [1] - 9:6
**specialist** [8] - 38:8, 38:14, 50:10, 51:10, 51:15, 51:20, 89:22, 89:24
**specialists** [4] - 17:1, 26:18, 26:19, 27:6
**specialized** [2] - 8:15, 8:17
**specific** [17] - 10:13, 14:15, 16:9, 18:17, 19:23, 25:10, 25:12, 25:14, 30:6, 36:19, 38:18, 44:22, 47:20, 51:2, 73:12, 76:4, 98:7
**specifically** [11] - 15:7, 18:5, 23:8, 26:9, 32:20, 38:3, 42:14, 42:22, 60:4, 82:7, 99:4
**specifics** [2] - 10:20, 11:5
**speculation** [2] - 82:20, 90:5
**spoke** [3] - 38:25, 39:9, 64:7
**sporadic** [1] - 11:2
**stability** [29] - 41:12, 45:7, 45:25, 54:14, 54:15, 56:16, 59:10, 64:19, 65:4, 65:16, 65:21, 65:24, 66:3, 71:8, 73:17, 73:24, 77:1, 77:3, 77:6, 77:14, 77:16, 79:16, 79:20, 80:7, 98:24, 99:14, 99:25, 101:14
**stand** [14] - 62:17, 62:20, 62:22, 69:5, 69:24, 70:15, 73:22, 75:16, 75:19, 76:1, 76:15, 84:6, 100:22, 100:23
**standard** [2] - 11:12, 22:10
**standards** [3] - 22:5, 34:9, 34:14
**standing** [6] - 70:3, 70:5, 71:11, 71:25, 78:4, 83:22
**stands** [1] - 70:16
**start** [3] - 5:22, 5:24, 89:15
**started** [5] - 12:4, 12:6, 13:3, 13:8, 13:10
**starting** [2] - 12:8, 15:17
**STATE** [1] - 103:3
**state** [5] - 4:7, 4:12, 14:4, 25:14, 25:17
**State** [2] - 103:7, 103:23
**stated** [16] - 30:3, 53:16, 53:17, 53:21, 53:23, 54:1, 58:22, 62:5, 62:10, 62:16, 62:19, 62:23, 73:16, 75:14, 101:14
**Statement** [14] - 2:9, 2:10, 2:12, 2:13, 2:14, 2:15, 2:16, 48:14, 50:5, 57:3, 58:6, 61:17, 74:23, 81:8
**statement** [31] - 23:24, 29:1, 30:1, 30:7, 30:18, 37:7, 47:24, 47:25, 48:10, 48:11, 48:12, 49:17, 59:7, 61:3, 61:5, 61:8, 64:12, 64:23, 65:2, 67:13, 69:8, 69:11, 69:12, 73:21, 76:18, 76:22, 80:8, 80:20, 81:15, 83:4, 99:19
**statements** [4] - 41:5, 43:23, 56:25, 63:19
**STATES** [1] - 1:1
**states** [1] - 30:5
**stations** [1] - 78:12
**status** [3] - 29:22, 32:7, 33:17
**steady** [1] - 54:2
**stem** [1] - 9:14
**steps** [1] - 36:5
**Steve** [1] - 17:20
**still** [12] - 13:10, 21:19, 23:13, 35:25, 37:1, 42:18, 52:21, 67:24, 70:25, 71:4, 72:23, 82:18
**stool** [15] - 56:17, 66:1, 70:7, 70:19, 71:4, 71:12, 71:15, 72:3, 72:9, 72:16, 77:13, 78:25, 79:10, 79:13, 84:7
**store** [11] - 17:4, 17:5, 27:3, 41:17, 44:2, 51:1, 75:11, 75:15, 91:8, 91:20, 92:14
**Stores** [3] - 2:6, 11:16, 25:22
**STORES** [1] - 1:7
**STREET** [1] - 1:18
**structure** [2] - 15:24, 36:14
**subject** [2] - 3:18, 90:6
**subjects** [1] - 16:13
**substance** [1] - 22:3
**such** [5] - 18:7, 33:8, 33:14, 36:12, 63:24
**suggest** [2] - 44:1, 45:4
**suggested** [2] - 62:12, 71:17
**suggesting** [1] - 75:12
**suggestion** [1] - 63:14
**suggestions** [3] - 62:8, 67:20, 68:8
**suitable** [1] - 75:18
**SUITE** [2] - 1:14, 1:18
**summarize** [1] - 33:4
**supermarket** [2] - 12:19, 13:2
**Supermarkets** [5] - 13:4, 13:20, 13:22, 15:1, 15:18
**support** [2] - 50:12, 51:17
**sure** [18] - 5:23, 6:11, 6:24, 7:5, 18:3, 19:1, 20:8, 23:3, 29:8, 38:13, 40:12, 42:24, 52:16, 58:2, 64:7, 68:5, 68:16, 101:20
**surprised** [1] - 93:14
**suspect** [1] - 38:6
**suspenders** [1] - 85:17
**sworn** [2] - 3:13, 4:3
**symptoms** [1] - 37:17
**syndrome** [1] - 62:19
**system** [2] - 28:13, 32:23

