# EXHIBIT 1

# DEPOSITION OF PLAINTIFF

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
AT ROME

---

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | No. 4:22-cv-00179 |
| | * | |
| K-VAT-FOOD STORES, INC., | * | |
| d/b/a FOOD CITY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

---

THE DEPOSITION OF
CHRISTOPHER MATTHEW BATTEN
January 11, 2023

---

Diane R. Angel, RPR, TN LCR #246
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

hardware all the way down my right side. I have an internal stimulator implant on my left side that's wired into my spine. There are factors on top of factors on top of factors that I have to consider, viability to function, and be a productive member of whatever employment.

**Q Can you type?**

A No. Not with -- again, with one hand, going back to those short conversations where I'm not efficient.

**Q So you can type with your left hand but it's just much slower?**

A They want me to type 30 words a minute. I cannot type 30 words in ten minutes. I was right-handed. Having to learn left-handed, it's awkward.

**Q So it's going to depend very much on the duties of whatever position you're talking about; is that fair to say?**

A Absolutely.

**Q So our records show that you started working at Food City in 2019.**

A Yes, sir.

**Q Were your -- physically were your limitations then roughly about the same as they are**

A I do not recall a physical handbook.
**Q Do they have an online resource for employees?**
A It's an in-store system. You can't go home and do these. This is at the store.
**Q That in-store system, do you know if you could access documents such as a handbook?**
A From -- I do not recall a handbook. I recall these Fast Tracks, these tests, as an ongoing thing that they -- you would get every few months; five, ten, 15 would pop up and you just clear them as you go. They try to keep it current.
**Q I don't know if you said this, but you were hired in the fuel clerk position and that was part time?**
A Yes, sir.
**Q Roughly 28 hours a week?**
A Yes, sir.
**Q Did that stay consistent during your time at Food City?**
A No, sir.
**Q How did it change?**
A It changed -- are we still talking about store --
**Q Let's stay with 773 for now.**

cashier, not a fuel coordinator. I mean, she had her own frustrations. I think something that I heard: In a -- it was either Mr. Ellison or Ms. Frances. It was, in a grocery store you don't ever stop hiring. When I heard that I was -- you know, I just...

**Q Was Ms. Hester critical of you for these inventory issues?**

A I was the only one that was trying to do it.

**Q So, no?**

A No.

MR. JACKSON: We've been going for about an hour. Let's take a bathroom break.

MR. HARGRAVES: Sounds good.

(Whereupon, a short break was had.)

MR. JACKSON: So, Mr. Ellison let me know on the break that it is store 774, not 773, so I wanted to get that straight on the record.

BY MR. JACKSON:

**Q Then you transferred, I believe, from 701 to 214, to Ringgold?**

A Yes, sir.

**Q How did that come to happen?**

A This was shortly after -- all the

A Yes, sir.

**Q Who did you talk to?**

A I don't recall how those conversations worked out but there was advance notice with the fuel coordinator and -- I would assume Emily Hobbs had to have been, but I don't -- actually, I don't want to assume that. I know the fuel coordinator was, but outside of that I don't recall.

**Q You got the time away, correct?**

A Yes, sir.

**Q At that time were you using any kind of assistive devices at work before you left for training, like a cane or any kind of device that you used?**

A The only device that I use is an implant and it's a neurostimulator.

**Q What does that do for you?**

A It sends a signal. The implant is above -- in my lower left back. The cord goes up my spine, and it sends an electrical signal that is -- it's basically tricking my brain that the pain that I feel in my hand -- I turn it on and it covers it up.

There's no physical tool or anything

**supervise a fuel clerk; is that correct?**

A No.

**Q Who's the first person that you recall in supervision at 214 having some discussion about, I'm going to bring a dog to work now?**

A So that's -- this question is -- I don't want to get it muddy. When I was approved, my time off to go get my service dog, my service dog was always coming back with me. That's what they're there for. She does not -- I did not get her to leave her at home. She is certified hearing, seeing, service, alleviating some of my personal issues, and it's not that, oh, by the way, when I come back home from this service dog camp I'm going to be bringing my service dog with me. I was always coming back with the dog. To say that I went down there and didn't tell anybody that I was bringing a service dog back is wholly inaccurate.

