# EXHIBIT 3

# DEPOSITION OF ELLISON

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
AT ROME

---

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | No. 4:22-cv-00179 |
| | * | |
| K-VAT-FOOD STORES, INC., | * | |
| d/b/a FOOD CITY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

---

THE VIDEOTAPED DEPOSITION OF
DAVID GARY ELLISON
January 11, 2023

---

Diane R. Angel, RPR, TN LCR #246
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

Q Okay. Any other professional certifications or training?
A No, sir.
Q Okay. Are you a member of any professional organizations or clubs?
A No, sir.
Q And I know this is kind of a weird question, but it's standard. Have you ever been convicted of a crime?
A No, sir.
Q Okay. And you work for K-VA-T Food Stores, Inc.; is that right?
A Yes, sir.
Q Is that -- I know it's commonly referred to...
A K-VA-T is the parent company name, doing business as Food City.
Q Okay. What is your current position with Food City?
A Senior human resources specialist.
Q And how long have you been in that position?
A Almost two years. February will mark two years.
Q All right. What was -- let me ask

involved in every conversation throughout the company and --

Q Okay.

A -- those requests.

Q The person to ask about that would be Donnie Meadows; is that fair?

A Yes, sir.

Q Or with regard to those prior accommodations, now Sherrell Lyon; is that right?

A Correct.

Q All right. When did you first meet Matthew Batten?

A That would have been May of 2019.

Q What was your impression of Mr. Batten?

A Mr. Batten was a, you know, capable young man being able to perform the essential functions of the job that he was hired for in the fuel station.

Q Was he a good employee?

A Yes, sir.

Q To your knowledge, was he ever written up?

A Under the time that I was his direct supervisor I never had any procedural issues with

him, never had to document or sit him down or anything.

**Q To your knowledge, did he ever receive any negative performance reviews?**

A Not that I'm aware of, no.

**Q Okay. When you first met Mr. Batten would you say that his disability was apparent?**

A Yes, sir.

**Q Did y'all have any discussion at that time about his condition?**

A Yes. I mean, obviously, I mean, you know, it's apparent that, you know, he doesn't have use of one of his arms. Talked about, you know, the duties within the fuel station and, you know, he stated that, you know, he felt he could perform all duties outlined for the position and, you know, went over the entire operational area, and he was very thankful to be able to gain employment with us.

**Q Were you a decision-maker in the hiring process for Mr. Batten in 2019?**

A Yes, sir.

**Q All right. Who else was a decision-maker on that?**

A Ultimately, myself as the store manager. He had an interview with a human relations

A Yeah.
**Q -- is there any reference in that statement regarding the meeting on August 12th, 2021, that Mr. Batten indicated he had fallen in the past?**
A No, sir, I don't believe there is.
**Q Okay. Do you recall Mr. Batten telling you that he had fallen before in this meeting?**
A I do not recall that.
**Q Do you recall him stating, the last time I fell I knocked myself out?**
A No, sir.
**Q Now, in this meeting you informed Mr. Batten that the decision had been made that the service dog would not be approved; is that right?**
A That is correct.
**Q When had that decision been made?**
A I cannot give you an exact date. I know I met with Mr. Batten the first time on August the 6th. I would have taken that information back to Donnie Meadows on that particular day, and it would have been sometime before the 12th but I cannot give you an exact date.
**Q Okay. Forgetting about an exact**

**or something they'll come over and help you out?**

A Yes, sir.

**Q Okay. It's fair to say that's a job that has that associate on their feet?**

A Yes, sir.

**Q Okay. Do you remember what Mr. Batten said when you floated the idea of him working the USCAN position?**

A He immediately stated that he could not do that because he could not stand for prolonged periods of time. When trying to ask him as to, you know, gauge how long he might be able to sit or stand, he could not give me any definite time frame to even try to, you know, accommodate that matter. He just immediately shot it down and said, no, I can't do that.

**Q Okay. Well, did you advise Mr. Batten that he might be able to sit down for some period of time in that position?**

A Unfortunately, we never got to that --

**Q Okay. So you never --**

A -- discussion.

**Q Okay. You never offered, hey, we can give you a stool, we can give you a chair?**

A No, sir.
**Q Okay.**
A Outside of him just, you know, immediately shooting it down.
**Q Okay. Was it your intent to offer him a chair?**
A No. I mean, we can't speculate as to, you know, what other accommodations could have been offered.
**Q Okay. Well, let me just ask you this: At the time you what were meeting with Mr. Batten on August 12th, 2021, you say he shot the USCAN position down. At the time you had the meeting did you intend to offer him the accommodation of a chair in the USCAN position?**
A That would have been a discussion that I would have had to have with Donnie Meadows at that point.
**Q Okay. So you did not intend at that time to offer him the use of a chair in the USCAN position?**
A I am not saying that I did or did not.
**Q Was there --**
A I would have to, you know, converse

condition.

**Q Did Mr. Batten make it clear that nothing was going to change and that he was still going to need the service animal?**

A Yes. He made it clear that, you know, he would not return to work without having his service dog present regardless of any position.

**Q Okay. Were you aware that Mr. Batten had put in his application for the service dog prior to even coming to work for Food City in 2019?**

A No, sir.

**Q You told Mr. Batten that you were not able -- that is Food City was not able to accommodate having a service animal present while he was working; is that right?**

A That is correct.

**Q Do you know why Food City could not accommodate having a service animal present?**

A I cannot speak to that. That was a decision made by Donnie Meadows, and I don't know the specifics or particulars of that decision-making.

**Q Okay. You don't know why it would have been a problem to have a service animal in the kiosk?**

Exhibit 8.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 8.)

BY MR. HARGRAVES:

**Q Do you recognize this document marked Exhibit 8?**

A Yes.

**Q What is this?**

A Just a summary of the termination information for Mr. Batten.

**Q And this indicates -- on status it says "terminated;" is that right?**

A That is correct.

**Q It says terminated February 14, 2022; is that right?**

A That is correct.

**Q It also has that as the last day worked; is that right?**

A I'm going to say that would not be his last physical day worked but that would be his last day in our system.

**Q Is the last day worked just the last day they're employed?**

A Typically, yes.

**Q Isn't that the same as their termination date?**

A Typically, yes.

**Q All right. He wasn't physically at Food City on February 14, 2022?**

A No, sir.

**Q The termination reason is "Failed to return from leave;" is that right?**

A That is correct.

**Q And, again, that's the leave that Mr. Batten never requested, Food City just placed him on; is that right?**

A That is correct.

**Q And so he was terminated for failing to return from that leave?**

A That is correct.

**Q Okay.**

MR. HARGRAVES: Let's mark that Exhibit 9.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 9.)

BY MR. HARGRAVES:

**Q All right. You've been handed what's marked as Exhibit 9. Do you recognize this**