IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
AT ROME

---

CHRISTOPHER MATTHEW BATTEN, *
*
Plaintiff, *
*
-vs- * No. 4:22-cv-00179
*
K-VAT-FOOD STORES, INC., *
d/b/a FOOD CITY, *
*
Defendant. *
*

---

THE DEPOSITION OF
CHRISTOPHER MATTHEW BATTEN
January 11, 2023

---

Diane R. Angel, RPR, TN LCR #246
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

APPEARANCES:

R. ETHAN HARGRAVES, ESQUIRE
ethan@masseyattorneys.com
Massey & Associates, PC
6400 Lee Highway, Suite 101
Chattanooga, Tennessee 37421
(423)697-4529
Appearing for the Plaintiff

HOWARD B. JACKSON, ESQUIRE
hjackson@wimberlylawson.com
Wimberly, Lawson, Wright,
Daves & Jones, PLLC
P.O. Box 2231
550 W. Main Avenue, Suite 900
Knoxville, Tennessee 37902
(865)546-1000
Appearing for the Defendant

ALSO PRESENT: David Ellison
Mellow Joy (Service Dog)

---

INDEX OF EXAMINATION

CHRISTOPHER MATTHEW BATTEN
Examination by Mr. Jackson ........................5
Examination by Mr. Hargraves .....................84

INDEX OF EXHIBITS

1 - Job Search Documentation ..................18
2 - Position Description for Fuel Clerk ........26
3 - Job Description Acknowledgment .............26
4 - Receipt for Associate Handbook .............36
5 - Note by Emily Hobbs ........................63
6 - (Collective) Doctors' Notes ................81

The deposition of CHRISTOPHER MATTHEW BATTEN, called as a witness at the instance of the Plaintiff, for any and all purposes allowed pursuant to the Federal Rules of Civil Procedure, taken pursuant to notice and agreement on January 11, 2023, at the law offices of Massey & Associates, P.C., 6400 Lee Highway, Suite 101, Chattanooga, Tennessee 37421, commencing at 9:31 a.m., before Diane R. Angel, Registered Professional Reporter and Notary Public.

S T I P U L A T I O N

It being agreed between counsel for the respective parties that Diane R. Angel, Notary Public and Registered Professional Reporter, may swear the witness, take his deposition in machine shorthand, afterwards reducing the same to typewriting.

All objections, except as to the form of the question and responsiveness of the answer, are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., are expressly waived. Signature reserved.

CHRISTOPHER MATTHEW BATTEN,

called at the instance of the Defendant, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. JACKSON:

Q We met a moment ago. I'll introduce myself on the record. My name is Howard Jackson. I'm the attorney representing Food City in this matter. I think you know Mr. Ellison?

A Uh-huh.

Q We're here today to take your deposition, so I'm going to be asking you some questions. If you don't hear me or if you don't understand, please let me know. Okay?

A Yes, sir.

Q And as you can see, our court reporter is taking down what we say. So if you have an answer that is yes or no, if you would please actually say yes or no rather than just nod your head, that would be good.

A Yes, sir.

Q You're doing good so far, but it's not like a normal conversation, again, because she's taking down what we say. And I'm sure that you're

going to know the answer to some of my questions before I finish getting them out, but if you would do your best to let me finish --

A I understand.

Q -- and then I'll do my best to return the courtesy and let you finish your answers. Fair enough?

A Yes, sir.

Q If you should need a break at some point let us know. We'll be glad to do that. My only caveat to that is if I have asked a question, please go ahead and answer the question and then just let us know that you need a break.

A Yes, sir.

Q Are you taking any medications that would inhibit your ability to testify?

A No, sir.

Q Is there any reason that you would not be able to give complete and truthful testimony today?

A No reason.

Q Can you state your name and address for the record.

A Christopher Matthew Batten. 2519 -- I'm sorry. 713 Heritage Park Drive, Chattanooga,

Tennessee 37421.

**Q Does anyone else live at that address with you?**

A No, sir.

**Q Do you have relatives here over the age of 18 that live in this county?**

A I do, sir.

**Q Can you tell us who they are.**

A I have my mother, Carolyn Ann Batten; and my sister, Kristen Lee Smith.

**Q That's it?**

A Yes, sir, that's it.

**Q I'll ask a little bit about your education. Did you graduate from high school?**

A I did.

**Q What high school?**

A Dobyns-Bennett in Kingsport, Tennessee.

**Q What year?**

A It was '98, I believe.

**Q Okay. Excuse me. I'm on the downside of a cold, but I'll cough occasionally.**

**Do you have formal education beyond high school?**

A I have some college.

**Q Where did you go to college?**
A East Tennessee State and University of Tennessee/Chattanooga.
**Q Do you know the approximate year that you were at East Tennessee?**
A '98 through the first -- so I graduated in the fall from high school, started East Tennessee State that spring, and then the following year. So it would be a year and a half, three semesters, either 2000 or 2001. I'm not exactly sure on that.
**Q Close enough. Did you have a particular major at that time?**
A Marketing.
**Q Then you went to UTC?**
A Yes, sir.
**Q And approximately when was that?**
A For the approximately next two semesters.
**Q Okay. Still in marketing?**
A Yes, sir.
**Q So you've had about five semesters of college?**
A Yes, sir.
**Q Did you end up getting an associate**

**degree or any kind of -- complete a program of any kind?**

A No, sir. I just went straight to work.

**Q Where did you go to work?**

A I got into the auto sales business. I worked at Mountain View Ford for a year and then Hunt Nissan for three years.

**Q In sales?**

A Yes, sir.

**Q Okay. Did you -- how long did you -- did you get out of auto sales after about five years?**

A It was less than five. I moved to Denver, Colorado, and got into the mortgage business.

**Q When you say got into the mortgage business, what position did you hold?**

A I started off as a wholesale broker and I went to work for H&R Block Mortgage and I ended my tenure in the collapse as a senior loan officer, team leader, and closer. And I held licenses personally in 36 states to still work wholesale.

**Q What is wholesale?**

A Wholesale is a brokerage shop; retail is an in-house lender that generates its own leads. H&R Block would convert tax clients into mortgage leads is the major difference between the two.

**Q So just help me understand again a little bit. What does a wholesale broker do?**

A A wholesale broker is somebody that has their own license, say for Tennessee, and my leads would be basically a phone book. I would take whatever batch of phone numbers I had. I would scrub it against the "Do Not Call" list. Then I would call a cold call to probe and generate my own leads. So wholesale, they're not provided for you. Retail, they are. And the commission difference is -- it's significant. Wholesale, I'm allowed to earn up to six points per mortgage, and then in the retail side it is an X number of loans regardless of size is where the compensation broke down as to how many loans I generated. No points.

**Q But in either case you're selling -- you're trying to persuade individual people to get a mortgage?**

A Yes, sir.

**Q Okay. About how long did you do that?**

A Roughly four years.
**Q Was that all in Colorado?**
A Yes, sir.
**Q Were the mortgage licensures required as part of the job?**
A Retail, no. Wholesale, yes.
**Q Do you still have the licensures?**
A No, sir. They expire after every couple of years. On top of all of the -- what resulted in the '08 collapse of the housing market, everything changed. Everybody had to start over. I didn't. I just got out.
**Q About -- approximately what year did you get out of the mortgage business?**
A It was '08, '09. I went through, in a six-month period, Countrywide and two other retail companies. Countrywide and one other. I went to work one morning, literally, chain on the door as things just started to close down.
**Q Time to do something else?**
A Yes, sir.
**Q What did you end up getting into next?**
A When I was in high school I worked at the Chop House in Kingsport. They have them in

Knoxville, Connors Steak & Seafood, same company. I went back to them, where after two years I was at the top of the nonsalary managers in both front of the house and back of the house, high volume, kitchen weekend. You'd call it a head cashier in the front of the house when I was in the front of the house. Then I transferred to Huntsville, Alabama, and I opened a Connors Steak & Seafood there. I was there for roughly two years.

**Q All right. So we're in 2010, 2011 time frame somewhere?**

A Close to, yeah.

**Q So how long did you stay at the Connors in Huntsville?**

A Roughly two years.

**Q All right. Then where did you go after that?**

A I moved to Charleston, South Carolina, in early, early 2011 and I got a big write-up where I left off with the restaurant business, Connors Steak & Seafood. Same position for a company called California Dreaming. It was the largest volume restaurant in the state of South Carolina.

**Q About how long did you stay with**

**California Dreaming?**

A It wasn't too terribly long. I -- a peculiar thing about this restaurant is the layout of ovens and coolers. They had a lot of hanging ovens and they had a fish dish that was basically a whole bunch of butter with a whole bunch of seasonings in it. I was pulling one out, somebody bumped me, and when I turned to catch the pan, you know, keep it from -- the fish falling out, all the oil did, and it melted the -- I had to have a skin graft from my elbow to my wrist on my right arm and stayed in a burn unit. After the initial hospital visit I would have to go back weekly to this particular facility in North Charleston for checkups and whatnot.

**Q So did you kind of exit the restaurant business at that point?**

A That was the last restaurant job I had, yes, sir.

**Q Where did you work after the California Dreaming?**

A Southern Standard Stone & Mulch.

**Q What kind of position were you in there?**

A Operations manager.

**Q Where was that located?**

A Charleston, South Carolina.

**Q How did you come to go into stone and mulch after being in the restaurant business?**

A Stumbled into it, quite literally. It would be akin to an Indeed job search. I found this one company, and it was like a dog with a bone, I didn't let off. So, basically, I was given a shot at doing that.

**Q How did you like that work?**

A It was -- I enjoyed it. I wish it didn't close the way that it did. There was two owners, and one owner used it as a piggy bank, so I found out later. He bought a boat, a Range Rover, paid for someone's apartment. So we were losing way more than what we were bringing in based upon his, I guess, loose pockets.

**Q All right. About how long were you there?**

A Until maybe 2013.

**Q Okay. And where did you go next?**

A In March of 2014 I was hit by a car and I spent a month in the ICU. I spent another month in a recovery hospital, a recovery bed, and was finally able to be released to my family, which

was my mom here in Chattanooga.

**Q All right. Are you working presently?**

A No, sir.

**Q What was the Absolute Storage job? I understood you worked there for a while.**

A I worked there for three and a half months.

**Q What is their business?**

A Storage facility.

