IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA AT ROME

---

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -vs- | : | NO. |
| | : | 4:22-CV-00179 |
| K-VAT-FOOD STORES, INC., d/b/a | : | |
| FOOD CITY, | : | |
| | : | |
| | : | |
| Defendant. | : | |

---

THE VIDEOTAPED DEPOSITION OF
GARY RICHARDS
January 12, 2023

---

Whitney A. Vaughn, TN LCR# 418
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

Richards



INDEX OF EXAMINATION


| | Page |
|---|---|
| Examination By Mr. Hargraves............ | 6 |
| Examination By Mr. Jackson.............. | 76 |


INDEX OF EXHIBITS


| | | |
|---|---|---|
| 1 | Associate Handbook................. | 15 |
| 2 | Statement sent 11/30/21........... | 30 |
| 3 | Certificate paperwork............. | 36 |
| 4 | Email Chain dated 7/23/21......... | 43 |
| 5 | Statement dated 8/6/21............ | 44 |
| 6 | Statement dated 8/12/21........... | 50 |
| 7 | Email Chain dated 9/8/21.......... | 58 |
| 8 | Email Chain dated 9/9/22.......... | 63 |
| 9 | Email Chain dated 3/11/22......... | 66 |

APPEARANCES:

Appearing for Plaintiff:

R. ETHAN HARGRAVES, ESQUIRE
ethan@masseyattorneys.com
Massey & Associates, P.C.
6400 Lee Highway, Suite 101
Chattanooga, Tennessee 37421
(423) 697-4529

Appearing for Defendant:

HOWARD B. JACKSON, ESQUIRE
hjackson@wimberlylawson.com
Wimberly, Lawson, Wright, Daves & Jones, PLLC
550 Main Avenue, Suite 900
Knoxville, Tennessee 37901
(865) 546-1000

ALSO PRESENT: Videographer, Patrick Black

---

The videotaped deposition of GARY RICHARDS, called as a witness at the instance of the Plaintiff, for purposes of discovery, pursuant to the Federal Rules of Civil Procedure, taken pursuant to agreement on January 12, 2023, at the law offices of Massey & Associates, P.C., 6400 Lee Highway, Suite 101, Chattanooga, Tennessee 37421, commencing at 10:38 a.m., before Whitney A. Vaughn, Court Reporter and Notary Public.

S T I P U L A T I O N

It being agreed between counsel for the respective parties that Whitney A. Vaughn, Court Reporter and Notary Public, may swear the witness, take his deposition in machine shorthand, afterwards reducing the same to typewriting.

All objections, except as to the form of the question and responsiveness of the answer, are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., are expressly waived. Signature waived.

//

THE VIDEOGRAPHER: We are now on the record. It is Thursday, the 12th of January 2023. The time is 10:38 a.m.

This is the video deposition of Gary Richards in the matter of Christopher Matthew Batten versus K-VA-T Food Stores, Incorporated, doing business as Food City. This is case number 4:22-cv-00179.

This deposition is being held today at the law offices of Massey & Associates, located at 6400 Lee Highway, Suite 101, in Chattanooga, Tennessee.

My name is Patrick Black, the videographer. Our court reporter is Whitney Vaughn.

Will counsel please introduce yourselves and state who you represent?

MR. HARGRAVES: Ethan Hargraves on behalf of the plaintiff, Matthew Batten.

MR. JACKSON: Howard Jackson for Food City.

THE VIDEOGRAPHER: I'll ask Ms. Vaughn to swear in the witness.

//

//

//

GARY RICHARDS,

called at the instance of the Plaintiff, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HARGRAVES:

**Q Mr. Richards, could you please state your full name for us?**

A Gary Richards.

**Q Okay. Mr. Richards, my name is Ethan Hargraves, and I work for Massey & Associates. I'm the attorney representing Mr. Batten in this case.**

**Have you ever testified in a deposition before?**

A No, I have not.

**Q Okay. The first thing I want to do is go over a few, kind of, ground rules so that you can understand the process, and hopefully it will go smoothly.**

**The first thing is we have a court reporter. She is writing everything down that we say. We can make her job a little bit easier by doing a couple things. If you will, try to let me finish my question before you start to answer so that we're not talking over each other. And I'll do my**

best to not interrupt you and let you finish your answer before I start asking another question. Does that sound fair?

A Fair.

Q Another thing that we can do is try to make our discussions clear. If you can try to answer verbally versus head nods, those are difficult to put in a transcript. She can do it, but it's difficult. Also, things like uh-huh and huh-uh, real easy to slip into that, but they look very similar on a transcript. So if that happens at some point -- and it might; that's okay -- I may just ask you to clarify is that a yes or is that a no. I'm not trying to be mean to you. I just want to make sure that we understand what your answer is. Okay?

A Gotcha.

Q Okay. If you don't understand a question that I've asked you, please do not answer it. All you got to do is tell me that you don't understand it, and I will do my best to rephrase it so that you can understand it. Okay?

A Yes.

Q And finally, I'm not going to take all day, but we will be going for a little while. If you need a break at any point, all you got to do is ask

**and we'll take a break. The only thing that I will say on that is that if I have asked you a question, I will want an answer before we take the break. Does that make sense?**

A Yes.

**Q Okay. What -- where do you live, Mr. Richards?**

A Rocky Face, Georgia.

**Q How long have you lived there?**

A Nine months.

**Q Okay. Where did you live before that?**

A Dalton.

**Q Okay. Were you in Dalton for a while?**

A I was there about five years.

**Q Did you attend high school?**

A I did.

**Q Where at?**

A Gilmer County.

**Q Gilmore?**

A Gilmer.

**Q Gilmer County?**

A Yes.

**Q And when did you graduate?**

A '93.

**Q Any college?**

A No.
**Q Okay. Do you have any professional licenses or certifications?**
A No.
**Q Okay. Any -- any other professional training?**
A No.
**Q Okay. Are you a member of any professional organizations or clubs?**
A No.
**Q And have you ever been convicted of a crime?**
A No.
**Q Okay. You work for K-VA-T Food Stores, Inc.; is that right?**
A Yes.
**Q That's commonly known as Food City?**
A Yes.
**Q What is your current position with Food City?**
A Store manager.
**Q Okay. And what store do you manage -- store number, rather?**
A Store number 214.
**Q And that's the -- that's the Food City**

**in Ringgold?**

A Yes.

**Q Okay. When did you first start with Food City?**

A In 2015.

**Q Okay. And what was your starting position?**

A Assistant manager.

**Q Okay. And which store was that at?**

A 239.

**Q Which one is that?**

A Dalton.

**Q Dalton. So at what point did you transfer from the Dalton store to the Ringgold store?**

A I went into the training program in 2018. 2019.

**Q Okay. Was that the training program to become a store manager?**

A Correct.

**Q Okay. So they trained you up to be the store manager for the Ringgold store number 214?**

A Well, I was first at 239.

**Q Okay.**

A Then transferred to 214.

**Q Okay. So you took over as the store**

manager at 239, the Dalton store --

A Correct.

Q -- is that right? And then shortly thereafter you moved over to the Ringgold store?

A Yes.

Q Okay. Do you remember when that was?

A 2019.

Q Okay. And that's where you are currently?

A Yes.

Q Okay. What are your job duties as a store manager?

A Oversee all the ins and outs of the store, daily operations, staffing, conditions, maintenance.

Q Okay. I know it's kind of a broad question. You manage the store; is that --

A Yes.

Q Food City has certain human resources -- or as they call them, human relations -- positions that work in each individual store; is that right?

A Correct.

Q Those are human relations coordinators; is that right?

A Correct.

**Q How many human relations coordinators does each store have, in your experience?**

A One.

**Q Okay. Are there any other human relations employees that work on site at each individual store?**

A No.

**Q Okay. Who do you -- I got to ask this, but I assume that everybody at the store answers directly to you?**

A Not directly, no.

**Q Okay. Which -- are there employees at 214 who do not report directly to you?**

A We -- it's broken down into department heads. So if there is any issues or concerns, they go to their direct supervisors.

**Q And then those direct supervisors --**

A If it comes to me. If it goes and they can't handle the situation, then it comes to me.

**Q Okay. Who do you -- who are you directly accountable to?**

A Currently, Daryl Massey.

**Q Who is Daryl Massey?**

A District manager.

Q Okay. Are you accountable in any way to the human resources director or the human relations director?

A No, sir.

Q Okay. As the store manager, do you make decisions about human relations issues?

A It depends on the situation.

Q We're here specifically talking about situations involving the ADA. As the store manager, are you authorized to make decisions for the store regarding ADA accommodations?

A No.

Q Is that something you got to pass up the chain?

A I do.

Q Who would you pass that up to?

A David Ellison.

Q Him being the senior human resources specialist?

A Correct.

Q And he was the senior human resources -- or human relations specialist as of August 2021; is that right?

A Yes.

Q Who was responsible for making sure

**that store number 214 complied with federal laws and regulations?**

A That would be myself and along with people from corporate.

**Q Okay. Who from corporate?**

A Again, it depends on the laws and the regulations. If you're talking about this particular incident, it would be David Ellison and his superiors.

**Q Okay. When it comes to complying with the ADA, the Americans with Disabilities Act, does the company provide you any training?**

A No, sir.

**Q Okay. Are you aware if the company provides any training with regard to ADA compliance?**

A I'm not aware.

**Q Okay. Does Food City have policies or procedures on disability accommodation?**

A Yes.

**Q Do you know where those policies or procedures would be?**

A In the employee handbook, I think, and it's on a hard drive that's stored in the computers. Store files -- store reports, I believe.

MR. HARGRAVES: Let's mark that as

Exhibit 1.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 1.)

BY MR. HARGRAVES:

**Q I'm showing you what's been marked Exhibit 1 with the Bates number K-VA-T 1 through 63. Do you recognize that document?**

A Well --

**Q Take your time.**

A Where are we at?

**Q I was just stating the page numbers. Do you recognize that document?**

A Yes.

**Q And that's the -- is that the associate handbook for Food City?**

A Correct.

**Q Is that the -- excuse me. I got something in my throat. Is that the document that you spoke of just a moment ago that would contain the policies or procedures on disability accommodation?**

A Yes.

**Q Okay. Now, this isn't a test, but do you think you can point us to where in this handbook the policies or procedures on disability are located?**

A I would if I had my glasses. I do not have my glasses.

**Q Okay. Fair enough. Do you remember what particular policy those would be under?**

A I guess it would be under the discrimination.

**Q Is that the no-harassment policy?**

A I don't know.

**Q Okay. But you expect that there are policies or procedures in there regarding the how to provide disability accommodations? Is that what you're saying?**

A There is nothing in here how to provide. It's just we do not discriminate against anyone with disabilities.

**Q Okay. Okay. To your knowledge, are there any -- does Food City have any policies or procedures about -- specifically about providing or not providing disability accommodations?**

A I don't know.

**Q Okay. Are you aware if Food City has any policies or procedures on service animals?**

A I don't know.

**Q Are you aware if Food City has any training that they offer on the ADA and service**

**animals?**

A I don't know.

**Q As the store manager, would you have had access to your associates' respective training files?**

A No.

**Q Okay. Who would have access to those documents?**

A Corporate office.

**Q Okay. Did you have any part in ensuring that individual associates had completed all required training?**

A I'm sorry. Repeat, please.

**Q Sure. Did you have any -- did you play any part in ensuring that individual associates had completed the required training?**

A Required training for what?

**Q For their position.**

A Yes.

**Q Okay. What was that role?**

A That's kind of a broad question. You're going to have to narrow it down for me, please.

**Q What did you do to ensure that individual associates had completed the required**

**training?**

A My role would be to follow up, follow through. And we also have computer-based training that they do. We make sure -- ensure they take that and sign off on it.

**Q Is that the Fast Track training?**

A Correct.

**Q And that's purely electronic training?**

A Yes.

**Q The resources that are attached to that training are purely electronic; is that your understanding?**

A The Fast Tracks, yes.

**Q Okay. There aren't physical --**

A We do hands-on training as well, yes.

**Q Okay. But with the Fast Track training, that's all on the computer?**

A Correct.

**Q All right. Are you aware of any Fast Track training for management positions that covers ADA accommodations?**

A I'm not aware.

**Q Okay. You -- did you -- did you, yourself, go through any Fast Track training?**

A No.

**Q Okay. Is that not something that managers do?**

A I'm not aware, no. I don't know.

**Q Are you -- do you have any responsibility regarding the hiring and firing of employees at your store?**

A Yes.

**Q Is that solely within your discretion or does corporate have any guidance on that?**

A Depends on the situation.

**Q Okay. Does corporate Food City encourage you to hire certain kinds of employees?**

A No.

**Q Are there any incentives, for example, for hiring employees who have disabilities?**

A No.

**Q Okay. Is it Food City's policy to provide a healthy and wholesome atmosphere for their associates?**

A Is it policy?

**Q Yes.**

A No.

**Q Okay. Is it Food City's policy to recognize the rights of each individual?**

A Yes.

**Q Okay. Does that extend to their associates as well?**

A Yes.

**Q Prior to Mr. Batten, had you ever had to handle an employee request for disability accommodation?**

A No.

**Q So Mr. Batten was the first?**

A Correct.

**Q Had you had any training on that issue before?**

A No.

**Q Have you since?**

A No.

**Q When did you first meet Mr. Batten?**

A I can't remember.

**Q Okay. You can ballpark it if you want.**

A 2000 -- I'm going to say 2020, maybe, thereabout.

**Q Was that when he was transferred to the 214 store?**

A Yes.

**Q Okay. So that would have been the first time that you met him?**

A Yes.

**Q Did you have any -- were you aware of him prior to him transferring to your store?**

A Prior to the transfer, we did do a conversation. He did come by the store because he was wanting to transfer there. We spoke, we met. Good guy. I spoke with the store manager, and then we made the transfer happen.

**Q Okay. After he transferred to 214, did you have any opportunity to observe his work?**

A Yeah. I went to the kiosk several times and everything was fine.

**Q Were you responsible for evaluating his performance?**

A No.

**Q Who was -- who was responsible for that?**

A The coordinator, the fuel coordinator.

**Q Okay. Who would that have been at that time?**

A At that time, I think it was Bailey Hamby.

**Q Okay. Can you spell that last name?**

A H-A-M-B-Y.

**Q Was the title of her position, was**

**that fuel clerk coordinator?**
A Correct.
**Q And what was that person's job?**
A To oversee the operations of the fuel center.
**Q Did they work from inside the store?**
A No. They work at the fuel center.
**Q Okay. And is the fuel center the gas station?**
A Yes.
**Q Does the fuel clerk coordinator have an office on site?**
A No.
**Q Okay. So where does the -- where would -- if I was going to Food City, where would I find the fuel clerk coordinator?**
A At the fuel center.
**Q So they would be just standing around the pumps?**
A No. There is a kiosk.
**Q Okay. That's a separate position from the fuel clerk?**
A Yes.
**Q So the fuel clerk and the fuel clerk coordinator both work in the kiosk?**

A Yes.

**Q Are there any other employees who work in the fuel kiosk?**

A Only designated ones when we -- because, obviously, the associates have to take breaks. We'll send people down to give breaks and lunches.

**Q Will that typically be one of the cashiers?**

A Yes.

**Q But, otherwise, it's just the fuel clerk and the fuel clerk coordinator in the kiosk?**

A Yes.

**Q Are they both there typically at the same time?**

A No.

**Q Why is that?**

A They just have overlapping -- not really overlapping shifts. Just you have one to 3:00, and then the other one will relieve.

**Q Okay. So one is a supervisory position. That is the fuel clerk coordinator is a supervisory position over the fuel clerk; is that right?**

A Yes.

**Q But they both will work the kiosk not at the same time, but they will take shifts on it?**

A Correct.

**Q All right. Thank you for clearing that up. Did you ever discuss with Ms. Hamby Mr. Batten's performance as the fuel clerk?**

A We have, yes.

**Q And what -- tell us what you remember about those conversations.**

A Performance was good.

**Q Did Ms. Hamby have any complaints or concerns about Mr. Batten?**

A Not that I'm aware.

**Q So Mr. Batten was a good employee?**

A Yes.

**Q To your knowledge, was he ever written up?**

A Not to my knowledge.

**Q Okay. I know this may seem like a silly question, but were you aware of his disabilities?**

A Yes.

**Q At least one being pretty obvious, he didn't have a right arm; is that fair?**

A Yes.

**Q Did y'all talk about that at all?**

A No.

**Q Okay. When he first came to transfer to your store, did he explain what his situation was?**

A He did.

**Q And what did he tell you?**

A He told me he was in an accident, you know, lost his arm and a couple other issues that he had -- he made me aware of.

**Q Do you remember what those other issues were?**

A Not off the top of my head I can't, no.

**Q Do you remember him telling you about the metal in the right side of his body?**

A No.

**Q Okay. Did you see the difficulties that he had at work because of his condition?**

A I saw no difficulties.

**Q Okay. Did anybody report any difficulties to you?**

A No.

**Q Were you familiar with an employee named Vince?**

A I don't remember.

**Q Okay. Do you remember an incident where an employee made a joke about Mr. Batten's amputated arm?**

A No, sir.

**Q When did you first learn that Mr. Batten had requested an accommodation in the form of a service animal?**

A The day he showed up to work.

**Q Okay. Do you remember what day that was?**

A No.

**Q Okay. Could it have been around July 23rd of 2021?**

A I don't know.

**Q So he had -- he didn't call you in advance of that? He just showed up with the dog?**

A Correct.

**Q Okay. How did you learn that he had showed -- that he had just showed up with the dog? Did you see him just show up?**

A I was paged to the office. When I went to the office, he was up there. He was in the office with the dog.

**Q Who paged you?**

A Emily -- Emily Hobbs.

**Q Did y'all have any discussion at that point?**

A We did.

**Q Now, I want to be clear. Did you and Ms. Hobbs have any discussion at that point?**

A No. No.

**Q So you went down to the office or up to the office?**

A Upstairs to the office, yes.

**Q And what did you do when you got there?**

A I asked him what -- you know, why was -- why was I paged to the office, and that's when he told me that he had a service dog and was going to bring it to work.

**Q Okay. What else did y'all talk about?**

A Well, I told him I couldn't authorize it, that I would have to reach out to the powers that be, which would be David Ellison, but he was on vacation that week. And I contacted Donnie Meadows.

**Q Okay. Donnie Meadows was the human relations director?**

MR. JACKSON: Donny Rector?

THE WITNESS: Or Donny Rector. I'm sorry.

BY MR. HARGRAVES:

**Q That's fine.**

A Donny Rector.

MR. JACKSON: Too many Donnies.

MR. HARGRAVES: Yeah, right.

BY MR. HARGRAVES:

**Q So you reached out to Donny Rector?**

A Correct.

**Q Donny, Donnie, David. I've done the same thing. So it's all right.**

**Donny Rector was over the Knoxville division and he was covering for Mr. Ellison at that point?**

A Yes.

**Q So you reached out -- did you call Mr. Rector?**

A We sent an email. Mr. Batten came by several hours before his shift. Then I reached out to get -- to find out if it was allowed, what we'd do, policies and procedures, just to get advice.

**Q Okay. Did you get any response from Mr. Rector?**

A I did.

**Q And what was that?**

A What kind of service animal it was, I

think is what he asked me.

Q Do you know why he asked that?

A I don't know.

Q Okay. But that was not -- that response you received, that wasn't on July 23rd? That wasn't the same day, was it?

A It was the same day -- I couldn't tell you the date. Just the day that Mr. Batten came in.

Q Was Mr. Batten sitting there waiting while you were trying to sort all this out?

