IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
AT ROME

---

CHRISTOPHER MATTHEW BATTEN, *
*
Plaintiff, *
*
-vs- * No. 4:22-cv-00179
*
K-VAT-FOOD STORES, INC., *
d/b/a FOOD CITY, *
*
Defendant. *
*

---

THE VIDEOTAPED DEPOSITION OF
DAVID GARY ELLISON
January 11, 2023

---

Diane R. Angel, RPR, TN LCR #246
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

Allison



APPEARANCES:

R. ETHAN HARGRAVES, ESQUIRE
ethan@masseyattorneys.com
Massey & Associates, PC
6400 Lee Highway, Suite 101
Chattanooga, Tennessee 37421
(423)697-4529
Appearing for the Plaintiff

HOWARD B. JACKSON, ESQUIRE
hjackson@wimberlylawson.com
Wimberly, Lawson, Wright,
Daves & Jones, PLLC
P.O. Box 2231
550 W. Main Avenue, Suite 900
Knoxville, Tennessee 37902
(865)546-1000
Appearing for the Defendant

VIDEOGRAPHER: Patrick Black

---

INDEX OF EXAMINATION

DAVID GARY ELLISON
Examination by Mr. Hargraves ......................6
Examination by Mr. Jackson ........................80

INDEX OF EXHIBITS

1 - Associate Handbook for K-VA-T Food .........16
Stores, Inc.

2 - Written Statement ..........................32

3 - Written Statement ..........................34

4 - Written Statement ..........................39

5 - Written Statement ..........................41

6 - Written Statement ..........................51

7 - Written Statement ..........................53

8 - Termination Information ....................62

9 - Email String ...............................63

10 - Email String ..............................67

11 - Email String ..............................69

12 - Email String ..............................71

13 - Email String ..............................73

14 - Email String ..............................77

The videotaped deposition of DAVID GARY ELLIS, called as a witness at the instance of the Plaintiff, for any and all purposes allowed pursuant to the Federal Rules of Civil Procedure, taken pursuant to notice and agreement on January 11, 2023, at the law offices of Massey & Associates, P.C., 6400 Lee Highway, Suite 101, Chattanooga, Tennessee 37421, commencing at 1:10 p.m., before Diane R. Angel, Registered Professional Reporter and Notary Public.

S T I P U L A T I O N

It being agreed between counsel for the respective parties that Diane R. Angel, Notary Public and Registered Professional Reporter, may swear the witness, take his deposition in machine shorthand, afterwards reducing the same to typewriting.

All objections, except as to the form of the question and responsiveness of the answer, are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., are expressly waived. Signature reserved.

THE VIDEOGRAPHER: Okay. We are now on the record. Today is Wednesday, the 11th of January, 2023. The time is 1:11 p.m.

This is the video deposition of David Ellison in the matter of Christopher Matthew Batten versus K-VAT Food Stores, Incorporated, doing business as Food City. This is case number 4:22-CV-00179.

This deposition is being held today at the law offices of Massey & Associates located at 6400 Lee Highway, Suite 101, in Chattanooga, Tennessee.

My name is Patrick Black, the videographer. Our court reporter is Diane Angel, both in association with Elite/Brentwood Reporting Services {sic}.

Will counsel please introduce themselves and state who you represent.

MR. HARGRAVES: Ethan Hargraves, on behalf of the plaintiff, Matthew Batten.

MR. JACKSON: Howard Jackson, on behalf of Food City.

THE VIDEOGRAPHER: And I'll ask the court reporter to swear in the witness.

//

DAVID GARY ELLISON,

called at the instance of the Plaintiff, having been first duly sworn, was examined and testified as follows:

MR. HARGRAVES: Before we begin, I would like say on the record that this deposition is taken pursuant to notice and agreement of counsel. It is being taken for discovery purposes under the Federal Rules of Civil Procedure.

Counsel, are we agreed to reserve all objections except as to form of the question and responsiveness of the answer?

MR. JACKSON: Sure.

MR. HARGRAVES: Okay.

EXAMINATION

BY MR. HARGRAVES:

**Q Mr. Ellison, if you would, just state your full name for us.**

A David Gary Ellison.

**Q All right. Mr. Ellison, you've seen me today. My name is Ethan Hargraves. I am the attorney for the plaintiff in this case, Mr. Matthew Batten.**

**Have you ever testified in a deposition before?**

A I have not.

Q Okay. Well, then, the first thing that I would like to do is go over a couple basic ground rules. They will probably sound a little bit familiar from this morning, but just so you can understand the process.

First, we're trying to make a clear record of everything that's said here. That's what the court reporter is doing. There are a couple things we can do to make her job a little bit easier. I would ask that, to the best of your ability, you would try to let me finish my question before you start to answer. You'll probably see where I'm going with something, but just hang on until I finish the question. And by the same token, I will do my best to not interrupt you, to let you finish your answer before I ask another question. Does that sound fair?

A Yes, sir.

Q Okay. Also, you're doing great so far. Verbal answers, as in out loud, are best. Head nods are difficult to pick up on a transcript. But even things like uh-huh and huh-uh, which we can all fall into, those come up pretty similar on a transcript. So there may come a time where I need

to clarify, like is that a yes or is that a no. And I'm not trying to be a jerk. I just want to make sure that we understand what your answer is. Does that make sense?

A Yes, sir.

Q All right. If I ask a question that you don't understand, please do not answer it. Just let me know that you don't understand it. I promise you won't hurt my feelings, much, and I'll rephrase the question so that you can answer it. Okay?

A Yes, sir.

Q And, finally, I don't plan on taking all day, but if at any point you need a break just let us know and we can take a break. The only thing I'll ask is that if I have asked a question I will want to get a quick answer to that question before we take the break. Does that make sense?

A Yes, sir.

Q Okay. Where do you live, Mr. Ellison?

A I live in Ooltewah, Tennessee.

Q And how long have you lived there?

A I have lived in Ooltewah since 2006.

Q Okay. Where did you live before that?

A Chattanooga, Tennessee.

**Q Have you always been pretty much local to Chattanooga?**

A Yes, sir.

**Q Okay. Did you attend high school?**

A Yes, sir.

**Q Where at?**

A Ooltewah High School.

**Q Okay. Did you graduate?**

A I did.

**Q Did you have any college after that?**

A Yes, sir.

**Q Where at?**

A I attended the University of Tennessee in Knoxville and then finished up at the University of Tennessee in Chattanooga.

**Q Okay. What was your major -- or your degree, rather?**

A I have a double degree in general business management and human resources management.

**Q Okay. Do you have any other degrees?**

A No, sir.

**Q Okay. Do you have any professional licenses?**

A No, sir.

**Q Okay. Any other professional certifications or training?**
A No, sir.
**Q Okay. Are you a member of any professional organizations or clubs?**
A No, sir.
**Q And I know this is kind of a weird question, but it's standard. Have you ever been convicted of a crime?**
A No, sir.
**Q Okay. And you work for K-VA-T Food Stores, Inc.; is that right?**
A Yes, sir.
**Q Is that -- I know it's commonly referred to...**
A K-VA-T is the parent company name, doing business as Food City.
**Q Okay. What is your current position with Food City?**
A Senior human resources specialist.
**Q And how long have you been in that position?**
A Almost two years. February will mark two years.
**Q All right. What was -- let me ask**

**this: When did you first start working for Food City?**

A So I worked for Bi-Lo here in Chattanooga and Food City bought out the Chattanooga division of the Bi-Lo stores back in September of 2015. So it was really a conversion from Bi-Lo into the Food City organization.

**Q Okay. I miss Bi-Lo. How long did you work for Bi-Lo prior to the conversion over to Food City?**

A I started with Bi-Lo in 1999. I did leave for six months once, and then my hire date now is 2007.

**Q What was your position with Bi-Lo?**

A My ending position was store manager.

**Q Okay. And which store did you manage?**

A I managed two different locations in the Chattanooga area: East Ridge, Tennessee, and Ooltewah, Tennessee.

**Q When the conversion happened is that when you moved into the HR position?**

A No, sir. I was still a store manager after conversion from 2015 up until February of 2021, when I moved into this role.

**Q This role being the senior HR specialist?**

A Correct.

**Q Okay. At the risk of asking a dumb question, what does K-VA-T Food Stores, Inc. do?**

A We are a retail supermarket grocery store.

**Q Okay. Are they -- is there a whole operation, the Food City franchise?**

A There are a couple of other banners that we operate as supermarkets, and there are a couple of other units of the business as well. We own our own water company, for instance.

**Q Okay. Do you know how many Food City locations K-VA-T operates?**

A Roughly 145.

**Q Okay. Do you know where K-VA-T is headquartered?**

A Abington, Virginia.

**Q During the time that you've worked for K-VA-T or Food City you've worked exclusively in the Chattanooga area?**

A Yes, sir.

**Q Okay. I want to focus in a little bit on your responsibilities as the senior HR**

**specialist and how you fit in with the other employees of K-VA-T. How many -- I assume your position is a managerial position?**

A It's more of an advising role. Zero people directly report to me.

**Q That was going to be my next question. Who do you directly report to?**

A I report to the director of human resources.

**Q And as of August of 2021, would that have been Donnie Meadows?**

A Yes, sir.

**Q Okay. Who is that now?**

A Sherrell Lyon.

**Q Okay. Do you have any other immediate supervisors that you report to?**

A No, sir.

**Q Okay. So the director of HR is your boss?**

A Yes, sir.

**Q Okay. Are you familiar with Donnie Meadows' qualifications in HR?**

A No, sir.

**Q Okay. Ultimately, as of August 2021, who was responsible for making sure that K-VA-T**

**complied with federal laws and regulations?**
A Ultimately, Donnie Meadows.
**Q Okay. And now that would be Sherrell Lyon?**
A Correct.
**Q Okay. Do you have any insight into how the director of human resources was trained for that task?**
A No, sir.
**Q Okay. When it comes to complying with the Americans with Disabilities Act, does the company provide any training that you're aware of?**
A For what level of associates?
**Q Well, I guess let me ask you this: Does the company provide any training with regard to compliance with the ADA, that you're aware of?**
A Not that I'm aware of.
**Q Okay. Does Food City have policies and procedures on disability accommodations?**
A Yes, sir. We have, you know, obviously an ADA policy in place to not discriminate against anyone based on any kind of disability or limitations that are out there.
And then going through interactive exchange processes, if something is brought up by an

associate, to try to navigate through those challenges.

Q Okay. And that was going to be my next question, is about equal employment or harassment policies. But I guess the question I want to focus in on is are you aware of any policies or procedures on accommodation of disabilities?

A Am I aware of?

Q Of K-VA-T having any policies or procedures for the accommodation of disabilities?

A Once again, we go through an interactive exchange process to try to come up with ideas on both sides of the equation to be able to arrive at a situation to where, you know, an associate -- we can accommodate for anything that they are requesting.

Q Is there anything written at Food City that memorializes that interactive exchange that you're talking about?

A I am not sure.

Q Okay. Food City does have an associate handbook; is that right?

A That is correct.

Q Of course, it's sitting right here in front of me. But --

MR. HARGRAVES: Let's go ahead and mark that as Exhibit 1. Howard, I don't have an extra copy but I just want to --

MR. JACKSON: That's all right.

MR. HARGRAVES: It's what was provided in discovery.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 1.)

BY MR. HARGRAVES:

**Q Mr. Ellison, if you could just take a minute, however long you need, just take a look at that. I'll represent to you that this is the associate handbook that was provided by Food City's attorneys in the context of this litigation, and my question will be just whether you recognize that?**

A Yes, sir.

**Q Does that appear to be the associate handbook of Food City?**

A Yes, sir.

**Q And would that have been applicable to the associates and other employees of Food City as of August 2021? Take your time.**

A (Witness perusing document.) Yes, sir. I will say this has an October 2021 revision.

**Q Okay. Do you know what that revision was?**

A I do not.

**Q Okay. And you had mentioned the ADA policy. Do you happen to know where that is?**

A I'm not certain without flipping through every page, looking specifically in the associate handbook.

**Q Flip to page --**

A I see equal employment.

**Q Yes, sir. Looking at page 4, there's the Equal Employment Opportunity section.**

A Uh-huh.

**Q It says, "It is Food City's policy to grant equal employment opportunities to all qualified persons without regard to race, color, sex, religion, age, national origin, disability, veteran's status, or any other protected status." Is that what it says?**

A Correct.

**Q Is that the equal employment opportunity policy you were talking about?**

A Yes.

**Q If you want to flip over to page 24 -- I'm sorry. Not page 24 -- page 28, are**

**you familiar with the personal leave of absence policy?**

A I am.

**Q What is that policy in a nutshell? I'm not asking you to quote it, but just kind of explain it to us.**

A An associate can request a personal leave of absence once they have been with the company at least 90 days. Associates are eligible for up to two personal leaves of absences within a 365-day calendar year for up to 90 days apiece.

**Q Okay. So that's a leave that an employee can request?**

A Yes. It is for personal reasons. It is an unpaid leave.

**Q Okay. At the end of that leave -- pardon me. Unlike with like, for example, FMLA, with a personal leave of absence there's not necessarily a guarantee of re-employment at the time of the completion of the leave; is that right?**

A It is not a job-protected leave.

**Q Right. Is that something that Food City can force an employee to take?**

A Can force an employee to take?

**Q (Moves head up and down.)**

A It's something that's offered for associates to be able to take.

**Q Okay. So an employee gets to choose whether to take a leave of absence?**

A That is correct.

**Q All right. Looking at -- let me ask you this: You had mentioned an ADA policy. Is that ADA policy that you mentioned contained in Exhibit 1?**

A (Witness perusing document.) To the best of my looking, I don't believe that it's specifically in this handbook presented, no.

**Q Okay. Do you have any insight as to where one might find that ADA policy?**

A I can't speculate.

**Q Okay. But you've seen that policy before?**

A We do have ADA. It could potentially be a Fast Track training, but once again, I can't specifically tell you exactly --

**Q Sure.**

A -- this is what it is and this is where it is.

**Q And I don't want you to guess. That's fine. But Fast Track training, is that an**

**electronic resource?**

A Yes, computer based.

**Q Okay. So it might be something that's contained within the training materials, is what you're saying?**

A Correct.

**Q Okay.**

A Potentially.

**Q You had also mentioned a procedure with regard to interactive exchange in the context of disability accommodations. Would you expect to find that same procedure in the ADA policy that you're discussing?**

A I can't necessarily tell you yes or no.

**Q Okay. Are you aware of where we might find that policy and procedure?**

A As far as how we exactly go about handling the interactive exchange?

**Q Yes, sir.**

A I cannot specifically tell you.

**Q Okay. Have you ever received any training from Food City on disability accommodation?**

A On how to have those conversations with associates?

**Q Any training related to disability accommodations.**

A Outside of having conversations with my supervisor, not specific.

**Q Okay. What supervisor would that be?**

A Donnie Meadows.

**Q Okay. Can you recall any specific conversations that y'all have had about that topic?**

A When going through the process of having discussions he would advise, you know, as far as gathering information, what questions to ask, how to -- what accommodations to be able to offer, really just being that go-between of, you know, gathering information from an associate, bringing it back to him, and allowing him to kind of make those decisions.

**Q Okay. Was Donnie Meadows ultimately the one who would make a decision with regard to an employee's disability accommodation request?**

A Yes, sir.

**Q Did you have the ability to make any recommendations?**

A He and I would discuss the facts but really, you know, he would be the one to make that determination or, you know, what accommodation we

might be able to offer or ultimately implement.

Q Okay. And we'll talk about Mr. Batten specifically here in a little bit, but prior to Mr. Batten had you ever had to engage in that interactive exchange with an associate at Food City?

A No, sir.

Q Okay. Was Mr. Batten the first time you ever had to engage in that process for determining a disability accommodation request?

A Yes, sir.

Q All right. In your conversations with Donnie Meadows did you discuss there being a certain obligation that Food City had with regard to an employee disability accommodation request?

A Can you repeat the question?

Q Probably not. So what I'll do is I'll ask the court reporter to read it back to us.

(Whereupon, the requested question was read back by the court reporter as follows:

Question: In your conversations with Donnie Meadows did you discuss there being a certain obligation that Food City had with regard to an employee disability accommodation request?)

A No, sir.

BY MR. HARGRAVES:

**Q All right. Do you think it's important for businesses to treat disabled employees fairly?**

A Yes, sir.

**Q Why do you think that's important?**

A Everyone should be treated equally and fairly without regards to any other factors.

**Q Are you aware if it's Food City's policy to treat disabled employees fairly?**

A Absolutely. We don't, you know, treat anybody any differently. We simply worry about being able to perform essential functions of a job.

**Q Are you aware of Food City ever having approved an employee disability accommodation request prior to Mr. Batten?**

A Approving an accommodation prior to him of any type?

**Q Of any type (moves head up and down).**

A I'm not specifically involved in that, knowing everything going on throughout the entire organization, but I'm going to say I'm certain that there has been, but once again, I'm not

involved in every conversation throughout the company and --

Q Okay.

A -- those requests.

**Q The person to ask about that would be Donnie Meadows; is that fair?**

A Yes, sir.

**Q Or with regard to those prior accommodations, now Sherrell Lyon; is that right?**

A Correct.

**Q All right. When did you first meet Matthew Batten?**

A That would have been May of 2019.

**Q What was your impression of Mr. Batten?**

A Mr. Batten was a, you know, capable young man being able to perform the essential functions of the job that he was hired for in the fuel station.

**Q Was he a good employee?**

A Yes, sir.

**Q To your knowledge, was he ever written up?**

A Under the time that I was his direct supervisor I never had any procedural issues with

him, never had to document or sit him down or anything.

Q To your knowledge, did he ever receive any negative performance reviews?

A Not that I'm aware of, no.

Q Okay. When you first met Mr. Batten would you say that his disability was apparent?

A Yes, sir.

Q Did y'all have any discussion at that time about his condition?

A Yes. I mean, obviously, I mean, you know, it's apparent that, you know, he doesn't have use of one of his arms. Talked about, you know, the duties within the fuel station and, you know, he stated that, you know, he felt he could perform all duties outlined for the position and, you know, went over the entire operational area, and he was very thankful to be able to gain employment with us.

Q Were you a decision-maker in the hiring process for Mr. Batten in 2019?

A Yes, sir.

Q All right. Who else was a decision-maker on that?

A Ultimately, myself as the store manager. He had an interview with a human relations

coordinator, Frances Harris, there at the store that facilitates the interviewing and onboarding processes, but ultimately it's for the store manager to be able to offer employment and make those hiring decisions.

**Q Okay. Were you present for the interview with Ms. Harris?**

A For Ms. Harris?

**Q With Ms. --**

A With Ms. Harris.

**Q Mr. Batten's interview with Ms. Harris.**

A Yes.

**Q Okay. Was there any interview between Ms. Harris and Mr. Batten that you were not present for?**

A Yes. Typically, what happens is an HRC will bring that associate in, be able to sit down with them, and then the store manager will do a final interview and ask any additional questions and make an employment offer.

**Q Okay. Do you know what was discussed between Ms. Harris and Mr. Batten with regard to any limitations on Mr. Batten's ability to do the job?**

A I was not present, so I cannot speak

to that.

**Q Okay. Would you say that given Mr. Batten's condition of having one of his arms amputated very clearly there were certain things that he simply would not be able to do?**

A Sure.

**Q But he was hired for the position; is that right?**

A That is correct.

**Q Did you ever supervise Mr. Batten closely during the time that he worked for Food City?**

A Closely, no. I mean, as the store manager there's other people below me that help supervise individual departments. His direct supervisor would have been the fuel coordinator within the fuel department there.

**Q So you would not have had -- necessarily had daily interaction with Mr. Batten?**

A Not necessarily.

**Q Okay. And what store were you the store manager of at that time?**

A 774, Ooltewah, Tennessee.

**Q Okay. Did you have any involvement in any of Mr. Batten's transfers between Food City**

**locations?**

A When he transferred from Ooltewah 774 to East Brainerd 701 I was involved in that transfer request, as he came to me and requested to transfer to the East Brainerd Road location, stated that it was closer to his home where he lived and would be a better fit for him and, you know, I approved that request -- anybody to be closer to home.

**Q Did you have any problems with that request?**

A Have any problems with him requesting to get closer to home, to transfer?

**Q Yes.**

A No, sir.

**Q Did you oppose that transfer in any way?**

A No, sir. I thought it was better for him.

**Q Prior to today were you aware of an employee named Vince making a joke about Mr. Batten's amputated arm?**

A No, sir.

**Q Do you know who Vince is?**

A No, sir.