## T

**take** [8] - 7:2, 7:6, 10:7, 36:5, 66:12, 89:14, 90:16, 101:17
**taken** [8] - 3:4, 3:7, 3:9, 3:18, 4:8, 51:10, 66:16, 101:21
**taking** [1] - 5:16
**talk** [4] - 15:22, 43:22, 56:23, 61:24
**talked** [2] - 17:8, 41:15
**talking** [5] - 5:22, 11:22, 56:20, 65:3, 66:18
**tap** [1] - 10:25
**tasked** [1] - 18:15
**taught** [4] - 16:13, 22:14, 22:22, 26:20
**tax** [4] - 31:23, 32:1, 32:7, 32:17
**teaching** [4] - 27:10, 27:11, 28:5, 29:4
**team** [5] - 12:25, 21:5, 22:18, 22:21, 26:17
**tell** [15] - 10:10, 24:25, 41:1, 45:20, 54:8, 54:9, 58:25, 60:9, 63:1, 65:12, 70:2, 77:4, 85:14, 86:7, 91:18
**tells** [1] - 67:13
**ten** [1] - 90:25
**Tennessee** [3] - 103:7, 103:13, 103:23
**TENNESSEE** [4] - 1:15, 1:18, 1:24, 103:3
**terms** [2] - 39:4, 51:13
**testified** [5] - 4:18, 4:20, 5:1, 5:8, 81:19
**testimony** [2] - 101:7, 101:11
**testing** [1] - 9:11
**than** [12] - 13:23, 41:20, 42:11, 54:19, 63:23, 69:15, 77:15, 78:24, 79:10, 81:22,

95:21, 95:22
**thank** [4] - 4:15, 57:2, 102:12, 102:16
**THE** [2] - 1:12, 1:16
**there** [50] - 5:16, 6:8, 7:11, 8:9, 8:11, 12:6, 12:20, 12:25, 13:10, 16:1, 16:16, 16:19, 23:13, 25:6, 28:15, 31:23, 31:25, 34:9, 34:12, 34:20, 42:19, 42:25, 43:18, 48:20, 49:2, 49:3, 53:15, 55:10, 58:14, 61:12, 63:16, 65:20, 72:19, 75:10, 75:14, 77:2, 78:1, 79:15, 80:9, 82:23, 83:3, 83:17, 87:5, 88:8, 96:5, 96:12, 96:18, 97:5, 102:2, 102:7
**there's** [10] - 34:19, 43:20, 65:22, 72:20, 72:23, 78:7, 80:16, 84:18, 86:10, 98:11
**Thereupon** [13] - 25:22, 29:12, 48:14, 50:5, 57:3, 58:6, 61:17, 66:16, 74:23, 81:8, 87:24, 95:6, 101:21
**these** [12] - 47:9, 56:25, 63:19, 68:2, 86:13, 86:14, 86:21, 87:8, 87:13, 87:18, 94:9
**they've** [2] - 54:25, 55:8
**thinking** [1] - 92:18
**THIS** [1] - 102:17
**thought** [7] - 48:25, 51:11, 62:21, 65:14, 67:24, 90:16, 94:25
**three** [4] - 4:24, 27:23, 99:18, 99:25
**today** [3] - 10:13, 38:4, 101:24
**today's** [1] - 61:7
**together** [1] - 40:15
**took** [5] - 51:8, 59:25, 82:19, 84:9
**tool** [1] - 79:18
**top** [5] - 49:16, 57:11, 74:10, 80:13, 85:10
**total** [1] - 7:12
**Track** [1] - 28:14
**trained** [1] - 99:4
**training** [30] - 9:6, 9:8, 10:2, 10:15, 10:17, 10:22, 16:3, 16:6, 16:9, 16:10, 16:14, 20:13, 20:23, 21:5, 21:14, 21:24, 22:3, 22:18, 23:1, 26:8, 26:12, 26:15, 26:24, 28:21, 28:22, 30:25, 42:4, 43:2
**trainings** [1] - 27:9
**transcript** [2] - 6:8, 103:8
**transition** [1] - 20:1
**transmission** [1] - 3:17
**true** [3] - 46:10, 101:24, 103:8
**truly** [2] - 34:9, 34:12
**truthfulness** [1] - 76:14
**trying** [12] - 6:10, 25:4, 29:8, 40:10, 40:11, 43:7, 44:5, 45:2, 45:24, 51:15, 55:21, 98:1
**turned** [2] - 53:10, 86:7
**two** [8] - 4:23, 8:14, 9:25, 13:9, 33:18, 53:16, 62:6, 88:5
**type** [8] - 9:17, 20:25, 32:17, 41:16, 45:18, 46:12, 69:9, 94:2
**types** [1] - 16:12
**typically** [2] - 67:7, 94:1