**Q I'm just asking if you have a recall of having some discussion with someone in management at 214 about, I'm going to get this service dog and be bringing it to work?**

A Emily Hobbs would have been a point person for this. I believe that her and the fuel coordinator would have gotten together on this.

**Q All right. On that day did you have any discussion with anyone about whether or not the dog could be present?**

A It was -- there was never -- there was never a conversation that said "you cannot bring your dog to work" until I had been back to work with my dog for a couple of days.

Now, for me to have these personal, you know, scales, the references, whatever the charts were, every single one but one was filled out by a Food City employee. The only reason why I say that is because I'm -- this is not a secret. Like I said, I'm not going to a service dog camp to bring home a house dog that I leave at the house. This was an open discussion and understood until I came back.

**Q All right. So when you came back after a couple of days did you have sort of an in-person discussion with Ms. Hobbs or Mr. Richards?**

A A couple of days -- I came back a couple days what? I'm sorry, I didn't understand the question.

**Q I'm trying to understand, when you had some discussion with Ms. Hobbs and Mr. Richards are we talking about an in-person discussion at the**

**store?**

A When I came back with her?

**Q Yes.**

A I did. And Gary Richards said that he wasn't sure, that he had never dealt with a service dog. So I handed him her documents for -- actually, y'all have them. There's actually Georgia and Colorado as well as far as statute.

So he took those documents and sent me on my way back out to the kiosk, and that was it.

**Q So in this statement of Ms. Hobbs it says, you know, we took the documents, and she says that we decided to let him work until we got an answer. Did somebody communicate the gist of that to you, we don't know the answer yet, but you just go ahead and work and then we'll be back with you?**

A No. There was never a "we'll be back with you." It was, "I've never dealt with this." He took my -- took her documents, and then I was out to the kiosk, good to go in my mind. That's what I'm thinking. Okay, they got everything they need, she's got her vest, I've got her cards, her certification, I've got everything that I need for this and I'm sent on my way.

And the way that this letter is laid

out, it's upside down because this -- before he left for camp I was not able to give him permission. The permission happened. That conversation happened after I was told I couldn't work, and I kept calling saying, can I come to work now, can I come to work now, have y'all submitted everything. I mean, I'm -- I just lost all my income. That's where that -- "I'm not able to give you that information."

**Q Oh, so she told you that but you're saying that was a later point in time?**

A Yeah, yeah. It was after, after I was already told not to come back.

**Q Who told you that?**

A I think it was David Ellison.

**Q Was this the August 6th meeting?**

A One of the four.

**Q Was there a meeting -- let's see -- when Mr. Ellison and Mr. Richards were present at the store; do you recall that?**

A Yes, sir.

**Q All right. And it was at that initial meeting where Mr. Ellison said, I'm trying to gather information, something to that effect?**

A Something to that effect.

**Q All right. Do you recall Mr. Ellison**

**asking you about the reasons why you wanted to have the dog present at work?**

A I do not recall the specific questions. Mr. Richardson {sic} -- I'm sorry. Go ahead with your next question.

**Q Did you tell him that your concerns were isolation and anxiety and balance?**

A Yes. Stability, anxiety, the isolation, and the ongoing classification of a fall risk that I am. So she's there for stability to help me get up wherever I'm at.

**Q Have you ever used any kind of external device for balance?**

A No.

**Q Has that ever been recommended to you?**

A No.

**Q Do you understand why that would not have been recommended?**

A No.

**Q Have you ever tried it?**

A No.

**Q During this initial meeting -- was that your first meeting with Mr. Ellison and Mr. Richards both present, when you were asked about**

**Q Had anything about your ability to perform the job physically changed from July to August?**

A No. My abilities stayed the same throughout, and that goes back to my stability issue, fall risk, my anxiety, PTSD, everything stayed the same. I still carry those. You know, she helps me deal with it.