**Q Did you work remotely or did you work at a facility?**

A At a facility.

**Q Where was it?**

A Dayton Boulevard. Red Bank.

**Q Was that like a five-day-a-week type of job?**

A Yes. It was four normal and then an abbreviated day, so it wasn't a full five, if you will.

**Q How did you come to work there?**

A Shortly after I was prevented to work at Food City I did not have any option but to look, and I was driving past the mall and I saw this place with a help wanted sign out front and I pulled in

and I just happened to catch the area manager and we stirred up a conversation about Boyd-Buchanan. I had went there for a period before Dobyns-Bennett and her children went there. I called her a couple days later and just -- she kind of steered me in the direction of what I needed to do to get in front of her bosses and she would pull me in that way, and that's how that came about.

**Q What was your actual job?**

A Just the office manager.

**Q At that location?**

A I believe they classified it as storage specialist at that location.

**Q What were your duties?**

A To collect outstanding balances, to generate business when -- if it ever dropped below a certain point. They wanted to be, I believe, 90 to 93 percent. One hundred percent is bad for them because they don't have anything to offer, but when people are going delinquent then I'm making calls and then I'm working on moving people out. I never physically did any of those. They never came up during my time. There was the hand sweep -- a wide sweep -- one of those wide dust brooms down the hallways. That was an all indoor facility.

**Q A little bit like the term "light cleaning"?**
A Very light. It didn't require much attention at all.
**Q Did you have your dog with you on that job?**
A I did.
**Q About how long did you end up working there?**
A Three months, right at three months.
**Q Do you recall how it ended?**
A I was told it was a communication and unprofessional discharge, where there was poor communication or unprofessional communication. I'm not real clear on which.
**Q Who told you this?**
A An area manager who -- I believe she was in South Carolina. And it happened over a Teams call 15 minutes after I got to work. I think it was January 4th. That was the only day that I worked in 2022. So 15 minutes after I got there I got a Teams call and somebody else showed up to take over.
**Q Do you remember the name of this person?**
A Teresa. I'm not sure of her last

name.

**Q Were you surprised?**

A Very much.

**Q Did anybody tell you what the unprofessional communication was?**

A No. It was basically she read it and then I got it in an email on my way home and that was it. I asked what should I do, what could I do and got no response, so...

**Q Has that been your only employment after Food City?**

A Yes, sir.

(Whereupon, Exhibit Number 1 was marked to said deposition and will be subsequently attached hereto.)

BY MR. JACKSON:

**Q I've handed you a document that we've labeled as Exhibit 1 to your deposition. We were provided this through your counsel. Can you just, for the record, tell us what this is.**

A This appears to be my job search.

**Q So these employers listed are places that you have sent in an application for employment via Indeed or some other method?**

A Yes, sir. This is all Indeed.

**Q Have you used other means to look for employment outside of Indeed?**

A Indeed had two streams. This is one. This would have been the active stream. The passive stream would have been feeds which would have been a job sent, hey, this job is open, the majority of which were things like schools, office things. I don't think that there was one job out of the feeds -- and I still get them -- that either I could do or -- that I could do physically.

I've been told on a couple of these high-paced, high-volume, title work, mortgage things that I tried to get back into -- if I have gotten somebody on the phone I have disclosed my situation and it quickly ends in, I don't think that this is a good fit because it is high paced, high volume, and, for lack of a better term, I am inefficient.

**Q When you say disclose your situation, what do you mean?**

A That I am an amputee, that I have damage from an MVA over what happened, broke everything on the right side of my body, and that I have a service dog, and that's my situation as I explain it, and it's usually a very, very short conversation after that.

**Q On this Exhibit 1 are there any retail businesses listed here?**
A I mean, if you're talking about like banks, retail, is that what you're asking?
**Q (Moves head up and down.)**
A Yes.
**Q So banks?**
A Yeah. Things of that nature, yes, sir.
**Q Okay.**
A Like financial services you see in there.
**Q What about like a grocery store or a drugstore?**
A Huh-uh.
**Q Nothing like that?**
A No, sir.
**Q Or even like a Best Buy or a Wal-Mart?**
A No, sir. I have to take my situation into full consideration, and my situation being physical limitations. All of these inside retail positions, every single one of these has a desk.
**Q So you want to be in a job where you have a desk and a chair?**

A I need a job that -- I need a chair at any job that I come into. I have a titanium femur. I have a plate and 16 screws in my right ankle. I have a plate and 19 screws in my right hip. And my right leg, as a result of this, is a little bit longer now because of the exterior hardware. My gait is altered. It's not exactly the most stable. It's like walking with one shoe on is how it feels. I know that that's a dramatic explanation to it. Not quite as much, but it's very close.

So I want to be mobile. I physically cannot be mobile, as in on my feet for three, four, five, six, seven, eight hours, however long it is.

**Q All right. So you need a desk --**

A (Moves head up and down.)

**Q -- in whatever sort of work you're going to do?**

A Yes, sir.

**Q Is there any other sort of physical requirement besides a desk that you would be aware of?**

A I mean, I can't speculate to the amount of other things that I need until I get to it. When -- since I'm missing my right arm I have

hardware all the way down my right side. I have an internal stimulator implant on my left side that's wired into my spine. There are factors on top of factors on top of factors that I have to consider, viability to function, and be a productive member of whatever employment.

**Q Can you type?**

A No. Not with -- again, with one hand, going back to those short conversations where I'm not efficient.

**Q So you can type with your left hand but it's just much slower?**

A They want me to type 30 words a minute. I cannot type 30 words in ten minutes. I was right-handed. Having to learn left-handed, it's awkward.

**Q So it's going to depend very much on the duties of whatever position you're talking about; is that fair to say?**

A Absolutely.

**Q So our records show that you started working at Food City in 2019.**

A Yes, sir.

**Q Were your -- physically were your limitations then roughly about the same as they are**

**now?**

A They were worse.

**Q They were worse then?**

A On April 19th, 2019, I fell down a flight of stairs and I broke four ribs on my right side.

**Q Where were you?**

A At my mother's house.

**Q Okay.**

A I fell from -- clear from the top all the way down and was stuck there for, seemed like, hours. I do believe it took close to an hour to get rolled around.

One of the things that you have to take into account, how am I supposed to get up when I only have one arm and a leg on that one arm with broken ribs. So that's the condition I walked into Food City with.

**Q Which Food City was it?**

A That would have been Ooltewah, the location. I believe it was 774.

**Q Might it have been 773?**

A It might have been, yes.

**Q How did you come to apply?**

A Driving by, I believe I was with my

mom and it's -- going down that road, the way that that store is situated, you see that Gas N Go before you see anything else. You'll pass McDonald's and, boom, it's there. You cannot see because the view is blocked by this Gas N Go. And, I mean, my mouth hit the -- would have hit the floor with this. Yeah, that's how I came across it.

**Q Was there a help wanted sign or anything?**

A I do not believe so.

**Q Just decided you were going to go in and apply?**

A I asked the attendant at the time -- I believe her name was Reba, and then -- I am really not 100 percent -- oh, then I went inside and found an assistant manager. I believe his name was D.J. And I asked him what I should do, how I should go about an application for this, what is the need. And through one of those two, if not both, there was a need.

**Q So you submitted an application?**

A I believe so.

**Q Did you interview with anyone?**

A I did.

**Q Who would that have been?**

A I interviewed with Ms. Frances. She would have been a front-end manager. And David Ellison popped in for the last five minutes of -- I believe it was my -- it might have been a second interview. He just wanted to, I guess, put his stamp on it, and he was the last person I talked to before I was told that this would work.

**Q Frances was the front-end manager and Mr. Ellison -- the same Mr. Ellison that's here today -- at that time was the store manager of 773?**

A He was the store manager of 773, yes.

**Q And so maybe a second interview. Do you remember who the second interview was with?**

A I don't. I just know that the -- there was a head cashier. I believe her name was Akilah. I'm not 100 percent sure if I spoke with her or not. But between Ms. Reba, who was the fuel coordinator; D.J., who was the assistant store manager, those two getting me into the office to speak to Ms. Frances, I know that happened and then it ended with Mr. David Ellison.

**Q So you talked to all those people at some point in the process?**

A Yes.

**Q In person?**

A Yes.

(Whereupon, Exhibit Number 2 was marked to said deposition and will be subsequently attached hereto.)

MR. JACKSON: And we'll go ahead and mark this one.

(Whereupon, Exhibit Number 3 was marked to said deposition and will be subsequently attached hereto.)

BY MR. JACKSON:

**Q Exhibits 2 and 3 kind of somewhat go together. Do you happen to recognize Exhibit 2 as the job description for the fuel clerk?**

A I do recognize that.

**Q Did you review that in connection with, again, your employment with Food City?**

A I did.

**Q And Exhibit 3 is a job description acknowledgment. Do you see that?**

A I do.

**Q And it says it's digitally signed by you May 20th, 2019. Do you see that?**

A Yes, sir, I do.

**Q Do you have any reason to disagree with that being your electronic signature?**

A No, sir.

**Q Did you in fact review the position description at or about May of 2019?**

A I did.

**Q And on Exhibit 3, the acknowledgment, it says, "Please list the job functions stated in the previously viewed job description that you are unable to perform." Do you see that?**

A I do.

**Q And it says "Moving 50 pounds."**

A Yes, sir.

**Q Did you make that entry, the moving 50 pounds?**

A I don't recall how we got there. I completely understand why it's there.

**Q Do you think maybe it's possible that somebody else typed it in after you told them?**

A Yes. Yes, that's very possible.

**Q All right. When you reviewed Exhibit 2 did you have a discussion with anybody about what was on it and what your limitations may be?**

A I did.

**Q With whom?**

A Reba -- and, again, I -- Ms. Reba.

I'm not sure of her last name.

**Q If you'll look at Exhibit 3, it says digitally signed by Frances Harris. Is she the Frances you mentioned earlier?**

A Yes, sir.

**Q Did you perhaps have some discussions with Frances as well?**

A I don't recall to the extent of -- there were -- and this is an example of having one arm, one hand. It's extremely difficult to open and place a 50-gallon trash bag.

**Q Sure.**

A I mean, it weighs, you know, a couple ounces, but to put that in there, I can't do it. That would have been something that I would have gone over.

**Q Okay. Let's look at it a little bit, Exhibit 2. Essential job functions: Provide efficient and courteous service to customers. That's something you could do?**

A Yes, sir, at all times.