A We waited for a little bit. We waited for a response. Then he went home because, like I said, he was there before his shift started.

Q Did he ultimately get to work his shift that day?

A He did.

Q I'm going to -- we want to talk about the details a little bit more, but ultimately did you make the decision to at least temporarily allow Mr. Batten to use his service animal?

A I did.

Q Do you think that was a reasonable decision to make?

A I think so at the time, yes.

Q At that time, could you think of any

**reason why it would be a problem for Mr. Batten, as the fuel clerk, to have his service animal in the kiosk?**

A Not at the time, no.

**Q Sitting here today, have you changed your mind on that?**

A I have not.

MR. HARGRAVES: Okay. All right. I want to show you another document. Let's mark this Exhibit 2.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 2.)

BY MR. HARGRAVES:

**Q All right. Looking at Exhibit 2, Bates number 000132, do you recognize this document?**

A Yes.

**Q What is it?**

A It's a statement that I made.

**Q Did you draft this?**

A I did.

**Q Do you remember when you drafted it?**

A I'm assuming on November 30th.

**Q Okay. And this at least initially describes the events that occurred on July 23rd of**

**2021; is that right?**

A Yes.

**Q So this was written approximately four months after those events occurred; is that right?**

A Yes.

**Q Is this -- is Exhibit 2 a fair and accurate copy of that statement that you wrote?**

A Now, this -- this is in my drafts at work. So if I printed this off, it's going to have that date on it, I believe, that this was typed up beforehand. I'm not sure. I'm sorry.

**Q No, that's fine. I'll represent to you this is what Food City's attorneys provided to us.**

A Okay.

**Q Does this appear to be a fair and accurate copy of the statement that you wrote?**

A Yes.

**Q And is this a complete and truthful account of what's contained herein?**

A Yes.

**Q It says at the top "sent Tuesday, November 30, 2021." Do you know what that is?**

A Yeah. I sent the -- sent the email, I guess.

Q Okay. Do you know who you sent this to?

A If I sent it, it probably would have been to David Ellison.

Q Okay. All right. I just kind of want to walk through it a little bit. So it notes that on July 23rd of 2021 Mr. Batten came in around 10 a.m.; is that right?

A Yes.

Q Okay. And that's when he told you about the service dog?

A Yes.

Q "I told Matt that I had never dealt with this before and didn't know what the protocol was in allowing service animals at work." Did I read that correctly?

A Yes.

Q Did you find out what the protocols were?

A I did not.

Q Okay. To your knowledge, were there any protocols?

A I don't know.

Q Okay. But you reached out to find out about any protocols; is that right?

A Yes.

**Q Did you get an answer about whether there are any protocols?**

A No.

**Q So to this day, are you aware of any protocols that Food City has with regard to employees using service animals at work?**

A No.

**Q Okay. You told Mr. Batten that you would get advice from human resources and that you would have an answer for him before he started his shift at 2; is that right?**

A Yes.

**Q You note that you emailed Mr. Rector and that Mr. Rector responded, asking about -- asking if it was a service or emotional support dog. Do you see that?**

A I can't see it because I don't have any glasses.

**Q Oh, I apologize. Your attorney is following along. And if I mess anything up, I'm sure he will let us know.**

**Is that what you recall with regard to what happened? You emailed Mr. Rector; he responded back and asked if it was a service animal or**

emotional support animal?

A Correct.

Q Did you ever have any further discussion with Mr. Rector about why that matters?

A No.

Q Okay. But you replied back at 11:57 letting Donny know that Matt was claiming the dog was both service and emotional. And when I received certification/documents for the animal, I would email. Does that sound like what happened?

A Yes.

Q So Mr. Batten had indicated to you at least that it wasn't just an emotional support animal, it was also a service animal; is that right?

A Yes.

Q You said about two-thirds of the way down: As I have never dealt with this situation, knowing the sensitivity of the subject of service animals and never receiving -- never receiving an answer from HR, I advised Matt that he could bring the animal to work with the understanding that may change based on review from the company. Does that sound right?

A Yes.

Q How did you know -- or what did you

**mean by "knowing the sensitivity of the subject of service animals"?**

A I just know the sensitivity of when customers bring service animals in the store.

**Q Okay. That can be a deeply personal issue?**

A Exactly. I mean, yes.

**Q Does -- or did Food City have training on customers who had service animals?**

A No.

**Q But you had interacted, I guess, with some?**

A Yes. We've -- yes. You have customers bring dogs.

**Q Was Mr. Batten's dog, was he wearing anything special?**

A Yes.

**Q Was he wearing like a service animal vest?**

A Yes.

**Q Did it have patches on it?**

A I don't recall.

**Q Do you recall if it said service animal on the back?**

A I don't recall.

Q Okay. You remember that Mr. Batten gave you some paperwork; is that right?

A Yes.

(Whereupon, the document, as referred to below, was marked and subsequently attached hereto as Exhibit No. 3.)

MR. HARGRAVES: Are we on 3?

THE COURT REPORTER: Uh-huh.

BY MR. HARGRAVES:

Q Looking at what has been marked Exhibit 3, Bates numbers 000134 through 137, do you recognize these documents?

A I remember this one, the photo. That's the one that stands out to me.

Q When you say "this one," which one is that?

A The one with his photo.

Q Do you recognize these as the photos that you and Ms. Hobbs took of the documentation that Mr. Batten provided to you on July 23rd?

A If it's the ones that we sent, then we actually scanned these in and sent them to Donny.

Q So you recognize page 3, which has Mr. Batten's picture with his dog?

A Yeah.

**Q But you don't recognize the other pages?**

A It was over a year ago. Sorry.

**Q That's fine. To your recollection, did Mr. Batten give you any other paperwork?**

A I can't remember.

**Q During the period of time -- let me ask you this: How long was Mr. Batten permitted to work with his service animal?**

A I can't remember.

**Q Okay. Was it approximately a week?**

A Probably about that. It was -- because David was on vacation. When he got back.

**Q During that week were there any issues with Mr. Batten using his service animal?**

A Not that I'm aware.

**Q Have you since become aware of any issues during that period of time --**

A No.

**Q -- of Mr. Batten using his service animal?**

A No.

**Q You got a call from David Ellison on this issue on July 30th at around 4:00; is that right?**

A I guess.
Q Okay. I'll represent that's what you indicate in your statement on Exhibit 2. You say that Mr. Ellison asked -- he called at 4 asking that I update him on the situation at which time I did and informed that I did allow Matt to work. Does that sound right?
A Yes.
Q What else was said in that conversation?
A I can't remember.
Q Okay. Do you remember if you communicated to Mr. Ellison that Mr. Batten was not having any issues working with his service animal?
A I can't remember.
Q Do you remember if Mr. Ellison asked you if there were any issues at that point with Mr. Batten using his service animal?
A I don't remember.
Q But certainly you wouldn't have told him that there were any issues, because there weren't; is that right?
A Probably not.
Q "David told me he would communicate with corporate and would get back with me. David

contacted me on 8/2/21 to discuss the matter further and again on 8/5/21 to set up a meeting with Matt on 8/6/21 at 1."

I want to break that down. So you initially spoke with Mr. Ellison on July 30th. Do you remember anything about your conversation with Mr. Ellison on -- when he called you back on August 2nd?

A No, sir.

Q Do you remember anything from your discussion with Mr. Ellison when he called you again on August 5th?

A No, sir.

Q So you had three conversations -- at least three conversations with Mr. Ellison prior to the August 6th meeting between you, Mr. Ellison, and Mr. Batten; is that right?

A If it's noted, yes.

Q Do you remember if you had any other meetings or conversations with Mr. Ellison that are not included here?

A No.

Q And do you remember anything about any of those conversations with Mr. Ellison that we haven't already talked about?

A No.

**Q Okay. Do you know why you would have had those two additional phone calls on August 2nd and August 5th?**

A I don't know.

**Q Is there any record of those phone calls anywhere?**

A Not that I'm aware.

**Q Ultimately, you set up a meeting with Mr. Batten on August 6th; is that right?**

A If that's what it states, then yes.

**Q Do you remember how that was communicated to Mr. Batten?**

A I don't remember.

**Q Okay. Do you remember if Mr. Batten was told ahead of time that David Ellison, the senior HR specialist, was going to be there?**

A I can't remember.

**Q Is there any reason you would not tell Mr. Batten --**

A No.

**Q -- that Mr. Ellison was going to be there?**

A No.

**Q And you indicated that Mr. Batten**

worked July 23rd, 24th, 25th, 27th, 30th, 31st, and August 1st. Does that sound right?

A Yes.

Q That's one, two, three, four, five, six -- that's seven days. So that's the week we talked about.

A Okay.

Q So he worked all of those days, as far as you know, with his service animal?

A Yes.

Q Before we get into the August 6th meeting, was there anything else about the July 23rd meeting between you and Mr. Batten that is significant that you remember?

A Not that I can remember.

Q Do you remember talking with Amber Grindle on that day?

A No.

Q Do you remember who Amber --

A I know who Amber is, but --

Q She didn't come into your office to make a complaint?

A I can't remember.

Q Do you remember Mr. -- when Mr. Batten came to see you, he had a service animal with him?

A Correct.

**Q Did that service animal act inappropriately that you saw?**

A I can't remember.

**Q Did it jump on you?**

A On me? No.

**Q Yes, sir. No?**

A Not that -- I can't remember if he did, no.

**Q Did the dog jump on anybody that you saw?**

A I can't remember.

**Q Did the dog attack anybody?**

A Attack, no.

**Q Certainly you would remember that?**

A Yes, I would remember attack.

**Q So you don't remember Amber Grindle coming to you and telling you that that damn dog jumped on me or something to that effect?**

A I can't remember.

MR. HARGRAVES: That's fine. All right. I'm going to show you another document. Let's mark that Exhibit 4.

//

//

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 4.)

BY MR. HARGRAVES:

**Q This is marked Exhibit 4, Bates number 000133. Do you recognize this?**

A Again, I can't read it.

**Q Okay. I keep forgetting. I'm just in autopilot here. I'll represent to you this is an email chain between you and Donny Rector on July 23rd, 2021. Okay? Is that the day that you emailed Mr. Rector regarding the request for Mr. Batten to use a service animal?**

A On July 23rd?

**Q Yes, sir.**

A Yes.

**Q Okay. It says, "Good morning, Donny. I have a Gas 'N Go associate that recently acquired a service dog to help with balance and emotional support. The associate wants to bring the dog to work. Please advise." Does that sound like what you said?**

A Yes.

**Q Mr. Rector responded about an hour later, quote, "Is it a service animal or an emotional**

**support dog?" Does that sound about right?**

A Yes.

**Q It looks like you responded at 11:57. "He claims it's both, service animal to help maintain balance and emotional support. Matt was in a very bad motorcycle accident which resulted in the loss of an arm, head trauma that has affected his vision among other things. I asked that he bring in the certification for the animal. When I receive, I will email to you." Does that sound right?**

A Yes.

**Q Ultimately, you set up a meeting between Mr. Batten, yourself, and David Ellison; is that right?**

A Yes.

**Q And that was August 6th of 2021?**

A I don't remember.

**Q Okay. Do you remember who set that up?**

A I don't remember.

MR. HARGRAVES: Are we on 5?

THE COURT REPORTER: Yes.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 5.)

BY MR. HARGRAVES:

Q Looking at what's marked Exhibit 5, Bates number 001063, I'll represent this is a copy of a note that you made regarding the August 6th meeting. Do you recall drafting a note --

A Yes.

Q -- or statement regarding that meeting?

A Yes.

Q Do you have any reason to believe that what your attorney has provided us is not the statement that you wrote?

A No.

Q It says on -- and would this be a document you drafted alone?

A Yes.

Q And do you remember when you drafted it?

A I do not.

Q Now, it's got a signature on it. Can you recognize that signature?

A Yes.

Q Is that yours?

A That's my signature.

Q And I'll represent the date is 8/6/21

below the signature. Would that be the day that you signed it?

A Yes.

Q Okay. And that being the day that this occurred, is that the day that you drafted this statement?

A Yes.

Q Okay. It's -- "On August 6th, David Ellison met with Matt Batten with myself as a witness to discuss the request of a service animal. Mr. Ellison asked Matt if there was any aspect of the job that he could not perform that required the assistance of a service animal. Matt replied that he was able to perform all duties that were required without question and had been doing so since his employment with Food City without the help from a service animal. Matt stated that the purpose of the service animal was to provide companionship and help with anxiety, isolation." As best you can tell, did I read that correctly?

A Yes.

Q Is that what you wrote?

A Yes.

Q And is that a complete and accurate and truthful account of what happened in that

**August 6th meeting?**

A From what I -- yes.

**Q Okay. Did you provide this note to David Ellison?**

A Yes.

**Q Did you provide it to anyone else?**

A No.

**Q The last sentence of this note says, "Matt stated that the purpose of the service animal was to provide companionship and help with anxiety and isolation." That's what you wrote, right?**

A If it's on there, that's what I wrote.

**Q It doesn't mention stability, does it?**

A No.

**Q Mr. Batten actually said in that meeting that he needed the dog for stability, didn't he?**

A In that meeting, I don't remember.

**Q Okay. If Mr. Batten says that he did mention in that meeting that he needed the dog for stability, would you say that's incorrect?**

A I'm sorry. Repeat.

**Q If Mr. Batten claims that he did mention stability in that August 6th meeting, do you have any reason to think that's incorrect?**

A Well, I -- I don't know.

**Q Okay. Do you recall Mr. Batten mentioning in that meeting that he had a history of falls?**

A I don't remember.

**Q Do you recall Mr. Batten mentioning in that meeting that the dog helped him with his stability?**

A I do not remember.

**Q Okay. None of those things are in your statement, are they?**

A No.

**Q But looking back at Exhibit 4, your email to Mr. Rector, you told Mr. Rector that "I have a Gas 'N Go associate that recently acquired a service dog to help with balance and emotional support;" is that right?**

A Yes.

**Q Okay. So you were aware that Mr. Batten needed the dog at least in part for balance?**

A That's what he told me the dog was for.

**Q Okay. Did you have any reason to believe that was not true?**

A None.

**Q Okay. There is nothing in your written statement about Mr. Batten mentioning a history of falls; is that right?**

A If it's not in there, then no.

**Q Also in your written statement, you say that -- you say that "Mr. Ellison asked Matt if there was any aspect of the job that he could not perform that required the assistance of a service animal." You say, "Matt replied that he was able to perform all duties that were required without question." Are those your words or Mr. Batten's words?**

A I don't remember.

**Q Okay. Do you remember if Mr. Batten said the words "without question"?**

A I don't remember.

**Q Okay. Do you remember where you got those words?**

A I don't remember.

**Q Okay. Do you remember Mr. Batten telling you that he did have issues doing his job?**

A Not that I'm aware, no. You talking about the meeting or in general?

**Q In the meeting, yes.**

A No.

**Q We're talking about the August 6th meeting between you, David Ellison, and Mr. Batten.**

A No, I don't remember.

**Q If Mr. Batten says that he did tell you and Mr. Ellison that he had issues doing his job, do you have any reason to contradict that?**

A No.

**Q Do you recall Mr. Ellison asking Mr. Batten if he could perform the job with or without accommodation?**

A I don't remember.

**Q Okay. So you don't remember Mr. Batten responding that he could do the job with accommodation?**

A No, sir.

**Q And that exchange is not in your written statement?**

A If it's not in it, then it's not in there.

MR. HARGRAVES: Let's mark this Exhibit 6.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 6.)

BY MR. HARGRAVES:

Q Looking at what's been marked Exhibit 6, Bates number 000141, do you recognize this document?

A I recognize the signature, yes.

Q Okay. And do you recognize the date as 8/12/21?

A I do not.

Q Okay. I'll represent to you that this is what was provided us as the statement that you wrote and -- regarding the meeting that occurred between you, Mr. Ellison, and Mr. Batten on August 12, 2021. Do you remember writing that statement?

A Yes.

Q And does this appear to be that statement?

A It does.

Q Okay. Is that -- that is your signature?

A Yes.

Q Okay. And as best you can tell us today, is that a complete -- or is that a fair and accurate copy of that statement?

A Yes.

Q And is it -- as you drafted it, is it a truthful account of the meeting that occurred on August 12, 2021?
A Yes.
Q Had you had any discussion with Mr. Ellison between the August 6th meeting and this August 12 meeting?
A I don't remember.
Q Okay. Do you remember what was discussed in the August 12 meeting?
A I can't remember.
Q Do you remember Mr. Ellison informing Mr. Batten that the service -- that the request for the service animal was being denied?
A I remember that, yes.
Q What do you remember about that conversation?
A Well, that's why we write them down, so I don't have to remember. Again, this was -- you know, a refresher, if I could read this, I mean, it might bring back something, but --
Q I tell you what. I'll read it to you. If I mess something up, your attorney will let us know.
It says: On August -- on 8/12/21,

Matt Batten met with David Ellison for a follow meeting regarding Mr. Batten having a service animal at the workplace. Mr. Ellison informed Mr. Batten that after review, the decision was made that at this point in time the request for the service animal has been denied.

Mr. Ellison asked if there were any jobs within the store to better accommodate his current needs, suggesting the USCAN -- suggesting USCAN attendant as it would allow him to be around others. Mr. Batten stated that there wasn't any position in the store that he would be able to perform his duties as he wasn't able to stand for short/long periods of time, that Gas 'N Go was the only position that was suitable as it allowed him to sit and stand as needed and that he was not leaving his dog with anyone, that where he goes, she goes.

Does it sound like I read that correctly?

A Yes.

Q And is that what you recall from that meeting?

A Yes.

Q So this is the meeting where Mr. Batten's request for the service animal was

**formally denied; is that right?**

A If that's in the statement, then yes.

**Q And that was after he had -- Mr. Batten had already worked for a week with the service animal without incident; is that right?**

A Yes.

**Q Do you have any idea when the decision to deny the request for a service animal was made?**

A I do not.

**Q Okay. So this was -- was this the first time that you were hearing about the result of the decision?**

A I don't remember.

**Q Okay. Had you had any discussion with anyone prior to this meeting regarding the offer of the USCAN position to Mr. Batten?**

A I don't remember.

**Q What is the USCAN position?**

A The USCAN attendant?

**Q Yes, sir.**

A They oversee self-check.

**Q That's the -- if you're at the self-checkout, that's the associate who is kind of hanging around in the middle, will help you if you have any issues?**

A Correct.
**Q In your experience, that's a standing and moving position; is that right?**
A Correct.
**Q That's not a "you can sit down" position?**
A Correct.
**Q Do you have any idea of why the USCAN position was offered to Mr. Batten?**
A From what you read, it was to provide so he wouldn't be alone. Is that what the statement said?
**Q "Suggesting USCAN attendant as it would allow him to be around others." Is that -- was that your understanding of why that was being offered to him?**
A Yes.
**Q Did you have any understanding of how the USCAN position was going to accommodate Mr. Batten's stability issues?**
A I didn't make the decision.
**Q Okay. And I understand that, but my question is, did you have any idea or insight into --**
A No.
**Q -- how or why the USCAN position would**

accommodate his stability issues?
A No.
Q Sitting here today, can you think of any ways that the USCAN position would have accommodated Mr. Batten's stability issues?
A No.
Q As you wrote, the Gas 'N Go position was the only position that allowed him to sit and stand as needed; is that fair?
A Fair.
Q Do you recall that although Mr. Batten was offered the USCAN attendant position, he -- he was told that he would not be allowed to bring the dog into the store with him in that position?
A I don't remember.
Q Okay. Do you remember if Mr. Ellison offered Mr. Batten the use of a stool or a chair in the USCAN position?
A I don't remember.
Q Would the -- would the use of a stool or a chair in the USCAN position potentially cause a safety hazard?
A No.
Q No. It wouldn't -- it couldn't potentially be a tripping hazard for customers?