**Q Okay. When did you first learn that**

**Mr. Batten had requested an accommodation in the form of a service dog?**

A The end of July of 2021. I was actually on vacation that week and Gary Richards had sent a message to Donny Rector, who is my counterpart in the Knoxville division, asking for advice basically, you know, what -- how do I need to handle this situation.

**Q Was Donny Rector kind of covering for you while you were on vacation?**

A Yes, sir.

**Q Do you know if Mr. Rector did anything with regard to that inquiry?**

A I do not know specifically.

**Q Okay.**

A I know I was aware of that when I got back the following week.

**Q How specifically did you become aware of it?**

A Donny Rector sent me an email. I can't remember the specifics of it. Basically, you know, follow up on that one. I'm not sure if he had made contact with Donnie Meadows at that point or not. I know I directly spoke with Donnie Meadows upon my return.

**Q Okay. Was that the first thing that you did upon learning of the request from Donny Rector?**
A Going to Donnie Meadows?
**Q Yes.**
A Yes, sir.
**Q Okay. Did you talk to anybody else before that?**
A No, sir.
**Q All right. When you went to Donnie Meadows was that a phone call? Was it an email?**
A I'm going to say a phone call.
**Q Okay. Do you remember anything about that phone call?**
A Basically, presenting it to him, asking him, you know, how to handle that situation, and I know at that point he was talking with Archie Skeens and Charlie Fugate to gain additional advice at that point.
**Q Okay. And just so we're clear, Charlie Fugate is general counsel --**
A Correct.
**Q -- for Food City? Who is Archie Skeens?**
A He was the safety manager --

Q Okay.
A -- for Food City.
Q Now, I don't -- I want to ask -- I have to ask some questions but I don't want to intrude on any attorney-client privilege, so assume that I'm not asking about communications with the in-house counsel. Okay?
Do you know -- or what was -- anything else you can remember about your conversation with Donnie Meadows?
A No.
Q Okay. Do you know what Mr. Meadows did next?
A Not specifically, no, sir.
Q Okay. Were you privy to any communications that Mr. Meadows had regarding this request from Mr. Batten?
A No, sir.
Q Okay. What did you do next?
A I awaited instruction from Mr. Meadows, and he advised that I meet with Mr. Batten to gain some additional information regarding his situation and request for the service dog.
And so that meeting was set up with

Gary Richards, the store manager, and myself, meeting with him in August of 2021.

Q Okay. Is that the August 6th meeting?

A Yes, sir.

Q Okay. Do you remember anything else about what Mr. Meadows said regarding the 8/4 {sic} meeting with Mr. Batten?

A Just to gain additional information as to, you know, the request and, you know, just to see kind of what was going on.

Q Okay. What was the goal of getting more information?

A I assume to be able to allow him to make the best decision.

Q Did you have any recommendation for Mr. Meadows?

A No, sir.

Q Okay. I want to go through some written statements that you've produced.

MR. HARGRAVES: Let's mark that as Exhibit 2.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 2.)

BY MR. HARGRAVES:

Q Looking at what's been marked Exhibit 2, the Bates number at the bottom is K-VA-T 000138. Do you recognize this document?

A Yes, sir.

Q Is this a written statement that you produced regarding the meeting on August 6th, 2021, with Mr. Batten and Mr. Richards?

A Yes, sir.

Q Okay. Now, I've said that you produced it, but I don't want to assume that. Did you draft this statement?

A Yes, sir.

Q Okay. Do you remember when you drafted it?

A Immediately following our conversation on that day.

Q Okay. Would you say that this is an accurate account of the meeting on August 6th, 2021?

A Yes, sir.

Q Would you say it's a complete account of what occurred on August 6th, 2021, at that meeting?

A To the best of my recollection, yes, sir.

**Q Okay. Did you write multiple drafts of this document?**

A Write multiple drafts of that particular document?

**Q Yes.**

A Not that I'm aware of. I mean, I know there were three separate meetings.

MR. HARGRAVES: I'm going to hand you another document. We'll mark that as Exhibit 3.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 3.)

BY MR. HARGRAVES:

**Q All right. Looking at what's been marked Exhibit 3, the Bates number at the bottom is 001060. Do you recognize this document?**

A Yes, sir.

**Q What is it?**

A A version of the document, the same document, potentially few less details there, before I finished and printed it out, maybe autosave something. I don't -- I'm not sure.

**Q Okay.**

A The signed written -- or the signed document there is the true and accurate account of

the conversation.

Q Okay. So do you have any idea why there would be a second draft of this document?

A Once again, maybe, I mean, autosave on the computer. I'm not sure.

Q Okay. So nobody else was drafting this document for you?

A No, sir.

Q Okay. Looking at it, it does appear that the signed version, which is Exhibit 2, has one additional sentence at the end; is that fair?

A That is fair.

Q All right. Do you -- does that refresh your recollection as to why there would be two different drafts?

A Once again, I cannot speak to the computer functions of autosaving or anything.

Q That's fine. I'm not asking you to make anything up. I just wanted to see if that jogs your memory in any way.

A No, sir.

Q Now, I want to go through this. Looking at Exhibit 2, the signed version -- and that is your signature; is that right?

A Yes, sir.

**Q Okay. In this meeting that you had with Mr. Batten and Mr. Richards did Mr. Batten mention that he needed the dog for help with companionship, anxiety, and isolation?**

A Yes, sir.

**Q Okay. To your recollection, are those the only three things that he mentioned?**

A He did also mention about how he had previously fallen and could help with -- help him steady on his feet, but, yes.

**Q Okay. So he did mention stability or being a fall risk?**

A Uh-huh.

**Q Is that a yes?**

A Yes, sir.

**Q That's fine. All right. See, I told you it would happen. That's okay.**

**Do you recall him telling you that the dog would assist with stability?**

A He may have mentioned that that could be a function of the dog. I'm -- I can't exactly recall that, yes, he specifically stated those exact words.

**Q Okay. Looking at the, if you count that last word, the fourth line up from the bottom**

**starting with, "He also stated," do you see where I'm at on the right side?**

A Yes, sir.

**Q "He also stated that he has fallen about five times and the dog helps him steady on his feet." Is that what you wrote?**

A Yes, sir.

**Q All right. So he did indicate that the dog helped him steady on his feet?**

A Could help him, yes.

**Q Okay. Was it your understanding that that was at least in part because of the many surgeries that he had had related to his accident?**

A I'm sure that's what he would revert to, but I can't specifically state that, yes, that is why.

**Q Okay. Did he indicate that that was why?**

A He did make mention of the car accident and the multiple surgeries that he had had.

**Q Okay. Now, at one point you asked him if there had been any change in anything -- and just looking at the third line down from the top.**

A Uh-huh.

**Q "During this exchange I asked Batten**

**if there had been a change in anything, as he has worked for us for two years." Did I read that correctly?**

A Yes, sir.

**Q And the next sentence says, "He stated that nothing had changed." Is that what it says?**

A Yes, sir.

**Q And, again, you said that this is a truthful and accurate document?**

A Yes, sir.

**Q You also asked him if he was able to perform all essential functions of the job; is that right?**

A Yes, sir.

**Q And in your written statement you say he responded that he could do so without question. That's the middle of the paragraph. Do you see that?**

A Yes, sir.

**Q Okay. Was that all he said on that topic?**

A To the best of my recollection, that he could do so without question as he had been doing since he began with Food City, and he had been

working with us for approximately two years at that point.

Q So you don't recall him telling you that, I still do everything I've done since day one but there are issues that do come up. I fall. Do you recall that?

A I do not.

Q Okay.

A I know he made mention that he had fallen about five times in the past.

Q Okay. But your recollection of this meeting is that he indicated he could do his job without question?

A Correct.

MR. HARGRAVES: Okay. I'm going to move on to the next statement. Let's mark this Exhibit 4.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 4.)

BY MR. HARGRAVES:

Q All right. I've handed you what's been marked as Exhibit 4. The Bates number is K-VA-T 00140. Do you recognize this document?

A Yes, sir.

**Q And what is it?**
A It's a written summary of my meeting with Mr. Batten on August the 12th, 2021, with Gary Richards there as well.
**Q And, again, who drafted this document?**
A That would be myself.
**Q Okay. Do you remember when?**
A Immediately following our discussion on August the 12th.
**Q Okay. And is that your signature on the document?**
A Yes, sir.
**Q Did you sign the document immediately after drafting it?**
A Yes, soon after. I mean, I don't know specifically --
**Q Okay.**
A -- but, yes.
**Q And would you say that this is a complete and accurate account of the meeting that occurred on August 12th, 2021, between you, Matthew Batten, and Gary Richards?**
A Yes, sir.
**Q Do you know why there would be a**

**second draft of this statement as well?**

A Once again, potentially autosaving within the office program, I'm not sure, as I continued to draft it.

MR. HARGRAVES: Let's mark that as Exhibit 5.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 5.)

BY MR. HARGRAVES:

**Q All right. Looking at Exhibit 5, Bates number K-VA-T 001061, do you recognize this document?**

A Yes, sir.

**Q Does it appear to be an exact copy of Exhibit 4, minus your signature? And take your time.**

A (Witness perusing document.) I believe it's exactly the same.

**Q Okay. Looking at this statement that you drafted, is there any mention of Mr. Batten stating that he had fallen in the past?**

A On this particular statement?

**Q Yeah. Well, looking at Exhibit 4, the signed version --**

A Yeah.
**Q -- is there any reference in that statement regarding the meeting on August 12th, 2021, that Mr. Batten indicated he had fallen in the past?**
A No, sir, I don't believe there is.
**Q Okay. Do you recall Mr. Batten telling you that he had fallen before in this meeting?**
A I do not recall that.
**Q Do you recall him stating, the last time I fell I knocked myself out?**
A No, sir.
**Q Now, in this meeting you informed Mr. Batten that the decision had been made that the service dog would not be approved; is that right?**
A That is correct.
**Q When had that decision been made?**
A I cannot give you an exact date. I know I met with Mr. Batten the first time on August the 6th. I would have taken that information back to Donnie Meadows on that particular day, and it would have been sometime before the 12th but I cannot give you an exact date.
**Q Okay. Forgetting about an exact**

**date, do you remember how the decision was made or how it was communicated to you?**

A It would have been communicated to me via telephone conversation.

**Q With Donnie Meadows?**

A Correct.

**Q Do you remember anything about that conversation?**

A Outside of him, you know, stating that, you know, we would not be able to approve that specific accommodation and to, you know, offer a potential job reassignment and, you know, potentially gather ideas from him as well as to, you know, what other accommodations may be available that he might be able to come up with as well.

**Q Okay. Did you ask any questions of Mr. Meadows?**

A As far as?

**Q In that conversation.**

A No, sir. I was basically taking information from him, once again, and taking it back to the meeting with Mr. Batten.

**Q Okay. Did Mr. Meadows indicate why Food City had decided not to provide the accommodation of the service dog?**

A I can't speak specifically. I can only, you know, speculate.

**Q Okay. Well, I'm not asking you to speculate. I want to be very clear. My question is, in that conversation, that phone conversation with Mr. Meadows, did he communicate to you what the reason was?**

A No, sir.

**Q Okay. Did Mr. Meadows come up with the idea to offer the USCAN position to Mr. Batten?**

A Yes, sir.

**Q Okay. Did he mention any other positions that should be offered to Mr. Batten?**

A No, sir.

**Q Okay. What is the USCAN position?**

A That is a person who oversees the self checkout stations at the front of the store instead of a traditional cashier register. It's where customers basically check themselves out and one person would oversee a set of stations and assist with any issues that a customer may have.

**Q Okay. Is that that associate that we'll see in the grocery store that's kind of just milling about between the self checkouts and if you have an issue with your checkout or you need a code**

**or something they'll come over and help you out?**

A Yes, sir.

**Q Okay. It's fair to say that's a job that has that associate on their feet?**

A Yes, sir.

**Q Okay. Do you remember what Mr. Batten said when you floated the idea of him working the USCAN position?**

A He immediately stated that he could not do that because he could not stand for prolonged periods of time. When trying to ask him as to, you know, gauge how long he might be able to sit or stand, he could not give me any definite time frame to even try to, you know, accommodate that matter. He just immediately shot it down and said, no, I can't do that.

**Q Okay. Well, did you advise Mr. Batten that he might be able to sit down for some period of time in that position?**

A Unfortunately, we never got to that --

**Q Okay. So you never --**

A -- discussion.

**Q Okay. You never offered, hey, we can give you a stool, we can give you a chair?**

A No, sir.
**Q Okay.**
A Outside of him just, you know, immediately shooting it down.
**Q Okay. Was it your intent to offer him a chair?**
A No. I mean, we can't speculate as to, you know, what other accommodations could have been offered.
**Q Okay. Well, let me just ask you this: At the time you what were meeting with Mr. Batten on August 12th, 2021, you say he shot the USCAN position down. At the time you had the meeting did you intend to offer him the accommodation of a chair in the USCAN position?**
A That would have been a discussion that I would have had to have with Donnie Meadows at that point.
**Q Okay. So you did not intend at that time to offer him the use of a chair in the USCAN position?**
A I am not saying that I did or did not.
**Q Was there --**
A I would have to, you know, converse

with Donnie Meadows again on all accommodations or actions being offered.

**Q Okay. Fair enough. You couldn't just offer it without first talking to Donnie Meadows?**

A That is correct.

**Q Did you talk to Donnie Meadows about potentially offering Mr. Batten a chair for the USCAN position?**

A After the fact of having this conversation with him, I advised Donnie that, you know, he had turned down that position and there was really no further discussion surrounding that.

**Q Did you inform Mr. Meadows of Mr. Batten's reason for turning down the USCAN position?**

A Yes, sir.

**Q That it -- because it was a fully standing position?**

A Because he stated he could not be on his feet for prolonged periods of time and he could not give us an accurate, you know, time frame as to how long he felt he might be able to be on his feet.

**Q Okay. Did you and Mr. Meadows have any discussion at that point about whether to supply**

**Mr. Batten with a chair or a stool or something to sit on in the USCAN position?**

A No, sir. Once again, after he had turned down that accommodation request there was really no further communication surrounding ideas around that.

**Q Did you at any point have any discussion with anyone outside of privileged communications about potentially offering Mr. Batten a chair or a stool in the USCAN position?**

A No, sir.

**Q Okay. Don't you think that might have been something that could have made a difference?**

A If we had gotten to that point to be able to discuss the specifics of the position, we can only speculate.

**Q All right. Was Mr. Batten preventing you from having that discussion?**

A Preventing me from talking with him?

**Q Yes.**

A No. Once again, I mean, all of my communication was coming from Donnie Meadows as far as, you know, the accommodations and the communication with him.

Q And Mr. Batten wasn't stopping you from going to Mr. Meadows and asking Mr. Meadows if perhaps Food City could provide a chair for the USCAN position?

A No. Mr. Batten never asked for that accommodation, you are correct.

Q Well, that's not my question.

Mr. Batten didn't do anything to prevent you from asking Mr. Meadows about possibly providing a chair, did he?

A No, that is correct. I simply reported back to Mr. Meadows what the conversations were based upon what accommodations were presented to him.

Q Now, the USCAN cashier position, that was offered specifically to accommodate Mr. Batten with regards to his isolation and anxiety; is that right?

A It was an accommodation for his entire position of employment.

Q Okay. But, specifically, the two things that it was meant to address was isolation and anxiety; is that right?

A It could potentially help with those.

Q Well, I'm just reading your words.

The middle of the paragraph on Exhibit 5 -- it may be Exhibit 4, the signed version, Bates number 000140. "I suggested" -- this is the middle of the paragraph on the right side. "I suggested that we could reassign him to a USCAN cashier position, as this would help aid in his battle of isolation and anxiety of working alone at the fuel center kiosk." Is that what it says?

A That is correct.

Q So that's what it was intended to help with; is that right?

A That it could, yes.

Q Okay. The USCAN cashier position was never intended to accommodate Mr. Batten with regard to his gait instability, was it?

MR. JACKSON: Objection. Go ahead and answer.

A That was a position to be able to allow him to, you know, continue employment inside of the store.

Q (By Mr. Hargraves) I'll repeat my question. The offer of the USCAN cashier position was never intended to accommodate Mr. Batten with regard to his gait instability; is that right?

MR. JACKSON: Same objection. Go

ahead and answer.

A I'm not sure -- I mean, he had been performing all essential functions of that job for two years, so, I mean, it was an accommodation to be able to allow him to continue employment.

**Q (By Mr. Hargraves) Let me ask it this way: It was never communicated to Mr. Batten that the offer of the USCAN position was intended as an accommodation of his gait instability; is that fair?**

A I'm not sure that that was discussed, no.

**Q Okay. It's certainly not mentioned here in your signed statement, is it?**

A No, sir.

**Q Okay. And Mr. Batten declined the USCAN position; is that right?**

A That is correct.

**Q He told you he couldn't physically do it; is that right?**

A That is correct.

MR. HARGRAVES: I believe this will be Exhibit 6.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 6.)

BY MR. HARGRAVES:

Q I'm handing you what's been marked Exhibit 6, Bates number K-VA-T 000142. Do you recognize this document?

A Yes, sir.

Q All right. This is the statement that you drafted and signed regarding the August 18, 2021, meeting between you, Matthew Batten, and witnessed by Brian Wattenbarger?

A Yes, sir.

Q And this is a statement that you drafted; is that right?

A Yes, sir.

Q Would this have been immediately following the August 18, 2021, meeting?

A Yes, sir.

Q And is this a complete and accurate statement with regard to what happened in the August 18, 2021, meeting?

A Yes, sir.

Q And with regard to all of these statements that you drafted, are these statements truthful?

A Yes, sir.

MR. HARGRAVES: And just for the sake

of being complete, let's mark this Exhibit 7.
(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 7.)
BY MR. HARGRAVES:
**Q Look at what's been marked as Exhibit 7, Bates number K-VA-T 001062, do you recognize this document?**
A Yes, sir.
**Q Does this appear to be an unsigned draft of Exhibit 6?**
A (Witness perusing document.) Yes, sir, I believe so.
**Q Okay. Just looking at the -- just the amount of text, it's evident that there is some difference between these two versions; is that fair?**
A (Witness perusing document.) Maybe slight verbiage, without going word for word for word here.
**Q Sure. And I'm not asking you to.**
A Maybe a slight verbiage here and there, once again, potential autosaving on the computer, but, I mean, the gist of the conversation is exactly the same.
**Q Okay. So sitting here today, you**

**can't tell us why there would be two versions of this document?**

A No, sir. Once again, I mean...

**Q But Exhibit 6 bears your signature; is that right?**

A That is correct.

**Q Now, in this meeting you confirmed to Mr. Batten, again, that his request for the service dog had been denied; is that fair?**

A That is correct.

**Q You offered or you mentioned the offer of the USCAN position again; is that right?**

A That is correct.

**Q And you also at this time offered Mr. Batten a leave of absence or FMLA; is that fair?**

A That is correct.

**Q Whose idea was it to offer -- well, let me ask you this: Was it your idea to offer a leave of absence or FMLA?**

A I got that direction from Donnie Meadows.

**Q Okay. Did Mr. Meadows explain to you why that was to be offered to Mr. Batten?**

A To be able to allow him time to potentially, you know, be able to see if he might be

able to return to work without the service animal.

**Q Okay. Did you discuss with Mr. Meadows why a leave of absence might change Mr. Batten's situation?**

A Did I discuss why a leave of absence might change his situation?

**Q Yes.**

A No, I did not.

**Q Did Mr. Meadows indicate why he thought the leave of absence was appropriate?**

A Once again, to potentially allow Mr. Batten to be able to return to work, you know, without the service animal present.

**Q Okay. Did you have any indication that Mr. Batten's physical condition was going to change during a leave of absence?**

A I mean, I can't speculate on all the particulars of his medical condition.

**Q Well, I'm not asking you that. I'm asking did you have any indication that his condition was going to change?**

A I did not know.

**Q Okay. He didn't tell you, hey, if I'm out for two weeks I might recover and be able to come back without the dog?**

A No, he never stated that.
**Q So you don't know why a leave of absence would have addressed Mr. Batten's need for accommodation?**
A Once again, to be able to potentially allow him time to be able to return to work without the service animal present.
**Q I guess my question is what was the time supposed to accomplish that would allow him to return without the service animal?**
A To potentially allow him, you know, to be able to return without needing that accommodation.
**Q Did Mr. Batten indicate there was something that was going to happen that would make it so he wouldn't need a service animal?**
A No, he did not.
**Q And did you and Mr. Meadows discuss what might happen that would eliminate Mr. Batten's need for a service animal?**
A No, we did not.
**Q Did Mr. Batten -- sorry. I didn't mean to cut you off.**
A I was just going to say, I don't know all the particulars of his, you know, entire medical

condition.