## U

**uh-huh** [1] - 6:6
**ultimately** [1] - 39:22
**ultimatum** [5] - 41:21, 46:6, 46:9, 65:7, 100:17
**unable** [1] - 62:22
**uncertain** [5] - 57:16, 57:20, 60:25, 61:12, 63:10
**under** [16] - 4:10, 8:25, 14:7, 16:6, 17:5, 18:4, 21:1, 31:10, 33:7, 33:14, 35:14, 36:1, 47:20, 55:5, 92:10, 93:23
**understand** [17] - 6:12, 6:16, 6:18, 6:21, 6:22, 40:12, 43:7, 45:2, 56:3, 57:23, 87:18, 90:10, 91:4, 97:10, 99:3, 102:5, 102:8
**understanding** [3] - 51:4, 75:24, 92:3
**understood** [1] - 56:4
**undetermined** [1] - 56:13
**undue** [10] - 33:22, 34:5, 36:6, 36:10, 36:20, 44:4, 44:14, 45:14, 96:5, 97:16
**union** [1] - 15:8
**unions** [1] - 8:19
**UNITED** [1] - 1:1
**unless** [5] - 51:18, 79:17, 90:1, 92:7
**unsure** [1] - 64:4
**until** [6] - 17:2, 20:4, 20:6, 48:2, 50:23, 96:15
**up** [15] - 12:14, 20:6, 23:6, 29:10, 33:18, 40:3, 46:6, 46:10, 47:9, 51:23, 61:23, 65:18, 67:22, 68:5, 95:22
**Uscan** [39] - 41:17, 42:3, 46:9, 54:22, 56:21, 62:13, 63:4, 63:8, 65:15, 65:22, 68:23, 69:17, 70:2, 70:14, 70:16, 71:2, 71:10, 71:24, 72:10, 72:17, 72:22, 72:25, 73:22, 75:12, 76:19, 76:24, 77:5, 78:7, 78:19, 79:11, 79:15, 83:15, 83:20, 84:6, 100:19, 100:21, 101:9, 101:13
**uses** [1] - 65:25
**usual** [1] - 3:18
**utilized** [3] - 11:2, 11:6, 28:21

## V

**VA** [4] - 1:7, 2:6, 11:16, 25:22
**vacation** [1] - 33:8
**varied** [1] - 16:1
**various** [6] - 21:5, 22:18, 26:19, 32:1, 77:25, 78:11
**verbal** [2] - 6:3, 63:22
**versa** [1] - 52:19
**versus** [2] - 19:16, 80:5
**very** [7] - 6:8, 10:13, 14:23, 15:4, 29:6, 46:2, 95:14
**veteran** [1] - 32:6
**veteran's** [1] - 29:22
**via** [1] - 3:5
**vice** [3] - 12:9, 17:23, 52:19
**Virginia** [2] - 7:10, 7:17
**VP** [16] - 11:25, 15:17, 15:24, 16:18, 16:22, 18:1, 18:24, 26:12, 30:24, 44:23, 55:17, 56:5, 56:11, 91:5, 95:11
**vs** [1] - 1:6