**Q In this initial meeting did you confirm for Mr. Ellison that you still had the abilities to perform the same job you had been performing, something to that effect?**

A Yes, sir.

**Q How did that meeting end, if you recall?**

A The last thing that I remember out of that meeting was thanking Mr. Ellison and asking him to thank Mr. D.J. for the opportunity that I was given to work there. Worst case scenario, I wanted to be respectful, as I felt a problem brewing, and I just want to get that across. That's the last thing I remember from that meeting.

**Q Were you kind of taken off work at that point?**

A Yes, sir.

A Yes, sir.
**Q And the second?**
A Yes, sir.
**Q Did you tell them you were recording?**
A I'm not sure.
**Q In the second meeting this was also Mr. Ellison and Mr. Richards, correct?**
A I -- one was with...
**Q The last one was with Mr. Wattenberger?**
A That's who -- that's who that was, yeah. So you're telling me it's the second. Okay.
**Q Yeah. I want to talk about the second meeting. There was a second meeting with Mr. Ellison and Mr. Richards, correct?**
A Okay.
**Q Do you recall --**
A I believe so, yes.
**Q And you recorded that one also?**
A Yes, sir.
**Q And your attorneys gave that to me?**
A Yes.
**Q In the second meeting was there some discussion of you perhaps being a USCAN coordinator or a USCAN cashier?**

A There were -- there was an alternate scenario that was put up, but to be clear, this was the -- I hope this isn't a crude expression, but it was a dead-on-arrival solution because for me to stand inside at the USCAN, at that USCAN desk, it did nothing for me standing for an entire shift, and that was just for isolation, is the way that that was framed, if I remember correctly. "What if we brought you inside around other people."

Okay. Well, that might help a little with the isolation, but it does nothing for me physically. It's actually much worse. I can't have a stool there. I have nothing -- I could do nothing but stand right there. That was my option.

**Q Just for the record, what is a USCAN cashier? What are their duties generally?**

A I have never done that job. As in passing, I think that it is making sure that people get checked out right, and if somebody is buying alcohol to check an ID. I think that that's the main deal with it.

**Q Suppose that Mr. Richards had agreed to let you have a chair in that position, would that have helped physically?**

A No. No, it would not. A chair

there, you can't put a chair there, from my understanding, because me having a chair causes them another risk factor of a customer walking by, tripping over the chair that I'm in, and now they've got an issue with the chair that wasn't there to begin with, and that's why there's not one there now. That is how I understood that.

**Q Where did you get that understanding?**

A It was at -- it would have been talking with somebody at 701. I can't remember her name. The chair was never offered, but I had asked somebody else. He -- all he offered was working at the USCAN, but it did nothing for me physically. Being around other people, yeah. I still have my dog; she's not going back.

**Q So that was a -- in this meeting would you agree that you made it clear to Mr. Ellison and Mr. Richards that regardless of the job you were assigned to your dog was going to be there?**

A Yes.

**Q And it didn't really make any difference whether it was an in-store or out-of-the store job, she was going to be there regardless?**

A It didn't. And the thing that I kept

going back to was, I worked alone in the USCAN where she's not -- or not USCAN.

Q **The fuel kiosk?**

A Yeah, the Gas N Go.

Q **Okay. Would there have been any accommodation that the company could have made that did not include the dog being present that would have been acceptable to you?**

A No. No. She preceded Food City and I was in the perfect position for her and me to continue my job.

Q **Would that still be your view today, that there's no type of position that Food City could offer that would be acceptable to you as long -- if it did not include the dog being present?**

A No.

Q **That's still your --**

A That is my stance.

Q **To this day?**

A To this day.

Q **And would you agree that you made that quite clear to Mr. Ellison and Mr. Richards?**

A Yes, sir.

Q **Going back to your comment a minute ago about having some discussion about the chair**