**Q Number 2, scan and ring customer orders?**

A Yes, sir.

**Q You did that in the fuel clerk**

**position?**

A Yes, sir.

**Q Number 3, receive and be accountable for funds; you did that?**

A Yes, sir.

**Q Number 4, keep workstation and area around fuel station neat and clean. Did you do a little bit of cleaning?**

A I did, to the best of my ability, whether -- if it be in pain. I don't want to be as vague to say as this applies to every single one, but it does. I'm a day-by-day person when you add the totality of all the injuries I have. Cleaning, reaching up, specifically, is painful. Squeegeeing is nearly impossible, and that store, for whatever reason, the kiosk floods, and I had quite a bit of difficulty with that, with that difficulty being able to try to stay ahead as much as I can. That's how I completed the function, but it was not easy.

**Q Did you get any help from others doing that or did you just sort of do what you could?**

A At times. And at other times I just did what I could.

**Q Did you ever get any complaints about**

**not getting enough done in the way of cleaning?**
A Not that I recall.
Q **Number 5, know and follow state and local laws regarding cigarette and tobacco sales.**
A I understand that.
Q **Number 6, know and follow federal laws regarding food stamps.**
A I understand that.
Q **Number 7, know and follow coupon handling procedures.**
A Yes, I understand that.
Q **Number 8, follow company check cashing and tendering policies.**
A By following, meaning they don't exist.
Q **What doesn't exist?**
A They don't get checks.
Q **Okay. Additional job functions: Assist with light stocking duties, putting out candy and cigarettes and such.**
A The reach was an issue. The bathroom area is an issue. We had -- whatever was stored back there, again, ties back into the weight. Getting down low on the pumps was difficult. They had multiple cleaning solutions that were for

multiple areas, and if I -- one in particular, if it didn't come off in time, as being cleaned off in time, you would see where it had eaten -- left its mark, very acidic. Things like that were difficult to get done in time because I am a good bit slower than I would assume the normal average fuel clerk.

**Q Did you do some of those cleaning duties sort of as able?**

A I tried, yes.

**Q Did others give you some assistance with cleaning, as far as you can recall?**

A You know, I don't recall how Ms. Reba broke things down. At that store specifically it was broken down into three shifts. Some things would have covered -- would have been covered throughout the day, some things at open, some things also at close. So I can't give a definitive as to what I was helped with, how much help I received per job function.

**Q Number 3 says cleaning the concrete area around the pumps. Did you do some of the concrete cleaning?**

A That was extremely difficult because it required a deck brush, you know, a coarse-haired brush, long stick around the pumps and specifically

the speed bumps.
**Q Not easy to do?**
A Not easy to do with one hand. And that's just the scrubbing. The other part is the hose, pulling the hose around from one side to the other. I have stumbled, and I can say without question one of the scariest things that I go through is falling and watching the ground come and I can't do anything to stop it.
So moving a hose around, stumbling over the speed bump, those are all fears, and I tried to do what I could without compromising myself physically.
**Q Did you actually do some of this concrete cleaning?**
A Some.
**Q To the extent you thought you could safely do it?**
A Some, yes.
**Q All right. Collect trash as needed.**
A Did not.
**Q You didn't do that?**
A No. It goes back to I can't put a trash bag in the trash can.
**Q Were you in essence excused from**

**doing that?**

A I'm not sure of which stores actually do it. I think -- yes, I did not have to do that chore.

**Q Keep paper towels and windshield wiper fluid stocked.**

A Again, the bending, pouring into -- the windshield wiper stuff. To put -- to open up the top of a trash can to put paper towels in there with one hand, because you have to lift something and put paper towels in at the same time, I struggled with it.

**Q Did you do it some of the time?**

A I did what I could with it.

**Q Okay. Were you ever reprimanded or rated down in some way based on this stocking windshield wiper fluid, et cetera?**

A The pumps themselves I heard about multiple times.

**Q Help me understand.**

A Where they weren't clean.

**Q Oh, okay, the next thing. Who did you hear about it from?**

A The fuel coordinator, Ms. Reba.

**Q Is that Reba with a "B," as in boy?**

A Yes, sir.

**Q What did she say?**

A She would take me to a pump and do it in front of me, and it wasn't pleasant. I mean, if it wasn't done to her satisfaction when she came in, then she'd -- there was a need to show me over and over, regardless of my explanation of how I could do what I could do or what I could not do, didn't matter. Do it faster. I can't do faster.

**Q She never understood that?**

A I'm not sure what -- I can't speculate what she was thinking at all times.

**Q She continued to give you some feedback on that subject, though?**

A In a negative manner she did it, and she did it publicly.

**Q Did she ever stop doing that while you were at 773?**

A No, sir.

**Q So these tasks that we've been talking about, did your ability to do them, or in some cases the difficulty doing them in other cases, did that remain fairly constant during your employment?**

A Yes, sir. I mean, that's my life.

Standing, whether if it's at home, my mom's house, the park for any extended period of time -- I don't have a great distance. I cannot make it very far due to the shape, discomfort, whatever the case may be. So, yeah, things, to this day, are difficult.

**Q When you were working in the fuel kiosk were you able to sit fairly often?**

A I was. That was the number one drive to that -- or number one thing about this job. I didn't care what the job was. I just had an opportunity to sit if I couldn't stand and stand when I could stand.

**Q If a customer came in the kiosk to buy something could you ring them up while you were sitting?**

A I don't think so. Whatever they needed, if I had to scan a card, whatever, I'd get to the window and I'd stand up for that, getting up and down.

**Q Was that usually a pretty short period of time when you had to stand to do a transaction?**

A There's -- for one transaction it's not much, but when you add multiple transactions on top of it, to where there is no getting back to a

chair -- that store is, from what I understand, fairly busy in comparison to the others because it has more pumps. I mean, there was times where I was stuck standing up, having a line. Yeah, so each individual one would be short, but added together is a game changer, yes, especially if somebody is hitting the call button, they need help. I can't be in two places at once, so...

**Q So at some point you -- well, let me do this.**

**(Whereupon, Exhibit Number 4 was marked to said deposition and will be subsequently attached hereto.)**

BY MR. JACKSON:

**Q Exhibit 4 is a receipt for associate handbook and the second page has an electronic signature. Do you agree that you got a handbook and you signed that you received it?**

A By handbook I think it means Fast Tracks, which are computer testing. They will walk through, this is how you do in this situation, and then at the end of whatever presentation it was there would be a test behind it. That's what I recall as a handbook.

**Q You don't recall getting actually --**

A I do not recall a physical handbook.

**Q Do they have an online resource for employees?**

A It's an in-store system. You can't go home and do these. This is at the store.

**Q That in-store system, do you know if you could access documents such as a handbook?**

A From -- I do not recall a handbook. I recall these Fast Tracks, these tests, as an ongoing thing that they -- you would get every few months; five, ten, 15 would pop up and you just clear them as you go. They try to keep it current.

**Q I don't know if you said this, but you were hired in the fuel clerk position and that was part time?**

A Yes, sir.

**Q Roughly 28 hours a week?**

A Yes, sir.

**Q Did that stay consistent during your time at Food City?**

A No, sir.

**Q How did it change?**

A It changed -- are we still talking about store --

**Q Let's stay with 773 for now.**

A Okay. At one point -- as I mentioned, there was three shifts a day. I was being called on a consistent basis on Fridays and asked to come in, will you come in 30 minutes early, I'm about to go into overtime. This was by the fuel coordinator, Reba.

Now, what she would do is schedule herself 43 hours and put herself there, and she'd laugh about it, that whenever David comes up he's going to be, I've got to get out of here, I've got to go, I can't go into overtime.

So I was the one that was in that pay -- in that spot behind her, so I would have to come in 30 minutes early.

And one day I got there and -- I didn't answer the phone. I got there and I saw her and I said, I saw you calling, Ms. Reba. I knew you -- what you were -- you were wanting me to come in 30 minutes early. Called the same time every month -- or every week about noon.

And things really turned at that point. Those hours where it was four-hour, five-hour shifts, at the end I was scheduled a couple of two-and-a-half hour shifts because I hadn't -- if you're scheduling yourself 43 hours and

you're always having to call me in early, why don't you just schedule it this way. And I guess that hit a nerve with Ms. Reba and --

**Q So she cut your --**

A -- so my hours -- oh, they went down to 10 to 13.

**Q Is that why you ended up transferring to another store?**

A Yes, sir.

**Q Where did you transfer to?**

A Store 701.

**Q Where is that?**

A East Brainerd Road.

**Q Who was the manager there?**

A Calvin Johnson.

**Q How did you end up getting a transfer?**

A I called -- or stopped in and I spoke with Mandy Hester and I asked -- she was the head cashier. I asked if there was any opportunity at that store. I'm not -- I'm working ten hours, you know. And she said, absolutely.

And so I came in and met with her and Calvin, and it was -- I don't know how it was worked out, but then I had to have a conversation with

Mr. Ellison about requesting a transfer, and they okayed it, all three.

**Q Mr. Ellison okayed it, along with Mr. Johnson?**

A Yes, sir.

**Q Did your duties remain the same?**

A No. They changed.

**Q How did they change?**

A So for one, store 701, it doesn't even have access to water so there's no bathroom, there's no hose, so the spraying, that went away. But other things were added to it, and I never really understood it, but...

**Q To be clear, you were still the fuel clerk in a kiosk?**

A Yes, sir.

**Q But there were some differences in the duties. What other things were added?**

A They didn't have an active fuel coordinator, so where everything was done by Ms. Reba as in, I need X amount of cigarettes or whatever else she had done, when I got to store 701 it bothered me that -- and we would constantly run out of stuff. There was no coordinator.

So I took it upon myself to ask for

help with staying stocked or what have you because we didn't have anybody that was doing anything. There were functions of the store managers that got passed down to any of the fuel clerks.

And one specific would be the security tag. They want a numbered bar coded security sticker over the front and around the side of every gas pump. What that was for is for people who would scan it, whether -- you could tell that the seal was broken, this pump was compromised. That's a manager's function in the handbook, if you will. But that's when -- just certain -- that's just an example of one that I can think of that was added to -- because, I mean, nobody -- like I said, nobody else did it, so they had -- so they had made their own to-do list and that was on there. But in the Fast Tracks, that's a manager's job, not an hourly fuel clerk. Just an example.