A Not that I -- I don't see one.
**Q Okay. But nevertheless, the USCAN attendant position is not one that utilizes a chair or a stool?**
A No.
**Q In the narrative that you wrote regarding your meeting on August 12, 2021, as I read it to you, there was nothing in there about Mr. Batten talking about his history of falls, correct?**
A Correct.
**Q Do you remember Mr. Batten in that meeting talking about his history of falls?**
A I don't remember.
**Q You don't remember Mr. Batten saying that the last time I fell, I knocked myself out?**
A I do not.
**Q Do you understand how a service animal can help someone who has gait instability or difficulty maintaining --**
A I do not.
**Q -- balance? You don't understand that?**
A No.
**Q Do you remember Mr. Batten at any**

**point communicating that his service animal helped him with those issues?**

A I don't remember.

MR. HARGRAVES: We've been going for about an hour. Do y'all need a break?

THE WITNESS: I would like some water, please.

MR. HARGRAVES: Let's go off the record.

THE VIDEOGRAPHER: The time is 11:36, and we are off the record.

(Whereupon, a short break was had.)

THE VIDEOGRAPHER: The time is 11:39, and we are back on the record.

MR. HARGRAVES: Let's mark this Exhibit 7.

(Whereupon, the document, as referred to below, was marked and subsequently attached hereto as Exhibit No. 7.)

BY MR. HARGRAVES:

**Q All right. Mr. Richards, again, as best you can, we're looking at what's been marked Exhibit 7, Bates number 001084 through 1085. On page 2 begins with an email from you on August 23rd of 2021 to Mr. David Ellison. Do you remember**

sending that email to Mr. Ellison?

A I don't remember.

Q Okay. I tell you what. I'll read it to you, and you let me know if that jogs your memory. On August 23rd, 2021 -- sorry. "On 8/23/21, Matt Batten called me at the store and told me that Mr. Ellison had given him two different documents for leave of absence, FMLA and personal LOA. Matt stated that he was not going to submit the FMLA documents nor was he going to submit the personal LOA documents. Matt told me he wanted to come to work with his service animal and then asked if I would allow him to do so and accommodate his service animal."

"I asked Matt what decision was told to him by Mr. Ellison regarding him bringing his service animal to work. Matt replied that the decision was -- that the request to bring his service animal to work was denied. I then told Matt that he already had his answer. Matt hung up. Gary."

Does that sound like what you wrote?

A It does.

Q Okay. Were you -- there is some follow-up emails here that occurred between various other management persons. Were you privy to any of

**those communications?**
A I'm sorry?
**Q Were you -- did you have any involvement in any of the follow-up emails on this?**
A Not that I'm aware.
**Q Okay. It looks like you sent that to David Ellison, Mr. Ellison forwarded it to Mr. Meadows and Mr. Lyon. Did any of those individuals -- did Mr. Lyon, Mr. Ellison, or Mr. Meadows reach out to you by phone to discuss this email that you sent?**
A I do not remember.
**Q Okay. Do you remember anything else from your phone call with Mr. Batten on August 23rd, 2021, that is not included in your email?**
A I do not.
**Q Is this a truthful account of what happened in that phone call?**
A To my knowledge, yes.
**Q Prior to this phone call, did you know that Mr. Batten had been offered FMLA or a personal leave of absence?**
A Yes.
**Q And do you remember how you became aware of that?**

A I just remember -- I think it was -- I can't say. So I'm not going to name. I just remember that we were waiting on that paperwork to come back.

**Q Okay.**

A That it was given and it should be brought back.

**Q So you knew at some point that paperwork had been given to Mr. Batten?**

A Right.

**Q Do you remember how you learned about that?**

A No.

**Q Okay. Would that have been a conversation between you and Mr. Ellison?**

A Yes.

**Q Do you remember anything about the why, that is why Mr. Batten was given those particular options?**

A No.

**Q Sitting here today, can you think of any reason why those two options would be appropriate for somebody in Mr. Batten's position?**

A No.

**Q The leave of absence, that's something**

in -- the personal leave of absence is something in Food City's policies and procedures; is that right?

A I'm -- I think so.

Q To your understanding, there are -- are there two 90-day personal leaves of absence that an employee --

A Yes.

Q -- can take?

A Yes.

Q It's not an FMLA job guarantee, but it's a leave that an employee can request --

A Yes.

Q -- is that fair?

A Yes.

Q To your understanding, is that something that the employee requests?

A Yes.

Q Okay. And if the employee requests it, they can submit the paperwork and the management can either grant or deny that request?

A Human resources will, yes.

Q Okay. In your experience, is a personal leave of absence something that human resources simply imposes on an employee?

A No.

**Q Okay. It's something the employee has to request?**

A Yes.

**Q Mr. Batten made it clear to you, at least in this phone call, that he didn't want a personal leave of absence; is that right?**

A Yes.

**Q Are you aware that Mr. Batten was thereafter placed on a personal leave of absence?**

A No.

**Q You didn't hear anything about that?**

A He was placed on a personal leave of absence?

**Q Yes.**

A No.

MR. HARGRAVES: Let's mark this as Exhibit 8.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 8.)

BY MR. HARGRAVES:

**Q Looking at Exhibit 8, that's Bates number 001064. Again, I don't usually do it this way, but to help you out, I'll represent this is an email chain between you and Jenna Johnston on**

September 9 of 2022. Does that ring any bells?

A Yes.

Q Okay. It says the first email is from Ms. Johnston. "Christopher's leave ended on 2/14/2022. Since he has not returned to work, please remove him from payroll effective 2/14/2022." Does that sound right?

A Yes.

Q And you responded about six minutes later, "Hey, Jenna, I believe there may be a hold on his status. David, would you please give Jenna and myself an update? Thanks. Gary." Looks like you cc'd David Ellison.

A Yes.

Q Is that what you responded to Ms. Johnston?

A Yes.

Q What did you mean by "I believe there may be a hold on his status"?

A Well, he hadn't been -- he didn't return to work. We were waiting on the FMLA papers, but I knew he -- I didn't know what to do.

Q Okay. So you knew that the paperwork had been given to Mr. Batten, but -- is that right?

A Correct.

**Q But you also knew that Mr. Batten had no interest in completing that paperwork?**

A According to this. But at this -- at this point, I wasn't in the loop on what was going on.

**Q Okay. The last thing you knew was you had talked to Mr. Batten and he was not requesting FMLA or a personal leave of absence; is that fair?**

A Correct, yes.

**Q So what is a hold?**

A That's just a term I used because I wasn't sure of the situation, to be honest with you.

**Q Okay. So then you just asked David to give you and Jenna an update?**

A Correct.

**Q Did you get that update from Mr. Ellison?**

A Yes.

**Q Did he -- was that an email, a phone call?**

A I don't remember.

**Q What was the substance of the update?**

A For me to term.

**Q To terminate Mr. Batten?**

A Yes.

**Q Do you -- was that to be effective February 14, 2022, as Ms. Johnston indicated?**

A It would have been, to my knowledge, yes.

**Q Do you remember anything else from that conversation --**

A No.

**Q -- with Mr. Ellison?**

A No, sir.

**Q Did you ask him, you know, why are we terminating?**

A I did not.

MR. HARGRAVES: Let's mark this Exhibit 9.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 9.)

BY MR. HARGRAVES:

**Q Looking at Exhibit 9, Bates number 001057. And I'll represent to you this is an email chain from earlier in 2022 between you, Mr. Ellison, and Ms. Johnston among others. Do you recall corresponding with those two people specifically regarding Mr. Batten?**

A No, I don't remember.

Q Okay. You don't remember having any knowledge about Mr. Batten being on a personal leave of absence; is that right?
A Correct.
Q The email from Ms. Johnston to you is March 11, 2022. Subject, Christopher Batten personal leave. It says, "Christopher's leave ended on 11/16/2021. Have you heard from him?" Does that sound right?
A Please repeat.
Q "Christopher's leave ended on 11/16/2021. Have you heard from him?" Does that sound right?
A I guess.
Q Okay. That was to you and also to 214HRC@FoodCity.com. Would that be the official email for whoever was in the human relations coordinator position at store 214?
A Yes.
Q Would that have been Emily Hobbs at that point?
A Yes.
Q So you then forwarded that onto David Ellison and said, "David, do we have an update?" Does that sound right?

A Yes.

**Q David responded to you and cc'd Jenna as well as Desirea Douglass, quote, "Jenna, please speak to Sherrell regarding this associate's status. I believe we will leave him on LOA at this time." Does that sound right?**

A I suppose -- I guess. I am confused about the -- what date was this?

**Q This was March 20, 2022. So this is prior to the exhibit we just looked at.**

A Then back to your question when you asked me about the HRC, it being Emily, at that point it probably wasn't Emily. It was probably Desirea since --

**Q Okay. And that would explain why she is then included up there?**

A Yes.

**Q Okay. Do you know if Ms. -- well, Ms. Douglass was not involved in any of the initial communications with Mr. Batten, to your knowledge, about the request for a service animal?**

A No.

**Q Okay. So you agree that Mr. Ellison indicates that Mr. Batten was on an LOA at that time; is that right? He says, "I believe we will leave him**

**on LOA at this time;" is that right?**

A If that's what is in the email.

**Q Okay. So would you understand that to mean that Mr. Batten was on a personal leave of absence?**

A Was I aware?

**Q No. Would you take that to mean that at that time, at least as Mr. Ellison was saying, Mr. Batten was on a personal leave of absence? Is that what that means?**

A That's the way I would take it, yes.

**Q Okay. If Mr. Batten was on a personal leave of absence at that time, would you expect that Mr. Batten had completed the personal leave of absence paperwork?**

A I have -- I have no idea.

**Q Is that the typical procedure for an employee to go on a personal leave of absence?**

A I'm sorry?

**Q Is that the typical procedure for an employee to go on a personal leave of absence, to complete a personal leave of absence form?**

A Are you asking me is it -- should an associate do the personal leave of absence form and submit them to take a personal leave of absence?

Q Yes.
A Then, yes, they do fill out the forms and submit them.
Q So if, as Mr. Ellison said, Mr. Batten was on a personal leave of absence at this time, you would expect that Mr. Batten had completed that paperwork?
A Yes.
Q Now, I may have already asked you this. Forgive me if I have. But do you know exactly when the decision was made to deny Mr. Batten's accommodation request for a service animal?
A I can't remember.
Q Do you know who ultimately made that decision?
A I do not.
Q Do you know if anyone else was hired to fill the fuel clerk position after Mr. Batten was terminated?
A After he was terminated?
Q Yes, sir.
A I can't remember.
Q After Mr. Batten was no longer coming into work, did somebody else fill in for that position?

A Yes. We had to fill the position, but I don't think there was anybody hired.

**Q Outside of communications with Food City's attorney, are there any other communications that you had with anyone regarding Mr. Batten's request for the use of his service animal that we haven't already talked about?**

A None that I'm aware.

**Q Okay. When Mr. Batten -- this is going back to July 2021. When was the first time you became aware of Mr. Batten's desire to go to a training camp for his service animal?**

A I think he had actually went on vacation, and they told me -- I was informed that the reason he was going, he was getting a dog. I didn't know it was a service dog.

**Q Do you remember when you were informed of that?**

A I couldn't tell you.

**Q Do you remember who informed you of that?**

A No, I do not.

**Q Mr. Batten was part time at that time, correct?**

A I don't remember.

**Q If he was part time at that time, were part-time employees, did they get vacation days?**

A Without pay, yes. They can take vacation.

**Q So it's called vacation, but it's without pay?**

A Time off, yes.

**Q Was that considered just personal leave?**

A No. It's just taking time off. I mean, you wouldn't call it personal leave.

**Q Are you aware of a policy at Food City that if an employee wanted to take two weeks or more off, they needed to formally request a personal leave of absence?**

A Yes.

**Q So if Mr. Batten was to be out for two weeks or more for this camp, you would expect that he would have submitted a request for a personal leave of absence?**

A Correct.

**Q And would that form -- would that completed form have come to you?**

A Yes.

**Q Okay. So do you remember Mr. Batten**

**submitting a personal leave of absence request?**

A I do not.

**Q Okay. Would you have had to approve Mr. Batten taking those what you call vacation days?**

A Not necessarily.

**Q Who could approve that?**

A The coordinator. She makes her -- she makes his schedules.

**Q Okay. Would the -- I want to make sure I'm understanding. The fuel clerk coordinator or the HRC?**

A Fuel clerk.

**Q Okay. So Bailey was the fuel clerk coordinator? What was her last name?**

A Hamby.

**Q Hamby. So you would expect that if the fuel clerk coordinator had approved it, it would have been Bailey Hamby at that time?**

A Yes.

**Q Did Ms. Hobbs ever come to you about Mr. Batten's request to be out for this service dog training camp?**

A I don't remember.

**Q But somebody at some point did tell you, hey, he was -- he is out for this service dog**

**training camp; is that right?**

A No.

**Q Okay.**

A I was just told he was getting a dog. That's all I was told. I didn't know what -- where it was at.

**Q Okay. Do you remember in the sequence of events when you were told that he is getting a dog?**

A No, I don't remember.

**Q Was that in the lead-up to him going to the camp?**

A No, I don't remember.

**Q Was it -- was it while he was out on vacation for the camp?**

A Honestly, I don't remember.

**Q I think you said -- and correct me if I'm wrong. I think you said that somebody told you he is getting a dog --**

A Yes.

**Q -- is that right?**

A Yes.

**Q So that would seem to indicate he is in the process of getting a dog; is that fair?**

A That's fair.

**Q So it sounds like that might be something that somebody would have said while he is in the process of being at the camp getting the dog; is that fair?**

A I don't know.

**Q Would that make sense?**

A I guess.

**Q Would it surprise you to learn that Mr. Batten says that he had told people before that he was going -- at Food City that he was going to the camp to get a dog?**

A Would I be surprised by it?

**Q Yes, sir.**

A No.

**Q Had you ever had any discussion with Mr. Batten about his need for a service animal prior to the camp?**

A None that -- none that I can recall.

**Q Okay. Has everything you have said here today been true?**

A To the best of my knowledge, yes.

**Q Okay. Were any of my questions confusing to the point that you did not understand them?**

A Only when I asked you to repeat, yes.

**Q Okay. When that happened, did I clarify all of those questions to your satisfaction?**

A Yes, you did.

MR. HARGRAVES: Okay. I don't have any further questions at this time, but Mr. Jackson might.

MR. JACKSON: Yeah. Just mainly one.

EXAMINATION

BY MR. JACKSON:

**Q You had some discussion of the USCAN coordinator position. Do you remember that with counsel?**

A Yes.

**Q And normally there is not a chair at that station. That's fair to say?**

A Yes.

**Q Would there be anything that would absolutely prevent the company from letting somebody have a chair there?**

A Not to my knowledge.

MR. JACKSON: That's all.

MR. HARGRAVES: Nothing further.

THE VIDEOGRAPHER: This concludes this deposition. One media file was used. The time is 11:59. We are off the record.

FURTHER THE DEPONENT SAITH NOT.

(Signature waived.)

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :
COUNTY OF HAMILTON :

I, Whitney A. Vaughn, Court Reporter and Notary Public, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. GARY RICHARDS was duly sworn by me; that pages 1 to 78, inclusive, were reduced to typewriting under my direction and supervision, and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This is the 23rd day of January, 2023.

Whitney Vaughn

Whitney Vaughn, TN LCR #418
Court Reporter and Notary Public
My Commission Expires 07/30/25

# EXHIBIT 2 – PART II

# EXHIBITS TO

# DEPOSITION OF RICHARDS

# WELCOME to K-VA-T Food Stores, Inc.



EXHIBIT
1
1-12-23
Richards
PENGAD 800-631-6989

# Associate Handbook

FOOD CITY®

# Food City Associate Handbook

FOOD CITY®

Value. Everyday.™

This handbook, and the rules, policies, and information contained herein supersedes any and all other associate handbooks, rules, policies, and information previously issued or followed by K-VA-T Food Stores, Inc. (Masculine gender is occasionally used in this handbook to refer to persons of both sexes.)

Published by K-VA-T Food Stores, Inc., March 1994

October 2021 Revision

# INTRODUCTION

## WELCOME TO FOOD CITY

We are pleased to present you with a copy of our Food City associate handbook. It has been designed to help you know your company better. Whether you have been with us for a short time or for a number of years, we want you to know we appreciate the contribution you are making to the continued successful operation of Food City. We believe it is our responsibility to keep you accurately informed of our company's policies and procedures.

As Food City grows, we want you to grow with it. Your company has made considerable progress since its beginning, and the credit goes to each individual associate—your job is important to our continued growth.

This handbook is a summary of the principles for which we stand, the benefits which you may enjoy, and the obligations which you assume as an associate. We do not intend that any "rule" or "policy" cause an undue hardship for any associate. We set them forth simply to let you know what you may expect from Food City and what will be expected of you.

This handbook is intended as a guide, and it is not intended to be, nor should it be, construed as an employment contract. The employee benefits, personnel policies, and rules contained in this handbook will remain in effect unless changes are considered necessary.

Food City reserves the right to make changes in this handbook, as it deems appropriate, with or without notice. This handbook supersedes any benefits, policies, or rules previously written or communicated.

Employment is terminable at the will of either the associate or Food City at any time, and no representative of Food City has any authority to make any contrary agreement except in writing and signed by the CEO.

You are requested to read your handbook carefully and keep it for future reference. If you should have any questions concerning the policies or benefits outlined in this handbook, please ask your supervisor who will be glad to help you.

We welcome our new associates and extend best wishes for continued success to those who have become a part of the growth and progress of our company. We are pleased to have you as a member of our team.

Sincerely,

Steven C. Smith

Steven C. Smith, President & Chief Executive Officer

# THE TEN COMMANDMENTS OF GOOD BUSINESS

## "OUR BUSINESS IS PEOPLE"

1. CUSTOMERS are the most important people in any business.
2. CUSTOMERS are not dependent upon us—we are dependent upon them.
3. CUSTOMERS are not an interruption of our work—they are the purpose of it.
4. CUSTOMERS do us a favor when they call—we are not doing them a favor by serving them.
5. CUSTOMERS are part of our business—not outsiders.
6. CUSTOMERS are not a cold statistic—they are flesh and blood human beings with feelings and emotions like our own.
7. A CUSTOMER is not someone to argue or match wits with.
8. CUSTOMERS are the ones who bring us their wants—it is our job to fill these wants.
9. CUSTOMERS are deserving of the most courteous and attentive treatment we can give them.
10. CUSTOMERS are the lifeblood of this and every other business—they provide our jobs!



K-VA-T
000004

# THE CUSTOMER AND YOU

In your contacts with customers, YOU, for these moments, represent our Company, as far as they are concerned. Our reputation with the customer is at stake—and it's in YOUR hands. Your actions and attitude can strengthen the Company or can quickly turn the customer against us. You have everything to GAIN by being courteous, friendly, and helpful, and everything to LOSE by being discourteous, unfriendly, and unconcerned. IF, JUST ONCE, WE FAIL TO SERVE THEM WELL—THEY MAY LEAVE US, NEVER TO RETURN.

Here are some pointers to keep in mind in your relationship with our "Boss," or the CUSTOMER:

1. LEARN TO SMILE, OFTEN. Start an epidemic of smiling! It's so much easier to smile than it is to frown. Give a smile and receive one in return.