**Q Did Mr. Batten make it clear that nothing was going to change and that he was still going to need the service animal?**

A Yes. He made it clear that, you know, he would not return to work without having his service dog present regardless of any position.

**Q Okay. Were you aware that Mr. Batten had put in his application for the service dog prior to even coming to work for Food City in 2019?**

A No, sir.

**Q You told Mr. Batten that you were not able -- that is Food City was not able to accommodate having a service animal present while he was working; is that right?**

A That is correct.

**Q Do you know why Food City could not accommodate having a service animal present?**

A I cannot speak to that. That was a decision made by Donnie Meadows, and I don't know the specifics or particulars of that decision-making.

**Q Okay. You don't know why it would have been a problem to have a service animal in the kiosk?**

A Once again, I don't make those decisions, so I --

**Q Okay.**

A -- I cannot answer that.

**Q Okay. The fuel clerk works alone in the kiosk; is that right?**

A That is correct.

**Q That's that little shack in the middle of the gas station, for lack of a better term?**

A That is correct.

**Q Is that area locked?**

A Yes, sir.

**Q So, in other words, customers can't just walk into the kiosk?**

A Exactly, yes.

**Q So the only person in there is the fuel clerk; is that right?**

A That is correct.

**Q Sitting here today, can you think of any reason why it would have been a burden on Food City to have a service dog in the kiosk with a fuel clerk?**

A I cannot speculate on that.

**Q Okay. We've been going for a little**

**over an hour. Would this be a good time for a break?**

MR. JACKSON: Sure.

MR. HARGRAVES: I mean, I can keep trucking.

MR. JACKSON: How much more do you have to go?

MR. HARGRAVES: Not an awful lot, but...

MR. JACKSON: Just whatever you want.

THE WITNESS: Give me a water, I'm good.

MR. HARGRAVES: All right. Well, I'll keep trucking. If you change your mind and need a break, just let me know.

THE WITNESS: Okay. Thank you.

BY MR. HARGRAVES:

**Q Were you involved in the ultimate termination of Mr. Batten's employment?**

A Was I involved in it?

**Q Yes, sir.**

A Not directly, no.

**Q All right. Indirectly?**

A Indirectly, I had a conversation with Mr. Lyon where, once again, an associate can be on

leave, a personal leave for up to -- two personal leaves back to back up to 90 days apiece. Once those leaves are, you know, exhausted and someone does not return to work they are, you know, terminated. And so, Mr. Lyon advised me to get with Gary Richards and go ahead and have him terminated in the system.

**Q Were you aware that Mr. Batten had reached out to Gary Richards following the August 18 meeting?**

A Following our last conversation where he called Mr. Richards on the phone and asked him if he could return to work at that point, yes.

**Q Were you aware of that phone call?**

A Yes. After the fact, yes.

**Q Did Mr. Richards come speak to you about that?**

A He called me on the phone, I believe.

**Q All right. What do you remember about that conversation?**

A Him just stating that Mr. Batten had called him asking him if he could return to work, you know, with his service animal and Mr. Richards says that he told him no, and that's all that I was aware of.

Q Okay. Do you recall Mr. Richards communicating to you that Mr. Batten had declined to use a personal leave of absence?

A He never returned the paperwork to Mr. Richards, so in essence he did not.

Q So he didn't take advantage of the personal leave of absence policy that allows employees to request it?

A Correct. He didn't specifically request it by filling out paperwork.

Q Okay. But Food City placed him on a leave of absence anyway; is that right?

A That is correct.

Q Isn't that a bit unusual?

A That was a decision made by Donnie Meadows.

Q Had you ever seen that happen before?

A No, I have not.

Q Typically, it's the employee who requests the personal leave of absence, yes?

A That is correct.

Q Okay. Do you know if Mr. Batten was ultimately terminated?

A Yes, he was terminated.

MR. HARGRAVES: Let's mark that as

Exhibit 8.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 8.)

BY MR. HARGRAVES:

**Q Do you recognize this document marked Exhibit 8?**

A Yes.

**Q What is this?**

A Just a summary of the termination information for Mr. Batten.

**Q And this indicates -- on status it says "terminated;" is that right?**

A That is correct.

**Q It says terminated February 14, 2022; is that right?**

A That is correct.

**Q It also has that as the last day worked; is that right?**

A I'm going to say that would not be his last physical day worked but that would be his last day in our system.

**Q Is the last day worked just the last day they're employed?**

A Typically, yes.

**Q Isn't that the same as their termination date?**
A Typically, yes.
**Q All right. He wasn't physically at Food City on February 14, 2022?**
A No, sir.
**Q The termination reason is "Failed to return from leave;" is that right?**
A That is correct.
**Q And, again, that's the leave that Mr. Batten never requested, Food City just placed him on; is that right?**
A That is correct.
**Q And so he was terminated for failing to return from that leave?**
A That is correct.
**Q Okay.**
MR. HARGRAVES: Let's mark that Exhibit 9.
(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 9.)
BY MR. HARGRAVES:
**Q All right. You've been handed what's marked as Exhibit 9. Do you recognize this**

**document?**

A Yes.

**Q What is it?**

A An email chain of communication from Jenna Johnston to the store regarding Mr. Batten's leave ending, Gary asking me if we have an update, and then me communicating back to Jenna to speak to Sherrell regarding the associate status.

**Q Okay. Who is Jenna Johnston?**

A She's an HR clerk in the department up in Abington.

**Q Okay. Is this a fair and accurate copy of this email chain?**

A As far as I know, yes.

**Q Okay. And it has -- Ms. Johnston's first email indicates that Mr. Batten's leave, that is the personal leave of absence, ended on November 16, 2021; is that right?**

A Yes. Looks like that had been the first leave.

**Q Okay. And then at the top you said, "Jenna, please speak to Sherrell regarding this associate's status. I believe we will leave him on LOA at this time;" is that right?**

A Yes.

**Q Is that you saying that you believe you'll leave him on the leave of absence?**

A Yeah. He was on LOA. Looks like his second LOA had already expired at that point.

**Q So the second leave of absence had expired as of November 16, 2021?**

A No. That would have been the first one --

**Q Okay.**

A -- from August to November.

**Q Okay.**

A And then November to February.

**Q Okay.**

A I don't have all those dates in my particular rolling system. That's what Jenna does up in the office.

**Q Got you. So were you saying -- were you essentially acknowledging the first leave of absence had expired but you wanted to leave him on leave of absence?**

A He was on LOA at the time. Once again, I was not aware that the second one had expired at that point.

**Q Oh, okay. What was the purpose of leaving him on LOA?**

A Once again, we had placed him on LOA, assuming him to be on a leave of absence when he did not return the paperwork back to the company.

**Q That's even though Mr. Batten told the store manager, Gary Richards, that he did not want to take a leave of absence?**

A Donnie Meadows still made the decision to place him on leave of absence in the system.

**Q Why not just fire him?**

A I can't speculate those decisions. Once again, that came -- that communication came from Donnie Meadows.

**Q Did you have any advisory role in terminating employees?**

A I advise based on company policies to store managers across the division.

**Q Okay. Did you not think that you should advise just terminate Mr. Batten's employment?**

A That was not communication advised to me from Donnie Meadows, no.

**Q Okay. Did y'all discuss termination?**

A No, we did not.

MR. HARGRAVES: I believe this is

Exhibit 10?

THE COURT REPORTER: Yes.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 10.)

BY MR. HARGRAVES:

**Q All right. Looking at what's been marked Exhibit 10, Bates number K-VA-T 001058 through 1059, do you recognize this document?**

A Looks like an email chain of communication.

**Q Okay. And you are included on at least some of these communications; is that right?**

A That is correct.

**Q Looking at the first email in the chain on the second page, that's from Gary Richards; is that right?**

A That is correct.

**Q So Mr. Richards indicated to you on August 23rd that Mr. Batten had called him at the store and told him that he -- that you had given him the option of a leave of absence or the FMLA; is that right?**

A That is correct.

**Q And in this email Mr. Richards says,**

**"Matt told me" -- "Matt stated that he was not going to submit the FMLA documents, nor was he going to submit the personal LOA documents;" is that right?**

A That is correct.

**Q You then forwarded that email to Donnie Meadows and Sherrell Lyon; is that right?**

A That is correct.

**Q What was Sherrell Lyon's position at that time?**

A He was working alongside Donnie Meadows to take over as director of human resources.

**Q Okay. Sherrell Lyon responded to you, asking you to keep a copy -- or to email him a copy of all your notes and recaps from your exchanges with Mr. Batten; is that right?**

A Uh-huh.

**Q And did you do that?**

A Send a copy of my notes to Sherrell?

**Q Yes.**

A I'm sure I did.

**Q Is that what the next email is, "please see attached"?**

A I'm sure it is. I'm not for certain. I mean, I'm sure it is.

**Q Do you have any way of confirming**

**what was attached to that email?**

A I'm not sure at this point.

MR. HARGRAVES: This will be Exhibit 11.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 11.)

BY MR. HARGRAVES:

**Q Looking at Exhibit 11, Bates number K-VA-T 001064, do you recognize this?**

A Yes. Looks to be an email chain of communication once again.

**Q Okay. Is this a fair and accurate copy of that email chain?**

A I believe so.

**Q Okay. The first email is on September 9th from Jenna Johnston to Gary Richards, CCing Rickie Estep; is that right?**

A That is correct.

**Q Who is Rickie Estep?**

A She is the office manager in Abington that handles leave of absences and short-term disability, all those types of claims for the company.

**Q It looks like Gary Richards responded**

**and also added you to the email chain; is that right?**

A Yes, sir.

Q **Okay. Ms. Johnston indicated that Mr. Batten should be removed from payroll effective February 14, 2022; is that right?**

A That is correct.

Q **So Mr. Batten's leave of absence expired, his first one expired on November 16, 2021. Are you aware of what his status was between November 16, 2021, and being removed from payroll on February 14, 2022?**

A That would have been a second personal LOA of 90 days. Associates are eligible for up to two of 90 days apiece within a 365-day calendar year, so he was placed on back-to-back personal LOAs.

Q **And that second LOA would have ended on February 14?**

A That is correct.

Q **And just to be clear, Mr. Batten also did not request this second LOA; is that right?**

A That is correct.

Q **Okay.**

MR. HARGRAVES: Let's mark this

Exhibit 12.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 12.)

BY MR. HARGRAVES:

**Q All right. Looking at what's been marked Exhibit 12, do you recognize this document?**

A It looks to be similar to Exhibit 10.

**Q That was going to be my next question. Does this appear to be a portion of what has already been introduced as Exhibit 10?**

A I believe so.

**Q All right. Did you have any verbal communications related to these emails?**

A With who? I mean, yes, I talked with Donnie Meadows, you know, throughout the course of, you know, our interactions and conversations.

At the end of August Donnie Meadows retired from the company and Sherrell Lyon was basically, you know, wanting to recap and, you know, kind of know where we stood with, you know, Mr. Batten at that point, as he was assuming reigns of the position.

**Q Okay. Do you remember Mr. Gary Richards calling you in regard to Mr. Batten?**

A Calling me when?

**Q Do you remember a phone call -- this would have been back around the time of the initial request. Do you remember a phone call on July 30th, 2021?**

A I'm not sure.

**Q Okay. Do you remember a phone call on August 2nd, 2021?**

A With who?

**Q With Gary Richards.**

A I can't specifically recall. I'm sure maybe we did have conversation after I got back from vacation prior to meeting with the associate, setting up a time to be able to meet with Mr. Batten.

**Q If Mr. Richards indicates that you and he had three phone calls related to this between July 30th, 2021, and August 5th, 2021, does that sound right?**

A I'm sure that's very possible.

**Q Okay. Do you remember any of those conversations?**

A Not specifically, no, sir.

**Q Do you know why you would have had a phone conversation with Mr. Richards the day before**

**the scheduled meeting with Mr. Batten on August 6th?**

A To potentially confirm the meeting and ensure that, you know, Mr. Batten was aware to be there. Once again, I can't specifically speak to the specifics of it.

**Q You don't remember if you and Mr. Richards talked about how you would handle the meeting?**

A No. I mean, he knew that I was coming to, you know, speak with Mr. Batten to, you know, gain additional information.

MR. HARGRAVES: Thirteen.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 13.)

BY MR. HARGRAVES:

**Q Looking at Exhibit 13, Bates number K-VA-T 001076 through 001077, do you recognize this document?**

A Yes, sir.

**Q And what is it?**

A An email communication from Donny Rector to myself that he received while I was on vacation, and I forwarded it to Donny and Sherrell at that point.

Q Is this a fair and accurate copy of that email chain?
A I believe so.
Q Okay. The first email at the bottom is from Emily Hobbs; is that right?
A Yes, sir.
Q She is an HRC, a human relations coordinator?
A She was at this point, yes.
Q Okay. That email appears to be blank and sent to Gary Richards; is that right?
A There was an email from Emily to Gary, yes.
Q Okay. Do you know if there was anything attached to that email from Ms. Hobbs to Mr. Richards?
A I mean, I can't specifically speculate or state what may have been attached to that.
Q Okay. The next email is from Donny Rector to you. That's July 26, 2021. It says, "Welcome back. I got this one late last week. Associate with a service animal. I thought you might want to take a look at it." Is that right?
A That is correct.

**Q Did you follow up with Mr. Rector about that email?**

A I did.

**Q Did you have a phone conversation?**

A Yes.

**Q Is that something we've already discussed or...**

A I'm not certain.

**Q Okay.**

A I mean, basically just calling him to see, you know, what the situation was, what action he may have taken. And, like I said, I went ahead and got with Donnie Meadows at that point, as you can see, within five minutes of me receiving it.

**Q Johnny on the spot. Did Mr. Rector indicate that he had done anything on the situation at that point?**

A You know, I don't remember exactly if he had gone to Donnie Meadows at that point or not.

**Q Do you remember what, if anything, he told you in that conversation?**

A No, sir. Other than, you know, there was a request for a service animal there at the fuel kiosk.

**Q Okay. Well, five minutes after you**

got that email from Mr. Rector you forwarded it on to Donnie Meadows asking him to please advise on an associate requesting to bring service dog to work at Gas N Go at 214; is that right?

A That is correct.

Q Did Mr. Meadows reach out to you in response to that request?

A Yes.

Q Was that by phone?

A Yeah. I know we had a phone conversation afterwards, him trying to find out more information about it, and after that I know is when he had further discussion, once again, with Archie and Charlie at the office.

Q Were you present for any of those conversations?

A I was not.

Q Okay. Did Mr. Meadows respond by email to your request to advise on this issue?

A I think it was done via telephone.

Q Okay. Did he send any text messages regarding this issue to you?

A Not that I remember.

Q Okay.

MR. HARGRAVES: Fourteen.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 14.)

BY MR. HARGRAVES:

**Q Looking at what's been marked Exhibit 14, Bates number K-VA-T 001078 through 1079, do you recognize this document?**

A Yes, sir.

**Q It looks to be just -- does it appear to be the same chain that we were just looking at in Exhibit 13 with just a couple more emails on it?**

A Yes, sir.

**Q Okay. Those additional emails, the first one is from Donnie Meadows to Archie Skeens and Charlie Fugate, and the next one is Archie Skeens to Donnie Meadows; is that fair?**

A Yes.

**Q Okay. Do you know why Donnie Meadows would be asking Archie Skeens to advise on the service dog request?**

A I am not for certain. Archie was the safety manager of the company.

**Q Okay. Do -- are disability accommodation requests considered a safety issue?**

A I guess they could be. Once again, I

don't -- I can't speculate as to exactly why Archie was brought into the loop.

**Q Okay. You wouldn't have thought to bring Mr. Skeens in on this particular type of request, would you?**

A No. I just went to my immediate supervisor, Donnie Meadows, at that point.

**Q Did Mr. Skeens ever communicate to you regarding any advice or guidance on the service dog request?**

A I don't remember ever specifically speaking to Archie regarding this entire situation, only Donnie Meadows.

**Q Okay. Do you know who ultimately made the decision to deny Mr. Batten's accommodation? Was that Mr. Meadows?**

A Yes.

**Q Do you know if anybody else participated in that decision?**

A I'm not for certain.

**Q Okay. Are you aware if anyone was hired to fill the fuel clerk position at that store after Mr. Batten left?**

A I cannot speak to that specifically. I mean, once again, we're always, you know, hiring

and staffing positions around the store.

Q Are you aware of Food City eliminating the fuel clerk position after Mr. Batten left?

A Eliminating the position?

Q (Moves head up and down.)

A No, sir. It still stands today.

Q Okay. So at some point somebody filled the position?

A That's fair to say.

Q Okay. Do you know who that would be?

A No, sir.

Q Certainly, the position wasn't left vacant?

A No. I mean, we can't -- we have to have people to operate the fuel station out there.

Q All right. Outside of Food City's attorney, obviously, are there any other communications that you had with anyone else regarding Mr. Batten's request for the use of a service dog that we have not discussed today?

A No, sir.

Q All right. Is everything that you said here today true?

A Yes, sir.

Q Okay. Were any of my questions -- did any of my questions need clarification?

A No, sir.

Q Do you feel that you understood all of the questions that I asked you?

A Yes, sir.

MR. HARGRAVES: Okay. I don't have any further questions at this time.

MR. JACKSON: I just have about one or two.

EXAMINATION

BY MR. JACKSON:

Q Let's look at Exhibit 4.

A Okay.

Q I'm looking at the last line there. "He stated" -- in that case you're saying Mr. Batten?

A Yes.

Q "-- that he could only work with the service dog present at this time, as he was not going to leave the dog with anyone else." Did I read that right?

A That is correct.

Q Was that a -- not a word for word, but a fair representation of the statement that

**Mr. Batten made?**

A Yes, sir.

**Q Did you communicate that statement or the gist of it to Mr. Meadows when you and he were speaking?**

A Yes, sir.

MR. JACKSON: That's all.

MR. HARGRAVES: Nothing further. Thank you, Mr. Ellison.

THE VIDEOGRAPHER: This marks the end of this deposition. One media file was used. The time is 2:43. We're off the record.

MR. JACKSON: And we'll read and sign too.

FURTHER THIS DEPONENT SAITH NOT.

(Signature reserved.)

# E R R A T A   P A G E

I, DAVID GARY ELLISON, the witness herein, have read the transcript of my testimony and the same is true and correct, to the best of my knowledge, with the exception of the following changes noted below, if any:

Page / Line / Change / Reason

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

______________ ________________________________________

________________________________
DAVID GARY ELLISON

Sworn to and subscribed before me, this the _____ day of ___________, 2023.

________________________________
Notary Public
My commission expires:______________

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :
:
COUNTY OF HAMILTON :

I, Diane R. Angel, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. DAVID GARY ELLISON was duly sworn by me; that pages 1 to 83, inclusive, were reduced to typewriting under my direction and supervision and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This the 17th day of January, 2023.

Diane R. Angel

DIANE R. ANGEL, RPR, TN LCR #246
Registered Professional Reporter
and Notary Public.
My Commission Expires: 3/10/2025

# WELCOME
## to
# K-VA-T Food Stores, Inc.

EXHIBIT
1-11-23
1
David Ellison
PENGAD 800-631-6989



# Associate Handbook

FOOD CITY

# Food City Associate Handbook

Value. Everyday.™

This handbook, and the rules, policies, and information contained herein supersedes any and all other associate handbooks, rules, policies, and information previously issued or followed by K-VA-T Food Stores, Inc. (Masculine gender is occasionally used in this handbook to refer to persons of both sexes.)

Published by K-VA-T Food Stores, Inc., March 1994

October 2021 Revision

# INTRODUCTION

## WELCOME TO FOOD CITY

We are pleased to present you with a copy of our Food City associate handbook. It has been designed to help you know your company better. Whether you have been with us for a short time or for a number of years, we want you to know we appreciate the contribution you are making to the continued successful operation of Food City. We believe it is our responsibility to keep you accurately informed of our company's policies and procedures.

As Food City grows, we want you to grow with it. Your company has made considerable progress since its beginning, and the credit goes to each individual associate—your job is important to our continued growth.

This handbook is a summary of the principles for which we stand, the benefits which you may enjoy, and the obligations which you assume as an associate. We do not intend that any "rule" or "policy" cause an undue hardship for any associate. We set them forth simply to let you know what you may expect from Food City and what will be expected of you.

This handbook is intended as a guide, and it is not intended to be, nor should it be, construed as an employment contract. The employee benefits, personnel policies, and rules contained in this handbook will remain in effect unless changes are considered necessary.

Food City reserves the right to make changes in this handbook, as it deems appropriate, with or without notice. This handbook supersedes any benefits, policies, or rules previously written or communicated.