## W

**WA** [1] - 20:19
**waiting** [1] - 53:18
**waived** [3] - 3:12, 3:17, 102:18
**walk** [2] - 17:25, 77:18
**walked** [2] - 79:9, 79:11
**walker** [3] - 66:1, 71:6, 79:22
**walking** [4] - 78:4, 78:15, 78:19, 79:14
**Walmart** [6] - 12:24, 15:3, 15:4, 15:5, 15:6, 15:14
**want** [26] - 4:7, 6:11, 7:5, 12:2, 15:22, 17:9, 22:12, 40:11, 43:23, 50:11, 50:13, 53:7, 56:3, 56:24, 57:1, 58:2, 61:22, 65:11, 65:12, 66:19, 75:3, 77:18, 90:16, 94:23, 95:4, 98:15
**wants** [1] - 98:6
**was** [183] - 4:3, 4:20, 5:1, 5:2, 5:6, 7:16, 8:16, 9:9, 9:19, 11:25, 12:8, 12:18, 12:20, 12:23, 13:2, 13:7, 13:10, 13:23, 14:18, 15:6, 15:9, 15:18, 16:1, 16:5, 16:19, 17:10, 17:16, 20:4, 20:5, 20:23, 22:10, 22:20, 22:22, 24:19, 25:6, 25:11, 25:23, 26:24, 26:25, 28:13, 29:13, 31:10, 31:16, 32:2, 32:17, 32:18, 33:23, 34:5, 34:9, 34:12, 35:3, 38:6, 38:8, 39:11, 40:7, 40:23, 41:11, 41:12, 41:13, 41:19, 42:6, 42:8, 42:16, 42:19, 42:20, 43:8, 43:9, 43:11, 43:13, 43:19, 44:5, 44:7, 45:25, 46:1, 46:2, 46:5, 47:6, 47:20, 48:15, 48:19, 48:25, 49:1, 50:6, 50:11, 50:14, 51:6, 51:11, 51:18, 52:8, 53:5, 53:19, 54:5, 54:15, 54:17, 55:16, 55:17, 55:22, 55:23, 56:5, 56:6, 56:11, 56:12, 56:14, 56:16, 57:4, 58:7, 58:15, 58:18, 58:23, 61:18, 62:22, 62:24, 63:3, 63:4, 63:7, 63:10, 63:25, 65:7, 65:9, 65:18, 65:23, 66:16, 71:19, 72:11, 72:25, 73:1, 73:7, 73:8, 73:17, 73:18, 74:16, 74:24, 75:8, 75:17, 75:18, 75:19, 76:11, 79:7, 79:17, 80:8, 81:9, 81:20, 81:22, 82:10, 82:23, 83:3, 83:12, 83:21, 83:24, 84:4, 87:5, 87:25, 89:24, 90:1, 90:2, 90:3, 90:4, 92:3, 92:7, 92:9, 92:19, 94:25, 95:2, 95:7, 95:22, 95:25, 96:11, 98:15, 98:18, 98:23, 98:25, 99:4, 99:9, 99:23, 100:2, 100:17, 101:21, 103:7
**wasn't** [16] - 9:8, 16:16, 44:13, 48:24, 65:6, 66:4, 71:21, 72:11, 75:14, 75:16, 79:5, 82:4, 83:1, 84:22, 100:10, 100:22
**ways** [1] - 78:14
**week** [3] - 50:21, 51:4, 90:15
**Welcome** [1] - 90:14
**wheelchair** [2] - 71:6, 71:16
**whereas** [1] - 71:2
**wherein** [1] - 81:16
**WHEREOF** [1] - 103:16
**whole** [1] - 81:14
**willing** [2] - 42:10, 100:10
**Wimberly** [1] - 22:19
**WIMBERLY** [1] - 1:17
**wise** [1] - 12:17
**wished** [1] - 33:16
**witness** [8] - 3:2, 3:12, 3:13, 4:2, 51:11, 53:10, 58:13, 62:3
**WITNESS** [1] - 103:16
**word** [2] - 6:19, 83:20
**words** [1] - 65:12
**wore** [1] - 13:24
**work** [19] - 11:16, 34:9, 41:22, 41:23, 46:7, 46:9, 50:20, 52:23, 54:17, 62:16,