**Q Approximately when did you transfer to 701? You started at 773 in May of '19.**

A I don't recall the specific date or close.

**Q Do you think it would have been in 2020?**

A I think it might have been. I mean,

it could -- I really don't recall.

Q **Okay.**

A I don't want to give you the wrong answer.

Q **Did the changes and duties such as trying to get inventory and other things, did those things make the job at 701 any physically more difficult?**

A Absolutely.

Q **In what way?**

A Because I was getting -- where I was asking for X, Y, and Z, I wound up having to go get X, Y, and Z. I increased my job functions on accident, and once it started it didn't -- I mean, it was, this guy's here, he knows what we need, get this, take it, get it transferred. So I'm in the store when I'm -- my job is out in the kiosk.

Q **In the store to get inventory?**

A I'm in the store turning in a list or grabbing a milk crate at a time. I mean...

Q **The milk crate with inventory in it?**

A Like cigarettes or whatnot.

Q **Not milk literally?**

A Not -- yeah. It was just a milk crate that things got transferred in.

**Q Any other way that the job at 701 was more difficult physically?**

A There was a lot -- there were a lot of things that kept me in the store that made it difficult. I even -- I was in the customer service area where said tobacco was and I've tripped over a toolbox. In the back, whether somebody has pulled inventory and sent it back to the -- I don't even know what the guy's position was, that would transfer the product from one department to another, back and forth. The steps were significantly more. The lifting was more, up to a point where I just physically couldn't do it, and I just didn't do it. I mean, it wasn't my job function to begin with. I did it when I could.

**Q Did you have any discussion with Mr. Johnson about not doing or not being able to do some of the inventory work?**

A Not Mr. Johnson. It was Mandy Hester.

**Q Okay. What did you and Ms. Hester talk about?**

A So in the mornings -- I opened at this store and it -- I would drive her out and she would unlock the kiosk. She would pull out the

till. She would, you know, pull the -- take the drops back with her. I'd drive her back to the store and she would go in. And in these circles, you know, getting stuff and driving her back, driving her back and forth, these conversations would come up. So outside of that, I did not spend any time with her one on one because I had it every morning. I didn't need to go find her.

**Q Did she -- was she helpful?**

A I mean, there was really nothing to do. It was -- I mean, there was no solution to it. So if -- a guy -- I don't know his last name -- Vince was, he was the fuel coordinator, and it was just a certificate on the door. He was never down there.

If I made a complaint, for at least maybe two weeks, some stuff would come down, some stuff wouldn't. But it was always, you know, why am I complaining about it. So I just stopped complaining about it. I did it when I could, and when I couldn't it didn't get done.

**Q Did that seem to be okay with Ms. Hester?**

A I can't speculate on Ms. Hester's perspective of that because she was, again, head

cashier, not a fuel coordinator. I mean, she had her own frustrations. I think something that I heard: In a -- it was either Mr. Ellison or Ms. Frances. It was, in a grocery store you don't ever stop hiring. When I heard that I was -- you know, I just...

**Q Was Ms. Hester critical of you for these inventory issues?**

A I was the only one that was trying to do it.

**Q So, no?**

A No.

MR. JACKSON: We've been going for about an hour. Let's take a bathroom break.

MR. HARGRAVES: Sounds good.

(Whereupon, a short break was had.)

MR. JACKSON: So, Mr. Ellison let me know on the break that it is store 774, not 773, so I wanted to get that straight on the record.

BY MR. JACKSON:

**Q Then you transferred, I believe, from 701 to 214, to Ringgold?**

A Yes, sir.

**Q How did that come to happen?**

A This was shortly after -- all the

stores got upgraded with biometric systems, and it required a thumbprint, fingerprint, whatever it was. This Vince that I referenced earlier, the fuel coordinator on paper, who I guess was certified to do things, okay, he thought that it was funny -- I'm sorry. This is difficult.

I was -- I had walked -- I had walked in -- I don't whether it was back from lunch or what, but I was walking back out and he had stopped me and he said, you know, now that we've got these biometrics, how is that going to work for you? And I just looked at him. He was like, your fingerprints on that? He was pointing to my prosthetic arm. It was an extremely difficult thing to hear.

I did not wake up from my accident without my arm. I had to make the decision to remove it roughly a year and a half after the wreck. Hypersensitive. I never thought I'd work again. I never thought I'd be independent again. And now I'm walking past somebody who thinks it's funny that I don't have a thumbprint as if, you know, that's the only finger that you can -- the right thumb, which wasn't the case. I could use my left hand.

And the variety of emotions that -- I

mean, it was not just one. It was not just angry. It was back to my wreck, back to no independence, back to before the job.

And I had told Mr. Johnson, Calvin Johnson, about it, and that man came out and he spent about an hour outside with me.

**Q** **Who did?**

A Calvin Johnson.

**Q** **Okay.**

A And it wasn't in defense of Vince or anything on my side. The man asked questions and they were questions I never thought would have happened that day.

And I -- the -- when I seen Mr. Ellison at 214 I made a reference to Calvin Johnson as, that man is -- he's amazing, because what he did in that moment, in that hour, he understood where I was coming from. But then he turned around and he was building value in me, like for myself, not me, a K-VA-T Food City employee. He was just being a good man.

**Q** **Okay.**

A And I would have gone the same route either way. If he came out and was what he was or if it was anything else, I would still have had the

same response, because I never thought I would have another job. I never thought I'd be independent again, and I made it clear that I was pissed, I was hurt, but I didn't want to cause somebody else what I had just gained, which was my independence and a job.

You know, I was angry at Vince. I never got over it with him. I don't think I've talked to him. I let him know I was angry. But that was -- that was the first of two issues: One, Vince doing that.

And then the second was back to this whole never stop hiring, because they were -- at 701 one day they were short. They did not have enough people working on an extraordinarily busy day, for whatever reason it was, and the person that worked in the kiosk that day worked inside and asked me if I would come in. Actually, I think it was they realized it the day before. So I got there, I wasn't scheduled to work that Saturday and I came in and I worked. I was just going to do exactly what they asked, if I would come in and help them out, yes.

So I came in, worked up until my lunchtime and I was walking out to go to lunch, and

at this store, being two shifts a day, the shifts are longer. It was agreed upon, I mean, from day one with Mandy Hester that when I took my lunch breaks I'd take an hour. I need that hour. I go home and -- I lived a mile from that store. I'd go home and lay down, charge my TENS unit, whatever the case may be. I need that time.

I'm walking out and Linda Santana, the HRC at 701 said, I need you back in 15, 20 minutes.

And I said -- I stopped and said to her, I said, I always take an hour and y'all asked me to come in.

And she's standing at the front, for whatever reason -- I don't even know why she was there -- panicking, but she stopped whatever she had going on and looked straight at me and said, you don't have a choice, and walked off.

And so I went on lunch. I mean, I took my hour and I came back, and within a couple of days of that happening I went in to see Mr. Johnson and Ms. Hester and I asked them, I said, I can't do this, because there was a lot of this pulling and a lot more dysfunction, and it just got too much.

**Q How did Mr. Johnson and Ms. Hester**

**respond?**

A They said, okay. That was it.

**Q How long after that was it before you transferred to 214, just roughly?**

A I would say within a month, maybe. Now, I had had a conversation with some -- with the fuel coordinator back at 774, a store I'm familiar with, and I went straight to the fuel coordinator and asked if they needed help and this lady said, yes, yes, we do. But I had already reached out to store 214, and I believe it was -- I think it had to have been Emily Hobbs. And in the discussions leading up to this -- I worked four days a week here. They -- we've come to an agreement to where I'm working four days in a row. I have my hour off for my lunch, and I have the three days off, which helps me physically. And Emily Hobbs, yeah, no problem, we need the help. You know, somebody was leaving.

So I get there and it was -- it was three days a week and every time I tried to ask, you know, what happened, why is this -- why did you tell me four days when they're only now letting me work three, I didn't get anywhere. But that is the 701 to 214, and that was the sequence of events that led

me there, up to getting started there.

Q So Gary Richards is the store manager at 214?

A Yes, sir.

Q Who was your supervisor at 214?

A For the life of me, I cannot remember her name. She was a fuel coordinator; I do know that.

Q Female?

A Yes.

Q And you were again working in the fuel kiosk?

A Yes, sir.

Q Were things about the same?

A Yes, sir.

Q Still part time?

A Yes. Yes, sir. It was less hours.

Q While you were at Food City did you apply for any of the jobs that are inside the store?

A No, sir.

Q Any particular reason?

A I physically cannot do them. Stocking is something -- if I'm putting something on the bottom shelf and I'm putting stuff on the top shelf, everything in between, I -- that's just

bending and reaching, and that does not include the fact that there's no chairs with wheels that you roll around and can do any of this stuff with. So on your feet the entire shift, I just physically cannot do it.

**Q We're going to talk in a minute about the time frame after you went on your training to get the dog, et cetera, but up until that time, I mean, how did you get along with Gary Richards?**

A I mean, I never really -- I didn't interact with him very much. He deferred more than anything else when it came to me if I had a question about something.

So an example, at 214 they had a hard plastic fold-out picnic table chair, and as I mentioned earlier, I sit on 19 screws and a plate. It's just not comfortable.

So I asked him, can I go buy a chair and put it in there. You have to talk to whatever her -- X, she's your fuel coordinator. That's just an example of my interactions with Gary. I did not deal with him a great deal until this whole thing came to a head.

**Q Okay. How did your fuel coordinator treat you at 214?**

A I don't know if cold shoulder comes close. There was -- I didn't know if I had done something. At the other two stores people talk to each other. Not there. So after I -- that example, asking if I could buy a chair, you know, she killed that. I had -- excuse me. At the -- at store 701 I had a milk crate that I left there and it had a cushion, a seat cushion. It had shades that we were allowed to put up for sun glare and a fan. Everywhere I go I take a fan. And I was able to leave it. And when I asked this fuel coordinator about the chair, no, don't need it.

Okay. So now I've got this milk crate that I'm dragging in and out, and I asked if I could leave it. No, can't leave anything. I mean, it was just short and rather dismissive.

**Q Did you ever have any discussions with anybody about how she was treating you, anybody in management?**

A Every time I tried to talk to Emily Hobbs, the HRC, she had something going on and she didn't have time. That was the default.