2. ALWAYS GREET THE CUSTOMER. A friendly, "GOOD MORNING!" and a sincere "THANK YOU!" makes shopping and working a pleasure.

3. NEVER ARGUE. Be attentive to a complaint. Remain courteous and, if there is a misunderstanding, call the Manager.

4. AVOID OVER-FAMILIARITY. Call customers "Mr.," "Ma'am," "Miss," "Sir," or "Mrs." Be careful of teasing customers. Do not make remarks that might be misunderstood about an item a customer has purchased. Since it is in the shopping cart, we must assume it was needed, wanted, and the customer can afford it.

5. BE HONEST. Never misrepresent a product.

6. REMEMBER THE FOOD CITY GUARANTEE. All merchandise is sold with a 100% satisfaction guarantee. The full purchase price is refunded if the merchandise has not given complete satisfaction.

7. GIVE EQUAL SERVICE TO ALL CUSTOMERS. Every customer is important and is welcome in our store.

8. DO NOT SOLICIT TIPS BY WORD OR ACTION. Your Company compensates you for the services you perform. Solicitation of tips is grounds for immediate dismissal.

9. "IT'S THE LITTLE THINGS IN LIFE" THAT COUNT —

   Say "THANK YOU" for consideration shown, and purchases made.

   Say "EXCUSE ME" when you must interrupt.



K-VA-T
000005

Say "PLEASE" when you ask for something.

Say "I'LL FIND OUT" instead of "I DON'T KNOW" when asked a question.

10. At Food City, we have a reputation for speedy checking, bagging, and loading. We must all work at it and cooperate fully. We will call to the front additional "courtesy clerks" as needed to quickly handle customer traffic. At this point, THE CUSTOMER does not want to be delayed. We have a duty to see that delays are kept at a minimum. Any associate, regardless of job classification, is expected to assist on the "front" when requested. Our customers make payday possible - Let's keep them happy!

# EMPLOYMENT POLICIES AND PROCEDURES

## OUR WORKING RELATIONSHIP

We welcome you to our Company and want you to enjoy your work here. Our management team is pledged to help you in every way.

During your first few months with us, you will find your supervisor and coworkers alike working more closely with you than at any time of your employment here. Their years of experience will give you a "helping hand" and "head start" with your orientation and job training. Food City will always be interested in you and your job here. Should you ever wish to leave our employment or should we desire to end the employment relationship, we both are free to do so at will. If this should happen, we encourage a notice of separation on your part and prior counseling on our part, depending on circumstances, giving us both time to hopefully prevent any misunderstanding or unfortunate separations.

Thank you for joining our team. We need your unique contribution and look forward to a mutually beneficial work experience.

At Food City, we recognize that, other than our customers, you are our most important asset. Without you, the Company cannot function and prosper. No matter what your role, you are an important part of our organization.

Therefore, with respect to you and all our other associates, Food City's goals and objectives are:

1. To provide for all our associates a healthy and wholesome atmosphere in which to work, not only in physical surroundings but in attitudes, actions, and communications.

2. To make sure that everyone in our organization knows what is expected of him or her and is properly compensated for the work he or she performs.

3. To recognize the rights of each individual.

4. To allow plenty of opportunity for promotion and advancement.

5. To recognize that our customers are the reason for our existence as an organization and to serve them courteously and serve them well.

6. To conduct all our operations in an ethical and upstanding manner in order to generate, by our actions, a reputation as a progressive, growing Company, eager to make the community a better place in which to live.

The Company's employment objective is to select individuals who meet high standards of personality, character, education, and occupational qualifications, who can carry on our work competently, who have a capacity for growth, and who will become an important part of our organization.

Food City realizes that its fundamental strength and future growth depend directly upon the contribution made by each person within its organization, that productivity and efficiency result from real job satisfaction and from the opportunity each person receives and accepts for his or her individual self- development.

The Company's employment policy is, therefore, designed to:

1. Place each associate, insofar as is possible, in a position that suits his or her natural aptitudes and skills.

2. Offer each associate opportunity for self-development and advancement through on-the-job training.

3. Recognize the importance of the work of each associate to the overall Company performance.

## EQUAL EMPLOYMENT OPPORTUNITY

It is Food City's policy to grant equal employment opportunities to all qualified persons without regard to race, color, sex, religion, age, national origin, disability, veteran's status, or any other protected status.

## LEGAL WORK STATUS

The Immigration Reform and Control Act of 1986 requires that all associates hired by Food City provide documentation proving that they have a legal right to work in the United States.

In compliance with this Act, all job offers extended to successful applicants are made contingent upon the receipt of the required documentation and completion of USCIS Form I-9.

## NO HARASSMENT

Food City does not tolerate the harassment of its associates, customers, or vendors. Any form of harassment relating to an individual's race, color, sex (including same sex), religion, age, national origin, handicap or disability, citizenship status, veteran status, or any other protected activity or category, is a violation of this policy and will result in disciplinary action up to and including dismissal.

Food City will not allow anyone to create an intimidating, hostile, or offensive environment. This includes supervisors, associates, or non-associates such as vendors.

The term "harassment" as used in this policy includes, but is not limited to, the following:

- Offensive remarks, comments, jokes, slurs, or verbal conduct pertaining to an individual's race, color, sex, religion, age, national origin, handicap or disability, citizenship status, or any other protected category
- Offensive pictures, drawings, photographs, or other graphic conduct or communications, including e-mail, faxes, and copies pertaining to an individual's race, color, sex, religion, age, national origin, handicap or disability, citizenship status, or any other protected category
- Offensive sexual remarks, sexual advances, or requests for sexual favors, regardless of the gender of the individuals involved
- Offensive physical conduct, including touching, regardless of the gender of the individuals involved
- Retaliation against an employee for refusing to respond to requests for sexual favors, for reporting a violation of this policy, or for participating in an investigation conducted under this policy

If you feel you are the victim of harassment, please notify anyone in management. You do not necessarily have to first notify your immediate supervisor of such a situation. Feel free to contact anyone in the Company's



K-VA-T
000008

management, including the Vice President of Human Resources, the Company President, or the Chairman of the Board. You are responsible for bringing your concerns about possible policy violations to our attention so that we can take appropriate actions to address your concerns.

## HOW AND WHY YOU WERE SELECTED

The success of Food City and your future here depends upon you. This is why we carefully select our associates through application, careful interview, and reference checking.

## PRE-EMPLOYMENT SCREENINGS AND EXAMS

After an offer of employment has been given, but before you actually start working, you may be asked to take a health examination at the Company's expense. Drug and alcohol screening may also be required. You may also be required to take another physical examination or drug and alcohol screening, at Company expense, when Food City determines it is job-related and consistent with business necessity.

## ILL ASSOCIATES

Food City recognizes that associates with life-threatening illnesses, including but not limited to cancer, heart disease, AIDS, or other disabilities, may wish to continue in as many of their normal pursuits as their condition allows, including work. As long as these associates are able to meet performance standards, with or without accommodation(s), and medical evidence indicates that their condition is not a danger to themselves, others, or property, Food City will endeavor to be sensitive to their conditions and treat them consistently with other ill associates. At the same time, the Company must provide a safe workplace for all associates and customers.

Food City offers the following range of resources available through Human Resources:

- Management and associate education and information on illness or disabilities including specific life-threatening illnesses
- Referral to agencies and organizations that offer supportive services for life-threatening illnesses or disabilities
- Benefit consultation to assist associates in effectively managing health, leave, and other benefits



K-VA-T
000009

# TYPES OF EMPLOYMENT

There are four (4) personnel classifications:

**FULL-TIME** — Any person who is regularly scheduled to work thirty-five (35) hours per week or more is classified as a full-time associate and is eligible to receive certain benefits.

**PART-TIME** — Any person who is regularly scheduled to work less than thirty-five (35) hours per week or whose work schedule must be specifically arranged because of other commitments of the associate (such as school) is classified as a part-time associate.

**PART-TIME STUDENT TRAINEE** — A part-time associate who is a full-time student of an accredited school. When school is in session, twenty (20) hours is the maximum time a part-time student trainee can work in one (1) week, except when a full-day, school holiday occurs on a day the store is open. The twenty (20) hours weekly limitation maybe increased by eight (8) hours for each holiday. When school is not in session, they cannot work more than eight (8) hours per day and forty (40) hours per week. These associates will be paid student rates.

**TEMPORARY** — Any person who is hired for temporary work on any schedule which does not exceed four (4) calendar months. Temporary personnel may be on a part-time or full-time schedule of work hours.

# NEW HIRES

It is the policy of Food City to hire all new entry-level associates (other than temporaries) as part-time.

# EMPLOYMENT OF RELATIVES

Family members and close relatives are permitted to work in the same store or work location. Close relatives are not permitted to work directly for, or in a supervisory role of, a relative. "Close relatives" defined as spouse, in-laws, brothers, sisters, children, or parents. Any exceptions to this policy must be approved by the Vice-President of Human Resources and is only granted in unusual circumstances.

# ORGANIZATION MEMBERSHIP IS NOT REQUIRED

Our federal law gives you the right not to have to join any organization in order to hold your job. It is not necessary for any associate to have to join

and pay dues and other union fees to any union in order to work at Food City.

It is the policy of our Company to pay wages that compare favorably with other wages in similar businesses in our area—to give the best possible working conditions we can to treat each associate as an individual.

Even more important, it is our intention to do everything possible to furnish excellent job security for anyone who works in our Company and provide that person with the best possible job satisfaction. It is our Company policy to promote from within the Company whenever possible. Only when a person with the qualifications for the job to be filled is not available, do we look to outside sources.

We believe that a labor union is an unnecessary third party and could seriously interfere with our ability to treat you and our customer in the manner you both deserve.

In the best interests of you and the Company, we will oppose, by every moral and legal means, any attempt by any outside organization to disturb or break up the fine relationship we enjoy.

## WE WANT YOU TO FEEL AT HOME

You may feel a little strange in your new surroundings. However, it will not take you long to get acquainted. Your fellow associates, especially your supervisor or Store Manager, will work closely with you and will provide you with all the information you need to better understand our policies and practices. If you need help, ask them.

## OUR PERFORMANCE REVIEW — YOUR PROGRESS REPORT

All of us like to know how we are doing on the job. Day-to-day comments from department managers help, but now and then there is a need to review all phases of your work performance. In our Company, we have "performance reviews." This procedure requires each supervisor to evaluate the performance of every person under their supervision. The purpose of these reviews is to provide management and you with a periodic review of your performance on the job and to identify any areas where you can improve your performance. Your review will cover the following points:

1. The amount of work you accomplish

2. The accuracy and thoroughness of your work

3. Knowledge of your job duties
4. Your dependability and attendance on the job
5. Your attitude toward your job, fellow associates, and the Company
6. Your ability to organize and plan your work
7. Your personal appearance
8. Your housekeeping skills—cleanliness in work area, floor, etc.
9. The enthusiasm and initiative you demonstrate in your work
10. Your attendance—willingness to work schedule required—tardiness and absence record
11. Your courtesy and cooperation toward fellow associates and customers

Our performance review program provides valuable information to use when considering associates for future promotion, transfers and adjustments to pay rate. In addition, our performance review gives you an opportunity to have a personal discussion of your performance with your immediate supervisor, and to learn how you can improve your on-the-job performance. If you have any questions about how you are doing, or what you can do to improve your performance, please ask your supervisor to visit with you in private. Your supervisor will always try to help you in every way possible.

## PROMOTIONS

At Food City, as in all organizations, different positions have different degrees of difficulty and relative importance to the operation of the Company. The more important of these positions are designated as full-time. Certain other positions may be filled by either full-time or part-time associates as required by the demands of the particular store or department. Within these full-time or part-time positions there are varying degrees of responsibility, proficiency, and/or ability which are all considered in the placement of a person in a particular job.

From time to time, vacancies occur for whatever reason, and at this time a replacement must be selected.

In making a selection to fill a vacancy, it is our policy to always look first at the junior associates within the Company for qualified candidates. Here, job performance, ability to learn, and aptitude are most important. Should we find more than one candidate of equal qualifications, the one with the

longest length of service would be selected. Only when no junior associate is found qualified, do we go out of the Company to hire.

## GUIDELINES FOR LAYOFF AND RECALL

Food City has a history of full employment, and we do not expect to have layoffs. However, if economic or business conditions create an unusual situation which makes it necessary to cut back our work force, then each job will be carefully checked along with each associate's record. Qualifications, past performance, and length of service of each associate will be the guidelines upon which such decisions are made.

## IMPORTANCE OF YOUR LENGTH OF SERVICE— SENIORITY

At Food City, we believe in recognizing your seniority and length of service. Seniority is given to associates through length of service which brings certain privileges and considerations. We have a good seniority program. Usually, this date is the day you were hired for the first time. However, if your seniority has been broken through resignation, discharge, or extended layoff, then your seniority date becomes the last day you were hired following the break in seniority. Associates having the same date of hire will hold seniority in alphabetical order.

Your seniority is important to you in the following ways:

1. It represents the investment in time and money by Food City in your training and experience. This gives you more job opportunity and promotion possibilities as your experience increases along with your seniority.

2. Your seniority has direct relationship to certain of our important associate benefits which are based upon length of service, such as paid vacations.

3. In case we should ever have a layoff, due to business conditions beyond our control, your seniority will give you more work opportunity provided you have necessary qualifications and seniority.

4. Your seniority is also recognized through your length-of-service awards.

## HOW YOUR SENIORITY WORKS

Seniority really starts to matter when you become a full-time associate.



K-VA-T
000013

From this day, your seniority will accrue (unless temporarily interrupted due to an approved leave of absence for personal reasons) until it is broken for one or more of the following reasons:

1. If you voluntarily quit or resign
2. If you are discharged
3. If you fail to report back to work within three (3) workdays after a recall from layoff
4. If you are laid off for a consecutive period of more than six (6) months
5. If you overstay an authorized leave of absence or vacation
6. If you are on sick leave longer than six (6) months unless an extension is granted by your Company
7. If you give a false reason for a leave of absence or accept employment elsewhere during an authorized leave of absence
8. If you falsify information on your pre-employment or post-employment personnel forms
9. If you are absent without notification or excuse for a period of two (2) consecutive days (scheduled workdays), you will be considered as having voluntarily quit your job

## YOUR LENGTH OF SERVICE

Our Company proudly recognizes the service our associates give to the community and to our Company each year. We are very proud of all associates who have been with us for a long time. So you may also convey to your friends and neighbors your years of service with Food City, we award handsome service pins for men and women. A pin is awarded to each associate who has completed two, five, ten, twenty, twenty-five, thirty, and forty years of service with our Company.

For purposes of seniority, our Company recognizes your prior service with another company or store that has joined us by purchase or merger.

We are glad you are here—we hope you like us and will receive many service awards.

## ADVANCEMENT—HOW TO GET AHEAD

As you acquire more skill and experience in your present position and

as job openings occur at a higher level, you will have the opportunity for advancement. As we indicated before, it is our policy to promote from within the Company whenever possible, taking into consideration such items as merit, performance, and length of service.

As you advance in positions of more responsibility, you will reach a point at which, in order to continue advancement, a move to another store or even another town may be required. We understand the difficulty this can cause for some; however, as a practical matter, we call it to your attention.

Your supervisors will be glad to discuss your opportunities for promotion with you. They will help you improve your potential for promotion and tell you how to get ahead.

## IS SOMETHING TROUBLING YOU?

When a group of people are closely working together, a few misunderstandings are bound to occur. We all recognize that everything is not going to run smoothly all the time. If something is bothering you, if you are discouraged, worried, or upset about your work or some outside problem, you cannot work at full efficiency. Feel free to discuss any problem with your Department Manager or Store Manager. They are interested in your welfare and will do what they can to help the situation. If neither can help, you will be referred to someone who can.

## SPEAKING UP—RESOLVING COMPLAINTS OR PROBLEMS THROUGH HEARINGS

In the event the efforts of your supervisor or Store Manager to resolve a problem for you fail, and if you feel it is of such nature that top management of the Company can help you solve it, then please communicate, preferably in writing, with the Company Vice President of Human Resources in Abingdon, VA.

Food City cares about all Company associates, and we are anxious to hear about any problems or complaints that cannot be resolved at the store level. There will be absolutely no discrimination against anyone who appeals a problem, so please, don't let the problem grow. Write, or if you feel you cannot adequately write, then call the Vice President of Human Resources immediately. You will receive a hearing by the Vice President of Human Resources.

Should you still be dissatisfied, you may make one last appeal to the Chief Executive Officer, who will render the final and binding decision.

The purpose of our hearing procedure is to help you work out any

complaint or problem that you might have. Remember, the only way we can understand and help you with your problems or complaints is if you come to us and explain your individual situation.

## PROGRESSIVE DISCIPLINE POLICY

At Food City, we believe discipline is not meant to be punishment in any way. However, when it becomes necessary to change an associate's performance or behavior from unacceptable to acceptable, our Progressive Discipline Policy enables us to endeavor to do so in a consistent manner.

Normal steps in the disciplinary process are outlined below. However, at management's discretion, management may enter into any level of disciplinary action, including termination.

**Oral Correction**—The supervisor will provide an oral correction to the associate. A written record of this correction will be placed in the associate's personnel file.

**Written Correction**—The supervisor will consult with higher management and prepare a written correction. The associate will be asked to sign indicating receipt of a copy of the written correction, and a copy will be placed in the associate's personnel file.

**Suspension Without Pay**—If the written correction does not correct the problem, the associate may be suspended without pay for a minimum of three (3) days. This suspension without pay must have the approval of the Chief Executive Officer.

**Termination**—The supervisor may recommend termination of associates. Recommendations will be reviewed by management, which will determine the action to be taken.

If the associate feels the termination is unfair, he or she may use our Open Door Policy or Hearing Procedure, if appropriate. Based upon this discussion, the appropriate Company officer will make a final determination in the case.

Management reserves the right to enter into any level of disciplinary action or termination depending on the circumstances.

## YOUR GUIDE TO PERSONAL CONDUCT

Food City wants to provide a good work environment for all associates. This desire is expressed in many forms: safe working conditions, maintenance of facilities and equipment, equitable wage structures, and progressive

benefit programs. In turn, it is reasonable to expect a good productive effort and the recognition of responsibility on the part of associates.

Each of us has the responsibility to our fellow workers to conduct ourselves according to certain rules of good behavior or conduct. In any business, some rules are needed to help everyone work together by letting them know what they can and cannot do. We expect our associates to follow our Company rules and show good behavior and efficiency. For these reasons, we have included, in our handbook, a number of work rules. You are expected to read, understand and follow these rules in your day-to-day work.

Disciplinary action, whether oral or written, is given only for the purpose of correcting someone for doing something wrong. Having to dismiss an associate is unpleasant for everyone, and we try to work with each associate to avoid such action. However, failure to follow our work rules is against the best interests of our other associates and our Company, and usually leads to dismissal. Should you have any questions, at all, concerning any work rule listed, please see your supervisor.

In order to be absolutely fair, we have what we call a "wash-out" period for certain disciplinary actions. An associate should not be penalized unless there is a repetitious problem. Therefore, after having made a "mistake," we will "wipe the slate clean" if no more rule infractions occur within twelve (12) months from the date of the last rule violation.