Employment is terminable at the will of either the associate or Food City at any time, and no representative of Food City has any authority to make any contrary agreement except in writing and signed by the CEO.

You are requested to read your handbook carefully and keep it for future reference. If you should have any questions concerning the policies or benefits outlined in this handbook, please ask your supervisor who will be glad to help you.

We welcome our new associates and extend best wishes for continued success to those who have become a part of the growth and progress of our company. We are pleased to have you as a member of our team.

Sincerely,

Steven C. Smith

Steven C. Smith, President & Chief Executive Officer

# THE TEN COMMANDMENTS OF GOOD BUSINESS

## "OUR BUSINESS IS PEOPLE"

1. CUSTOMERS are the most important people in any business.
2. CUSTOMERS are not dependent upon us—we are dependent upon them.
3. CUSTOMERS are not an interruption of our work—they are the purpose of it.
4. CUSTOMERS do us a favor when they call—we are not doing them a favor by serving them.
5. CUSTOMERS are part of our business—not outsiders.
6. CUSTOMERS are not a cold statistic—they are flesh and blood human beings with feelings and emotions like our own.
7. A CUSTOMER is not someone to argue or match wits with.
8. CUSTOMERS are the ones who bring us their wants—it is our job to fill these wants.
9. CUSTOMERS are deserving of the most courteous and attentive treatment we can give them.
10. CUSTOMERS are the lifeblood of this and every other business—they provide our jobs!



K-VA-T
000004

# THE CUSTOMER AND YOU

In your contacts with customers, YOU, for these moments, represent our Company, as far as they are concerned. Our reputation with the customer is at stake—and it's in YOUR hands. Your actions and attitude can strengthen the Company or can quickly turn the customer against us. You have everything to GAIN by being courteous, friendly, and helpful, and everything to LOSE by being discourteous, unfriendly, and unconcerned. IF, JUST ONCE, WE FAIL TO SERVE THEM WELL—THEY MAY LEAVE US, NEVER TO RETURN.

Here are some pointers to keep in mind in your relationship with our "Boss," or the CUSTOMER:

1. LEARN TO SMILE, OFTEN. Start an epidemic of smiling! It's so much easier to smile than it is to frown. Give a smile and receive one in return.

2. ALWAYS GREET THE CUSTOMER. A friendly, "GOOD MORNING!" and a sincere "THANK YOU!" makes shopping and working a pleasure.

3. NEVER ARGUE. Be attentive to a complaint. Remain courteous and, if there is a misunderstanding, call the Manager.

4. AVOID OVER-FAMILIARITY. Call customers "Mr.," "Ma'am," "Miss," "Sir," or "Mrs." Be careful of teasing customers. Do not make remarks that might be misunderstood about an item a customer has purchased. Since it is in the shopping cart, we must assume it was needed, wanted, and the customer can afford it.

5. BE HONEST. Never misrepresent a product.

6. REMEMBER THE FOOD CITY GUARANTEE. All merchandise is sold with a 100% satisfaction guarantee. The full purchase price is refunded if the merchandise has not given complete satisfaction.

7. GIVE EQUAL SERVICE TO ALL CUSTOMERS. Every customer is important and is welcome in our store.

8. DO NOT SOLICIT TIPS BY WORD OR ACTION. Your Company compensates you for the services you perform. Solicitation of tips is grounds for immediate dismissal.

9. "IT'S THE LITTLE THINGS IN LIFE" THAT COUNT —

   Say "THANK YOU" for consideration shown, and purchases made.

   Say "EXCUSE ME" when you must interrupt.



K-VA-T
000005

Say "PLEASE" when you ask for something.

Say "I'LL FIND OUT" instead of "I DON'T KNOW" when asked a question.

10. At Food City, we have a reputation for speedy checking, bagging, and loading. We must all work at it and cooperate fully. We will call to the front additional "courtesy clerks" as needed to quickly handle customer traffic. At this point, THE CUSTOMER does not want to be delayed. We have a duty to see that delays are kept at a minimum. Any associate, regardless of job classification, is expected to assist on the "front" when requested. Our customers make payday possible - Let's keep them happy!

# EMPLOYMENT POLICIES AND PROCEDURES

## OUR WORKING RELATIONSHIP

We welcome you to our Company and want you to enjoy your work here. Our management team is pledged to help you in every way.

During your first few months with us, you will find your supervisor and coworkers alike working more closely with you than at any time of your employment here. Their years of experience will give you a "helping hand" and "head start" with your orientation and job training. Food City will always be interested in you and your job here. Should you ever wish to leave our employment or should we desire to end the employment relationship, we both are free to do so at will. If this should happen, we encourage a notice of separation on your part and prior counseling on our part, depending on circumstances, giving us both time to hopefully prevent any misunderstanding or unfortunate separations.

Thank you for joining our team. We need your unique contribution and look forward to a mutually beneficial work experience.

At Food City, we recognize that, other than our customers, you are our most important asset. Without you, the Company cannot function and prosper. No matter what your role, you are an important part of our organization.

Therefore, with respect to you and all our other associates, Food City's goals and objectives are:

1. To provide for all our associates a healthy and wholesome atmosphere in which to work, not only in physical surroundings but in attitudes, actions, and communications.



K-VA-T
000006

2. To make sure that everyone in our organization knows what is expected of him or her and is properly compensated for the work he or she performs.

3. To recognize the rights of each individual.

4. To allow plenty of opportunity for promotion and advancement.

5. To recognize that our customers are the reason for our existence as an organization and to serve them courteously and serve them well.

6. To conduct all our operations in an ethical and upstanding manner in order to generate, by our actions, a reputation as a progressive, growing Company, eager to make the community a better place in which to live.

The Company's employment objective is to select individuals who meet high standards of personality, character, education, and occupational qualifications, who can carry on our work competently, who have a capacity for growth, and who will become an important part of our organization.

Food City realizes that its fundamental strength and future growth depend directly upon the contribution made by each person within its organization, that productivity and efficiency result from real job satisfaction and from the opportunity each person receives and accepts for his or her individual self- development.

The Company's employment policy is, therefore, designed to:

1. Place each associate, insofar as is possible, in a position that suits his or her natural aptitudes and skills.

2. Offer each associate opportunity for self-development and advancement through on-the-job training.

3. Recognize the importance of the work of each associate to the overall Company performance.

## EQUAL EMPLOYMENT OPPORTUNITY

It is Food City's policy to grant equal employment opportunities to all qualified persons without regard to race, color, sex, religion, age, national origin, disability, veteran's status, or any other protected status.

## LEGAL WORK STATUS

The Immigration Reform and Control Act of 1986 requires that all associates hired by Food City provide documentation proving that they have a legal right to work in the United States.

In compliance with this Act, all job offers extended to successful applicants are made contingent upon the receipt of the required documentation and completion of USCIS Form I-9.

## NO HARASSMENT

Food City does not tolerate the harassment of its associates, customers, or vendors. Any form of harassment relating to an individual's race, color, sex (including same sex), religion, age, national origin, handicap or disability, citizenship status, veteran status, or any other protected activity or category, is a violation of this policy and will result in disciplinary action up to and including dismissal.

Food City will not allow anyone to create an intimidating, hostile, or offensive environment. This includes supervisors, associates, or non-associates such as vendors.

The term "harassment" as used in this policy includes, but is not limited to, the following:

- Offensive remarks, comments, jokes, slurs, or verbal conduct pertaining to an individual's race, color, sex, religion, age, national origin, handicap or disability, citizenship status, or any other protected category
- Offensive pictures, drawings, photographs, or other graphic conduct or communications, including e-mail, faxes, and copies pertaining to an individual's race, color, sex, religion, age, national origin, handicap or disability, citizenship status, or any other protected category
- Offensive sexual remarks, sexual advances, or requests for sexual favors, regardless of the gender of the individuals involved
- Offensive physical conduct, including touching, regardless of the gender of the individuals involved
- Retaliation against an employee for refusing to respond to requests for sexual favors, for reporting a violation of this policy, or for participating in an investigation conducted under this policy

If you feel you are the victim of harassment, please notify anyone in management. You do not necessarily have to first notify your immediate supervisor of such a situation. Feel free to contact anyone in the Company's



K-VA-T
000008

management, including the Vice President of Human Resources, the Company President, or the Chairman of the Board. You are responsible for bringing your concerns about possible policy violations to our attention so that we can take appropriate actions to address your concerns.

## HOW AND WHY YOU WERE SELECTED

The success of Food City and your future here depends upon you. This is why we carefully select our associates through application, careful interview, and reference checking.

## PRE-EMPLOYMENT SCREENINGS AND EXAMS

After an offer of employment has been given, but before you actually start working, you may be asked to take a health examination at the Company's expense. Drug and alcohol screening may also be required. You may also be required to take another physical examination or drug and alcohol screening, at Company expense, when Food City determines it is job-related and consistent with business necessity.

## ILL ASSOCIATES

Food City recognizes that associates with life-threatening illnesses, including but not limited to cancer, heart disease, AIDS, or other disabilities, may wish to continue in as many of their normal pursuits as their condition allows, including work. As long as these associates are able to meet performance standards, with or without accommodation(s), and medical evidence indicates that their condition is not a danger to themselves, others, or property, Food City will endeavor to be sensitive to their conditions and treat them consistently with other ill associates. At the same time, the Company must provide a safe workplace for all associates and customers.

Food City offers the following range of resources available through Human Resources:

- Management and associate education and information on illness or disabilities including specific life-threatening illnesses
- Referral to agencies and organizations that offer supportive services for life-threatening illnesses or disabilities
- Benefit consultation to assist associates in effectively managing health, leave, and other benefits

## TYPES OF EMPLOYMENT

There are four (4) personnel classifications:

**FULL-TIME** — Any person who is regularly scheduled to work thirty-five (35) hours per week or more is classified as a full-time associate and is eligible to receive certain benefits.

**PART-TIME** — Any person who is regularly scheduled to work less than thirty-five (35) hours per week or whose work schedule must be specifically arranged because of other commitments of the associate (such as school) is classified as a part-time associate.

**PART-TIME STUDENT TRAINEE** — A part-time associate who is a full-time student of an accredited school. When school is in session, twenty (20) hours is the maximum time a part-time student trainee can work in one (1) week, except when a full-day, school holiday occurs on a day the store is open. The twenty (20) hours weekly limitation maybe increased by eight (8) hours for each holiday. When school is not in session, they cannot work more than eight (8) hours per day and forty (40) hours per week. These associates will be paid student rates.

**TEMPORARY** — Any person who is hired for temporary work on any schedule which does not exceed four (4) calendar months. Temporary personnel may be on a part-time or full-time schedule of work hours.

## NEW HIRES

It is the policy of Food City to hire all new entry-level associates (other than temporaries) as part-time.

## EMPLOYMENT OF RELATIVES

Family members and close relatives are permitted to work in the same store or work location. Close relatives are not permitted to work directly for, or in a supervisory role of, a relative. "Close relatives" defined as spouse, in-laws, brothers, sisters, children, or parents. Any exceptions to this policy must be approved by the Vice-President of Human Resources and is only granted in unusual circumstances.

## ORGANIZATION MEMBERSHIP IS NOT REQUIRED

Our federal law gives you the right not to have to join any organization in order to hold your job. It is not necessary for any associate to have to join

and pay dues and other union fees to any union in order to work at Food City.

It is the policy of our Company to pay wages that compare favorably with other wages in similar businesses in our area—to give the best possible working conditions we can to treat each associate as an individual.

Even more important, it is our intention to do everything possible to furnish excellent job security for anyone who works in our Company and provide that person with the best possible job satisfaction. It is our Company policy to promote from within the Company whenever possible. Only when a person with the qualifications for the job to be filled is not available, do we look to outside sources.

We believe that a labor union is an unnecessary third party and could seriously interfere with our ability to treat you and our customer in the manner you both deserve.

In the best interests of you and the Company, we will oppose, by every moral and legal means, any attempt by any outside organization to disturb or break up the fine relationship we enjoy.

## WE WANT YOU TO FEEL AT HOME

You may feel a little strange in your new surroundings. However, it will not take you long to get acquainted. Your fellow associates, especially your supervisor or Store Manager, will work closely with you and will provide you with all the information you need to better understand our policies and practices. If you need help, ask them.

## OUR PERFORMANCE REVIEW — YOUR PROGRESS REPORT

All of us like to know how we are doing on the job. Day-to-day comments from department managers help, but now and then there is a need to review all phases of your work performance. In our Company, we have "performance reviews." This procedure requires each supervisor to evaluate the performance of every person under their supervision. The purpose of these reviews is to provide management and you with a periodic review of your performance on the job and to identify any areas where you can improve your performance. Your review will cover the following points:

1. The amount of work you accomplish

2. The accuracy and thoroughness of your work

3. Knowledge of your job duties
4. Your dependability and attendance on the job
5. Your attitude toward your job, fellow associates, and the Company
6. Your ability to organize and plan your work
7. Your personal appearance
8. Your housekeeping skills—cleanliness in work area, floor, etc.
9. The enthusiasm and initiative you demonstrate in your work
10. Your attendance—willingness to work schedule required—tardiness and absence record
11. Your courtesy and cooperation toward fellow associates and customers

Our performance review program provides valuable information to use when considering associates for future promotion, transfers and adjustments to pay rate. In addition, our performance review gives you an opportunity to have a personal discussion of your performance with your immediate supervisor, and to learn how you can improve your on-the-job performance. If you have any questions about how you are doing, or what you can do to improve your performance, please ask your supervisor to visit with you in private. Your supervisor will always try to help you in every way possible.

## PROMOTIONS

At Food City, as in all organizations, different positions have different degrees of difficulty and relative importance to the operation of the Company. The more important of these positions are designated as full-time. Certain other positions may be filled by either full-time or part-time associates as required by the demands of the particular store or department. Within these full-time or part-time positions there are varying degrees of responsibility, proficiency, and/or ability which are all considered in the placement of a person in a particular job.

From time to time, vacancies occur for whatever reason, and at this time a replacement must be selected.

In making a selection to fill a vacancy, it is our policy to always look first at the junior associates within the Company for qualified candidates. Here, job performance, ability to learn, and aptitude are most important. Should we find more than one candidate of equal qualifications, the one with the

longest length of service would be selected. Only when no junior associate is found qualified, do we go out of the Company to hire.

## GUIDELINES FOR LAYOFF AND RECALL

Food City has a history of full employment, and we do not expect to have layoffs. However, if economic or business conditions create an unusual situation which makes it necessary to cut back our work force, then each job will be carefully checked along with each associate's record. Qualifications, past performance, and length of service of each associate will be the guidelines upon which such decisions are made.

## IMPORTANCE OF YOUR LENGTH OF SERVICE—SENIORITY

At Food City, we believe in recognizing your seniority and length of service. Seniority is given to associates through length of service which brings certain privileges and considerations. We have a good seniority program. Usually, this date is the day you were hired for the first time. However, if your seniority has been broken through resignation, discharge, or extended layoff, then your seniority date becomes the last day you were hired following the break in seniority. Associates having the same date of hire will hold seniority in alphabetical order.

Your seniority is important to you in the following ways:

1. It represents the investment in time and money by Food City in your training and experience. This gives you more job opportunity and promotion possibilities as your experience increases along with your seniority.

2. Your seniority has direct relationship to certain of our important associate benefits which are based upon length of service, such as paid vacations.

3. In case we should ever have a layoff, due to business conditions beyond our control, your seniority will give you more work opportunity provided you have necessary qualifications and seniority.

4. Your seniority is also recognized through your length-of-service awards.

## HOW YOUR SENIORITY WORKS

Seniority really starts to matter when you become a full-time associate.



K-VA-T
000013

From this day, your seniority will accrue (unless temporarily interrupted due to an approved leave of absence for personal reasons) until it is broken for one or more of the following reasons:

1. If you voluntarily quit or resign
2. If you are discharged
3. If you fail to report back to work within three (3) workdays after a recall from layoff
4. If you are laid off for a consecutive period of more than six (6) months
5. If you overstay an authorized leave of absence or vacation
6. If you are on sick leave longer than six (6) months unless an extension is granted by your Company
7. If you give a false reason for a leave of absence or accept employment elsewhere during an authorized leave of absence
8. If you falsify information on your pre-employment or post-employment personnel forms
9. If you are absent without notification or excuse for a period of two (2) consecutive days (scheduled workdays), you will be considered as having voluntarily quit your job

## YOUR LENGTH OF SERVICE

Our Company proudly recognizes the service our associates give to the community and to our Company each year. We are very proud of all associates who have been with us for a long time. So you may also convey to your friends and neighbors your years of service with Food City, we award handsome service pins for men and women. A pin is awarded to each associate who has completed two, five, ten, twenty, twenty-five, thirty, and forty years of service with our Company.

For purposes of seniority, our Company recognizes your prior service with another company or store that has joined us by purchase or merger.

We are glad you are here—we hope you like us and will receive many service awards.

## ADVANCEMENT—HOW TO GET AHEAD

As you acquire more skill and experience in your present position and

as job openings occur at a higher level, you will have the opportunity for advancement. As we indicated before, it is our policy to promote from within the Company whenever possible, taking into consideration such items as merit, performance, and length of service.

As you advance in positions of more responsibility, you will reach a point at which, in order to continue advancement, a move to another store or even another town may be required. We understand the difficulty this can cause for some; however, as a practical matter, we call it to your attention.

Your supervisors will be glad to discuss your opportunities for promotion with you. They will help you improve your potential for promotion and tell you how to get ahead.

## IS SOMETHING TROUBLING YOU?

When a group of people are closely working together, a few misunderstandings are bound to occur. We all recognize that everything is not going to run smoothly all the time. If something is bothering you, if you are discouraged, worried, or upset about your work or some outside problem, you cannot work at full efficiency. Feel free to discuss any problem with your Department Manager or Store Manager. They are interested in your welfare and will do what they can to help the situation. If neither can help, you will be referred to someone who can.

## SPEAKING UP—RESOLVING COMPLAINTS OR PROBLEMS THROUGH HEARINGS

In the event the efforts of your supervisor or Store Manager to resolve a problem for you fail, and if you feel it is of such nature that top management of the Company can help you solve it, then please communicate, preferably in writing, with the Company Vice President of Human Resources in Abingdon, VA.

Food City cares about all Company associates, and we are anxious to hear about any problems or complaints that cannot be resolved at the store level. There will be absolutely no discrimination against anyone who appeals a problem, so please, don't let the problem grow. Write, or if you feel you cannot adequately write, then call the Vice President of Human Resources immediately. You will receive a hearing by the Vice President of Human Resources.

Should you still be dissatisfied, you may make one last appeal to the Chief Executive Officer, who will render the final and binding decision.

The purpose of our hearing procedure is to help you work out any

complaint or problem that you might have. Remember, the only way we can understand and help you with your problems or complaints is if you come to us and explain your individual situation.

## PROGRESSIVE DISCIPLINE POLICY

At Food City, we believe discipline is not meant to be punishment in any way. However, when it becomes necessary to change an associate's performance or behavior from unacceptable to acceptable, our Progressive Discipline Policy enables us to endeavor to do so in a consistent manner.

Normal steps in the disciplinary process are outlined below. However, at management's discretion, management may enter into any level of disciplinary action, including termination.

**Oral Correction**—The supervisor will provide an oral correction to the associate. A written record of this correction will be placed in the associate's personnel file.

**Written Correction**—The supervisor will consult with higher management and prepare a written correction. The associate will be asked to sign indicating receipt of a copy of the written correction, and a copy will be placed in the associate's personnel file.

**Suspension Without Pay**—If the written correction does not correct the problem, the associate may be suspended without pay for a minimum of three (3) days. This suspension without pay must have the approval of the Chief Executive Officer.

**Termination**—The supervisor may recommend termination of associates. Recommendations will be reviewed by management, which will determine the action to be taken.

If the associate feels the termination is unfair, he or she may use our Open Door Policy or Hearing Procedure, if appropriate. Based upon this discussion, the appropriate Company officer will make a final determination in the case.

Management reserves the right to enter into any level of disciplinary action or termination depending on the circumstances.

## YOUR GUIDE TO PERSONAL CONDUCT

Food City wants to provide a good work environment for all associates. This desire is expressed in many forms: safe working conditions, maintenance of facilities and equipment, equitable wage structures, and progressive

benefit programs. In turn, it is reasonable to expect a good productive effort and the recognition of responsibility on the part of associates.

Each of us has the responsibility to our fellow workers to conduct ourselves according to certain rules of good behavior or conduct. In any business, some rules are needed to help everyone work together by letting them know what they can and cannot do. We expect our associates to follow our Company rules and show good behavior and efficiency. For these reasons, we have included, in our handbook, a number of work rules. You are expected to read, understand and follow these rules in your day-to-day work.