62:23, 64:23, 65:8, 69:4, 72:13, 76:9, 90:21, 100:15, 100:16
**worked** [5] - 13:9, 13:19, 15:3, 17:23, 53:16
**working** [2] - 62:15, 64:15
**workplace** [2] - 62:4, 75:6
**works** [1] - 53:12
**would** [158] - 5:20, 8:8, 10:22, 18:9, 18:23, 19:7, 19:10, 19:14, 19:15, 19:19, 20:7, 20:10, 21:3, 21:4, 21:18, 21:19, 23:3, 23:17, 23:19, 23:25, 24:21, 25:15, 25:16, 27:3, 27:5, 28:21, 28:22, 28:23, 28:24, 28:25, 30:4, 30:24, 31:12, 32:22, 32:23, 33:17, 34:11, 34:17, 36:18, 36:19, 36:21, 37:15, 38:13, 38:15, 38:16, 40:6, 41:13, 42:5, 42:17, 43:17, 44:4, 44:21, 45:3, 45:9, 45:14, 45:17, 45:21, 46:3, 49:9, 50:11, 52:11, 52:16, 52:24, 52:25, 54:6, 54:11, 54:20, 55:3, 55:4, 55:12, 55:24, 56:15, 56:20, 56:22, 59:5, 62:13, 63:11, 63:21, 64:2, 64:14, 64:18, 64:23, 65:4, 65:15, 65:23, 65:24, 66:22, 67:5, 68:15, 69:24, 70:5, 71:5, 72:1, 72:13, 72:19, 73:4, 73:12, 73:20, 73:23, 73:24, 73:25, 75:12, 75:15, 76:25, 77:6, 77:9, 77:14, 77:20, 77:23, 78:1, 78:4, 78:11, 78:19, 78:22, 78:24, 79:3, 79:15, 79:16, 79:22, 80:4, 82:8, 82:18, 82:24, 83:6, 83:10, 83:18, 83:19, 89:21, 89:25, 90:5, 90:12, 91:5, 92:6, 92:16, 92:19, 93:16, 94:4, 95:21, 95:22, 95:23, 96:5, 96:12, 96:17, 96:20, 97:4, 97:18, 97:20, 98:2, 101:2, 101:13
**wouldn't** [8] - 34:20, 41:23, 46:21, 51:17, 55:6, 69:15, 78:20, 79:12
**WRIGHT** [1] - 1:17
**write** [1] - 25:1
**written** [2] - 23:23, 31:6
**wrong** [2] - 19:10, 65:13

## Y

**yeah** [2] - 66:14, 93:6
**year** [2] - 13:13, 53:3
**years** [10] - 4:23, 5:12, 7:12, 13:11, 17:11, 20:18, 41:10, 53:16, 53:18, 62:6
**yes** [125] - 4:19, 6:1, 6:4, 6:9, 6:14, 7:7, 7:15, 7:19, 7:22, 8:8, 9:16, 11:17, 11:20, 11:23, 12:1, 12:12, 14:6, 14:11, 14:16, 15:13, 15:21, 16:15, 16:24, 17:2, 18:14, 19:5, 19:8, 19:12, 20:10, 21:9, 21:13, 21:17, 24:10, 24:15, 24:20, 25:19, 26:23, 27:2, 27:4, 27:7, 27:10, 27:19, 28:3, 29:24, 30:22, 31:14, 31:18, 32:5, 32:25, 33:3, 34:2, 34:7, 34:10, 34:25, 35:19, 35:23, 36:2, 36:9, 36:16, 38:17, 42:19, 43:12, 47:11, 52:15, 55:3, 55:20, 57:2, 57:10, 57:12, 59:1, 59:4, 59:8, 59:12, 60:16, 60:19, 60:21, 61:4, 63:2, 64:17, 65:10, 65:17, 66:22, 66:23, 67:3, 67:11, 67:17, 68:10, 69:1, 70:22, 71:1, 71:11, 75:23, 76:21, 77:22, 78:2, 78:6, 78:9, 78:13, 78:17, 78:23, 79:6, 79:20, 80:22, 81:18, 81:24, 84:2, 85:11, 88:9, 88:10, 88:16, 88:22, 89:18, 90:9, 90:12, 90:18, 90:23, 91:3, 92:15, 93:3, 93:10, 95:4, 95:15, 99:16, 100:25, 101:6
**yourself** [1] - 73:12

## Z

**Zoom** [6] - 3:5, 5:19, 6:6, 20:25, 24:6, 27:22
**ZOOM** [1] - 1:11
**Zoom-type** [1] - 20:25