Now, I think that there were two hiring events at my store tenure at 214. I understand those times, but, no, I didn't get

anywhere.

**Q Were you attempting to talk to Ms. Hobbs about the fuel coordinator?**

A I just wanted to know if I could leave my stuff. I mean, that -- as an accommodation. You know, I've got one arm. I'm trying to deal with getting in through a door that closes by itself, unloading stuff, packing stuff up, loading it back up every day. It just -- to me, it was unnecessary. There was ample room. Bathroom that had boxes of old signage, toilet paper, just random stuff, and I couldn't even leave it there.

**Q Per the fuel coordinator?**

A Yeah.

**Q Was that -- did you make some attempt to talk to Ms. Hobbs about this same subject?**

A I did.

**Q Did you ever get your explanation out?**

A No, no. I made attempts and I never got to. And the -- I wanted to bring it up with Gary Richards. And the whole thing about this is when I thought I was going to talk to Gary Richards I went into his office and it was Gary Richards and David Ellison, when I thought I was just going to

talk to Gary about getting my crate in there.

Q **Was this before the time that the dog issue came in?**

A No, no, no. This was at the end, after I already had the dog, after I had already returned to work.

Q **Okay.**

A So I'm sure we skipped something in the middle there, but...

Q **Yeah, somewhat. We'll get back to that.**

**Any other sort of issue that you had with this fuel coordinator while you were at 214?**

A No. I mean, like I said, she was very short, very dismissive. Tried to ask about this fourth day, why can I not work this fourth day and it still kept me under 28 hours, but -- I think it was something with my time. There's like a third -- from what I understand, there's a mandatory break, and I didn't get any break.

Q **You're talking about breaks at work?**

A At 214. I think I might have gotten -- I might have been able to -- I'm not sure of the length of time I was there, but it was less than ten days that I was actually able to leave and

take my break, and it just -- that was difficult.

**Q Are you distinguishing a break from lunch?**

A Lunch. Yeah, take my lunch break. I mean, I had zero clock out. Clock in, clock out, go home, that was it.

**Q So you were not taking lunches?**

A No, I did not take lunches.

**Q Were you able to discuss that with Emily or Gary?**

A No, no, no. Actually, let me back up. Yes, I did bring something up to Gary. I said, short of -- I didn't want to raise, just start throwing accusations, whatever. It came down to, this is not what I thought was going to happen. When I first talked and first communicated with this store I would be working four days, and those four days would have added up to 28 hours, which is that part-time threshold.

I reached back out to 774 to that fuel coordinator and I asked, do y'all still need help, this is not what, for lack of a better term, what I signed up for. She said, yes.

I ran it by Gary. I said, Gary, can I go back -- I talked to 774, they have a spot open,

may I go.

And he said, yes. And there was an issue with that "yes." I thought he was saying yes, because I had already spoken to them once. When he said yes, he was saying, yes, I could go.

I turned -- I knew that the fuel coordinator was making the schedule. I said, Gary just let me -- he told me I can go back to Ooltewah, back to, you know, these days, please don't put me on the schedule.

So I get to Ooltewah and the store manager sat down with the front-end -- the head cashier or front-end manager and together they said no. They said, but, you know, they're building one out on Ooltewah-Ringgold Road, you can try there when they open that one. I was talking about right now. I thought I was able to come in.

I hadn't gone through the appropriate channels as I thought I did, spoken with the fuel coordinator who said they needed help. I thought I was going there to find out what my schedule was, but it turns out I went and found out, no, I needed to call the fuel coordinator at 214 and tell her I need -- please don't -- please put me back on the schedule, please -- I'm not able to go to 774 after

all.

**Q Who was the store manager at 774?**

A I couldn't tell you his name.

**Q And who was the other person?**

A I couldn't tell you her name either. She -- it seems like a carousel. She -- this manager, the female manager, she was the HRC at 701 before she went to 774. So, you know, me and her, we crossed paths on the way in and out.

**Q So you went to have training, some sort of training experience in July of 2021?**

A For my service dog?

**Q Yes.**

A Yes, sir. It was a two-week long camp.

**Q Where was it?**

A It was outside of Atlanta. Alpharetta, I think maybe, was the name of the city.

**Q You stayed down there for the training?**

A Uh-huh.

**Q Yes?**

A Yes, sir. Sorry.

**Q That's okay. Did you speak to anybody at Food City to get the time away?**

A Yes, sir.

**Q Who did you talk to?**

A I don't recall how those conversations worked out but there was advance notice with the fuel coordinator and -- I would assume Emily Hobbs had to have been, but I don't -- actually, I don't want to assume that. I know the fuel coordinator was, but outside of that I don't recall.

**Q You got the time away, correct?**

A Yes, sir.

**Q At that time were you using any kind of assistive devices at work before you left for training, like a cane or any kind of device that you used?**

A The only device that I use is an implant and it's a neurostimulator.

**Q What does that do for you?**

A It sends a signal. The implant is above -- in my lower left back. The cord goes up my spine, and it sends an electrical signal that is -- it's basically tricking my brain that the pain that I feel in my hand -- I turn it on and it covers it up.

There's no physical tool or anything

like that that I'm using that's external. That's just a pain -- and that's the only -- and I've had that for -- oh, years before Food City.

**Q That helps you deal with pain?**

A Yeah. When you said devices I didn't want to leave anything out.

**Q Thank you. Who was the first person at Food City after you returned from the camp that you spoke to about coming back to work?**

A I am not sure. How do you mean?

**Q Did you talk to your coordinator, to Emily, to somebody and say, hey, I'm ready to come back to work now, I have this dog?**

A Oh no, no, no, no. It was -- I was scheduled off for two weeks and then right back on. There was no conversation about me coming back to work; I never left. I was out of town for two weeks, and that was abundantly clear.

**Q Who is the first person at Food City that you recall having any kind of discussion with about having a dog with you at work?**

A And so I need a little more clarification. So I was approved for a service dog almost six years ago today at this point. It's a long waiting list. I don't know if it's more than

six, but the list is between four and five years.

Throughout my tenure at Food City it was a common conversation, as I'm learning more about their dogs, Canine Assistants, what information that I was getting because it was sporadic because of COVID. They were considered a COVID hot spot there, so they shut all that down, all the camps. So I'd get a sporadic email. I'd share it with whoever I was around. It didn't matter what store I was at. It wasn't a talking piece upon being hired, but neither was the four ribs that I broke when I fell down the steps.

**Q Do you ever recall telling anybody at store 214 specifically that I'm going to be bringing a dog to work now?**

A If I'm not mistaken, one of the front-end managers filled out a survey that I had to submit to Canine Assistants. It's a personal personnel assessment, and one of the front-end managers at 214 filled one of those out for me.

**Q Do you remember who that was?**

A Tyler something.

**Q Male? Female?**

A Male.

**Q The front-end manager doesn't**

**supervise a fuel clerk; is that correct?**

A No.

**Q Who's the first person that you recall in supervision at 214 having some discussion about, I'm going to bring a dog to work now?**

A So that's -- this question is -- I don't want to get it muddy. When I was approved, my time off to go get my service dog, my service dog was always coming back with me. That's what they're there for. She does not -- I did not get her to leave her at home. She is certified hearing, seeing, service, alleviating some of my personal issues, and it's not that, oh, by the way, when I come back home from this service dog camp I'm going to be bringing my service dog with me. I was always coming back with the dog. To say that I went down there and didn't tell anybody that I was bringing a service dog back is wholly inaccurate.

**Q I'm just asking if you have a recall of having some discussion with someone in management at 214 about, I'm going to get this service dog and be bringing it to work?**

A Emily Hobbs would have been a point person for this. I believe that her and the fuel coordinator would have gotten together on this.

Amber -- I don't even know what her name is, Amber, the head cashier. I don't recall specifically who and in which order, but this was not a secret.

Q **Amber Grindle?**

A Who?

Q **Amber Grindle?**

A Maybe. I'm not sure.

Q **You don't remember the name of the fuel coordinator?**

A No, I don't.

Q **Do you have a specific recall of a discussion with Emily Hobbs about bringing your dog to work?**

A No, sir, I do not have a specific recall of that conversation.

MR. JACKSON: Let's go off the record.

(Whereupon, an off-the-record discussion was had.)

(Whereupon, Exhibit Number 5 was marked to said deposition and will be subsequently attached hereto.)

BY MR. JACKSON:

Q **I'm handing you a document we've labeled Exhibit 5, and I understand it's not your**

**document. It's something that Ms. Hobbs provided. I'll give you a minute to review it.**

A (Witness perusing document.)

**Q Ms. Hobbs references a phone call on or about July 23rd. Do you recall having such a phone call?**

A No.

**Q Do you deny that such a phone call happened?**

A Yes.

**Q Do you recall having any kind of discussion with Ms. Hobbs where she told you that she didn't have the ability to tell you whether you could bring a service dog or not?**

A When she deferred to Gary Richards was the only time that she said, "I can't make that decision," and the reason she deferred to Gary -- because this is after I had come back to work and was told I can't come back to work until whatever. This happened at that point, when I'm calling, trying to come back to work.

**Q Did you just sort of appear for work with the dog on your scheduled day? Is that what happened?**

A Yes.

**Q All right. On that day did you have any discussion with anyone about whether or not the dog could be present?**

A It was -- there was never -- there was never a conversation that said "you cannot bring your dog to work" until I had been back to work with my dog for a couple of days.

Now, for me to have these personal, you know, scales, the references, whatever the charts were, every single one but one was filled out by a Food City employee. The only reason why I say that is because I'm -- this is not a secret. Like I said, I'm not going to a service dog camp to bring home a house dog that I leave at the house. This was an open discussion and understood until I came back.

**Q All right. So when you came back after a couple of days did you have sort of an in-person discussion with Ms. Hobbs or Mr. Richards?**

A A couple of days -- I came back a couple days what? I'm sorry, I didn't understand the question.

**Q I'm trying to understand, when you had some discussion with Ms. Hobbs and Mr. Richards are we talking about an in-person discussion at the**

**store?**

A When I came back with her?

**Q Yes.**

A I did. And Gary Richards said that he wasn't sure, that he had never dealt with a service dog. So I handed him her documents for -- actually, y'all have them. There's actually Georgia and Colorado as well as far as statute.

So he took those documents and sent me on my way back out to the kiosk, and that was it.