Food City rules are basically common sense, requiring conduct acceptable to a customer service oriented employment environment. When these common sense practices are violated, disciplinary action may be taken. While the following list is not all-inclusive, some of the violations which can result in disciplinary action—including discharge—are:

1. Inefficiency, unsatisfactory performance or customer service, or lack of application or effort on the job
2. Committing action which affects the safety of equipment, associates or customers
3. Violating a safety rule or practice
4. Knowingly completing the timecard or time record of another associate; having one's card or record completed by another associate; or unauthorized altering of a timecard or time record
5. Being late for work without proper notice or excuse
6. Being absent one (1) day without proper notice or excuse
7. Being absent two (2) consecutive days without proper notice or excuse
8. Loafing or spending unnecessary time away from job



K-VA-T
000017

9. Leaving your job or your regular working place during working hours for any reason without authorization from your Store Manager, except for lunch
10. Leaving work before the end of the regular workday or not being ready to work at normal starting time
11. Failure to follow check-cashing procedures
12. Unauthorized use of Company telephones
13. Violation of associate purchasing policy
14. Smoking, eating, or drinking in restricted areas
15. Possession or consumption of alcohol or illegal drugs on Company premises, or reporting to work under the influence of intoxicants or drugs - under the influence means not only obvious impairment, it also means physical evidence that a substance has been consumed on or off Company premises
16. Disorderly conduct on Company property
17. Immoral or indecent conduct on Company property
18. Foul or abusive language to any supervisor, associate, or customers
19. Concealment of a disease that will endanger fellow workers or customers
20. Falsification or misrepresentation of a fact or facts in any Company record, document, time record, invoice or any other Company-related matter
21. Any misrepresentation, falsification of information, or omission of information or other facts in seeking employment, no matter when discovered
22. Dishonesty or removal of another person's property or Company property without permission
23. Willful destruction of Company property
24. Insubordination (refusal to follow instructions or an order)
25. Gambling on Company property or while on the job
26. Instigating a fight on the job
27. Unauthorized possession of firearms, fireworks, or explosives on Company property
28. Contributing to unsanitary conditions
29. Unauthorized presence in store office, or other restricted areas
30. Writing bad checks
31. Failure to adhere to dress code
32. Parking in unauthorized areas
33. Reckless driving on Company property



K-VA-T
000018

34. Failure to properly account for funds entrusted to you
35. Conduct which reflects discredit upon the Company
36. Failure or refusal to cooperate with a Company investigation
37. Failure to promptly report to your workstation
38. Any three (3) minor offenses—minor offense may be any offense that has an oral or written warning of the first offense

Violations of Company policies outlined in other sections of the handbook, or habitual offenders of various Company rules, will be dealt with by written correction to dismissal, depending upon frequency and nature of offense

The above list of Company rules and causes for corrective action is by way of illustration to inform all associates what is expected of them in their daily work performance at this Company. It is not intended to be all-inclusive. Provisions may be modified, added, or deleted.

## TERMINATION OF EMPLOYMENT

Termination of employment is always unpleasant and costly so you can be sure it won't be considered lightly. If, however, discharge becomes necessary, advance notice may or may not be given depending on the circumstances, and unused vacation will not be paid.

## OTHER EMPLOYMENT

We realize that many of our associates, and particularly our part-timers, have other employment in one form or another. This is agreeable to us so long as it neither interferes with the associate's work attendance or job performance nor creates a conflict of interest.

The following are considered by our Company as a "Conflict of Interest:"

1. Active ownership of, or platonic interest in, a business operation competitive with ours in any way.
2. Employment with a competitor doing business in the retail grocery industry.
3. Employment directly or indirectly with a sales company (direct vendor, manufacturer, or food industry brokerage) which makes sales and/or service calls on any store owned by our Company or those owned by our competition.

Any associate whose other employment is considered a "Conflict of Interest" will be subject to immediate dismissal.

## SHOULD YOU RESIGN

We hope you remain with us for a long time. However, sometimes personal affairs force a change in jobs. In such cases, please give your supervisor at least two weeks' notice. This courtesy will allow your supervisor enough time to adjust working schedules and secure a replacement. Also, your advance notice will reflect favorably on your employment record. Payroll checks will be made available on the next regularly scheduled payday.

Whenever possible, an exit interview will be conducted for anyone who resigns. It is to your advantage to participate in this interview so that we can give you information about your benefits. Also, we will want to have your honest opinion on our Company policies and practices which will enable us to improve our relationship with everyone.

## COMPANY REFERENCES

We are glad to cooperate with former associates by answering, as fully as possible, any inquiries which may be received from their prospective employers. Your Company, however, does not give general open "To Whom It May Concern" letters of recommendation. Company references may not be issued by anyone other than the Human Resources Department.

## RE-EMPLOYMENT

Anyone who has voluntarily left our employment and whose work performance met our standards while employed will be considered for re-employment status in any position for which they are suitable, and possess appropriate skills and experience. Such individuals will be considered as new associates, with no continuation of any previously earned but forfeited Company benefits or seniority. These associates will complete all pre-employment paperwork.

# YOUR HOURS OF WORK AND YOUR PAY

## PAYROLL WORKWEEK



The official payroll workweek begins at 12:01 A.M. Saturday morning and ends at 12:00 midnight Friday. Your particular work schedule will depend on your job. Your Manager will explain your work schedule to you. Should you ever have any question on when you are to be at your workstation, ready to work, please ask your Manager.



K-VA-T
000020

Due to the nature of our particular business, we are sometimes not able to establish a definite number of hours to be worked each day. Sometimes schedules must be changed because of business conditions or because fellow associates are unavailable for work. Schedule changes are inconvenient for all concerned, including your Manager, but sometimes they are necessary. Regular posted schedules will be followed whenever possible. Your cooperation will be appreciated, and we will try to cooperate with you.

## TIME RECORDS

Due to various federal regulations and in keeping good business practice, we are required to show the time worked on a daily basis for each associate. Please check with the Store Manager for detailed instructions on the system which is in use at your location.

Please be certain to enter data on your time card or time record when you are supposed to. If you forget or make an error, notify your Manager, at once, who will make the correction. It is important to report your time accurately. Reporting false information is prohibited and can lead to dismissal.

When clocking out on the last day of the week, review your card or time record carefully to see that all your hours of work are recorded properly, and sign the card or time record to certify that it is correct.

In addition to regular work time, associates will be paid for — and the time clock should be used to record — time spent in meetings, lectures, and training programs, as well as travel time required by the Company, on the same basis as if it were regular work. Whenever the programs required are away from the time clock, the time to be credited will be added to the timecard or time record by the Store Manager.

## OUR PAY POLICY

It is our Company policy to pay wages and salaries comparable to those paid for similar jobs and services in our surrounding area. We maintain our wage and salary structure by periodically conducting wage surveys. We adjust our wage and salary ranges in accordance with the business and general economic conditions of our Company.

The pay range for your individual job classification is determined by the requirements of your job with such factors considered as responsibility, skill, training, education, and working conditions. Wage increases are based upon your record of performance on the job and your particular job classification.

## PAYDAY

Paydays at Food City are handled on a weekly basis. Your paycheck for the previous workweek will be available to you every Thursday. The pay you receive is for work you performed during the previous workweek. Paychecks are typically deposited directly to your bank or pay card that you have indicated. If you have elected to receive pay through a paper check, you may pick it up on Thursday.

## SHOULD YOU FIND AN ERROR IN YOUR PAY

Every precaution is taken to avoid errors in your paycheck. If an error does occur, tell your Manager. If an error is found, the adjustment will be made on the next paycheck.

## OVERTIME

For hourly associates, all work performed in excess of forty (40) hours in a payroll week will be paid at one-and-one-half (1-1/2) times the average hourly rate of pay earned during the first forty (40) hours.

## PREMIUM RATE

Full-time, retail associates who are scheduled and work between 9:00 P.M. and 6:00 A.M. receive a 50 cent-per-hour premium for all hours worked between these times. Additionally, those full-time associates working on Sunday will also receive the 50 cent-per-hour premium. However, premium rate is paid only during the first forty (40) hours worked during any week.

## REST PERIODS

Rest periods are paid time provided by the Company for your relaxation and enjoyment. Rest periods are given for not more than fifteen (15) minutes in duration during every four (4) hours or more worked. All rest periods are to be recorded as directed by your Store Manager.

Rest periods are scheduled by your Department Manager when they will least interfere with the operation of the store or service to the customers.

Normally, you are not to leave the store premises during rest periods. Should you need to leave for any reason, please get the prior approval of your Store Manager.

## MEAL PERIODS



Anyone working more than six (6) hours per day is normally scheduled to take one (1) hour for a meal. This meal period will be scheduled by your supervisor and will be around the middle of your shift. You must never exceed five (5) hours working time either before or after a scheduled meal period. For night stock associates only, the meal period may be shortened to not less than thirty-five (35) minutes by special permission of your Store Manager. This time is your own, and you are free to use it as you see fit. Please try to make your personal calls during this time. Always take the full time set aside for your meal period unless requested to do otherwise by your Manager. During this meal period, you are not to perform any work whatsoever. It's important to record your time at the beginning and end of your meal period.

## YOUR PAYROLL DEDUCTIONS

Does your paycheck represent the full amount of your earnings? No. We are required to deduct your federal and, where applicable, state income tax from your paycheck. This deducted amount is turned over to the United States and State treasuries, and you are given credit for it on your income tax at the end of the year. The amount of the tax deduction is determined by your earnings and the number of your dependents. Each year, you will receive a W-2 showing your total earnings for the year and the amount of taxes withheld.

Also, out of your paycheck will come deductions for Social Security at the rate established by law. Your Company contributes an equal amount of that deducted from your wages. Any other deductions such as health plan coverage, etc., must be authorized by you before they can be made.

# BENEFITS

## THE PAYCHECK ISN'T ALL—THERE'S MORE

Your weekly paycheck does not represent your entire compensation from Food City. Not only do you receive cash wages each week, but you also may receive a substantial number of benefits, which while not paid in cash, still represent real dollars to you and your family. These benefits include such items as paid vacations, paid holidays, various types of insurances, etc. We want you to have a full understanding of your benefits so we are devoting an entire section to the discussion of each one.



K-VA-T
000023

If you have any questions concerning any of your benefits, please ask your supervisor or contact the Human Resources Department.

## YOUR VACATION WITH PAY



We believe that our full-time associates should have a time of rest and relaxation each and every year. Vacation with pay is for this purpose and is one of the ways we show our appreciation to you for your length of service and good work. For this reason, it is Company policy to require that at least one (1) week of earned vacation be taken each year. Vacation time due in excess of one (1) week may be taken in increments of one day or more at a time.

Full-time associates who have been with the Company for a minimum of twelve (12) continuous months since their last date of hire or the date on which they became a full-time associate, whichever is later, will receive a vacation according to the following schedule:

| LENGTH OF SERVICE | PAID VACATION |
|---|---|
| After 1 year of continuous service | 1 week |
| After 3 years of continuous service | 2 weeks |
| After 10 years of continuous service | 3 weeks |
| After 20 years of continuous service | 4 weeks |

Continuous service of one (1) year means twelve (12) continuous months since the last date of employment or since becoming a full-time associate. In most instances, the date you become a full-time associate is established as your vacation effective date. In the event an associate is off on a leave of absence, the vacation effective date will be adjusted accordingly. An example would be an associate who worked for ten (10) months, was off for two (2) months on a personal leave of absence, and returned. That associate would have to work two (2) additional months in order to be eligible for a regular vacation period, i.e., the ten (10) months previous uninterrupted service and then the two (2) months when he or she returned from their leave would make the equivalent of twelve (12) continuous months.

Vacations may be taken at any time during the year, except for the heavy holiday period. We must consider that we are a service industry and that our customers are our real employers, and as such, their demands must be met first, vacations scheduled second. In order to be sure we maintain sufficient manpower to serve our customers, all vacations to be taken

during the peak vacation period of May 15 - September 15 will be scheduled no later than April 15. In order to do this, each Store Manager will have each department head draw up a schedule reflecting your requested period. This will be accomplished by allowing the more senior associates first choice and most junior associates last choice.

Vacations taken outside this peak period may be requested on shorter notice, but it is always best to allow at least a thirty (30)-day planning time.

Due to variation in the number of hours worked by hourly associates during the year, and in order to be fair to all concerned, vacation pay will be the total of regular and premium hours for the fifty-two (52) calendar weeks prior to your full- time date (vacation effective date) divided by fifty-two (52), then multiplied by your current straight-time rate of pay. For this vacation hour's calculation, vacation taken as time off will be included as time worked.

May we repeat again — vacation is earned by completing a full year of continuous service; vacation is never prorated but rather earned totally by passing the vacation effective date. You will become eligible for vacation pay only after passing your vacation effective date.

Part-time service will not be counted in determining length of service.

An associate who voluntarily quits without giving the Company at least two (2) weeks' notice, or is discharged, forfeits all vacation rights.

## HOLIDAYS

Full-time associates, after the successful completion of ninety (90) calendar days, shall be eligible for the following holidays:

- New Year's Day
- Memorial Day
- Independence Day
- Your Birthday
- Labor Day
- Thanksgiving Day
- Christmas Day



To qualify for holiday pay, you must work the scheduled day before and the scheduled day after a holiday, unless your absence on either of these days has been excused in writing by your Store Manager. Holiday pay will amount to the average number of hours worked on a daily basis during the prior thirteen (13) weeks. This average will be calculated by adding up the total hours worked at regular or premium pay during the prior thirteen (13) weeks divided by thirteen (13) then further divided by five (5) to determine



K-VA-T
000025

the length of the average work day, then multiplied by the current rate of pay at straight time. For this purpose, vacation time taken as time off will be included as time worked. For example: if your average workweek in the prior thirteen (13) weeks is forty (40) hours, we would divide by five (5) to determine that your average work day is eight (8) hours. Then your holiday pay would be eight (8) hours multiplied by your straight-time rate of pay.

Holiday hours are not included in computing overtime for the week in which the overtime occurs. Associates will receive holiday pay no matter what day in the week the holiday falls. Should you be required to work on a holiday, you shall be paid straight-time hourly rate for the time worked in addition to your holiday pay. If you are scheduled to work on a holiday and you then fail to show up and perform the work, you will not receive holiday pay unless you have an acceptable excuse for failing to report to work.

If the paid holiday falls during your vacation, you will be paid for the holiday in addition to your vacation, but an additional day off will not be granted. To be eligible for a paid holiday that falls within your vacation period, you must have worked your last regularly scheduled workday in the week prior to your vacation and your first regularly scheduled workday in the week after your vacation period.

Associates on any type of leave of absence other than two weeks' military reserve training leave, will not receive pay for holidays during their leave.

It is Company policy to require time off be taken for your birthday holiday. Whenever it is not in the best interests of the store for your actual birthday to be taken as a holiday, another day close to the holiday, and mutually agreeable to both you and your Store Manager, shall be substituted.

## JURY DUTY



If you are summoned for jury duty, please tell your Store Manager as soon as possible. As good citizens, any of us are subject to being called for jury duty. In order to avoid any severe financial loss to you from serving on a jury, the Company will pay a full-time associate the difference between jury duty pay and the amount you would have earned. The daily jury duty pay will amount to the average number of hours worked on a daily basis during the prior thirteen (13) weeks, less any compensation received for jury duty and any compensation for hours worked. You are expected to work on any day when you are not required to perform jury service. Juries are frequently excused for all or part of a day. It is certainly not our intent to subsidize this time off. To be eligible for jury duty pay, you must get a statement from the



K-VA-T
000026

court clerk indicating the time you served on the jury and the amount you received as jury duty pay and turn the statement in to your Store Manager.

## BEREAVEMENT PAY

All actively employed full-time associates who have completed their ninety (90)-day waiting period may receive scheduled time off with pay if they attend the funeral of a member of their immediate family. The immediate family is defined as father, mother, grandparents, grandchildren, husband, wife, child, sister, brother, and immediate step-relatives. The associate may receive a maximum of three (3) scheduled work days off with pay starting the day of the funeral and two days prior. Bereavement pay is based on the average number of hours worked on a daily basis during the prior thirteen (13) weeks, less any hours worked.

This bereavement pay is intended to offset lost income to you during this sad period. Should you suffer no loss of income due to a change of schedule still allowing you to work your regular schedule during this pay period, you would have no loss of income.

For associates in their waiting period, and part-time or temporary associates, funeral leave without pay will be granted upon the death of a member of the immediate family.

## HEALTH CARE AND DENTAL PLANS

Health care and dental plans are important benefits available to full-time associates. You should know about the health care and dental plans you have and what is available for you by being a full-time associate of Food City. This is a real protection that we are happy to provide for you and your family's benefit.

So you and your family may have the complete understanding and appreciation of the many benefits available under our group plan, we suggest you read the plan summary published by the health care plan administrator. Plan documents are available on My Profile or from the Human Resources Department.

All full-time associates are eligible for health and dental coverage on the first day after completing the ninety (90)-day waiting period, subject to timely completion of required enrollment process. If you are not actively at work on the date you are eligible to become covered, you will be insured on the first day you return to work.

Full-time associates are also eligible to extend medical and dental coverage to your dependents at the Company's group rate. This is, by far, the most inexpensive method to obtain this protection, and we highly recommend that you elect to use it if needed.

## LIFE INSURANCE

All full-time associates are eligible for life insurance coverage after completion of their ninety (90)-day waiting period. If you are not actively at work on the date you are eligible to become covered, you will be insured on the first day you return to work. The Company pays the full cost of your coverage.

The amount of coverage depends on your job classification and years of service.

At the time you become eligible for life insurance, you will receive a copy of the policy. Coverage is automatic, and you are not required to take any action to receive coverage.

## UNEMPLOYMENT INSURANCE

Your Company pays the entire cost of this insurance. Its purpose is to provide temporary income for workers and their families when, through no fault of their own, they have lost their jobs. To be eligible, a person must have earned a certain amount in covered employment and be willing and able to work.

Your Company pays a percentage of its payroll to the Unemployment Compensation Fund according to the Company's employment experience. If you become unemployed through no fault of your own, you may be eligible for unemployment compensation for a limited period of time under the laws for the states in which we operate. The laws are administered by the State Unemployment Compensation Commission. Applications for benefits are made through your local State Employment Service Offices.

## YOUR STOCK OWNERSHIP PLAN (ESOP)

Your Company has established an Employee Stock Ownership Plan which allows you to participate in the growth of the Company. The success of the Company, and all our combined efforts, determine the financial support the Plan will provide for your retirement years. The cost of the Plan is paid entirely by the Company.

You are eligible to participate in the Plan when you have completed one (1) year of service, received credit for 1,000 hours of service during this period, attained to age of twenty-one (21), and are employed at the end of the Plan year. More detail is provided in the separate "Summary Plan Description."

Your Company Human Resources Department will be glad to answer any questions you may have about the Plan.

# 401(k)

Your Company offers a 401(k) retirement plan available to both part- and full-time associates. You are eligible to participate in the Plan when you are twenty-one (21) years of age, complete one (1) year of service, and work at least 1,000 hours during the year to receive matching contributions. For every dollar you put in the Plan, your Company will make a matching contribution equal to 100% of your elective deferral that does not exceed three percent (3%) of your compensation each payroll period. More detail is provided in the separate "Summary Plan Description."

Your Company Human Resources Department will be glad to answer any questions you may have about the Plan.

# YOUR SOCIAL SECURITY BENEFITS AND PAYMENTS

Federal Social Security provides a variety of benefits including old age retirement payments, death benefits, disability insurance, and monthly income payments, to certain dependent survivors of covered associates. A percentage of your gross salary is deducted, as required by law, as your contribution for this protection. Your Company contributes an equal amount to that deducted from your wages. The Social Security programs are in addition to the benefit programs for associates offered by the Company.

# WAGE REPLACEMENT
# (Short-Term Disability)

**Full-Time Hourly Associates**

After the completion of your ninety (90)-day waiting period, you are eligible to participate in the disability insurance plan if you are a full-time associate.