Disciplinary action, whether oral or written, is given only for the purpose of correcting someone for doing something wrong. Having to dismiss an associate is unpleasant for everyone, and we try to work with each associate to avoid such action. However, failure to follow our work rules is against the best interests of our other associates and our Company, and usually leads to dismissal. Should you have any questions, at all, concerning any work rule listed, please see your supervisor.

In order to be absolutely fair, we have what we call a "wash-out" period for certain disciplinary actions. An associate should not be penalized unless there is a repetitious problem. Therefore, after having made a "mistake," we will "wipe the slate clean" if no more rule infractions occur within twelve (12) months from the date of the last rule violation.

Food City rules are basically common sense, requiring conduct acceptable to a customer service oriented employment environment. When these common sense practices are violated, disciplinary action may be taken. While the following list is not all-inclusive, some of the violations which can result in disciplinary action—including discharge—are:

1. Inefficiency, unsatisfactory performance or customer service, or lack of application or effort on the job
2. Committing action which affects the safety of equipment, associates or customers
3. Violating a safety rule or practice
4. Knowingly completing the timecard or time record of another associate; having one's card or record completed by another associate; or unauthorized altering of a timecard or time record
5. Being late for work without proper notice or excuse
6. Being absent one (1) day without proper notice or excuse
7. Being absent two (2) consecutive days without proper notice or excuse
8. Loafing or spending unnecessary time away from job

9. Leaving your job or your regular working place during working hours for any reason without authorization from your Store Manager, except for lunch
10. Leaving work before the end of the regular workday or not being ready to work at normal starting time
11. Failure to follow check-cashing procedures
12. Unauthorized use of Company telephones
13. Violation of associate purchasing policy
14. Smoking, eating, or drinking in restricted areas
15. Possession or consumption of alcohol or illegal drugs on Company premises, or reporting to work under the influence of intoxicants or drugs - under the influence means not only obvious impairment, it also means physical evidence that a substance has been consumed on or off Company premises
16. Disorderly conduct on Company property
17. Immoral or indecent conduct on Company property
18. Foul or abusive language to any supervisor, associate, or customers
19. Concealment of a disease that will endanger fellow workers or customers
20. Falsification or misrepresentation of a fact or facts in any Company record, document, time record, invoice or any other Company-related matter
21. Any misrepresentation, falsification of information, or omission of information or other facts in seeking employment, no matter when discovered
22. Dishonesty or removal of another person's property or Company property without permission
23. Willful destruction of Company property
24. Insubordination (refusal to follow instructions or an order)
25. Gambling on Company property or while on the job
26. Instigating a fight on the job
27. Unauthorized possession of firearms, fireworks, or explosives on Company property
28. Contributing to unsanitary conditions
29. Unauthorized presence in store office, or other restricted areas
30. Writing bad checks
31. Failure to adhere to dress code
32. Parking in unauthorized areas
33. Reckless driving on Company property

34. Failure to properly account for funds entrusted to you
35. Conduct which reflects discredit upon the Company
36. Failure or refusal to cooperate with a Company investigation
37. Failure to promptly report to your workstation
38. Any three (3) minor offenses—minor offense may be any offense that has an oral or written warning of the first offense

Violations of Company policies outlined in other sections of the handbook, or habitual offenders of various Company rules, will be dealt with by written correction to dismissal, depending upon frequency and nature of offense

The above list of Company rules and causes for corrective action is by way of illustration to inform all associates what is expected of them in their daily work performance at this Company. It is not intended to be all-inclusive. Provisions may be modified, added, or deleted.

## TERMINATION OF EMPLOYMENT

Termination of employment is always unpleasant and costly so you can be sure it won't be considered lightly. If, however, discharge becomes necessary, advance notice may or may not be given depending on the circumstances, and unused vacation will not be paid.

## OTHER EMPLOYMENT

We realize that many of our associates, and particularly our part-timers, have other employment in one form or another. This is agreeable to us so long as it neither interferes with the associate's work attendance or job performance nor creates a conflict of interest.

The following are considered by our Company as a "Conflict of Interest:"

1. Active ownership of, or platonic interest in, a business operation competitive with ours in any way.
2. Employment with a competitor doing business in the retail grocery industry.
3. Employment directly or indirectly with a sales company (direct vendor, manufacturer, or food industry brokerage) which makes sales and/or service calls on any store owned by our Company or those owned by our competition.

Any associate whose other employment is considered a "Conflict of Interest" will be subject to immediate dismissal.



K-VA-T
000019

## SHOULD YOU RESIGN

We hope you remain with us for a long time. However, sometimes personal affairs force a change in jobs. In such cases, please give your supervisor at least two weeks' notice. This courtesy will allow your supervisor enough time to adjust working schedules and secure a replacement. Also, your advance notice will reflect favorably on your employment record. Payroll checks will be made available on the next regularly scheduled payday.

Whenever possible, an exit interview will be conducted for anyone who resigns. It is to your advantage to participate in this interview so that we can give you information about your benefits. Also, we will want to have your honest opinion on our Company policies and practices which will enable us to improve our relationship with everyone.

## COMPANY REFERENCES

We are glad to cooperate with former associates by answering, as fully as possible, any inquiries which may be received from their prospective employers. Your Company, however, does not give general open "To Whom It May Concern" letters of recommendation. Company references may not be issued by anyone other than the Human Resources Department.

## RE-EMPLOYMENT

Anyone who has voluntarily left our employment and whose work performance met our standards while employed will be considered for re-employment status in any position for which they are suitable, and possess appropriate skills and experience. Such individuals will be considered as new associates, with no continuation of any previously earned but forfeited Company benefits or seniority. These associates will complete all pre-employment paperwork.

# YOUR HOURS OF WORK AND YOUR PAY

## PAYROLL WORKWEEK




The official payroll workweek begins at 12:01 A.M. Saturday morning and ends at 12:00 midnight Friday. Your particular work schedule will depend on your job. Your Manager will explain your work schedule to you. Should you ever have any question on when you are to be at your workstation, ready to work, please ask your Manager.



K-VA-T
000020

Due to the nature of our particular business, we are sometimes not able to establish a definite number of hours to be worked each day. Sometimes schedules must be changed because of business conditions or because fellow associates are unavailable for work. Schedule changes are inconvenient for all concerned, including your Manager, but sometimes they are necessary. Regular posted schedules will be followed whenever possible. Your cooperation will be appreciated, and we will try to cooperate with you.

## TIME RECORDS

Due to various federal regulations and in keeping good business practice, we are required to show the time worked on a daily basis for each associate. Please check with the Store Manager for detailed instructions on the system which is in use at your location.

Please be certain to enter data on your time card or time record when you are supposed to. If you forget or make an error, notify your Manager, at once, who will make the correction. It is important to report your time accurately. Reporting false information is prohibited and can lead to dismissal.

When clocking out on the last day of the week, review your card or time record carefully to see that all your hours of work are recorded properly, and sign the card or time record to certify that it is correct.

In addition to regular work time, associates will be paid for — and the time clock should be used to record — time spent in meetings, lectures, and training programs, as well as travel time required by the Company, on the same basis as if it were regular work. Whenever the programs required are away from the time clock, the time to be credited will be added to the timecard or time record by the Store Manager.

## OUR PAY POLICY

It is our Company policy to pay wages and salaries comparable to those paid for similar jobs and services in our surrounding area. We maintain our wage and salary structure by periodically conducting wage surveys. We adjust our wage and salary ranges in accordance with the business and general economic conditions of our Company.

The pay range for your individual job classification is determined by the requirements of your job with such factors considered as responsibility, skill, training, education, and working conditions. Wage increases are based upon your record of performance on the job and your particular job classification.

## PAYDAY

Paydays at Food City are handled on a weekly basis. Your paycheck for the previous workweek will be available to you every Thursday. The pay you receive is for work you performed during the previous workweek. Paychecks are typically deposited directly to your bank or pay card that you have indicated. If you have elected to receive pay through a paper check, you may pick it up on Thursday.

## SHOULD YOU FIND AN ERROR IN YOUR PAY

Every precaution is taken to avoid errors in your paycheck. If an error does occur, tell your Manager. If an error is found, the adjustment will be made on the next paycheck.

## OVERTIME

For hourly associates, all work performed in excess of forty (40) hours in a payroll week will be paid at one-and-one-half (1-1/2) times the average hourly rate of pay earned during the first forty (40) hours.

## PREMIUM RATE

Full-time, retail associates who are scheduled and work between 9:00 P.M. and 6:00 A.M. receive a 50 cent-per-hour premium for all hours worked between these times. Additionally, those full-time associates working on Sunday will also receive the 50 cent-per-hour premium. However, premium rate is paid only during the first forty (40) hours worked during any week.

## REST PERIODS

Rest periods are paid time provided by the Company for your relaxation and enjoyment. Rest periods are given for not more than fifteen (15) minutes in duration during every four (4) hours or more worked. All rest periods are to be recorded as directed by your Store Manager.

Rest periods are scheduled by your Department Manager when they will least interfere with the operation of the store or service to the customers.

Normally, you are not to leave the store premises during rest periods. Should you need to leave for any reason, please get the prior approval of your Store Manager.

## MEAL PERIODS



Anyone working more than six (6) hours per day is normally scheduled to take one (1) hour for a meal. This meal period will be scheduled by your supervisor and will be around the middle of your shift. You must never exceed five (5) hours working time either before or after a scheduled meal period. For night stock associates only, the meal period may be shortened to not less than thirty-five (35) minutes by special permission of your Store Manager. This time is your own, and you are free to use it as you see fit. Please try to make your personal calls during this time. Always take the full time set aside for your meal period unless requested to do otherwise by your Manager. During this meal period, you are not to perform any work whatsoever. It's important to record your time at the beginning and end of your meal period.

## YOUR PAYROLL DEDUCTIONS

Does your paycheck represent the full amount of your earnings? No. We are required to deduct your federal and, where applicable, state income tax from your paycheck. This deducted amount is turned over to the United States and State treasuries, and you are given credit for it on your income tax at the end of the year. The amount of the tax deduction is determined by your earnings and the number of your dependents. Each year, you will receive a W-2 showing your total earnings for the year and the amount of taxes withheld.

Also, out of your paycheck will come deductions for Social Security at the rate established by law. Your Company contributes an equal amount of that deducted from your wages. Any other deductions such as health plan coverage, etc., must be authorized by you before they can be made.

# BENEFITS

## THE PAYCHECK ISN'T ALL—THERE'S MORE

Your weekly paycheck does not represent your entire compensation from Food City. Not only do you receive cash wages each week, but you also may receive a substantial number of benefits, which while not paid in cash, still represent real dollars to you and your family. These benefits include such items as paid vacations, paid holidays, various types of insurances, etc. We want you to have a full understanding of your benefits so we are devoting an entire section to the discussion of each one.



K-VA-T
000023

If you have any questions concerning any of your benefits, please ask your supervisor or contact the Human Resources Department.

## YOUR VACATION WITH PAY



We believe that our full-time associates should have a time of rest and relaxation each and every year. Vacation with pay is for this purpose and is one of the ways we show our appreciation to you for your length of service and good work. For this reason, it is Company policy to require that at least one (1) week of earned vacation be taken each year. Vacation time due in excess of one (1) week may be taken in increments of one day or more at a time.

Full-time associates who have been with the Company for a minimum of twelve (12) continuous months since their last date of hire or the date on which they became a full-time associate, whichever is later, will receive a vacation according to the following schedule:

| LENGTH OF SERVICE | PAID VACATION |
|---|---|
| After 1 year of continuous service | 1 week |
| After 3 years of continuous service | 2 weeks |
| After 10 years of continuous service | 3 weeks |
| After 20 years of continuous service | 4 weeks |

Continuous service of one (1) year means twelve (12) continuous months since the last date of employment or since becoming a full-time associate. In most instances, the date you become a full-time associate is established as your vacation effective date. In the event an associate is off on a leave of absence, the vacation effective date will be adjusted accordingly. An example would be an associate who worked for ten (10) months, was off for two (2) months on a personal leave of absence, and returned. That associate would have to work two (2) additional months in order to be eligible for a regular vacation period, i.e., the ten (10) months previous uninterrupted service and then the two (2) months when he or she returned from their leave would make the equivalent of twelve (12) continuous months.

Vacations may be taken at any time during the year, except for the heavy holiday period. We must consider that we are a service industry and that our customers are our real employers, and as such, their demands must be met first, vacations scheduled second. In order to be sure we maintain sufficient manpower to serve our customers, all vacations to be taken

during the peak vacation period of May 15 - September 15 will be scheduled no later than April 15. In order to do this, each Store Manager will have each department head draw up a schedule reflecting your requested period. This will be accomplished by allowing the more senior associates first choice and most junior associates last choice.

Vacations taken outside this peak period may be requested on shorter notice, but it is always best to allow at least a thirty (30)-day planning time.

Due to variation in the number of hours worked by hourly associates during the year, and in order to be fair to all concerned, vacation pay will be the total of regular and premium hours for the fifty-two (52) calendar weeks prior to your full- time date (vacation effective date) divided by fifty-two (52), then multiplied by your current straight-time rate of pay. For this vacation hour's calculation, vacation taken as time off will be included as time worked.

May we repeat again — vacation is earned by completing a full year of continuous service; vacation is never prorated but rather earned totally by passing the vacation effective date. You will become eligible for vacation pay only after passing your vacation effective date.

Part-time service will not be counted in determining length of service.

An associate who voluntarily quits without giving the Company at least two (2) weeks' notice, or is discharged, forfeits all vacation rights.

## HOLIDAYS

Full-time associates, after the successful completion of ninety (90) calendar days, shall be eligible for the following holidays:

- New Year's Day
- Memorial Day
- Independence Day
- Your Birthday
- Labor Day
- Thanksgiving Day
- Christmas Day



To qualify for holiday pay, you must work the scheduled day before and the scheduled day after a holiday, unless your absence on either of these days has been excused in writing by your Store Manager. Holiday pay will amount to the average number of hours worked on a daily basis during the prior thirteen (13) weeks. This average will be calculated by adding up the total hours worked at regular or premium pay during the prior thirteen (13) weeks divided by thirteen (13) then further divided by five (5) to determine



K-VA-T
000025

the length of the average work day, then multiplied by the current rate of pay at straight time. For this purpose, vacation time taken as time off will be included as time worked. For example: if your average workweek in the prior thirteen (13) weeks is forty (40) hours, we would divide by five (5) to determine that your average work day is eight (8) hours. Then your holiday pay would be eight (8) hours multiplied by your straight-time rate of pay.

Holiday hours are not included in computing overtime for the week in which the overtime occurs. Associates will receive holiday pay no matter what day in the week the holiday falls. Should you be required to work on a holiday, you shall be paid straight-time hourly rate for the time worked in addition to your holiday pay. If you are scheduled to work on a holiday and you then fail to show up and perform the work, you will not receive holiday pay unless you have an acceptable excuse for failing to report to work.

If the paid holiday falls during your vacation, you will be paid for the holiday in addition to your vacation, but an additional day off will not be granted. To be eligible for a paid holiday that falls within your vacation period, you must have worked your last regularly scheduled workday in the week prior to your vacation and your first regularly scheduled workday in the week after your vacation period.

Associates on any type of leave of absence other than two weeks' military reserve training leave, will not receive pay for holidays during their leave.

It is Company policy to require time off be taken for your birthday holiday. Whenever it is not in the best interests of the store for your actual birthday to be taken as a holiday, another day close to the holiday, and mutually agreeable to both you and your Store Manager, shall be substituted.

## JURY DUTY



If you are summoned for jury duty, please tell your Store Manager as soon as possible. As good citizens, any of us are subject to being called for jury duty. In order to avoid any severe financial loss to you from serving on a jury, the Company will pay a full-time associate the difference between jury duty pay and the amount you would have earned. The daily jury duty pay will amount to the average number of hours worked on a daily basis during the prior thirteen (13) weeks, less any compensation received for jury duty and any compensation for hours worked. You are expected to work on any day when you are not required to perform jury service. Juries are frequently excused for all or part of a day. It is certainly not our intent to subsidize this time off. To be eligible for jury duty pay, you must get a statement from the



K-VA-T
000026

court clerk indicating the time you served on the jury and the amount you received as jury duty pay and turn the statement in to your Store Manager.

## BEREAVEMENT PAY

All actively employed full-time associates who have completed their ninety (90)-day waiting period may receive scheduled time off with pay if they attend the funeral of a member of their immediate family. The immediate family is defined as father, mother, grandparents, grandchildren, husband, wife, child, sister, brother, and immediate step-relatives. The associate may receive a maximum of three (3) scheduled work days off with pay starting the day of the funeral and two days prior. Bereavement pay is based on the average number of hours worked on a daily basis during the prior thirteen (13) weeks, less any hours worked.

This bereavement pay is intended to offset lost income to you during this sad period. Should you suffer no loss of income due to a change of schedule still allowing you to work your regular schedule during this pay period, you would have no loss of income.

For associates in their waiting period, and part-time or temporary associates, funeral leave without pay will be granted upon the death of a member of the immediate family.

## HEALTH CARE AND DENTAL PLANS

Health care and dental plans are important benefits available to full-time associates. You should know about the health care and dental plans you have and what is available for you by being a full-time associate of Food City. This is a real protection that we are happy to provide for you and your family's benefit.

So you and your family may have the complete understanding and appreciation of the many benefits available under our group plan, we suggest you read the plan summary published by the health care plan administrator. Plan documents are available on My Profile or from the Human Resources Department.

All full-time associates are eligible for health and dental coverage on the first day after completing the ninety (90)-day waiting period, subject to timely completion of required enrollment process. If you are not actively at work on the date you are eligible to become covered, you will be insured on the first day you return to work.

Full-time associates are also eligible to extend medical and dental coverage to your dependents at the Company's group rate. This is, by far, the most inexpensive method to obtain this protection, and we highly recommend that you elect to use it if needed.

## LIFE INSURANCE

All full-time associates are eligible for life insurance coverage after completion of their ninety (90)-day waiting period. If you are not actively at work on the date you are eligible to become covered, you will be insured on the first day you return to work. The Company pays the full cost of your coverage.

The amount of coverage depends on your job classification and years of service.

At the time you become eligible for life insurance, you will receive a copy of the policy. Coverage is automatic, and you are not required to take any action to receive coverage.

## UNEMPLOYMENT INSURANCE

Your Company pays the entire cost of this insurance. Its purpose is to provide temporary income for workers and their families when, through no fault of their own, they have lost their jobs. To be eligible, a person must have earned a certain amount in covered employment and be willing and able to work.

Your Company pays a percentage of its payroll to the Unemployment Compensation Fund according to the Company's employment experience. If you become unemployed through no fault of your own, you may be eligible for unemployment compensation for a limited period of time under the laws for the states in which we operate. The laws are administered by the State Unemployment Compensation Commission. Applications for benefits are made through your local State Employment Service Offices.

## YOUR STOCK OWNERSHIP PLAN (ESOP)

Your Company has established an Employee Stock Ownership Plan which allows you to participate in the growth of the Company. The success of the Company, and all our combined efforts, determine the financial support the Plan will provide for your retirement years. The cost of the Plan is paid entirely by the Company.

You are eligible to participate in the Plan when you have completed one (1) year of service, received credit for 1,000 hours of service during this period, attained to age of twenty-one (21), and are employed at the end of the Plan year. More detail is provided in the separate "Summary Plan Description."

Your Company Human Resources Department will be glad to answer any questions you may have about the Plan.

# 401(k)

Your Company offers a 401(k) retirement plan available to both part- and full-time associates. You are eligible to participate in the Plan when you are twenty-one (21) years of age, complete one (1) year of service, and work at least 1,000 hours during the year to receive matching contributions. For every dollar you put in the Plan, your Company will make a matching contribution equal to 100% of your elective deferral that does not exceed three percent (3%) of your compensation each payroll period. More detail is provided in the separate "Summary Plan Description."

Your Company Human Resources Department will be glad to answer any questions you may have about the Plan.

# YOUR SOCIAL SECURITY BENEFITS AND PAYMENTS

Federal Social Security provides a variety of benefits including old age retirement payments, death benefits, disability insurance, and monthly income payments, to certain dependent survivors of covered associates. A percentage of your gross salary is deducted, as required by law, as your contribution for this protection. Your Company contributes an equal amount to that deducted from your wages. The Social Security programs are in addition to the benefit programs for associates offered by the Company.

# WAGE REPLACEMENT
# (Short-Term Disability)

## Full-Time Hourly Associates

After the completion of your ninety (90)-day waiting period, you are eligible to participate in the disability insurance plan if you are a full-time associate.