**Q So in this statement of Ms. Hobbs it says, you know, we took the documents, and she says that we decided to let him work until we got an answer. Did somebody communicate the gist of that to you, we don't know the answer yet, but you just go ahead and work and then we'll be back with you?**

A No. There was never a "we'll be back with you." It was, "I've never dealt with this." He took my -- took her documents, and then I was out to the kiosk, good to go in my mind. That's what I'm thinking. Okay, they got everything they need, she's got her vest, I've got her cards, her certification, I've got everything that I need for this and I'm sent on my way.

And the way that this letter is laid

out, it's upside down because this -- before he left for camp I was not able to give him permission. The permission happened. That conversation happened after I was told I couldn't work, and I kept calling saying, can I come to work now, can I come to work now, have y'all submitted everything. I mean, I'm -- I just lost all my income. That's where that -- "I'm not able to give you that information."

**Q Oh, so she told you that but you're saying that was a later point in time?**

A Yeah, yeah. It was after, after I was already told not to come back.

**Q Who told you that?**

A I think it was David Ellison.

**Q Was this the August 6th meeting?**

A One of the four.

**Q Was there a meeting -- let's see -- when Mr. Ellison and Mr. Richards were present at the store; do you recall that?**

A Yes, sir.

**Q All right. And it was at that initial meeting where Mr. Ellison said, I'm trying to gather information, something to that effect?**

A Something to that effect.

**Q All right. Do you recall Mr. Ellison**

**asking you about the reasons why you wanted to have the dog present at work?**

A I do not recall the specific questions. Mr. Richardson {sic} -- I'm sorry. Go ahead with your next question.

**Q Did you tell him that your concerns were isolation and anxiety and balance?**

A Yes. Stability, anxiety, the isolation, and the ongoing classification of a fall risk that I am. So she's there for stability to help me get up wherever I'm at.

**Q Have you ever used any kind of external device for balance?**

A No.

**Q Has that ever been recommended to you?**

A No.

**Q Do you understand why that would not have been recommended?**

A No.

**Q Have you ever tried it?**

A No.

**Q During this initial meeting -- was that your first meeting with Mr. Ellison and Mr. Richards both present, when you were asked about**

**the reasons for wanting the service dog?**

A There were three meetings with -- two meetings with myself and Mr. Richardson and Mr. Ellison, and I'm not sure as to what happened in what order.

**Q Okay. So there was a first meeting?**

A Uh-huh.

**Q And then -- I'm talking about the first meeting now.**

A Okay.

**Q To the best of your recollection, in that first meeting do you recall Mr. Ellison asking you about your ability to do the job?**

A Yes.

**Q And how did you respond?**

A That I could do my job, but I do have limitations. I, again, am a fall risk. I'm always worrying about that. I do have PTSD. My stability and my gait and moving -- one thing that shields me, if I fall she comes to help stabilize me to help me get up.

**Q Do you recall whether you gave Mr. Ellison and Mr. Richards any sort of explanation to that effect in this meeting?**

A I believe that was the explanation.

**Q Had anything about your ability to perform the job physically changed from July to August?**

A No. My abilities stayed the same throughout, and that goes back to my stability issue, fall risk, my anxiety, PTSD, everything stayed the same. I still carry those. You know, she helps me deal with it.

**Q In this initial meeting did you confirm for Mr. Ellison that you still had the abilities to perform the same job you had been performing, something to that effect?**

A Yes, sir.

**Q How did that meeting end, if you recall?**

A The last thing that I remember out of that meeting was thanking Mr. Ellison and asking him to thank Mr. D.J. for the opportunity that I was given to work there. Worst case scenario, I wanted to be respectful, as I felt a problem brewing, and I just want to get that across. That's the last thing I remember from that meeting.

**Q Were you kind of taken off work at that point?**

A Yes, sir.

**Q Do you recall a second meeting with Mr. Ellison and Mr. Richards somewhere in the ballpark of a week later?**

A I believe so.

**Q So we're still in August of 2021, correct?**

A Correct.

**Q Did you record that meeting?**

A I believe I did.

**Q Any particular reason?**

A When I came in for the first meeting I honestly thought that this was about the accommodation for me to leave my stuff there, and I did that so I could take it to Mr. Ellison, who I understood is now the new HRC for the area. I recorded this for something to give him, but he was the one in the room. That's why I recorded this. I had been asking to leave my stuff, just a milk crate with my stuff in it. It hurts to sit. I need something -- shades, and I couldn't get a chair, couldn't get anything. I just wanted something to take to Mr. Ellison. Mr. Ellison just happened to be in the room.

**Q Oh, so you recorded the first meeting also?**

A Yes, sir.

**Q And the second?**

A Yes, sir.

**Q Did you tell them you were recording?**

A I'm not sure.

**Q In the second meeting this was also Mr. Ellison and Mr. Richards, correct?**

A I -- one was with...

**Q The last one was with Mr. Wattenberger?**

A That's who -- that's who that was, yeah. So you're telling me it's the second. Okay.

**Q Yeah. I want to talk about the second meeting. There was a second meeting with Mr. Ellison and Mr. Richards, correct?**

A Okay.

**Q Do you recall --**

A I believe so, yes.

**Q And you recorded that one also?**

A Yes, sir.

**Q And your attorneys gave that to me?**

A Yes.

**Q In the second meeting was there some discussion of you perhaps being a USCAN coordinator or a USCAN cashier?**

A There were -- there was an alternate scenario that was put up, but to be clear, this was the -- I hope this isn't a crude expression, but it was a dead-on-arrival solution because for me to stand inside at the USCAN, at that USCAN desk, it did nothing for me standing for an entire shift, and that was just for isolation, is the way that that was framed, if I remember correctly. "What if we brought you inside around other people."

Okay. Well, that might help a little with the isolation, but it does nothing for me physically. It's actually much worse. I can't have a stool there. I have nothing -- I could do nothing but stand right there. That was my option.

**Q Just for the record, what is a USCAN cashier? What are their duties generally?**

A I have never done that job. As in passing, I think that it is making sure that people get checked out right, and if somebody is buying alcohol to check an ID. I think that that's the main deal with it.

**Q Suppose that Mr. Richards had agreed to let you have a chair in that position, would that have helped physically?**

A No. No, it would not. A chair

there, you can't put a chair there, from my understanding, because me having a chair causes them another risk factor of a customer walking by, tripping over the chair that I'm in, and now they've got an issue with the chair that wasn't there to begin with, and that's why there's not one there now. That is how I understood that.

**Q Where did you get that understanding?**

A It was at -- it would have been talking with somebody at 701. I can't remember her name. The chair was never offered, but I had asked somebody else. He -- all he offered was working at the USCAN, but it did nothing for me physically. Being around other people, yeah. I still have my dog; she's not going back.

**Q So that was a -- in this meeting would you agree that you made it clear to Mr. Ellison and Mr. Richards that regardless of the job you were assigned to your dog was going to be there?**

A Yes.

**Q And it didn't really make any difference whether it was an in-store or out-of-the store job, she was going to be there regardless?**

A It didn't. And the thing that I kept

going back to was, I worked alone in the USCAN where she's not -- or not USCAN.

Q **The fuel kiosk?**

A Yeah, the Gas N Go.

Q **Okay. Would there have been any accommodation that the company could have made that did not include the dog being present that would have been acceptable to you?**

A No. No. She preceded Food City and I was in the perfect position for her and me to continue my job.

Q **Would that still be your view today, that there's no type of position that Food City could offer that would be acceptable to you as long -- if it did not include the dog being present?**

A No.

Q **That's still your --**

A That is my stance.

Q **To this day?**

A To this day.

Q **And would you agree that you made that quite clear to Mr. Ellison and Mr. Richards?**

A Yes, sir.

Q **Going back to your comment a minute ago about having some discussion about the chair**

**being at the USCAN, how did that topic come up?**

A Being sent back home after hearing the offer of working at the USCAN, I still spoke to a couple of people that worked at Food City that I had made pals with, I guess you could say. It's the only situation that would have come up, is I would have to have a chair there, and I believe it -- I believe it was Alexis -- can't remember her -- Pack saying that I would never get a chair at USCAN. That's where that came from.

**Q Who is --**

A She was a cashier. She ultimately became a front-end manager and she worked in the Gas N Go kiosk, the Gas N Go, and then head cashier, so she did both. And when I'm telling her this I'm -- to the best of my knowledge, she's telling me that's why I could never have a chair.

**Q Did you ever have any discussion with Mr. Ellison about whether you could have a chair in the USCAN?**

A No, sir.

**Q Or with Mr. Richards?**

A No, sir. They made it clear that she wasn't -- that the dog was not coming, period.

**Q So at that point there's no other**

**discussion to be had --**

A (Moves head from side to side.)

**Q -- would you agree?**

A I think I would have to agree.

**Q So then there was this third conversation -- I have a date of August 18. Does that sound about right? -- where Mr. Ellison and Mr. Wattenberger were present?**

A I believe so.

**Q And at that point Mr. Ellison basically communicated that the company was denying the accommodation of having a dog present, something to that effect?**

A Uh-huh.

**Q Yes?**

A Yes, sir.

**Q And offered potentially a leave if you wanted to try that for a while?**

A Two, one of two. To the best of my recollection, an FMLA or a PLA. Now, as I -- I might be simple, but I think that you need a reason for a medical leave of absence, like medically. I didn't have anything medical so I don't understand why that was even being offered. The personal leave of absence I turned down because I need to work. I

need to work.

Now, if there was some sort of assertion that I can get things figured out over an FMLA scenario -- my arm is not growing back. The metal is not coming out of my body. I am who I am. That medical leave was tactical, in my opinion.

**Q There was a discussion that was part of this meeting, though, if you were interested you could apply for a leave, something to that effect?**

A As I said, one of them, I don't think was -- I mean, I'm not a lawyer. I think if I take a medical leave of absence I have to have a medical condition that I'll be able to get better from, going back to my arm. That is the conversation, yes.

**Q And is that pretty much how that discussion ended?**

A I believe so.

**Q In this last discussion where Mr. Ellison was present did he mention USCAN again?**

A I'm not -- I am unsure. I do not -- I don't recall the particulars down to each last sentence of the meetings. It might have come up in one and it didn't come up in another. I don't think it came up again, to the best of my knowledge.