If you become totally disabled because of non-occupational sickness or injury so that you are prevented from performing all of the duties of your occupation, you will receive a weekly income at a rate of sixty percent (60%) of your basic hourly rate. Payments will begin on the first (1st) day of disability due to an accident or the eighth (8th) day of disability due to sickness (except from the first day hospitalized if less than eight (8) days) and will continue for not more than twenty-six (26) weeks of any continuous disability. Written proof of disability will be required. Benefit payments will end on the earliest of the following dates:

1. The first day the associate returns to work;

2. The day a doctor's statement releases the associate to return to work; **or**

3. The expiration of the benefit payment duration of twenty-six (26) weeks.

While you are on such personal disability leave status, your medical and life insurance payment will be continued by the Company on the same cost basis as if you were working.

If you are not able to come back to work after twenty-six (26) weeks, you may request, in writing, a ninety (90)-day personal leave of absence. In exceptional circumstances, an additional ninety (90)-day personal leave may be granted. In no circumstances will the total disability and personal leave exceed fifty-two (52) weeks.

When you are given your return-to-work release by your medical doctor, it is important that you contact your Store Manager as soon as possible. It may have been necessary to replace you in your present position. Except as provided by law, upon return to work from disability leave, there is no guarantee of re-employment; however, the associate who has been on an extended disability leave will be considered for re-employment when a suitable position becomes available. All persons on a disability leave are given re-employment priority over those on a personal leave of absence.

In the event you are on a medical leave of absence with an insurance company other than those representing our Company liable to pay you benefits, and benefits are not being paid to you through either our K-VA-T disability plan or worker's compensation, your K-VA-T medical and life insurance may be continued only at your expense, except as provided by law.

If you are not able to return to work after twenty-six (26) weeks (or longer by the length of a personal leave of absence, if granted), you will be terminated from our active payroll.

1. Supply the proper claim forms to your doctor or hospital at the time of the claim.

2. Follow up on claims in process (with the Human Resources Department).

3. Completely pay all insurance premiums due during a leave of absence in advance of the leave starting date.

4. Upon the occurrence of a qualifying event, a full-time associate may continue health care coverage through the CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT of 1986 or COBRA. Your family



K-VA-T
000030

members may also continue coverage if they are no longer eligible because of your death, divorce, or because a child reaches the age limit. It is very important to let the Human Resources Department know of any changes that may affect your coverage. The length of time you may be covered depends on why you are no longer eligible for group insurance.

It is the associate's (your) responsibility to file any claim for disability benefits which you may be due and return completed forms from the physician to Human Resources.

Notify the K-VA-T Human Resources Department of the following in order that your insurance information may be kept current:

a. Change of marital status
b. Change in number or status of dependents
c. Change in beneficiary (life insurance)
d. Any other significant changes of status

**Full-Time Salaried Associates**

Salaried associates, after completion of the 90-day waiting period, are eligible to apply for a full weekly income for the first thirteen (13) weeks of disability, and up to an additional thirteen (13) weeks at 75% of the base salary. Income eligibility requires you to provide Human Resources with the appropriate medical documentation and clinical notes from the attending physician for determination of benefits.

Your Human Resources Department will be glad to help you with any of the above!

## PERSONAL LEAVE OF ABSENCE

An unpaid leave of absence may be granted for personal reasons to any associate after completion of their ninety (90)-day waiting period. All leave of absence requests must be presented in writing to the Store Manager, who shall forward it, along with his recommendation, to the Vice President of Human Resources for consideration. The appropriate officers of the Company shall then decide, within a reasonable time, whether or not to grant the request and advise in writing of the decision.

All such leaves of absence shall be for a specific period of time, not to exceed ninety (90) days, and must be requested two (2) weeks in advance of the starting date, whenever possible. The Company may, if requested, extend a leave of absence for a period up to an additional ninety (90) days.

All such approved leaves of absence will contain a specific date to be available to return to work. The associate on leave of absence, who desires to return, must reapply at least two (2) weeks prior to this scheduled date. There is no guarantee of immediate re-employment; however, the associate will be considered for re-employment when a suitable position becomes available, and a new date to report is set. Any associate who fails to return to work on this date will be considered to have quit without notice. Any associate, while on such a leave of absence, who accepts other employment will be considered to have quit.

An associate does not earn any benefits during a personal leave of absence. Examples would be vacation, holiday pay, etc.

Further, during an unpaid leave, the Company does not continue to pay for the health plan coverage the Company provides the associate. The associate should contact the Store Manager to make arrangements for payment prior to the leave starting date if he or she desires to maintain the insurance program during the leave of absence.

## FAMILY AND MEDICAL LEAVE OF ABSENCE

Your Company has always been concerned about any associate's need for a leave of absence. Our policies have always been generous, in that respect, and designed to meet your needs. On August 5, 1993, a new federal law became effective which governs many leave of absence situations for practically all of your Company's full-time associates and for many part-time associates. This law is called the Family and Medical Leave Act of 1993 (FMLA). A brief summary of associate's rights is printed below in the language suggested by the U.S. Department of Labor. All of your Company's leave of absence policies pertaining to family and medical leaves will be administered in compliance with the FMLA. In the event that there is a conflict between any leave policy and the requirements of the law, the law will prevail. In some instances, your Company's policies may be more generous than that required by law.

Eligible employees may take up to twelve (12) weeks of unpaid, job-protected leave each year for specified family and medical reasons.

**Employee Eligibility:** To be eligible for family or medical leave, employees must have worked at least:

1. Twelve (12) months for the Company; and

2. 1,250 hours for the Company over the previous twelve (12) months.

**Conditions Triggering Leave:** Family and medical leave must involve one or more of the following reasons:



K-VA-T
000032

1. To care for a newly born child, or placement of a child with the employee for adoption or foster care.

2. To care for an immediate family member (spouse, child, or employee's parent) with a serious health condition.

3. The employee has a serious health condition which makes the employee unable to perform the employee's job duties.

4. Because of any qualifying exigency arising out of the fact that the employee's spouse, son, daughter, or parent is a covered service member on active duty, or who has been called to active duty.

5. To care for a covered service member with a serious injury or illness if the employee is the spouse, child, parent, or next of kin of the service member.

**Duration Of Leave:** For leave other than to care for a covered service member, eligible employees may receive up to twelve (12) workweeks of unpaid leave during any "rolling" twelve (12)-month period, measured backward from the date of any family or medical leave. Family and medical leave involving the birth or placement of a child for adoption or foster care must be concluded within twelve (12) months of the birth or placement.

Eligible employees may take family and medical leave intermittently — which means taking leave in blocks of time, or by reducing your normal weekly or daily work schedule — whenever it is medically necessary to care for a seriously ill family member, or because you are seriously ill and unable to work, or for leave based on a qualifying exigency, or to care for a covered service member. Intermittent leave is not permitted for birth of a child or placement of a child for adoption or foster care.

Eligible employees may take up to twenty-six (26) weeks of leave to care for a covered service member with a serious injury or illness in a single twelve (12)-month period, measured forward from the date that such leave begins.

Subject to certain conditions, eligible employees may choose (or the Company may require you) to use accrued paid leave (such as sick time or vacation leave) as a substitute for some or all of the family and medical leave.

Particular limitations apply to certain leaves when both spouses are employed by the same employer. If these limitations apply, the Company will inform you when responding to your request for leave.

**Maintenance Of Health Benefits:** The Company will maintain coverage for eligible employees and dependents (if applicable) during family and

medical leave. This coverage will be provided if you or your family were covered under the plan before the leave was taken and on the same terms as if you had continued to work. Where appropriate, you must make arrangements to continue to pay your share of health plan premiums while on leave.

In some instances, the Company may recover premiums it paid to maintain health coverage for you and your family if you do not return to work from your leave.

**Job Restoration:** Upon returning from a family and medical leave, eligible employees will normally be restored to their original job, or to an equivalent job with equivalent pay, benefits, and other employment terms and conditions. However, an employee does not continue to accrue additional benefits such as personal leave and vacation, for example, while on family and medical leave.

Use of family and medical leave cannot result in the loss of any employment benefit that employees earned, or were entitled to, before using family and medical leave.

**Notice And Medical Certification:** When seeking family and medical leave, employees may be required to provide:

1. Thirty (30) days advance notice of the need to take family and medical leave, if the need is foreseeable.
2. Medical certifications supporting the need for leave due to a serious health condition affecting you or an immediate family member. Second or third medical opinions (at the Company's expense), and periodic recertification may also be required.
3. Periodic reports during the leave regarding your status and intent to return to work.
4. Medical certification of fitness for duty before returning to work, if the leave was due to your health condition.

When leave is needed to care for an immediate family member or for the employee's own illness, and is for planned medical treatment, the employee must try to schedule treatment so that it will not unduly disrupt the Company's operation.

**Extended Medical Leave:** Eligible employees who have exhausted their family and medical leave, and all other employees, may be allowed to take extended medical leave of absence, not to exceed twelve (12) months following the last day worked. Employees who take such extended medical leave are not guaranteed to be returned to work or reinstatement

to a particular job, rate of pay, or shift, at the end of their extended medical leave. However, the Company will attempt to return employees to their regular position if it is available. If it is not available at the time reinstatement is sought, we will attempt to place you in a similar job for which you are qualified, if such job is available. Employees on extended medical leave may maintain their insurance benefits, subject to policy terms and conditions by paying the applicable COBRA premiums in a timely manner. Employees on extended medical leave do not accrue any additional employee benefits such as personal leave or vacation while on extended medical leave.

**Other Employment:** Outside employment during your leave period is prohibited and may result in disciplinary action, up to and including, immediate termination of employment.

**Failure to Return from Leave or Comply with this Policy:** Employees may be subject to immediate termination for:

1. Failure to return to work within twelve (12) months of the beginning of a medical leave;
2. Failure to return to work within twelve (12) weeks of the beginning of a family leave;
3. Failure to return to work as scheduled following the end of a medical or family leave;
4. Providing false or misleading information or omitting certain information in connection with a family or medical leave; or
5. Violation of any of the Company's rules and regulations relating to a family or medical leave (or any other policy or performance standard).

## EMPLOYEE RIGHTS AND RESPONSIBILITIES UNDER THE FAMILY AND MEDICAL LEAVE ACT

### Basic Leave Entitlement

FMLA requires covered employers to provide up to twelve (12) weeks of unpaid, job-protected leave to eligible employees for the following reasons:

- For incapacity due to pregnancy, prenatal medical care or child birth;
- To care for the employee's child after birth, or placement for adoption or foster care;
- To care for the employee's spouse, son or daughter, or parent, who has a serious health condition; **or**

- For a serious health condition that makes the employee unable to perform the employee's job.

**Military Family Leave Entitlements**

Eligible employees whose spouse, son, daughter, or parent is on covered active duty or call to covered active duty status may use their twelve (12)-week leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

FMLA also includes a special leave entitlement that permits eligible employees to take up to twenty-six (26) weeks of leave to care for a covered service member during a single twelve (12)-month period. A covered service member is: (1) a current member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious injury or illness;* or (2) a veteran who was discharged or released under conditions other than dishonorable at any time during the five (5)-year period prior to the first date the eligible employee takes FMLA leave to care for the covered veteran, and who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness.*

*The FMLA definitions of "serious injury or illness" for current service members and veterans are distinct from the FMLA definition of "serious health condition."

**Benefits and Protections**

During FMLA leave, the employer must maintain the employee's health coverage under any "group health plan" on the same terms as if the employee had continued to work. Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.

Use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

**Eligibility Requirements**

Employees are eligible if they have worked for a covered employer for at least twelve (12) months, have 1,250 hours of service in the previous twelve (12) months, and if at least fifty (50) employees are employed by the employer within seventy-five (75) miles.

## Definition of Serious Health Condition

A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job, or prevents the qualified family member from participating in school or other daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than three (3) consecutive calendar days combined with at least two (2) visits to a health care provider or one (1) visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

## Use of Leave

An employee does not need to use this leave entitlement in one block. Leave can be taken intermittently or on a reduced leave schedule when medically necessary. Employees must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the employer's operations. Leave due to qualifying exigencies may also be taken on an intermittent basis.

## Substitution of Paid Leave for Unpaid Leave

Employees may choose or employers may require use of accrued paid leave while taking FMLA leave. In order to use paid leave for FMLA leave, employees must comply with the employer's normal paid leave policies.

## Employee Responsibilities

Employees must provide thirty (30) days' advance notice of the need to take FMLA leave when the need is foreseeable. When thirty (30)-days notice is not possible, the employee must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedures.

Employees must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Employees also must inform the employer if the requested leave is for a reason for which FMLA leave was previously taken

K-VA-T
000037

or certified. Employees also may be required to provide a certification and periodic recertification supporting the need for leave.

### Employer Responsibilities

Covered employers must inform employees requesting leave whether they are eligible under FMLA. If they are, the notice must specify any additional information required as well as the employees' rights and responsibilities. If they are not eligible, the employer must provide a reason for the ineligibility.

Covered employers must inform employees if leave will be designated as FMLA-protected and the amount of leave counted against the employee's leave entitlement. If the employer determines that the leave is not FMLA-protected, the employer must notify the employee.

### Unlawful Acts by Employers

FMLA makes it unlawful for any employer to:

- Interfere with, restrain, or deny the exercise of any right provided under FMLA; **and**
- Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

### Enforcement

An employee may file a complaint with the U.S. Department of Labor or may bring a private lawsuit against an employer.

FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State or local law or collective bargaining agreement which provides greater family or medical leave rights.

FMLA section 109 (29 U.S.C. § 2619) requires FMLA covered employers to post the text of this notice. Regulation 29 C.F.R. § 825.300(a) may require additional disclosures. For additional information:

1-866-4US-WAGE (1-866-487-9243)
TTY: 1-877-889-5627
www.wagehour.dol.gov
U.S. Department of Labor Wage and Hour Division

# PARENTAL LEAVE POLICY

The Parental Leave Policy applies to some Tennessee employees as defined below:

**A. General**

Employees who have been employed for at least twelve (12) consecutive months as full-time employees may be absent for a period not to exceed four (4) months for adoption, pregnancy, childbirth and nursing an infant. With regard to adoption, the four (4)-month period shall begin at the time an employee receives custody of the child. Any time off under this policy will also count toward an employee's use of FMLA leave (if the employee qualifies for FMLA leave), and such leaves shall run concurrently to the extent possible.

**B. Notice to the Company**

Employees who give at least three (3) months advance notice of their anticipated date of departure for such leave, their length of leave, and their intention to return to full-time employment after leave, shall be restored to their previous or similar positions with the same status, pay, length of service credit and seniority, wherever applicable, as of the date of their leave.

Employees who are prevented from giving three (3) months advance notice because of a medical emergency which necessitates that leave begin earlier than originally anticipated shall not forfeit their rights and benefits under this section solely because of their failure to give three (3) months advance notice.

Employees who are prevented from giving three (3) months advance notice because the notice of adoption was received less than three (3) months in advance shall not forfeit their rights and benefits under this section solely because of their failure to give three (3) months advance notice.

**C. Other Provisions**

1. Leave will be without pay, except that employees will be required to use accrued vacation and sick leave as under the Company's FMLA policy. Such leave shall not affect the employees' right to receive vacation time, advancement, seniority, length of service credit, benefits, plans or programs for which the employees were eligible at the date of their leave, and any other benefits or rights of their employment incident to the employees' employment position; provided, that the Company need not provide for the cost of any benefits, plans or programs during the period of such leave, unless the Company so provides for all employees on leaves of absence.

2. If an employee's job position is so unique that the Company cannot,

after reasonable efforts, fill that position temporarily, then the Company need not reinstate the employee at the end of such leave period.

3. The purpose of this section is to provide leave time to employees for adoption, pregnancy, childbirth and nursing the infant, where applicable; therefore, if the Company learns that the employee has utilized the period of leave to actively pursue other employment opportunities, or if the Company learns that the employee has worked for another employer during the period of leave, then the Company will not reinstate the employee at the end of such leave.

4. Whenever the Company determined that the employee will not be reinstated at the end of such leave because the employee's position cannot be filled temporarily, or because the employee has used such leave to pursue employment opportunities or to work for another employer, the Company will notify the employee.

## MILITARY SERVICE LEAVE OF ABSENCE

If you enter the military service, we will do our best to protect the career which you began with us. The Uniformed Services Employment and Reemployment Rights Act (USERRA) provides the guidelines for reemployment of individuals who voluntarily or involuntarily leave their employment to undertake military service. We will work to comply with this and other similar laws that promote reemployment following an individual's service time.

## MILITARY RESERVE OR NATIONAL GUARD TRAINING LEAVES



If you are a member of a Military Reserve or National Guard Unit and must serve a short period of active duty (usually not more than two (2) weeks), you may take a military leave of absence, without Company pay. Or you may arrange to take your unused vacation with pay during your tour of active duty.

Please give your Store Manager four (4) weeks' notice when you plan to serve.

## WORKER'S COMPENSATION

Your Company pays 100% of this protection for you. This is designed to assist you if you are hurt accidentally while at work. The specific benefits that you may be eligible for are determined by the workers compensation laws and regulations of the state where you work.

While you are on a Worker's Compensation leave status, your medical and life insurance payments will be continued by the Company on the same cost basis as if you were working.

If you are unable to return to work – with or without a reasonable accommodation – after twenty-six (26) weeks, you will be offered a ninety (90)-day leave of absence. All leave of absence requests must be returned to Human Resources for consideration. If you are unable to return to work at the end of the ninety (90)-day leave, you may request a second ninety (90)-day leave of absence. If you are unable to return to work at the end of the second leave of absence, or do not apply for a second leave, you will be terminated from active payroll. After termination, any full-time associate may continue health care coverage through the Consolidated Omnibus Budget Reconciliation Act of 1986 or COBRA.

# YOUR RESPONSIBILITIES TO FOOD CITY

## YOUR PART

Along with the advantages and opportunities offered by our Company go certain responsibilities—obligations that you will want to meet. Your most important responsibility, of course, is to do a good job on the work which is assigned to you by your supervisor. Your supervisor is responsible for what you do, so it is a good idea to respect experience, listen to his/her instructions he/she gives, and carry them out promptly and cheerfully. Completing each assignment to the satisfaction of your supervisor is the surest way to make progress.

In addition to following instructions, doing a good job requires you to think for yourself—ask questions and make constructive suggestions. You will find that your supervisor will appreciate your efforts to do an outstanding job and improve your Company.

Doing a good job also implies certain obligations on your part, such as maintaining good health and mental alertness, using good judgment, being prompt and regular in your attendance, cooperating with your fellow workers, and being loyal to your Company—its people, its customers, and its services. You will want to keep well informed about your Company

so that you will be able to talk intelligently about it to your friends and neighbors. To them, you represent Food City and what you say can do much to shape their final opinion of it.

## SUBSTANCE ABUSE

If we are to continue to fulfill our responsibility to provide reliable and safe products and services to our customers and a safe working environment for our associates, associates of Food City must be able to perform their duties in a safe and efficient manner. Therefore, no associate shall work or report to work while under the influence of alcohol or illegal drugs, nor under the influence of prescription or non-prescription medication which would affect their ability to perform their job in a safe and efficient manner. Under the influence means not only obvious impairment, it also means physical evidence that a substance has been consumed on or off Company premises. No associate shall consume, display, or have in their possession, on Food City property, alcoholic beverages or illegal drugs at any time during their workday, including in the workplace or in Company vehicles, during lunch breaks, and on-call hours. To do so could jeopardize the safety of other associates, the public, Company equipment, and the Company's relations with the public, and is prime cause for disciplinary action, up to and including dismissal.