If you become totally disabled because of non-occupational sickness or injury so that you are prevented from performing all of the duties of your occupation, you will receive a weekly income at a rate of sixty percent (60%) of your basic hourly rate. Payments will begin on the first (1st) day of disability due to an accident or the eighth (8th) day of disability due to sickness (except from the first day hospitalized if less than eight (8) days) and will continue for not more than twenty-six (26) weeks of any continuous disability. Written proof of disability will be required. Benefit payments will end on the earliest of the following dates:

1. The first day the associate returns to work;



K-VA-T
000029

2. The day a doctor's statement releases the associate to return to work; **or**

3. The expiration of the benefit payment duration of twenty-six (26) weeks.

While you are on such personal disability leave status, your medical and life insurance payment will be continued by the Company on the same cost basis as if you were working.

If you are not able to come back to work after twenty-six (26) weeks, you may request, in writing, a ninety (90)-day personal leave of absence. In exceptional circumstances, an additional ninety (90)-day personal leave may be granted. In no circumstances will the total disability and personal leave exceed fifty-two (52) weeks.

When you are given your return-to-work release by your medical doctor, it is important that you contact your Store Manager as soon as possible. It may have been necessary to replace you in your present position. Except as provided by law, upon return to work from disability leave, there is no guarantee of re-employment; however, the associate who has been on an extended disability leave will be considered for re-employment when a suitable position becomes available. All persons on a disability leave are given re-employment priority over those on a personal leave of absence.

In the event you are on a medical leave of absence with an insurance company other than those representing our Company liable to pay you benefits, and benefits are not being paid to you through either our K-VA-T disability plan or worker's compensation, your K-VA-T medical and life insurance may be continued only at your expense, except as provided by law.

If you are not able to return to work after twenty-six (26) weeks (or longer by the length of a personal leave of absence, if granted), you will be terminated from our active payroll.

1. Supply the proper claim forms to your doctor or hospital at the time of the claim.

2. Follow up on claims in process (with the Human Resources Department).

3. Completely pay all insurance premiums due during a leave of absence in advance of the leave starting date.

4. Upon the occurrence of a qualifying event, a full-time associate may continue health care coverage through the CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT of 1986 or COBRA. Your family

members may also continue coverage if they are no longer eligible because of your death, divorce, or because a child reaches the age limit. It is very important to let the Human Resources Department know of any changes that may affect your coverage. The length of time you may be covered depends on why you are no longer eligible for group insurance.

It is the associate's (your) responsibility to file any claim for disability benefits which you may be due and return completed forms from the physician to Human Resources.

Notify the K-VA-T Human Resources Department of the following in order that your insurance information may be kept current:

a. Change of marital status
b. Change in number or status of dependents
c. Change in beneficiary (life insurance)
d. Any other significant changes of status

**Full-Time Salaried Associates**

Salaried associates, after completion of the 90-day waiting period, are eligible to apply for a full weekly income for the first thirteen (13) weeks of disability, and up to an additional thirteen (13) weeks at 75% of the base salary. Income eligibility requires you to provide Human Resources with the appropriate medical documentation and clinical notes from the attending physician for determination of benefits.

Your Human Resources Department will be glad to help you with any of the above!

## PERSONAL LEAVE OF ABSENCE

An unpaid leave of absence may be granted for personal reasons to any associate after completion of their ninety (90)-day waiting period. All leave of absence requests must be presented in writing to the Store Manager, who shall forward it, along with his recommendation, to the Vice President of Human Resources for consideration. The appropriate officers of the Company shall then decide, within a reasonable time, whether or not to grant the request and advise in writing of the decision.

All such leaves of absence shall be for a specific period of time, not to exceed ninety (90) days, and must be requested two (2) weeks in advance of the starting date, whenever possible. The Company may, if requested, extend a leave of absence for a period up to an additional ninety (90) days.

All such approved leaves of absence will contain a specific date to be available to return to work. The associate on leave of absence, who desires to return, must reapply at least two (2) weeks prior to this scheduled date. There is no guarantee of immediate re-employment; however, the associate will be considered for re-employment when a suitable position becomes available, and a new date to report is set. Any associate who fails to return to work on this date will be considered to have quit without notice. Any associate, while on such a leave of absence, who accepts other employment will be considered to have quit.

An associate does not earn any benefits during a personal leave of absence. Examples would be vacation, holiday pay, etc.

Further, during an unpaid leave, the Company does not continue to pay for the health plan coverage the Company provides the associate. The associate should contact the Store Manager to make arrangements for payment prior to the leave starting date if he or she desires to maintain the insurance program during the leave of absence.

## FAMILY AND MEDICAL LEAVE OF ABSENCE

Your Company has always been concerned about any associate's need for a leave of absence. Our policies have always been generous, in that respect, and designed to meet your needs. On August 5, 1993, a new federal law became effective which governs many leave of absence situations for practically all of your Company's full-time associates and for many part-time associates. This law is called the Family and Medical Leave Act of 1993 (FMLA). A brief summary of associate's rights is printed below in the language suggested by the U.S. Department of Labor. All of your Company's leave of absence policies pertaining to family and medical leaves will be administered in compliance with the FMLA. In the event that there is a conflict between any leave policy and the requirements of the law, the law will prevail. In some instances, your Company's policies may be more generous than that required by law.

Eligible employees may take up to twelve (12) weeks of unpaid, job-protected leave each year for specified family and medical reasons.

**Employee Eligibility:** To be eligible for family or medical leave, employees must have worked at least:

1. Twelve (12) months for the Company; and

2. 1,250 hours for the Company over the previous twelve (12) months.

**Conditions Triggering Leave:** Family and medical leave must involve one or more of the following reasons:



K-VA-T
000032

1. To care for a newly born child, or placement of a child with the employee for adoption or foster care.

2. To care for an immediate family member (spouse, child, or employee's parent) with a serious health condition.

3. The employee has a serious health condition which makes the employee unable to perform the employee's job duties.

4. Because of any qualifying exigency arising out of the fact that the employee's spouse, son, daughter, or parent is a covered service member on active duty, or who has been called to active duty.

5. To care for a covered service member with a serious injury or illness if the employee is the spouse, child, parent, or next of kin of the service member.

**Duration Of Leave:** For leave other than to care for a covered service member, eligible employees may receive up to twelve (12) workweeks of unpaid leave during any "rolling" twelve (12)-month period, measured backward from the date of any family or medical leave. Family and medical leave involving the birth or placement of a child for adoption or foster care must be concluded within twelve (12) months of the birth or placement.

Eligible employees may take family and medical leave intermittently — which means taking leave in blocks of time, or by reducing your normal weekly or daily work schedule — whenever it is medically necessary to care for a seriously ill family member, or because you are seriously ill and unable to work, or for leave based on a qualifying exigency, or to care for a covered service member. Intermittent leave is not permitted for birth of a child or placement of a child for adoption or foster care.

Eligible employees may take up to twenty-six (26) weeks of leave to care for a covered service member with a serious injury or illness in a single twelve (12)-month period, measured forward from the date that such leave begins.

Subject to certain conditions, eligible employees may choose (or the Company may require you) to use accrued paid leave (such as sick time or vacation leave) as a substitute for some or all of the family and medical leave.

Particular limitations apply to certain leaves when both spouses are employed by the same employer. If these limitations apply, the Company will inform you when responding to your request for leave.

**Maintenance Of Health Benefits:** The Company will maintain coverage for eligible employees and dependents (if applicable) during family and

medical leave. This coverage will be provided if you or your family were covered under the plan before the leave was taken and on the same terms as if you had continued to work. Where appropriate, you must make arrangements to continue to pay your share of health plan premiums while on leave.

In some instances, the Company may recover premiums it paid to maintain health coverage for you and your family if you do not return to work from your leave.

**Job Restoration:** Upon returning from a family and medical leave, eligible employees will normally be restored to their original job, or to an equivalent job with equivalent pay, benefits, and other employment terms and conditions. However, an employee does not continue to accrue additional benefits such as personal leave and vacation, for example, while on family and medical leave.

Use of family and medical leave cannot result in the loss of any employment benefit that employees earned, or were entitled to, before using family and medical leave.

**Notice And Medical Certification:** When seeking family and medical leave, employees may be required to provide:

1. Thirty (30) days advance notice of the need to take family and medical leave, if the need is foreseeable.
2. Medical certifications supporting the need for leave due to a serious health condition affecting you or an immediate family member. Second or third medical opinions (at the Company's expense), and periodic recertification may also be required.
3. Periodic reports during the leave regarding your status and intent to return to work.
4. Medical certification of fitness for duty before returning to work, if the leave was due to your health condition.

When leave is needed to care for an immediate family member or for the employee's own illness, and is for planned medical treatment, the employee must try to schedule treatment so that it will not unduly disrupt the Company's operation.

**Extended Medical Leave:** Eligible employees who have exhausted their family and medical leave, and all other employees, may be allowed to take extended medical leave of absence, not to exceed twelve (12) months following the last day worked. Employees who take such extended medical leave are not guaranteed to be returned to work or reinstatement

to a particular job, rate of pay, or shift, at the end of their extended medical leave. However, the Company will attempt to return employees to their regular position if it is available. If it is not available at the time reinstatement is sought, we will attempt to place you in a similar job for which you are qualified, if such job is available. Employees on extended medical leave may maintain their insurance benefits, subject to policy terms and conditions by paying the applicable COBRA premiums in a timely manner. Employees on extended medical leave do not accrue any additional employee benefits such as personal leave or vacation while on extended medical leave.

**Other Employment:** Outside employment during your leave period is prohibited and may result in disciplinary action, up to and including, immediate termination of employment.

**Failure to Return from Leave or Comply with this Policy:** Employees may be subject to immediate termination for:

1. Failure to return to work within twelve (12) months of the beginning of a medical leave;
2. Failure to return to work within twelve (12) weeks of the beginning of a family leave;
3. Failure to return to work as scheduled following the end of a medical or family leave;
4. Providing false or misleading information or omitting certain information in connection with a family or medical leave; or
5. Violation of any of the Company's rules and regulations relating to a family or medical leave (or any other policy or performance standard).

## EMPLOYEE RIGHTS AND RESPONSIBILITIES UNDER THE FAMILY AND MEDICAL LEAVE ACT

### Basic Leave Entitlement

FMLA requires covered employers to provide up to twelve (12) weeks of unpaid, job-protected leave to eligible employees for the following reasons:

- For incapacity due to pregnancy, prenatal medical care or child birth;
- To care for the employee's child after birth, or placement for adoption or foster care;
- To care for the employee's spouse, son or daughter, or parent, who has a serious health condition; **or**

- For a serious health condition that makes the employee unable to perform the employee's job.

**Military Family Leave Entitlements**

Eligible employees whose spouse, son, daughter, or parent is on covered active duty or call to covered active duty status may use their twelve (12)-week leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

FMLA also includes a special leave entitlement that permits eligible employees to take up to twenty-six (26) weeks of leave to care for a covered service member during a single twelve (12)-month period. A covered service member is: (1) a current member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious injury or illness;* or (2) a veteran who was discharged or released under conditions other than dishonorable at any time during the five (5)-year period prior to the first date the eligible employee takes FMLA leave to care for the covered veteran, and who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness.*

*The FMLA definitions of "serious injury or illness" for current service members and veterans are distinct from the FMLA definition of "serious health condition."

**Benefits and Protections**

During FMLA leave, the employer must maintain the employee's health coverage under any "group health plan" on the same terms as if the employee had continued to work. Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.

Use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

**Eligibility Requirements**

Employees are eligible if they have worked for a covered employer for at least twelve (12) months, have 1,250 hours of service in the previous twelve (12) months, and if at least fifty (50) employees are employed by the employer within seventy-five (75) miles.

## Definition of Serious Health Condition

A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job, or prevents the qualified family member from participating in school or other daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than three (3) consecutive calendar days combined with at least two (2) visits to a health care provider or one (1) visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

## Use of Leave

An employee does not need to use this leave entitlement in one block. Leave can be taken intermittently or on a reduced leave schedule when medically necessary. Employees must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the employer's operations. Leave due to qualifying exigencies may also be taken on an intermittent basis.

## Substitution of Paid Leave for Unpaid Leave

Employees may choose or employers may require use of accrued paid leave while taking FMLA leave. In order to use paid leave for FMLA leave, employees must comply with the employer's normal paid leave policies.

## Employee Responsibilities

Employees must provide thirty (30) days' advance notice of the need to take FMLA leave when the need is foreseeable. When thirty (30)-days notice is not possible, the employee must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedures.

Employees must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Employees also must inform the employer if the requested leave is for a reason for which FMLA leave was previously taken

or certified. Employees also may be required to provide a certification and periodic recertification supporting the need for leave.

**Employer Responsibilities**

Covered employers must inform employees requesting leave whether they are eligible under FMLA. If they are, the notice must specify any additional information required as well as the employees' rights and responsibilities. If they are not eligible, the employer must provide a reason for the ineligibility.

Covered employers must inform employees if leave will be designated as FMLA-protected and the amount of leave counted against the employee's leave entitlement. If the employer determines that the leave is not FMLA-protected, the employer must notify the employee.

**Unlawful Acts by Employers**

FMLA makes it unlawful for any employer to:

- Interfere with, restrain, or deny the exercise of any right provided under FMLA; **and**
- Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

**Enforcement**

An employee may file a complaint with the U.S. Department of Labor or may bring a private lawsuit against an employer.

FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State or local law or collective bargaining agreement which provides greater family or medical leave rights.

FMLA section 109 (29 U.S.C. § 2619) requires FMLA covered employers to post the text of this notice. Regulation 29 C.F.R. § 825.300(a) may require additional disclosures. For additional information:

1-866-4US-WAGE (1-866-487-9243)
TTY: 1-877-889-5627
www.wagehour.dol.gov
U.S. Department of Labor Wage and Hour Division

# PARENTAL LEAVE POLICY

The Parental Leave Policy applies to some Tennessee employees as defined below:

**A. General**

Employees who have been employed for at least twelve (12) consecutive months as full-time employees may be absent for a period not to exceed four (4) months for adoption, pregnancy, childbirth and nursing an infant. With regard to adoption, the four (4)-month period shall begin at the time an employee receives custody of the child. Any time off under this policy will also count toward an employee's use of FMLA leave (if the employee qualifies for FMLA leave), and such leaves shall run concurrently to the extent possible.

**B. Notice to the Company**

Employees who give at least three (3) months advance notice of their anticipated date of departure for such leave, their length of leave, and their intention to return to full-time employment after leave, shall be restored to their previous or similar positions with the same status, pay, length of service credit and seniority, wherever applicable, as of the date of their leave.

Employees who are prevented from giving three (3) months advance notice because of a medical emergency which necessitates that leave begin earlier than originally anticipated shall not forfeit their rights and benefits under this section solely because of their failure to give three (3) months advance notice.

Employees who are prevented from giving three (3) months advance notice because the notice of adoption was received less than three (3) months in advance shall not forfeit their rights and benefits under this section solely because of their failure to give three (3) months advance notice.

**C. Other Provisions**

1. Leave will be without pay, except that employees will be required to use accrued vacation and sick leave as under the Company's FMLA policy. Such leave shall not affect the employees' right to receive vacation time, advancement, seniority, length of service credit, benefits, plans or programs for which the employees were eligible at the date of their leave, and any other benefits or rights of their employment incident to the employees' employment position; provided, that the Company need not provide for the cost of any benefits, plans or programs during the period of such leave, unless the Company so provides for all employees on leaves of absence.

2. If an employee's job position is so unique that the Company cannot,

after reasonable efforts, fill that position temporarily, then the Company need not reinstate the employee at the end of such leave period.

3. The purpose of this section is to provide leave time to employees for adoption, pregnancy, childbirth and nursing the infant, where applicable; therefore, if the Company learns that the employee has utilized the period of leave to actively pursue other employment opportunities, or if the Company learns that the employee has worked for another employer during the period of leave, then the Company will not reinstate the employee at the end of such leave.

4. Whenever the Company determined that the employee will not be reinstated at the end of such leave because the employee's position cannot be filled temporarily, or because the employee has used such leave to pursue employment opportunities or to work for another employer, the Company will notify the employee.

## MILITARY SERVICE LEAVE OF ABSENCE

If you enter the military service, we will do our best to protect the career which you began with us. The Uniformed Services Employment and Reemployment Rights Act (USERRA) provides the guidelines for reemployment of individuals who voluntarily or involuntarily leave their employment to undertake military service. We will work to comply with this and other similar laws that promote reemployment following an individual's service time.

## MILITARY RESERVE OR NATIONAL GUARD TRAINING LEAVES



If you are a member of a Military Reserve or National Guard Unit and must serve a short period of active duty (usually not more than two (2) weeks), you may take a military leave of absence, without Company pay. Or you may arrange to take your unused vacation with pay during your tour of active duty.

Please give your Store Manager four (4) weeks' notice when you plan to serve.

## WORKER'S COMPENSATION

Your Company pays 100% of this protection for you. This is designed to assist you if you are hurt accidentally while at work. The specific benefits that you may be eligible for are determined by the workers compensation laws and regulations of the state where you work.

While you are on a Worker's Compensation leave status, your medical and life insurance payments will be continued by the Company on the same cost basis as if you were working.

If you are unable to return to work – with or without a reasonable accommodation – after twenty-six (26) weeks, you will be offered a ninety (90)-day leave of absence. All leave of absence requests must be returned to Human Resources for consideration. If you are unable to return to work at the end of the ninety (90)-day leave, you may request a second ninety (90)-day leave of absence. If you are unable to return to work at the end of the second leave of absence, or do not apply for a second leave, you will be terminated from active payroll. After termination, any full-time associate may continue health care coverage through the Consolidated Omnibus Budget Reconciliation Act of 1986 or COBRA.

# YOUR RESPONSIBILITIES TO FOOD CITY

## YOUR PART

Along with the advantages and opportunities offered by our Company go certain responsibilities—obligations that you will want to meet. Your most important responsibility, of course, is to do a good job on the work which is assigned to you by your supervisor. Your supervisor is responsible for what you do, so it is a good idea to respect experience, listen to his/her instructions he/she gives, and carry them out promptly and cheerfully. Completing each assignment to the satisfaction of your supervisor is the surest way to make progress.

In addition to following instructions, doing a good job requires you to think for yourself—ask questions and make constructive suggestions. You will find that your supervisor will appreciate your efforts to do an outstanding job and improve your Company.

Doing a good job also implies certain obligations on your part, such as maintaining good health and mental alertness, using good judgment, being prompt and regular in your attendance, cooperating with your fellow workers, and being loyal to your Company—its people, its customers, and its services. You will want to keep well informed about your Company

so that you will be able to talk intelligently about it to your friends and neighbors. To them, you represent Food City and what you say can do much to shape their final opinion of it.

## SUBSTANCE ABUSE

If we are to continue to fulfill our responsibility to provide reliable and safe products and services to our customers and a safe working environment for our associates, associates of Food City must be able to perform their duties in a safe and efficient manner. Therefore, no associate shall work or report to work while under the influence of alcohol or illegal drugs, nor under the influence of prescription or non-prescription medication which would affect their ability to perform their job in a safe and efficient manner. Under the influence means not only obvious impairment, it also means physical evidence that a substance has been consumed on or off Company premises. No associate shall consume, display, or have in their possession, on Food City property, alcoholic beverages or illegal drugs at any time during their workday, including in the workplace or in Company vehicles, during lunch breaks, and on-call hours. To do so could jeopardize the safety of other associates, the public, Company equipment, and the Company's relations with the public, and is prime cause for disciplinary action, up to and including dismissal.

Should you be required to take any kind of prescription or non-prescription medication which affects your job performance, you are required to report this to your supervisor. Your supervisor will determine if it is necessary to temporarily place you on another assignment to ensure your safety and the safety of our associates and the public.

To protect the best interests of associates and the public, management at Food City will take whatever measures are necessary to determine if alcohol or illegal drugs are located on or are being used on Company property. Measures that may be used include, but are not limited to, searches of people and of personal property located on Company premises, which may be conducted by law enforcement authorities or by management, as well as drug and/or alcohol tests. The above-mentioned searches and drug tests will not be conducted if an individual refuses to submit; however, refusal to submit will result in immediate removal from service and may result in termination.

Associates experiencing problems with alcohol or other drugs are urged to voluntarily seek assistance to resolve such problems before they require management referral or disciplinary action. A portion of the cost of treatment may be covered by your health plan, and you may have to assume responsibilities for the cost of a portion of the treatment. Successful treatment will be viewed positively. However, participation in a treatment program will not prevent normal disciplinary action for a

violation which may have already occurred, nor will it relieve an associate of the responsibility to perform assigned duties in a safe and efficient manner.