**Q Ultimately, you decided you weren't going to apply for any sort of leave; is that fair to say?**

A That's correct. I called -- I'm not...

**Q So you had a phone call with Mr. Richards?**

A Yes, sir.

**Q And that was one of the recordings that you provided, correct?**

A That was the final one, yes, sir.

**Q And he continued with the decision Mr. Ellison had communicated, about not working with a dog present, Mr. Richards did?**

A He didn't give me an answer one way or another. I had to confirm a response. To the best of my recollection, his response was what did David tell you, best of my recollection. My response was short, as in, no, and then Gary hung up. There you go, hung up, I think is how it ended.

**Q And that's your answer, or something to that effect?**

A I believe so (moves head up and down).

**Q Was that your last conversation with**

anybody at Food City management?
A Yes, I believe so.
Q That phone call?
A (Moves head up and down.)
Q Did you ever have any direct communication with Rickie Estep?
A Who is Rickie?
Q She's in Abington?
A In what?
Q She's in Abington, in the HR office.
A No, I don't recall that.
Q Okay. I didn't think so, but I wanted to see if you had any different information.
Did you have any communication with Mr. Ellison about having the dog present that's beyond what you've already told us about?
A No, sir.
Q Did you have any communication with anybody in Food City management about having the dog present that's beyond what you've already told us about?
A No, sir.
Q Did you ever give anybody in management at Food City any other sort of a document that said, okay, here's Mr. Batten's job

**limitations?**

A Did I give them some sort of a documentation?

**Q Yes.**

A I did not -- unless it was something specific that had happened while I was there. I do recall a couple of doctor's notes, one being a heat exertion. There are a few minor things that had popped up during my tenure, if that's what you're asking, I believe.

**Q Let's just do this.**

A Maybe five or six.

MR. JACKSON: Let's just make that Exhibit 6.

(Whereupon, Exhibit Number 6 was marked to said deposition and will be subsequently attached hereto.)

BY MR. JACKSON:

**Q So Exhibit 6 is five pages. Do you recall providing any sort of physician advice or notes beyond what's in Exhibit 6?**

A Regarding?

**Q Anything, any kind of physical condition.**

A As in any documentation related to my

service dog?

**Q No, no. Anything of your physical abilities or issues.**

A I do not recall. I do not recall ever being asked for any, and if they were, I had no problem getting them, for anything.

**Q This is the only thing I've seen and all I'm trying to figure out is if we're missing something or is this all there is.**

A I don't recall.

**Q Okay. You gave us a list of some potential witnesses through your attorney. One of them is your mother, Carolyn Batten?**

A Yes, I believe so.

**Q Do you know if she had any direct interaction with Food City management herself?**

A I am not aware.

**Q You don't think she did?**

A No, I don't think she did.

**Q Have you ever had any direct interaction with Donny Rector?**

A That name doesn't sound familiar.

**Q Have you ever had any direct interaction with Sherrell Lyon?**

A Yes.

**Q What was that about?**

A To the best of my recollection, in the onboarding process at 774 he brought down a document for me to sign. I don't think that there was a whole lot of filling out to it, but it was basically that I am disabled and this is their acknowledgment of having a disabled individual working for them. That's about as far as that goes with Sherrell.

**Q Nothing -- no direct communication with him relative to having a dog present at work, correct?**

A Not to my knowledge, no.

**Q Did you have any discussion with Emily Hobbs about having the dog present, beyond what you've already told us about?**

A Not that I'm aware of. I mean, the only time Emily would have -- nevermind. I'm not going to speculate. No.

**Q Nothing that you recall?**

A Nothing that I recall, no, sir.

MR. JACKSON: Just give me a minute. I'm just about done.

MR. HARGRAVES: Okay.

(Whereupon, a short break was had.)

MR. JACKSON: I'm done, subject to any questions I might have after your attorney has asked.

EXAMINATION

BY MR. HARGRAVES:

**Q Mr. Batten, I just have a few questions. Did any of your job duties at Food City in your opinion put you at greater risk of falling down?**

A Yes.

**Q Like what?**

A Especially the curbs, using the cleaner and spraying all this outside at 774 that's slick, fall there. At 701, it is on a raised platform, and I actually fell into that kiosk a couple of times when I first got there because it is raised. Getting tobacco from the customer service and getting it ready for transfer I tripped over a toolbox twice. So it has happened so I know that it can.

**Q And had you communicated to Food City that you had fallen before?**

A No.

**Q In your conversations with David Ellison did you communicate that you had had falls**

**before?**

A Oh, yeah, I believe so.

**Q Okay. And is -- I don't know if we covered this, but your service dog's name is Mellow Joy?**

A It is.

**Q She goes by Mellow?**

A That's correct.

**Q Is Mellow trained to help you with your fall issue?**

A Yes.

**Q What does she do?**

A She is, for lack of a better term, a stabilizer. She will come to me, allow me to use her to push onto to gain whatever leverage I can, far short of putting my entire body weight on her, to be able to get back to my feet.

**Q What other kinds of tasks is she trained to perform for you?**

A She is certified in seeing and hearing. She's also -- she can retrieve. I've had -- when we walk I can lean into her. She leans back, which is a bit of a stability. When she's ahead and I'm pulling her leash she will keep it taught unless she's pulled back for stabilization.

**Q When did you first start the process to get a service dog?**

A I believe it was in 2017.

**Q So it was before you started working for Food City?**

A Yes, sir.

**Q In your conversations with David Ellison did he ever offer to provide you a chair in the USCAN position?**

A No, sir.

**Q In the time that you worked at Food City had you ever seen anybody else in the USCAN position using a chair?**

A No, sir.

MR. HARGRAVES: Nothing further.

MR. JACKSON: I don't have any follow-up. Thank you.

MR. HARGRAVES: I think we'll read and sign.

FURTHER THIS DEPONENT SAITH NOT.

(Signature reserved.)

# E R R A T A   P A G E

I, CHRISTOPHER MATTHEW BATTEN, the witness herein, have read the transcript of my testimony and the same is true and correct, to the best of my knowledge, with the exception of the following changes noted below, if any:

Page / Line / Change / Reason

____________ ____________________________________

____________ ____________________________________

____________ ____________________________________

____________ ____________________________________

____________ ____________________________________

____________ ____________________________________

____________ ____________________________________

____________ ____________________________________

____________ ____________________________________

____________ ____________________________________

____________ ____________________________________

____________ ____________________________________

____________________________
CHRISTOPHER MATTHEW BATTEN

Sworn to and subscribed before me, this the _____ day of ___________, 2023.

____________________________________
Notary Public
My commission expires:______________

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :
:
COUNTY OF HAMILTON :

I, Diane R. Angel, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. CHRISTOPHER MATTHEW BATTEN was duly sworn by me; that pages 1 to 88, inclusive, were reduced to typewriting under my direction and supervision and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This the 17th day of January, 2023.

Diane R. Angel

DIANE R. ANGEL, RPR, TN LCR #246
Registered Professional Reporter
and Notary Public.
My Commission Expires: 3/10/2025

# EXHIBIT 1 – PART II

# EXHIBITS TO

# DEPOSITION OF PLAINTIFF

EXHIBIT
1 1-11-23
Christopher Batten

**JOB SEARCH**

| DATE OF APPLICATION | METHOD OF APPLICATION | EMPLOYER | POSITION | RESULT |
|---|---|---|---|---|
| 4.4.2022 | Indeed | The Mortgage Calculator - FL | Remote Mortgage Processor | No interview or offer |
| 4.7.2022 | Indeed | Foundation Title and Escrow | Escrow Officer | No interview or offer |
| 4.7.2022 | Indeed | The Mortgage Calculator - CA | Remote Mortgage Processor | No interview or offer |
| 4.11.2022 | Indeed | First Horizon | Mortgage Loan Officer | No interview or offer |
| 4.13.2022 | Indeed | ReminderMedia | Sales Closer - Remote | No interview or offer |
| 4.15.2022 | Indeed | Obsidian Financial Services | Mortgage Loan Officer | No interview or offer |
| 4.21.2022 | Indeed | Quontic Bank | Loan Processor - Remote | No interview or offer |
| 4.26.2022 | Indeed | Thomas Enterprises | Customer Service Rep. - Remote | No interview or offer |
| 4.29.2022 | Indeed | SelectQuote | Sales Advisor – Remote | No interview or offer |
| 5.10.2022 | Indeed | Windstream Communication | Customer Care Specialist – Remote | No interview or offer |
| 5.10.2022 | Indeed | Great Lakes Investments | Insurance Sales Rep | No interview or offer |

| | | | | |
|---|---|---|---|---|
| 5.10.2022 | Indeed | SHR Talent | Sales Rep | No interview or offer |
| 5.14.2022 | Indeed | Milford Federal Bank | Unknown | No interview or offer |
| 5.25.2022 | Indeed | Mutual of Omaha Mortgage | Loan Officer - Reverse Mortgage | No interview or offer |
| 5.31.2022 | Indeed | FirstBank | Financial Services Rep | No interview or offer |
| 5.31.2022 | Indeed | UniTrust Financial Group | Remote Sales Rep | No interview or offer |
| 5.31.2022 | Indeed | Liberty Investments | Remote Sales Consultant | No interview or offer |
| 7.19.2022 | Indeed | Parallon | Virtual Customer Advisor | No interview or offer |
| 7.19.2022 | Indeed | MedSrv, LLC | Customer Service Rep | No interview or offer |
| 7.19.2022 | Indeed | Mike Collins & Associates | Sales Assistant | No interview or offer |
| 7.19.2022 | Indeed | InfoCision Management Corporation | Work from Home Call Center | No interview or offer |
| 7.19.2022 | Indeed | Claims Recovery Financial Services | Post Foreclosure Mortgage Claims Processor – Remote | No interview or offer |