Should you be required to take any kind of prescription or non-prescription medication which affects your job performance, you are required to report this to your supervisor. Your supervisor will determine if it is necessary to temporarily place you on another assignment to ensure your safety and the safety of our associates and the public.

To protect the best interests of associates and the public, management at Food City will take whatever measures are necessary to determine if alcohol or illegal drugs are located on or are being used on Company property. Measures that may be used include, but are not limited to, searches of people and of personal property located on Company premises, which may be conducted by law enforcement authorities or by management, as well as drug and/or alcohol tests. The above-mentioned searches and drug tests will not be conducted if an individual refuses to submit; however, refusal to submit will result in immediate removal from service and may result in termination.

Associates experiencing problems with alcohol or other drugs are urged to voluntarily seek assistance to resolve such problems before they require management referral or disciplinary action. A portion of the cost of treatment may be covered by your health plan, and you may have to assume responsibilities for the cost of a portion of the treatment. Successful treatment will be viewed positively. However, participation in a treatment program will not prevent normal disciplinary action for a

violation which may have already occurred, nor will it relieve an associate of the responsibility to perform assigned duties in a safe and efficient manner.

## BEGIN ON TIME

In order for all our jobs to work together satisfactorily, we must all be present and on time every day. If, for any reason, you are unable to be at your work at your regular starting time, please call your supervisor so that schedule adjustments can be made. If you are unable to report to work because of illness or emergency, please notify your supervisor at the earliest possible moment.

## ATTENDANCE

Of course, we want you to be at work every scheduled day. However, we know that it may occasionally be necessary for you to be absent from work because of illness or personal reasons. In those cases, please notify your supervisor at least one (1) hour before the beginning of your scheduled starting time. Advance notification is necessary so that proper arrangements can be made to handle your work during your absence. However, notification – while helpful – does not necessarily excuse the absence.

## RUMORS—THE COMPANY GRAPEVINE

Rumors have a habit of flying around from time to time, and some people seem to take delight in passing them on as the gospel truth. When you hear a rumor, please ask your supervisor "for the truth."

## CARE OF EQUIPMENT

Your Company has invested thousands of dollars in equipment which is designed to enable you to do your work more efficiently. Your cooperation in the care and use of this equipment is necessary to maintain it in good operating condition. If any of our equipment is defective or is not best for the job, please notify your supervisor immediately. A few timely repairs may prevent complete breakdown of the equipment.

## GOOD HOUSEKEEPING

One sure indication of a good associate is the condition and appearance of his or her work area. Orderliness in your work area reduces accidents, improves health conditions, reduces fire hazards, adds to the efficiency of your work, improves the quality of our service, and portrays a favorable image to customers who may be touring our facilities. We can all help by

placing trash and refuse in the containers provided, and by applying a few simple rules of cleanliness. It is everyone's responsibility to help keep Food City clean and sanitary as we work.

## NAME BADGES

To help you develop friendly relations with your customers and fellow associates, Food City provides you with an attractive name badge to be worn on the upper left side of your vest or smock, or on a Company-provided lanyard. This badge is a means of identifying yourself to your customers and is a sign of your willingness to help them. These name badges must be worn at all times while on duty. If you lose your badge, another can be purchased from your Store Manager.

## PERSONAL APPEARANCE

Our Company's professional atmosphere is maintained, in part, by the image we present to our customers and vendors. We expect all associates to present a neat, well-groomed appearance and a courteous disposition. These qualities go further than any other factors in making a favorable impression on the public and your fellow workers.

Dress should be appropriate for your position and must conform to the established standards. You may view job specific uniforms/dress code on Fast Track or you may ask your Manager to provide additional information on the dress code policy for your particular position. Company-issued uniforms are available, or you may choose to purchase Company apparel to wear instead. You should avoid extremes in dress. Skimpy or revealing clothing is unacceptable. Associates should dress in a business-like manner. Jeans (unless authorized by your Manager), t-shirts, unauthorized sweatshirts, unauthorized shorts, miniskirts (more than 3" above the knee), form-fitting apparel, "hotpants," short tops, halter tops, backless dresses, slouch or "hang down" pants (pants worn below the waistline), flip-flops, sandals and hats (except as required for sun protection or in production areas) are NOT ACCEPTABLE attire in the workplace. Furthermore, the Company's professional image can be tarnished because of customers' negative reactions to excessive piercings. For that reason, we do not allow associates to display jewelry which may be offensive to our customers. Due to health and food safety concerns, no one working in production areas may wear any jewelry, except a plain wedding band. Other non-production area associates may wear jewelry in moderation. Proper head covering or hairnet and protective clothing must be worn when required by State Health Department regulations. The Company's professional image can also be adversely affected by an associate's display of visible body tattoos. For this reason, tattoos should be covered, whenever possible, but in no instance may they be offensive. Good personal hygiene is also important in terms of our customers' favorable opinion and in terms of your respect



K-VA-T
000044

for your fellow associates. Accordingly, associates are expected to come to work in a clean condition—no body odor or dirty appearance will be tolerated.

Associates are expected to observe our Personal Appearance Policy at all times while at work. Associates who report to work in unacceptable attire or appearance may be requested to leave work and return in acceptable attire or appearance. Such time off from work will be without pay.

**Managers are responsible for insuring that associates project a professional image and adhere to our Personal Appearance Policy. The interpretation of the above rules will be strictly at the discretion of the Store Manager or supervisor. Failure to conform to established standards of dress and grooming may result in disciplinary action.**

## DRESS CODE

### For All Associates

1. Name badges must be worn at all times.
2. Personal body cleanliness must be maintained at all times—no body odor or dirty appearance will be tolerated.
3. Comfortable, neat, low-heel shoes are required. (No flip-flops or open-toe shoes are allowed.) Shoes must be kept neat, clean, and laces must be tied at all times.
4. Proper head covering or hairnet must be worn when required by State Health Department regulation. Beard guards must be worn if applicable.
5. No jeans may be worn except where specifically allowed in the dress code.
6. Company-furnished uniforms must be kept neat and clean.
7. Fingernails must be trimmed, filed, and maintained so the edges and surfaces are smooth and easily cleaned. Additionally, associates in food service areas (Meat, Seafood, Produce, Salad Bar, and Bakery/ Deli) may not wear fingernail polish or artificial fingernails.
8. Jewelry, when worn, should be modest and in good taste.
9. Associates will neither eat, drink, smoke, nor use other forms of tobacco at any time while on duty. This applies to all K-VA-T personnel, as well as to any manufacturers or distributor sales representatives when working in Food City stores.

10. Food City hooded sweatshirts and jackets must be worn over approved apparel.

**For All Female Associates**

1. Cosmetics may be used in moderation.
2. Tan khaki pants (with belt) or tan khaki skirts must be worn.

**For All Male Associates**

1. Haircuts and beards are to be kept neat, clean, and of moderate length.
2. Tan khaki pants must be worn (with belt).

**Non-Management female associates in the following departments: Grocery, Front End, Fuel, Floral and GoCart:**

Choose one of the following options:

1. Smock furnished by the Company, must be properly buttoned. Blouses visible under the smock must be of business attire and a matching color. Short or long sleeve will be acceptable.
2. Food City polo shirt, furnished by the Company, must be tucked inside pants.
3. Food City sweatshirt, purchased by the associate, must be worn with a collared shirt or turtleneck.

All full-time associates will be provided with three smocks and/or Food City polo shirts. Part-time associates will be provided with two smocks and/or Food City polo shirts. Additional uniforms may be purchased.

**Non-Management male associates in the following departments: Grocery, Front End, Fuel, Floral and GoCart:**

Choose one of the following options:

1. Vest, furnished by the Company, must be properly buttoned and worn with a dress shirt suitable for wearing with a man's business suit.
2. Food City polo shirts, furnished by the Company, must be tucked inside pants.

3. Food City sweatshirt, purchased by the associate, must be worn with collared shirt or turtleneck.

4. Caps or head coverings are not permitted while on duty except with special permission from your Store Manager. A Food City approved cap may be worn.

All full-time associates will be provided with three vests and/or Food City polo shirts. Part-time associates will be provided with two vests and/or Food City polo shirts. Additional uniforms may be purchased.

**Male and female associates in the following positions: Front-End Managers and Customer Service Coordinators:**

1. Manager polo shirt, furnished by the Company, must be tucked inside pants and worn while on duty.

2. Tan khaki pants must be worn (with belt). Females may also wear tan khaki skirts.

All full-time associates will be provided with three shirts. Part-time associates will be provided with two shirts. Additional uniforms may be purchased.

**Bakery/Deli and Salad Bar Department Associates:**

1. All Bakery/Deli and Salad Bar associates must wear a Company-furnished coat, properly buttoned at all times while on duty.

2. Blouses or shirts worn under the coat must be suitable attire.

3. Black or tan khaki pants must be worn (with belt). Females may also wear black or tan khaki skirts.

4. A hat, furnished by the Company, must be worn at all times while on duty.

All full-time associates will be provided with three coats and one hat. Part-time associates will be provided with two coats and one hat. Additional uniforms may be purchased.

**Meat, Seafood and Sushi Associates:**

All meat, seafood and sushi associates will follow the same uniform instructions for male and female front-end associates with the following exceptions:

1. An apron or jacket, furnished by the Company, must be worn at all times while on duty.

2. A hat, furnished by the Company, must be worn at all times while on duty. Additional hats may be purchased.

**Produce Associates:**

All produce associates will follow the same uniform instructions for male and female front-end associates with the following exceptions:

1. A green coat or green apron, furnished by the Company, must be worn at all times while on duty.

2. Company-furnished hats must be worn at all times by associates while on duty or when working in the preparation area. Additional hats may be purchased.

**Male and female associates in the following positions: Pharmacy Manager and Pharmacist:**

1. White Pharmacist coats will be furnished by the Company and must be properly buttoned and worn while on duty.

2. Male Pharmacists will wear either a Food City Pharmacy polo shirt (which may be purchased from the Company) or dress shirt suitable to be worn with a business suit.

3. Female Pharmacists will wear either a Food City Pharmacy polo shirt (which may be purchased from the Company) or dress blouse.

4. Dress pants must be worn. Females may also wear skirts.

All Pharmacy Managers and full-time Pharmacists will be provided with three white Pharmacist coats. All part-time Pharmacists will be provided with two white Pharmacist coats. Additional uniforms may be purchased.

**Male and female associates in the following positions: Pharmacy Technicians and Certified Pharmacy Technicians:**

Tan khaki pants must be worn. Females may also wear tan khaki skirts.

Choose one of the following options:

1. Food City Pharmacy smock, furnished by the Company, must be properly buttoned. Blouses or shirts under the smock must be of business attire and a matching color. Short or long sleeve will be acceptable.

2. Food City Pharmacy polo shirt, furnished by the Company, must be tucked inside pants.

All full-time Pharmacy Technicians and Certified Pharmacy Technicians will be provided with three Pharmacy smocks and/or Pharmacy polo shirts. All part-time Pharmacy Technicians and Certified Pharmacy Technicians will be provided with two Pharmacy smocks and/or Pharmacy polo shirts. Additional uniforms may be purchased.

**Non-Management Associates**

During the period of April 1st until October 31st, Food City knee-length shorts may be purchased and worn instead of pants or skirts. The khaki shorts must be worn with a Food City polo shirt.

# WHAT FOOD CITY EXPECTS FROM YOU

## HONESTY

Absolute honesty is accepted as the first requirement of employment. The trust placed in everyone is based on complete confidence in that person's integrity. Many associates handle cash transactions, while all of us are responsible for goods, materials, or equipment of value. The good name you can earn for honesty is one of the greatest assets you can possess. Any dishonest act will be considered grounds for dismissal with forfeiture of all accumulated benefits.

Always remember—it's important to BE HONEST but it's doubly important not to let questionable actions appear to others to be dishonest. Your good name can be destroyed forever by one act of dishonesty.

## ENTHUSIASM

The outstanding person in any group is the one who is enthusiastic. The enthusiastic associate will take the interest in learning everything about his or her Company and will take every opportunity to improve the Company's operations and services and reduce expenses. Entering wholeheartedly into the promotion of your store, both as a successful business enterprise and as a group of educated people, will bring greater enjoyment in your immediate task and will mark you as worthy of assuming greater responsibilities.

## GETTING ALONG WITH OTHER PEOPLE

Some people have the natural ability to win friends with a smile, a handshake, or a pleasant word. Others have to work at it and keep trying



K-VA-T
000049

until they have learned to get along with others. Being fair, sincere, and cooperative is the easiest way to win friends and keep them whether they are customers or fellow associates.

Here are some things that DO NOT make work a pleasure:

a. Rumors
b. Arguments
c. Failure to cooperate
d. Irritable atmosphere
e. Failure to be productive

You are the one who can keep these things from happening.

## OUR TELEPHONE PRACTICE

Our telephones are maintained for Company business. Please refrain from using Company phones for personal calls. Repeated non-business calls are subject to reprimand.

Ask your friends and relatives not to call during working hours unless there is an emergency. If there is an emergency, you will be called to the telephone. Otherwise, the calling number will be taken and you will be notified so you may return the call on a rest or meal period.

## TELEPHONE COURTESY



All of us who answer telephones for the store should do so promptly and in a business-like manner. First impressions are very important. When answering the store phone, greet the caller with "Good Morning" or "Good Afternoon (your store name)." If you must leave the phone to get information to answer the caller's questions, or to call someone else to the phone be sure to tell the caller, "Just a moment, please, while I get that information for you." If an in-store call, such as in the Meat Department, you should answer, "Meat Department, (your Name) speaking." The important thing is to be friendly, cheerful, and helpful.

Should you ever find it necessary to put a caller on "hold" to transfer a call or reach someone to answer, it is your responsibility to check back and see that the call was answered. NEVER LEAVE A CALLER ON HOLD FOR MORE THAN THIRTY (30) SECONDS WITHOUT RE-ANSWERING THE CALL YOURSELF.

## PERSONAL CONTACT AT WORK

Visitation of associates by friends or relatives is not encouraged, and any such visits should be limited and be of a short duration. Socializing with friends or relatives while on duty, whether customers or associates, is prohibited.

We will not become involved in the domestic or love life of associates; therefore, domestic disputes on Company time or property are prohibited. An associate who permits his/her domestic problems to interfere in any way with the Company's business may be discharged.

## ASSOCIATE AS A CUSTOMER

Food City values your business and appreciates you as a customer. We hope you and your family will shop with us on a regular basis and support us as we support you.

For obvious reasons, all of us, associates, must observe certain rules of good business in making purchases. These are simple and easy to follow, and serve to protect us, as associates, and the store.

### Associate Purchase Policy

1. Never check out your own purchases or those of your family or close friends.
2. All persons connected with Food City will pay the full, regular price in effect on the day the merchandise is purchased.
3. All purchases for use or consumption within the store must be paid for immediately. The cash receipt for the purchases must be attached to the item or in your possession **at the time of consumption.**
4. All purchases to be removed from the store must be selected after clocking out for the day. Purchases must be checked out through the checkouts and taken out the FRONT DOOR in the same manner as any other customer. **You are not allowed to set items aside for purchase at a later time.**
5. Items, once bought, may not be stored in the store work spaces or refrigerated areas. Items found here will be considered the property of the store and be placed back on sale, **and/or destroyed.**
6. Store management has the right to inspect any packages taken out of the store.
7. **Items not from the regular sales display counter or shelf,**



K-VA-T
000051

**i.e., store supplies, case lots, etc., must be price marked and approved by a member of management.**

8. **Damaged and reduced merchandise may be purchased by our associates after being properly discounted by the Department Manager or member of store management and placed on the sales floor.**

Failure to follow the above procedures will result in disciplinary action up to, and including, dismissal **and/or prosecution.**

## WASTE PREVENTION

Waste of time, materials, equipment, and utilities is costly to your Company and to you. You can help make Food City prosperous by the amount of time you save, as well as the quality of work which you perform. You should make every minute count. Eliminate waste wherever possible. In the long run, you will benefit by helping to reduce operating costs because the amount of money which is saved by eliminating waste can be shared by all of us.

## ACCIDENTS AND INJURIES

All injuries and accidents, no matter how slight they may appear to you, must be reported to your supervisor at once. He or she will then direct you to the proper First Aid and medical attention. Failure to report an accident or injury will result in disciplinary action, even dismissal.

Do your best to eliminate accident hazards, but when an accident happens, report it immediately.

## FIRE PREVENTION

These rules are offered with the belief that many accidents can be prevented. However, rules alone will not prevent accidents; it takes the cooperation of all of us to see that accidents are eliminated. Report any unsafe condition to your supervisor and always try to THINK SAFETY.

1. Keep your store clean and see that all trash is removed from the workplace.
2. Be careful with burning cigarettes. Smoking is not permitted in any facility. Smoking should be in the designated areas only. Every associate should be conscious of the dangers of burning cigarettes.
3. Be conscious of all fire hazards. Everyone should become aware

of fire hazards resulting from faulty wiring, electrical motors, air conditioning and heating units, and refrigeration equipment. Any fire hazards should be reported at once to your Store Manager.

4. Know the location of the fire extinguishers in your store and be familiar with their operation.

## SAFETY

The first person to benefit from your observance of the SAFETY rules is yourself! Stay alert to situations which might be dangerous to YOU, YOUR FELLOW WORKERS, AND YOUR CUSTOMERS.

**The Most Important Safety Rules Are:**

1. Eliminate accident hazards! Keep the floors clean and free of water, paper, vegetable leaves, etc.; keep cases out of the aisles; keep merchandise on display and on the shelf straight; get rid of nails that stick out; keep storage area neat and straight. Never allow a possible accident hazard to exist. If you cannot eliminate it yourself, bring it to your supervisor's attention.

2. Use tools and equipment properly–keep them in safe working condition–and put them back in their proper places when you are finished.

3. Don't indulge in HORSEPLAY. If you are injured in "horseplay," normally you are not covered by Worker's Compensation Insurance.

4. Lift correctly by using these simple procedures:

   a. Never lift beyond your strength.
   b. Get a secure footing (feet 8 to 12 inches apart).
   c. Bend at the KNEES and grasp the object firmly underneath.
   d. Keep the back straight and as near UPRIGHT as possible.
   e. Lift gradually by straightening the legs with the strong leg muscles (keeping the back upright).
   f. Avoid jerky, twisting motions.

5. All aisles are to be kept clear.

6. If you drive a Company vehicle, do not speed beyond the limits established by the Company and those considered legal by town, city, state, or federal authorities.

These rules are offered with the belief that many accidents can be prevented. However, rules alone will not prevent accidents; it takes the cooperation of all of us to see that accidents are eliminated. Report any unsafe condition to your supervisor and always try to THINK SAFETY.

## PARKING




In the supermarket business of today, a store's volume of business is directly related to the parking facilities available. Preferred parking spaces should always be saved for those people who pay our salary—THE CUSTOMERS. Ask your Manager where you should park. Parking in unauthorized spaces is a violation of Company policy and disciplinary action will be taken.

## SOLICITATION

In the interest of the efficiency, convenience, and the continued goodwill of our customers, and for the protection of our associates, there shall be no solicitation or distribution of literature of any kind on the store premises by any associate during his or another associate's working time, or by other persons at any time. Working time is defined as all time during which associates are required to be working.

There shall be no distribution of literature of any kind, other than consumer information (such as menus, dietary information, etc.) prepared by the grocery industry or the government, by any person in customer service areas or shopping areas of the store.

Any associate who violates any provision of this rule shall be subject to counseling and disciplinary action up to and including discharge. Your Store Manager should be notified immediately when a violation occurs.