## BEGIN ON TIME

In order for all our jobs to work together satisfactorily, we must all be present and on time every day. If, for any reason, you are unable to be at your work at your regular starting time, please call your supervisor so that schedule adjustments can be made. If you are unable to report to work because of illness or emergency, please notify your supervisor at the earliest possible moment.

## ATTENDANCE

Of course, we want you to be at work every scheduled day. However, we know that it may occasionally be necessary for you to be absent from work because of illness or personal reasons. In those cases, please notify your supervisor at least one (1) hour before the beginning of your scheduled starting time. Advance notification is necessary so that proper arrangements can be made to handle your work during your absence. However, notification – while helpful – does not necessarily excuse the absence.

## RUMORS—THE COMPANY GRAPEVINE

Rumors have a habit of flying around from time to time, and some people seem to take delight in passing them on as the gospel truth. When you hear a rumor, please ask your supervisor "for the truth."

## CARE OF EQUIPMENT

Your Company has invested thousands of dollars in equipment which is designed to enable you to do your work more efficiently. Your cooperation in the care and use of this equipment is necessary to maintain it in good operating condition. If any of our equipment is defective or is not best for the job, please notify your supervisor immediately. A few timely repairs may prevent complete breakdown of the equipment.

## GOOD HOUSEKEEPING

One sure indication of a good associate is the condition and appearance of his or her work area. Orderliness in your work area reduces accidents, improves health conditions, reduces fire hazards, adds to the efficiency of your work, improves the quality of our service, and portrays a favorable image to customers who may be touring our facilities. We can all help by

placing trash and refuse in the containers provided, and by applying a few simple rules of cleanliness. It is everyone's responsibility to help keep Food City clean and sanitary as we work.

## NAME BADGES

To help you develop friendly relations with your customers and fellow associates, Food City provides you with an attractive name badge to be worn on the upper left side of your vest or smock, or on a Company-provided lanyard. This badge is a means of identifying yourself to your customers and is a sign of your willingness to help them. These name badges must be worn at all times while on duty. If you lose your badge, another can be purchased from your Store Manager.

## PERSONAL APPEARANCE

Our Company's professional atmosphere is maintained, in part, by the image we present to our customers and vendors. We expect all associates to present a neat, well-groomed appearance and a courteous disposition. These qualities go further than any other factors in making a favorable impression on the public and your fellow workers.

Dress should be appropriate for your position and must conform to the established standards. You may view job specific uniforms/dress code on Fast Track or you may ask your Manager to provide additional information on the dress code policy for your particular position. Company-issued uniforms are available, or you may choose to purchase Company apparel to wear instead. You should avoid extremes in dress. Skimpy or revealing clothing is unacceptable. Associates should dress in a business-like manner. Jeans (unless authorized by your Manager), t-shirts, unauthorized sweatshirts, unauthorized shorts, miniskirts (more than 3" above the knee), form-fitting apparel, "hotpants," short tops, halter tops, backless dresses, slouch or "hang down" pants (pants worn below the waistline), flip-flops, sandals and hats (except as required for sun protection or in production areas) are NOT ACCEPTABLE attire in the workplace. Furthermore, the Company's professional image can be tarnished because of customers' negative reactions to excessive piercings. For that reason, we do not allow associates to display jewelry which may be offensive to our customers. Due to health and food safety concerns, no one working in production areas may wear any jewelry, except a plain wedding band. Other non-production area associates may wear jewelry in moderation. Proper head covering or hairnet and protective clothing must be worn when required by State Health Department regulations. The Company's professional image can also be adversely affected by an associate's display of visible body tattoos. For this reason, tattoos should be covered, whenever possible, but in no instance may they be offensive. Good personal hygiene is also important in terms of our customers' favorable opinion and in terms of your respect

for your fellow associates. Accordingly, associates are expected to come to work in a clean condition—no body odor or dirty appearance will be tolerated.

Associates are expected to observe our Personal Appearance Policy at all times while at work. Associates who report to work in unacceptable attire or appearance may be requested to leave work and return in acceptable attire or appearance. Such time off from work will be without pay.

**Managers are responsible for insuring that associates project a professional image and adhere to our Personal Appearance Policy. The interpretation of the above rules will be strictly at the discretion of the Store Manager or supervisor. Failure to conform to established standards of dress and grooming may result in disciplinary action.**

## DRESS CODE

### For All Associates

1. Name badges must be worn at all times.
2. Personal body cleanliness must be maintained at all times—no body odor or dirty appearance will be tolerated.
3. Comfortable, neat, low-heel shoes are required. (No flip-flops or open-toe shoes are allowed.) Shoes must be kept neat, clean, and laces must be tied at all times.
4. Proper head covering or hairnet must be worn when required by State Health Department regulation. Beard guards must be worn if applicable.
5. No jeans may be worn except where specifically allowed in the dress code.
6. Company-furnished uniforms must be kept neat and clean.
7. Fingernails must be trimmed, filed, and maintained so the edges and surfaces are smooth and easily cleaned. Additionally, associates in food service areas (Meat, Seafood, Produce, Salad Bar, and Bakery/ Deli) may not wear fingernail polish or artificial fingernails.
8. Jewelry, when worn, should be modest and in good taste.
9. Associates will neither eat, drink, smoke, nor use other forms of tobacco at any time while on duty. This applies to all K-VA-T personnel, as well as to any manufacturers or distributor sales representatives when working in Food City stores.

10. Food City hooded sweatshirts and jackets must be worn over approved apparel.

**For All Female Associates**

1. Cosmetics may be used in moderation.
2. Tan khaki pants (with belt) or tan khaki skirts must be worn.

**For All Male Associates**

1. Haircuts and beards are to be kept neat, clean, and of moderate length.
2. Tan khaki pants must be worn (with belt).

**Non-Management female associates in the following departments: Grocery, Front End, Fuel, Floral and GoCart:**

Choose one of the following options:

1. Smock furnished by the Company, must be properly buttoned. Blouses visible under the smock must be of business attire and a matching color. Short or long sleeve will be acceptable.
2. Food City polo shirt, furnished by the Company, must be tucked inside pants.
3. Food City sweatshirt, purchased by the associate, must be worn with a collared shirt or turtleneck.

All full-time associates will be provided with three smocks and/or Food City polo shirts. Part-time associates will be provided with two smocks and/or Food City polo shirts. Additional uniforms may be purchased.

**Non-Management male associates in the following departments: Grocery, Front End, Fuel, Floral and GoCart:**

Choose one of the following options:

1. Vest, furnished by the Company, must be properly buttoned and worn with a dress shirt suitable for wearing with a man's business suit.
2. Food City polo shirts, furnished by the Company, must be tucked inside pants.

3. Food City sweatshirt, purchased by the associate, must be worn with collared shirt or turtleneck.

4. Caps or head coverings are not permitted while on duty except with special permission from your Store Manager. A Food City approved cap may be worn.

All full-time associates will be provided with three vests and/or Food City polo shirts. Part-time associates will be provided with two vests and/or Food City polo shirts. Additional uniforms may be purchased.

**Male and female associates in the following positions: Front-End Managers and Customer Service Coordinators:**

1. Manager polo shirt, furnished by the Company, must be tucked inside pants and worn while on duty.

2. Tan khaki pants must be worn (with belt). Females may also wear tan khaki skirts.

All full-time associates will be provided with three shirts. Part-time associates will be provided with two shirts. Additional uniforms may be purchased.

**Bakery/Deli and Salad Bar Department Associates:**

1. All Bakery/Deli and Salad Bar associates must wear a Company-furnished coat, properly buttoned at all times while on duty.

2. Blouses or shirts worn under the coat must be suitable attire.

3. Black or tan khaki pants must be worn (with belt). Females may also wear black or tan khaki skirts.

4. A hat, furnished by the Company, must be worn at all times while on duty.

All full-time associates will be provided with three coats and one hat. Part-time associates will be provided with two coats and one hat. Additional uniforms may be purchased.

**Meat, Seafood and Sushi Associates:**

All meat, seafood and sushi associates will follow the same uniform instructions for male and female front-end associates with the following exceptions:

1. An apron or jacket, furnished by the Company, must be worn at all times while on duty.

2. A hat, furnished by the Company, must be worn at all times while on duty. Additional hats may be purchased.

**Produce Associates:**

All produce associates will follow the same uniform instructions for male and female front-end associates with the following exceptions:

1. A green coat or green apron, furnished by the Company, must be worn at all times while on duty.

2. Company-furnished hats must be worn at all times by associates while on duty or when working in the preparation area. Additional hats may be purchased.

**Male and female associates in the following positions: Pharmacy Manager and Pharmacist:**

1. White Pharmacist coats will be furnished by the Company and must be properly buttoned and worn while on duty.

2. Male Pharmacists will wear either a Food City Pharmacy polo shirt (which may be purchased from the Company) or dress shirt suitable to be worn with a business suit.

3. Female Pharmacists will wear either a Food City Pharmacy polo shirt (which may be purchased from the Company) or dress blouse.

4. Dress pants must be worn. Females may also wear skirts.

All Pharmacy Managers and full-time Pharmacists will be provided with three white Pharmacist coats. All part-time Pharmacists will be provided with two white Pharmacist coats. Additional uniforms may be purchased.

**Male and female associates in the following positions: Pharmacy Technicians and Certified Pharmacy Technicians:**

Tan khaki pants must be worn. Females may also wear tan khaki skirts.

Choose one of the following options:

1. Food City Pharmacy smock, furnished by the Company, must be properly buttoned. Blouses or shirts under the smock must be of business attire and a matching color. Short or long sleeve will be acceptable.

2. Food City Pharmacy polo shirt, furnished by the Company, must be tucked inside pants.

All full-time Pharmacy Technicians and Certified Pharmacy Technicians will be provided with three Pharmacy smocks and/or Pharmacy polo shirts. All part-time Pharmacy Technicians and Certified Pharmacy Technicians will be provided with two Pharmacy smocks and/or Pharmacy polo shirts. Additional uniforms may be purchased.

**Non-Management Associates**

During the period of April 1st until October 31st, Food City knee-length shorts may be purchased and worn instead of pants or skirts. The khaki shorts must be worn with a Food City polo shirt.

# WHAT FOOD CITY EXPECTS FROM YOU

## HONESTY

Absolute honesty is accepted as the first requirement of employment. The trust placed in everyone is based on complete confidence in that person's integrity. Many associates handle cash transactions, while all of us are responsible for goods, materials, or equipment of value. The good name you can earn for honesty is one of the greatest assets you can possess. Any dishonest act will be considered grounds for dismissal with forfeiture of all accumulated benefits.

Always remember—it's important to BE HONEST but it's doubly important not to let questionable actions appear to others to be dishonest. Your good name can be destroyed forever by one act of dishonesty.

## ENTHUSIASM

The outstanding person in any group is the one who is enthusiastic. The enthusiastic associate will take the interest in learning everything about his or her Company and will take every opportunity to improve the Company's operations and services and reduce expenses. Entering wholeheartedly into the promotion of your store, both as a successful business enterprise and as a group of educated people, will bring greater enjoyment in your immediate task and will mark you as worthy of assuming greater responsibilities.

## GETTING ALONG WITH OTHER PEOPLE

Some people have the natural ability to win friends with a smile, a handshake, or a pleasant word. Others have to work at it and keep trying

until they have learned to get along with others. Being fair, sincere, and cooperative is the easiest way to win friends and keep them whether they are customers or fellow associates.

Here are some things that DO NOT make work a pleasure:

a. Rumors
b. Arguments
c. Failure to cooperate
d. Irritable atmosphere
e. Failure to be productive

You are the one who can keep these things from happening.

## OUR TELEPHONE PRACTICE

Our telephones are maintained for Company business. Please refrain from using Company phones for personal calls. Repeated non-business calls are subject to reprimand.

Ask your friends and relatives not to call during working hours unless there is an emergency. If there is an emergency, you will be called to the telephone. Otherwise, the calling number will be taken and you will be notified so you may return the call on a rest or meal period.

## TELEPHONE COURTESY



All of us who answer telephones for the store should do so promptly and in a business-like manner. First impressions are very important. When answering the store phone, greet the caller with "Good Morning" or "Good Afternoon (your store name)." If you must leave the phone to get information to answer the caller's questions, or to call someone else to the phone be sure to tell the caller, "Just a moment, please, while I get that information for you." If an in-store call, such as in the Meat Department, you should answer, "Meat Department, (your Name) speaking." The important thing is to be friendly, cheerful, and helpful.

Should you ever find it necessary to put a caller on "hold" to transfer a call or reach someone to answer, it is your responsibility to check back and see that the call was answered. NEVER LEAVE A CALLER ON HOLD FOR MORE THAN THIRTY (30) SECONDS WITHOUT RE-ANSWERING THE CALL YOURSELF.

## PERSONAL CONTACT AT WORK

Visitation of associates by friends or relatives is not encouraged, and any such visits should be limited and be of a short duration. Socializing with friends or relatives while on duty, whether customers or associates, is prohibited.

We will not become involved in the domestic or love life of associates; therefore, domestic disputes on Company time or property are prohibited. An associate who permits his/her domestic problems to interfere in any way with the Company's business may be discharged.

## ASSOCIATE AS A CUSTOMER

Food City values your business and appreciates you as a customer. We hope you and your family will shop with us on a regular basis and support us as we support you.

For obvious reasons, all of us, associates, must observe certain rules of good business in making purchases. These are simple and easy to follow, and serve to protect us, as associates, and the store.

### Associate Purchase Policy

1. Never check out your own purchases or those of your family or close friends.
2. All persons connected with Food City will pay the full, regular price in effect on the day the merchandise is purchased.
3. All purchases for use or consumption within the store must be paid for immediately. The cash receipt for the purchases must be attached to the item or in your possession **at the time of consumption.**
4. All purchases to be removed from the store must be selected after clocking out for the day. Purchases must be checked out through the checkouts and taken out the FRONT DOOR in the same manner as any other customer. **You are not allowed to set items aside for purchase at a later time.**
5. Items, once bought, may not be stored in the store work spaces or refrigerated areas. Items found here will be considered the property of the store and be placed back on sale, **and/or destroyed.**
6. Store management has the right to inspect any packages taken out of the store.
7. **Items not from the regular sales display counter or shelf,**

**i.e., store supplies, case lots, etc., must be price marked and approved by a member of management.**

8. **Damaged and reduced merchandise may be purchased by our associates after being properly discounted by the Department Manager or member of store management and placed on the sales floor.**

Failure to follow the above procedures will result in disciplinary action up to, and including, dismissal **and/or prosecution.**

## WASTE PREVENTION

Waste of time, materials, equipment, and utilities is costly to your Company and to you. You can help make Food City prosperous by the amount of time you save, as well as the quality of work which you perform. You should make every minute count. Eliminate waste wherever possible. In the long run, you will benefit by helping to reduce operating costs because the amount of money which is saved by eliminating waste can be shared by all of us.

## ACCIDENTS AND INJURIES

All injuries and accidents, no matter how slight they may appear to you, must be reported to your supervisor at once. He or she will then direct you to the proper First Aid and medical attention. Failure to report an accident or injury will result in disciplinary action, even dismissal.

Do your best to eliminate accident hazards, but when an accident happens, report it immediately.

## FIRE PREVENTION

These rules are offered with the belief that many accidents can be prevented. However, rules alone will not prevent accidents; it takes the cooperation of all of us to see that accidents are eliminated. Report any unsafe condition to your supervisor and always try to THINK SAFETY.

1. Keep your store clean and see that all trash is removed from the workplace.

2. Be careful with burning cigarettes. Smoking is not permitted in any facility. Smoking should be in the designated areas only. Every associate should be conscious of the dangers of burning cigarettes.

3. Be conscious of all fire hazards. Everyone should become aware

of fire hazards resulting from faulty wiring, electrical motors, air conditioning and heating units, and refrigeration equipment. Any fire hazards should be reported at once to your Store Manager.

4. Know the location of the fire extinguishers in your store and be familiar with their operation.

## SAFETY

The first person to benefit from your observance of the SAFETY rules is yourself! Stay alert to situations which might be dangerous to YOU, YOUR FELLOW WORKERS, AND YOUR CUSTOMERS.

**The Most Important Safety Rules Are:**

1. Eliminate accident hazards! Keep the floors clean and free of water, paper, vegetable leaves, etc.; keep cases out of the aisles; keep merchandise on display and on the shelf straight; get rid of nails that stick out; keep storage area neat and straight. Never allow a possible accident hazard to exist. If you cannot eliminate it yourself, bring it to your supervisor's attention.
2. Use tools and equipment properly–keep them in safe working condition–and put them back in their proper places when you are finished.
3. Don't indulge in HORSEPLAY. If you are injured in "horseplay," normally you are not covered by Worker's Compensation Insurance.
4. Lift correctly by using these simple procedures:
   a. Never lift beyond your strength.
   b. Get a secure footing (feet 8 to 12 inches apart).
   c. Bend at the KNEES and grasp the object firmly underneath.
   d. Keep the back straight and as near UPRIGHT as possible.
   e. Lift gradually by straightening the legs with the strong leg muscles (keeping the back upright).
   f. Avoid jerky, twisting motions.
5. All aisles are to be kept clear.
6. If you drive a Company vehicle, do not speed beyond the limits established by the Company and those considered legal by town, city, state, or federal authorities.

These rules are offered with the belief that many accidents can be prevented. However, rules alone will not prevent accidents; it takes the cooperation of all of us to see that accidents are eliminated. Report any unsafe condition to your supervisor and always try to THINK SAFETY.

## PARKING




In the supermarket business of today, a store's volume of business is directly related to the parking facilities available. Preferred parking spaces should always be saved for those people who pay our salary—THE CUSTOMERS. Ask your Manager where you should park. Parking in unauthorized spaces is a violation of Company policy and disciplinary action will be taken.

## SOLICITATION

In the interest of the efficiency, convenience, and the continued goodwill of our customers, and for the protection of our associates, there shall be no solicitation or distribution of literature of any kind on the store premises by any associate during his or another associate's working time, or by other persons at any time. Working time is defined as all time during which associates are required to be working.

There shall be no distribution of literature of any kind, other than consumer information (such as menus, dietary information, etc.) prepared by the grocery industry or the government, by any person in customer service areas or shopping areas of the store.

Any associate who violates any provision of this rule shall be subject to counseling and disciplinary action up to and including discharge. Your Store Manager should be notified immediately when a violation occurs.

## SHOPLIFTING

Shoplifting is a serious problem in any retail business. Losses add to the cost of merchandise and can affect job security. We should be alert to all suspicious customers. Shoplifting is a very sensitive problem and must be handled by experienced associates to avoid difficulties.

If you see anyone in the store whom you suspect, don't say or do anything. Quickly report the incident to your Store Manager, Assistant, or the person in charge. If possible, do not let the suspect out of your sight. Under no circumstances is an associate to confront or openly accuse a customer of shoplifting. Only a Store Manager or person in charge has the authority to apprehend a shoplifter.

## HOLDUPS

Should a holdup occur, **remain as calm as possible**, and without hesitation, obey all orders by the holdup person. However, during their presence, be sure to concentrate on features, dress, scars, voice, automobile, tag number, etc., for identification at a later time.

# KEEPING IN TOUCH

## YOUR PERSONNEL RECORD

When you became employed by Food City, you completed an application supplying us with various facts we must know about you. This information was transferred to a permanent and confidential file that is the Company's employment record of you as an individual. Keeping this record correct and up to date is important to you because it enables the Company to reach you in an emergency, forward your mail, properly maintain your insurance and other benefits, compute your payroll deductions, etc.

Your Store Manager should be notified promptly of changes in:

1. Address and telephone number
2. Marital status (for insurance and withholding tax purposes)
3. Name
4. Beneficiary or dependents listed in your insurance policy
5. Number of dependents (for insurance and withholding purposes)

In addition, please let your Store Manager know about the completion of any training or educational courses, so that you may receive proper consideration as better job opportunities arise throughout the Company.

## BULLETIN BOARDS

Periodically, we post information of general interest to you on our Company bulletin boards. Please form the habit of checking these bulletin boards daily so that you will be familiar with the information found there. Only Company-authorized communications may be posted on the Company bulletin boards.

## IF YOU JUST WANT TO TALK...

All of us have our problems — sometimes small and sometimes not so small. Personal problems gang up on us, and we don't know where to turn. Whenever problems begin to bother you to the point of interfering with your work, your physical well-being, or your outlook on life, it often helps to get it off your chest. At





K-VA-T
000055

times like these, we want to help you, if we can, without being "nosy." Any of us will be glad to talk with you, in confidence, about any problems you may have. Naturally, we have your best interests at heart and are always willing to be helpful.