| | | | | |
|---|---|---|---|---|
| 7.25.2022 | Indeed | LATPP, Inc. | Educational Sales and Customer Success Associate – Remote | No interview or offer |
| 7.25.2022 | Indeed | Direct Fairways | Sales Rep – Remote | No interview or offer |
| 7.25.2022 | Indeed | Highmark Residential, LLC | Leasing Consultant | No interview or offer |
| 7.28.2022 | Indeed | SelectQuote | Sales Dev. Advisor | No interview or offer |
| 7.28.2022 | Indeed | DivcoData | Account Manager | No interview or offer |
| 8.8.2022 | Indeed | Flexicrew Staffing | Loan Processor | No interview or offer |
| 8.8.2022 | Indeed | SelectQuoter | Remote Sales Advisor | No interview or offer |
| 8.22.2022 | Indeed | Clean Water Partners | Sales Rep | No interview or offer |
| 8.22.2022 | Indeed | Foundation Title and Escrow Series | Jr. Escrow Officer | No interview or offer |
| 8.22.2022 | Indeed | Alco Management | Occupancy Coordinator | No interview or offer |
| 9.6.2022 | Indeed | Steel Warehouse | Account Manager | No interview or offer |
| 9.6.2022 | Indeed | Regional Management | Asst. Branch Manager | No interview or offer |

| | | | | |
|---|---|---|---|---|
| 9.13.2022 | Indeed | Claims Recovery Financial Services | Post Foreclosure Mortgage Claims Processor – Remote | No interview or offer |
| 9.13.2022 | Indeed | MedSrv | Refund Analyst - Remote | No interview or offer |
| 9.22.2022 | Indeed | Kinsmith Finance | Customer Service Rep | No interview or offer |
| 9.22.2022 | Indeed | Echelon Fitness | Position Unknown | No interview or offer |
| 9.22.2022 | Indeed | Scenic Community Credit Union | Consumer Loan Processor | No interview or offer |
| 9.28.2022 | Indeed | Viking Cruises | Customer Relations Agent – Remote | No interview or offer |
| 9.28.2022 | Indeed | Viewstream, Inc. | Customer Experience Functional Consultants | No interview or offer |
| 9.30.2022 | Indeed | Optavise | Account Executive | No interview or offer |
| 9.30.2022 | Indeed | Best Brands, Inc. | Key Accounts Manager | No interview or offer |

# POSITION DESCRIPTION

EXHIBIT
PENGAD 800-631-6989
2 1-11-23
Christopher Batten

**TITLE:** Fuel Clerk
**REPORTS TO:** Fuel Coordinator

## ESSENTIAL JOB FUNCTIONS

1. Provide efficient and courteous service to customers at all times.
2. Scan and ring customer orders according to company policy.
3. Receive and be accountable for all funds taken for each transaction.
4. Keep work station and area around fuel station neat and clean.
5. Know and follow all state and local laws regarding cigarette/tobacco sales.
6. Know and follow all federal laws regarding food stamp.
7. Know and follow all coupon handling procedures.
8. Follow company check cashing and tendering policies.

## ADDITIONAL JOB FUNCTIONS

1. Assist with light stocking duties (candy, cigarettes, chips, motor oil).
2. Sweep and mop work area.
3. Cleaning the concrete area around the pumps of the fuel station daily with approved methods.
4. Replace misplaced items to the proper location.
5. Collect trash as needed.
6. Keep paper towels and windshield wiper fluid stocked at pumps.
7. Keep pumps clean.
8. Other duties may be assigned as needed.

## EQUIPMENT

1. Registers and Scanners
2. Intercom
3. Adding Machine
4. Pump Switches
5. Veeder Root Meter

## SAFETY REQUIREMENTS

1. Counters and floor areas should be free and clean of hazards.
2. Store associates need to use proper scanning techniques to alleviate hand and wrist disorders.
3. All cleaning supplies should be kept in designated areas.
4. Know location and operating procedures for fire extinguishers.
5. Know and follow correct lifting procedures.
6. Associates should wear proper footwear for their working environment.
7. Know location and operating procedures for the emergency shut-off valve for the gas tanks.
8. Not leaving the kiosk after dark unless another associate is working with them.
9. Till or money must be transported via automobile & NEVER alone.

## PHYSICAL DEMANDS

1. **Job Requirements (in an 8-hour workday)**
   A. Sit – Frequently
   B. Stand – Frequently
   C. Walk – Occasionally

2. **Movements**
   A. Bend/stoop – Frequently (up to 4 hours)
   B. Reach above shoulder level – Occasionally (up to 2 hours)
   C. Pushing/pulling – Frequently (up to 4 hours)

3. **Weight Carried**
   A. Up to 10-lbs. – Frequently (up to 4 hours)
   B. 11 to 25-lbs. – Frequently (up to 4 hours)
   C. 26 to 50-lbs. – Occasionally (up to 2 hours)
   D. 51-lbs. and up – not at all

4. **Weight Lifted**
   A. Up to 10-lbs. – Frequently (up to 4 hours)
   B. 11 to 25-lbs. – Frequently (up to 4 hours)
   C. 26 to 50-lbs. – Occasionally (up to 2 hours)
   D. 51-lbs. and up – not at all

5. **Hands Used for Repetitive Action, such as:**
   A. Simple/light grasping (up to 6 hours)
   B. Firm, strong grasping (up to 2 hours)

Digitally Signed By: Christopher Batten
Date: May-20-2019 1:17:35 PM EDT

Employee Signature

05/20/2019

Date

EXHIBIT
3 1-11-23
Christopher Batten

Job Description Acknowledgment

I have read the job description assigned to the position I have been offered and can complete all job functions as described.

☐ Yes
☑ No

Please list the job functions stated in the previously viewed job description that you are unable to perform:
Moving 50 pounds

Digitally Signed By: Christopher Batten
Date: May-20-2019 1:19:17 PM EDT

Employee Signature

Digitally Signed By: Frances Harris
Date: May-21-2019 10:35:16 AM EDT

Manager Signature

EXHIBIT
4 1-11-23
Christopher Batten
PENGAD 800-631-6989

**Receipt for Associate Handbook**

I have received my copy of the August 2017 Revision of the Food City Associate Handbook. I agree that this handbook and the policies, practices, and information contained herein, supersede any and all other associate handbooks, policies, practices, and information previously issued by K-VA-T Food Stores, Inc., or any other predecessor company. I agree to read my handbook and keep my handbook for future reference and observe present and any future company personnel policies and rules outlined in this handbook. I further understand
that this handbook is intended as a guide for personnel policies, benefits, and general information, and that these guidelines should not be construed as an employment contract.

I understand management reserves the right to make changes in the guidelines or their application as it deems appropriate, and these changes may be made with or without notice. I also understand that employment is terminable at the will of either the associate or the company at any time, and that no representative of the company other than the Chief Executive Officer has any authority to make any contrary agreement.

Digitally Signed By: Christopher Batten
Date: May-20-2019 1:18:06 PM EDT

Employee Signature

05/20/2019

Date

EXHIBIT
5 1-11-23
Christopher Batte
PENGAD 800-631-6989

On July 23rd, 2021, Matthew Batten called to inform me that the camp that he attended while he was out was to train and to receive a Service Dog. Before he left for this camp Matthew Batten said that the camp was just for his disability. I spoke with him to let him know that I was not able to give him permission for this and I wasn't sure what information that I would be able to give him now and that I would need to reach out to my HR Supervisor. Later Matthew Batten came to the store with his Service dog and his paperwork. During the meeting with Matthew, his Service Dog kept jumping on Amber Grindle. I kept telling Matthew that now we haven't heard anything about what we could do with his Service dog. Matthew wanted to talk to Gary Richards about his dog and what he needed to do. After Gary talked to Matthew, we took photos of his document to send in to get approval for his Service dog. I kept telling Matthew, I did not have permission to give him about his service dog and that I was just the middleman. We reached out to Donny Rector to see what we could do about his service dog. Gary and I did not hear anything from Donny and decided to let him work until we received an answer.

Emily Hobbs
Emily Hobbs
11/29/2021

Patient: Batten, Christopher DOB: Oct 02 1979 Chart#:

150799

GALEN MEDICAL GROUP

*Wisdom. Compassion. Integrity.*

East Internal Medicine & Pediatrics
1651 Gunbarrel Road, Suite 302
Chattanooga, TN 37421
423-899-2904

EXHIBIT 1-11-23 6 Christopher Batten

# CERTIFICATE TO RETURN TO WORK OR SCHOOL

Christopher Batten is my primary care patient. He takes gabapentin regularly, which is a medication that makes him extremely sensitive and intolerant to heat. Please accommodate any needs he may have surrounding this issue.

August 14, 2020

Katrina Gooden M.D.



K-VA-T
000962

150799

ELITE
PAIN CONSULTANTS

To whom it may concern,

This is a note to confirm that Christopher Batten was seen in my office today, 8/9/20 - 8/10/20, for a doctor's appointment.

If you have any questions in this regard, please do not hesitate to call our office at 423-339-9581.

Sincerely,

CF

Elite Pain Consultants

150799

erlanger
Health System

EMG CHATTANOOGA BONE AND JOINT
1809 GUNBARREL ROAD, SUITE 101
CHATTANOOGA TN 37421-7182
Dept: 423-893-9020
Dept Fax: 423-893-9040

August 14, 2020

Patient: **Christopher Matt Batten**
Date of Birth: **10/2/1979**
Date of Visit: **8/14/2020**

To Whom It May Concern:

It is my medical opinion that Christopher Batten may continue to work, but please limit his standing and walking for the next three weeks.

If you have any questions or concerns, please don't hesitate to call.

Sincerely,

Mark L Cloutier, NP

Patient: Batten, Matthew DOB: Oct 02 1979 Chart#:

GALEN
MEDICAL GROUP

*Wisdom. Compassion. Integrity.*

150799

East Internal Medicine & Pediatrics
1651 Gunbarrel Road, Suite 302
Chattanooga, TN 37421
423-899-2904

# CERTIFICATE TO RETURN TO WORK OR SCHOOL

Matthew Batten has been under my care from 09/30/2019 to 10/03/2019 and is able to return to work/school on: 10/04/2019

Remarks:

Diagnosis:

September 30, 2019

Kristin Evans, NP

RECEIVED OCT 0 7 2019



K-VA-T
000965

Patient: Batten, Matthew DOB: Oct 02 1979 Chart#:

180799

GALEN
MEDICAL GROUP

Wisdom. Compassion. Integrity.

East Internal Medicine & Pediatrics
1651 Gunbarrel Road, Suite 302
Chattanooga, TN 37421
423-899-2904

# CERTIFICATE TO RETURN TO WORK OR SCHOOL

Matthew Batten has been under my care today and is able to return to work on: 10/6/19 .

Diagnosis: Cellulitis - resolved

October 4, 2019

Katrina Gooden, M.D.

RECEIVED OCT 0 7 2019