## SHOPLIFTING

Shoplifting is a serious problem in any retail business. Losses add to the cost of merchandise and can affect job security. We should be alert to all suspicious customers. Shoplifting is a very sensitive problem and must be handled by experienced associates to avoid difficulties.

If you see anyone in the store whom you suspect, don't say or do anything. Quickly report the incident to your Store Manager, Assistant, or the person in charge. If possible, do not let the suspect out of your sight. Under no circumstances is an associate to confront or openly accuse a customer of shoplifting. Only a Store Manager or person in charge has the authority to apprehend a shoplifter.



K-VA-T
000054

## HOLDUPS

Should a holdup occur, **remain as calm as possible**, and without hesitation, obey all orders by the holdup person. However, during their presence, be sure to concentrate on features, dress, scars, voice, automobile, tag number, etc., for identification at a later time.

# KEEPING IN TOUCH

## YOUR PERSONNEL RECORD

When you became employed by Food City, you completed an application supplying us with various facts we must know about you. This information was transferred to a permanent and confidential file that is the Company's employment record of you as an individual. Keeping this record correct and up to date is important to you because it enables the Company to reach you in an emergency, forward your mail, properly maintain your insurance and other benefits, compute your payroll deductions, etc.

Your Store Manager should be notified promptly of changes in:

1. Address and telephone number
2. Marital status (for insurance and withholding tax purposes)
3. Name
4. Beneficiary or dependents listed in your insurance policy
5. Number of dependents (for insurance and withholding purposes)

In addition, please let your Store Manager know about the completion of any training or educational courses, so that you may receive proper consideration as better job opportunities arise throughout the Company.

## BULLETIN BOARDS

Periodically, we post information of general interest to you on our Company bulletin boards. Please form the habit of checking these bulletin boards daily so that you will be familiar with the information found there. Only Company-authorized communications may be posted on the Company bulletin boards.

## IF YOU JUST WANT TO TALK...

All of us have our problems — sometimes small and sometimes not so small. Personal problems gang up on us, and we don't know where to turn. Whenever problems begin to bother you to the point of interfering with your work, your physical well-being, or your outlook on life, it often helps to get it off your chest. At





K-VA-T
000055

times like these, we want to help you, if we can, without being "nosy." Any of us will be glad to talk with you, in confidence, about any problems you may have. Naturally, we have your best interests at heart and are always willing to be helpful.

## ASSOCIATE RESPONSE LINE

Food City promotes an open door policy. Open communication creates an honest and productive work environment that benefits all associates. If you have suspect or observe unethical, illegal, or irresponsible workplace behavior, don't ignore the situation. Discuss it with a member of management, Human Resources, or Security/Loss Prevention. If you feel more comfortable, you may call the Associate Response Line at 1-866-601-5757. This toll-free number is available twenty-four (24) hours a day and seven (7) days a week for your convenience. You may also choose to email your concern to arline@foodcity.com. Concerns that would require you to contact the Associate Response Line would include, but not be limited to the following:

Harassment
Health or Safety Issues
Drug or Alcohol Abuse
Other Illegal or Unethical Practices
Theft or Fraud
Workers Comp Fraud
Workplace Violence

## HOTLINE TO MANAGEMENT

From time to time, you may be concerned about a situation or problem. Feel free to contact any member of management with questions. If you wish, you may contact the Corporate Office by mail or phone at:

Steve Smith
K-VA-T Food Stores, Inc.
P.O. Box 1158
Abingdon, VA 24212
Phone: (276) 623-5100

## OTHER INFORMATION

In addition to this associate policy handbook, you will receive other information from Food City, whether in written or electronic form. You will want to make this information available to your family so they may know more about your job and your benefits. In addition, you will receive letters at your home. There is no regular schedule for distribution of this information–the function of each letter or publication is to provide you and your family with interesting news and helpful information that will keep you up to date on the happenings at Food City.

# PLEASE KEEP THIS BOOKLET FOR FUTURE REFERENCE

## NOTES

# INDEX

Accidents and Injuries .......... 49
Advancement .......... 11
Appearance .......... 41
Associate as a Customer .......... 48
Associate Responsibilities .......... 38
Attendance .......... 40
Begin on Time .......... 40
Benefits .......... 20
Bereavement Pay .......... 24
Bulletin Boards .......... 52
Complaints .......... 12
Customer Relations
  Ten Commandments of Good Business .......... 1
  The Customer and You .......... 2
Discipline Policy .......... 13
Dress Code .......... 42
Employment Policies and Procedures
  Equal Employment Opportunity .......... 4
  Legal Work Status .......... 5
  New Hires .......... 7
  Other Employment .......... 16
  Re-Employment .......... 17
  Selection .......... 6
  Types of Employment .......... 7
  Working Relationship .......... 3
Equipment, Care of .......... 40
Fire Prevention .......... 49
Getting Along with Other People .......... 46
Harassment .......... 5
Health Care and Dental Plans .......... 24
Holdups .......... 52
Holidays .......... 22
Hotline to Management .......... 53
Housekeeping .......... 40
Ill Associates .......... 6
Insurance
  Disability .......... 26

Life ........ 25
Unemployment ........ 25
Worker's Compensation ........ 38
Jury Duty ........ 23
Layoff and Recall ........ 10
Leaves of Absence
Disability ........ 26
Family and Medical ........ 29
Military and Reserve ........ 37
Personal ........ 28
Length of Service ........ 11
Meal Periods ........ 20
Name Badges ........ 41
Organization Membership ........ 7
Other Information ........ 53
Parking ........ 51
Pay Policy ........ 18
Errors ........ 19
Overtime ........ 19
Payday ........ 19
Payroll Deductions ........ 20
Premium Rate ........ 19
Performance Review ........ 8
Personal Conduct ........ 13
Personal Contact ........ 48
Personnel Record ........ 52
Pre-Employment Screenings and Exams ........ 6
Promotions ........ 9
References ........ 17
Relatives ........ 7
Resignation ........ 17
Rest Periods ........ 19
Rumors ........ 40
Safety ........ 50
Seniority ........ 10
Shoplifting ........ 51
Social Security ........ 26
Solicitation ........ 51
Stock Ownership Plan (ESOP) ........ 25

Substance Abuse ........................................................ 39
Telephone ................................................................. 47
Termination of Employment ...................................... 16
Time Records ............................................................ 18
Vacation .................................................................... 21
Waste Prevention ...................................................... 49
Workweek .................................................................. 17

# RECEIPT FOR ASSOCIATE HANDBOOK

I have received my copy of the October 2021 Revision of the Food City Associate Handbook. I agree that this handbook and the policies, practices, and information contained herein, supersede any and all other associate handbooks, policies, practices, and information previously issued by K-VA-T Food Stores, Inc., or any other predecessor company. I agree to read my handbook and keep my handbook for future reference and observe present and any future Company personnel policies and rules outlined in this handbook. I further understand that this handbook is intended as a guide for personnel policies, benefits, and general information, and that these guidelines should not be construed as an employment contract.

I understand management reserves the right to make changes in the guidelines or their application as it deems appropriate, and these changes may be made with or without notice. I also understand that employment is terminable at the will of either the associate or the Company at any time, and that no representative of the Company other than the Chief Executive Off icer has any authority to make any contrary agreement.

Associate's Signature:______________________ Date:______________________

Manager's Signature:______________________ Associate ID No:______________________

Department:______________________ Store No:______________________

# Fast Track Learning System

Name:_______________________________

ID: _______________ Password: __________

It is important to protect your password and personal information by storing your booklet in a secure location.

FOOD CITY

Value. Everyday.™

© Copyright 2021 Food City

**Gary Richards**

**Sent:** Tuesday, November 30, 2021 7:56 AM

On 7/23/21 at approximately 10:00am Matt Batten ( fuel center associate ) came into the store to inform me that he had acquired a service dog and that the animal would accompany him while working. I told Matt that I had never dealt with this before and didn't know what the protocol was on allowing service animals at work. I told Matt I would seek advice from our Human Resource department and would have an answer for him before he started his shift at 2:00pm that day 07/23/21. David Ellison our HR representative was on vacation so we were instructed to reach out to HR representative Donny Rector for another region with any questions, concerns or issues in David's absents. I sent Donny an email at 10:26am 7/23/21 explaining the situation and asking to advise. Donny replied at 11:29am 07/23/21 asking if it was a service or emotional support dog, I replied back at 11:57am letting Donny know that Matt was claiming the dog was both service and emotional and when I received certification/documents for the animal I would email. Matt didn't return to the store until he started his shift and I asked that he remain with me in the office so I could email documents and get an answer. I emailed Donny at 2:17pm but never received an answer as to handle the situation ( allow or not allow to work). As I have never dealt with this situation, knowing the sensitivity of the subject of service animals and never receiving and answer from HR, I advised Matt that he could bring the animal to work with the understanding that may change based on review from the company. Matt agreed to this. I never received a response until David Ellison called me on 07/30/21 at approximately 4:00pm asking that I update him on the situation at which time I did and informed that I did allow Matt to work. David told me he would communicate with corporate and would get back with me. David contacted me on 08/02/21 to discuss the matter further and again on 08/05/21 to set up a meeting with Matt on 08/06/21 at 1:00pm. Matt worked the following days leading up to the meeting 07/23, 07/24, 07/25, 07/27, 07/30, 07/31, 08/01

Gary Richards

EXHIBIT
1-12-23
2
Richards
PENGAD 800-631-6989



K-VA-T
000132

EXHIBIT 1-12-23
3
Richards
PENGAD 800-631-6989

g effects ar
y ice to war
create exc

ile
e read all
in accord

# Graduation Certificate

## Class of July 2021

This certifies that

Mellow Joy

Has successfully completed teaching at

Canine Assistants, Inc.

As of this day July 20th in the year 2021

Certificate is awarded as a

Service Dog

I hereby attest that the named individual has successfully completed the required training course in accordance with Canine Assistants, Inc. guidelines respective to service dog training, is a recipient in good standing, and should be granted all rights and privileges under the applicable state code (attached) pertaining to service dogs in training and/or in service.

In accordance with applicable Federal & State laws, any person, firm, corporation, or the agent of any person, firm or corporation who denies or interferes with admittance to or otherwise interferes with the rights of a physically disabled person, or person engaged in the training of a guide or service dog shall be guilty of a misdemeanor and, upon conviction subject to the penalty as set forth in the appropriate state code (attached).

Jennifer Arnold, Executive Director

Canine Assistants, Inc.
3160 Francis Road - Alpharetta, GA 30004
(770) 664-7178 www.canineassistants.org

# Canine Assistants

*Educating the Dogs Who Change the World*

*Legal Access Provided by ADA*



**Matthew Batten**
**& Mellow Joy**

**I.D. #: CSD008291TN**

**Issue Date: July 2021**

# TENNESSEE
# STATE HAS LAWS REGARDING
# GUIDE: YES HEARING: YES SERVICE: YES

STATUE REGARDING ACCESSIBILITY: Title 62, Chapter 7, 62-7-112 (1996) and 66-7-104 (1972) and 66-7-106 (1989)
LOCATIONS ALLOWED: Any public accommodation, amusement or recreation, including but not limited to any inn, hotel, restaurant, eating house, barber shop, billiard parlor, store, public conveyance on land or water, theater, motion picture house, public educational institution or elevator.
STATUTE REGARDING INTERFERENCE: 62-7-112 (1996)
INTERFERENCE INCLUDES: No proprietor, employee, or other person in charge of any public accommodation shall refuse to permit a blind, physically disabled or hearing-impaired person to enter such place or to make use of the accommodations therein provided.
STATUE REGARDING HOUSING: 66-7-104 (1972) & 66-7-106 (1989) (Guide Dogs)
HOUSING INCLUDES: Any real property or portion thereof which is used to occupy or is inteded, arranged or designed to be used or occupied, as the home, residence or sleeping place of one (1) or more human beings, but does not include any single family residence, the occupants of which rent, lease or furnish for compensation not more than one (1) room therein.
STATUTE REGARDING OWNER LICENSES AND FEES: No Mention
LICENSES OR FEE REQUIREMENTS: N/A
IDENTIFICATION REQUIREMENTS: The Guide Dog and Service Dog must wear a harness and on leash. A Hearing Dog must be on leash. A Hearing Dog user may apply for an identification card in lieu training center ID from the Tennessee Council for the Hearing Impaired
MISREPRESENTATION OF DISABILITY: 55-8-179 (1989) Unless disabled no person can use a leash blaze orange in color.

## Sherrell Lyon

**From:** Gary Richards
**Sent:** Friday, July 23, 2021 11:57 AM
**To:** Donny Rector
**Subject:** RE: Associates With Service Dogs

He claims it's both, service animal to help maintain balance and emotional support . Mat was in a very bad motorcycle accident which resulted in the loss of an arm , head trauma that has affected his vision among other things. I asked that he bring in the certification for the animal . When I receive I will email to you

**From:** Donny Rector
**Sent:** Friday, July 23, 2021 11:29 AM
**To:** Gary Richards <Gary.Richards@FoodCity.com>
**Subject:** RE: Associates With Service Dogs

Is it a service animal or an emotional support dog?

EXHIBIT 4 1-12-23 Richards PENGAD 800-631-6989

**From:** Gary Richards
**Sent:** Friday, July 23, 2021 10:26 AM
**To:** Donny Rector <donny.rector@foodcity.com>
**Subject:** Associates With Service Dogs

Good Morning Donnie ,
I have a Gas N Go associate that recently acquired a service dog to help with balance and emotional support . the associate wants to bring the dog to work. Please advise

Thank You,
Gary
**Gary Richards | Store Manager | Food City 214**

**Gary Richards | Store Manager | Food City 214**

## Gary Richards

On August 6th David Ellison met with Matt Batten with myself as a witness to discuss the request of a service animal . Mr. Ellison asked Matt if there was any aspect of the job that he could not perform that required the assistance of a service animal , Matt replied that he was able to perform all duties that were required without question and had been doing so since his employment with Food City without the help from a service animal. Matt stated that the purpose of the service animal was to provide companionship and help with anxiety, isolation.

Gary Richards
8/6/21

EXHIBIT
PENGAD 800-631-6989
5 1-12-23
Richards

**Gary Richards**

On 08/12/21 Matt Batten met with David Ellison for a follow meeting regarding Mr. Batten having a service animal at the workplace. Mr. Ellison informed Mr. Batten that after review the decision was made that at this point in time the request for the service animal has been denied. Mr. Ellison asked if there were any jobs within the store to better accommodate his current needs suggesting U-scan attendant as it would allow him to be around others. Mr. Batten stated that there wasn't any position in the store that he would be able to perform his duties as he wasn't able to stand for short/long periods of time that Gas N Go was the only position that was suitable as it allowed him to sit and stand as needed and that he was not leaving his dog with anyone, that where he goes she goes.

Gary Richards
8/12/21

EXHIBIT
1-12-23
6
Richards
PENGAD 800-631-6989

EXHIBIT
1-12-23
7
Richards
PENGAD 800-631-6989

**From:** Sherrell Lyon
**Sent:** Wednesday, September 8, 2021 6:54 PM
**To:** Rickie Estep <estepr@FoodCity.com>
**Subject:** FW: Matt Batten

Please call me.

Sherrell Lyon Jr. Director of Human Resources
KVAT Food Stores, Inc. lyonjrs@foodcity.com 276.623.5100 Ext. 5995

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Tuesday, September 7, 2021 3:08 PM
**To:** Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Matt Batten

Sherrell,

Where do we stand with this associate? He never turned in paperwork. Donnie had stated we would assume him to be on a personal LOA should he fail to do so.

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** David Ellison
**Sent:** Tuesday, August 24, 2021 11:54 AM
**To:** Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** RE: Matt Batten

Please see attached.

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** Sherrell Lyon lyonjrs@FoodCity.com
**Sent:** Tuesday, August 24, 2021 11:39 AM
**To:** David Ellison David.Ellison@foodcity.com
**Subject:** RE: Matt Batten

David,

Please email me a copy of all of your notes and recaps from your exchanges with Matt Batten.

You keep a copy as well....

Sherrell Lyon Jr. Director of Human Resources
KVAT Food Stores, Inc. lyonjrs@foodcity.com 276.623.5100 Ext. 5995

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Monday, August 23, 2021 5:11 PM
**To:** Donnie Meadows <MeadowsD@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Matt Batten

FYI

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** Gary Richards <Gary.Richards@FoodCity.com>
**Sent:** Monday, August 23, 2021 5:08 PM
**To:** David Ellison <David.Ellison@foodcity.com>
**Subject:** Matt Batten

On 08/23/21 Matt Batten called me at the store and told me that Mr. Ellison had given him two different documents for leave of absents, FMLA and Personal LOA. Matt stated that he was not going to submit the FMLA documents nor was he going to submit the personal LOA documents. Matt told me he wanted to come to work with his service animal and then asked if I would allow him to do so and accommodate his service animal. I asked Matt what decision was told to him by Mr. Ellison regarding him bringing his service animal to work, Matt replied that the decision was that the request to bring his service animal to work was denied. I then told Matt that he already had his answer. Matt hung up.

Gary
**Gary Richards | Store Manager | Food City 214**

**From:** Gary Richards <Gary.Richards@FoodCity.com>
**Sent:** Friday, September 9, 2022 11:32 AM
**To:** Jenna Johnston <johnstonje@foodcity.com>; David Ellison <David.Ellison@foodcity.com>
**Cc:** Rickie Estep <estepr@FoodCity.com>
**Subject:** Re: Christopher Batten

Hey Jenna,
I believe there may be a hold on his status. David would you please give Jenna and myself an update.

Thanks,
Gary

EXHIBIT 8 1-12-23 Richards
PENGAD 800-631-6989

---

**From:** Jenna Johnston <johnstonje@foodcity.com>
**Sent:** Friday, September 9, 2022 11:26 AM
**To:** Gary Richards <Gary.Richards@FoodCity.com>
**Cc:** Rickie Estep <estepr@FoodCity.com>
**Subject:** Christopher Batten

Christopher's leave ended on 2-14-2022. Since he has not returned to work, please remove him from payroll effective 2-14-2022.

Thanks,
Jenna
**Gary Richards | Store Manager | Food City 214**

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Friday, March 11, 2022 11:22 AM
**To:** Gary Richards <Gary.Richards@FoodCity.com>
**Cc:** Jenna Johnston <johnstonje@foodcity.com>; Desirea Douglass <desirea.douglass@foodcity.com>
**Subject:** Re: Christopher Batten - Personal Leave

Jenna,
Please speak to Sherrell regarding this associate's status. I believe we will leave him on LOA at this time.

David Ellison
Senior Human Resources Specialist
Chattanooga Division

---

**From:** Gary Richards <Gary.Richards@FoodCity.com>
**Sent:** Friday, March 11, 2022 11:15:07 AM
**To:** David Ellison <David.Ellison@foodcity.com>
**Cc:** Jenna Johnston <johnstonje@foodcity.com>; Desirea Douglass <desirea.douglass@foodcity.com>
**Subject:** FW: Christopher Batten - Personal Leave

David,
Do we have an update ?

**From:** Jenna Johnston
**Sent:** Friday, March 11, 2022 8:53 AM
**To:** 214HRC <214HRC@FoodCity.com>; Gary Richards <Gary.Richards@FoodCity.com>
**Subject:** Christopher Batten - Personal Leave

Christopher's leave ended on 11-16-2021. Have you heard from him?

Thanks,
Jenna

**Gary Richards | Store Manager | Food City 214**

EXHIBIT 9 1-12-23 Richards PENGAD 800-631-6989