## ASSOCIATE RESPONSE LINE

Food City promotes an open door policy. Open communication creates an honest and productive work environment that benefits all associates. If you have suspect or observe unethical, illegal, or irresponsible workplace behavior, don't ignore the situation. Discuss it with a member of management, Human Resources, or Security/Loss Prevention. If you feel more comfortable, you may call the Associate Response Line at 1-866-601-5757. This toll-free number is available twenty-four (24) hours a day and seven (7) days a week for your convenience. You may also choose to email your concern to arline@foodcity.com. Concerns that would require you to contact the Associate Response Line would include, but not be limited to the following:

Harassment
Health or Safety Issues
Drug or Alcohol Abuse
Other Illegal or Unethical Practices
Theft or Fraud
Workers Comp Fraud
Workplace Violence

## HOTLINE TO MANAGEMENT

From time to time, you may be concerned about a situation or problem. Feel free to contact any member of management with questions. If you wish, you may contact the Corporate Office by mail or phone at:

Steve Smith
K-VA-T Food Stores, Inc.
P.O. Box 1158
Abingdon, VA 24212
Phone: (276) 623-5100

## OTHER INFORMATION

In addition to this associate policy handbook, you will receive other information from Food City, whether in written or electronic form. You will want to make this information available to your family so they may know more about your job and your benefits. In addition, you will receive letters at your home. There is no regular schedule for distribution of this information–the function of each letter or publication is to provide you and your family with interesting news and helpful information that will keep you up to date on the happenings at Food City.

# PLEASE KEEP THIS BOOKLET FOR FUTURE REFERENCE

## NOTES

# INDEX

Accidents and Injuries ........ 49
Advancement ........ 11
Appearance ........ 41
Associate as a Customer ........ 48
Associate Responsibilities ........ 38
Attendance ........ 40
Begin on Time ........ 40
Benefits ........ 20
Bereavement Pay ........ 24
Bulletin Boards ........ 52
Complaints ........ 12
Customer Relations
    Ten Commandments of Good Business ........ 1
    The Customer and You ........ 2
Discipline Policy ........ 13
Dress Code ........ 42
Employment Policies and Procedures
    Equal Employment Opportunity ........ 4
    Legal Work Status ........ 5
    New Hires ........ 7
    Other Employment ........ 16
    Re-Employment ........ 17
    Selection ........ 6
    Types of Employment ........ 7
    Working Relationship ........ 3
Equipment, Care of ........ 40
Fire Prevention ........ 49
Getting Along with Other People ........ 46
Harassment ........ 5
Health Care and Dental Plans ........ 24
Holdups ........ 52
Holidays ........ 22
Hotline to Management ........ 53
Housekeeping ........ 40
Ill Associates ........ 6
Insurance
    Disability ........ 26

Life ........ 25
Unemployment ........ 25
Worker's Compensation ........ 38
Jury Duty ........ 23
Layoff and Recall ........ 10
Leaves of Absence
Disability ........ 26
Family and Medical ........ 29
Military and Reserve ........ 37
Personal ........ 28
Length of Service ........ 11
Meal Periods ........ 20
Name Badges ........ 41
Organization Membership ........ 7
Other Information ........ 53
Parking ........ 51
Pay Policy ........ 18
Errors ........ 19
Overtime ........ 19
Payday ........ 19
Payroll Deductions ........ 20
Premium Rate ........ 19
Performance Review ........ 8
Personal Conduct ........ 13
Personal Contact ........ 48
Personnel Record ........ 52
Pre-Employment Screenings and Exams ........ 6
Promotions ........ 9
References ........ 17
Relatives ........ 7
Resignation ........ 17
Rest Periods ........ 19
Rumors ........ 40
Safety ........ 50
Seniority ........ 10
Shoplifting ........ 51
Social Security ........ 26
Solicitation ........ 51
Stock Ownership Plan (ESOP) ........ 25

Substance Abuse ........................................................ 39
Telephone ................................................................ 47
Termination of Employment ..................................... 16
Time Records ........................................................... 18
Vacation .................................................................. 21
Waste Prevention ..................................................... 49
Workweek ................................................................ 17

# RECEIPT FOR ASSOCIATE HANDBOOK

I have received my copy of the October 2021 Revision of the Food City Associate Handbook. I agree that this handbook and the policies, practices, and information contained herein, supersede any and all other associate handbooks, policies, practices, and information previously issued by K-VA-T Food Stores, Inc., or any other predecessor company. I agree to read my handbook and keep my handbook for future reference and observe present and any future Company personnel policies and rules outlined in this handbook. I further understand that this handbook is intended as a guide for personnel policies, benefits, and general information, and that these guidelines should not be construed as an employment contract.

I understand management reserves the right to make changes in the guidelines or their application as it deems appropriate, and these changes may be made with or without notice. I also understand that employment is terminable at the will of either the associate or the Company at any time, and that no representative of the Company other than the Chief Executive Off icer has any authority to make any contrary agreement.

Associate's Signature:______________________ Date:______________________

Manager's Signature:______________________ Associate ID No:______________________

Department:______________________ Store No:______________________

**Fast Track Learning System**

Name:________________________________

ID: ________________ Password: ___________

It is important to protect your password and personal information by storing your booklet in a secure location.

FOOD CITY®

Value. Everyday.™

© Copyright 2021 Food City

EXHIBIT
2 1-11-23
David Ellison

On 8/6/21, I met with Matthew Batten at Food City 214 with Gary Richards as my witness. Matthew has recently turned in documents and a request for an accommodation for a service dog to be present with him as he works his shifts at the fuel center. During this exchange, I asked Batten if there had been a change in anything as he has worked for us for two years. He stated that nothing had changed. He stated that he had been waiting for a service dog for over 4 years. I asked him if he was able to perform all essential functions of the job, and he stated he could do so without question as he had been doing them since he began his employment with Food City. He stated that he needed the service animal to help him in his battle of anxiety, panic attacks, and feeling of isolation. He also stated that he has fallen about 5 times and the dog helps him steady on his feet. At the end of the meeting, I reiterated that I was gathering information during out exchange meeting, and I would be back in contact with him again soon.

David Ellison
8/6/21

On 8/6/21, I met with Matthew Batten at Food City 214 with Gary Richards as my witness. Matthew has recently turned in documents and a request for an accommodation for a service dog to be present with him as he works his shifts at the fuel center. During this exchange, I asked Batten if there had been a change in anything as he has worked for us for two years. He stated that nothing had changed. He stated that he had been waiting for a service dog for over 4 years. I asked him if he was able to perform all essential functions of the job, and he stated he could do so without question as he had been doing them since he began his employment with Food City. He stated that he needed the service animal to help him in his battle of anxiety, panic attacks, and feeling of isolation. He also stated that he has fallen about 5 times and the dog helps him steady on his feet.

EXHIBIT
1-11-23
3
David Ellison
PENGAD 800-631-6989

EXHIBIT
1-11-23
4
David Ellison
PENGAD 800-631-6989

On 8/12/21, I met with Matthew Batten at Food City 214 with Gary Richards as my witness. I informed Batten that his request for a service animal in the work place had been reviewed and denied at this time. I stated that he had been performing the job for over two years without any accommodations. I asked him for his ideas or suggestions of any other possible accommodations that may be available for him. He stated that he did not know of anything else that could accommodate him. I suggested that we could reassign him to a USCAN Cashier position as this would help aide in his battle of isolation and anxiety of working alone at the fuel center kiosk. He stated he could not work any position that mandated that he stand for prolonged periods of time as he has Complex Regional Pain Syndrome (CRPS). He stated that the fuel center allowed him to stand when needed and sit when needed. When asked how long he thought he could stand, he was unable to give any exact time. He stated that he could only work with the service dog present at this time as he was not going to leave the dog with anyone else.

David Ellison
8/12/21

On 8/12/21, I met with Matthew Batten at Food City 214 with Gary Richards as my witness. I informed Batten that his request for a service animal in the work place had been reviewed and denied at this time. I stated that he had been performing the job for over two years without any accommodations. I asked him for his ideas or suggestions of any other possible accommodations that may be available for him. He stated that he did not know of anything else that could accommodate him. I suggested that we could reassign him to a USCAN Cashier position as this would help aide in his battle of isolation and anxiety of working alone at the fuel center kiosk. He stated he could not work any position that mandated that he stand for prolonged periods of time as he has Complex Regional Pain Syndrome (CRPS). He stated that the fuel center allowed him to stand when needed and sit when needed. When asked how long he thought he could stand, he was unable to give any exact time. He stated that he could only work with the service dog present at this time as he was not going to leave the dog with anyone else.

EXHIBIT
5 1-11-23
David Ellison
PENGAD 800-631-6989

On 8/18/21, I met with Matthew Batten at 214 with Bryan Wattenbarger as my witness. I explained to Matthew again that the request for his service animal to be present with him at work has still been denied at this time. I asked him again about the consideration of reassignment to a USCAN Cashier. He once again denied that accommodation stating he could not perform that duty. At this time, I explained that another accommodation I could present him is with a leave of absence. I handed him paperwork for FMLA and a personal leave of absence. I explained to him that if it was medically related that would be covered under FMLA, he would need medical certification with his paperwork. However, if he wanted to take some personal time, he could be eligible for up to 90 days of a personal leave of absence. He stated that regardless of how long of a leave of absence he may be eligible for or takes, he will only work in the future with his service animal present. He once again stated that he would not do anything without his service animal present in the future. He stated he had a vested interest in this company after working for the past two years and he was not quitting. He thanked me for the opportunity I gave him for employment two years ago. I explained to him that we would need the paperwork back to the Store Manager, Gary Richards, by the end of next week. I stated that should he fail to return paperwork to us, we would consider him to be on a personal leave of absence at that time. He stated he would personally bring it back to Gary next week.

EXHIBIT
6 1-11-23
David Ellison
PENGAD 800-631-6989

David Ellison
8/18/21

On 8/18/21, I met with Matthew Batten at 214 with Bryan Wattenbarger as my witness. I explained to Matthew again that the request for his service animal to be present with him at work has still been denied at this time. I asked him again about the consideration of reassignment to a USCAN Cashier. He once again denied that accommodation stating he could not perform that duty. At this time, I explained that another accommodation I could present him is with a leave of absence. I handed him paperwork for FMLA and a personal leave of absence. I explained to him that if it was indeed a medical condition that would be covered under FMLA, he would need medical certification with his paperwork. However, if he wanted to take some personal time, he could be eligible for up to 90 days of a personal leave of absence. He stated that regardless of how long of a leave of absence he may be eligible for or takes, he will only work in the future with his service animal present. He once again stated that he would not do anything without his service animal present in the future. He stated he had a vested interest in this company after working for the past two years and he was not quitting. He thanked me for the opportunity I gave him for employment two years ago. I explained to him that we would need the paperwork back to the Store Manager, Gary Richards, by the end of next week. I stated that should he fail to return paperwork to us, we would consider him to be on a personal leave of absence at that time. He stated he would personally bring it back to Gary next week.

EXHIBIT
7 1-11-23
David Ellison
PENGAD 800-631-6989

# MATTHEW M Batten - 000150799 - K-VA-T Food Stores, Inc.

EXHIBIT 8 1-11-23 David Ellison PENGAD 800-631-6989

## Termination Information

| | |
|---|---|
| Name | MATTHEW M Batten |
| Status | Terminated |
| SSN | 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 |
| Employee number | 000150799 |
| Time clock | |
| Terminated | 02/14/2022 |
| Last day worked | 02/14/2022 |
| Pay through | 02/14/2022 |
| Termination reason | Fail to Return From Leave |
| Type | Voluntary |
| Home company | K-VA-T Food Stores, Inc. |
| Eligible for rehire | No |

Notes

PENGAD 800-631-6989
EXHIBIT
9 1-11-23
David Ellison

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Friday, March 11, 2022 11:22 AM
**To:** Gary Richards <Gary.Richards@FoodCity.com>
**Cc:** Jenna Johnston <johnstonje@foodcity.com>; Desirea Douglass <desirea.douglass@foodcity.com>
**Subject:** Re: Christopher Batten - Personal Leave

Jenna,
Please speak to Sherrell regarding this associate's status. I believe we will leave him on LOA at this time.

David Ellison
Senior Human Resources Specialist
Chattanooga Division

---

**From:** Gary Richards <Gary.Richards@FoodCity.com>
**Sent:** Friday, March 11, 2022 11:15:07 AM
**To:** David Ellison <David.Ellison@foodcity.com>
**Cc:** Jenna Johnston <johnstonje@foodcity.com>; Desirea Douglass <desirea.douglass@foodcity.com>
**Subject:** FW: Christopher Batten - Personal Leave

David,
Do we have an update ?

**From:** Jenna Johnston
**Sent:** Friday, March 11, 2022 8:53 AM
**To:** 214HRC <214HRC@FoodCity.com>; Gary Richards <Gary.Richards@FoodCity.com>
**Subject:** Christopher Batten - Personal Leave

Christopher's leave ended on 11-16-2021. Have you heard from him?

Thanks,
Jenna

**Gary Richards | Store Manager | Food City 214**

EXHIBIT
PENGAD 800-631-6989
10 1-11-23
David Ellison

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Tuesday, September 7, 2021 3:08 PM
**To:** Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Matt Batten

Sherrell,

Where do we stand with this associate? He never turned in paperwork. Donnie had stated we would assume him to be on a personal LOA should he fail to do so.

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** David Ellison
**Sent:** Tuesday, August 24, 2021 11:54 AM
**To:** Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** RE: Matt Batten

Please see attached.

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** Sherrell Lyon lyonjrs@FoodCity.com
**Sent:** Tuesday, August 24, 2021 11:39 AM
**To:** David Ellison David.Ellison@foodcity.com
**Subject:** RE: Matt Batten

David,

Please email me a copy of all of your notes and recaps from your exchanges with Matt Batten.

You keep a copy as well....

Sherrell Lyon Jr. Director of Human Resources
KVAT Food Stores, Inc. lyonjrs@foodcity.com 276.623.5100 Ext. 5995

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Monday, August 23, 2021 5:11 PM
**To:** Donnie Meadows <MeadowsD@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Matt Batten

FYI

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** Gary Richards <Gary.Richards@FoodCity.com>
**Sent:** Monday, August 23, 2021 5:08 PM
**To:** David Ellison <David.Ellison@foodcity.com>
**Subject:** Matt Batten

On 08/23/21 Matt Batten called me at the store and told me that Mr. Ellison had given him two different documents for leave of absents, FMLA and Personal LOA. Matt stated that he was not going to submit the FMLA documents nor was he going to submit the personal LOA documents. Matt told me he wanted to come to work with his service animal and then asked if I would allow him to do so and accommodate his service animal. I asked Matt what decision was told to him by Mr. Ellison regarding him bringing his service animal to work, Matt replied that the decision was that the request to bring his service animal to work was denied. I then told Matt that he already had his answer. Matt hung up.

Gary
**Gary Richards | Store Manager | Food City 214**

EXHIBIT 11 1-11-23 David Ellison PENGAD 800-631-6989

**From:** Gary Richards <Gary.Richards@FoodCity.com>
**Sent:** Friday, September 9, 2022 11:32 AM
**To:** Jenna Johnston <johnstonje@foodcity.com>; David Ellison <David.Ellison@foodcity.com>
**Cc:** Rickie Estep <estepr@FoodCity.com>
**Subject:** Re: Christopher Batten

Hey Jenna,
I believe there may be a hold on his status. David would you please give Jenna and myself an update.

Thanks,
Gary

---

**From:** Jenna Johnston <johnstonje@foodcity.com>
**Sent:** Friday, September 9, 2022 11:26 AM
**To:** Gary Richards <Gary.Richards@FoodCity.com>
**Cc:** Rickie Estep <estepr@FoodCity.com>
**Subject:** Christopher Batten

Christopher's leave ended on 2-14-2022. Since he has not returned to work, please remove him from payroll effective 2-14-2022.

Thanks,
Jenna
**Gary Richards | Store Manager | Food City 214**

**From:** David Ellison
**Sent:** Tuesday, August 24, 2021 11:54 AM
**To:** Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** RE: Matt Batten

EXHIBIT
12 1-11-23
David Ellison
PENGAD 800-631-6989

Please see attached.

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** Sherrell Lyon lyonjrs@FoodCity.com
**Sent:** Tuesday, August 24, 2021 11:39 AM
**To:** David Ellison David.Ellison@foodcity.com
**Subject:** RE: Matt Batten

David,

Please email me a copy of all of your notes and recaps from your exchanges with Matt Batten.

You keep a copy as well....

Sherrell Lyon Jr. Director of Human Resources
KVAT Food Stores, Inc. lyonjrs@foodcity.com 276.623.5100 Ext. 5995

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Monday, August 23, 2021 5:11 PM
**To:** Donnie Meadows <MeadowsD@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Matt Batten

FYI

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** Gary Richards <Gary.Richards@FoodCity.com>
**Sent:** Monday, August 23, 2021 5:08 PM

**To:** David Ellison <David.Ellison@foodcity.com>
**Subject:** Matt Batten

On 08/23/21 Matt Batten called me at the store and told me that Mr. Ellison had given him two different documents for leave of absents, FMLA and Personal LOA. Matt stated that he was not going to submit the FMLA documents nor was he going to submit the personal LOA documents. Matt told me he wanted to come to work with his service animal and then asked if I would allow him to do so and accommodate his service animal. I asked Matt what decision was told to him by Mr. Ellison regarding him bringing his service animal to work, Matt replied that the decision was that the request to bring his service animal to work was denied. I then told Matt that he already had his answer. Matt hung up.

Gary

**Gary Richards | Store Manager | Food City 214**

EXHIBIT
PENGAD 800-631-6989
13 1-11-23
David Ellison

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Monday, July 26, 2021 8:07 AM
**To:** Donnie Meadows <MeadowsD@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Please advise on associate requesting to bring service dog to work at Gas n Go at 214.

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** Donny Rector <donny.rector@foodcity.com>
**Sent:** Monday, July 26, 2021 8:02 AM
**To:** David Ellison <David.Ellison@foodcity.com>
**Cc:** Sarah Spahr <spahrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Welcome back! Got this one late last week, associate with a service animal I thought you might want to take a look at.

**From:** Gary Richards
**Sent:** Friday, July 23, 2021 2:17 PM
**To:** Donny Rector <donny.rector@foodcity.com>
**Subject:** FW: Christopher Batten

**From:** Emily Hobbs
**Sent:** Friday, July 23, 2021 2:15 PM
**To:** Gary Richards <Gary.Richards@FoodCity.com>
**Subject:** Christopher Batten

*Emily J. Hobbs*
*Store #214*
*Human Relations Coordinator*
*150 Highway 41*
*Ringgold, GA 30736*
*706-891-2606*

Emily Hobbs | Human Relations Coordinator | Food City 214

Gary Richards | Store Manager | Food City 214

EXHIBIT 14 4-11-23 David Ellison

PENGAD 800-631-6989

**From:** Archie Skeens <skeensa@FoodCity.com>
**Sent:** Monday, July 26, 2021 8:44 AM
**To:** Donnie Meadows <MeadowsD@FoodCity.com>
**Cc:** Charlie Fugate <fugatec@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** RE: Christopher Batten

I will as soon as I can speak to Charlie about this issue.

Archie

**From:** Donnie Meadows <MeadowsD@FoodCity.com>
**Sent:** Monday, July 26, 2021 8:17 AM
**To:** Archie Skeens <skeensa@FoodCity.com>
**Cc:** Charlie Fugate <fugatec@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Archie:
Will you advise David on this service dog request?
Thanks,
Donnie

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Monday, July 26, 2021 8:07 AM
**To:** Donnie Meadows <MeadowsD@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Please advise on associate requesting to bring service dog to work at Gas n Go at 214.

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** Donny Rector <donny.rector@foodcity.com>
**Sent:** Monday, July 26, 2021 8:02 AM
**To:** David Ellison <David.Ellison@foodcity.com>
**Cc:** Sarah Spahr <spahrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Welcome back! Got this one late last week, associate with a service animal I thought you might want to take a look at.

**From:** Gary Richards
**Sent:** Friday, July 23, 2021 2:17 PM

**To:** Donny Rector <donny.rector@foodcity.com>
**Subject:** FW: Christopher Batten

**From:** Emily Hobbs
**Sent:** Friday, July 23, 2021 2:15 PM
**To:** Gary Richards <Gary.Richards@FoodCity.com>
**Subject:** Christopher Batten

*Emily J. Hobbs*
*Store #214*
*Human Relations Coordinator*
*150 Highway 41*
*Ringgold, GA 30736*
*706-891-2606*

**Emily Hobbs | Human Relations Coordinator | Food City 214**

**Gary Richards | Store Manager | Food City 214**