UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

---

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN,<br><br>Plaintiff,<br><br>vs.<br><br>K-VA-T FOOD STORES, INC. d/b/a FOOD CITY,<br><br>Defendant. | ) | CIVIL ACTION FILE NO. 4:22-CV-00179 |

---

JANUARY 27, 2023

**ZOOM DEPOSITION OF DONNIE MEADOWS**

APPEARING FOR THE PLAINTIFF:

R. ETHAN HARGRAVES, ESQUIRE
MASSEY & ASSOCIATES
6400 LEE HIGHWAY, SUITE 101
CHATTANOOGA, TENNESSEE 37421

APPEARING FOR THE DEFENDANT:

HOWARD B. JACKSON, ESQUIRE
WIMBERLY LAWSON WRIGHT DAVES & JONES
550 MAIN STREET, SUITE 900
KNOXVILLE, TENNESSEE 37902

ALSO PRESENT: CHRISTOPHER BATTEN

**CATHY H. KERLEY, RPR**
**HALL & ASSOCIATES**
**POST OFFICE BOX 428**
**CHATTANOOGA, TENNESSEE 37401**
**423-267-4328**

Meadows

# I N D E X


| | Page |
|---|---|
| Deposition of DONNIE MEADOWS<br>Direct Examination by Mr. Hargraves | 4 |


## EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | K-VA-T Food Stores Associate Handbook | 25 |
| 2 | Equal Employment Opportunity Document | 29 |
| 3 | Statement of Emily Hobbs 11/29/21 | 48 |
| 4 | Statement of Gary Richards 11/30/21 | 50 |
| 5 | Statement of David Ellison 8/6/21 | 57 |
| 6 | Statement of Gary Richards 8/6/21 | 58 |
| 7 | Statement by David Ellison 8/12/21 | 61 |
| 8 | Statement of Gary Richards 8/12/21 | 74 |
| 9 | Statement by David Ellison 8/18/21 | 81 |
| 10 | Canine Assistants, Inc. Documents | 87 |
| 11 | Email Chain 7/26/21 | 95 |

The deposition of DONNIE MEADOWS, called as a witness at the instance of the Plaintiff, for use pursuant to the Federal Rules of Civil Procedure, taken by notice and agreement on the 27th day of January, 2023, via Zoom.

S T I P U L A T I O N S

Deposition is being taken by agreement of counsel for the plaintiff and the defendant. It is agreed that the deposition shall be taken in machine shorthand by Cathy H. Kerley, Notary Public and Court Reporter, that the signature of the witness to the completed deposition is waived, and that the witness may be sworn by the said Notary Public.

It is further agreed that all formalities as to caption, notice, certificate and mode of transmission are waived, and that the deposition is taken subject to the usual exceptions as to irrelevancy, incompetency and immateriality, which are reserved to the hearing of the cause, except as to the form of the question.

DONNIE MEADOWS,

called as a witness at the instance of the Plaintiff, having been first duly sworn, was examined and deposed as follows:

DIRECT EXAMINATION

BY MR. HARGRAVES:

Q All right. I just want to state on the record that this deposition is being taken pursuant to notice and agreement of counsel and for all purposes or for discovery purposes under the Georgia Civil Practice Act.

Mr. Meadows, could you please state your full name for the record.

A Donnie L. Meadows.

Q Thank you, Mr. Meadows. My name is Ethan Hargraves. I am the attorney for the plaintiff in this case, Mr. Matthew Batten. Have you ever testified in a deposition before?

A Yes, I have.

Q When was the last time you testified in a deposition, if you don't mind?

A I can't give you an exact date. It's been a few years. I'm going to say at least two or three.

Q Okay. Do you remember what kind of

case it was that you testified in?
A I think it was an EEOC related case.
Q Did it relate to disability accommodation?
A Honestly I don't recall that. I just remember that it was an EEOC case. I'm sorry.
Q That's fine. And have you ever testified in a deposition with regard to a case involving ADA accommodation?
A Not that I recall, no, sir.
Q Okay. Well, since it's been a few years, what I'd like to do first is go over a couple of ground rules so that hopefully the process can be smooth and we can get through it.
We have a court reporter, Cathy, who is taking down everything that we say, but there are a couple of things that we can do to make her job a little bit easier, especially with this being by Zoom.
The first is if you would do your best to allow me to finish my full question before you start to answer so we're not talking over each other and I will do my best to make sure that I let you finish your answer before I start to ask another question. Does that make sense?

A Yes.
Q Okay. And the next thing, and you're doing great so far, is verbal answers are best, yes and no where appropriate. Head nods can be difficult to put on the record, especially on Zoom, and even things like uh-huh and huh-uh, which we can all kind of fall into, those can look very similar on a transcript. So there may come a time where I just ask to clarify is that a yes or is that a no. And I promise you I'm not trying to be a jerk. I just want to make sure that we understand what your answer is. Does that make sense?
A Yes.
Q And if I ask you a question at some point that you don't understand for whatever reason, please don't answer it. Just let me know that. If you don't understand it, whether it's a word in the question or whether I've just asked you a bad question, which will almost certainly happen, just let me know you don't understand it and I will rephrase it so that you can understand it. Okay?
A Sure.
Q Okay. And this is not an endurance

contest. So if at any point you need a break, all you've got to do is let me know and we'll take a break. That's perfectly normal. The only caveat I have for that is if I have asked a question, I'm going to want to make sure I get an answer to the question before we take a break. Okay?
A Yes.
Q Okay. Mr. Meadows, where do you currently live?
A I live in Abingdon, Virginia.
Q How long have you lived there?
A 21 years total.
Q All right. Did you attend high school?
A Yes, I did.
Q Where was that?
A In Bluefield, Virginia.
Q Did you graduate?
A Yes, I did.
Q Did you have any further education after that?
A Yes. I have a bachelor's and a graduate degree.
Q What are those degrees in?
A So my graduate degree is in

industrial relations.
Q Industry relations?
A Industrial relations.
Q Okay. What is that?
A Primarily a focus on labor.
Q Does that have any crossover with like human resources?
A Yes, it would certainly.
Q Okay. Is there a human resources degree?
A There probably is a human resources degree. My degree is industrial relations.
Q Do you know like what the main distinction is between those two?
A The primary focus more specialized on industrial relations or at least my program was more specialized on the labor issue.
Q Like what?
A Primarily dealing with labor unions, negotiating of contracts and the compliance of those.
Q Okay. Do you have any other professional licenses or certifications?
A I no longer have certifications or licenses. I did have a certification under SHRM

and I also had a license for life, health, and annuity insurance products.
Q What is SHRM?
A SHRM is a human resource organization. S-H-R-M is the abbreviation for it.
Q Did you receive any special training to get that certification?
A Early on training wasn't a requirement. It was more education based and experience based. Later I think they instituted a program requiring testing to receive the certification.
Q So did you -- did your certification stem from the education and experience based model?
A Yes.
Q What type of education did you receive for that certification?
A It was based off of my graduate degree.
Q Okay. So you had to have a certain level of education before you could be eligible for the certification?
A Or experience or a combination of the two.

Q Okay. But SHRM didn't provide any training or extra training or education to you as part of that certification?
A Not as a part of that. SHRM as a resource provides information about policies and compliance.
Q Okay. Did you ever take advantage of any of those resources from SHRM?
A Absolutely.
Q All right. Can you tell us -- give us an example of that.
A No. I can't give you anything specific today. That's been a very long time.
Q Okay. Do you recall if you ever had any training or education from SHRM related to ADA compliance?
A Not training, but information.
Q Okay. Do you remember anything about the information from SHRM?
A Not specifics, no.
Q Okay. Do you remember when that would have been that you had that training or information?
A Well, as I said, SHRM is also a resource much like Cornell Library to tap into

current guidelines and practices and so I've utilized that product on a sporadic basis over my entire HR career.
Q Okay. And we'll -- we'll get into more specifics a little bit later on, but do you recall if you utilized any SHRM resources in the context of this case involving Mr. Batten?
A No, sir, I don't recall that.
Q Okay. Are you presently a member of any professional clubs or organizations?
A I am not.
Q And this is just a standard question. Have you ever been convicted of a crime?
A No, sir.
Q Congratulations. Now, you used to work for K-VA-T Food Stores, Inc.; is that right?
A That's correct, yes.
Q And that's doing business as Food City; right?
A Yes, sir.
Q And so if I refer to them as Food City, you'll know who I'm talking about; right?
A Yes, sir.
Q Okay. Your latest position with Food City was VP of human resources; is that right?

A Yes, sir.
Q Okay. And let me ask you, I want to kind of get an outline of your job history with Food City. Do you remember when you first started with Food City?
A I started there in 2001.
Q All right. Do you remember what your starting position was?
A Vice president human resources.
Q Oh, okay. Had you had any prior experience in that area?
A Yes, I had.
Q All right. Well, let's -- let's back up, then, a little bit and go back to after you graduated with your bachelor's and your graduate degree in industrial relations, where did you first land career-wise?
A Initially I was with another supermarket chain. And once I completed my graduate degree, I was there first in a human resources capacity. Later I merged over into overseeing the operations.
After that service I was employed at Walmart corporate on they're -- in their people division on a labor team. And from there I joined

Food City.
Q What was that first supermarket chain you started with?
A Acme Supermarkets.
Q Acme?
A A-c-m-e.
Q Do you remember when that was when you first started?
A I worked for them two times. I started there early on while I was still in high school. I left for a few years and then I rejoined after receiving my graduate degree. So I'm sorry. I can't give you the year that I rejoined them for the HR.
Q That's fine. And I'll ask you a lot of questions that you may not remember the answer to and that's okay. I've just got to ask the questions.
Okay. What -- when you worked with Acme Supermarkets in the -- after you completed your graduate degree, what kinds of things were you doing for Acme Supermarkets?
A So it was a smaller company than Food City. So I wore multiple hats. I had responsibility for HR, the payroll, as well as

oversaw marketing and advertising for them initially.
Q Did you have any responsibilities for ensuring compliance with state and federal regulations?
A Yes, I did. That certainly fell under the HR hat.
Q As part of that job, were you -- I assume you were responsible for overseeing compliance with ADA regulations?
A In relationship to associates, yes.
Q In that position did you ever have to deal with an employee request for ADA accommodation?
A I can't give you a specific one, but I'll say yes, I did. It's fairly common.
Q Okay. Do you remember if you granted the accommodation or if it was denied?
A Over the course of my career probably granted hundreds of them, accommodations.
Q Okay. Do you know how many you denied?
A No. It's very rare to have one that you can't find some common ground.
Q Okay. All right. And then after

Acme Supermarkets, you said you moved to did you say Hallmark?

A I worked for Walmart.

Q Walmart. Very different. Okay. And what did you do for Walmart?

A So Walmart I was in the people division, specifically labor division, dealing primarily with labor union organization efforts.

Q What was essentially your job in that position?

A Education.

Q Education for management?

A Yes.

Q Okay. In your role with Walmart, did you have to deal with ADA compliance?

A I did not.

Q Prior to starting as the VP of human resources at Food City, was Acme Supermarkets the last time you had any responsibilities related to ADA compliance?

A Yes.

Q I want to talk to you a little bit about where you fit in kind of the corporate structure at Food City. As the VP of HR, how many employees were direct reports to you?

A It varied. There was a max of probably 21, 22 when I at one point had responsibility for the training department as well.
Q What department was that?
A Training, that fell under the HR department initially.
Q Oh, okay. Did you oversee all training or any specific aspects of training?
A The director of training reported to me.
Q Did you have any say in what types of materials or subjects were used or taught in the training?
A In a general sense, yes.
Q Did the -- I know there wasn't always a director of HR. Actually let me ask you this. During the time that you served as the VP of HR, was there ever a director of HR position?
A Only near my exit.
Q Okay. And did that -- did the director of HR position answer directly to the VP of HR?
A Yes, sir.
Q What about the division HR

specialists, did they directly report to you?
A Yes, they did until we created the director position.
Q Okay. What about store managers?
A Store managers fell under the operations division. They did not report to me.
Q Okay. Any other positions we haven't talked about that directly reported to you?
MR. JACKSON: Do you want to focus a time frame a little bit? I mean, he was in the job for 21 years.
Q Mr. Meadows, let's say as of -- as of 2021, any other positions that reported directly to you?
A So I had a nurse who reported to me and then, of course, benefits was part of human resources.
Q And who were you directly accountable to?
A Steve Smith, CEO.
Q Okay. Anybody else?
A No, sir, not directly accountable to. I worked directly with a number of the vice presidents.
Q If you can, walk us through what your

job duties were as the VP of HR.
A So in general to lead the HR department to make sure HR is contributing to the overall goals of the company, but under HR specifically, the organizational policy, recruitment, retention, compliance of labor laws such as Department of Labor laws and OSHA and EEO, employee relations, compensation and benefits. In general that would be the primary responsibilities.
Q With regard to labor law compliance, did that include the Americans with Disabilities Act?
A Certainly, yes.
Q And were you ever tasked with making individual employee -- individual decisions related to specific employees in that regard?
A I certainly reviewed those requests and advised.
Q Okay. Were any other management level employees of Food City authorized to make ADA accommodation decisions without your approval?
A Routinely those would flow through HR. I can't say that an operations VP or district manager didn't ever handle those on their own.

I'm not sure.
Q Okay. It's at least possible that those decisions could have been made without your direct involvement. Is that what you're saying?
A Yes. That's possible.
Q Okay. But on some occasions you would be asked to advise on those?
A Yes.
Q Okay. And then on some, correct me if I'm wrong, you would -- you would actually make the final decision.
A Yes. That's correct on some.
Q Can you give us any insight into what would -- what would make an ADA compliance question, what would necessitate your direct involvement on one of those versus one that you could let someone in operations decide?
A The nature of the accommodation requested I think would be the best way to describe that.
Q Right. Can you flesh that out a little.
A No. I can't give you a specific one, no.
Q In August of 2021, I know that's

close to the transition period, but in August of 2021, were you the one in charge of the HR department at Food City?
A I was until August 27th. That's -- that was my retirement day.
Q Okay. So as of -- at least up until August 27, 2021, would you have been the one responsible for making sure that Food City is in compliance with federal laws and regulations?
A Yes, sir. I would have reviewed those requests.
Q All right. Did Food City ever provide you with any training or education on how to ensure compliance with federal laws and regulations?
A So Food City provided me an opportunity to -- to have resources for that education. So I've over the years attended a number of WA conferences, several of those provided by Howard's organization. I also attended some of the more regional or local firms.
As well I attended EEO compliance training and I believe that was in Charlotte, North Carolina, a couple of times. I completed online courses or more like a Zoom-type of

conference with SHRM under that.
As well from to time to time we would -- probably not an annual basis, Howard himself would come to our organization and conduct various labor law training for our -- our team.
Q Okay. Any of those things you've just listed, did any of them ever involve ADA compliance?
A Yes.
Q And of those that involved ADA compliance, did any involve the issue of disability accommodation?
A Yes.
Q And did you receive any training materials related to ADA accommodations?
A Do I have those? No. Were they part of the presentation? Yes.
Q Would those be -- would you expect that's something that would still be in Food City's possession?
A I don't know.
Q Okay. Do you remember -- prior to August of 2021, do you remember the last time you had an ADA compliance-related training or education course?

A I'm sorry. I don't.
Q Do you remember anything about the substance of any of the training related to ADA accommodation?
A Effectively covering the standards and the process to make a determination for those accommodations.
Q And I'm not -- you know, I know you don't have it in front of you, but do you remember anything about like what the standard was for ADA accommodation?
A I don't want to speak to it without refreshing and I did not do that. So no.
Q Okay. Do you remember who taught any of the courses that you had related to ADA accommodation?
A So as I mentioned, Howard has conducted various labor law training with our team and in Wimberly Lawson conferences and I think it's Baker Donelson was the local conferences that some of my team attended and myself. And then the EEO I believe was taught by the director when I attended in -- director of EEO at Charlotte.
Q Okay. In making the decision in this case related to Mr. Batten, did you consult any of

the educational or training materials from any of those courses or events that you just listed?
A I'm not sure. I certainly would have used additional resources, SHRM being one of those, as well as the EEO. And then any time I bounced up against a legal issue that I didn't have prior experience with, I consulted with our general counsel, which I specifically did in this instance.
Q Okay. And I'm not going to ask you about the communications that you had with counsel, those privileged communications, but is there any chance that you still have access to or could figure out what resources you consulted in making this decision with regard to Mr. Batten?
A No.
Q Would you expect that Food City would have a record of it?
A I would not.
Q To your knowledge, does Food City have policies or procedures on disability accommodation?
A I don't think we have a written policy outside of just our employment statement on discrimination would include disability, but not

ADA compliance, no.
Q I'm going to share my screen real quick.
A Just remember I'm on a mobile phone, so.
Q Oh, okay. Well, I will Zoom in as much as I can and we'll do our best.
All right. Mr. Meadows, do you see the screen that I've just shared?
A Yes.
Q Does that appear to be -- and I'm happy to scroll through it. It's 63 pages. Does that appear to be the Food City Associate Handbook?
A Based off the cover page I see, yes, it appears to be.
Q Okay. And the policy that you just mentioned related to I think you said equal employment, was that what you said?
A Yes, sir.
Q Is this where you would expect to find that policy?
A I'm sorry. I can't -- okay. I see at the bottom of that page that says equal employment opportunity. I can tell you this,

the -- well, I didn't write the response to this letter, but I reviewed Sherrell's letter and I believe that section is cited in the EEO response.
Q Okay. And all I'm trying to figure out is the policy that you remember. Is this the one that you remember or there was some other policy?
A I'm not aware of another policy.
Q Okay. So to your knowledge, did Food City have an ADA specific policy aside from what is or was in the associate handbook?
A Not a Food City specific policy, but certainly follow compliance of any federal or state laws. So not Food City specific.
Q Okay. You would expect that the associate handbook would at least have some guidance that says we're to follow state and federal laws?
A Yes.
MR. HARGRAVES: Okay. Let's mark that as Exhibit 1.
(Thereupon, Exhibit No. 1, K-VA-T Food Stores Associate Handbook, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:
Q To your knowledge, does Food City or did Food City have any policies or procedures on employee use of service animals?
A Not that I'm aware.
Q Okay. And I think I know the answer to this question, but to your knowledge, did Food City have any training related to the ADA and specifically service animals?
A Not that I'm aware.
Q Okay. In the time that you served as the VP of HR, did Food City have any training on employee disability accommodation?
A Beyond the HR department?
Q Any training.
A Certainly the sources that I've already made mention of includes the HR team. So the specialists were directly involved in those various resources, but then specialists also taught to management level a course called Megastar and a portion of Megastar did a -- included a review of labor law compliance. So yes.
Q Okay. The Megastar training, was that -- I think you said that that was offered to

management level employees; is that right?
A Yes.
Q Would that include store managers?
A Yes.
Q Would that include division HR specialists?
A Yes.
Q Okay. Do you remember what, if any, materials were used in those trainings?
A Yes. We had a teaching guide.
Q Do you remember if that teaching guide covered ADA accommodation?
A No. I don't remember.
Q Do you remember if it covered the ADA at all?
A I'm not positive, no.
Q But it covered labor law compliance. Is that what you're saying?
A Yes.
Q Okay. All right. I'm going to show you another document and hopefully you can see it. Let me Zoom in here for you. All right. Do you recognize this? This document has three pages and I can scroll through it for you. Do you recognize it?

A I recognize it. I don't know where it's included, but I -- I am familiar with it, yes.
Q Is this -- is this part of the Megastar teaching guide?
A I'm not positive.
Q Okay.
A It should be.
Q Okay. Can you think of any other -- any other place that this particular document might be found in Food City's records?
A Outside Megastar, possibly. We had a learning management system. So it was all electronic called Fast Track. It could reside there. I'm not certain.
Q Okay. But whatever this -- whatever packet this document is part of, do you recognize it as a policy and a procedures document of Food City?
A I recognize that as a document we would have utilized in training and I think that training would have been Megastar.
Q Okay. Would you expect that this would -- to the extent it speaks to Food City's policies, would you expect that this is an

accurate statement of Food City's policies?

MR. JACKSON: I'm going to object to the form of the question, but go ahead and answer.

A I see it as a teaching document, not necessarily Food City's policy. And remember, once again, I'm on my mobile phone. So it's very difficult to see what you're presenting here.

Q Sure. And I'm sorry. I'm trying to make it as legible as I can for you. Let me blow it up. Maybe that's a little bit better.

Let's mark this Exhibit 2.

(Thereupon, Exhibit No. 2, Equal Employment Opportunity Document, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q So the first line here, if you can see it, says, "It is Food City's policy to grant equal employment opportunities to all qualified persons without regard to race, color, sex, religion, age, national origin, disability or veteran's status." Can you see that good enough to say whether I read that right?

A Yes.

Q Okay. So is that a -- is that a

statement of Food City's policy on this issue?
A Without comparing, that sounds like the same policy stated in the handbook.
Q Okay. So would you -- would you expect this document to the extent it states a specific Food City policy, that this is an accurate statement of Food City's policy?
A It appears to be.
Q Okay. I'm going to scroll down.
All right. We're on the page related to the ADA. Do you see where it says, "A qualified employee or applicant with a disability"? Do you see that?
A I do.
Q "Is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question." Is that an accurate statement of Food City's policy?
A "A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job." So that -- yes, that seems reasonable.
Q Okay. As the VP of HR, would you have been familiar with Mr. Batten's training

file?
A No, sir.
Q Okay. Does Food City have a policy or procedure related to the hiring of persons with disabilities?
A As far as written, what you have already quoted from the handbook in --
Q Okay. Sorry. Go ahead. I didn't mean to cut you off.
A I think that was labeled under employment.
Q Would that be the equal employment opportunity policy?
A Yes.
Q Do you know -- sorry. Go ahead.
A Disability was included inside of that; correct?
Q Yes. I believe that's -- I believe that's what I read. Do you know if Food City had any incentives to hire or retain people with disabilities?
A Clarify what you mean by incentives.
Q Were there any tax incentives to hiring or retaining persons with disabilities?
A There were hiring incentives for

various different classes and we managed those tax incentives through Maximus and any new hire was presented for their evaluation.
Q Maximus's evaluation?
A Yes. Maximus ran it through their database to see if that hire, whether veteran status or etc., if that qualified for any tax credit.
Q What is Maximus?
A I'm sorry?
Q What is Maximus?
A For us Maximus -- to my knowledge that's the only function they performed for us. They're just an organization that did review of our new hire database to make determinations whether or not that individual fell into a class that was eligible for any type of tax credit.
Q And do you know if that was done with regard to Mr. Batten?
A Not specifically. It should have included all new hires.
Q Okay. So you would expect that his name would have been run through that system at least?
A As a new hire, yes.

Q Okay. Are you familiar with Food City's policy on personal leaves of absence?
A Yes.
Q If you could summarize that policy in a nutshell.
A So when someone needed time off that didn't fall under Family Medical Leave or other paid leave such as vacation or a holiday, they could make a request for a personal leave.
Q Is that the only way to get a personal leave of absence, to request it?
A No. Sometimes leaves were assigned when someone had -- had expired their other leaves, such as under -- someone is out on a -- for a disability claim and they expired their disability, but wished to continue their employment status, they would be converted to a personal leave for up to two 90-day periods.
Q Okay. To your knowledge, when a disabled employee of Food City needed an accommodation and Food City made the determination that it could provide it without any undue burden on the company, was it Food City's policy to provide that accommodation?
A You're going to have to clarify. Are

you just saying in general?
Q Yes. In general when a disabled employee needed an accommodation and Food City determined that it could provide an accommodation without undue burden, was it Food City's policy to provide it?
A Yes. We provided a lot of accommodations. If the accommodation met all the work requirement standards, if there was truly a need and we could meet that accommodation, yes.
Q Okay. So Food City would make a determination about whether there was truly a need for it?
A So one of the standards is reviewing the functions of the job.
Q And if they -- if they can perform it without accommodation, would it be Food City's policy to not provide the accommodation?
A If there's not a need to perform the job, there wouldn't be a need for the accommodation.
Q In your mind is that the same thing as being able to perform the job without accommodation?
A Yes.

Q So if an employee demonstrated that they could perform the job without accommodation, then it was Food City's policy to not provide the requested accommodation?
A In general I don't recall a lot of accommodation -- I don't recall other accommodation requests where they were able to perform the job without it.
Q I'm going to look back at Exhibit 2 real quick.
A Okay.
Q You can see it. It says, "A qualified employee or applicant" -- and again this is under the ADA policy. "A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question." Did I read that right?
A Yes.
Q So does that mean that an employee is qualified if they can do the job with or without accommodations?
A That's what it says, yes.
Q So then an employee who can do the job without accommodation is still a qualified

employee under the ADA policy; is that right?
A Yes.
Q All right. The next sentence in the policy is, "A reasonable accommodation is the requirement that employers take steps that are not an undue hardship to make employment possible for persons with disabilities." Did I read that right?
A Yes.
Q And it says, "An undue hardship is an action requiring significant difficulty or expense when considered in the light of the factors such as employer's size, financial resources, and the nature and structure of the employer's operation." Did I read that right?
A Yes.
Q Are those the things that Food City would consider in determining whether a accommodation, a specific accommodation, would be an undue hardship?
A Certainly that would be part of the process, but if they're performing without accommodation, those are moot points.
Q Okay. Well, but isn't the policy that even if they are performing without

accommodation, they're still a qualified employee?
MR. JACKSON: Objection. Go ahead and answer.
A I don't follow your -- what you're looking for here. This is -- if they're qualified in performing the job without an accommodation, end of statement.
Q So if somebody is -- if somebody has a medical condition and they're performing their job, but it causes them great pain physically because of the disability, they're not eligible for accommodation because they're doing their job?
MR. JACKSON: Objection. Go ahead and answer.
A Certainly they would be.
Q Just because somebody is fighting through the pain or the symptoms of their disability doesn't mean they don't need accommodation; is that right?
MR. JACKSON: Objection. Go ahead and answer.
A I don't disagree.
Q All right. Have you ever met Mr. Matthew Batten?
A No, sir.

Q Okay. Do you have any knowledge about his employment record with Food City specifically or generally?
A Today, no.
Q Okay. Do you have any reason to suspect that he was a bad employee?
A Based on conversations with the HR specialist, David Ellison, no. He was a satisfactory employee.
Q When did you first learn that Mr. Batten had requested an accommodation in the form of a service dog?
A I'm not sure. That information would have come through the specialist.
Q Okay. Would that -- at the time would that have been David Ellison?
A Yes.
Q All right. Disregarding the specific date on which you learned, do you remember the context of when you first learned that Mr. Batten had requested the use of a service dog?
A No. All I remember is the note recapping the meeting David had and that's included in the review of the response.
Q Do you remember who you first spoke

with regarding Mr. Batten's request for accommodation?

A You're going to have to clarify. In terms of after I had the information or receiving the information?

Q Whenever you first learned that Mr. Batten had requested an accommodation in the form of being allowed to use a service dog, do you remember who you first spoke to about that requested accommodation?

A Once I had the information, this was new for me. I consulted with the general counsel.

Q You had never had an accommodation request related to a service dog before?

A Not that I recall.

Q Okay. Aside from general counsel, do you remember speaking to anybody else about Mr. Batten's request for the use of the service dog?

A Well, clarification, David Ellison. None other.

Q Okay. Ultimately did you make the decision to deny Mr. Batten's request for the use of a service dog?

A At the time that I made the

recommendation that we place him on leave after he refused to consider the accommodation that we served up.
Q Okay. Who made the decision to deny Mr. Batten's request for the use of a service dog?
A That would have been -- I made the decision to Mr. Ellison. My recommendation was that we not move forward with the service dog, but we move forward with a different accommodation.
Q Okay. I'm not trying to -- I'm not trying to beat a dead horse. I just want to make sure I understand who the decision-makers were. Did you make the decision and relay that to Mr. Ellison or did you and Mr. Ellison make the decision together?
A I made the decision based off of information provided to me from Mr. Ellison.
Q Okay. Did anyone else provide information to assist in your making that decision?
A General counsel.
Q Okay. Do you remember, if you can, when the decision was made to deny Mr. Batten's request?
A No. I don't remember.

Q Okay. And can you tell us what were the reasons -- reason or reasons for your decision to deny the requests for the use of his service dog.

A So based off of the statements that were given to Mr. -- let's see, Mr. Batten told Mr. Ellison that he could perform the job and Mr. Ellison acknowledged that he had been performing the job, I believe, for a couple of years.

The main thing that he was requesting was provide some stability. And I don't believe he was -- he would even allow us to further discuss that during our informal exchange with him when we talked about an alternative accommodation being a similar type job, but allowing him to move to inside the store from the fuel kiosk as a Uscan cashier.

And Mr. Batten was just not open to any solution other than the service animal and effectively, as I recall, gave us an ultimatum. He either brings his service animal to work or he wouldn't be at work.

And that led to granting him personal leave just honestly to provide an opportunity to

save his job, give him a chance to reconsider either going the current role or accepting the assignment as the Uscan cashier.

Q Based off of the training material in Exhibit 2, would you agree that it would have been Food City's position that Mr. Batten was a qualified employee?

A Mr. Batten was a satisfactory employee performing essential functions of his job without any accommodation and we were willing to give him an accommodation, but different than his request.

Q Let me ask a better question. Referring to Exhibit 2, specifically the definition of qualified employee, since you've said Mr. Batten was able to perform the essential functions of his job without accommodation, would he still be considered a qualified employee?

A Yes. There was no question about whether he was a qualified employee.

Q Okay. And I mean a qualified employee specifically with regard to Food City's ADA compliance.

A I'm not sure I follow the clarification you're seeking there.

Q Well, what I'm referring to is the ADA training material in Exhibit 2 where it says that "A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question." And what I'm trying to understand is if, to your knowledge, it was Food City's position that Mr. Batten was a qualified employee because he could do the job without reasonable accommodation?
A He certainly was a qualified employee, yes.
Q And to your knowledge, was a qualified employee who could perform the job without reasonable accommodation, were they ineligible for reasonable accommodation?
A Any qualified employee would be eligible for a reasonable accommodation if there was a need. That's part of the process to determine the need being requested and if there's another way to satisfy that need.
Q Okay. We'll talk some more and I want to look at some statements and emails regarding the conversations with Mr. Batten, but with regard to your decision to deny the use of

the service dog and instead suggest the alternate position in the store, did you do that because you made the determination that the allowance of the service dog would be an undue burden on Food City?
A I did not. I just was trying to find an accommodation.
Q What was the reason for denying the use of the service dog, then?
A We could meet the need that Mr. Batten had requested assistance to through another accommodation.
Q Okay. But if you could meet the need with the requested accommodation and it wasn't an undue burden, then why not just provide that requested accommodation?
A We were in our informal discussion and exchange. Isn't that the purpose to -- to explore alternatives? And that's as we did.
Q Okay.
A So we felt we had a reasonable alternative assignment that would meet his need without the specific accommodation he requested.
Q Did you in your capacity of the VP of HR, did you have some problem with the use -- with Mr. Batten's use of his service dog?

A Absolutely not.
Q Then what I'm trying to understand is if you didn't have a problem with it, why would you suggest an alternative?
A How -- just simply exploring how could we meet the need as he requested for the stability. So that's the only reason.
Q Did you believe that Mr. Batten's use of the service dog would not meet his need?
A I did not make any assessment of that.
Q Did you or anyone else at Food City ever make the determination that Mr. Batten's use of the service dog would constitute an undue burden on Food City?
A No, sir.
Q Did you think it would constitute any type of burden on Food City?
A No, sir.
Q Can you tell me anything else to explain why, then, you would have offered an alternative instead of just granting the requested accommodation?
A Simply trying to meet his need for stability and the job that was proposed to him

allowed for that, but it was simply, you know, an open discussion that he was very close-minded to.
Q He would only accept the use of the service dog as an accommodation; is that right?
A That's what was conveyed to me that he -- he served it up as an ultimatum, dog or not work.
Q Did Food City not give him an ultimatum, Uscan position or not work?
A That's not true. We served that up. He did not accept it and did not explore further with us what other type of accommodation might make it feasible for him. So no, sir.
Q All right. Well, Food City didn't accept his request for the use of a service dog; did they?
A We had not fully explored alternatives.
Q Why didn't Food City further explore the use of his service dog?
A Mr. Batten -- Mr. Batten wouldn't engage in discussion with us for any other alternatives.
Q After Mr. Batten left Food City's employment, do you know if anyone filled the fuel

clerk position that he left?
A I'm not knowledgeable of that, no.
Q Okay. Do you remember what you reviewed in making the decision to deny Mr. Batten's request for the use of a service dog?
A That -- that was all reviewed with general counsel.
Q Okay. I'm going to go over a few documents. Let me blow these up real quick. All right. Can you see my screen?
A Yes.
Q Do you recognize this particular document?
A I do. That's -- without comparing, I believe that's one of the exhibits included from a meeting that Mr. Ellison had with Mr. Batten.
Q Okay. Do you recall if you reviewed this particular document prior to making your decision?
A This specific -- I was under the impression I reviewed all the discussions between Mr. Ellison and Mr. Batten.
MR. JACKSON: Just for clarity on the record, this statement is from Emily Hobbs.
Q Do you remember reading a statement

by Ms. Emily Hobbs, Mr. Meadows?
A Not until I did a review of this EEO response by Mr. Lyon.
Q Okay. So you don't recall if you read this prior to making your decision to deny the use of a service dog?
A I do not recall that.
Q Let's mark that as Exhibit 3.
A So this is not Mr. Ellison's statement as Howard said? This is Emily's statement?
Q This is a statement of Emily Hobbs.
A Okay.

(Thereupon, Exhibit No. 3, Statement of Emily Hobbs 11/29/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:
Q Was it part of your decision to deny Mr. Batten's use of his service dog that there had been any kind of complaints about the behavior of his dog?
A I had no prior knowledge of Mr. Batten's dog other -- I wasn't even aware he had the dog. I thought he was -- the request was

around a dog he was receiving. So maybe my recall is not clear there, but no.

Q Okay. You don't recall there being a report, an allegation, that Mr. Batten's dog jumped on somebody?

A I don't recall any reports about Mr. Batten's dog prior to making -- during the course of our exchange and making a decision, no.

Q Okay. Fair to say, then, that would not have constituted something on which you based your decision?

A That's correct.

Q Okay. All right. Do you see this next document?

A Barely. I see Gary Richards's name at the top.

Q Okay. This is a statement signed by Gary Richards regarding what happened on July 23rd, 2021. Do you happen to recognize this document?

A I've read this document. Is it -- it may be part of the response, but only as a recent review did I recall this document.

Q Okay. You don't recall one way or the other whether you read this in the context of

making the decision?
A I do not.
Q Okay. Do you know why -- if I didn't already say it, let's mark that as Exhibit 4.

(Thereupon, Exhibit No. 4, Statement of Gary Richards 11/30/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q Do you know why an HR specialist would want to clarify whether a service dog was an emotional support dog or a service dog?
A Well, I think we'd want to -- no.
Q To your knowledge, was it part of Food City's policies or procedures to make that distinction?
A Not to my knowledge.
Q Okay. When you made your decision to deny the use of Mr. Batten's service dog, were you aware that Mr. Batten had been allowed to work for approximately a week while using his service dog?
A I don't believe I had any knowledge of that until I reviewed this document recently. No, sir.
Q Okay. So now you are aware that Gary

Richards, the store manager, in the absence of specific guidance from HR made the decision to allow Mr. Batten to use his service dog for about a week. Is that your understanding?
A Based off of that document.
Q Do you think that was a reasonable decision by Mr. Richards?
A I think Mr. Richards took some -- he had to be knowledgeable of the conversations that had taken place between the specialist and Mr. Batten. In fact, I thought he was witness to at least one of those, but may be bad recall. I don't think he acted fair in terms of the latitude to make that decision without going back to the specialist who had been engaged in trying to reach an accommodation with Mr. Batten.
So, no, sir, I wouldn't support his decision to do that unless he was advised to do that either by his district manager or the specialist.
Q All right. I'm going to share another document with you. Okay. Do you recognize this document? And I can blow it up some more if you need it.
A No. I'm reading through. I am

familiar with that document. This is -- this is David's document; correct?
Q This is the -- do you recognize this as the document signed by David Ellison concerning the events on August 6th, 2021?
A I do and I don't know if that's as a result of reviewing the EEO response or if that was something presented to me, but that aligns with my recall of information from David.
Q Okay. So you think you remember that you would have had this at the time of making your decision?
A I believe so.
Q Okay.
A That's not an affirmative yes.
Q Sure. If you had it, would it have been emailed to you, do you think?
A Likely. Possibly email and followed with a hard copy or vice versa.
Q Okay. Is that an email that you might still have access to?
A I have no access to my former files from work.
Q Okay. Would you expect that Food City would have access to that record?

A I don't know what Food City did with my files. Keep in mind I've been gone about a year and a half now. So I don't know.
Q Okay.
A Only if -- only if that was a part of the -- of the file. I don't know about the email.
Q Okay. All right. I just want to go through this. It says, "On 8/6/21, I met with Matthew Batten at Food City 214 with Gary Richards as my witness. Matthew has recently turned in documents and a request for an accommodation for a service dog to be present with him as he works his shifts at the fuel center.

"During this exchange, I asked Batten if there had been a change in anything as he has worked for us for two years. He stated that nothing had changed. He stated that he had been waiting for a service dog for over four years.

"I asked him if he was able to perform all essential functions of the job.

"And he stated he could do so without question as he had been doing them since he began his employment with Food City. He stated that he needed the service animal to help him in his battle with anxiety, panic attacks, and feeling of

isolation. He also stated that he has fallen about five times and the dog helps him steady on his feet.

"At the end of the meeting, I reiterated that I was gathering information during out exchange meeting and I would be back in contact with him again soon." As best you can tell, did I read that correctly?

A As best I can tell.

Q So if you had this at the time you made your decision, you would have been aware that Mr. Batten needed the service dog not only in relation to anxiety, panic attacks, and isolation, but also stability; is that right?

A Stability is certainly the -- was the key component that I recall that he needed assistance with at work. And the isolation was also a discussion and thus the accommodation to allow him to move inside the facility rather than only at the fuel kiosk so he would be around coworkers and additional people. So that led to the offering of the accommodation for the Uscan, I believe.

Q Okay. So when an employee is able to perform the job, but they've got a disability that

makes them fall down and renders them a fall risk to some level, clearly that's somebody who is -- who would benefit from an accommodation, yes?
A Would benefit from a accommodation.
Q And under that circumstance, it wouldn't be Food City's policy that that employee is ineligible for an accommodation just because they've been doing the job; is that right?
A So we did offer an accommodation. That seems to be the key point there. We discussed this accommodation and offered an alternative accommodation that would have met his needs it appears.
Q Okay. This may be a dumb question, but I've got to ask it. So because Food City made some offer of an accommodation, was it your position as VP of HR that Mr. Batten was eligible for some accommodation?
A We were simply engaging in arriving at a solution for Mr. Batten. And so, yes, we're trying to solve the accommodation request.
Q Okay. You decided he was eligible for an accommodation. It was just a dispute as to what that accommodation would be. Is that fair?
A No. I think you're overlooking the

part that he's able to perform the job without any accommodation.
Q Okay. Well, I want to understand Food City's position as you understood it as the VP of HR. Was it your position as the VP of HR that Mr. Batten was not eligible for accommodation?
MR. JACKSON: Objection. Go ahead and answer.
A No.
Q Was it your position as VP of HR that Mr. Batten was eligible for some accommodation?
A Undetermined. We were -- I think that was the purpose of discussion, what was needed and what would satisfy what he defined as a need, which was basically stability. So he already had in his role a stool available and, likewise, I don't believe we got to the point because he -- he shut down the discussion of talking about what aids would be needed for the Uscan position. Keep in mind the Uscan position would address his -- his feeling of isolation.
Q All right. We will talk a little bit more about that, but I want to get through some of these statements first.

REPORTER: Did you want that to be 5?

MR. HARGRAVES: Yes. Thank you.

(Thereupon, Exhibit No. 5, Statement of David Ellison 8/6/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q All right. Mr. Meadows, can you see my screen?

A Yes. I'm able to see Gary Richards at the top and Gary Richards's signature.

Q Yes, sir. Do you recognize this document?

A I've read this document recently. Had I read this document previously, I'm uncertain.

Q Is it possible that this is -- that this is -- that this is a document that you reviewed in the context of making your decision?

A It is possible, but I'm uncertain.

Q That's fair. And I've been referencing the decision. When I say that, do you understand that I'm referring to the decision that you made around August of 2021 to deny the use of a service dog?

A That's my interpretation.

Q Okay. I just want to make sure that I'm being clear.

Okay. So let's mark this as Exhibit 6 before I forget again.

(Thereupon, Exhibit No. 6, Statement of Gary Richards 8/6/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q All right. So it says, "On August 6th David Ellison met with Matt Batten with myself as a witness to discuss the request of a service animal. Mr. Ellison asked Matt if there was any aspect of the job that he could not perform that required the assistance of a service animal.

"Matt replied that he was able to perform all duties that were required without question and had been doing so since his employment with Food City without the help from a service animal. Matt stated that the purpose of the service animal was to provide companionship and help with anxiety, isolation." Did I read that correctly as best you can tell?

A As best I can see, yes.
Q And that appears to be signed by Gary Richards. Is that what you see?
A Yes.
Q Would you agree that this relates to the same meeting, the August 6 meeting, that Exhibit 5, Mr. Ellison's statement, pertains to?
A It appears to be, yes.
Q Okay. Mr. Ellison referenced Mr. Batten's need related to stability and falls; is that right?
A Yes.
Q Mr. Richards makes no mention of that; is that right?
A Not in this note.
Q Do you know why he didn't make mention of it?
A I do not.
Q Okay. Did you ever discuss this August 6 meeting with Mr. Ellison or Mr. Richards?
A I don't recall discussing it with Mr. Richards. I do -- I'm fairly certain I had discussion with Mr. Ellison.
Q Do you know -- can you say when that discussion took place?

A I can't, no.
Q That's fine. Do you remember if Mr. Ellison told you in that conversation that he had specifically asked Matthew Batten in this meeting if he could perform the job with or without accommodation? Do you remember if Mr. Ellison told you about that?
A I don't.
Q Okay. Did Mr. Ellison tell you that Mr. Batten said in that meeting that he could perform the job with accommodation?
A I don't recall that.
Q Okay. I'm showing you another document. Do you see this one? It says on 8/12/21.
A Yes.
Q And it appears to be signed by David Ellison?
A Yes.
Q Do you recognize this document?
A I do recall this, yes.
Q And as best you can recollect, do you recall this from your review of documents in making the decision?
A Uncertain.

Q Okay. It's possible you reviewed it then, but you may have also reviewed it in the context of reviewing the EEOC position statement?
A Yes.
Q Okay. Is the EEOC position statement the only thing you reviewed in preparation for today's deposition?
A The statement and the attachments.
Q Okay. Okay. Were you aware that Mr. Ellison had had a meeting with Matthew Batten and again Mr. Richards on August 12th of 2021?
A Uncertain, but I knew there were multiple meetings between Mr. Batten and Mr. Ellison.
MR. HARGRAVES: Okay. Let's mark this Exhibit 7.

(Thereupon, Exhibit No. 7, Statement by David Ellison 8/12/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q All right. I just want to go through it. Let's finish up with this and maybe we can talk about a break after this. We've been going a little while.

"On 8/12/21, I met with Matthew Batten at Food City 214 with Gary Richards as my witness. I informed Batten that his request for a service animal in the workplace had been reviewed and denied at this time. I stated that he had been performing the job for over two years without any accommodations. I asked him for his ideas or suggestions of any other possible accommodations that may be available for him.

"He stated that he did not know of anything else that could accommodate him.

"I suggested that we could reassign him to a Uscan cashier position as this would help aid in his battle of isolation and anxiety of working alone at the fuel center kiosk.

"He stated he could not work any position that mandated that he stand for prolonged periods of time as he as complex regional pain syndrome, CRPS. He stated that the fuel center allowed him to stand when needed and sit when needed. When asked how long he thought he could stand, he was unable to give any exact time. He stated that he could only work with the service dog present at this time as he was not going to leave the dog with anyone else." As best you can

tell, did I read that correctly?
A Yes.
Q So this was the meeting where the Uscan cashier position was first offered to Mr. Batten. Is that fair?
A To the best of my knowledge.
Q Okay. Was it your idea to offer Mr. Batten the Uscan cashier position as an alternative accommodation?
A I'm uncertain of that. It was -- it would have been as a result of discussion between Mr. Ellison and myself on what else could we explore that might accommodate him. So it could have been his suggestion. Honestly I don't -- do not recall at this point.
Q Okay. To your knowledge, is there any record of the conversations between you and Mr. Ellison that you referenced?
A Beyond these statements, I do not recall any records of our discussions.
Q To your -- to your recollection would those discussions have been all verbal?
A Other than Mr. Ellison forwarding an email to me of something such as this, that's -- keep in mind, he is in Chattanooga. I was in

Abingdon. So normally if he had a document of that nature, he would probably scan it and email it as an attachment. He may have mailed it to me. I'm unsure at this point.
Q Okay. Did you have phone calls with Mr. Ellison regarding this case?
A I'm sure I spoke with him either face to face or by phone.
Q Do you know if Food City recorded employee phone calls at that time?
A Not to my knowledge.
Q Okay. In Mr. Ellison's statement here, Exhibit 7, he indicates that he told Mr. Batten that this would help aid in his battle of isolation and anxiety of working alone at the fuel center kiosk. Is that what it says?
A Yes.
Q He doesn't say that it would aid Mr. Batten with regard to his stability issues; does he?
A It doesn't appear that got that deep in the discussion based off of effectively Mr. Batten's statement that he would only work with the service dog. So it looks like he shut the discussion short.

Q Okay. Does it say anywhere in this statement that Mr. Batten interrupted Mr. Ellison and prevented him from talking about how this accommodation would aid with stability?

A It doesn't say that. Mr. Ellison did convey to me that Mr. Batten wasn't open-minded and effectively was just giving him an ultimatum that service dog or I'm not going to work. So I do think that was a factor based off of Mr. Ellison's discussions with me, yes.

Q Okay. I don't want to -- I don't want to put words in your mouth. So tell me if I'm wrong on this. Do I remember correctly that you said a little while ago that you thought the Uscan position would at least in part aid in the stability issues?

A Yes. I think we could have -- we could have -- this position that was served up or other similar positions that could have been explored, certainly there could have been an accommodation to aid with the stability issue. There's -- the Uscan component itself is in a podium form or was at that time. So that would certainly -- would have aided in his stability, as well as I don't know if Mr. Batten uses a cane or

walker or if he needed a stool as he had in the fuel center. All of those were possibilities to address the stability issue, but obviously that that wasn't part -- didn't get that deep in the discussion.

Q Okay. Does anybody need a break at this time? We've been going about an hour and a half.

A So how long do you anticipate?

Q I mean, I'm getting a little bit close, but I may have another hour.

MR. JACKSON: Really? Okay. Take a bathroom break, then.

MR. HARGRAVES: Yeah. That's fine. Let's say eight minutes. Come back at 11:15.

(Thereupon, a brief recess was taken.)

BY MR. HARGRAVES:

Q Okay. Mr. Meadows, we were talking about Exhibit 7. I want to ask you about the interactive exchange. Are you familiar with that phrase?

A Yes. We -- I would call it informal exchange, but, yes, I am.

Q In the context of ADA accommodation, what is that?

A In the context of the ADA accommodation?
Q Yes.
A It's just an open exchange to explore accommodations that meet a person's needs would be my interpretation.
Q Okay. Does it typically involve the employer and the employee having a conversation back and forth about the -- about the accommodations?
A Yes.
Q Okay. Looking at Mr. Ellison's statement, he initially tells Mr. Batten that the request for the service animal has been reviewed and denied. That's on the second line. Is that fair?
A It did say that, yes.
Q And then it looks like Mr. Ellison asked Mr. Batten if he had any ideas or suggestions of any other possible accommodations, and that's line four. Is that right?
A The document is not up, but, of course, I read it.
Q Oh, I'm sorry. I thought I still had screen sharing.

A That's okay. Remember, I'm on an iPhone and it's difficult to see these documents anyhow, so.
Q Well, Mr. Jackson is looking at the same thing and if I screw something up, I'm sure he'll let us know. So line four says that Mr. Ellison asked Mr. Batten for ideas or suggestions of any other possible accommodations. Is that right?
A Yes.
Q So then he effectively put the ball in Mr. Batten's court.
A Well, he's asking for his input and if you were to have an exchange, isn't that what you would expect? I would.
Q Sure. Mr. Batten responded that he didn't know of anything else that could accommodate him. Is that fair or is that what it says?
A That's what it says.
Q So Mr. Ellison asked for ideas. Mr. Batten said I don't have any. And then it's at that point that Mr. Ellison offered the Uscan position. Is that right?
A It appears according to this

document, yes.
Q Okay. Which begs a response from Mr. Batten. And Mr. Batten responded that he couldn't work in a position that required him to stand for prolonged periods of time. Is that right?
A It does.
Q Right. According to this statement, did Mr. Ellison offer any type of solution for that problem?
A According to the statement, no. I think the statement maybe isn't the full context of discussion based off of my recall of my discussion with Mr. Ellison. Mr. Batten effectively wouldn't consider anything other than the service animal, so.
Q Well, but he did consider the Uscan position; didn't he?
MR. JACKSON: Objection. Go ahead and answer.
A I don't think he did.
Q Well, he says -- I mean, he says I can't do that position because it require -- it would require him to stand for prolonged periods of time. Isn't that what it says?

A That's what it says.
Q And you tell me. Is the Uscan position a standing position?
A It normally is, as well as, you know, the fuel center would include a lot of standing, but the difference is the fuel center I believe has a stool available.
Q The fuel center -- sorry. Go ahead. I didn't mean to cut you off.
A That's okay. Go ahead.
Q The fuel center has a kiosk in the middle. Is that right?
A The fuel center is a kiosk, an enclosed kiosk. The Uscan is -- also has a podium or stand that includes display and a keyboard that the Uscan operator stands by.
Q Okay. The fuel center kiosk position has a chair; is that right?
A A stool or a chair.
Q Okay. Something to sit on; is that right?
A Yes.
Q And the desk area that's in the fuel center, that's at a level where somebody could sit and still do their job; right?

A Yes.
Q Whereas, the Uscan position has a podium; is that right?
A It does. It could still have a stool or, you know, some other aid, whether that would be a wheelchair or a cane or walker, whatever appropriate for the individual to be able to provide the stability needed to perform the job.
Q Okay. But we've got to be clear. The Uscan position without any modification is a standing only position, yes?
A Routinely it's without a stool or a chair.
Q Okay. Now, you mentioned a few things that could be done to change that, stool, wheelchair, cane. None of those things were ever suggested or even offered to Mr. Batten; were they?
A According to this document that was not discussed, but, again, my call with Mr. Ellison, Mr. Batten wasn't open to discuss it any further, so.
Q Well, let me ask you this. When Mr. Batten said I can't do the Uscan position because that's a standing position, don't you

think that would have been the time for Mr. Ellison to say, oh, well, we can -- we can fix that, we can give you a stool?

MR. JACKSON: Objection. Go ahead and answer.

A Based on this document only. Not necessarily based on the actual discussion.

Q Were you aware of any plan by Food City to offer Mr. Batten the use of a stool or other assistive device in the Uscan position?

A Sir, it wasn't a plan. It was a discussion to explore what -- what other assignments would make this work.

Q Okay. Were you aware of any discussions with anyone about potentially offering Mr. Batten the use of a stool or other assistive device in the Uscan position?

A I don't think the discussion got that far. There would have been other alternative positions to discuss, though. There's a -- as a fuel cashier, it's the same function as not only the Uscan cashier, but bakery/deli cashier or pharmacy cashier. So there's still other options that could have been discussed that were not.

Q Okay. The Uscan position was the

only position that was ever offered to Mr. Batten as a proposed accommodation; is that right?
A Based on this document.
Q Okay. Well, would you have been aware of any -- if another position had been offered as an accommodation to Mr. Batten?
A I was only aware of the information that was provided to me by Mr. Ellison. So I'm not aware that they got that far in their discussion of exploring other accommodations.
Q Okay. Did you do anything to apprise yourself of the specific functions that would have been served by Mr. Batten's service dog?
A Did I do anything to apprise myself? Only in relation to the performance of the job and I believe the earlier document stated the stability was one of those factors and then isolation was another component, if I remember correctly.
Q You would agree that at least based on Mr. Batten's statement, that he needed to be able to sit and stand as needed. Now, the Uscan position without any modification would not address that stability issue; would it?
A Would have with additional

accommodation.

Q Which were not offered to Mr. Batten; correct?

A Apparently not, not based off of this document.

Q I'm going to show you another document.

A Okay.

Q Can you see the page Gary Richards at the top?

A I do.

Q Okay. Do you recognize this?

A I have read this document.

Q Okay. And same question, do you know if you read this in the context of making the decision or was this something that you read solely in your review in preparation for this deposition?

A For certain in preparation. I can't say for certain prior to that.

MR. HARGRAVES: Okay. Let's make this Exhibit 8.

(Thereupon, Exhibit No. 8, Statement of Gary Richards 8/12/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q I just want to go through it. "On 8/12/21 Matt Batten met with David Ellison for a follow meeting regarding Mr. Batten having a service animal at the workplace. Mr. Ellison informed Mr. Batten that after review the decision was made that at this point in time the request for the service animal has been denied. Mr. Ellison asked if there were any jobs within the store to better accommodate his current needs, suggesting Uscan attendant as it would allow him to be around others.

"Mr. Batten stated that there wasn't any position in the store that he would be able to perform his duties as he wasn't able to stand for short/long periods of time, that Gas N Go was the only position that he was suitable as it allowed him to sit and stand as needed and that he was not leaving his dog with anyone, that where he goes, she goes." To the best of your ability did I read that correctly?

A Yes.

Q Okay. Did you have any understanding as to why Mr. Batten asserted that he needed to be

able to sit and stand as needed?
A I don't have any recall of that, no.
Q Were you aware of what Mr. Batten's specific disabilities were?
A I knew Mr. Batten had some physical disabilities, but as -- I think Mr. Ellison had shared with me as a result of some kind of an accident, but that occurred prior to coming to work for Food City. And if I recall correctly, I think he had -- that accident included loss of an arm. Outside of that, no. That's all I was aware of.
Q Did you have any reason to doubt the truthfulness of Mr. Batten asserting that he needed to be able to sit and stand as needed?
A None.
Q Okay. At least in Mr. Richards's statement, he indicates that Mr. Ellison characterized the Uscan attendant as allowing Mr. Batten to "be around others". Is that right?
A Yes. That's what it says.
Q So this is another statement from another person that indicates Mr. Ellison did not characterize the Uscan position as an accommodation that would address Mr. Batten's

stability issues.
A It doesn't say that there -- anything about stability. So I agree with that.
Q All right. Can you tell us in what way the Uscan position without any modification would have addressed Mr. Batten's stability issues?
A It's a podium that he could -- he would be able to lean against if he needed to, but based off of what he's saying here just to the job in the fuel center, they're essentially the same, but to your point earlier, the fuel center did include a stool, but this -- if stability -- stability of a podium I think would be equal to or greater than what a dog can provide as far as stability.
Q You mentioned that those positions had some similarities. I kind of want to walk through those. So in the fuel clerk's position, kind of the home base would be the kiosk. Is that fair?
A Yes.
Q But the fuel clerk would have the occasional responsibility of going out to the various pumps; is that right?

A There would be a need for that occasionally, yes.
Q Okay. So the fuel clerk position would involve some standing and walking; is that right?
A Yes, normally.
Q The Uscan position, similarly there's home base at the podium; right?
A Yes.
Q But that attendant or that associate would on occasion have to go to the various self-checkout stations. Is that fair?
A Yes.
Q Okay. So in those ways they are similar. They both involve some level of walking; right?
A Some level, yes.
Q You'd agree that during the time that Mr. Batten would be walking in the Uscan position, he wouldn't have the benefit of the podium; is that right?
A He would not, is that what you said?
Q Yes, sir.
A It would be no different than he didn't have the benefit of the stool at the fuel

center. So they're equivalent jobs.
Q Well, except at the fuel center, he would be able to sit in the kiosk as needed; right?
A That wasn't your question.
Q Yes, sir.
A Your question was when he was assisting a customer. So at the fuel center if he walked to the pump, he didn't have the benefit of the stool or the podium. No different than at Uscan, when he walked away from the podium to assist a customer, he wouldn't have the benefit of a stool or podium.
Q So at least while he's walking in the Uscan position, there would be nothing different that would address his stability issues; correct?
A It was equivalent unless Mr. Batten used another tool.
Q A service animal is or can be an assistive device with regards to stability, yes?
A Possible, but it seems, you know, use of a cane or walker to be I would think more effective, but I'm not the physician, so.
Q I don't mean to be sarcastic, but just so we're clear on the record, you aren't a

physician; right?
A I am not.
Q And you don't have any medical expertise that would qualify you to say whether someone needs a cane versus a service animal; correct?
A So we were looking for a stability solution. That was the purpose of my statement there. So that's all.
Q Okay. All right. I'm going to share another document with you. Do you recognize this document?
A I can't see the top of that document, so.
Q I think that's it. It begins on 8/18/21 and there's a signature at the bottom.
A And I don't see the signature at the bottom.
Q Is that -- is that better?
A Okay. It's a statement from David.
Q Do you recognize this document?
A I do, yes. I recently reviewed that document.
Q Can you say whether you reviewed this document in the context of making your decision?

A I can't say that I saw that document. I can say I had a similar discussion with David.
Q Okay. Similar in what way?
A A discussion about offering Mr. Batten the option of a leave of absence.
MR. HARGRAVES: Okay. Let's mark that Exhibit 9.

(Thereupon, Exhibit No. 9, Statement by David Ellison 8/18/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q I don't think we necessarily need to read through this whole thing, but do you recognize this as Mr. Ellison's statement regarding the meeting wherein he offered the leave of absence to Mr. Batten?
A I recognize it, yes.
Q Okay. And I think you testified earlier that that was -- that had been your recommendation; is that right?
A It was my recommendation rather than Mr. Batten leaving his employment to place him on leave to keep the door open for him, yes.
Q Okay. Did you have any -- did you

anticipate in any way that Mr. Batten's physical condition might change during the course of the leave of absence?
A That wasn't the purpose.
Q Okay. Well, fair enough, but my question is did you have any reason to believe that his physical condition, specifically his need for accommodation, would change during the course of a leave of absence?
A Again, the purpose of this was to leave the door open to have further discussion about an accommodation and to avoid Mr. Batten from leaving his employment.
Q Okay.
A He did a satisfactory job.
Q Okay. If Mr. Batten had a legitimate need for the service animal, did you expect that he would still have that need at the end of his leave of absence if he took it?
A That's just speculation.
Q Okay.
A I don't have a comment.
Q Was there anything that indicated to you that he would not need the service dog at the end of a leave of absence?

A Again, that wasn't the purpose.
Q Well, sir, I'm not asking you about the purpose. I'm asking you if there was anything, any facts, any statement, anything at all that gave you the impression that Mr. Batten would not need the service dog at the end of a leave of absence?
A If Mr. Batten had given further consideration to alternative accommodations, maybe that would have satisfied the need for his initial request, so.
Q Okay. So was it at least part of the purpose behind the leave of absence to allow Mr. Batten the time to reconsider and accept the Uscan position?
A To reconsider and engage in further discussion if there were other alternatives that would meet his needs.
Q Okay. You would agree that he had kind of said the last word on Uscan position, right, that he couldn't do it because it was a standing position?
A According to the document.
Q Okay. And the leave of absence was at least in part so that that exchange could

perhaps continue.
A Yes.
Q Did anybody at any point during this leave of absence that Mr. Batten was placed on reach out to Mr. Batten and say, hey, we know you said you couldn't stand in the Uscan position, well, we can offer you a stool?
A So you remember I retired and I don't know what took place after Mr. Batten took the leave of absence. So I can't speak to that.
Q Okay. As far as you're aware, did that happen?
A Again, I retired. So I don't have any knowledge of it.
Q Okay. That answers my question.
All right. I'm going to share my screen again. All right. I'm going to ask you if you recognize this document and there's a signature down below. So I'm going to scroll down to it. Do you recognize this document?
A I don't. I'm not going to declare it wasn't an exhibit, but I don't recall a document from the assistant manager.
Q Okay. Do you recall whether you reviewed this particular document in the context

of making the decision?
A I don't recall.
Q Okay. Do you recognize this document at least as a document that you reviewed in the EEOC packet?
A I don't. It doesn't mean I didn't, but I don't.
Q Okay. That's fine.
All right. Do you see the document I've shared that says David Ellison at the top?
A Yes.
Q Do you recognize this document?
A I don't believe I've read this document before. You may tell me it's part of the exhibits, but I don't recall reading this.
Q Okay. And just for belt and suspenders, do you have any recollection of reviewing this document in the context of making your decision?
A This appears after the fact of the -- this is all about completing the paperwork for the leave of absence. So this does not have any bearing on making a decision about the accommodation.
Q Okay. Do you have any recollection

of whether you reviewed this document prior to your retirement?
A I don't recall this document.
Q Okay. All right. Do you see the document I've just shared? It should be a picture.
A It's turned sideways. I can tell it says certificate or something to that. It says something certificate.
Q Here we go. And there's a few pages to this. I'll scroll down slowly. Well, now that one is sideways. Sorry.
All right. Do you recognize these documents or these pictures rather?
A I definitely recognize that certificate and the picture with the dog. I think those must have been included in the exhibit packet, but I know I saw that certificate somewhere.
Q Okay. Do you know if you reviewed these pictures or these documents that are in the pictures in the context of making your decision?
A Honestly I don't recall that. I recall seeing at least the picture and this certificate you have on the screen. Did I see

those prior to -- or you keep saying made the decision, but the discussion about the accommodation, I don't recall this.

Q Okay.

A I knew that there was a -- he was seeking a service animal.

Q Are you aware that Mr. Batten provided these documents to Gary Richards in the context of asking for the approval of the use of a service dog?

A I can't recall that.

Q Okay. You don't recall if Gary Richards ever forwarded you these documents?

A He maybe did. I don't recall that. I remember seeing the document as an exhibit, but as far as someone forwarding it to me, I don't recall that.

Q Do you understand that these documents pertain to Mr. Batten and his service dog?

A I do.

MR. HARGRAVES: Let's make that Exhibit 10.

(Thereupon, Exhibit No. 10, Canine Assistants, Inc. Documents, was marked to the deposition

of Donnie Meadows and
filed herein.)

BY MR. HARGRAVES:

Q All right. Do you see the document I've just shared? It's two pages. It's an email chain.
A I cannot. Is it legible to me? No. Is there any way you can enlarge that?
Q Yes, sir.
A Okay. So, yes, I see that it's a -- I guess an email from Archie Skeens to myself.
Q Okay. Let me scroll down to the beginning of the chain or to the end. So it begins with Emily Hobbs to Gary Richards. Do you see that?
A Yes.
Q And then from Gary Richards to Donny Rector. Do you see that?
A I did.
Q And then from Donny Rector to David Ellison and CC'd Sarah Spahr; is that right?
A Yes.
Q And then David Ellison to you and Sherrell Lyon. Do you recognize this email chain?
A I -- I don't, but it clearly has my

name on it.
Q So you don't remember if you reviewed this email chain or any attachments in the context of making your decision?
A Can you show me the attachment?
Q I can't. I can only show you what's here on the document. Do you have any recollection of reviewing this email chain or any attachments to it?
A I don't recall reviewing this email. I can't say. I don't recall.
Q Okay. Who is Archie Skeens?
A Archie Skeens is a safety director.
Q All right. Let me take -- well, the start of the email chain begins with Emily Hobbs. It looks like a blank email to Gary Richards; is that right?
A That's what it appears to be, yes.
Q And then Gary Richards forwarded that to Donny Rector. Do you know why Gary Richards would have forwarded this to Donny Rector?
A Donny Rector is an HR specialist at that time in the Knoxville division and maybe the division's specialist was out for some reason. That would have been Sherrell Lyon at that time

unless this was already -- unless David Ellison was already in the position. So I assume it's so close to August that David was in the position. So maybe he was -- Donny was covering for him. That would be my speculation only.
Q Okay. The subject of the email, the beginning of the email change, is Christopher Batten; is that right?
A That's what it says, yes.
Q Do you understand that to be Matthew Batten?
A I would make that assumption, yes.
Q The email from Donny Rector to David Ellison on July 26, 2021, says, "Welcome back. Got this one late last week, associate with a service animal I thought you might want to take a look at." Is that right?
A Yes.
Q And then David Ellison forwarded it to you and said, "Please advise on associate requesting to bring service dog to work at Gas n Go at 214." Did I read that right?
A Yes.
Q So it looks like he emailed that to you on Monday, July 26, and then it looks like ten

minutes later you forward it to Archie; is that right?
A That's what it indicates, yes.
Q Okay. Why -- help me understand. Since you were the VP of HR, why would you be forwarding this question to a safety director?
A Mr. Skeens had dealt with a service animal at store level in the past. I had not.
Q How did you become aware that Mr. Skeens had had that prior experience with service animals?
A I don't recall.
Q Is it fair to say that you already had that knowledge at the time that you got this email?
A I had that knowledge or I made that assumption.
Q Okay. What -- tell us what you do remember about Mr. Skeens's prior experience with the service animal issue at store level.
A Mr. Skeens -- I don't -- I'm sorry. I don't recall how I had knowledge about that or if I had knowledge about that. I made some assumption when I forwarded this to him that he had some background about service dogs, but I

don't recall why now.
Q Okay. Do you know if your understanding at the time was that he had dealt with the request by an employee for the use of a service dog?
A No. No. I don't think that would be the case unless it was just an informal discussion he had with an employee.
Q So what was the service dog issue that you were under the impression Mr. Skeens had dealt with before?
A Just service dogs in general. That's all I can recall.
Q Okay. But at the store level?
A Yes.
Q Okay. Would that indicate either an employee or a customer?
A Sir, thinking back I have to make the assumption at this point that it was -- it would be customer based.
Q Okay.
A So I don't have any recall beyond that.
Q Okay. So after you emailed Mr. Skeens, it looks like he fairly quickly

responded that I will as soon as I can speak to Charlie about this issue; is that right?
A That's what it says, yes.
Q And Charlie Fugate is who he's referring to?
A Yeah. That's who is copied and Mr. Skeens reported to Charlie and Charlie is general counsel.
Q So that's Food City's lawyer?
A Yes.
Q After this email did Mr. Skeens get back with you to, as you say, advise you on this request?
A Honestly I'm surprised by this email. I don't think Mr. Skeens and I had any discussion. My discussions would have been with Mr. Fugate, the general counsel.
Q Okay. So as far as you know, you didn't have any other discussions with Mr. Skeens outside of this email?
A To my recall, my discussions were with Charlie, not with -- not with Archie.
Q Okay. Does safety director -- under normal circumstances does a safety director get involved in ADA accommodation requests?

A Typically, no. If it were -- if it were any type of safety issue involved in the request as far as need for a piece of equipment or etc., then would possibly consult with them, but routinely, no.
Q Okay. Is an employee who is a fall risk, is that a potential safety issue?
A Well, absolutely.
Q I know these sound like dumb questions, but I've got to ask them. Can an employee who falls down, can that prevent that employee from doing their job?
A As a result of an injury from falling down might prevent them, but no. We all fall from time to time, I think, so no.
Q Well, during the context of the fall, can that interfere with your ability to do your job?
A Short of an injury, no.
Q If you're injured when you fall, can that interfere with your ability to do your job?
A Certainly.
REPORTER: Did you want that to be 11?
MR. HARGRAVES: I thought that was

10.

MR. JACKSON: 10 was the dog documents, certification.

MR. HARGRAVES: So, yes, I do want that to be 11.

(Thereupon, Exhibit No. 11, Email Chain 7/26/21, was marked to the deposition of Donnie Meadows and filed herein.)

BY MR. HARGRAVES:

Q In your time as the VP of HR, do you recall other employees at Food City requesting accommodations for disabilities?

A It's very routine or a high-frequency basis to receive accommodation requests, yes.

Q Can you recall ever denying requests?

A I can recall having discussions that look for alternative solutions to the request, just as we did with Mr. Batten. So I think denying the request is framed a little differently than what I would say. We were looking for a solution other than what was served up that would meet his needs. So that would be routine in requests to explore solutions.

Q Was it a policy or a procedure of

Food City to always reject the initial proposed accommodation?
A Always reject, no.
Q If the initial proposed accommodation did not cause an undue burden, would there be any reason for Food City to propose an alternative accommodation?
A Just looking for the best accommodation.
Q Right. And assuming that the initial proposed accommodation was the best accommodation and Food City had no issues with it, would there be any reason for Food City to offer a proposed alternative accommodation?
A You don't know until you explore that; do you?
Q Well, how would you explore if there -- if Food City had no reasons at the outset to oppose an initial request for accommodation, how would Food City explore whether they needed to propose an alternative?
A Through the informal discussion process. How else might we do -- meet the need of the request?
Q And if through the course of that

discussion Food City found out that the proposed request or the proposed accommodation caused no burden on Food City and the alternative accommodation would require modification, would there be any reason to reject that initial requested accommodation?

MR. JACKSON: Objection. Go ahead and answer.

A I don't have a response to that.

Q Did you understand my question?

A No. You need to clarify, I guess.

Q All right. I'm asking you a hypothetical. And in the hypothetical you have a proposed accommodation from an employee and you had made the determination that that proposed accommodation causes no burden, undue or otherwise, to Food City and you know that an alternative accommodation would require some modification. Okay. In that scenario can you think of any reason why Food City would reject the initial requested accommodation?

MR. JACKSON: Same objection. Go ahead and answer.

A The need for a modification doesn't necessarily make it a bad accommodation. Just

trying to arrive at the best solution.
Q What would be the best solution?
MR. JACKSON: Objection.
Q What characterizes the best solution?
A Meeting the -- meeting the defined needs, not necessarily the wants. So it's clear on this one specific, not the hypothetical, but the preference is -- the preference is not necessarily the only solution available, so.
Q Okay.
A There's no sin in exploring for alternative approaches.
Q Okay. Did you have reason to believe that Mr. Batten's request for the use of a service dog was a want and not a need?
A A preference.
Q Okay. So you believed that he -- it was a preference for him to have the service dog, not necessarily a need. Is that what you're saying?
A No.
Q Okay.
A It was his preference. He had a need for the stability and isolation and the dog appears to be one solution and that was his

preferred solution. It doesn't mean it's the only solution.
Q Did you understand that the service dog was specifically trained to meet multiple of Mr. Batten's needs?
A I don't recall. No, I don't recall that.
Q Did you or anybody else at your direction ever ask Mr. Batten what it was about the service dog that he needed?
A I believe that's in one of the discussions that he and Mr. Ellison had.
Q And Mr. Batten indicated that the dog helped with anxiety, isolation, and stability; right?
A Yes.
Q So Mr. Batten maintained that the dog helped with all three of those. Is that fair?
A According to the statement.
Q Right. Did you have any reason to doubt that?
A No.
Q Okay. And was Mr. Batten ever offered any accommodation that similarly addressed all three: Anxiety, isolation and stability?

A I think the discussion for alternative accommodations was cut short by Mr. Batten.
Q So it's Mr. Batten's fault that Food City didn't offer him a more appropriate accommodation. Is that what you're saying?
MR. JACKSON: Objection. Go ahead and answer.
A It's a dual responsibility to explore those alternatives. He wasn't willing to do so.
Q Did he say that?
A When he ended the session.
Q Oh, how did Mr. Batten end the session?
A I'm going to work with my dog or I'm not going to work. I'm paraphrasing, but in essence, that was his ultimatum.
Q Well, he responded to the proposal of the Uscan position; didn't he?
A According to the document.
Q He responded that the Uscan position wasn't appropriate because it made him stand and he physically couldn't stand all the time; isn't that right?
A Yes. That's what the document said.

Q And nobody ever responded to that by offering any solution that would allow Mr. Batten to address that aspect of his disability; is that right?
A I think the discussions were cut short before we got to that level, yes.
Q Is it your testimony that Mr. Batten prevented Food City from offering him a modification to the Uscan position?
A Prevented him?
Q Is it your testimony that Mr. Batten prevented Food City from offering him a modification to the Uscan position that would address his stated stability concerns?
A No.
MR. HARGRAVES: I think I'm done, but can we just take a brief recess, about five minutes, and let me just look over my notes and then we can come back.
MR. JACKSON: Sure.
(Thereupon, a brief recess was taken.)
BY MR. HARGRAVES:
Q Mr. Meadows, has everything you've said here today been true to the best of your abilities?

A It has.
Q Okay. And I know there were a couple of times I asked you a question that I had to rephrase. Did I rephrase those questions that you didn't understand to your satisfaction?
A I believe so.
Q Okay. Is there any question that you didn't understand that I did not rephrase for you?
A No.
Q Okay. All right. Well, I don't have any further questions for you. Mr. Jackson might, but thank you.
MR. JACKSON: No. I don't have any questions.
MR. HARGRAVES: Okay. Mr. Meadows, I appreciate your time. Thank you, sir.

FURTHER THIS DEPONENT SAITH NOT.

(Signature waived.)

REPORTER'S CERTIFICATION

STATE OF TENNESSEE :
:
COUNTY OF HAMILTON :

I, Cathy H. Kerley, LCR No. 95, RPR, licensed court reporter and notary public, in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing 102 pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 13th day of February, 2023.

CATHY H. KERLEY, RPR, LCR #95
Expiration Date 6/30/2024
Notary Public in and for the State of Tennessee.
My commission expires
June 7, 2026

#

**#95** [1] - 103:21

1

**1** [3] - 2:6, 25:21, 25:22
**10** [5] - 2:17, 87:23, 87:24, 95:1, 95:2
**101** [1] - 1:14
**102** [1] - 103:8
**11** [4] - 2:18, 94:24, 95:5, 95:6
**11/29/21** [2] - 2:9, 48:15
**11/30/21** [2] - 2:11, 50:6
**11:15** [1] - 66:15
**12th** [1] - 61:11
**13th** [1] - 103:16

2

**2** [7] - 2:8, 29:11, 29:12, 35:9, 42:5, 42:14, 43:2
**2001** [1] - 12:6
**2021** [10] - 17:13, 19:25, 20:2, 20:7, 21:23, 49:19, 52:5, 57:24, 61:11, 90:14
**2023** [3] - 1:10, 3:5, 103:17
**2026** [1] - 103:24
**21** [3] - 7:12, 16:2, 17:11
**214** [3] - 53:9, 62:2, 90:22
**22** [1] - 16:2
**23rd** [1] - 49:19
**25** [1] - 2:7
**26** [2] - 90:14, 90:25
**27** [2] - 1:10, 20:7
**27th** [2] - 3:5, 20:4
**29** [1] - 2:8

3

**3** [3] - 2:9, 48:8, 48:14
**37401** [1] - 1:24
**37421** [1] - 1:15
**37902** [1] - 1:18

4

**4** [4] - 2:3, 2:10, 50:4, 50:5
**423-267-4328** [1] - 1:25
**428** [1] - 1:24
**48** [1] - 2:9
**4:22-CV-00179** [1] - 1:6

5

**5** [4] - 2:12, 57:1, 57:3, 59:7
**50** [1] - 2:11
**550** [1] - 1:18
**57** [1] - 2:12
**58** [1] - 2:13

6

**6** [5] - 2:13, 58:5, 58:6, 59:6, 59:20
**6/30/2024** [1] - 103:22
**61** [1] - 2:14
**63** [1] - 24:12
**6400** [1] - 1:14
**6th** [2] - 52:5, 58:12

7

**7** [6] - 2:14, 61:16, 61:17, 64:13, 66:19, 103:24
**7/26/21** [2] - 2:18, 95:6
**74** [1] - 2:15

8

**8** [3] - 2:15, 74:22, 74:23
**8/12/21** [7] - 2:14, 2:15, 60:15, 61:18, 62:1, 74:24, 75:4
**8/18/21** [3] - 2:16, 80:16, 81:9
**8/6/21** [5] - 2:12, 2:13, 53:8, 57:4, 58:7
**81** [1] - 2:16
**87** [1] - 2:17

9

**9** [3] - 2:16, 81:7, 81:8
**90-day** [1] - 33:18
**900** [1] - 1:18
**95** [2] - 2:18, 103:6

A

**a-c-m-e** [1] - 13:6
**abbreviation** [1] - 9:5
**abilities** [1] - 101:25
**ability** [4] - 75:21, 94:17, 94:21, 103:9
**Abingdon** [2] - 7:10, 64:1
**able** [16] - 34:23, 35:7, 42:16, 53:19, 54:24, 56:1, 57:10, 58:18, 71:7, 73:22, 75:15, 75:16, 76:1, 76:15, 77:9, 79:3
**about** [47] - 10:5, 10:18, 11:22, 15:23, 16:25, 17:4, 17:8, 22:2, 22:10, 23:11, 34:12, 38:2, 39:9, 39:17, 41:15, 42:19, 48:21, 49:6, 51:3, 53:2, 53:6, 54:2, 56:20, 56:24, 60:7, 61:24, 65:3, 66:7, 66:19, 67:9, 72:15, 77:3, 81:4, 82:12, 83:2, 85:21, 85:23, 87:2, 91:19, 91:22, 91:23, 91:25, 93:2, 99:9, 101:17
**above** [1] - 103:7
**absence** [15] - 33:2, 33:11, 51:1, 81:5, 81:17, 82:3, 82:9, 82:19, 82:25, 83:7, 83:13, 83:24, 84:4, 84:10, 85:22
**absolutely** [3] - 10:9, 45:1, 94:8
**accept** [4] - 46:3, 46:11, 46:15, 83:14
**accepting** [1] - 42:2
**access** [4] - 23:13, 52:21, 52:22, 52:25
**accident** [2] - 76:8, 76:10
**accommodate** [4] - 62:11, 63:13, 68:18, 75:11
**accommodation** [116] - 5:4, 5:9, 14:14, 14:18, 18:22, 19:18, 21:12, 22:4, 22:11, 22:16, 23:22, 26:13, 27:12, 30:16, 30:21, 33:21, 33:24, 34:3, 34:4, 34:8, 34:10, 34:17, 34:18, 34:21, 34:24, 35:2, 35:4, 35:6, 35:7, 35:16, 35:25, 36:4, 36:19, 36:23, 37:1, 37:6, 37:12, 37:19, 38:11, 39:2, 39:7, 39:10, 39:13, 40:2, 40:9, 41:15, 42:10, 42:11, 42:17, 43:5, 43:10, 43:15, 43:16, 43:18, 44:6, 44:11, 44:13, 44:15, 44:22, 45:23, 46:4, 46:12, 51:16, 53:11, 54:18, 54:22, 55:3, 55:4, 55:7, 55:9, 55:11, 55:12, 55:16, 55:18, 55:21, 55:23, 55:24, 56:2, 56:7, 56:12, 60:6, 60:11, 63:9, 65:4, 65:21, 66:24, 67:2, 73:2, 73:6, 74:1, 76:25, 82:8, 82:12, 85:24, 87:3, 93:25, 95:15, 96:2, 96:4, 96:7, 96:9, 96:11, 96:14, 96:19, 97:2, 97:4, 97:6, 97:14, 97:16, 97:18, 97:21, 97:25, 99:24, 100:6
**accommodations** [15] - 14:20, 21:15, 22:7, 34:8, 35:22, 62:7, 62:8, 67:5, 67:10, 67:20, 68:8, 73:10, 83:9, 95:13, 100:2
**according** [7] - 68:25, 69:8, 69:11, 71:19, 83:23, 99:19, 100:20
**accountable** [2] - 17:18, 17:22
**accurate** [4] - 29:1, 30:7, 30:18, 103:8
**acknowledged** [1] - 41:8
**Acme** [6] - 13:4, 13:5, 13:20, 13:22, 15:1, 15:18
**Act** [2] - 4:11, 18:13
**acted** [1] - 51:13
**action** [2] - 36:11, 103:11
**ACTION** [1] - 1:6
**actual** [1] - 72:7
**actually** [2] - 16:17, 19:10
**ADA** [28] - 5:9, 10:15, 14:10, 14:13, 15:15, 15:20, 18:22, 19:14, 21:7, 21:10, 21:15, 21:24, 22:3, 22:10, 22:15, 24:1, 25:10, 26:8, 27:12, 27:14, 30:11, 35:14, 36:1, 42:23, 43:2, 66:24, 67:1, 93:25
**additional** [3] - 23:4, 54:21, 73:25
**address** [7] - 56:22, 66:3, 73:24, 76:25, 79:16, 101:3, 101:14
**addressed** [2] - 77:6, 99:24
**advantage** [1] - 10:7
**advertising** [1] - 14:1
**advise** [3] - 19:7, 90:20, 93:12
**advised** [2] - 18:19, 51:18
**affirmative** [1] - 52:15
**affixed** [1] - 103:16
**after** [15] - 7:21, 12:14, 12:23, 13:12, 13:20, 14:25, 39:4, 40:1, 46:24, 61:24, 75:7, 84:9, 85:20, 92:24, 93:11
**again** [10] - 29:6, 35:13, 54:7, 58:5, 61:11, 71:20, 82:10, 83:1, 84:13, 84:17
**against** [2] - 23:6, 77:9
**age** [1] - 29:21
**ago** [1] - 65:14
**agree** [6] - 42:5, 59:5, 73:20, 77:3, 78:18, 83:19
**agreed** [2] - 3:9, 3:15
**agreement** [3] - 3:4, 3:7, 4:9
**ahead** [14] - 29:3, 31:8, 31:15, 37:2, 37:13, 37:20, 56:8, 69:19, 70:8, 70:10, 72:4, 97:7, 97:23, 100:7
**aid** [7] - 62:14, 64:14, 64:18, 65:4, 65:15, 65:21, 71:5
**aided** [1] - 65:24
**aids** [1] - 56:20
**aligns** [1] - 52:8
**allegation** [1] - 49:4
**allow** [7] - 5:21, 41:13, 51:3, 54:19, 75:12, 83:13, 101:2
**allowance** [1] - 44:3
**allowed** [5] - 39:8, 46:1, 50:20, 62:20, 75:18
**allowing** [2] - 41:16, 76:19
**almost** [1] - 6:20
**alone** [2] - 62:15, 64:15
**already** [7] - 26:17, 31:7, 50:4, 56:17, 90:1, 90:2, 91:13
**ALSO** [1] - 1:19
**alternate** [1] - 44:1
**alternative** [16] -


1

41:15, 44:21, 45:4, 45:22, 55:12, 63:9, 72:19, 83:9, 95:18, 96:6, 96:14, 96:21, 97:3, 97:18, 98:12, 100:2
**alternatives** [5] - 44:18, 46:18, 46:23, 83:17, 100:10
**Americans** [1] - 18:12
**animal** [19] - 41:20, 41:22, 53:24, 58:14, 58:17, 58:22, 58:23, 62:4, 67:14, 69:16, 75:6, 75:9, 79:19, 80:5, 82:17, 87:6, 90:16, 91:8, 91:20
**animals** [3] - 26:4, 26:9, 91:11
**annual** [1] - 21:3
**annuity** [1] - 9:2
**answer** [18] - 5:22, 5:24, 6:12, 6:17, 7:5, 13:16, 16:22, 26:6, 29:3, 37:3, 37:14, 37:21, 56:9, 69:20, 72:5, 97:8, 97:23, 100:8
**answers** [2] - 6:3, 84:15
**anticipate** [2] - 66:9, 82:1
**anxiety** [7] - 53:25, 54:13, 58:24, 62:14, 64:15, 99:14, 99:25
**anybody** [5] - 17:21, 39:17, 66:6, 84:3, 99:8
**anyhow** [1] - 68:3
**anyone** [6] - 40:18, 45:12, 46:25, 62:25, 72:15, 75:20
**anything** [15] - 10:12, 10:18, 22:2, 22:10, 45:20, 53:15, 62:11, 68:17, 69:15, 73:11, 73:14, 77:2, 82:23, 83:4
**anywhere** [1] - 65:1
**apparently** [1] - 74:4
**appear** [3] - 24:11, 24:13, 64:21
**APPEARING** [2] - 1:12, 1:16
**appears** [10] - 24:16, 30:8, 55:13, 59:2, 59:8, 60:17, 68:25, 85:20, 89:18, 98:25
**applicant** [5] - 30:12, 30:19, 35:13, 35:15, 43:3
**appreciate** [1] - 102:16
**apprise** [2] - 73:11, 73:14
**approaches** [1] - 98:12
**appropriate** [4] - 6:4, 71:7, 100:5, 100:22
**approval** [2] - 18:22, 87:9
**approximately** [1] - 50:21
**Archie** [5] - 88:11, 89:12, 89:13, 91:1, 93:22
**area** [2] - 12:11, 70:23
**arm** [1] - 76:11
**arrive** [1] - 98:1
**arriving** [1] - 55:19
**aside** [2] - 25:10, 39:16
**ask** [15] - 5:24, 6:9, 6:15, 12:2, 13:15, 13:17, 16:17, 23:10, 42:13, 55:15, 66:19, 71:23, 84:17, 94:10, 99:9
**asked** [14] - 6:19, 7:4, 19:7, 53:14, 53:19, 58:14, 60:4, 62:7, 62:21, 67:19, 68:7, 68:21, 75:10, 102:3
**asking** [5] - 68:13, 83:2, 83:3, 87:9, 97:12
**aspect** [2] - 58:15, 101:3
**aspects** [1] - 16:9
**asserted** [1] - 75:25
**asserting** [1] - 76:14
**assessment** [1] - 45:10
**assigned** [1] - 33:12
**assignment** [2] - 42:3, 44:21
**assignments** [1] - 72:13
**assist** [2] - 40:19, 79:12
**assistance** [3] - 44:10, 54:17, 58:16
**assistant** [1] - 84:23
**Assistants** [2] - 2:17, 87:24
**assisting** [1] - 79:8
**assistive** [3] - 72:10, 72:16, 79:20
**Associate** [3] - 2:6, 24:13, 25:23
**associate** [5] - 25:11, 25:16, 78:10, 90:15, 90:20
**ASSOCIATES** [2] - 1:14, 1:23
**associates** [1] - 14:11
**assume** [2] - 14:9, 90:2
**assuming** [1] - 96:10
**assumption** [4] - 90:12, 91:17, 91:24, 92:19
**attachment** [2] - 64:3, 89:5
**attachments** [3] - 61:8, 89:3, 89:9
**attacks** [2] - 53:25, 54:13
**attend** [1] - 7:13
**attendant** [3] - 75:12, 76:19, 78:10
**attended** [5] - 20:18, 20:21, 20:22, 22:21, 22:23
**attorney** [1] - 4:16
**August** [12] - 19:25, 20:1, 20:4, 20:7, 21:23, 52:5, 57:24, 58:12, 59:6, 59:20, 61:11, 90:3
**authorized** [1] - 18:21
**available** [4] - 56:17, 62:9, 70:7, 98:9
**avoid** [1] - 82:12
**aware** [18] - 25:8, 26:5, 26:10, 48:24, 50:20, 50:25, 54:11, 61:9, 72:8, 72:14, 73:5, 73:7, 73:9, 76:3, 76:11, 84:11, 87:7, 91:9

## B

**bachelor's** [2] - 7:22, 12:15
**back** [11] - 12:13, 12:14, 35:9, 51:14, 54:6, 66:15, 67:9, 90:14, 92:18, 93:12, 101:19
**background** [1] - 91:25
**bad** [4] - 6:20, 38:6, 51:12, 97:25
**Baker** [1] - 22:20
**bakery/deli** [1] - 72:22
**ball** [1] - 68:11
**barely** [1] - 49:15
**base** [2] - 77:20, 78:8
**based** [21] - 9:9, 9:10, 9:14, 9:19, 24:15, 38:7, 40:16, 41:5, 42:4, 49:10, 51:5, 64:22, 65:9, 69:13, 72:6, 72:7, 73:3, 73:20, 74:4, 77:10, 92:20
**basically** [1] - 56:16
**basis** [3] - 11:2, 21:3, 95:15
**bathroom** [1] - 66:13
**Batten** [97] - 4:17, 11:7, 22:25, 23:15, 32:19, 37:24, 38:11, 38:20, 39:7, 41:6, 41:19, 42:6, 42:8, 42:16, 43:9, 43:24, 44:10, 46:21, 46:24, 47:16, 50:20, 51:3, 51:11, 51:16, 53:9, 53:14, 54:12, 55:17, 55:20, 56:6, 56:12, 58:12, 60:4, 60:10, 61:10, 61:13, 62:2, 62:3, 63:5, 63:8, 64:14, 64:19, 65:2, 65:6, 65:25, 67:13, 67:19, 68:7, 68:16, 68:22, 69:3, 69:14, 71:17, 71:21, 71:24, 72:9, 72:16, 73:1, 73:6, 74:2, 75:4, 75:5, 75:7, 75:14, 75:25, 76:5, 76:14, 76:20, 78:19, 79:17, 81:5, 81:17, 81:23, 82:12, 82:16, 83:5, 83:8, 83:14, 84:4, 84:5, 84:9, 87:7, 87:19, 90:8, 90:11, 95:19, 99:9, 99:13, 99:17, 99:23, 100:3, 100:13, 101:2, 101:7, 101:11
**batten** [1] - 47:22
**BATTEN** [2] - 1:4, 1:19
**Batten's** [27] - 30:25, 39:1, 39:18, 39:23, 40:5, 40:23, 44:25, 45:8, 45:13, 47:5, 48:20, 48:24, 49:4, 49:7, 50:19, 59:10, 64:23, 68:12, 73:13, 73:21, 76:3, 76:25, 77:6, 82:1, 98:14, 99:5, 100:4
**battle** [3] - 53:25, 62:14, 64:14
**bearing** [1] - 85:23
**beat** [1] - 40:11
**become** [1] - 91:9
**before** [10] - 4:18, 5:21, 5:24, 7:6, 9:22, 39:14, 58:5, 85:14, 92:11, 101:6
**began** [1] - 53:22
**beginning** [2] - 88:13, 90:7
**begins** [3] - 80:15, 88:14, 89:15
**begs** [1] - 69:2
**behavior** [1] - 48:21
**behind** [1] - 83:13
**being** [10] - 3:7, 4:8, 5:19, 23:4, 34:23, 39:8, 41:16, 43:20, 49:3, 58:3
**believe** [20] - 20:23, 22:22, 25:3, 31:18, 41:9, 41:12, 45:8, 47:15, 50:22, 52:13, 54:23, 56:18, 70:6, 73:16, 82:6, 85:13, 98:13, 99:11, 102:6
**believed** [1] - 98:17
**below** [2] - 84:19, 103:15
**belt** [1] - 85:16
**benefit** [6] - 55:3, 55:4, 78:20, 78:25, 79:9, 79:12
**benefits** [2] - 17:16, 18:8
**best** [20] - 5:21, 5:23, 6:3, 19:19, 24:7, 54:7, 54:9, 58:25, 59:1, 60:22, 62:25, 63:6, 75:21, 96:8, 96:11, 98:1, 98:2, 98:4, 101:24, 103:8
**better** [4] - 29:10, 42:13, 75:11, 80:19
**between** [6] - 8:14, 47:21, 51:10, 61:13, 63:11, 63:17
**beyond** [3] - 26:14, 63:19, 92:22
**bit** [8] - 5:18, 11:5, 12:14, 15:22, 17:10, 29:10, 56:23, 66:10
**blank** [1] - 89:16
**blow** [3] - 29:9, 47:9, 51:23
**Bluefield** [1] - 7:17
**Board** [1] - 103:13
**both** [1] - 78:15
**bottom** [3] - 24:24, 80:16, 80:18
**bounced** [1] - 23:6
**BOX** [1] - 1:24
**break** [6] - 7:1, 7:3, 7:6, 61:24, 66:6, 66:13
**brief** [3] - 66:16, 101:17, 101:21
**bring** [1] - 90:21
**brings** [1] - 41:22
**burden** [9] - 33:22, 34:5, 44:4, 44:14, 45:15, 45:18, 96:5, 97:3, 97:16
**business** [1] - 11:18

**BY** [14] - 4:6, 26:1, 29:16, 48:18, 50:9, 57:7, 58:10, 61:21, 66:17, 75:2, 81:12, 88:3, 95:10, 101:22

## C

**call** [2] - 66:22, 71:20
**called** [4] - 3:1, 4:2, 26:20, 28:14
**calls** [2] - 64:5, 64:10
**can** [66] - 5:14, 5:17, 6:4, 6:7, 6:22, 10:10, 17:25, 19:13, 19:21, 24:7, 24:25, 27:21, 27:24, 28:9, 29:9, 29:17, 29:22, 30:16, 30:21, 34:16, 35:12, 35:16, 35:21, 35:24, 40:22, 41:1, 43:5, 45:20, 47:10, 51:23, 54:7, 54:9, 57:8, 58:25, 59:1, 59:24, 60:22, 61:23, 62:25, 72:2, 72:3, 74:9, 77:4, 77:15, 79:19, 80:24, 81:2, 84:7, 86:7, 88:8, 89:5, 89:6, 92:13, 93:1, 94:10, 94:11, 94:17, 94:20, 95:16, 95:17, 97:19, 101:17, 101:19
**can't** [18] - 4:22, 10:12, 13:13, 14:15, 14:24, 18:24, 19:23, 24:23, 60:1, 69:23, 71:24, 74:19, 80:13, 81:1, 84:10, 87:11, 89:6, 89:11
**cane** [5] - 65:25, 71:6, 71:16, 79:22, 80:5
**Canine** [2] - 2:17, 87:24
**cannot** [1] - 88:7
**capacity** [2] - 12:21, 44:23
**caption** [1] - 3:16
**career** [3] - 11:3, 12:17, 14:19
**career-wise** [1] - 12:17
**Carolina** [1] - 20:24
**case** [10] - 4:17, 5:1, 5:2, 5:6, 5:8, 11:7, 22:25, 64:6, 92:7, 103:12
**cashier** [9] - 41:18, 42:3, 62:13, 63:4, 63:8, 72:21, 72:22, 72:23
**Cathy** [3] - 3:10, 5:15, 103:6
**CATHY** [2] - 1:23, 103:21
**cause** [2] - 3:21, 96:5
**caused** [1] - 97:2
**causes** [2] - 37:10, 97:16
**caveat** [1] - 7:3
**CC'd** [1] - 88:21
**center** [17] - 53:13, 62:15, 62:19, 64:16, 66:2, 70:5, 70:6, 70:8, 70:11, 70:13, 70:17, 70:24, 77:11, 77:13, 79:1, 79:2, 79:8
**CEO** [1] - 17:20
**certain** [5] - 9:21, 28:15, 59:22, 74:19, 74:20
**certainly** [15] - 6:20, 8:8, 14:6, 18:14, 18:18, 23:3, 25:13, 26:16, 36:21, 37:15, 43:11, 54:15, 65:20, 65:24, 94:22
**certificate** [6] - 3:16, 86:8, 86:9, 86:16, 86:18, 86:25
**CERTIFICATION** [1] - 103:1
**certification** [8] - 8:25, 9:7, 9:12, 9:13, 9:18, 9:23, 10:3, 95:3
**certifications** [2] - 8:23, 8:24
**certify** [3] - 103:7, 103:10, 103:13
**Chain** [2] - 2:18, 95:6
**chain** [8] - 12:19, 13:2, 88:6, 88:13, 88:24, 89:3, 89:8, 89:15
**chair** [3] - 70:18, 70:19, 71:13
**chance** [2] - 23:13, 42:1
**change** [5] - 53:15, 71:15, 82:2, 82:8, 90:7
**changed** [1] - 53:17
**characterize** [1] - 76:24
**characterized** [1] - 76:19
**characterizes** [1] - 98:4
**charge** [1] - 20:2
**Charlie** [5] - 93:2, 93:4, 93:7, 93:22
**Charlotte** [2] - 20:23, 22:23
**CHATTANOOGA** [2] - 1:15, 1:24
**Chattanooga** [1] - 63:25
**checkout** [1] - 78:12
**Christopher** [1] - 90:7
**CHRISTOPHER** [2] - 1:4, 1:19
**circumstance** [1] - 55:5
**circumstances** [1] - 93:24
**cited** [1] - 25:3
**City** [65] - 11:19, 11:22, 11:25, 12:4, 12:5, 13:1, 13:24, 15:18, 15:24, 18:21, 20:3, 20:8, 20:12, 20:16, 23:17, 23:20, 24:13, 25:10, 25:12, 25:14, 26:2, 26:3, 26:8, 26:12, 28:19, 30:6, 31:3, 31:19, 33:20, 33:21, 34:3, 34:11, 36:17, 38:2, 44:4, 45:12, 45:15, 45:18, 46:8, 46:14, 46:19, 52:25, 53:1, 53:9, 53:23, 55:15, 58:21, 62:2, 64:9, 72:9, 76:9, 95:12, 96:1, 96:6, 96:12, 96:13, 96:18, 96:20, 97:1, 97:3, 97:17, 97:20, 100:5, 101:8, 101:12
**CITY** [1] - 1:8
**City's** [22] - 21:20, 28:11, 28:24, 29:1, 29:5, 29:18, 30:1, 30:7, 30:18, 33:2, 33:23, 34:5, 34:17, 35:3, 42:6, 42:22, 43:8, 46:24, 50:15, 55:6, 56:4, 93:9
**CIVIL** [1] - 1:6
**Civil** [2] - 3:3, 4:11
**claim** [1] - 33:15
**clarification** [2] - 39:20, 42:25
**clarify** [6] - 6:9, 31:22, 33:25, 39:3, 50:11, 97:11
**clarity** [1] - 47:23
**class** [1] - 32:16
**classes** [1] - 32:1
**clear** [5] - 49:2, 58:3, 71:9, 79:25, 98:6
**clearly** [2] - 55:2, 88:25
**clerk** [3] - 47:1, 77:23, 78:3
**clerk's** [1] - 77:19
**close** [4] - 20:1, 46:2, 66:11, 90:3
**close-minded** [1] - 46:2
**clubs** [1] - 11:10
**color** [1] - 29:20
**combination** [1] - 9:24
**come** [5] - 6:8, 21:4, 38:14, 66:15, 101:19
**coming** [1] - 76:8
**comment** [1] - 82:22
**commission** [1] - 103:23
**common** [2] - 14:16, 14:24
**communications** [2] - 23:11, 23:12
**companionship** [1] - 58:23
**company** [3] - 13:23, 18:4, 33:23
**comparing** [2] - 30:2, 47:14
**compensation** [1] - 18:8
**complaints** [1] - 48:21
**completed** [4] - 3:12, 12:19, 13:20, 20:24
**completing** [1] - 85:21
**complex** [1] - 62:18
**compliance** [21] - 8:20, 10:6, 10:16, 14:4, 14:10, 15:15, 15:20, 18:6, 18:11, 19:14, 20:9, 20:14, 20:22, 21:8, 21:11, 21:24, 24:1, 25:13, 26:22, 27:17, 42:23
**compliance-related** [1] - 21:24
**component** [3] - 54:16, 65:22, 73:18
**concerning** [1] - 52:4
**concerns** [1] - 101:14
**condition** [3] - 37:9, 82:2, 82:7
**conduct** [1] - 21:4
**conducted** [1] - 22:18
**conference** [1] - 21:1
**conferences** [3] - 20:19, 22:19, 22:20
**congratulations** [1] - 11:15
**consider** [4] - 36:18, 40:2, 69:15, 69:17
**consideration** [1] - 83:9
**considered** [2] - 36:12, 42:18
**constitute** [2] - 45:14, 45:17
**constituted** [1] - 49:10
**consult** [2] - 22:25, 94:4
**consulted** [3] - 23:7, 23:14, 39:12
**contact** [1] - 54:7
**contest** [1] - 7:1
**context** [16] - 11:7, 38:20, 49:25, 57:19, 61:3, 66:24, 67:1, 69:12, 74:15, 80:25, 84:25, 85:18, 86:22, 87:9, 89:3, 94:16
**continue** [2] - 33:16, 84:1
**contracts** [1] - 8:20
**contributing** [1] - 18:3
**conversation** [2] - 60:3, 67:8
**conversations** [4] - 38:7, 43:24, 51:9, 63:17
**converted** [1] - 33:17
**convey** [1] - 65:6
**conveyed** [1] - 46:5
**convicted** [1] - 11:13
**copied** [1] - 93:6
**copy** [1] - 52:19
**Cornell** [1] - 10:25
**corporate** [2] - 12:24, 15:23
**correct** [9] - 11:17, 19:9, 19:12, 31:17, 49:12, 52:2, 74:3, 79:16, 80:6
**correctly** [7] - 54:8, 58:25, 63:1, 65:13, 73:19, 75:22, 76:9
**could** [40] - 4:12, 9:22, 19:3, 19:17, 23:14, 28:14, 33:4, 33:9, 33:22, 34:4, 34:10, 35:2, 41:7, 43:10, 43:14, 44:9, 44:12, 45:6, 53:21, 58:15, 60:5, 60:10, 62:11, 62:12, 62:16, 62:21, 62:23, 63:12, 63:13, 65:17, 65:18, 65:19, 65:20, 68:17, 70:24, 71:4, 71:15, 72:24, 77:8, 83:25
**couldn't** [4] - 69:4, 83:21, 84:6, 100:23
**counsel** [11] - 3:8, 4:9, 23:8, 23:12, 39:12, 39:16, 40:21, 47:7, 93:8, 93:17, 103:10
**COUNTY** [1] - 103:4
**couple** [5] - 5:13, 5:17, 20:24, 41:9, 102:2

**course** [9] - 14:19, 17:16, 21:25, 26:20, 49:8, 67:23, 82:2, 82:8, 96:25
**courses** [3] - 20:25, 22:15, 23:2
**Court** [3] - 3:11, 103:13, 103:14
**court** [3] - 5:15, 68:12, 103:6
**COURT** [1] - 1:1
**cover** [1] - 24:15
**covered** [3] - 27:12, 27:14, 27:17
**covering** [2] - 22:5, 90:4
**coworkers** [1] - 54:21
**created** [1] - 17:2
**credit** [2] - 32:8, 32:17
**crime** [1] - 11:13
**crossover** [1] - 8:6
**CRPS** [1] - 62:19
**current** [3] - 11:1, 42:2, 75:11
**currently** [1] - 7:9
**customer** [4] - 79:8, 79:12, 92:17, 92:20
**cut** [4] - 31:9, 70:9, 100:2, 101:5

## D

**d/b/a** [1] - 1:8
**database** [2] - 32:6, 32:15
**Date** [1] - 103:22
**date** [3] - 4:22, 38:19, 103:14
**DAVES** [1] - 1:17
**David** [24] - 2:12, 2:14, 2:16, 38:8, 38:16, 38:23, 39:20, 52:4, 52:9, 57:3, 58:12, 60:17, 61:17, 75:4, 80:20, 81:2, 81:8, 85:10, 88:20, 88:23, 90:1, 90:3, 90:13, 90:19
**David's** [1] - 52:2
**day** [3] - 3:5, 20:5, 103:17
**dead** [1] - 40:11
**deal** [2] - 14:13, 15:15
**dealing** [2] - 8:19, 15:7
**dealt** [3] - 91:7, 92:3, 92:11
**decide** [1] - 19:17
**decided** [1] - 55:22
**decision** [41] - 19:11, 22:24, 23:15, 39:23, 40:4, 40:7, 40:12, 40:13, 40:15, 40:16, 40:20, 40:23, 41:2, 43:25, 47:4, 47:19, 48:5, 48:19, 49:8, 49:11, 50:1, 50:18, 51:2, 51:7, 51:14, 51:18, 52:12, 54:11, 57:19, 57:22, 57:23, 60:24, 74:16, 75:7, 80:25, 85:1, 85:19, 85:23, 86:22, 87:2, 89:4
**decision-makers** [1] - 40:12
**decisions** [3] - 18:16, 18:22, 19:3
**declare** [1] - 84:21
**deep** [2] - 64:21, 66:4
**defendant** [2] - 1:9, 3:8
**DEFENDANT** [1] - 1:16
**defined** [2] - 56:15, 98:5
**definitely** [1] - 86:15
**definition** [1] - 42:15
**degree** [10] - 7:23, 7:25, 8:10, 8:12, 9:20, 12:16, 12:20, 13:12, 13:21
**degrees** [1] - 7:24
**demonstrated** [1] - 35:1
**denied** [5] - 14:18, 14:22, 62:5, 67:15, 75:9
**deny** [10] - 39:23, 40:4, 40:23, 41:3, 43:25, 47:4, 48:5, 48:19, 50:19, 57:24
**denying** [3] - 44:7, 95:16, 95:20
**department** [6] - 16:3, 16:5, 16:7, 18:3, 20:3, 26:14
**Department** [1] - 18:7
**DEPONENT** [1] - 102:17
**deposed** [1] - 4:4
**DEPOSITION** [1] - 1:11
**Deposition** [2] - 2:3, 3:7
**deposition** [22] - 3:1, 3:9, 3:12, 3:18, 4:8, 4:18, 4:21, 5:8, 25:23, 29:13, 48:15, 50:6, 57:4, 58:7, 61:7, 61:18, 74:18, 74:24, 81:9, 87:25, 95:7, 103:7
**describe** [1] - 19:20
**Description** [1] - 2:5
**desk** [1] - 70:23
**determination** [6] - 22:6, 33:21, 34:12, 44:3, 45:13, 97:15
**determinations** [1] - 32:15
**determine** [1] - 43:20
**determined** [1] - 34:4
**determining** [1] - 36:18
**device** [3] - 72:10, 72:17, 79:20
**did** [112] - 5:3, 7:13, 7:15, 7:18, 7:19, 7:20, 8:25, 9:6, 9:13, 9:17, 10:7, 12:16, 14:3, 14:6, 14:12, 14:16, 15:1, 15:5, 15:14, 15:16, 16:8, 16:12, 16:16, 16:21, 17:1, 17:2, 17:6, 18:12, 20:12, 21:7, 21:11, 21:14, 22:13, 22:25, 23:8, 25:9, 26:3, 26:7, 26:12, 26:21, 32:14, 35:18, 36:7, 36:15, 38:10, 39:22, 40:13, 40:14, 40:18, 44:2, 44:5, 44:18, 44:23, 44:24, 45:8, 45:10, 45:12, 45:17, 46:8, 46:11, 46:16, 48:2, 49:23, 53:1, 54:8, 55:9, 57:1, 58:24, 59:19, 60:9, 62:10, 63:1, 64:5, 65:5, 67:17, 69:9, 69:17, 69:21, 73:11, 73:14, 75:21, 75:24, 76:13, 76:23, 77:13, 81:25, 82:6, 82:15, 82:17, 84:3, 84:11, 86:25, 87:14, 88:19, 90:22, 91:9, 93:11, 95:19, 96:5, 97:10, 98:13, 99:3, 99:8, 99:20, 100:11, 100:13, 102:4, 102:8
**Did** [1] - 94:23
**didn't** [23] - 10:1, 18:25, 23:6, 25:1, 31:8, 33:7, 45:3, 46:14, 46:19, 50:3, 59:16, 66:4, 68:17, 69:18, 70:9, 78:25, 79:9, 85:6, 93:19, 100:5, 100:19, 102:5, 102:8
**difference** [1] - 70:6
**different** [7] - 15:4, 32:1, 40:9, 42:11, 78:24, 79:10, 79:15
**differently** [1] - 95:20
**difficult** [3] - 6:5, 29:7, 68:2
**difficulty** [1] - 36:11
**Direct** [1] - 2:3
**direct** [3] - 15:25, 19:4, 19:15
**DIRECT** [1] - 4:5
**direction** [1] - 99:9
**directly** [8] - 16:22, 17:1, 17:8, 17:13, 17:18, 17:22, 17:23, 26:18
**director** [11] - 16:10, 16:17, 16:19, 16:22, 17:3, 22:22, 22:23, 89:13, 91:6, 93:23, 93:24
**disabilities** [7] - 31:5, 31:21, 31:24, 36:7, 76:4, 76:6, 95:13
**Disabilities** [1] - 18:12
**disability** [17] - 5:3, 21:12, 23:21, 23:25, 26:13, 29:21, 30:13, 30:20, 31:16, 33:15, 33:16, 35:15, 37:11, 37:18, 43:4, 54:25, 101:3
**disabled** [2] - 33:20, 34:2
**disagree** [1] - 37:22
**discovery** [1] - 4:10
**discrimination** [1] - 23:25
**discuss** [5] - 41:14, 58:13, 59:19, 71:21, 72:20
**discussed** [3] - 55:11, 71:20, 72:24
**discussing** [1] - 59:21
**discussion** [28] - 44:16, 46:2, 46:22, 54:18, 56:14, 56:19, 59:23, 59:25, 63:11, 64:22, 64:25, 66:5, 69:13, 69:14, 72:7, 72:12, 72:18, 73:10, 81:2, 81:4, 82:11, 83:17, 87:2, 92:7, 93:15, 96:22, 97:1, 100:1
**discussions** [11] - 47:21, 63:20, 63:22, 65:10, 72:15, 93:16, 93:19, 93:21, 95:17, 99:12, 101:5
**display** [1] - 70:15
**dispute** [1] - 55:23
**disregarding** [1] - 38:18
**distinction** [2] - 8:14, 50:16
**district** [2] - 18:24, 51:19
**DISTRICT** [2] - 1:1, 1:1
**division** [7] - 12:25, 15:7, 16:25, 17:6, 27:5, 89:23
**DIVISION** [1] - 1:2
**division's** [1] - 89:24
**do** [132] - 4:25, 5:12, 5:17, 5:20, 5:23, 7:2, 7:8, 8:13, 8:22, 10:14, 10:18, 10:21, 11:5, 12:4, 12:7, 13:7, 14:17, 14:21, 15:5, 17:9, 21:16, 21:22, 21:23, 22:2, 22:9, 22:13, 22:14, 24:7, 24:8, 27:8, 27:11, 27:14, 27:22, 27:24, 28:17, 30:11, 30:13, 30:14, 31:15, 31:19, 32:18, 35:21, 35:24, 38:1, 38:5, 38:19, 38:25, 39:8, 39:16, 40:22, 43:10, 44:2, 46:25, 47:3, 47:12, 47:14, 47:17, 47:25, 48:7, 49:13, 49:19, 50:2, 50:3, 50:10, 51:6, 51:18, 51:22, 52:3, 52:6, 52:17, 53:21, 57:12, 57:22, 59:16, 59:18, 59:22, 59:24, 60:2, 60:6, 60:14, 60:20, 60:21, 60:22, 63:14, 63:19, 64:9, 65:9, 65:13, 66:9, 69:23, 70:25, 71:24, 73:11, 73:14, 74:11, 74:12, 74:14, 80:11, 80:21, 80:22, 81:14, 83:21, 84:20, 84:24, 85:3, 85:9, 85:12, 85:17, 85:25, 86:4, 86:13, 86:20, 87:18, 87:21, 88:4, 88:14, 88:18, 88:24, 89:7, 89:20, 90:10, 91:18, 92:2, 94:17, 94:21, 95:4, 95:11, 96:16, 96:23, 100:10, 103:7
**Document** [2] - 2:8, 29:13
**document** [63] - 27:21, 27:23, 28:10, 28:17, 28:18, 28:20, 29:4, 30:5, 47:13, 47:18, 49:14, 49:20,

49:21, 49:23, 50:23, 51:5, 51:22, 51:23, 52:1, 52:2, 52:4, 57:13, 57:14, 57:15, 57:18, 60:14, 60:20, 64:1, 67:22, 69:1, 71:19, 72:6, 73:3, 73:16, 74:5, 74:7, 74:13, 80:11, 80:12, 80:13, 80:21, 80:23, 80:25, 81:1, 83:23, 84:18, 84:20, 84:22, 84:25, 85:3, 85:4, 85:9, 85:12, 85:14, 85:18, 86:1, 86:3, 86:5, 87:15, 88:4, 89:7, 100:20, 100:25
**Documents** [2] - 2:17, 87:25
**documents** [10] - 47:9, 53:11, 60:23, 68:2, 86:14, 86:21, 87:8, 87:13, 87:19, 95:3
**does** [18] - 5:25, 6:12, 8:6, 23:20, 24:11, 24:12, 26:2, 31:3, 35:20, 64:20, 65:1, 66:6, 67:7, 69:7, 71:4, 85:22, 93:23, 93:24
**doesn't** [8] - 37:18, 64:18, 64:21, 65:5, 77:2, 85:6, 97:24, 99:1
**dog** [63] - 38:12, 38:21, 39:8, 39:14, 39:19, 39:24, 40:5, 40:8, 41:4, 44:1, 44:4, 44:8, 44:25, 45:9, 45:14, 46:4, 46:6, 46:15, 46:20, 47:5, 48:6, 48:20, 48:22, 48:24, 48:25, 49:1, 49:4, 49:7, 50:11, 50:12, 50:19, 50:21, 51:3, 53:12, 53:18, 54:2, 54:12, 57:25, 62:24, 62:25, 64:24, 65:8, 73:13, 75:20, 77:15, 82:24, 83:6, 86:16, 87:10, 87:20, 90:21, 92:5, 92:9, 95:2, 98:15, 98:18, 98:24, 99:4, 99:10, 99:13, 99:17, 100:15
**dogs** [2] - 91:25, 92:12
**doing** [8] - 6:3, 11:18, 13:22, 37:12, 53:22, 55:8, 58:20, 94:12
**don't** [81] - 4:21, 5:5, 6:16, 6:17, 6:18, 6:21, 11:8, 21:21, 22:1, 22:9, 22:12, 23:23, 27:13, 28:1, 35:5, 35:6, 37:4, 37:18, 37:22, 40:25, 41:12, 48:4, 49:3, 49:6, 49:24, 50:22, 51:13, 52:6, 53:1, 53:3, 53:6, 56:18, 59:21, 60:8, 60:12, 63:14, 65:11, 65:25, 68:22, 69:21, 71:25, 72:18, 76:2, 79:24, 80:3, 80:17, 81:13, 82:22, 84:8, 84:13, 84:21, 84:22, 85:2, 85:6, 85:7, 85:13, 85:15, 86:3, 86:23, 87:3, 87:12, 87:14, 87:16, 88:25, 89:2, 89:10, 89:11, 91:12, 91:21, 91:22, 92:1, 92:6, 92:22, 93:15, 96:15, 97:9, 99:6, 102:10, 102:13
**done** [3] - 32:18, 71:15, 101:16
**Donelson** [1] - 22:20
**Donnie** [12] - 4:14, 25:24, 29:14, 48:16, 50:7, 57:5, 58:8, 61:19, 74:25, 81:10, 88:1, 95:7
**DONNIE** [4] - 1:11, 2:3, 3:1, 4:1
**Donny** [7] - 88:17, 88:20, 89:20, 89:21, 89:22, 90:4, 90:13
**door** [2] - 81:24, 82:11
**doubt** [2] - 76:13, 99:21
**down** [10] - 5:16, 30:9, 55:1, 56:19, 84:19, 86:11, 88:12, 94:11, 94:14
**dual** [1] - 100:9
**duly** [2] - 4:3, 103:13
**dumb** [2] - 55:14, 94:9
**during** [10] - 16:18, 41:14, 49:7, 53:14, 54:5, 78:18, 82:2, 82:8, 84:3, 94:16
**duties** [3] - 18:1, 58:19, 75:16

## E

**each** [1] - 5:22
**earlier** [3] - 73:16, 77:12, 81:20
**early** [2] - 9:8, 13:10
**easier** [1] - 5:18
**education** [12] - 7:20, 9:9, 9:14, 9:17, 9:22, 10:2, 10:15, 15:11, 15:12, 20:13, 20:18, 21:25
**educational** [1] - 23:1
**EEO** [8] - 18:7, 20:22, 22:22, 22:23, 23:5, 25:3, 48:2, 52:7
**EEOC** [5] - 5:2, 5:6, 61:3, 61:5, 85:5
**effective** [1] - 79:23
**effectively** [6] - 22:5, 41:21, 64:22, 65:7, 68:11, 69:15
**efforts** [1] - 15:8
**eight** [1] - 66:15
**either** [5] - 41:22, 42:2, 51:19, 64:7, 92:16
**electronic** [1] - 28:14
**eligible** [8] - 9:22, 32:17, 37:11, 43:18, 55:17, 55:22, 56:6, 56:12
**Ellison** [57] - 2:12, 2:14, 2:16, 38:8, 38:16, 39:20, 40:7, 40:14, 40:17, 41:7, 41:8, 47:16, 47:22, 52:4, 57:4, 58:12, 58:14, 59:9, 59:20, 59:23, 60:3, 60:7, 60:9, 60:18, 61:10, 61:14, 61:18, 63:12, 63:18, 63:23, 64:6, 65:2, 65:5, 67:18, 68:7, 68:21, 68:23, 69:9, 69:14, 71:21, 72:2, 73:8, 75:4, 75:6, 75:10, 76:6, 76:18, 76:23, 81:9, 85:10, 88:21, 88:23, 90:1, 90:14, 90:19, 99:12
**Ellison's** [6] - 48:9, 59:7, 64:12, 65:10, 67:12, 81:15
**else** [11] - 17:21, 39:17, 40:18, 45:12, 45:20, 62:11, 62:25, 63:12, 68:17, 96:23, 99:8
**Email** [2] - 2:18, 95:6
**email** [20] - 52:18, 52:20, 53:6, 63:24, 64:2, 88:5, 88:11, 88:24, 89:3, 89:8, 89:10, 89:15, 89:16, 90:6, 90:7, 90:13, 91:15, 93:11, 93:14, 93:20
**emailed** [3] - 52:17, 90:24, 92:24
**emails** [1] - 43:23
**Emily** [7] - 2:9, 47:24, 48:1, 48:12, 48:14, 88:14, 89:15
**Emily's** [1] - 48:10
**emotional** [1] - 50:12
**employed** [1] - 12:23
**employee** [41] - 14:13, 18:8, 18:16, 26:4, 26:13, 30:12, 30:19, 33:20, 34:3, 35:1, 35:13, 35:14, 35:20, 35:24, 36:1, 37:1, 38:6, 38:9, 42:7, 42:9, 42:15, 42:18, 42:20, 42:22, 43:3, 43:9, 43:12, 43:14, 43:17, 54:24, 55:6, 64:10, 67:8, 92:4, 92:8, 92:17, 94:6, 94:11, 94:12, 97:14, 103:10
**employees** [5] - 15:25, 18:17, 18:21, 27:1, 95:12
**employer** [1] - 67:8
**employer's** [2] - 36:13, 36:14
**employers** [1] - 36:5
**Employment** [2] - 2:8, 29:12
**employment** [14] - 23:24, 24:19, 24:25, 29:19, 31:11, 31:12, 33:17, 36:6, 38:2, 46:25, 53:23, 58:21, 81:23, 82:13
**enclosed** [1] - 70:14
**end** [7] - 37:7, 54:4, 82:18, 82:25, 83:6, 88:13, 100:13
**ended** [1] - 100:12
**endurance** [1] - 6:25
**engage** [2] - 46:22, 83:16
**engaged** [1] - 51:15
**engaging** [1] - 55:19
**enlarge** [1] - 88:8
**enough** [2] - 29:22, 82:5
**ensure** [1] - 20:14
**ensuring** [1] - 14:4
**entire** [1] - 11:3
**Equal** [2] - 2:8, 29:12
**equal** [5] - 24:18, 24:24, 29:19, 31:12, 77:15
**equipment** [1] - 94:3
**equivalent** [2] - 79:1, 79:17
**especially** [2] - 5:18, 6:5
**ESQUIRE** [2] - 1:13, 1:17
**essence** [1] - 100:17
**essential** [7] - 30:17, 30:22, 35:17, 42:9, 42:16, 43:6, 53:20
**essentially** [2] - 15:9, 77:11
**etc** [2] - 32:7, 94:4
**ETHAN** [1] - 1:13
**Ethan** [1] - 4:16
**evaluation** [2] - 32:3, 32:4
**even** [5] - 6:6, 36:25, 41:13, 48:24, 71:17
**events** [2] - 23:2, 52:5
**ever** [21] - 4:18, 5:7, 10:7, 10:14, 11:13, 14:12, 16:19, 18:15, 18:25, 20:12, 21:7, 37:23, 45:13, 59:19, 71:16, 73:1, 87:13, 95:16, 99:9, 99:23, 101:1
**everything** [2] - 5:16, 101:23
**evidenced** [1] - 103:14
**exact** [2] - 4:22, 62:22
**Examination** [1] - 2:3
**EXAMINATION** [1] - 4:5
**examined** [1] - 4:4
**example** [1] - 10:11
**except** [2] - 3:21, 79:2
**exceptions** [1] - 3:19
**exchange** [10] - 41:14, 44:17, 49:8, 53:14, 54:6, 66:20, 66:23, 67:4, 68:14, 83:25
**exhibit** [3] - 84:22, 86:17, 87:15
**Exhibit** [27] - 25:21, 25:22, 29:11, 29:12, 35:9, 42:5, 42:14, 43:2, 48:8, 48:14, 50:4, 50:5, 57:3, 58:5, 58:6, 59:7, 61:16, 61:17, 64:13, 66:19, 74:22, 74:23, 81:7, 81:8, 87:23, 87:24, 95:6
**exhibits** [2] - 47:15, 85:15
**EXHIBITS** [1] - 2:4
**exit** [1] - 16:20
**expect** [11] - 21:18, 23:17, 24:21, 25:15, 28:23, 28:25, 30:5, 32:22, 52:24, 68:15, 82:17
**expense** [1] - 36:11
**experience** [7] -

9:10, 9:14, 9:24, 12:11, 23:7, 91:10, 91:19
**expertise** [1] - 80:4
**expiration** [1] - 103:14
**Expiration** [1] - 103:22
**expired** [2] - 33:13, 33:15
**expires** [1] - 103:23
**explain** [1] - 45:21
**explore** [11] - 44:18, 46:11, 46:19, 63:13, 67:4, 72:12, 95:24, 96:15, 96:17, 96:20, 100:9
**explored** [2] - 46:17, 65:20
**exploring** [3] - 45:5, 73:10, 98:11
**extent** [2] - 28:24, 30:5
**extra** [1] - 10:2

## F

**face** [2] - 64:7, 64:8
**facility** [1] - 54:19
**fact** [2] - 51:11, 85:20
**factor** [1] - 65:9
**factors** [2] - 36:12, 73:17
**facts** [1] - 83:4
**fair** [12] - 49:9, 51:13, 55:24, 57:21, 63:5, 67:16, 68:18, 77:21, 78:12, 82:5, 91:13, 99:18
**fairly** [3] - 14:16, 59:22, 92:25
**fall** [8] - 6:7, 33:7, 55:1, 94:6, 94:14, 94:16, 94:20
**fallen** [1] - 54:1
**falling** [1] - 94:13
**falls** [2] - 59:10, 94:11
**familiar** [5] - 28:2, 30:25, 33:1, 52:1, 66:20
**Family** [1] - 33:7
**far** [9] - 6:3, 31:6, 72:19, 73:9, 77:16, 84:11, 87:16, 93:18, 94:3
**Fast** [1] - 28:14
**fault** [1] - 100:4
**feasible** [1] - 46:13
**February** [1] - 103:17
**Federal** [1] - 3:3
**federal** [5] - 14:4, 20:9, 20:14, 25:13, 25:18
**feeling** [2] - 53:25, 56:22
**feet** [1] - 54:3
**fell** [4] - 14:6, 16:6, 17:5, 32:16
**felt** [1] - 44:20
**few** [6] - 4:23, 5:11, 13:11, 47:8, 71:14, 86:10
**fighting** [1] - 37:16
**figure** [2] - 23:14, 25:4
**file** [2] - 31:1, 53:6
**FILE** [1] - 1:6
**filed** [11] - 25:24, 29:14, 48:16, 50:7, 57:5, 58:8, 61:19, 74:25, 81:10, 88:1, 95:8
**files** [2] - 52:22, 53:2
**filled** [1] - 46:25
**final** [1] - 19:11
**financial** [1] - 36:13
**financially** [1] - 103:11
**find** [3] - 14:24, 24:22, 44:5
**fine** [5] - 5:7, 13:15, 60:2, 66:14, 85:8
**finish** [3] - 5:21, 5:24, 61:23
**firms** [1] - 20:21
**first** [16] - 4:3, 5:12, 5:20, 12:4, 12:17, 12:20, 13:2, 13:8, 29:17, 38:10, 38:20, 38:25, 39:6, 39:9, 56:25, 63:4
**fit** [1] - 15:23
**five** [2] - 54:2, 101:17
**fix** [1] - 72:2
**flesh** [1] - 19:21
**flow** [1] - 18:23
**focus** [3] - 8:5, 8:15, 17:9
**follow** [5] - 25:13, 25:17, 37:4, 42:24, 75:5
**followed** [1] - 52:18
**following** [1] - 103:14
**follows** [1] - 4:4
**FOOD** [2] - 1:7, 1:8
**Food** [90] - 2:6, 11:16, 11:18, 11:21, 11:24, 12:4, 12:5, 13:1, 13:23, 15:18, 15:24, 18:21, 20:3, 20:8, 20:12, 20:16, 21:19, 23:17, 23:20, 24:13, 25:9, 25:12, 25:14, 25:22, 26:2, 26:3, 26:7, 26:12, 28:11, 28:18, 28:24, 29:1, 29:5, 29:18, 30:1, 30:6, 30:7, 30:18, 31:3, 31:19, 33:1, 33:20, 33:21, 33:23, 34:3, 34:5, 34:11, 34:17, 35:3, 36:17, 38:2, 42:6, 42:22, 43:8, 44:4, 45:12, 45:15, 45:18, 46:8, 46:14, 46:19, 46:24, 50:15, 52:24, 53:1, 53:9, 53:23, 55:6, 55:15, 56:4, 58:21, 62:2, 64:9, 72:8, 76:9, 93:9, 95:12, 96:1, 96:6, 96:12, 96:13, 96:18, 96:20, 97:1, 97:3, 97:17, 97:20, 100:4, 101:8, 101:12
**for** [136] - 3:2, 3:8, 4:10, 4:13, 4:16, 6:16, 7:4, 9:1, 9:5, 9:18, 9:23, 11:16, 13:9, 13:11, 13:14, 13:22, 13:25, 14:1, 14:3, 14:9, 14:13, 15:3, 15:5, 15:12, 16:3, 17:11, 20:8, 20:17, 21:5, 22:6, 22:10, 27:22, 27:24, 29:9, 31:25, 32:3, 32:7, 32:12, 32:13, 32:17, 33:9, 33:15, 33:18, 34:13, 34:20, 36:6, 37:5, 37:12, 39:1, 39:12, 39:18, 39:23, 40:5, 41:2, 41:3, 41:9, 43:16, 43:18, 44:7, 45:6, 45:24, 46:1, 46:13, 46:15, 46:22, 47:5, 47:23, 50:20, 51:3, 53:11, 53:16, 53:18, 54:22, 55:7, 55:18, 55:20, 55:23, 56:6, 56:12, 56:20, 61:6, 62:3, 62:6, 62:7, 62:9, 62:17, 67:14, 68:7, 68:13, 68:21, 69:5, 69:9, 69:24, 71:7, 72:1, 74:17, 74:19, 74:20, 75:4, 75:9, 75:16, 76:9, 78:1, 80:7, 81:24, 82:8, 82:17, 83:10, 85:16, 85:21, 87:9, 89:24, 90:4, 92:4, 94:3, 95:13, 95:18, 95:21, 96:6, 96:8, 96:13, 96:19, 97:24, 98:11, 98:14, 98:18, 98:24, 100:1, 102:8, 102:11, 103:7, 103:22
**FOR** [2] - 1:12, 1:16
**foregoing** [1] - 103:8
**forget** [1] - 58:5
**form** [5] - 3:21, 29:3, 38:12, 39:8, 65:23
**formalities** [1] - 3:16
**former** [1] - 52:22
**forth** [1] - 67:9
**forward** [3] - 40:8, 40:9, 91:1
**forwarded** [5] - 87:13, 89:19, 89:21, 90:19, 91:24
**forwarding** [3] - 63:23, 87:16, 91:6
**found** [2] - 28:11, 97:1
**four** [3] - 53:18, 67:21, 68:6
**frame** [1] - 17:10
**framed** [1] - 95:20
**frequency** [1] - 95:14
**front** [1] - 22:9
**fuel** [24] - 41:17, 46:25, 53:13, 54:20, 62:15, 62:19, 64:16, 66:2, 70:5, 70:6, 70:8, 70:11, 70:13, 70:17, 70:23, 72:21, 77:11, 77:12, 77:19, 77:23, 78:3, 78:25, 79:2, 79:8
**Fugate** [2] - 93:4, 93:16
**full** [3] - 4:13, 5:21, 69:12
**fully** [1] - 46:17
**function** [2] - 32:13, 72:21
**functions** [9] - 30:17, 30:22, 34:15, 35:17, 42:9, 42:17, 43:6, 53:20, 73:12
**further** [12] - 3:15, 7:20, 41:13, 46:11, 46:19, 71:22, 82:11, 83:8, 83:16, 102:11, 103:10, 103:13
**FURTHER** [1] - 102:17

## G

**Gary** [22] - 2:10, 2:13, 2:15, 49:15, 49:18, 50:5, 50:25, 53:9, 57:10, 57:11, 58:6, 59:2, 62:2, 74:9, 74:23, 87:8, 87:12, 88:14, 88:17, 89:16, 89:19, 89:20
**Gas** [2] - 75:17, 90:21
**gathering** [1] - 54:5
**gave** [2] - 41:21, 83:5
**general** [14] - 16:15, 18:2, 18:9, 23:8, 34:1, 34:2, 35:5, 39:12, 39:16, 40:21, 47:7, 92:12, 93:8, 93:17
**generally** [1] - 38:3
**Georgia** [1] - 4:11
**GEORGIA** [1] - 1:1
**get** [10] - 5:14, 7:5, 9:7, 11:4, 12:3, 33:10, 56:24, 66:4, 93:11, 93:24
**getting** [1] - 66:10
**give** [12] - 4:22, 10:10, 10:12, 13:13, 14:15, 19:13, 19:23, 42:1, 42:11, 46:8, 62:22, 72:3
**given** [2] - 41:6, 83:8
**giving** [1] - 65:7
**Go** [2] - 75:17, 90:22
**go** [22] - 5:12, 12:14, 29:3, 31:8, 31:15, 37:2, 37:13, 37:20, 47:8, 53:7, 56:8, 61:22, 69:19, 70:8, 70:10, 72:4, 75:3, 78:11, 86:10, 97:7, 97:22, 100:7
**goals** [1] - 18:4
**goes** [2] - 75:20, 75:21
**going** [27] - 4:23, 7:5, 23:10, 24:2, 27:20, 29:2, 30:9, 33:25, 35:9, 39:3, 42:2, 47:8, 51:14, 51:21, 61:24, 62:24, 65:8, 66:7, 74:6, 77:24, 80:10, 84:16, 84:17, 84:19, 84:21, 100:15, 100:16
**gone** [1] - 53:2
**good** [1] - 29:22
**got** [13] - 7:2, 13:17, 54:25, 55:15, 56:18, 64:21, 71:9, 72:18, 73:9, 90:15, 91:14, 94:10, 101:6
**graduate** [8] - 7:18, 7:23, 7:25, 9:19, 12:15, 12:20, 13:12, 13:21
**graduated** [1] - 12:15
**grant** [1] - 29:18
**granted** [2] - 14:17, 14:20
**granting** [2] - 41:24, 45:22
**great** [2] - 6:3, 37:10
**greater** [1] - 77:15

**ground** [2] - 5:13, 14:24
**guess** [2] - 88:11, 97:11
**guidance** [2] - 25:17, 51:2
**guide** [3] - 27:10, 27:12, 28:5
**guidelines** [1] - 11:1

## H

**had** [88] - 9:1, 9:21, 10:14, 10:22, 12:10, 12:12, 13:24, 15:19, 16:2, 17:15, 21:24, 22:15, 23:11, 27:10, 28:12, 31:19, 33:13, 38:11, 38:21, 38:23, 39:4, 39:7, 39:11, 39:13, 41:8, 44:10, 44:20, 46:17, 47:16, 48:20, 48:23, 48:25, 50:20, 50:22, 51:9, 51:10, 51:15, 52:11, 52:16, 53:15, 53:17, 53:22, 54:10, 56:17, 57:15, 58:20, 59:22, 60:4, 61:10, 62:4, 62:5, 64:1, 66:1, 67:19, 67:24, 73:5, 76:5, 76:6, 76:10, 77:18, 81:2, 81:20, 82:16, 83:8, 83:19, 91:7, 91:8, 91:10, 91:14, 91:16, 91:22, 91:23, 91:25, 92:3, 92:8, 92:10, 93:15, 96:12, 96:18, 97:15, 98:23, 99:12, 102:3
**had you** [1] - 12:10
**half** [2] - 53:3, 66:8
**HALL** [1] - 1:23
**Hallmark** [1] - 15:2
**HAMILTON** [1] - 103:4
**hand** [1] - 103:16
**Handbook** [3] - 2:7, 24:14, 25:23
**handbook** [4] - 25:11, 25:16, 30:3, 31:7
**handle** [1] - 18:25
**happen** [3] - 6:21, 49:19, 84:12
**happened** [1] - 49:18
**happy** [1] - 24:12
**hard** [1] - 52:19
**hardship** [3] - 36:6, 36:10, 36:20
**HARGRAVES** [26] - 1:13, 4:6, 25:20, 26:1, 29:16, 48:18, 50:9, 57:2, 57:7, 58:10, 61:15, 61:21, 66:14, 66:17, 74:21, 75:2, 81:6, 81:12, 87:22, 88:3, 94:25, 95:4, 95:10, 101:16, 101:22, 102:15
**Hargraves** [2] - 2:3, 4:16
**has** [16] - 22:17, 27:23, 37:8, 53:10, 53:15, 54:1, 67:14, 70:7, 70:11, 70:14, 70:18, 71:2, 75:9, 88:25, 101:23, 102:1
**hat** [1] - 14:7
**hats** [1] - 13:24
**have** [125] - 4:17, 4:19, 5:7, 5:15, 7:4, 7:11, 7:20, 7:22, 8:6, 8:22, 8:24, 8:25, 9:21, 10:22, 11:13, 14:3, 14:12, 14:23, 15:15, 16:12, 19:3, 20:7, 20:10, 20:17, 21:16, 22:9, 23:3, 23:7, 23:13, 23:18, 23:21, 23:23, 25:10, 25:16, 26:3, 26:8, 26:12, 28:21, 28:22, 30:25, 31:3, 31:6, 32:20, 32:23, 33:25, 37:23, 38:1, 38:5, 38:14, 38:16, 39:3, 40:6, 42:5, 44:24, 45:3, 45:21, 49:10, 52:11, 52:16, 52:21, 52:22, 52:25, 54:11, 55:12, 61:2, 63:11, 63:14, 63:22, 64:3, 64:5, 65:17, 65:18, 65:19, 65:20, 65:24, 66:11, 68:14, 68:22, 71:4, 72:1, 72:19, 72:24, 73:4, 73:12, 73:25, 74:13, 75:24, 76:2, 76:13, 77:6, 77:23, 78:11, 78:20, 78:25, 79:9, 79:12, 80:3, 81:25, 82:6, 82:11, 82:18, 82:22, 83:10, 84:13, 85:17, 85:22, 85:25, 86:17, 86:25, 89:7, 89:21, 89:25, 92:18, 92:22, 93:16, 93:19, 97:9, 97:13, 98:13, 98:18, 99:20, 102:10, 102:13, 103:16
**haven't** [1] - 17:7
**having** [4] - 4:3, 67:8, 75:5, 95:17
**he he** [2] - 46:6, 56:19
**head** [1] - 6:4
**health** [1] - 9:1
**hearing** [1] - 3:20
**help** [6] - 53:24, 58:21, 58:24, 62:13, 64:14, 91:4
**helped** [2] - 99:14, 99:18
**helps** [1] - 54:2
**hereby** [1] - 103:7
**herein** [11] - 25:24, 29:14, 48:16, 50:7, 57:5, 58:8, 61:19, 74:25, 81:10, 88:1, 95:8
**hereunto** [1] - 103:16
**high** [3] - 7:13, 13:10, 95:14
**high-frequency** [1] - 95:14
**HIGHWAY** [1] - 1:14
**himself** [1] - 21:4
**hire** [5] - 31:20, 32:2, 32:6, 32:15, 32:25
**hires** [1] - 32:21
**hiring** [3] - 31:4, 31:24, 31:25
**history** [1] - 12:3
**Hobbs** [7] - 2:9, 47:24, 48:1, 48:12, 48:15, 88:14, 89:15
**holiday** [1] - 33:8
**home** [2] - 77:20, 78:8
**honestly** [5] - 5:5, 41:25, 63:14, 86:23, 93:14
**hopefully** [2] - 5:13, 27:21
**horse** [1] - 40:11
**hour** [2] - 66:7, 66:11
**Howard** [3] - 21:3, 22:17, 48:10
**HOWARD** [1] - 1:17
**Howard's** [1] - 20:20
**HR** [34] - 11:3, 13:14, 13:25, 14:7, 15:24, 16:6, 16:17, 16:18, 16:19, 16:22, 16:23, 16:25, 18:1, 18:2, 18:3, 18:4, 18:24, 20:2, 26:12, 26:14, 26:17, 27:5, 30:24, 38:7, 44:24, 50:10, 51:2, 55:17, 56:5, 56:11, 89:22, 91:5, 95:11
**huh-uh** [1] - 6:6
**human** [9] - 8:7, 8:9, 8:11, 9:4, 11:25, 12:9, 12:20, 15:17, 17:16
**hundreds** [1] - 14:20
**hypothetical** [3] - 97:13, 98:7

## I

**idea** [1] - 63:7
**ideas** [4] - 62:7, 67:19, 68:7, 68:21
**immateriality** [1] - 3:20
**impression** [3] - 47:21, 83:5, 92:10
**IN** [1] - 103:16
**INC** [1] - 1:7
**Inc** [3] - 2:17, 11:16, 87:25
**incentives** [5] - 31:20, 31:22, 31:23, 31:25, 32:2
**include** [6] - 18:12, 23:25, 27:3, 27:5, 70:5, 77:13
**included** [8] - 26:22, 28:2, 31:16, 32:21, 38:24, 47:15, 76:10, 86:17
**includes** [2] - 26:17, 70:15
**incompetency** [1] - 3:19
**indicate** [1] - 92:16
**indicated** [2] - 82:23, 99:13
**indicates** [4] - 64:13, 76:18, 76:23, 91:3
**individual** [8] - 18:16, 30:15, 30:20, 32:16, 35:15, 43:4, 71:7
**industrial** [5] - 8:1, 8:3, 8:12, 8:16, 12:16
**industry** [1] - 8:2
**ineligible** [2] - 43:16, 55:7
**informal** [5] - 41:14, 44:16, 66:22, 92:7, 96:22
**information** [13] - 10:5, 10:17, 10:19, 10:23, 38:13, 39:4, 39:5, 39:11, 40:17, 40:19, 52:9, 54:5, 73:7
**informed** [2] - 62:3, 75:7
**initial** [7] - 83:10, 96:1, 96:4, 96:10, 96:19, 97:5, 97:21
**initially** [4] - 12:18, 14:2, 16:7, 67:13
**injured** [1] - 94:20
**injury** [2] - 94:13, 94:19
**input** [1] - 68:13
**inside** [3] - 31:16, 41:17, 54:19
**insight** [1] - 19:13
**instance** [3] - 3:2, 4:2, 23:9
**instead** [2] - 44:1, 45:22
**instituted** [1] - 9:10
**insurance** [1] - 9:2
**interactive** [1] - 66:20
**interested** [1] - 103:11
**interfere** [2] - 94:17, 94:21
**interpretation** [2] - 58:1, 67:6
**interrupted** [1] - 65:2
**into** [6] - 6:7, 10:25, 11:4, 12:21, 19:13, 32:16
**involve** [5] - 21:7, 21:11, 67:7, 78:4, 78:15
**involved** [4] - 21:10, 26:18, 93:25, 94:2
**involvement** [2] - 19:4, 19:16
**involving** [2] - 5:9, 11:7
**iPhone** [1] - 68:2
**irrelevancy** [1] - 3:19
**isn't** [6] - 36:24, 44:17, 68:14, 69:12, 69:25, 100:23
**isolation** [11] - 54:1, 54:13, 54:17, 56:22, 58:24, 62:14, 64:15, 73:18, 98:24, 99:14, 99:25
**issue** [12] - 8:17, 21:11, 23:6, 30:1, 65:21, 66:3, 73:24, 91:20, 92:9, 93:2, 94:2, 94:7
**issues** [6] - 64:19, 65:16, 77:1, 77:7, 79:16, 96:12
**itself** [1] - 65:22

## J

**JACKSON** [18] - 1:17, 17:9, 29:2, 37:2, 37:13, 37:20, 47:23, 56:8, 66:12, 69:19, 72:4, 95:2, 97:7, 97:22, 98:3, 100:7, 101:20, 102:13
**Jackson** [2] - 68:4, 102:11
**January** [1] - 3:5
**JANUARY** [1] - 1:10
**jerk** [1] - 6:11
**job** [45] - 5:18, 12:3,

14:8, 15:9, 17:11, 18:1, 30:17, 30:22, 34:15, 34:20, 34:23, 35:2, 35:8, 35:17, 35:21, 35:25, 37:6, 37:10, 37:12, 41:7, 41:9, 41:16, 42:1, 42:9, 42:17, 43:6, 43:10, 43:14, 45:25, 53:20, 54:25, 55:8, 56:1, 58:15, 60:5, 60:11, 62:6, 70:25, 71:8, 73:15, 77:11, 82:15, 94:12, 94:18, 94:21

**jobs** [2] - 75:10, 79:1
**joined** [1] - 12:25
**JONES** [1] - 1:17
**July** [3] - 49:19, 90:14, 90:25
**jumped** [1] - 49:5
**June** [1] - 103:24

## K

**K-VA-T** [4] - 1:7, 2:6, 11:16, 25:22
**keep** [5] - 53:2, 56:21, 63:25, 81:24, 87:1
**Kerley** [2] - 3:10, 103:6
**KERLEY** [2] - 1:23, 103:21
**key** [2] - 54:16, 55:10
**keyboard** [1] - 70:15
**kind** [9] - 4:25, 6:7, 12:3, 15:23, 48:21, 76:7, 77:18, 77:20, 83:20
**kinds** [1] - 13:21
**kiosk** [10] - 41:17, 54:20, 62:15, 64:16, 70:11, 70:13, 70:14, 70:17, 77:20, 79:3
**knew** [3] - 61:12, 76:5, 87:5
**know** [46] - 6:17, 6:21, 7:2, 8:13, 11:22, 14:21, 16:16, 19:25, 21:21, 22:8, 26:6, 28:1, 31:15, 31:19, 32:18, 46:1, 46:25, 50:3, 50:10, 52:6, 53:1, 53:3, 53:6, 59:16, 59:24, 62:10, 64:9, 65:25, 68:6, 68:17, 70:4, 71:5, 74:14, 79:21, 84:5, 84:9, 86:18, 86:20, 89:20, 92:2, 93:18, 94:9, 96:15, 97:17, 102:2
**knowledge** [22] - 23:20, 25:9, 26:2, 26:7, 32:12, 33:19, 38:1, 43:8, 43:13, 48:23, 50:14, 50:17, 50:22, 63:6, 63:16, 64:11, 84:14, 91:14, 91:16, 91:22, 91:23, 103:9
**knowledgeable** [2] - 47:2, 51:9
**KNOXVILLE** [1] - 1:18
**Knoxville** [1] - 89:23

## L

**labeled** [1] - 31:10
**labor** [12] - 8:5, 8:17, 8:19, 12:25, 15:7, 15:8, 18:6, 18:11, 21:5, 22:18, 26:22, 27:17
**Labor** [1] - 18:7
**land** [1] - 12:17
**last** [5] - 4:20, 15:19, 21:23, 83:20, 90:15
**late** [1] - 90:15
**later** [4] - 9:10, 11:5, 12:21, 91:1
**latest** [1] - 11:24
**latitude** [1] - 51:13
**law** [5] - 18:11, 21:5, 22:18, 26:22, 27:17
**laws** [6] - 18:6, 18:7, 20:9, 20:14, 25:14, 25:18
**Lawson** [1] - 22:19
**LAWSON** [1] - 1:17
**lawyer** [1] - 93:9
**LCR** [3] - 103:6, 103:14, 103:21
**lead** [1] - 18:2
**lean** [1] - 77:9
**learn** [1] - 38:10
**learned** [3] - 38:19, 38:20, 39:6
**learning** [1] - 28:13
**least** [15] - 4:23, 8:16, 19:2, 20:6, 25:16, 32:24, 51:12, 65:15, 73:20, 76:17, 79:14, 83:12, 83:25, 85:4, 86:24
**Leave** [1] - 33:7
**leave** [21] - 33:8, 33:9, 33:11, 33:18, 40:1, 41:25, 62:25, 81:5, 81:16, 81:24, 82:3, 82:9, 82:11, 82:19, 82:25, 83:7, 83:13, 83:24, 84:4, 84:10, 85:22
**leaves** [3] - 33:2, 33:12, 33:14
**leaving** [3] - 75:20, 81:23, 82:13
**led** [2] - 41:24, 54:21
**LEE** [1] - 1:14
**left** [3] - 13:11, 46:24, 47:1
**legal** [1] - 23:6
**legible** [2] - 29:9, 88:7
**legitimate** [1] - 82:16
**letter** [2] - 25:2
**level** [12] - 9:22, 18:21, 26:20, 27:1, 55:2, 70:24, 78:15, 78:17, 91:8, 91:20, 92:14, 101:6
**Library** [1] - 10:25
**license** [1] - 9:1
**licensed** [2] - 103:6, 103:13
**Licensed** [1] - 103:14
**licenses** [2] - 8:23, 8:25
**life** [1] - 9:1
**light** [1] - 36:12
**like** [16] - 5:12, 6:6, 8:7, 8:13, 8:18, 10:25, 20:25, 22:10, 30:2, 64:24, 67:18, 89:16, 90:24, 90:25, 92:25, 94:9
**likely** [1] - 52:18
**likewise** [1] - 56:18
**line** [4] - 29:17, 67:15, 67:21, 68:6
**listed** [2] - 21:7, 23:2
**little** [12] - 5:18, 11:5, 12:14, 15:22, 17:10, 19:22, 29:10, 56:23, 61:25, 65:14, 66:10, 95:20
**live** [2] - 7:9, 7:10
**lived** [1] - 7:11
**local** [2] - 20:21, 22:20
**long** [4] - 7:11, 10:13, 62:21, 66:9
**longer** [1] - 8:24
**look** [6] - 6:7, 35:9, 43:23, 90:17, 95:18, 101:18
**looking** [6] - 37:5, 67:12, 68:4, 80:7, 95:21, 96:8
**looks** [6] - 64:24, 67:18, 89:16, 90:24, 90:25, 92:25
**loss** [1] - 76:10
**Lyon** [3] - 48:3, 88:24, 89:25

## M

**machine** [1] - 3:10
**mailed** [1] - 64:3
**MAIN** [1] - 1:18
**main** [2] - 8:13, 41:11
**maintained** [1] - 99:17
**make** [33] - 5:17, 5:23, 5:25, 6:11, 6:12, 7:5, 18:3, 18:21, 19:10, 19:14, 22:6, 29:9, 32:15, 33:9, 34:11, 36:6, 39:22, 40:11, 40:13, 40:14, 45:10, 45:13, 46:13, 50:15, 51:14, 58:2, 59:16, 72:13, 74:21, 87:22, 90:12, 92:18, 97:25
**makers** [1] - 40:12
**makes** [2] - 55:1, 59:13
**making** [21] - 18:15, 20:8, 22:24, 23:15, 40:19, 47:4, 47:18, 48:5, 49:7, 49:8, 50:1, 52:11, 57:19, 60:24, 74:15, 80:25, 85:1, 85:18, 85:23, 86:22, 89:4
**managed** [1] - 32:1
**management** [5] - 15:12, 18:20, 26:20, 27:1, 28:13
**manager** [4] - 18:25, 51:1, 51:19, 84:23
**managers** [3] - 17:4, 17:5, 27:3
**mandated** [1] - 62:17
**many** [2] - 14:21, 15:24
**mark** [7] - 25:20, 29:11, 48:8, 50:4, 58:4, 61:15, 81:6
**marked** [11] - 25:23, 29:13, 48:15, 50:6, 57:4, 58:7, 61:18, 74:24, 81:9, 87:25, 95:7
**marketing** [1] - 14:1
**MASSEY** [1] - 1:14
**material** [2] - 42:4, 43:2
**materials** [4] - 16:13, 21:15, 23:1, 27:9
**Matt** [3] - 58:12, 58:14, 75:4
**matt** [2] - 58:18, 58:22
**Matthew** [8] - 4:17, 37:24, 53:9, 53:10, 60:4, 61:10, 62:1, 90:10
**MATTHEW** [1] - 1:4
**max** [1] - 16:1
**Maximus** [5] - 32:2, 32:5, 32:9, 32:11, 32:12
**Maximus's** [1] - 32:4
**maybe** [8] - 29:10, 49:1, 61:23, 69:12, 83:9, 87:14, 89:23, 90:4
**MEADOWS** [4] - 1:11, 2:3, 3:1, 4:1
**Meadows** [22] - 4:12, 4:14, 4:15, 7:8, 17:12, 24:8, 25:24, 29:14, 48:1, 48:16, 50:7, 57:5, 57:8, 58:8, 61:19, 66:18, 74:25, 81:10, 88:1, 95:8, 101:23, 102:15
**mean** [12] - 17:10, 31:9, 31:22, 35:20, 37:18, 42:21, 66:10, 69:22, 70:9, 79:24, 85:6, 99:1
**medical** [2] - 37:9, 80:3
**Medical** [1] - 33:7
**meet** [12] - 34:10, 44:9, 44:12, 44:21, 45:6, 45:9, 45:24, 67:5, 83:18, 95:23, 96:23, 99:4
**meeting** [15] - 38:23, 47:16, 54:4, 54:6, 59:6, 59:20, 60:5, 60:10, 61:10, 63:3, 75:5, 81:16, 98:5
**meetings** [1] - 61:13
**Megastar** [6] - 26:21, 26:24, 28:5, 28:12, 28:22
**member** [1] - 11:9
**mention** [3] - 26:17, 59:13, 59:17
**mentioned** [4] - 22:17, 24:18, 71:14, 77:17
**merged** [1] - 12:21
**met** [7] - 34:8, 37:23, 53:8, 55:12, 58:12, 62:1, 75:4
**middle** [1] - 70:12
**might** [9] - 28:11, 46:12, 52:21, 63:13, 82:2, 90:16, 94:14, 96:23, 102:11
**mind** [5] - 4:21, 34:22, 53:2, 56:21, 63:25
**minded** [2] - 46:2, 65:6

**minutes** [3] - 66:15, 91:1, 101:18
**mobile** [2] - 24:4, 29:6
**mode** [1] - 3:17
**model** [1] - 9:15
**modification** [8] - 71:10, 73:23, 77:5, 97:4, 97:19, 97:24, 101:9, 101:13
**Monday** [1] - 90:25
**moot** [1] - 36:23
**mouth** [1] - 65:12
**move** [4] - 40:8, 40:9, 41:16, 54:19
**moved** [1] - 15:1
**MR** [42] - 4:6, 17:9, 25:20, 26:1, 29:2, 29:16, 37:2, 37:13, 37:20, 47:23, 48:18, 50:9, 56:8, 57:2, 57:7, 58:10, 61:15, 61:21, 66:12, 66:14, 66:17, 69:19, 72:4, 74:21, 75:2, 81:6, 81:12, 87:22, 88:3, 94:25, 95:2, 95:4, 95:10, 97:7, 97:22, 98:3, 100:7, 101:16, 101:20, 101:22, 102:13, 102:15
**multiple** [3] - 13:24, 61:13, 99:4
**must** [1] - 86:17

## N

**name** [6] - 4:13, 4:15, 32:23, 49:15, 89:1, 103:14
**national** [1] - 29:21
**nature** [3] - 19:18, 36:14, 64:2
**near** [1] - 16:20
**necessarily** [7] - 29:5, 72:7, 81:13, 97:25, 98:6, 98:9, 98:19
**necessitate** [1] - 19:15
**need** [34] - 7:1, 34:10, 34:12, 34:19, 34:20, 37:18, 43:19, 43:20, 43:21, 44:9, 44:12, 44:21, 45:6, 45:9, 45:24, 51:24, 56:16, 59:10, 66:6, 78:1, 81:13, 82:7, 82:17, 82:18, 82:24, 83:6, 83:10, 94:3, 96:23, 97:11, 97:24, 98:15, 98:19, 98:23
**needed** [23] - 33:6, 33:20, 34:3, 53:24, 54:12, 54:16, 56:15, 56:20, 62:20, 62:21, 66:1, 71:8, 73:21, 73:22, 75:19, 75:25, 76:1, 76:15, 77:9, 79:3, 96:20, 99:10
**needs** [8] - 55:13, 67:5, 75:11, 80:5, 83:18, 95:23, 98:6, 99:5
**negotiating** [1] - 8:20
**never** [1] - 39:13
**new** [5] - 32:2, 32:15, 32:21, 32:25, 39:12
**next** [3] - 6:2, 36:3, 49:14
**No** [13] - 2:5, 25:22, 29:12, 48:14, 50:5, 57:3, 58:6, 61:17, 74:23, 81:8, 87:24, 95:6, 103:6
**no** [68] - 5:10, 6:4, 6:10, 8:24, 10:12, 10:20, 11:8, 11:14, 14:23, 17:22, 19:23, 19:24, 21:16, 22:13, 23:16, 24:1, 27:13, 27:16, 31:2, 33:12, 37:25, 38:4, 38:8, 38:22, 40:25, 42:19, 45:16, 45:19, 46:13, 47:2, 48:23, 49:2, 49:8, 50:13, 50:24, 51:17, 51:25, 52:22, 55:25, 56:10, 59:13, 60:1, 69:11, 76:2, 76:11, 78:24, 79:10, 88:7, 92:6, 94:1, 94:5, 94:14, 94:15, 94:19, 96:3, 96:12, 96:18, 97:2, 97:11, 97:16, 98:11, 98:21, 99:6, 99:22, 101:15, 102:9, 102:13
**NO** [1] - 1:6
**nobody** [1] - 101:1
**nods** [1] - 6:4
**none** [3] - 39:21, 71:16, 76:16
**normal** [2] - 7:3, 93:24
**normally** [3] - 64:1, 70:4, 78:6
**North** [1] - 20:24
**NORTHERN** [1] - 1:1
**NOT** [1] - 102:17
**notarial** [1] - 103:16
**Notary** [3] - 3:10, 3:14, 103:22
**notary** [1] - 103:6
**note** [2] - 38:22, 59:15
**notes** [1] - 101:18
**nothing** [2] - 53:17, 79:15
**notice** [3] - 3:4, 3:16, 4:9
**number** [3] - 17:23, 20:19, 103:14
**nurse** [1] - 17:15
**nutshell** [1] - 33:5

## O

**object** [1] - 29:2
**objection** [10] - 37:2, 37:13, 37:20, 56:8, 69:19, 72:4, 97:7, 97:22, 98:3, 100:7
**obviously** [1] - 66:3
**occasion** [1] - 78:11
**occasional** [1] - 77:24
**occasionally** [1] - 78:2
**occasions** [1] - 19:6
**occurred** [1] - 76:8
**OF** [4] - 1:1, 1:11, 103:3, 103:4
**off** [14] - 9:19, 24:15, 31:9, 33:6, 40:16, 41:5, 42:4, 51:5, 64:22, 65:9, 69:13, 70:9, 74:4, 77:10
**offer** [8] - 55:9, 55:16, 63:7, 69:9, 72:9, 84:7, 96:13, 100:5
**offered** [11] - 26:25, 45:21, 55:11, 63:4, 68:23, 71:17, 73:1, 73:6, 74:2, 81:16, 99:24
**offering** [6] - 54:22, 72:15, 81:4, 101:2, 101:8, 101:12
**OFFICE** [1] - 1:24
**okay** [198] - 4:25, 5:11, 6:2, 6:23, 6:25, 7:6, 7:8, 8:4, 8:9, 8:22, 9:21, 10:1, 10:7, 10:14, 10:18, 10:21, 11:4, 11:9, 11:24, 12:2, 12:10, 13:17, 13:19, 14:17, 14:21, 14:25, 15:4, 15:14, 16:8, 16:21, 17:4, 17:7, 17:21, 18:20, 19:2, 19:6, 19:9, 20:6, 21:6, 21:22, 22:14, 22:24, 23:10, 24:6, 24:17, 24:23, 25:4, 25:9, 25:15, 25:20, 26:6, 26:11, 26:24, 27:8, 27:20, 28:7, 28:9, 28:16, 28:23, 29:25, 30:4, 30:9, 30:24, 31:3, 31:8, 32:22, 33:1, 33:19, 34:11, 35:11, 36:24, 38:1, 38:5, 38:15, 39:16, 39:22, 40:4, 40:10, 40:18, 40:22, 41:1, 42:21, 43:22, 44:12, 44:19, 47:3, 47:8, 47:17, 48:4, 48:13, 49:3, 49:9, 49:13, 49:17, 49:24, 50:3, 50:18, 50:25, 51:22, 52:10, 52:14, 52:20, 52:24, 53:4, 53:7, 54:24, 55:14, 55:22, 56:3, 58:2, 58:4, 59:9, 59:19, 60:9, 60:13, 61:1, 61:5, 61:9, 61:15, 63:7, 63:16, 64:5, 64:12, 65:1, 65:11, 66:6, 66:12, 66:18, 67:7, 67:12, 68:1, 69:2, 70:10, 70:17, 70:20, 71:9, 71:14, 72:14, 72:25, 73:4, 73:11, 74:8, 74:12, 74:14, 74:21, 75:24, 76:17, 78:3, 78:14, 80:10, 80:20, 81:3, 81:6, 81:19, 81:25, 82:5, 82:14, 82:16, 82:21, 83:12, 83:19, 83:24, 84:11, 84:15, 84:24, 85:3, 85:8, 85:16, 85:25, 86:4, 86:20, 87:4, 87:12, 88:10, 88:12, 89:12, 90:6, 91:4, 91:18, 92:2, 92:14, 92:16, 92:21, 92:24, 93:18, 93:23, 94:6, 97:19, 98:10, 98:13, 98:17, 98:22, 99:23, 102:2, 102:7, 102:10, 102:15
**once** [3] - 12:19, 29:6, 39:11
**one** [21] - 14:15, 14:23, 16:2, 19:16, 19:23, 20:2, 20:7, 23:4, 25:6, 34:14, 47:15, 49:24, 51:12, 60:14, 73:17, 86:12, 90:15, 98:7, 98:25, 99:11
**online** [1] - 20:25
**open** [7] - 41:19, 46:2, 65:6, 67:4, 71:21, 81:24, 82:11
**open-minded** [1] - 65:6
**operation** [1] - 36:14
**operations** [4] - 12:22, 17:6, 18:24, 19:17
**operator** [1] - 70:16
**opportunities** [1] - 29:19
**opportunity** [4] - 20:17, 24:25, 31:13, 41:25
**Opportunity** [2] - 2:8, 29:13
**oppose** [1] - 96:19
**option** [1] - 81:5
**options** [1] - 72:23
**organization** [5] - 9:5, 15:8, 20:20, 21:4, 32:14
**organizational** [1] - 18:5
**organizations** [1] - 11:10
**origin** [1] - 29:21
**OSHA** [1] - 18:7
**others** [1] - 75:13
**others"** [1] - 76:20
**otherwise** [1] - 97:17
**outcome** [1] - 103:11
**outline** [1] - 12:3
**outset** [1] - 96:18
**outside** [4] - 23:24, 28:12, 76:11, 93:20
**overall** [1] - 18:4
**overlooking** [1] - 55:25
**oversaw** [1] - 14:1
**oversee** [1] - 16:8
**overseeing** [2] - 12:22, 14:9
**own** [1] - 18:25

## P

**packet** [3] - 28:17, 85:5, 86:18
**Page** [2] - 2:2, 2:5
**page** [4] - 24:15, 24:24, 30:10, 74:9
**pages** [5] - 24:12, 27:23, 86:10, 88:5, 103:8
**paid** [1] - 33:8
**pain** [3] - 37:10, 37:17, 62:18
**panic** [2] - 53:25, 54:13
**paperwork** [1] - 85:21
**paraphrasing** [1] - 100:16
**part** [19] - 10:3, 10:4, 14:8, 17:16, 21:16, 28:4, 28:17, 36:21, 43:19, 48:19, 49:22, 50:14, 53:5, 56:1, 65:15, 66:4, 83:12, 83:25, 85:14

**particular** [4] - 28:10, 47:12, 47:18, 84:25
**parties** [1] - 103:11
**past** [1] - 91:8
**payroll** [1] - 13:25
**people** [4] - 12:24, 15:6, 31:20, 54:21
**perfectly** [1] - 7:3
**perform** [21] - 30:16, 30:21, 34:16, 34:19, 34:23, 35:2, 35:8, 35:17, 41:7, 42:16, 43:5, 43:14, 53:20, 54:25, 56:1, 58:16, 58:19, 60:5, 60:11, 71:8, 75:16
**performance** [1] - 73:15
**performed** [1] - 32:13
**performing** [7] - 36:22, 36:25, 37:6, 37:9, 41:9, 42:9, 62:6
**perhaps** [1] - 84:1
**period** [1] - 20:1
**periods** [5] - 33:18, 62:18, 69:5, 69:24, 75:17
**person** [1] - 76:23
**person's** [1] - 67:5
**personal** [5] - 33:2, 33:9, 33:11, 33:18, 41:24
**persons** [4] - 29:20, 31:4, 31:24, 36:7
**pertain** [1] - 87:19
**pertains** [1] - 59:7
**pharmacy** [1] - 72:23
**phone** [5] - 24:4, 29:6, 64:5, 64:8, 64:10
**phrase** [1] - 66:21
**physical** [3] - 76:5, 82:1, 82:7
**physically** [2] - 37:10, 100:23
**physician** [2] - 79:23, 80:1
**picture** [3] - 86:6, 86:16, 86:24
**pictures** [3] - 86:14, 86:21, 86:22
**piece** [1] - 94:3
**place** [6] - 28:10, 40:1, 51:10, 59:25, 81:23, 84:9
**placed** [1] - 84:4
**plaintiff** [3] - 1:5, 3:8, 4:17
**Plaintiff** [2] - 3:2, 4:3
**PLAINTIFF** [1] - 1:12
**plan** [2] - 72:8, 72:11
**Please** [1] - 90:20
**please** [2] - 4:12, 6:17
**podium** [10] - 65:23, 70:14, 71:3, 77:8, 77:14, 78:8, 78:20, 79:10, 79:11, 79:13
**point** [12] - 6:16, 7:1, 16:2, 55:10, 56:18, 63:15, 64:4, 68:23, 75:8, 77:12, 84:3, 92:19
**points** [1] - 36:23
**policies** [6] - 10:5, 23:21, 26:3, 28:25, 29:1, 50:15
**policy** [31] - 18:5, 23:24, 24:17, 24:22, 25:5, 25:7, 25:8, 25:10, 25:12, 28:18, 29:5, 29:18, 30:1, 30:3, 30:6, 30:7, 30:18, 31:3, 31:13, 33:2, 33:4, 33:23, 34:5, 34:18, 35:3, 35:14, 36:1, 36:4, 36:24, 55:6, 95:25
**portion** [1] - 26:21
**position** [63] - 11:24, 12:8, 14:12, 15:10, 16:19, 16:22, 17:3, 42:6, 43:8, 44:2, 46:9, 47:1, 55:17, 56:4, 56:5, 56:11, 56:21, 61:3, 61:5, 62:13, 62:17, 63:4, 63:8, 65:15, 65:18, 68:24, 69:4, 69:18, 69:23, 70:3, 70:17, 71:2, 71:10, 71:11, 71:24, 71:25, 72:10, 72:17, 72:25, 73:1, 73:5, 73:23, 75:15, 75:18, 76:24, 77:5, 77:19, 78:3, 78:7, 78:19, 79:15, 83:15, 83:20, 83:22, 84:6, 90:2, 90:3, 100:19, 100:21, 101:9, 101:13
**positions** [5] - 17:7, 17:13, 65:19, 72:20, 77:17
**positive** [2] - 27:16, 28:6
**possession** [1] - 21:20
**possibilities** [1] - 66:2
**possible** [10] - 19:2, 19:5, 36:6, 57:17, 57:20, 61:1, 62:8, 67:20, 68:8, 79:21
**possibly** [3] - 28:12, 52:18, 94:4
**POST** [1] - 1:24
**potential** [1] - 94:7
**potentially** [1] - 72:15
**Practice** [1] - 4:11
**practices** [1] - 11:1
**preference** [5] - 98:8, 98:16, 98:18, 98:23
**preferred** [1] - 99:1
**preparation** [3] - 61:6, 74:17, 74:19
**present** [2] - 53:12, 62:24
**PRESENT** [1] - 1:19
**presentation** [1] - 21:17
**presented** [2] - 32:3, 52:8
**presenting** [1] - 29:7
**presently** [1] - 11:9
**president** [1] - 12:9
**presidents** [1] - 17:24
**prevent** [2] - 94:11, 94:14
**prevented** [4] - 65:3, 101:8, 101:10, 101:12
**previously** [1] - 57:15
**primarily** [3] - 8:5, 8:19, 15:8
**primary** [2] - 8:15, 18:9
**privileged** [1] - 23:12
**probably** [5] - 8:11, 14:19, 16:2, 21:3, 64:2
**problem** [3] - 44:24, 45:3, 69:10
**procedure** [2] - 31:4, 95:25
**Procedure** [1] - 3:4
**procedures** [4] - 23:21, 26:3, 28:18, 50:15
**process** [5] - 5:14, 22:6, 36:22, 43:19, 96:23
**product** [1] - 11:2
**products** [1] - 9:2
**professional** [2] - 8:23, 11:10
**program** [2] - 8:16, 9:11
**prolonged** [3] - 62:17, 69:5, 69:24
**promise** [1] - 6:10
**proposal** [1] - 100:18
**propose** [2] - 96:6, 96:21
**proposed** [10] - 45:25, 73:2, 96:1, 96:4, 96:11, 96:13, 97:1, 97:2, 97:14, 97:15
**provide** [15] - 10:1, 20:13, 33:22, 33:24, 34:4, 34:6, 34:18, 35:3, 40:18, 41:12, 41:25, 44:14, 58:23, 71:8, 77:15
**provided** [6] - 20:16, 20:20, 34:7, 40:17, 73:8, 87:8
**provides** [1] - 10:5
**Public** [3] - 3:11, 3:14, 103:22
**public** [1] - 103:6
**pump** [1] - 79:9
**pumps** [1] - 77:25
**purpose** [9] - 44:17, 56:14, 58:22, 80:8, 82:4, 82:10, 83:1, 83:3, 83:13
**purposes** [2] - 4:10
**pursuant** [2] - 3:3, 4:9
**put** [3] - 6:5, 65:12, 68:11

**Q**

**qualified** [20] - 29:19, 30:12, 30:19, 32:7, 35:13, 35:14, 35:21, 35:25, 37:1, 37:5, 42:7, 42:15, 42:18, 42:20, 42:21, 43:3, 43:9, 43:11, 43:14, 43:17
**qualify** [1] - 80:4
**questions** [6] - 13:16, 13:18, 94:10, 102:4, 102:11, 102:14
**quick** [3] - 24:3, 35:10, 47:9
**quickly** [1] - 92:25
**quoted** [1] - 31:7

**R**

**race** [1] - 29:20
**ran** [1] - 32:5
**rare** [1] - 14:23
**rather** [3] - 54:19, 81:22, 86:14
**reach** [2] - 51:15, 84:5
**read** [21] - 29:23, 31:19, 35:18, 36:7, 36:15, 48:5, 49:21, 49:25, 54:8, 57:14, 57:15, 58:24, 63:1, 67:23, 74:13, 74:15, 74:16, 75:21, 81:14, 85:13, 90:22
**reading** [3] - 47:25, 51:25, 85:15
**real** [3] - 24:2, 35:10, 47:9
**really** [1] - 66:12
**reason** [14] - 6:17, 38:5, 41:2, 44:7, 45:7, 76:13, 82:6, 89:24, 96:6, 96:13, 97:5, 97:20, 98:13, 99:20
**reasonable** [12] - 30:16, 30:21, 30:23, 35:16, 36:4, 43:5, 43:10, 43:15, 43:16, 43:18, 44:20, 51:6
**reasons** [3] - 41:2, 96:18
**reassign** [1] - 62:12
**recall** [54] - 5:5, 5:10, 10:14, 11:6, 11:8, 35:5, 35:6, 39:15, 41:21, 47:17, 48:4, 48:7, 49:1, 49:3, 49:6, 49:23, 49:24, 51:12, 52:9, 54:16, 59:21, 60:12, 60:21, 60:23, 63:15, 63:20, 69:13, 76:2, 76:9, 84:22, 84:24, 85:2, 85:15, 86:3, 86:23, 86:24, 87:3, 87:11, 87:12, 87:14, 87:17, 89:10, 89:11, 91:12, 91:22, 92:1, 92:13, 92:22, 93:21, 95:12, 95:16, 95:17, 99:6
**recapping** [1] - 38:23
**receive** [5] - 9:6, 9:11, 9:18, 21:14, 95:15
**receiving** [3] - 13:12, 39:4, 49:1
**recent** [1] - 49:22
**recently** [4] - 50:23, 53:10, 57:14, 80:22
**recess** [3] - 66:16, 101:17, 101:21
**recognize** [23] - 27:23, 27:24, 28:1, 28:17, 28:20, 47:12, 49:19, 51:23, 52:3, 57:12, 60:20, 74:12, 80:11, 80:21, 81:15, 81:18, 84:18, 84:20, 85:3, 85:12, 86:13, 86:15, 88:24
**recollect** [1] - 60:22
**recollection** [4] - 63:21, 85:17, 85:25, 89:8
**recommendation** [4] - 40:1, 40:7, 81:21, 81:22
**reconsider** [3] - 42:1, 83:14, 83:16

**record** [10] - 4:8, 4:13, 6:5, 23:18, 38:2, 47:24, 52:25, 63:17, 79:25, 103:8
**recorded** [1] - 64:9
**records** [2] - 28:11, 63:20
**recruitment** [1] - 18:6
**Rector** [6] - 88:18, 88:20, 89:20, 89:21, 89:22, 90:13
**refer** [1] - 11:21
**referenced** [2] - 59:9, 63:18
**referencing** [1] - 57:22
**referring** [4] - 42:14, 43:1, 57:23, 93:5
**refreshing** [1] - 22:13
**refused** [1] - 40:2
**regard** [9] - 5:8, 18:11, 18:17, 23:15, 29:20, 32:19, 42:22, 43:25, 64:19
**regarding** [6] - 39:1, 43:24, 49:18, 64:6, 75:5, 81:16
**regards** [1] - 79:20
**regional** [2] - 20:21, 62:18
**regulations** [4] - 14:5, 14:10, 20:9, 20:15
**reiterated** [1] - 54:5
**reject** [4] - 96:1, 96:3, 97:5, 97:20
**rejoined** [2] - 13:12, 13:14
**relate** [1] - 5:3
**related** [16] - 5:2, 10:15, 15:19, 18:17, 21:15, 21:24, 22:3, 22:15, 22:25, 24:18, 26:8, 30:10, 31:4, 39:14, 59:10, 103:10
**relates** [1] - 59:5
**relation** [2] - 54:13, 73:15
**relations** [7] - 8:1, 8:2, 8:3, 8:12, 8:16, 12:16, 18:8
**relationship** [1] - 14:11
**relay** [1] - 40:13
**religion** [1] - 29:21
**remember** [41] - 4:25, 5:6, 10:18, 10:21, 12:4, 12:7, 13:7, 13:16, 14:17, 21:22, 21:23, 22:2, 22:9, 22:14, 24:4, 25:5, 25:6, 27:8, 27:11, 27:13, 27:14, 29:5, 38:19, 38:22, 38:25, 39:9, 39:17, 40:22, 40:25, 47:3, 47:25, 52:10, 60:2, 60:6, 65:13, 68:1, 73:18, 84:8, 87:15, 89:2, 91:19
**renders** [1] - 55:1
**rephrase** [4] - 6:22, 102:4, 102:8
**replied** [1] - 58:18
**report** [3] - 17:1, 17:6, 49:4
**reported** [6] - 16:10, 17:8, 17:13, 17:15, 93:7, 103:7
**Reporter** [2] - 3:11, 103:14
**REPORTER** [2] - 57:1, 94:23
**reporter** [2] - 5:15, 103:6
**REPORTER'S** [1] - 103:1
**Reporting** [1] - 103:13
**reports** [2] - 15:25, 49:6
**request** [29] - 14:13, 33:9, 33:11, 39:1, 39:14, 39:18, 39:23, 40:5, 40:24, 42:12, 46:15, 47:5, 48:25, 53:11, 55:21, 58:13, 62:3, 67:14, 75:8, 83:11, 92:4, 93:13, 94:3, 95:18, 95:20, 96:19, 96:24, 97:2, 98:14
**requested** [15] - 19:19, 35:4, 38:11, 38:21, 39:7, 39:10, 43:20, 44:10, 44:13, 44:15, 44:22, 45:6, 45:22, 97:6, 97:21
**requesting** [3] - 41:11, 90:21, 95:12
**requests** [8] - 18:18, 20:11, 35:7, 41:3, 93:25, 95:15, 95:16, 95:24
**require** [4] - 69:23, 69:24, 97:4, 97:18
**required** [3] - 58:16, 58:19, 69:4
**requirement** [3] - 9:9, 34:9, 36:5
**requiring** [2] - 9:11, 36:11
**reserved** [1] - 3:20
**reside** [1] - 28:14
**resource** [3] - 9:4, 10:5, 10:25
**resources** [15] - 8:7, 8:9, 8:11, 10:8, 11:6, 11:25, 12:9, 12:21, 15:18, 17:17, 20:17, 23:4, 23:14, 26:19, 36:13
**responded** [6] - 68:16, 69:3, 93:1, 100:18, 100:21, 101:1
**response** [8] - 25:1, 25:3, 38:24, 48:3, 49:22, 52:7, 69:2, 97:9
**responsibilities** [3] - 14:3, 15:19, 18:10
**responsibility** [4] - 13:25, 16:3, 77:24, 100:9
**responsible** [2] - 14:9, 20:8
**result** [4] - 52:7, 63:11, 76:7, 94:13
**retain** [1] - 31:20
**retaining** [1] - 31:24
**retention** [1] - 18:6
**retired** [2] - 84:8, 84:13
**retirement** [2] - 20:5, 86:2
**review** [8] - 26:22, 32:14, 38:24, 48:2, 49:23, 60:23, 74:17, 75:7
**reviewed** [21] - 18:18, 20:10, 25:2, 47:4, 47:6, 47:17, 47:21, 50:23, 57:19, 61:1, 61:2, 61:6, 62:4, 67:14, 80:22, 80:24, 84:25, 85:4, 86:1, 86:20, 89:2
**reviewing** [6] - 34:14, 52:7, 61:3, 85:18, 89:8, 89:10
**Richards** [26] - 2:10, 2:13, 2:15, 49:18, 50:6, 51:1, 51:7, 51:8, 53:9, 57:10, 58:7, 59:3, 59:13, 59:20, 59:22, 61:11, 62:2, 74:9, 74:24, 87:8, 87:13, 88:14, 88:17, 89:16, 89:19, 89:20
**Richards's** [3] - 49:15, 57:11, 76:17
**right** [84] - 4:7, 7:13, 10:10, 11:16, 11:19, 11:22, 11:25, 12:7, 12:13, 14:25, 19:21, 20:12, 24:8, 27:1, 27:20, 27:22, 29:23, 30:10, 35:18, 36:1, 36:3, 36:8, 36:15, 37:19, 37:23, 38:18, 46:4, 46:14, 47:10, 49:13, 51:21, 53:7, 54:14, 55:8, 56:23, 57:8, 58:11, 59:11, 59:14, 61:22, 67:21, 68:9, 68:24, 69:6, 69:8, 70:12, 70:18, 70:21, 70:25, 71:3, 73:2, 76:20, 77:4, 77:25, 78:5, 78:8, 78:16, 78:21, 79:4, 80:1, 80:10, 81:21, 83:21, 84:16, 84:17, 85:9, 86:4, 86:13, 88:4, 88:21, 89:14, 89:17, 90:8, 90:17, 90:22, 91:2, 93:2, 96:10, 97:12, 99:15, 99:20, 100:24, 101:4, 102:10
**risk** [2] - 55:1, 94:7
**role** [3] - 15:14, 42:2, 56:17
**ROME** [1] - 1:2
**routine** [2] - 95:14, 95:23
**routinely** [3] - 18:23, 71:12, 94:5
**RPR** [3] - 1:23, 103:6, 103:21
**Rules** [1] - 3:3
**rules** [1] - 5:13
**run** [1] - 32:23

## S

**safety** [6] - 89:13, 91:6, 93:23, 93:24, 94:2, 94:7
**SAITH** [1] - 102:17
**Sarah** [1] - 88:21
**sarcastic** [1] - 79:24
**satisfaction** [1] - 102:5
**satisfactory** [3] - 38:9, 42:8, 82:15
**satisfied** [1] - 83:10
**satisfy** [2] - 43:21, 56:15
**save** [1] - 42:1
**saw** [2] - 81:1, 86:18
**scan** [1] - 64:2
**scenario** [1] - 97:19
**school** [2] - 7:14, 13:11
**screen** [7] - 24:2, 24:9, 47:10, 57:9, 67:25, 84:17, 86:25
**screw** [1] - 68:5
**scroll** [6] - 24:12, 27:24, 30:9, 84:19, 86:11, 88:12
**seal** [1] - 103:16
**second** [1] - 67:15
**section** [1] - 25:3
**see** [32] - 24:8, 24:15, 24:23, 27:21, 29:4, 29:7, 29:18, 29:22, 30:11, 30:13, 32:6, 35:12, 41:6, 47:10, 49:13, 49:15, 57:8, 57:10, 59:1, 59:3, 60:14, 68:2, 74:9, 80:13, 80:17, 85:9, 86:4, 86:25, 88:4, 88:10, 88:15, 88:18
**seeing** [2] - 86:24, 87:15
**seeking** [2] - 42:25, 87:6
**self** [1] - 78:12
**self-checkout** [1] - 78:12
**sense** [3] - 5:25, 6:13, 16:15
**sentence** [1] - 36:3
**served** [8] - 16:18, 26:11, 40:3, 46:6, 46:10, 65:18, 73:13, 95:22
**service** [70] - 12:23, 26:4, 26:9, 38:12, 38:21, 39:8, 39:14, 39:18, 39:24, 40:5, 40:8, 41:3, 41:20, 41:22, 44:1, 44:4, 44:8, 44:25, 45:9, 45:14, 46:4, 46:15, 46:20, 47:5, 48:6, 48:20, 50:11, 50:12, 50:19, 50:21, 51:3, 53:12, 53:18, 53:24, 54:12, 57:25, 58:14, 58:16, 58:22, 58:23, 62:4, 62:23, 64:24, 65:8, 67:14, 69:16, 73:13, 75:6, 75:9, 79:19, 80:5, 82:17, 82:24, 83:6, 87:6, 87:10, 87:19, 90:16, 90:21, 91:7, 91:11, 91:20, 91:25, 92:5, 92:9, 92:12, 98:14, 98:18, 99:3, 99:10
**session** [2] - 100:12, 100:14
**set** [1] - 103:16
**several** [1] - 20:19
**sex** [1] - 29:20
**shall** [1] - 3:9
**share** [4] - 24:2, 51:21, 80:10, 84:16
**shared** [5] - 24:9, 76:7, 85:10, 86:5, 88:5
**sharing** [1] - 67:25

**Sherrell** [2] - 88:24, 89:25
**Sherrell's** [1] - 25:2
**shifts** [1] - 53:13
**short** [4] - 64:25, 94:19, 100:2, 101:6
**short/long** [1] - 75:17
**shorthand** [1] - 3:10
**should** [3] - 28:8, 32:20, 86:5
**show** [4] - 27:20, 74:6, 89:5, 89:6
**showing** [1] - 60:13
**SHRM** [13] - 8:25, 9:3, 9:4, 9:5, 10:1, 10:4, 10:8, 10:15, 10:19, 10:24, 11:6, 21:1, 23:4
**shut** [2] - 56:19, 64:24
**sideways** [2] - 86:7, 86:12
**Signature** [1] - 102:18
**signature** [5] - 3:11, 57:11, 80:16, 80:17, 84:19
**signed** [4] - 49:17, 52:4, 59:2, 60:17
**significant** [1] - 36:11
**similar** [6] - 6:8, 41:16, 65:19, 78:15, 81:2, 81:3
**similarities** [1] - 77:18
**similarly** [2] - 78:7, 99:24
**simply** [4] - 45:5, 45:24, 46:1, 55:19
**sin** [1] - 98:11
**sir** [25] - 5:10, 11:8, 11:14, 11:20, 11:23, 12:1, 16:24, 17:22, 20:10, 24:20, 31:2, 37:25, 45:16, 45:19, 46:13, 50:24, 51:17, 57:12, 72:11, 78:23, 79:6, 83:2, 88:9, 92:18, 102:16
**sit** [8] - 62:20, 70:20, 70:24, 73:22, 75:19, 76:1, 76:15, 79:3
**size** [1] - 36:13
**Skeens** [12] - 88:11, 89:12, 89:13, 91:7, 91:10, 91:21, 92:10, 92:25, 93:7, 93:11, 93:15, 93:19
**Skeens's** [1] - 91:19
**skills** [1] - 103:9
**slowly** [1] - 86:11
**smaller** [1] - 13:23
**Smith** [1] - 17:20
**smooth** [1] - 5:14
**solely** [1] - 74:17
**solution** [13] - 41:20, 55:20, 69:9, 80:8, 95:22, 98:1, 98:2, 98:4, 98:9, 98:25, 99:1, 99:2, 101:2
**solutions** [2] - 95:18, 95:24
**solve** [1] - 55:21
**somebody** [6] - 37:8, 37:16, 49:5, 55:2, 70:24
**someone** [6] - 19:17, 33:6, 33:13, 33:14, 80:5, 87:16
**something** [9] - 21:19, 49:10, 52:8, 63:24, 68:5, 70:20, 74:16, 86:8, 86:9
**sometimes** [1] - 33:12
**somewhere** [1] - 86:19
**soon** [2] - 54:7, 93:1
**sorry** [12] - 5:6, 13:13, 22:1, 24:23, 29:8, 31:8, 31:15, 32:10, 67:24, 70:8, 86:12, 91:21
**sound** [1] - 94:9
**sounds** [1] - 30:2
**sources** [1] - 26:16
**Spahr** [1] - 88:21
**speak** [3] - 22:12, 84:10, 93:1
**speaking** [1] - 39:17
**speaks** [1] - 28:24
**special** [1] - 9:6
**specialist** [8] - 38:8, 38:14, 50:10, 51:10, 51:15, 51:20, 89:22, 89:24
**specialists** [4] - 17:1, 26:18, 26:19, 27:6
**specialized** [2] - 8:15, 8:17
**specific** [17] - 10:13, 14:15, 16:9, 18:17, 19:23, 25:10, 25:12, 25:14, 30:6, 36:19, 38:18, 44:22, 47:20, 51:2, 73:12, 76:4, 98:7
**specifically** [11] - 15:7, 18:5, 23:8, 26:9, 32:20, 38:3, 42:14, 42:22, 60:4, 82:7, 99:4
**specifics** [2] - 10:20, 11:5
**speculation** [2] - 82:20, 90:5
**spoke** [3] - 38:25, 39:9, 64:7
**sporadic** [1] - 11:2
**stability** [29] - 41:12, 45:7, 45:25, 54:14, 54:15, 56:16, 59:10, 64:19, 65:4, 65:16, 65:21, 65:24, 66:3, 71:8, 73:17, 73:24, 77:1, 77:3, 77:6, 77:14, 77:16, 79:16, 79:20, 80:7, 98:24, 99:14, 99:25, 101:14
**stand** [14] - 62:17, 62:20, 62:22, 69:5, 69:24, 70:15, 73:22, 75:16, 75:19, 76:1, 76:15, 84:6, 100:22, 100:23
**standard** [2] - 11:12, 22:10
**standards** [3] - 22:5, 34:9, 34:14
**standing** [6] - 70:3, 70:5, 71:11, 71:25, 78:4, 83:22
**stands** [1] - 70:16
**start** [3] - 5:22, 5:24, 89:15
**started** [5] - 12:4, 12:6, 13:3, 13:8, 13:10
**starting** [2] - 12:8, 15:17
**STATE** [1] - 103:3
**state** [5] - 4:7, 4:12, 14:4, 25:14, 25:17
**State** [2] - 103:7, 103:23
**stated** [15] - 30:3, 53:16, 53:17, 53:21, 53:23, 54:1, 58:22, 62:5, 62:10, 62:16, 62:19, 62:23, 73:16, 75:14, 101:14
**Statement** [14] - 2:9, 2:10, 2:12, 2:13, 2:14, 2:15, 2:16, 48:14, 50:5, 57:3, 58:6, 61:17, 74:23, 81:8
**statement** [31] - 23:24, 29:1, 30:1, 30:7, 30:18, 37:7, 47:24, 47:25, 48:10, 48:11, 48:12, 49:17, 59:7, 61:3, 61:5, 61:8, 64:12, 64:23, 65:2, 67:13, 69:8, 69:11, 69:12, 73:21, 76:18, 76:22, 80:8, 80:20, 81:15, 83:4, 99:19
**statements** [4] - 41:5, 43:23, 56:25, 63:19
**STATES** [1] - 1:1
**states** [1] - 30:5
**stations** [1] - 78:12
**status** [3] - 29:22, 32:7, 33:17
**steady** [1] - 54:2
**stem** [1] - 9:14
**steps** [1] - 36:5
**Steve** [1] - 17:20
**still** [12] - 13:10, 21:19, 23:13, 35:25, 37:1, 42:18, 52:21, 67:24, 70:25, 71:4, 72:23, 82:18
**stool** [15] - 56:17, 66:1, 70:7, 70:19, 71:4, 71:12, 71:15, 72:3, 72:9, 72:16, 77:13, 78:25, 79:10, 79:13, 84:7
**store** [11] - 17:4, 17:5, 27:3, 41:17, 44:2, 51:1, 75:11, 75:15, 91:8, 91:20, 92:14
**Stores** [3] - 2:6, 11:16, 25:22
**STORES** [1] - 1:7
**STREET** [1] - 1:18
**structure** [2] - 15:24, 36:14
**subject** [2] - 3:18, 90:6
**subjects** [1] - 16:13
**substance** [1] - 22:3
**such** [5] - 18:7, 33:8, 33:14, 36:12, 63:24
**suggest** [2] - 44:1, 45:4
**suggested** [2] - 62:12, 71:17
**suggesting** [1] - 75:12
**suggestion** [1] - 63:14
**suggestions** [3] - 62:8, 67:20, 68:8
**suitable** [1] - 75:18
**SUITE** [2] - 1:14, 1:18
**summarize** [1] - 33:4
**supermarket** [2] - 12:19, 13:2
**Supermarkets** [5] - 13:4, 13:20, 13:22, 15:1, 15:18
**support** [2] - 50:12, 51:17
**sure** [18] - 5:23, 6:11, 6:24, 7:5, 18:3, 19:1, 20:8, 23:3, 29:8, 38:13, 40:12, 42:24, 52:16, 58:2, 64:7, 68:5, 68:16, 101:20
**surprised** [1] - 93:14
**suspect** [1] - 38:6
**suspenders** [1] - 85:17
**sworn** [2] - 3:13, 4:3
**symptoms** [1] - 37:17
**syndrome** [1] - 62:19
**system** [2] - 28:13, 32:23


## T


**take** [8] - 7:2, 7:6, 10:7, 36:5, 66:12, 89:14, 90:16, 101:17
**taken** [8] - 3:4, 3:7, 3:9, 3:18, 4:8, 51:10, 66:16, 101:21
**taking** [1] - 5:16
**talk** [4] - 15:22, 43:22, 56:23, 61:24
**talked** [2] - 17:8, 41:15
**talking** [5] - 5:22, 11:22, 56:20, 65:3, 66:18
**tap** [1] - 10:25
**tasked** [1] - 18:15
**taught** [4] - 16:13, 22:14, 22:22, 26:20
**tax** [4] - 31:23, 32:1, 32:7, 32:17
**teaching** [4] - 27:10, 27:11, 28:5, 29:4
**team** [5] - 12:25, 21:5, 22:18, 22:21, 26:17
**tell** [15] - 10:10, 24:25, 41:1, 45:20, 54:8, 54:9, 58:25, 60:9, 63:1, 65:12, 70:2, 77:4, 85:14, 86:7, 91:18
**tells** [1] - 67:13
**ten** [1] - 90:25
**Tennessee** [3] - 103:7, 103:13, 103:23
**TENNESSEE** [4] - 1:15, 1:18, 1:24, 103:3
**terms** [2] - 39:4, 51:13
**testified** [5] - 4:18, 4:20, 5:1, 5:8, 81:19
**testimony** [2] - 101:7, 101:11
**testing** [1] - 9:11
**than** [12] - 13:23, 41:20, 42:11, 54:19, 63:23, 69:15, 77:15, 78:24, 79:10, 81:22,

95:21, 95:22
**thank** [4] - 4:15, 57:2, 102:12, 102:16
**THE** [2] - 1:12, 1:16
**there** [50] - 5:16, 6:8, 7:11, 8:9, 8:11, 12:6, 12:20, 12:25, 13:10, 16:1, 16:16, 16:19, 23:13, 25:6, 28:15, 31:23, 31:25, 34:9, 34:12, 34:20, 42:19, 42:25, 43:18, 48:20, 49:2, 49:3, 53:15, 55:10, 58:14, 61:12, 63:16, 65:20, 72:19, 75:10, 75:14, 77:2, 78:1, 79:15, 80:9, 82:23, 83:3, 83:17, 87:5, 88:8, 96:5, 96:12, 96:18, 97:5, 102:2, 102:7
**there's** [10] - 34:19, 43:20, 65:22, 72:20, 72:23, 78:7, 80:16, 84:18, 86:10, 98:11
**Thereupon** [13] - 25:22, 29:12, 48:14, 50:5, 57:3, 58:6, 61:17, 66:16, 74:23, 81:8, 87:24, 95:6, 101:21
**these** [12] - 47:9, 56:25, 63:19, 68:2, 86:13, 86:14, 86:21, 87:8, 87:13, 87:18, 94:9
**they've** [2] - 54:25, 55:8
**thinking** [1] - 92:18
**THIS** [1] - 102:17
**thought** [7] - 48:25, 51:11, 62:21, 65:14, 67:24, 90:16, 94:25
**three** [4] - 4:24, 27:23, 99:18, 99:25
**today** [3] - 10:13, 38:4, 101:24
**today's** [1] - 61:7
**together** [1] - 40:15
**took** [5] - 51:8, 59:25, 82:19, 84:9
**tool** [1] - 79:18
**top** [5] - 49:16, 57:11, 74:10, 80:13, 85:10
**total** [1] - 7:12
**Track** [1] - 28:14
**trained** [1] - 99:4
**training** [30] - 9:6, 9:8, 10:2, 10:15, 10:17, 10:22, 16:3, 16:6, 16:9, 16:10, 16:14, 20:13, 20:23, 21:5, 21:14, 21:24, 22:3, 22:18, 23:1, 26:8, 26:12, 26:15, 26:24, 28:21, 28:22, 30:25, 42:4, 43:2
**trainings** [1] - 27:9
**transcript** [2] - 6:8, 103:8
**transition** [1] - 20:1
**transmission** [1] - 3:17
**true** [3] - 46:10, 101:24, 103:8
**truly** [2] - 34:9, 34:12
**truthfulness** [1] - 76:14
**trying** [12] - 6:10, 25:4, 29:8, 40:10, 40:11, 43:7, 44:5, 45:2, 45:24, 51:15, 55:21, 98:1
**turned** [2] - 53:10, 86:7
**two** [8] - 4:23, 8:14, 9:25, 13:9, 33:18, 53:16, 62:6, 88:5
**type** [8] - 9:17, 20:25, 32:17, 41:16, 45:18, 46:12, 69:9, 94:2
**types** [1] - 16:12
**typically** [2] - 67:7, 94:1

**U**

**uh-huh** [1] - 6:6
**ultimately** [1] - 39:22
**ultimatum** [5] - 41:21, 46:6, 46:9, 65:7, 100:17
**unable** [1] - 62:22
**uncertain** [5] - 57:16, 57:20, 60:25, 61:12, 63:10
**under** [16] - 4:10, 8:25, 14:7, 16:6, 17:5, 18:4, 21:1, 31:10, 33:7, 33:14, 35:14, 36:1, 47:20, 55:5, 92:10, 93:23
**understand** [17] - 6:12, 6:16, 6:18, 6:21, 6:22, 40:12, 43:7, 45:2, 56:3, 57:23, 87:18, 90:10, 91:4, 97:10, 99:3, 102:5, 102:8
**understanding** [3] - 51:4, 75:24, 92:3
**understood** [1] - 56:4
**undetermined** [1] - 56:13
**undue** [10] - 33:22, 34:5, 36:6, 36:10, 36:20, 44:4, 44:14, 45:14, 96:5, 97:16
**union** [1] - 15:8
**unions** [1] - 8:19
**UNITED** [1] - 1:1
**unless** [5] - 51:18, 79:17, 90:1, 92:7
**unsure** [1] - 64:4
**until** [6] - 17:2, 20:4, 20:6, 48:2, 50:23, 96:15
**up** [15] - 12:14, 20:6, 23:6, 29:10, 33:18, 40:3, 46:6, 46:10, 47:9, 51:23, 61:23, 65:18, 67:22, 68:5, 95:22
**Uscan** [39] - 41:17, 42:3, 46:9, 54:22, 56:21, 62:13, 63:4, 63:8, 65:15, 65:22, 68:23, 69:17, 70:2, 70:14, 70:16, 71:2, 71:10, 71:24, 72:10, 72:17, 72:22, 72:25, 73:22, 75:12, 76:19, 76:24, 77:5, 78:7, 78:19, 79:11, 79:15, 83:15, 83:20, 84:6, 100:19, 100:21, 101:9, 101:13
**uses** [1] - 65:25
**usual** [1] - 3:18
**utilized** [3] - 11:2, 11:6, 28:21

**V**

**VA** [4] - 1:7, 2:6, 11:16, 25:22
**vacation** [1] - 33:8
**varied** [1] - 16:1
**various** [6] - 21:5, 22:18, 26:19, 32:1, 77:25, 78:11
**verbal** [2] - 6:3, 63:22
**versa** [1] - 52:19
**versus** [2] - 19:16, 80:5
**very** [7] - 6:8, 10:13, 14:23, 15:4, 29:6, 46:2, 95:14
**veteran** [1] - 32:6
**veteran's** [1] - 29:22
**via** [1] - 3:5
**vice** [3] - 12:9, 17:23, 52:19
**Virginia** [2] - 7:10, 7:17
**VP** [16] - 11:25, 15:17, 15:24, 16:18, 16:22, 18:1, 18:24, 26:12, 30:24, 44:23, 55:17, 56:5, 56:11, 91:5, 95:11
**vs** [1] - 1:6

**W**

**WA** [1] - 20:19
**waiting** [1] - 53:18
**waived** [3] - 3:12, 3:17, 102:18
**walk** [2] - 17:25, 77:18
**walked** [2] - 79:9, 79:11
**walker** [3] - 66:1, 71:6, 79:22
**walking** [4] - 78:4, 78:15, 78:19, 79:14
**Walmart** [6] - 12:24, 15:3, 15:4, 15:5, 15:6, 15:14
**want** [26] - 4:7, 6:11, 7:5, 12:2, 15:22, 17:9, 22:12, 40:11, 43:23, 50:11, 50:13, 53:7, 56:3, 56:24, 57:1, 58:2, 61:22, 65:11, 65:12, 66:19, 75:3, 77:18, 90:16, 94:23, 95:4, 98:15
**wants** [1] - 98:6
**was** [183] - 4:3, 4:20, 5:1, 5:2, 5:6, 7:16, 8:16, 9:9, 9:19, 11:25, 12:8, 12:18, 12:20, 12:23, 13:2, 13:7, 13:10, 13:23, 14:18, 15:6, 15:9, 15:18, 16:1, 16:5, 16:19, 17:10, 17:16, 20:4, 20:5, 20:23, 22:10, 22:20, 22:22, 24:19, 25:6, 25:11, 25:23, 26:24, 26:25, 28:13, 29:13, 31:10, 31:16, 32:2, 32:17, 32:18, 33:23, 34:5, 34:9, 34:12, 35:3, 38:6, 38:8, 39:11, 40:7, 40:23, 41:11, 41:12, 41:13, 41:19, 42:6, 42:8, 42:16, 42:19, 42:20, 43:8, 43:9, 43:11, 43:13, 43:19, 44:5, 44:7, 45:25, 46:1, 46:2, 46:5, 47:6, 47:20, 48:15, 48:19, 48:25, 49:1, 50:6, 50:11, 50:14, 51:6, 51:11, 51:18, 52:8, 53:5, 53:19, 54:5, 54:15, 54:17, 55:16, 55:17, 55:22, 55:23, 56:5, 56:6, 56:11, 56:12, 56:14, 56:16, 57:4, 58:7, 58:15, 58:18, 58:23, 61:18, 62:22, 62:24, 63:3, 63:4, 63:7, 63:10, 63:25, 65:7, 65:9, 65:18, 65:23, 66:16, 71:19, 72:11, 72:25, 73:1, 73:7, 73:8, 73:17, 73:18, 74:16, 74:24, 75:8, 75:17, 75:18, 75:19, 76:11, 79:7, 79:17, 80:8, 81:9, 81:20, 81:22, 82:10, 82:23, 83:3, 83:12, 83:21, 83:24, 84:4, 87:5, 87:25, 89:24, 90:1, 90:2, 90:3, 90:4, 92:3, 92:7, 92:9, 92:19, 94:25, 95:2, 95:7, 95:22, 95:25, 96:11, 98:15, 98:18, 98:23, 98:25, 99:4, 99:9, 99:23, 100:2, 100:17, 101:21, 103:7
**wasn't** [16] - 9:8, 16:16, 44:13, 48:24, 65:6, 66:4, 71:21, 72:11, 75:14, 75:16, 79:5, 82:4, 83:1, 84:22, 100:10, 100:22
**ways** [1] - 78:14
**week** [3] - 50:21, 51:4, 90:15
**Welcome** [1] - 90:14
**wheelchair** [2] - 71:6, 71:16
**whereas** [1] - 71:2
**wherein** [1] - 81:16
**WHEREOF** [1] - 103:16
**whole** [1] - 81:14
**willing** [2] - 42:10, 100:10
**Wimberly** [1] - 22:19
**WIMBERLY** [1] - 1:17
**wise** [1] - 12:17
**wished** [1] - 33:16
**witness** [8] - 3:2, 3:12, 3:13, 4:2, 51:11, 53:10, 58:13, 62:3
**WITNESS** [1] - 103:16
**word** [2] - 6:19, 83:20
**words** [1] - 65:12
**wore** [1] - 13:24
**work** [19] - 11:16, 34:9, 41:22, 41:23, 46:7, 46:9, 50:20, 52:23, 54:17, 62:16,

62:23, 64:23, 65:8, 69:4, 72:13, 76:9, 90:21, 100:15, 100:16
**worked** [5] - 13:9, 13:19, 15:3, 17:23, 53:16
**working** [2] - 62:15, 64:15
**workplace** [2] - 62:4, 75:6
**works** [1] - 53:12
**would** [158] - 5:20, 8:8, 10:22, 18:9, 18:23, 19:7, 19:10, 19:14, 19:15, 19:19, 20:7, 20:10, 21:3, 21:4, 21:18, 21:19, 23:3, 23:17, 23:19, 23:25, 24:21, 25:15, 25:16, 27:3, 27:5, 28:21, 28:22, 28:23, 28:24, 28:25, 30:4, 30:24, 31:12, 32:22, 32:23, 33:17, 34:11, 34:17, 36:18, 36:19, 36:21, 37:15, 38:13, 38:15, 38:16, 40:6, 41:13, 42:5, 42:17, 43:17, 44:4, 44:21, 45:3, 45:9, 45:14, 45:17, 45:21, 46:3, 49:9, 50:11, 52:11, 52:16, 52:24, 52:25, 54:6, 54:11, 54:20, 55:3, 55:4, 55:12, 55:24, 56:15, 56:20, 56:22, 59:5, 62:13, 63:11, 63:21, 64:2, 64:14, 64:18, 64:23, 65:4, 65:15, 65:23, 65:24, 66:22, 67:5, 68:15, 69:24, 70:5, 71:5, 72:1, 72:13, 72:19, 73:4, 73:12, 73:20, 73:23, 73:24, 73:25, 75:12, 75:15, 76:25, 77:6, 77:9, 77:14, 77:20, 77:23, 78:1, 78:4, 78:11, 78:19, 78:22, 78:24, 79:3, 79:15, 79:16, 79:22, 80:4, 82:8, 82:18, 82:24, 83:6, 83:10, 83:18, 83:19, 89:21, 89:25, 90:5, 90:12, 91:5, 92:6, 92:16, 92:19, 93:16, 94:4, 95:21, 95:22, 95:23, 96:5, 96:12, 96:17, 96:20, 97:4, 97:18, 97:20, 98:2, 101:2, 101:13
**wouldn't** [8] - 34:20, 41:23, 46:21, 51:17, 55:6, 69:15, 78:20, 79:12
**WRIGHT** [1] - 1:17
**write** [1] - 25:1
**written** [2] - 23:23, 31:6
**wrong** [2] - 19:10, 65:13

## Y

**yeah** [2] - 66:14, 93:6
**year** [2] - 13:13, 53:3
**years** [10] - 4:23, 5:12, 7:12, 13:11, 17:11, 20:18, 41:10, 53:16, 53:18, 62:6
**yes** [125] - 4:19, 6:1, 6:4, 6:9, 6:14, 7:7, 7:15, 7:19, 7:22, 8:8, 9:16, 11:17, 11:20, 11:23, 12:1, 12:12, 14:6, 14:11, 14:16, 15:13, 15:21, 16:15, 16:24, 17:2, 18:14, 19:5, 19:8, 19:12, 20:10, 21:9, 21:13, 21:17, 24:10, 24:15, 24:20, 25:19, 26:23, 27:2, 27:4, 27:7, 27:10, 27:19, 28:3, 29:24, 30:22, 31:14, 31:18, 32:5, 32:25, 33:3, 34:2, 34:7, 34:10, 34:25, 35:19, 35:23, 36:2, 36:9, 36:16, 38:17, 42:19, 43:12, 47:11, 52:15, 55:3, 55:20, 57:2, 57:10, 57:12, 59:1, 59:4, 59:8, 59:12, 60:16, 60:19, 60:21, 61:4, 63:2, 64:17, 65:10, 65:17, 66:22, 66:23, 67:3, 67:11, 67:17, 68:10, 69:1, 70:22, 71:1, 71:11, 75:23, 76:21, 77:22, 78:2, 78:6, 78:9, 78:13, 78:17, 78:23, 79:6, 79:20, 80:22, 81:18, 81:24, 84:2, 85:11, 88:9, 88:10, 88:16, 88:22, 89:18, 90:9, 90:12, 90:18, 90:23, 91:3, 92:15, 93:3, 93:10, 95:4, 95:15, 99:16, 100:25, 101:6
**yourself** [1] - 73:12

## Z

**Zoom** [6] - 3:5, 5:19, 6:6, 20:25, 24:6, 27:22
**ZOOM** [1] - 1:11
**Zoom-type** [1] - 20:25

# WELCOME
## to
## K-VA-T Food Stores, Inc.



EXHIBIT
1
D. Meadows
PENGAD 800-631-6989

# Associate Handbook

FOOD CITY

K-VA-T
000001

# Food City Associate Handbook

FOOD CITY®

Value. Everyday.™

This handbook, and the rules, policies, and information contained herein supersedes any and all other associate handbooks, rules, policies, and information previously issued or followed by K-VA-T Food Stores, Inc. (Masculine gender is occasionally used in this handbook to refer to persons of both sexes.)

Published by K-VA-T Food Stores, Inc., March 1994

October 2021 Revision

# INTRODUCTION

## WELCOME TO FOOD CITY

We are pleased to present you with a copy of our Food City associate handbook. It has been designed to help you know your company better. Whether you have been with us for a short time or for a number of years, we want you to know we appreciate the contribution you are making to the continued successful operation of Food City. We believe it is our responsibility to keep you accurately informed of our company's policies and procedures.

As Food City grows, we want you to grow with it. Your company has made considerable progress since its beginning, and the credit goes to each individual associate—your job is important to our continued growth.

This handbook is a summary of the principles for which we stand, the benefits which you may enjoy, and the obligations which you assume as an associate. We do not intend that any "rule" or "policy" cause an undue hardship for any associate. We set them forth simply to let you know what you may expect from Food City and what will be expected of you.

This handbook is intended as a guide, and it is not intended to be, nor should it be, construed as an employment contract. The employee benefits, personnel policies, and rules contained in this handbook will remain in effect unless changes are considered necessary.

Food City reserves the right to make changes in this handbook, as it deems appropriate, with or without notice. This handbook supersedes any benefits, policies, or rules previously written or communicated.

Employment is terminable at the will of either the associate or Food City at any time, and no representative of Food City has any authority to make any contrary agreement except in writing and signed by the CEO.

You are requested to read your handbook carefully and keep it for future reference. If you should have any questions concerning the policies or benefits outlined in this handbook, please ask your supervisor who will be glad to help you.

We welcome our new associates and extend best wishes for continued success to those who have become a part of the growth and progress of our company. We are pleased to have you as a member of our team.

Sincerely,

Steven C. Smith

Steven C. Smith, President & Chief Executive Officer

# THE TEN COMMANDMENTS OF GOOD BUSINESS

## "OUR BUSINESS IS PEOPLE"

1. CUSTOMERS are the most important people in any business.
2. CUSTOMERS are not dependent upon us—we are dependent upon them.
3. CUSTOMERS are not an interruption of our work—they are the purpose of it.
4. CUSTOMERS do us a favor when they call—we are not doing them a favor by serving them.
5. CUSTOMERS are part of our business—not outsiders.
6. CUSTOMERS are not a cold statistic—they are flesh and blood human beings with feelings and emotions like our own.
7. A CUSTOMER is not someone to argue or match wits with.
8. CUSTOMERS are the ones who bring us their wants—it is our job to fill these wants.
9. CUSTOMERS are deserving of the most courteous and attentive treatment we can give them.
10. CUSTOMERS are the lifeblood of this and every other business—they provide our jobs!

# THE CUSTOMER AND YOU

In your contacts with customers, YOU, for these moments, represent our Company, as far as they are concerned. Our reputation with the customer is at stake—and it's in YOUR hands. Your actions and attitude can strengthen the Company or can quickly turn the customer against us. You have everything to GAIN by being courteous, friendly, and helpful, and everything to LOSE by being discourteous, unfriendly, and unconcerned. IF, JUST ONCE, WE FAIL TO SERVE THEM WELL—THEY MAY LEAVE US, NEVER TO RETURN.

Here are some pointers to keep in mind in your relationship with our "Boss," or the CUSTOMER:

1. LEARN TO SMILE, OFTEN. Start an epidemic of smiling! It's so much easier to smile than it is to frown. Give a smile and receive one in return.
2. ALWAYS GREET THE CUSTOMER. A friendly, "GOOD MORNING!" and a sincere "THANK YOU!" makes shopping and working a pleasure.
3. NEVER ARGUE. Be attentive to a complaint. Remain courteous and, if there is a misunderstanding, call the Manager.
4. AVOID OVER-FAMILIARITY. Call customers "Mr.," "Ma'am," "Miss," "Sir," or "Mrs." Be careful of teasing customers. Do not make remarks that might be misunderstood about an item a customer has purchased. Since it is in the shopping cart, we must assume it was needed, wanted, and the customer can afford it.
5. BE HONEST. Never misrepresent a product.
6. REMEMBER THE FOOD CITY GUARANTEE. All merchandise is sold with a 100% satisfaction guarantee. The full purchase price is refunded if the merchandise has not given complete satisfaction.
7. GIVE EQUAL SERVICE TO ALL CUSTOMERS. Every customer is important and is welcome in our store.
8. DO NOT SOLICIT TIPS BY WORD OR ACTION. Your Company compensates you for the services you perform. Solicitation of tips is grounds for immediate dismissal.
9. "IT'S THE LITTLE THINGS IN LIFE" THAT COUNT —

   Say "THANK YOU" for consideration shown, and purchases made.

   Say "EXCUSE ME" when you must interrupt.



K-VA-T
000005

Say "PLEASE" when you ask for something.

Say "I'LL FIND OUT" instead of "I DON'T KNOW" when asked a question.

10. At Food City, we have a reputation for speedy checking, bagging, and loading. We must all work at it and cooperate fully. We will call to the front additional "courtesy clerks" as needed to quickly handle customer traffic. At this point, THE CUSTOMER does not want to be delayed. We have a duty to see that delays are kept at a minimum. Any associate, regardless of job classification, is expected to assist on the "front" when requested. Our customers make payday possible - Let's keep them happy!

# EMPLOYMENT POLICIES AND PROCEDURES

## OUR WORKING RELATIONSHIP

We welcome you to our Company and want you to enjoy your work here. Our management team is pledged to help you in every way.

During your first few months with us, you will find your supervisor and coworkers alike working more closely with you than at any time of your employment here. Their years of experience will give you a "helping hand" and "head start" with your orientation and job training. Food City will always be interested in you and your job here. Should you ever wish to leave our employment or should we desire to end the employment relationship, we both are free to do so at will. If this should happen, we encourage a notice of separation on your part and prior counseling on our part, depending on circumstances, giving us both time to hopefully prevent any misunderstanding or unfortunate separations.

Thank you for joining our team. We need your unique contribution and look forward to a mutually beneficial work experience.

At Food City, we recognize that, other than our customers, you are our most important asset. Without you, the Company cannot function and prosper. No matter what your role, you are an important part of our organization.

Therefore, with respect to you and all our other associates, Food City's goals and objectives are:

1. To provide for all our associates a healthy and wholesome atmosphere in which to work, not only in physical surroundings but in attitudes, actions, and communications.



K-VA-T
000006

2. To make sure that everyone in our organization knows what is expected of him or her and is properly compensated for the work he or she performs.

3. To recognize the rights of each individual.

4. To allow plenty of opportunity for promotion and advancement.

5. To recognize that our customers are the reason for our existence as an organization and to serve them courteously and serve them well.

6. To conduct all our operations in an ethical and upstanding manner in order to generate, by our actions, a reputation as a progressive, growing Company, eager to make the community a better place in which to live.

The Company's employment objective is to select individuals who meet high standards of personality, character, education, and occupational qualifications, who can carry on our work competently, who have a capacity for growth, and who will become an important part of our organization.

Food City realizes that its fundamental strength and future growth depend directly upon the contribution made by each person within its organization, that productivity and efficiency result from real job satisfaction and from the opportunity each person receives and accepts for his or her individual self- development.

The Company's employment policy is, therefore, designed to:

1. Place each associate, insofar as is possible, in a position that suits his or her natural aptitudes and skills.

2. Offer each associate opportunity for self-development and advancement through on-the-job training.

3. Recognize the importance of the work of each associate to the overall Company performance.

## EQUAL EMPLOYMENT OPPORTUNITY

It is Food City's policy to grant equal employment opportunities to all qualified persons without regard to race, color, sex, religion, age, national origin, disability, veteran's status, or any other protected status.

## LEGAL WORK STATUS

The Immigration Reform and Control Act of 1986 requires that all associates hired by Food City provide documentation proving that they have a legal right to work in the United States.

In compliance with this Act, all job offers extended to successful applicants are made contingent upon the receipt of the required documentation and completion of USCIS Form I-9.

## NO HARASSMENT

Food City does not tolerate the harassment of its associates, customers, or vendors. Any form of harassment relating to an individual's race, color, sex (including same sex), religion, age, national origin, handicap or disability, citizenship status, veteran status, or any other protected activity or category, is a violation of this policy and will result in disciplinary action up to and including dismissal.

Food City will not allow anyone to create an intimidating, hostile, or offensive environment. This includes supervisors, associates, or non-associates such as vendors.

The term "harassment" as used in this policy includes, but is not limited to, the following:

- Offensive remarks, comments, jokes, slurs, or verbal conduct pertaining to an individual's race, color, sex, religion, age, national origin, handicap or disability, citizenship status, or any other protected category
- Offensive pictures, drawings, photographs, or other graphic conduct or communications, including e-mail, faxes, and copies pertaining to an individual's race, color, sex, religion, age, national origin, handicap or disability, citizenship status, or any other protected category
- Offensive sexual remarks, sexual advances, or requests for sexual favors, regardless of the gender of the individuals involved
- Offensive physical conduct, including touching, regardless of the gender of the individuals involved
- Retaliation against an employee for refusing to respond to requests for sexual favors, for reporting a violation of this policy, or for participating in an investigation conducted under this policy

If you feel you are the victim of harassment, please notify anyone in management. You do not necessarily have to first notify your immediate supervisor of such a situation. Feel free to contact anyone in the Company's

management, including the Vice President of Human Resources, the Company President, or the Chairman of the Board. You are responsible for bringing your concerns about possible policy violations to our attention so that we can take appropriate actions to address your concerns.

## HOW AND WHY YOU WERE SELECTED

The success of Food City and your future here depends upon you. This is why we carefully select our associates through application, careful interview, and reference checking.

## PRE-EMPLOYMENT SCREENINGS AND EXAMS

After an offer of employment has been given, but before you actually start working, you may be asked to take a health examination at the Company's expense. Drug and alcohol screening may also be required. You may also be required to take another physical examination or drug and alcohol screening, at Company expense, when Food City determines it is job-related and consistent with business necessity.

## ILL ASSOCIATES

Food City recognizes that associates with life-threatening illnesses, including but not limited to cancer, heart disease, AIDS, or other disabilities, may wish to continue in as many of their normal pursuits as their condition allows, including work. As long as these associates are able to meet performance standards, with or without accommodation(s), and medical evidence indicates that their condition is not a danger to themselves, others, or property, Food City will endeavor to be sensitive to their conditions and treat them consistently with other ill associates. At the same time, the Company must provide a safe workplace for all associates and customers.

Food City offers the following range of resources available through Human Resources:

- Management and associate education and information on illness or disabilities including specific life-threatening illnesses
- Referral to agencies and organizations that offer supportive services for life-threatening illnesses or disabilities
- Benefit consultation to assist associates in effectively managing health, leave, and other benefits

## TYPES OF EMPLOYMENT

There are four (4) personnel classifications:

**FULL-TIME** — Any person who is regularly scheduled to work thirty-five (35) hours per week or more is classified as a full-time associate and is eligible to receive certain benefits.

**PART-TIME** — Any person who is regularly scheduled to work less than thirty-five (35) hours per week or whose work schedule must be specifically arranged because of other commitments of the associate (such as school) is classified as a part-time associate.

**PART-TIME STUDENT TRAINEE** — A part-time associate who is a full-time student of an accredited school. When school is in session, twenty (20) hours is the maximum time a part-time student trainee can work in one (1) week, except when a full-day, school holiday occurs on a day the store is open. The twenty (20) hours weekly limitation maybe increased by eight (8) hours for each holiday. When school is not in session, they cannot work more than eight (8) hours per day and forty (40) hours per week. These associates will be paid student rates.

**TEMPORARY** — Any person who is hired for temporary work on any schedule which does not exceed four (4) calendar months. Temporary personnel may be on a part-time or full-time schedule of work hours.

## NEW HIRES

It is the policy of Food City to hire all new entry-level associates (other than temporaries) as part-time.

## EMPLOYMENT OF RELATIVES

Family members and close relatives are permitted to work in the same store or work location. Close relatives are not permitted to work directly for, or in a supervisory role of, a relative. "Close relatives" defined as spouse, in-laws, brothers, sisters, children, or parents. Any exceptions to this policy must be approved by the Vice-President of Human Resources and is only granted in unusual circumstances.

## ORGANIZATION MEMBERSHIP IS NOT REQUIRED

Our federal law gives you the right not to have to join any organization in order to hold your job. It is not necessary for any associate to have to join

and pay dues and other union fees to any union in order to work at Food City.

It is the policy of our Company to pay wages that compare favorably with other wages in similar businesses in our area—to give the best possible working conditions we can to treat each associate as an individual.

Even more important, it is our intention to do everything possible to furnish excellent job security for anyone who works in our Company and provide that person with the best possible job satisfaction. It is our Company policy to promote from within the Company whenever possible. Only when a person with the qualifications for the job to be filled is not available, do we look to outside sources.

We believe that a labor union is an unnecessary third party and could seriously interfere with our ability to treat you and our customer in the manner you both deserve.

In the best interests of you and the Company, we will oppose, by every moral and legal means, any attempt by any outside organization to disturb or break up the fine relationship we enjoy.

## WE WANT YOU TO FEEL AT HOME

You may feel a little strange in your new surroundings. However, it will not take you long to get acquainted. Your fellow associates, especially your supervisor or Store Manager, will work closely with you and will provide you with all the information you need to better understand our policies and practices. If you need help, ask them.

## OUR PERFORMANCE REVIEW — YOUR PROGRESS REPORT

All of us like to know how we are doing on the job. Day-to-day comments from department managers help, but now and then there is a need to review all phases of your work performance. In our Company, we have "performance reviews." This procedure requires each supervisor to evaluate the performance of every person under their supervision. The purpose of these reviews is to provide management and you with a periodic review of your performance on the job and to identify any areas where you can improve your performance. Your review will cover the following points:

1. The amount of work you accomplish
2. The accuracy and thoroughness of your work

3. Knowledge of your job duties
4. Your dependability and attendance on the job
5. Your attitude toward your job, fellow associates, and the Company
6. Your ability to organize and plan your work
7. Your personal appearance
8. Your housekeeping skills—cleanliness in work area, floor, etc.
9. The enthusiasm and initiative you demonstrate in your work
10. Your attendance—willingness to work schedule required—tardiness and absence record
11. Your courtesy and cooperation toward fellow associates and customers

Our performance review program provides valuable information to use when considering associates for future promotion, transfers and adjustments to pay rate. In addition, our performance review gives you an opportunity to have a personal discussion of your performance with your immediate supervisor, and to learn how you can improve your on-the-job performance. If you have any questions about how you are doing, or what you can do to improve your performance, please ask your supervisor to visit with you in private. Your supervisor will always try to help you in every way possible.

## PROMOTIONS

At Food City, as in all organizations, different positions have different degrees of difficulty and relative importance to the operation of the Company. The more important of these positions are designated as full-time. Certain other positions may be filled by either full-time or part-time associates as required by the demands of the particular store or department. Within these full-time or part-time positions there are varying degrees of responsibility, proficiency, and/or ability which are all considered in the placement of a person in a particular job.

From time to time, vacancies occur for whatever reason, and at this time a replacement must be selected.

In making a selection to fill a vacancy, it is our policy to always look first at the junior associates within the Company for qualified candidates. Here, job performance, ability to learn, and aptitude are most important. Should we find more than one candidate of equal qualifications, the one with the

longest length of service would be selected. Only when no junior associate is found qualified, do we go out of the Company to hire.

## GUIDELINES FOR LAYOFF AND RECALL

Food City has a history of full employment, and we do not expect to have layoffs. However, if economic or business conditions create an unusual situation which makes it necessary to cut back our work force, then each job will be carefully checked along with each associate's record. Qualifications, past performance, and length of service of each associate will be the guidelines upon which such decisions are made.

## IMPORTANCE OF YOUR LENGTH OF SERVICE—SENIORITY

At Food City, we believe in recognizing your seniority and length of service. Seniority is given to associates through length of service which brings certain privileges and considerations. We have a good seniority program. Usually, this date is the day you were hired for the first time. However, if your seniority has been broken through resignation, discharge, or extended layoff, then your seniority date becomes the last day you were hired following the break in seniority. Associates having the same date of hire will hold seniority in alphabetical order.

Your seniority is important to you in the following ways:

1. It represents the investment in time and money by Food City in your training and experience. This gives you more job opportunity and promotion possibilities as your experience increases along with your seniority.
2. Your seniority has direct relationship to certain of our important associate benefits which are based upon length of service, such as paid vacations.
3. In case we should ever have a layoff, due to business conditions beyond our control, your seniority will give you more work opportunity provided you have necessary qualifications and seniority.
4. Your seniority is also recognized through your length-of-service awards.

## HOW YOUR SENIORITY WORKS

Seniority really starts to matter when you become a full-time associate.

From this day, your seniority will accrue (unless temporarily interrupted due to an approved leave of absence for personal reasons) until it is broken for one or more of the following reasons:

1. If you voluntarily quit or resign
2. If you are discharged
3. If you fail to report back to work within three (3) workdays after a recall from layoff
4. If you are laid off for a consecutive period of more than six (6) months
5. If you overstay an authorized leave of absence or vacation
6. If you are on sick leave longer than six (6) months unless an extension is granted by your Company
7. If you give a false reason for a leave of absence or accept employment elsewhere during an authorized leave of absence
8. If you falsify information on your pre-employment or post-employment personnel forms
9. If you are absent without notification or excuse for a period of two (2) consecutive days (scheduled workdays), you will be considered as having voluntarily quit your job

## YOUR LENGTH OF SERVICE

Our Company proudly recognizes the service our associates give to the community and to our Company each year. We are very proud of all associates who have been with us for a long time. So you may also convey to your friends and neighbors your years of service with Food City, we award handsome service pins for men and women. A pin is awarded to each associate who has completed two, five, ten, twenty, twenty-five, thirty, and forty years of service with our Company.

For purposes of seniority, our Company recognizes your prior service with another company or store that has joined us by purchase or merger.

We are glad you are here—we hope you like us and will receive many service awards.

## ADVANCEMENT—HOW TO GET AHEAD

As you acquire more skill and experience in your present position and

as job openings occur at a higher level, you will have the opportunity for advancement. As we indicated before, it is our policy to promote from within the Company whenever possible, taking into consideration such items as merit, performance, and length of service.

As you advance in positions of more responsibility, you will reach a point at which, in order to continue advancement, a move to another store or even another town may be required. We understand the difficulty this can cause for some; however, as a practical matter, we call it to your attention.

Your supervisors will be glad to discuss your opportunities for promotion with you. They will help you improve your potential for promotion and tell you how to get ahead.

## IS SOMETHING TROUBLING YOU?

When a group of people are closely working together, a few misunderstandings are bound to occur. We all recognize that everything is not going to run smoothly all the time. If something is bothering you, if you are discouraged, worried, or upset about your work or some outside problem, you cannot work at full efficiency. Feel free to discuss any problem with your Department Manager or Store Manager. They are interested in your welfare and will do what they can to help the situation. If neither can help, you will be referred to someone who can.

## SPEAKING UP—RESOLVING COMPLAINTS OR PROBLEMS THROUGH HEARINGS

In the event the efforts of your supervisor or Store Manager to resolve a problem for you fail, and if you feel it is of such nature that top management of the Company can help you solve it, then please communicate, preferably in writing, with the Company Vice President of Human Resources in Abingdon, VA.

Food City cares about all Company associates, and we are anxious to hear about any problems or complaints that cannot be resolved at the store level. There will be absolutely no discrimination against anyone who appeals a problem, so please, don't let the problem grow. Write, or if you feel you cannot adequately write, then call the Vice President of Human Resources immediately. You will receive a hearing by the Vice President of Human Resources.

Should you still be dissatisfied, you may make one last appeal to the Chief Executive Officer, who will render the final and binding decision.

The purpose of our hearing procedure is to help you work out any

complaint or problem that you might have. Remember, the only way we can understand and help you with your problems or complaints is if you come to us and explain your individual situation.

## PROGRESSIVE DISCIPLINE POLICY

At Food City, we believe discipline is not meant to be punishment in any way. However, when it becomes necessary to change an associate's performance or behavior from unacceptable to acceptable, our Progressive Discipline Policy enables us to endeavor to do so in a consistent manner.

Normal steps in the disciplinary process are outlined below. However, at management's discretion, management may enter into any level of disciplinary action, including termination.

**Oral Correction**—The supervisor will provide an oral correction to the associate. A written record of this correction will be placed in the associate's personnel file.

**Written Correction**—The supervisor will consult with higher management and prepare a written correction. The associate will be asked to sign indicating receipt of a copy of the written correction, and a copy will be placed in the associate's personnel file.

**Suspension Without Pay**—If the written correction does not correct the problem, the associate may be suspended without pay for a minimum of three (3) days. This suspension without pay must have the approval of the Chief Executive Officer.

**Termination**—The supervisor may recommend termination of associates. Recommendations will be reviewed by management, which will determine the action to be taken.

If the associate feels the termination is unfair, he or she may use our Open Door Policy or Hearing Procedure, if appropriate. Based upon this discussion, the appropriate Company officer will make a final determination in the case.

Management reserves the right to enter into any level of disciplinary action or termination depending on the circumstances.

## YOUR GUIDE TO PERSONAL CONDUCT

Food City wants to provide a good work environment for all associates. This desire is expressed in many forms: safe working conditions, maintenance of facilities and equipment, equitable wage structures, and progressive

benefit programs. In turn, it is reasonable to expect a good productive effort and the recognition of responsibility on the part of associates.

Each of us has the responsibility to our fellow workers to conduct ourselves according to certain rules of good behavior or conduct. In any business, some rules are needed to help everyone work together by letting them know what they can and cannot do. We expect our associates to follow our Company rules and show good behavior and efficiency. For these reasons, we have included, in our handbook, a number of work rules. You are expected to read, understand and follow these rules in your day-to-day work.

Disciplinary action, whether oral or written, is given only for the purpose of correcting someone for doing something wrong. Having to dismiss an associate is unpleasant for everyone, and we try to work with each associate to avoid such action. However, failure to follow our work rules is against the best interests of our other associates and our Company, and usually leads to dismissal. Should you have any questions, at all, concerning any work rule listed, please see your supervisor.

In order to be absolutely fair, we have what we call a "wash-out" period for certain disciplinary actions. An associate should not be penalized unless there is a repetitious problem. Therefore, after having made a "mistake," we will "wipe the slate clean" if no more rule infractions occur within twelve (12) months from the date of the last rule violation.

Food City rules are basically common sense, requiring conduct acceptable to a customer service oriented employment environment. When these common sense practices are violated, disciplinary action may be taken. While the following list is not all-inclusive, some of the violations which can result in disciplinary action—including discharge—are:

1. Inefficiency, unsatisfactory performance or customer service, or lack of application or effort on the job
2. Committing action which affects the safety of equipment, associates or customers
3. Violating a safety rule or practice
4. Knowingly completing the timecard or time record of another associate; having one's card or record completed by another associate; or unauthorized altering of a timecard or time record
5. Being late for work without proper notice or excuse
6. Being absent one (1) day without proper notice or excuse
7. Being absent two (2) consecutive days without proper notice or excuse
8. Loafing or spending unnecessary time away from job



K-VA-T
000017

9. Leaving your job or your regular working place during working hours for any reason without authorization from your Store Manager, except for lunch
10. Leaving work before the end of the regular workday or not being ready to work at normal starting time
11. Failure to follow check-cashing procedures
12. Unauthorized use of Company telephones
13. Violation of associate purchasing policy
14. Smoking, eating, or drinking in restricted areas
15. Possession or consumption of alcohol or illegal drugs on Company premises, or reporting to work under the influence of intoxicants or drugs - under the influence means not only obvious impairment, it also means physical evidence that a substance has been consumed on or off Company premises
16. Disorderly conduct on Company property
17. Immoral or indecent conduct on Company property
18. Foul or abusive language to any supervisor, associate, or customers
19. Concealment of a disease that will endanger fellow workers or customers
20. Falsification or misrepresentation of a fact or facts in any Company record, document, time record, invoice or any other Company-related matter
21. Any misrepresentation, falsification of information, or omission of information or other facts in seeking employment, no matter when discovered
22. Dishonesty or removal of another person's property or Company property without permission
23. Willful destruction of Company property
24. Insubordination (refusal to follow instructions or an order)
25. Gambling on Company property or while on the job
26. Instigating a fight on the job
27. Unauthorized possession of firearms, fireworks, or explosives on Company property
28. Contributing to unsanitary conditions
29. Unauthorized presence in store office, or other restricted areas
30. Writing bad checks
31. Failure to adhere to dress code
32. Parking in unauthorized areas
33. Reckless driving on Company property

34. Failure to properly account for funds entrusted to you
35. Conduct which reflects discredit upon the Company
36. Failure or refusal to cooperate with a Company investigation
37. Failure to promptly report to your workstation
38. Any three (3) minor offenses—minor offense may be any offense that has an oral or written warning of the first offense

Violations of Company policies outlined in other sections of the handbook, or habitual offenders of various Company rules, will be dealt with by written correction to dismissal, depending upon frequency and nature of offense

The above list of Company rules and causes for corrective action is by way of illustration to inform all associates what is expected of them in their daily work performance at this Company. It is not intended to be all-inclusive. Provisions may be modified, added, or deleted.

## TERMINATION OF EMPLOYMENT

Termination of employment is always unpleasant and costly so you can be sure it won't be considered lightly. If, however, discharge becomes necessary, advance notice may or may not be given depending on the circumstances, and unused vacation will not be paid.

## OTHER EMPLOYMENT

We realize that many of our associates, and particularly our part-timers, have other employment in one form or another. This is agreeable to us so long as it neither interferes with the associate's work attendance or job performance nor creates a conflict of interest.

The following are considered by our Company as a "Conflict of Interest:"

1. Active ownership of, or platonic interest in, a business operation competitive with ours in any way.
2. Employment with a competitor doing business in the retail grocery industry.
3. Employment directly or indirectly with a sales company (direct vendor, manufacturer, or food industry brokerage) which makes sales and/or service calls on any store owned by our Company or those owned by our competition.

Any associate whose other employment is considered a "Conflict of Interest" will be subject to immediate dismissal.

## SHOULD YOU RESIGN

We hope you remain with us for a long time. However, sometimes personal affairs force a change in jobs. In such cases, please give your supervisor at least two weeks' notice. This courtesy will allow your supervisor enough time to adjust working schedules and secure a replacement. Also, your advance notice will reflect favorably on your employment record. Payroll checks will be made available on the next regularly scheduled payday.

Whenever possible, an exit interview will be conducted for anyone who resigns. It is to your advantage to participate in this interview so that we can give you information about your benefits. Also, we will want to have your honest opinion on our Company policies and practices which will enable us to improve our relationship with everyone.

## COMPANY REFERENCES

We are glad to cooperate with former associates by answering, as fully as possible, any inquiries which may be received from their prospective employers. Your Company, however, does not give general open "To Whom It May Concern" letters of recommendation. Company references may not be issued by anyone other than the Human Resources Department.

## RE-EMPLOYMENT

Anyone who has voluntarily left our employment and whose work performance met our standards while employed will be considered for re-employment status in any position for which they are suitable, and possess appropriate skills and experience. Such individuals will be considered as new associates, with no continuation of any previously earned but forfeited Company benefits or seniority. These associates will complete all pre-employment paperwork.

# YOUR HOURS OF WORK AND YOUR PAY

## PAYROLL WORKWEEK



The official payroll workweek begins at 12:01 A.M. Saturday morning and ends at 12:00 midnight Friday. Your particular work schedule will depend on your job. Your Manager will explain your work schedule to you. Should you ever have any question on when you are to be at your workstation, ready to work, please ask your Manager.



K-VA-T
000020

Due to the nature of our particular business, we are sometimes not able to establish a definite number of hours to be worked each day. Sometimes schedules must be changed because of business conditions or because fellow associates are unavailable for work. Schedule changes are inconvenient for all concerned, including your Manager, but sometimes they are necessary. Regular posted schedules will be followed whenever possible. Your cooperation will be appreciated, and we will try to cooperate with you.

## TIME RECORDS

Due to various federal regulations and in keeping good business practice, we are required to show the time worked on a daily basis for each associate. Please check with the Store Manager for detailed instructions on the system which is in use at your location.

Please be certain to enter data on your time card or time record when you are supposed to. If you forget or make an error, notify your Manager, at once, who will make the correction. It is important to report your time accurately. Reporting false information is prohibited and can lead to dismissal.

When clocking out on the last day of the week, review your card or time record carefully to see that all your hours of work are recorded properly, and sign the card or time record to certify that it is correct.

In addition to regular work time, associates will be paid for — and the time clock should be used to record — time spent in meetings, lectures, and training programs, as well as travel time required by the Company, on the same basis as if it were regular work. Whenever the programs required are away from the time clock, the time to be credited will be added to the timecard or time record by the Store Manager.

## OUR PAY POLICY

It is our Company policy to pay wages and salaries comparable to those paid for similar jobs and services in our surrounding area. We maintain our wage and salary structure by periodically conducting wage surveys. We adjust our wage and salary ranges in accordance with the business and general economic conditions of our Company.

The pay range for your individual job classification is determined by the requirements of your job with such factors considered as responsibility, skill, training, education, and working conditions. Wage increases are based upon your record of performance on the job and your particular job classification.

## PAYDAY

Paydays at Food City are handled on a weekly basis. Your paycheck for the previous workweek will be available to you every Thursday. The pay you receive is for work you performed during the previous workweek. Paychecks are typically deposited directly to your bank or pay card that you have indicated. If you have elected to receive pay through a paper check, you may pick it up on Thursday.

## SHOULD YOU FIND AN ERROR IN YOUR PAY

Every precaution is taken to avoid errors in your paycheck. If an error does occur, tell your Manager. If an error is found, the adjustment will be made on the next paycheck.

## OVERTIME

For hourly associates, all work performed in excess of forty (40) hours in a payroll week will be paid at one-and-one-half (1-1/2) times the average hourly rate of pay earned during the first forty (40) hours.

## PREMIUM RATE

Full-time, retail associates who are scheduled and work between 9:00 P.M. and 6:00 A.M. receive a 50 cent-per-hour premium for all hours worked between these times. Additionally, those full-time associates working on Sunday will also receive the 50 cent-per-hour premium. However, premium rate is paid only during the first forty (40) hours worked during any week.

## REST PERIODS

Rest periods are paid time provided by the Company for your relaxation and enjoyment. Rest periods are given for not more than fifteen (15) minutes in duration during every four (4) hours or more worked. All rest periods are to be recorded as directed by your Store Manager.

Rest periods are scheduled by your Department Manager when they will least interfere with the operation of the store or service to the customers.

Normally, you are not to leave the store premises during rest periods. Should you need to leave for any reason, please get the prior approval of your Store Manager.

## MEAL PERIODS



Anyone working more than six (6) hours per day is normally scheduled to take one (1) hour for a meal. This meal period will be scheduled by your supervisor and will be around the middle of your shift. You must never exceed five (5) hours working time either before or after a scheduled meal period. For night stock associates only, the meal period may be shortened to not less than thirty-five (35) minutes by special permission of your Store Manager. This time is your own, and you are free to use it as you see fit. Please try to make your personal calls during this time. Always take the full time set aside for your meal period unless requested to do otherwise by your Manager. During this meal period, you are not to perform any work whatsoever. It's important to record your time at the beginning and end of your meal period.

## YOUR PAYROLL DEDUCTIONS

Does your paycheck represent the full amount of your earnings? No. We are required to deduct your federal and, where applicable, state income tax from your paycheck. This deducted amount is turned over to the United States and State treasuries, and you are given credit for it on your income tax at the end of the year. The amount of the tax deduction is determined by your earnings and the number of your dependents. Each year, you will receive a W-2 showing your total earnings for the year and the amount of taxes withheld.

Also, out of your paycheck will come deductions for Social Security at the rate established by law. Your Company contributes an equal amount of that deducted from your wages. Any other deductions such as health plan coverage, etc., must be authorized by you before they can be made.

# BENEFITS

## THE PAYCHECK ISN'T ALL—THERE'S MORE

Your weekly paycheck does not represent your entire compensation from Food City. Not only do you receive cash wages each week, but you also may receive a substantial number of benefits, which while not paid in cash, still represent real dollars to you and your family. These benefits include such items as paid vacations, paid holidays, various types of insurances, etc. We want you to have a full understanding of your benefits so we are devoting an entire section to the discussion of each one.

If you have any questions concerning any of your benefits, please ask your supervisor or contact the Human Resources Department.

## YOUR VACATION WITH PAY



We believe that our full-time associates should have a time of rest and relaxation each and every year. Vacation with pay is for this purpose and is one of the ways we show our appreciation to you for your length of service and good work. For this reason, it is Company policy to require that at least one (1) week of earned vacation be taken each year. Vacation time due in excess of one (1) week may be taken in increments of one day or more at a time.

Full-time associates who have been with the Company for a minimum of twelve (12) continuous months since their last date of hire or the date on which they became a full-time associate, whichever is later, will receive a vacation according to the following schedule:

| LENGTH OF SERVICE | PAID VACATION |
|---|---|
| After 1 year of continuous service | 1 week |
| After 3 years of continuous service | 2 weeks |
| After 10 years of continuous service | 3 weeks |
| After 20 years of continuous service | 4 weeks |

Continuous service of one (1) year means twelve (12) continuous months since the last date of employment or since becoming a full-time associate. In most instances, the date you become a full-time associate is established as your vacation effective date. In the event an associate is off on a leave of absence, the vacation effective date will be adjusted accordingly. An example would be an associate who worked for ten (10) months, was off for two (2) months on a personal leave of absence, and returned. That associate would have to work two (2) additional months in order to be eligible for a regular vacation period, i.e., the ten (10) months previous uninterrupted service and then the two (2) months when he or she returned from their leave would make the equivalent of twelve (12) continuous months.

Vacations may be taken at any time during the year, except for the heavy holiday period. We must consider that we are a service industry and that our customers are our real employers, and as such, their demands must be met first, vacations scheduled second. In order to be sure we maintain sufficient manpower to serve our customers, all vacations to be taken



K-VA-T
000024

during the peak vacation period of May 15 - September 15 will be scheduled no later than April 15. In order to do this, each Store Manager will have each department head draw up a schedule reflecting your requested period. This will be accomplished by allowing the more senior associates first choice and most junior associates last choice.

Vacations taken outside this peak period may be requested on shorter notice, but it is always best to allow at least a thirty (30)-day planning time.

Due to variation in the number of hours worked by hourly associates during the year, and in order to be fair to all concerned, vacation pay will be the total of regular and premium hours for the fifty-two (52) calendar weeks prior to your full- time date (vacation effective date) divided by fifty-two (52), then multiplied by your current straight-time rate of pay. For this vacation hour's calculation, vacation taken as time off will be included as time worked.

May we repeat again — vacation is earned by completing a full year of continuous service; vacation is never prorated but rather earned totally by passing the vacation effective date. You will become eligible for vacation pay only after passing your vacation effective date.

Part-time service will not be counted in determining length of service.

An associate who voluntarily quits without giving the Company at least two (2) weeks' notice, or is discharged, forfeits all vacation rights.

## HOLIDAYS

Full-time associates, after the successful completion of ninety (90) calendar days, shall be eligible for the following holidays:

- New Year's Day
- Memorial Day
- Independence Day
- Your Birthday
- Labor Day
- Thanksgiving Day
- Christmas Day



To qualify for holiday pay, you must work the scheduled day before and the scheduled day after a holiday, unless your absence on either of these days has been excused in writing by your Store Manager. Holiday pay will amount to the average number of hours worked on a daily basis during the prior thirteen (13) weeks. This average will be calculated by adding up the total hours worked at regular or premium pay during the prior thirteen (13) weeks divided by thirteen (13) then further divided by five (5) to determine



K-VA-T
000025

the length of the average work day, then multiplied by the current rate of pay at straight time. For this purpose, vacation time taken as time off will be included as time worked. For example: if your average workweek in the prior thirteen (13) weeks is forty (40) hours, we would divide by five (5) to determine that your average work day is eight (8) hours. Then your holiday pay would be eight (8) hours multiplied by your straight-time rate of pay.

Holiday hours are not included in computing overtime for the week in which the overtime occurs. Associates will receive holiday pay no matter what day in the week the holiday falls. Should you be required to work on a holiday, you shall be paid straight-time hourly rate for the time worked in addition to your holiday pay. If you are scheduled to work on a holiday and you then fail to show up and perform the work, you will not receive holiday pay unless you have an acceptable excuse for failing to report to work.

If the paid holiday falls during your vacation, you will be paid for the holiday in addition to your vacation, but an additional day off will not be granted. To be eligible for a paid holiday that falls within your vacation period, you must have worked your last regularly scheduled workday in the week prior to your vacation and your first regularly scheduled workday in the week after your vacation period.

Associates on any type of leave of absence other than two weeks' military reserve training leave, will not receive pay for holidays during their leave.

It is Company policy to require time off be taken for your birthday holiday. Whenever it is not in the best interests of the store for your actual birthday to be taken as a holiday, another day close to the holiday, and mutually agreeable to both you and your Store Manager, shall be substituted.

## JURY DUTY



If you are summoned for jury duty, please tell your Store Manager as soon as possible. As good citizens, any of us are subject to being called for jury duty. In order to avoid any severe financial loss to you from serving on a jury, the Company will pay a full-time associate the difference between jury duty pay and the amount you would have earned. The daily jury duty pay will amount to the average number of hours worked on a daily basis during the prior thirteen (13) weeks, less any compensation received for jury duty and any compensation for hours worked. You are expected to work on any day when you are not required to perform jury service. Juries are frequently excused for all or part of a day. It is certainly not our intent to subsidize this time off. To be eligible for jury duty pay, you must get a statement from the



K-VA-T
000026

court clerk indicating the time you served on the jury and the amount you received as jury duty pay and turn the statement in to your Store Manager.

## BEREAVEMENT PAY

All actively employed full-time associates who have completed their ninety (90)-day waiting period may receive scheduled time off with pay if they attend the funeral of a member of their immediate family. The immediate family is defined as father, mother, grandparents, grandchildren, husband, wife, child, sister, brother, and immediate step-relatives. The associate may receive a maximum of three (3) scheduled work days off with pay starting the day of the funeral and two days prior. Bereavement pay is based on the average number of hours worked on a daily basis during the prior thirteen (13) weeks, less any hours worked.

This bereavement pay is intended to offset lost income to you during this sad period. Should you suffer no loss of income due to a change of schedule still allowing you to work your regular schedule during this pay period, you would have no loss of income.

For associates in their waiting period, and part-time or temporary associates, funeral leave without pay will be granted upon the death of a member of the immediate family.

## HEALTH CARE AND DENTAL PLANS

Health care and dental plans are important benefits available to full-time associates. You should know about the health care and dental plans you have and what is available for you by being a full-time associate of Food City. This is a real protection that we are happy to provide for you and your family's benefit.

So you and your family may have the complete understanding and appreciation of the many benefits available under our group plan, we suggest you read the plan summary published by the health care plan administrator. Plan documents are available on My Profile or from the Human Resources Department.

All full-time associates are eligible for health and dental coverage on the first day after completing the ninety (90)-day waiting period, subject to timely completion of required enrollment process. If you are not actively at work on the date you are eligible to become covered, you will be insured on the first day you return to work.

Full-time associates are also eligible to extend medical and dental coverage to your dependents at the Company's group rate. This is, by far, the most inexpensive method to obtain this protection, and we highly recommend that you elect to use it if needed.

## LIFE INSURANCE

All full-time associates are eligible for life insurance coverage after completion of their ninety (90)-day waiting period. If you are not actively at work on the date you are eligible to become covered, you will be insured on the first day you return to work. The Company pays the full cost of your coverage.

The amount of coverage depends on your job classification and years of service.

At the time you become eligible for life insurance, you will receive a copy of the policy. Coverage is automatic, and you are not required to take any action to receive coverage.

## UNEMPLOYMENT INSURANCE

Your Company pays the entire cost of this insurance. Its purpose is to provide temporary income for workers and their families when, through no fault of their own, they have lost their jobs. To be eligible, a person must have earned a certain amount in covered employment and be willing and able to work.

Your Company pays a percentage of its payroll to the Unemployment Compensation Fund according to the Company's employment experience. If you become unemployed through no fault of your own, you may be eligible for unemployment compensation for a limited period of time under the laws for the states in which we operate. The laws are administered by the State Unemployment Compensation Commission. Applications for benefits are made through your local State Employment Service Offices.

## YOUR STOCK OWNERSHIP PLAN (ESOP)

Your Company has established an Employee Stock Ownership Plan which allows you to participate in the growth of the Company. The success of the Company, and all our combined efforts, determine the financial support the Plan will provide for your retirement years. The cost of the Plan is paid entirely by the Company.

You are eligible to participate in the Plan when you have completed one (1) year of service, received credit for 1,000 hours of service during this period, attained to age of twenty-one (21), and are employed at the end of the Plan year. More detail is provided in the separate "Summary Plan Description."

Your Company Human Resources Department will be glad to answer any questions you may have about the Plan.

# 401(k)

Your Company offers a 401(k) retirement plan available to both part- and full-time associates. You are eligible to participate in the Plan when you are twenty-one (21) years of age, complete one (1) year of service, and work at least 1,000 hours during the year to receive matching contributions. For every dollar you put in the Plan, your Company will make a matching contribution equal to 100% of your elective deferral that does not exceed three percent (3%) of your compensation each payroll period. More detail is provided in the separate "Summary Plan Description."

Your Company Human Resources Department will be glad to answer any questions you may have about the Plan.

# YOUR SOCIAL SECURITY BENEFITS AND PAYMENTS

Federal Social Security provides a variety of benefits including old age retirement payments, death benefits, disability insurance, and monthly income payments, to certain dependent survivors of covered associates. A percentage of your gross salary is deducted, as required by law, as your contribution for this protection. Your Company contributes an equal amount to that deducted from your wages. The Social Security programs are in addition to the benefit programs for associates offered by the Company.

# WAGE REPLACEMENT
# (Short-Term Disability)

**<u>Full-Time Hourly Associates</u>**

After the completion of your ninety (90)-day waiting period, you are eligible to participate in the disability insurance plan if you are a full-time associate.

If you become totally disabled because of non-occupational sickness or injury so that you are prevented from performing all of the duties of your occupation, you will receive a weekly income at a rate of sixty percent (60%) of your basic hourly rate. Payments will begin on the first (1st) day of disability due to an accident or the eighth (8th) day of disability due to sickness (except from the first day hospitalized if less than eight (8) days) and will continue for not more than twenty-six (26) weeks of any continuous disability. Written proof of disability will be required. Benefit payments will end on the earliest of the following dates:

1. The first day the associate returns to work;

2. The day a doctor's statement releases the associate to return to work; **or**

3. The expiration of the benefit payment duration of twenty-six (26) weeks.

While you are on such personal disability leave status, your medical and life insurance payment will be continued by the Company on the same cost basis as if you were working.

If you are not able to come back to work after twenty-six (26) weeks, you may request, in writing, a ninety (90)-day personal leave of absence. In exceptional circumstances, an additional ninety (90)-day personal leave may be granted. In no circumstances will the total disability and personal leave exceed fifty-two (52) weeks.

When you are given your return-to-work release by your medical doctor, it is important that you contact your Store Manager as soon as possible. It may have been necessary to replace you in your present position. Except as provided by law, upon return to work from disability leave, there is no guarantee of re-employment; however, the associate who has been on an extended disability leave will be considered for re-employment when a suitable position becomes available. All persons on a disability leave are given re-employment priority over those on a personal leave of absence.

In the event you are on a medical leave of absence with an insurance company other than those representing our Company liable to pay you benefits, and benefits are not being paid to you through either our K-VA-T disability plan or worker's compensation, your K-VA-T medical and life insurance may be continued only at your expense, except as provided by law.

If you are not able to return to work after twenty-six (26) weeks (or longer by the length of a personal leave of absence, if granted), you will be terminated from our active payroll.

1. Supply the proper claim forms to your doctor or hospital at the time of the claim.

2. Follow up on claims in process (with the Human Resources Department).

3. Completely pay all insurance premiums due during a leave of absence in advance of the leave starting date.

4. Upon the occurrence of a qualifying event, a full-time associate may continue health care coverage through the CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT of 1986 or COBRA. Your family

members may also continue coverage if they are no longer eligible because of your death, divorce, or because a child reaches the age limit. It is very important to let the Human Resources Department know of any changes that may affect your coverage. The length of time you may be covered depends on why you are no longer eligible for group insurance.

It is the associate's (your) responsibility to file any claim for disability benefits which you may be due and return completed forms from the physician to Human Resources.

Notify the K-VA-T Human Resources Department of the following in order that your insurance information may be kept current:

a. Change of marital status
b. Change in number or status of dependents
c. Change in beneficiary (life insurance)
d. Any other significant changes of status

**Full-Time Salaried Associates**

Salaried associates, after completion of the 90-day waiting period, are eligible to apply for a full weekly income for the first thirteen (13) weeks of disability, and up to an additional thirteen (13) weeks at 75% of the base salary. Income eligibility requires you to provide Human Resources with the appropriate medical documentation and clinical notes from the attending physician for determination of benefits.

Your Human Resources Department will be glad to help you with any of the above!

## PERSONAL LEAVE OF ABSENCE

An unpaid leave of absence may be granted for personal reasons to any associate after completion of their ninety (90)-day waiting period. All leave of absence requests must be presented in writing to the Store Manager, who shall forward it, along with his recommendation, to the Vice President of Human Resources for consideration. The appropriate officers of the Company shall then decide, within a reasonable time, whether or not to grant the request and advise in writing of the decision.

All such leaves of absence shall be for a specific period of time, not to exceed ninety (90) days, and must be requested two (2) weeks in advance of the starting date, whenever possible. The Company may, if requested, extend a leave of absence for a period up to an additional ninety (90) days.

All such approved leaves of absence will contain a specific date to be available to return to work. The associate on leave of absence, who desires to return, must reapply at least two (2) weeks prior to this scheduled date. There is no guarantee of immediate re-employment; however, the associate will be considered for re-employment when a suitable position becomes available, and a new date to report is set. Any associate who fails to return to work on this date will be considered to have quit without notice. Any associate, while on such a leave of absence, who accepts other employment will be considered to have quit.

An associate does not earn any benefits during a personal leave of absence. Examples would be vacation, holiday pay, etc.

Further, during an unpaid leave, the Company does not continue to pay for the health plan coverage the Company provides the associate. The associate should contact the Store Manager to make arrangements for payment prior to the leave starting date if he or she desires to maintain the insurance program during the leave of absence.

## FAMILY AND MEDICAL LEAVE OF ABSENCE

Your Company has always been concerned about any associate's need for a leave of absence. Our policies have always been generous, in that respect, and designed to meet your needs. On August 5, 1993, a new federal law became effective which governs many leave of absence situations for practically all of your Company's full-time associates and for many part-time associates. This law is called the Family and Medical Leave Act of 1993 (FMLA). A brief summary of associate's rights is printed below in the language suggested by the U.S. Department of Labor. All of your Company's leave of absence policies pertaining to family and medical leaves will be administered in compliance with the FMLA. In the event that there is a conflict between any leave policy and the requirements of the law, the law will prevail. In some instances, your Company's policies may be more generous than that required by law.

Eligible employees may take up to twelve (12) weeks of unpaid, job-protected leave each year for specified family and medical reasons.

**Employee Eligibility:** To be eligible for family or medical leave, employees must have worked at least:

1. Twelve (12) months for the Company; and
2. 1,250 hours for the Company over the previous twelve (12) months.

**Conditions Triggering Leave:** Family and medical leave must involve one or more of the following reasons:



K-VA-T
000032

1. To care for a newly born child, or placement of a child with the employee for adoption or foster care.

2. To care for an immediate family member (spouse, child, or employee's parent) with a serious health condition.

3. The employee has a serious health condition which makes the employee unable to perform the employee's job duties.

4. Because of any qualifying exigency arising out of the fact that the employee's spouse, son, daughter, or parent is a covered service member on active duty, or who has been called to active duty.

5. To care for a covered service member with a serious injury or illness if the employee is the spouse, child, parent, or next of kin of the service member.

**Duration Of Leave:** For leave other than to care for a covered service member, eligible employees may receive up to twelve (12) workweeks of unpaid leave during any "rolling" twelve (12)-month period, measured backward from the date of any family or medical leave. Family and medical leave involving the birth or placement of a child for adoption or foster care must be concluded within twelve (12) months of the birth or placement.

Eligible employees may take family and medical leave intermittently — which means taking leave in blocks of time, or by reducing your normal weekly or daily work schedule — whenever it is medically necessary to care for a seriously ill family member, or because you are seriously ill and unable to work, or for leave based on a qualifying exigency, or to care for a covered service member. Intermittent leave is not permitted for birth of a child or placement of a child for adoption or foster care.

Eligible employees may take up to twenty-six (26) weeks of leave to care for a covered service member with a serious injury or illness in a single twelve (12)-month period, measured forward from the date that such leave begins.

Subject to certain conditions, eligible employees may choose (or the Company may require you) to use accrued paid leave (such as sick time or vacation leave) as a substitute for some or all of the family and medical leave.

Particular limitations apply to certain leaves when both spouses are employed by the same employer. If these limitations apply, the Company will inform you when responding to your request for leave.

**Maintenance Of Health Benefits:** The Company will maintain coverage for eligible employees and dependents (if applicable) during family and

medical leave. This coverage will be provided if you or your family were covered under the plan before the leave was taken and on the same terms as if you had continued to work. Where appropriate, you must make arrangements to continue to pay your share of health plan premiums while on leave.

In some instances, the Company may recover premiums it paid to maintain health coverage for you and your family if you do not return to work from your leave.

**Job Restoration:** Upon returning from a family and medical leave, eligible employees will normally be restored to their original job, or to an equivalent job with equivalent pay, benefits, and other employment terms and conditions. However, an employee does not continue to accrue additional benefits such as personal leave and vacation, for example, while on family and medical leave.

Use of family and medical leave cannot result in the loss of any employment benefit that employees earned, or were entitled to, before using family and medical leave.

**Notice And Medical Certification:** When seeking family and medical leave, employees may be required to provide:

1. Thirty (30) days advance notice of the need to take family and medical leave, if the need is foreseeable.
2. Medical certifications supporting the need for leave due to a serious health condition affecting you or an immediate family member. Second or third medical opinions (at the Company's expense), and periodic recertification may also be required.
3. Periodic reports during the leave regarding your status and intent to return to work.
4. Medical certification of fitness for duty before returning to work, if the leave was due to your health condition.

When leave is needed to care for an immediate family member or for the employee's own illness, and is for planned medical treatment, the employee must try to schedule treatment so that it will not unduly disrupt the Company's operation.

**Extended Medical Leave:** Eligible employees who have exhausted their family and medical leave, and all other employees, may be allowed to take extended medical leave of absence, not to exceed twelve (12) months following the last day worked. Employees who take such extended medical leave are not guaranteed to be returned to work or reinstatement

to a particular job, rate of pay, or shift, at the end of their extended medical leave. However, the Company will attempt to return employees to their regular position if it is available. If it is not available at the time reinstatement is sought, we will attempt to place you in a similar job for which you are qualified, if such job is available. Employees on extended medical leave may maintain their insurance benefits, subject to policy terms and conditions by paying the applicable COBRA premiums in a timely manner. Employees on extended medical leave do not accrue any additional employee benefits such as personal leave or vacation while on extended medical leave.

**Other Employment:** Outside employment during your leave period is prohibited and may result in disciplinary action, up to and including, immediate termination of employment.

**Failure to Return from Leave or Comply with this Policy:** Employees may be subject to immediate termination for:

1. Failure to return to work within twelve (12) months of the beginning of a medical leave;
2. Failure to return to work within twelve (12) weeks of the beginning of a family leave;
3. Failure to return to work as scheduled following the end of a medical or family leave;
4. Providing false or misleading information or omitting certain information in connection with a family or medical leave; or
5. Violation of any of the Company's rules and regulations relating to a family or medical leave (or any other policy or performance standard).

## EMPLOYEE RIGHTS AND RESPONSIBILITIES UNDER THE FAMILY AND MEDICAL LEAVE ACT

### Basic Leave Entitlement

FMLA requires covered employers to provide up to twelve (12) weeks of unpaid, job-protected leave to eligible employees for the following reasons:

- For incapacity due to pregnancy, prenatal medical care or child birth;
- To care for the employee's child after birth, or placement for adoption or foster care;
- To care for the employee's spouse, son or daughter, or parent, who has a serious health condition; **or**



K-VA-T
000035

- For a serious health condition that makes the employee unable to perform the employee's job.

**Military Family Leave Entitlements**

Eligible employees whose spouse, son, daughter, or parent is on covered active duty or call to covered active duty status may use their twelve (12)-week leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

FMLA also includes a special leave entitlement that permits eligible employees to take up to twenty-six (26) weeks of leave to care for a covered service member during a single twelve (12)-month period. A covered service member is: (1) a current member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious injury or illness;* or (2) a veteran who was discharged or released under conditions other than dishonorable at any time during the five (5)-year period prior to the first date the eligible employee takes FMLA leave to care for the covered veteran, and who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness.*

*The FMLA definitions of "serious injury or illness" for current service members and veterans are distinct from the FMLA definition of "serious health condition."

**Benefits and Protections**

During FMLA leave, the employer must maintain the employee's health coverage under any "group health plan" on the same terms as if the employee had continued to work. Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.

Use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

**Eligibility Requirements**

Employees are eligible if they have worked for a covered employer for at least twelve (12) months, have 1,250 hours of service in the previous twelve (12) months, and if at least fifty (50) employees are employed by the employer within seventy-five (75) miles.

## Definition of Serious Health Condition

A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job, or prevents the qualified family member from participating in school or other daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than three (3) consecutive calendar days combined with at least two (2) visits to a health care provider or one (1) visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

## Use of Leave

An employee does not need to use this leave entitlement in one block. Leave can be taken intermittently or on a reduced leave schedule when medically necessary. Employees must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the employer's operations. Leave due to qualifying exigencies may also be taken on an intermittent basis.

## Substitution of Paid Leave for Unpaid Leave

Employees may choose or employers may require use of accrued paid leave while taking FMLA leave. In order to use paid leave for FMLA leave, employees must comply with the employer's normal paid leave policies.

## Employee Responsibilities

Employees must provide thirty (30) days' advance notice of the need to take FMLA leave when the need is foreseeable. When thirty (30)-days notice is not possible, the employee must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedures.

Employees must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Employees also must inform the employer if the requested leave is for a reason for which FMLA leave was previously taken



K-VA-T
000037

or certified. Employees also may be required to provide a certification and periodic recertification supporting the need for leave.

**Employer Responsibilities**

Covered employers must inform employees requesting leave whether they are eligible under FMLA. If they are, the notice must specify any additional information required as well as the employees' rights and responsibilities. If they are not eligible, the employer must provide a reason for the ineligibility.

Covered employers must inform employees if leave will be designated as FMLA-protected and the amount of leave counted against the employee's leave entitlement. If the employer determines that the leave is not FMLA-protected, the employer must notify the employee.

**Unlawful Acts by Employers**

FMLA makes it unlawful for any employer to:

- Interfere with, restrain, or deny the exercise of any right provided under FMLA; **and**
- Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

**Enforcement**

An employee may file a complaint with the U.S. Department of Labor or may bring a private lawsuit against an employer.

FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State or local law or collective bargaining agreement which provides greater family or medical leave rights.

FMLA section 109 (29 U.S.C. § 2619) requires FMLA covered employers to post the text of this notice. Regulation 29 C.F.R. § 825.300(a) may require additional disclosures. For additional information:

1-866-4US-WAGE (1-866-487-9243)
TTY: 1-877-889-5627
www.wagehour.dol.gov
U.S. Department of Labor Wage and Hour Division

# PARENTAL LEAVE POLICY

The Parental Leave Policy applies to some Tennessee employees as defined below:

**A. General**

Employees who have been employed for at least twelve (12) consecutive months as full-time employees may be absent for a period not to exceed four (4) months for adoption, pregnancy, childbirth and nursing an infant. With regard to adoption, the four (4)-month period shall begin at the time an employee receives custody of the child. Any time off under this policy will also count toward an employee's use of FMLA leave (if the employee qualifies for FMLA leave), and such leaves shall run concurrently to the extent possible.

**B. Notice to the Company**

Employees who give at least three (3) months advance notice of their anticipated date of departure for such leave, their length of leave, and their intention to return to full-time employment after leave, shall be restored to their previous or similar positions with the same status, pay, length of service credit and seniority, wherever applicable, as of the date of their leave.

Employees who are prevented from giving three (3) months advance notice because of a medical emergency which necessitates that leave begin earlier than originally anticipated shall not forfeit their rights and benefits under this section solely because of their failure to give three (3) months advance notice.

Employees who are prevented from giving three (3) months advance notice because the notice of adoption was received less than three (3) months in advance shall not forfeit their rights and benefits under this section solely because of their failure to give three (3) months advance notice.

**C. Other Provisions**

1. Leave will be without pay, except that employees will be required to use accrued vacation and sick leave as under the Company's FMLA policy. Such leave shall not affect the employees' right to receive vacation time, advancement, seniority, length of service credit, benefits, plans or programs for which the employees were eligible at the date of their leave, and any other benefits or rights of their employment incident to the employees' employment position; provided, that the Company need not provide for the cost of any benefits, plans or programs during the period of such leave, unless the Company so provides for all employees on leaves of absence.

2. If an employee's job position is so unique that the Company cannot,



K-VA-T
000039

after reasonable efforts, fill that position temporarily, then the Company need not reinstate the employee at the end of such leave period.

3. The purpose of this section is to provide leave time to employees for adoption, pregnancy, childbirth and nursing the infant, where applicable; therefore, if the Company learns that the employee has utilized the period of leave to actively pursue other employment opportunities, or if the Company learns that the employee has worked for another employer during the period of leave, then the Company will not reinstate the employee at the end of such leave.

4. Whenever the Company determined that the employee will not be reinstated at the end of such leave because the employee's position cannot be filled temporarily, or because the employee has used such leave to pursue employment opportunities or to work for another employer, the Company will notify the employee.

## MILITARY SERVICE LEAVE OF ABSENCE

If you enter the military service, we will do our best to protect the career which you began with us. The Uniformed Services Employment and Reemployment Rights Act (USERRA) provides the guidelines for reemployment of individuals who voluntarily or involuntarily leave their employment to undertake military service. We will work to comply with this and other similar laws that promote reemployment following an individual's service time.

## MILITARY RESERVE OR NATIONAL GUARD TRAINING LEAVES



If you are a member of a Military Reserve or National Guard Unit and must serve a short period of active duty (usually not more than two (2) weeks), you may take a military leave of absence, without Company pay. Or you may arrange to take your unused vacation with pay during your tour of active duty.

Please give your Store Manager four (4) weeks' notice when you plan to serve.



K-VA-T
000040

## WORKER'S COMPENSATION

Your Company pays 100% of this protection for you. This is designed to assist you if you are hurt accidentally while at work. The specific benefits that you may be eligible for are determined by the workers compensation laws and regulations of the state where you work.

While you are on a Worker's Compensation leave status, your medical and life insurance payments will be continued by the Company on the same cost basis as if you were working.

If you are unable to return to work – with or without a reasonable accommodation – after twenty-six (26) weeks, you will be offered a ninety (90)-day leave of absence. All leave of absence requests must be returned to Human Resources for consideration. If you are unable to return to work at the end of the ninety (90)-day leave, you may request a second ninety (90)-day leave of absence. If you are unable to return to work at the end of the second leave of absence, or do not apply for a second leave, you will be terminated from active payroll. After termination, any full-time associate may continue health care coverage through the Consolidated Omnibus Budget Reconciliation Act of 1986 or COBRA.

# YOUR RESPONSIBILITIES TO FOOD CITY

## YOUR PART

Along with the advantages and opportunities offered by our Company go certain responsibilities—obligations that you will want to meet. Your most important responsibility, of course, is to do a good job on the work which is assigned to you by your supervisor. Your supervisor is responsible for what you do, so it is a good idea to respect experience, listen to his/her instructions he/she gives, and carry them out promptly and cheerfully. Completing each assignment to the satisfaction of your supervisor is the surest way to make progress.

In addition to following instructions, doing a good job requires you to think for yourself—ask questions and make constructive suggestions. You will find that your supervisor will appreciate your efforts to do an outstanding job and improve your Company.

Doing a good job also implies certain obligations on your part, such as maintaining good health and mental alertness, using good judgment, being prompt and regular in your attendance, cooperating with your fellow workers, and being loyal to your Company—its people, its customers, and its services. You will want to keep well informed about your Company

so that you will be able to talk intelligently about it to your friends and neighbors. To them, you represent Food City and what you say can do much to shape their final opinion of it.

## SUBSTANCE ABUSE

If we are to continue to fulfill our responsibility to provide reliable and safe products and services to our customers and a safe working environment for our associates, associates of Food City must be able to perform their duties in a safe and efficient manner. Therefore, no associate shall work or report to work while under the influence of alcohol or illegal drugs, nor under the influence of prescription or non-prescription medication which would affect their ability to perform their job in a safe and efficient manner. Under the influence means not only obvious impairment, it also means physical evidence that a substance has been consumed on or off Company premises. No associate shall consume, display, or have in their possession, on Food City property, alcoholic beverages or illegal drugs at any time during their workday, including in the workplace or in Company vehicles, during lunch breaks, and on-call hours. To do so could jeopardize the safety of other associates, the public, Company equipment, and the Company's relations with the public, and is prime cause for disciplinary action, up to and including dismissal.

Should you be required to take any kind of prescription or non-prescription medication which affects your job performance, you are required to report this to your supervisor. Your supervisor will determine if it is necessary to temporarily place you on another assignment to ensure your safety and the safety of our associates and the public.

To protect the best interests of associates and the public, management at Food City will take whatever measures are necessary to determine if alcohol or illegal drugs are located on or are being used on Company property. Measures that may be used include, but are not limited to, searches of people and of personal property located on Company premises, which may be conducted by law enforcement authorities or by management, as well as drug and/or alcohol tests. The above-mentioned searches and drug tests will not be conducted if an individual refuses to submit; however, refusal to submit will result in immediate removal from service and may result in termination.

Associates experiencing problems with alcohol or other drugs are urged to voluntarily seek assistance to resolve such problems before they require management referral or disciplinary action. A portion of the cost of treatment may be covered by your health plan, and you may have to assume responsibilities for the cost of a portion of the treatment. Successful treatment will be viewed positively. However, participation in a treatment program will not prevent normal disciplinary action for a



K-VA-T
000042

violation which may have already occurred, nor will it relieve an associate of the responsibility to perform assigned duties in a safe and efficient manner.

## BEGIN ON TIME

In order for all our jobs to work together satisfactorily, we must all be present and on time every day. If, for any reason, you are unable to be at your work at your regular starting time, please call your supervisor so that schedule adjustments can be made. If you are unable to report to work because of illness or emergency, please notify your supervisor at the earliest possible moment.

## ATTENDANCE

Of course, we want you to be at work every scheduled day. However, we know that it may occasionally be necessary for you to be absent from work because of illness or personal reasons. In those cases, please notify your supervisor at least one (1) hour before the beginning of your scheduled starting time. Advance notification is necessary so that proper arrangements can be made to handle your work during your absence. However, notification – while helpful – does not necessarily excuse the absence.

## RUMORS—THE COMPANY GRAPEVINE

Rumors have a habit of flying around from time to time, and some people seem to take delight in passing them on as the gospel truth. When you hear a rumor, please ask your supervisor "for the truth."

## CARE OF EQUIPMENT

Your Company has invested thousands of dollars in equipment which is designed to enable you to do your work more efficiently. Your cooperation in the care and use of this equipment is necessary to maintain it in good operating condition. If any of our equipment is defective or is not best for the job, please notify your supervisor immediately. A few timely repairs may prevent complete breakdown of the equipment.

## GOOD HOUSEKEEPING

One sure indication of a good associate is the condition and appearance of his or her work area. Orderliness in your work area reduces accidents, improves health conditions, reduces fire hazards, adds to the efficiency of your work, improves the quality of our service, and portrays a favorable image to customers who may be touring our facilities. We can all help by

placing trash and refuse in the containers provided, and by applying a few simple rules of cleanliness. It is everyone's responsibility to help keep Food City clean and sanitary as we work.

## NAME BADGES

To help you develop friendly relations with your customers and fellow associates, Food City provides you with an attractive name badge to be worn on the upper left side of your vest or smock, or on a Company-provided lanyard. This badge is a means of identifying yourself to your customers and is a sign of your willingness to help them. These name badges must be worn at all times while on duty. If you lose your badge, another can be purchased from your Store Manager.

## PERSONAL APPEARANCE

Our Company's professional atmosphere is maintained, in part, by the image we present to our customers and vendors. We expect all associates to present a neat, well-groomed appearance and a courteous disposition. These qualities go further than any other factors in making a favorable impression on the public and your fellow workers.

Dress should be appropriate for your position and must conform to the established standards. You may view job specific uniforms/dress code on Fast Track or you may ask your Manager to provide additional information on the dress code policy for your particular position. Company-issued uniforms are available, or you may choose to purchase Company apparel to wear instead. You should avoid extremes in dress. Skimpy or revealing clothing is unacceptable. Associates should dress in a business-like manner. Jeans (unless authorized by your Manager), t-shirts, unauthorized sweatshirts, unauthorized shorts, miniskirts (more than 3" above the knee), form-fitting apparel, "hotpants," short tops, halter tops, backless dresses, slouch or "hang down" pants (pants worn below the waistline), flip-flops, sandals and hats (except as required for sun protection or in production areas) are NOT ACCEPTABLE attire in the workplace. Furthermore, the Company's professional image can be tarnished because of customers' negative reactions to excessive piercings. For that reason, we do not allow associates to display jewelry which may be offensive to our customers. Due to health and food safety concerns, no one working in production areas may wear any jewelry, except a plain wedding band. Other non-production area associates may wear jewelry in moderation. Proper head covering or hairnet and protective clothing must be worn when required by State Health Department regulations. The Company's professional image can also be adversely affected by an associate's display of visible body tattoos. For this reason, tattoos should be covered, whenever possible, but in no instance may they be offensive. Good personal hygiene is also important in terms of our customers' favorable opinion and in terms of your respect



K-VA-T
000044

for your fellow associates. Accordingly, associates are expected to come to work in a clean condition—no body odor or dirty appearance will be tolerated.

Associates are expected to observe our Personal Appearance Policy at all times while at work. Associates who report to work in unacceptable attire or appearance may be requested to leave work and return in acceptable attire or appearance. Such time off from work will be without pay.

**Managers are responsible for insuring that associates project a professional image and adhere to our Personal Appearance Policy. The interpretation of the above rules will be strictly at the discretion of the Store Manager or supervisor. Failure to conform to established standards of dress and grooming may result in disciplinary action.**

## DRESS CODE

### For All Associates

1. Name badges must be worn at all times.
2. Personal body cleanliness must be maintained at all times—no body odor or dirty appearance will be tolerated.
3. Comfortable, neat, low-heel shoes are required. (No flip-flops or open-toe shoes are allowed.) Shoes must be kept neat, clean, and laces must be tied at all times.
4. Proper head covering or hairnet must be worn when required by State Health Department regulation. Beard guards must be worn if applicable.
5. No jeans may be worn except where specifically allowed in the dress code.
6. Company-furnished uniforms must be kept neat and clean.
7. Fingernails must be trimmed, filed, and maintained so the edges and surfaces are smooth and easily cleaned. Additionally, associates in food service areas (Meat, Seafood, Produce, Salad Bar, and Bakery/ Deli) may not wear fingernail polish or artificial fingernails.
8. Jewelry, when worn, should be modest and in good taste.
9. Associates will neither eat, drink, smoke, nor use other forms of tobacco at any time while on duty. This applies to all K-VA-T personnel, as well as to any manufacturers or distributor sales representatives when working in Food City stores.

10. Food City hooded sweatshirts and jackets must be worn over approved apparel.

**For All Female Associates**

1. Cosmetics may be used in moderation.

2. Tan khaki pants (with belt) or tan khaki skirts must be worn.

**For All Male Associates**

1. Haircuts and beards are to be kept neat, clean, and of moderate length.

2. Tan khaki pants must be worn (with belt).

**Non-Management female associates in the following departments: Grocery, Front End, Fuel, Floral and GoCart:**

Choose one of the following options:

1. Smock furnished by the Company, must be properly buttoned. Blouses visible under the smock must be of business attire and a matching color. Short or long sleeve will be acceptable.

2. Food City polo shirt, furnished by the Company, must be tucked inside pants.

3. Food City sweatshirt, purchased by the associate, must be worn with a collared shirt or turtleneck.

All full-time associates will be provided with three smocks and/or Food City polo shirts. Part-time associates will be provided with two smocks and/or Food City polo shirts. Additional uniforms may be purchased.

**Non-Management male associates in the following departments: Grocery, Front End, Fuel, Floral and GoCart:**

Choose one of the following options:

1. Vest, furnished by the Company, must be properly buttoned and worn with a dress shirt suitable for wearing with a man's business suit.

2. Food City polo shirts, furnished by the Company, must be tucked inside pants.

3. Food City sweatshirt, purchased by the associate, must be worn with collared shirt or turtleneck.

4. Caps or head coverings are not permitted while on duty except with special permission from your Store Manager. A Food City approved cap may be worn.

All full-time associates will be provided with three vests and/or Food City polo shirts. Part-time associates will be provided with two vests and/or Food City polo shirts. Additional uniforms may be purchased.

**Male and female associates in the following positions: Front-End Managers and Customer Service Coordinators:**

1. Manager polo shirt, furnished by the Company, must be tucked inside pants and worn while on duty.

2. Tan khaki pants must be worn (with belt). Females may also wear tan khaki skirts.

All full-time associates will be provided with three shirts. Part-time associates will be provided with two shirts. Additional uniforms may be purchased.

**Bakery/Deli and Salad Bar Department Associates:**

1. All Bakery/Deli and Salad Bar associates must wear a Company-furnished coat, properly buttoned at all times while on duty.

2. Blouses or shirts worn under the coat must be suitable attire.

3. Black or tan khaki pants must be worn (with belt). Females may also wear black or tan khaki skirts.

4. A hat, furnished by the Company, must be worn at all times while on duty.

All full-time associates will be provided with three coats and one hat. Part-time associates will be provided with two coats and one hat. Additional uniforms may be purchased.

**Meat, Seafood and Sushi Associates:**

All meat, seafood and sushi associates will follow the same uniform instructions for male and female front-end associates with the following exceptions:

1. An apron or jacket, furnished by the Company, must be worn at all times while on duty.

2. A hat, furnished by the Company, must be worn at all times while on duty. Additional hats may be purchased.

**Produce Associates:**

All produce associates will follow the same uniform instructions for male and female front-end associates with the following exceptions:

1. A green coat or green apron, furnished by the Company, must be worn at all times while on duty.

2. Company-furnished hats must be worn at all times by associates while on duty or when working in the preparation area. Additional hats may be purchased.

**Male and female associates in the following positions: Pharmacy Manager and Pharmacist:**

1. White Pharmacist coats will be furnished by the Company and must be properly buttoned and worn while on duty.

2. Male Pharmacists will wear either a Food City Pharmacy polo shirt (which may be purchased from the Company) or dress shirt suitable to be worn with a business suit.

3. Female Pharmacists will wear either a Food City Pharmacy polo shirt (which may be purchased from the Company) or dress blouse.

4. Dress pants must be worn. Females may also wear skirts.

All Pharmacy Managers and full-time Pharmacists will be provided with three white Pharmacist coats. All part-time Pharmacists will be provided with two white Pharmacist coats. Additional uniforms may be purchased.

**Male and female associates in the following positions: Pharmacy Technicians and Certified Pharmacy Technicians:**

Tan khaki pants must be worn. Females may also wear tan khaki skirts.

Choose one of the following options:

1. Food City Pharmacy smock, furnished by the Company, must be properly buttoned. Blouses or shirts under the smock must be of business attire and a matching color. Short or long sleeve will be acceptable.

2. Food City Pharmacy polo shirt, furnished by the Company, must be tucked inside pants.

All full-time Pharmacy Technicians and Certified Pharmacy Technicians will be provided with three Pharmacy smocks and/or Pharmacy polo shirts. All part-time Pharmacy Technicians and Certified Pharmacy Technicians will be provided with two Pharmacy smocks and/or Pharmacy polo shirts. Additional uniforms may be purchased.

**Non-Management Associates**

During the period of April 1st until October 31st, Food City knee-length shorts may be purchased and worn instead of pants or skirts. The khaki shorts must be worn with a Food City polo shirt.

# WHAT FOOD CITY EXPECTS FROM YOU

## HONESTY

Absolute honesty is accepted as the first requirement of employment. The trust placed in everyone is based on complete confidence in that person's integrity. Many associates handle cash transactions, while all of us are responsible for goods, materials, or equipment of value. The good name you can earn for honesty is one of the greatest assets you can possess. Any dishonest act will be considered grounds for dismissal with forfeiture of all accumulated benefits.

Always remember—it's important to BE HONEST but it's doubly important not to let questionable actions appear to others to be dishonest. Your good name can be destroyed forever by one act of dishonesty.

## ENTHUSIASM

The outstanding person in any group is the one who is enthusiastic. The enthusiastic associate will take the interest in learning everything about his or her Company and will take every opportunity to improve the Company's operations and services and reduce expenses. Entering wholeheartedly into the promotion of your store, both as a successful business enterprise and as a group of educated people, will bring greater enjoyment in your immediate task and will mark you as worthy of assuming greater responsibilities.

## GETTING ALONG WITH OTHER PEOPLE

Some people have the natural ability to win friends with a smile, a handshake, or a pleasant word. Others have to work at it and keep trying

until they have learned to get along with others. Being fair, sincere, and cooperative is the easiest way to win friends and keep them whether they are customers or fellow associates.

Here are some things that DO NOT make work a pleasure:

a. Rumors
b. Arguments
c. Failure to cooperate
d. Irritable atmosphere
e. Failure to be productive

You are the one who can keep these things from happening.

## OUR TELEPHONE PRACTICE

Our telephones are maintained for Company business. Please refrain from using Company phones for personal calls. Repeated non-business calls are subject to reprimand.

Ask your friends and relatives not to call during working hours unless there is an emergency. If there is an emergency, you will be called to the telephone. Otherwise, the calling number will be taken and you will be notified so you may return the call on a rest or meal period.

## TELEPHONE COURTESY



All of us who answer telephones for the store should do so promptly and in a business-like manner. First impressions are very important. When answering the store phone, greet the caller with "Good Morning" or "Good Afternoon (your store name)." If you must leave the phone to get information to answer the caller's questions, or to call someone else to the phone be sure to tell the caller, "Just a moment, please, while I get that information for you." If an in-store call, such as in the Meat Department, you should answer, "Meat Department, (your Name) speaking." The important thing is to be friendly, cheerful, and helpful.

Should you ever find it necessary to put a caller on "hold" to transfer a call or reach someone to answer, it is your responsibility to check back and see that the call was answered. NEVER LEAVE A CALLER ON HOLD FOR MORE THAN THIRTY (30) SECONDS WITHOUT RE-ANSWERING THE CALL YOURSELF.



K-VA-T
000050

## PERSONAL CONTACT AT WORK

Visitation of associates by friends or relatives is not encouraged, and any such visits should be limited and be of a short duration. Socializing with friends or relatives while on duty, whether customers or associates, is prohibited.

We will not become involved in the domestic or love life of associates; therefore, domestic disputes on Company time or property are prohibited. An associate who permits his/her domestic problems to interfere in any way with the Company's business may be discharged.

## ASSOCIATE AS A CUSTOMER

Food City values your business and appreciates you as a customer. We hope you and your family will shop with us on a regular basis and support us as we support you.

For obvious reasons, all of us, associates, must observe certain rules of good business in making purchases. These are simple and easy to follow, and serve to protect us, as associates, and the store.

**Associate Purchase Policy**

1. Never check out your own purchases or those of your family or close friends.
2. All persons connected with Food City will pay the full, regular price in effect on the day the merchandise is purchased.
3. All purchases for use or consumption within the store must be paid for immediately. The cash receipt for the purchases must be attached to the item or in your possession **at the time of consumption.**
4. All purchases to be removed from the store must be selected after clocking out for the day. Purchases must be checked out through the checkouts and taken out the FRONT DOOR in the same manner as any other customer. **You are not allowed to set items aside for purchase at a later time.**
5. Items, once bought, may not be stored in the store work spaces or refrigerated areas. Items found here will be considered the property of the store and be placed back on sale, **and/or destroyed.**
6. Store management has the right to inspect any packages taken out of the store.
7. **Items not from the regular sales display counter or shelf,**



K-VA-T
000051

**i.e., store supplies, case lots, etc., must be price marked and approved by a member of management.**

8. **Damaged and reduced merchandise may be purchased by our associates after being properly discounted by the Department Manager or member of store management and placed on the sales floor.**

Failure to follow the above procedures will result in disciplinary action up to, and including, dismissal **and/or prosecution.**

## WASTE PREVENTION

Waste of time, materials, equipment, and utilities is costly to your Company and to you. You can help make Food City prosperous by the amount of time you save, as well as the quality of work which you perform. You should make every minute count. Eliminate waste wherever possible. In the long run, you will benefit by helping to reduce operating costs because the amount of money which is saved by eliminating waste can be shared by all of us.

## ACCIDENTS AND INJURIES

All injuries and accidents, no matter how slight they may appear to you, must be reported to your supervisor at once. He or she will then direct you to the proper First Aid and medical attention. Failure to report an accident or injury will result in disciplinary action, even dismissal.

Do your best to eliminate accident hazards, but when an accident happens, report it immediately.

## FIRE PREVENTION

These rules are offered with the belief that many accidents can be prevented. However, rules alone will not prevent accidents; it takes the cooperation of all of us to see that accidents are eliminated. Report any unsafe condition to your supervisor and always try to THINK SAFETY.

1. Keep your store clean and see that all trash is removed from the workplace.
2. Be careful with burning cigarettes. Smoking is not permitted in any facility. Smoking should be in the designated areas only. Every associate should be conscious of the dangers of burning cigarettes.
3. Be conscious of all fire hazards. Everyone should become aware

of fire hazards resulting from faulty wiring, electrical motors, air conditioning and heating units, and refrigeration equipment. Any fire hazards should be reported at once to your Store Manager.

4. Know the location of the fire extinguishers in your store and be familiar with their operation.

## SAFETY

The first person to benefit from your observance of the SAFETY rules is yourself! Stay alert to situations which might be dangerous to YOU, YOUR FELLOW WORKERS, AND YOUR CUSTOMERS.

**The Most Important Safety Rules Are:**

1. Eliminate accident hazards! Keep the floors clean and free of water, paper, vegetable leaves, etc.; keep cases out of the aisles; keep merchandise on display and on the shelf straight; get rid of nails that stick out; keep storage area neat and straight. Never allow a possible accident hazard to exist. If you cannot eliminate it yourself, bring it to your supervisor's attention.

2. Use tools and equipment properly–keep them in safe working condition–and put them back in their proper places when you are finished.

3. Don't indulge in HORSEPLAY. If you are injured in "horseplay," normally you are not covered by Worker's Compensation Insurance.

4. Lift correctly by using these simple procedures:

   a. Never lift beyond your strength.
   b. Get a secure footing (feet 8 to 12 inches apart).
   c. Bend at the KNEES and grasp the object firmly underneath.
   d. Keep the back straight and as near UPRIGHT as possible.
   e. Lift gradually by straightening the legs with the strong leg muscles (keeping the back upright).
   f. Avoid jerky, twisting motions.

5. All aisles are to be kept clear.

6. If you drive a Company vehicle, do not speed beyond the limits established by the Company and those considered legal by town, city, state, or federal authorities.



K-VA-T
000053

These rules are offered with the belief that many accidents can be prevented. However, rules alone will not prevent accidents; it takes the cooperation of all of us to see that accidents are eliminated. Report any unsafe condition to your supervisor and always try to THINK SAFETY.

## PARKING




In the supermarket business of today, a store's volume of business is directly related to the parking facilities available. Preferred parking spaces should always be saved for those people who pay our salary—THE CUSTOMERS. Ask your Manager where you should park. Parking in unauthorized spaces is a violation of Company policy and disciplinary action will be taken.

## SOLICITATION

In the interest of the efficiency, convenience, and the continued goodwill of our customers, and for the protection of our associates, there shall be no solicitation or distribution of literature of any kind on the store premises by any associate during his or another associate's working time, or by other persons at any time. Working time is defined as all time during which associates are required to be working.

There shall be no distribution of literature of any kind, other than consumer information (such as menus, dietary information, etc.) prepared by the grocery industry or the government, by any person in customer service areas or shopping areas of the store.

Any associate who violates any provision of this rule shall be subject to counseling and disciplinary action up to and including discharge. Your Store Manager should be notified immediately when a violation occurs.

## SHOPLIFTING

Shoplifting is a serious problem in any retail business. Losses add to the cost of merchandise and can affect job security. We should be alert to all suspicious customers. Shoplifting is a very sensitive problem and must be handled by experienced associates to avoid difficulties.

If you see anyone in the store whom you suspect, don't say or do anything. Quickly report the incident to your Store Manager, Assistant, or the person in charge. If possible, do not let the suspect out of your sight. Under no circumstances is an associate to confront or openly accuse a customer of shoplifting. Only a Store Manager or person in charge has the authority to apprehend a shoplifter.

## HOLDUPS

Should a holdup occur, **remain as calm as possible**, and without hesitation, obey all orders by the holdup person. However, during their presence, be sure to concentrate on features, dress, scars, voice, automobile, tag number, etc., for identification at a later time.

# KEEPING IN TOUCH

## YOUR PERSONNEL RECORD

When you became employed by Food City, you completed an application supplying us with various facts we must know about you. This information was transferred to a permanent and confidential file that is the Company's employment record of you as an individual. Keeping this record correct and up to date is important to you because it enables the Company to reach you in an emergency, forward your mail, properly maintain your insurance and other benefits, compute your payroll deductions, etc.

Your Store Manager should be notified promptly of changes in:

1. Address and telephone number
2. Marital status (for insurance and withholding tax purposes)
3. Name
4. Beneficiary or dependents listed in your insurance policy
5. Number of dependents (for insurance and withholding purposes)

In addition, please let your Store Manager know about the completion of any training or educational courses, so that you may receive proper consideration as better job opportunities arise throughout the Company.

## BULLETIN BOARDS

Periodically, we post information of general interest to you on our Company bulletin boards. Please form the habit of checking these bulletin boards daily so that you will be familiar with the information found there. Only Company-authorized communications may be posted on the Company bulletin boards.

## IF YOU JUST WANT TO TALK...

All of us have our problems — sometimes small and sometimes not so small. Personal problems gang up on us, and we don't know where to turn. Whenever problems begin to bother you to the point of interfering with your work, your physical well-being, or your outlook on life, it often helps to get it off your chest. At



times like these, we want to help you, if we can, without being "nosy." Any of us will be glad to talk with you, in confidence, about any problems you may have. Naturally, we have your best interests at heart and are always willing to be helpful.

## ASSOCIATE RESPONSE LINE

Food City promotes an open door policy. Open communication creates an honest and productive work environment that benefits all associates. If you have suspect or observe unethical, illegal, or irresponsible workplace behavior, don't ignore the situation. Discuss it with a member of management, Human Resources, or Security/Loss Prevention. If you feel more comfortable, you may call the Associate Response Line at 1-866-601-5757. This toll-free number is available twenty-four (24) hours a day and seven (7) days a week for your convenience. You may also choose to email your concern to arline@foodcity.com. Concerns that would require you to contact the Associate Response Line would include, but not be limited to the following:

Harassment
Health or Safety Issues
Drug or Alcohol Abuse
Other Illegal or Unethical Practices
Theft or Fraud
Workers Comp Fraud
Workplace Violence

## HOTLINE TO MANAGEMENT

From time to time, you may be concerned about a situation or problem. Feel free to contact any member of management with questions. If you wish, you may contact the Corporate Office by mail or phone at:

Steve Smith
K-VA-T Food Stores, Inc.
P.O. Box 1158
Abingdon, VA 24212
Phone: (276) 623-5100

## OTHER INFORMATION

In addition to this associate policy handbook, you will receive other information from Food City, whether in written or electronic form. You will want to make this information available to your family so they may know more about your job and your benefits. In addition, you will receive letters at your home. There is no regular schedule for distribution of this information–the function of each letter or publication is to provide you and your family with interesting news and helpful information that will keep you up to date on the happenings at Food City.

# PLEASE KEEP THIS BOOKLET FOR FUTURE REFERENCE

## NOTES

# INDEX


Accidents and Injuries.......... 49
Advancement .......... 11
Appearance.......... 41
Associate as a Customer .......... 48
Associate Responsibilities .......... 38
Attendance .......... 40
Begin on Time.......... 40
Benefits.......... 20
Bereavement Pay .......... 24
Bulletin Boards.......... 52
Complaints .......... 12
Customer Relations
- Ten Commandments of Good Business.......... 1
- The Customer and You.......... 2

Discipline Policy .......... 13
Dress Code.......... 42
Employment Policies and Procedures
- Equal Employment Opportunity.......... 4
- Legal Work Status.......... 5
- New Hires .......... 7
- Other Employment .......... 16
- Re-Employment .......... 17
- Selection.......... 6
- Types of Employment.......... 7
- Working Relationship.......... 3

Equipment, Care of .......... 40
Fire Prevention .......... 49
Getting Along with Other People.......... 46
Harassment .......... 5
Health Care and Dental Plans.......... 24
Holdups .......... 52
Holidays.......... 22
Hotline to Management .......... 53
Housekeeping.......... 40
Ill Associates.......... 6
Insurance
- Disability.......... 26

Life ........ 25
Unemployment ........ 25
Worker's Compensation ........ 38
Jury Duty ........ 23
Layoff and Recall ........ 10
Leaves of Absence
Disability ........ 26
Family and Medical ........ 29
Military and Reserve ........ 37
Personal ........ 28
Length of Service ........ 11
Meal Periods ........ 20
Name Badges ........ 41
Organization Membership ........ 7
Other Information ........ 53
Parking ........ 51
Pay Policy ........ 18
Errors ........ 19
Overtime ........ 19
Payday ........ 19
Payroll Deductions ........ 20
Premium Rate ........ 19
Performance Review ........ 8
Personal Conduct ........ 13
Personal Contact ........ 48
Personnel Record ........ 52
Pre-Employment Screenings and Exams ........ 6
Promotions ........ 9
References ........ 17
Relatives ........ 7
Resignation ........ 17
Rest Periods ........ 19
Rumors ........ 40
Safety ........ 50
Seniority ........ 10
Shoplifting ........ 51
Social Security ........ 26
Solicitation ........ 51
Stock Ownership Plan (ESOP) ........ 25

Substance Abuse ........................................................ 39
Telephone .................................................................... 47
Termination of Employment ..................................... 16
Time Records ............................................................ 18
Vacation ...................................................................... 21
Waste Prevention ...................................................... 49
Workweek .................................................................. 17

# RECEIPT FOR ASSOCIATE HANDBOOK

I have received my copy of the October 2021 Revision of the Food City Associate Handbook. I agree that this handbook and the policies, practices, and information contained herein, supersede any and all other associate handbooks, policies, practices, and information previously issued by K-VA-T Food Stores, Inc., or any other predecessor company. I agree to read my handbook and keep my handbook for future reference and observe present and any future Company personnel policies and rules outlined in this handbook. I further understand that this handbook is intended as a guide for personnel policies, benefits, and general information, and that these guidelines should not be construed as an employment contract.

I understand management reserves the right to make changes in the guidelines or their application as it deems appropriate, and these changes may be made with or without notice. I also understand that employment is terminable at the will of either the associate or the Company at any time, and that no representative of the Company other than the Chief Executive Off icer has any authority to make any contrary agreement.

Associate's Signature:____________________ Date:____________________

Manager's Signature:____________________ Associate ID No:____________________

Department:____________________ Store No:____________________

**Fast Track Learning System**

Name:________________________________

ID: ________________ Password: __________

It is important to protect your password and personal information by storing your booklet in a secure location.

FOOD CITY

Value. Everyday.™

© Copyright 2021 Food City

# EQUAL EMPLOYMENT OPPORTUNITY

It is Food City's policy to grant equal employment opportunities to all qualified persons without regard to race, color, sex, religion, age, national origin, disability or veteran's status. To deny a qualified person the chance to contribute to our effort because you are a member of a minority group is an injustice not only to the individual but to our company and nation as well. It is the intent and desire of our company to provide equal opportunities in employment, promotion, wages, benefits, and all other privileges, terms and conditions of employment. Our only concern is that a person be qualified to perform the job. This policy has the support of the highest levels of our management team.

**PROTECTED CLASSES**

- Americans with Disabilities Act (ADA): The ADA makes it unlawful to make inquiries as to whether an applicant is an individual with a disability or as to the nature or severity of such disability.
- Age: Federal law prohibits employment discrimination against people 40 years and older. A person's age should not be asked nor should inquiries be made as to the dates of high school or college graduation, unless it is a bona fide requirement of the job that is stated in the job description.
- Birthplace: This may be construed as national origin discrimination.
- Citizenship: The interviewer may inquire whether the candidate is eligible to work legally in the United States. However, if this question is asked, it must be asked of all candidates interviewed.
- Marital status and family status: For example, questions concerning the number of children a candidate has, childcare arrangements, or whether the candidate intends to have children.
- Arrest record: A conviction does not automatically disqualify an applicant from consideration of employment.
- Religious or political affiliations
- National origin: Lineage, ancestry, descent, mother tongue, including national origin of parents.
- Sex/Gender & Sexual Orientation
- Veteran Status

EXHIBIT 2 D. Meadows
PENGAD 800-631-6989

## AMERICANS WITH DISABILITIES ACT

**The Americans with Disabilities Act (ADA) of 1990 states that a qualified person with a disability is one who can perform the essential duties of the job with or without reasonable accommodations, has the required skills and experience for the job, and meets other job-related requirements.**

## AREAS YOU *MAY NOT* ASK ABOUT:

- The existence, nature, extent, origin or prognosis of disability
- Present health condition
- Past attendance record with former employer
- Physical characteristics such as burns, scars or missing limbs
- Current or past use of prescription drugs
- If the person has had an alcohol or drug problem
- Past or present workers' compensation history
- Past medical history
- Whether or not the applicant will need to leave for treatment
- If family members have a history of illness
- If the applicant has a medical condition or disability

## QUESTIONS YOU MAY ASK:

- Do you have any reason to believe you would have difficulty performing any of the essential job duties?
- Do you have any reason to believe you would have difficulty meeting company work schedule?
- Would you please explain how you would perform this essential job duty? (When observable disability raises doubts)
- Whether the applicant will have any trouble meeting the attendance requirements.

**ADA (Americans with Disabilities Act)**

The Americans with Disabilities Act of 1990 prohibits employers from discriminating against qualified individuals with *disabilities* in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions, and privileges of employment.

Under the ADA, an individual with a disability is a person:

- Has a physical or mental impairment that substantially limits one or more "*major life activities*." Major life activities include:
  - Self-Care
  - Performing manual tasks
  - Walking
  - Seeing
  - Hearing
  - Speaking
  - Breathing
  - Learning
  - Working
- Has a record of such an impairment; or
- Is regarded as having such an impairment

A qualified employee or applicant with a disability is an individual who, with or without *reasonable accommodation*, can perform the essential functions of the job in question.

A reasonable accommodation is the requirement that employers take steps that are not an *undue hardship* to make employment possible for persons with disabilities.

An undue hardship is an action requiring significant difficulty or expense when considered in the light of factors such as employer's size, financial resources, and the nature and structure of the employer's operation.

A Reasonable Accommodation may include:

- Making existing facilities readily accessible to individuals with disabilities
- Restructuring of a job, a work schedule, or a reassignment of a disabled employee to a vacant position
- Acquiring or modifying equipment or devices
- Adjusting or modifying examinations, training materials, or policies
- Providing qualified interpreters or readers

When there are more than one reasonable accommodations for an associate, it is ultimately the decision of the employer, not the associate as to which accommodation to make.

On July 23rd, 2021, Matthew Batten called to inform me that the camp that he attended while he was out was to train and to receive a Service Dog. Before he left for this camp Matthew Batten said that the camp was just for his disability. I spoke with him to let him know that I was not able to give him permission for this and I wasn't sure what information that I would be able to give him now and that I would need to reach out to my HR Supervisor. Later Matthew Batten came to the store with his Service dog and his paperwork. During the meeting with Matthew, his Service Dog kept jumping on Amber Grindle. I kept telling Matthew that now we haven't heard anything about what we could do with his Service dog. Matthew wanted to talk to Gary Richards about his dog and what he needed to do. After Gary talked to Matthew, we took photos of his document to send in to get approval for his Service dog. I kept telling Matthew, I did not have permission to give him about his service dog and that I was just the middleman. We reached out to Donny Rector to see what we could do about his service dog. Gary and I did not hear anything from Donny and decided to let him work until we received an answer.

Emily Hobbs

Emily Hobbs

11/29/2021

EXHIBIT
3
D. Meadows
PENGAD 800-631-6989

**Gary Richards**

**Sent:** Tuesday, November 30, 2021 7:56 AM

On 7/23/21 at approximately 10:00am Matt Batten ( fuel center associate ) came into the store to inform me that he had acquired a service dog and that the animal would accompany him while working. I told Matt that I had never dealt with this before and didn't know what the protocol was on allowing service animals at work. I told Matt I would seek advice from our Human Resource department and would have an answer for him before he started his shift at 2:00pm that day 07/23/21. David Ellison our HR representative was on vacation so we were instructed to reach out to HR representative Donny Rector for another region with any questions, concerns or issues in David's absents. I sent Donny an email at 10:26am 7/23/21 explaining the situation and asking to advise. Donny replied at 11:29am 07/23/21 asking if it was a service or emotional support dog, I replied back at 11:57am letting Donny know that Matt was claiming the dog was both service and emotional and when I received certification/documents for the animal I would email. Matt didn't return to the store until he started his shift and I asked that he remain with me in the office so I could email documents and get an answer. I emailed Donny at 2:17pm but never received an answer as to handle the situation ( allow or not allow to work). As I have never dealt with this situation, knowing the sensitivity of the subject of service animals and never receiving and answer from HR, I advised Matt that he could bring the animal to work with the understanding that may change based on review from the company. Matt agreed to this. I never received a response until David Ellison called me on 07/30/21 at approximately 4:00pm asking that I update him on the situation at which time I did and informed that I did allow Matt to work. David told me he would communicate with corporate and would get back with me. David contacted me on 08/02/21 to discuss the matter further and again on 08/05/21 to set up a meeting with Matt on 08/06/21 at 1:00pm. Matt worked the following days leading up to the meeting 07/23, 07/24, 07/25, 07/27, 07/30, 07/31, 08/01

Gary Richards

Gary Richards

EXHIBIT 4 D. Meadows

PENGAD 800-631-6989



K-VA-T
000132

On 8/6/21, I met with Matthew Batten at Food City 214 with Gary Richards as my witness. Matthew has recently turned in documents and a request for an accommodation for a service dog to be present with him as he works his shifts at the fuel center. During this exchange, I asked Batten if there had been a change in anything as he has worked for us for two years. He stated that nothing had changed. He stated that he had been waiting for a service dog for over 4 years. I asked him if he was able to perform all essential functions of the job, and he stated he could do so without question as he had been doing them since he began his employment with Food City. He stated that he needed the service animal to help him in his battle of anxiety, panic attacks, and feeling of isolation. He also stated that he has fallen about 5 times and the dog helps him steady on his feet. At the end of the meeting, I reiterated that I was gathering information during out exchange meeting, and I would be back in contact with him again soon.

David Ellis
8/6/21

EXHIBIT
PENGAD 800-631-6989
5
D. Meadows

**Gary Richards**

On August 6th David Ellison met with Matt Batten with myself as a witness to discuss the request of a service animal . Mr. Ellison asked Matt if there was any aspect of the job that he could not perform that required the assistance of a service animal , Matt replied that he was able to perform all duties that were required without question and had been doing so since his employment with Food City without the help from a service animal. Matt stated that the purpose of the service animal was to provide companionship and help with anxiety, isolation.

Gary Richards

8/6/21

EXHIBIT
6
D. Meadows
PENGAD 800-631-6989

On 8/12/21, I met with Matthew Batten at Food City 214 with Gary Richards as my witness. I informed Batten that his request for a service animal in the work place had been reviewed and denied at this time. I stated that he had been performing the job for over two years without any accommodations. I asked him for his ideas or suggestions of any other possible accommodations that may be available for him. He stated that he did not know of anything else that could accommodate him. I suggested that we could reassign him to a USCAN Cashier position as this would help aide in his battle of isolation and anxiety of working alone at the fuel center kiosk. He stated he could not work any position that mandated that he stand for prolonged periods of time as he has Complex Regional Pain Syndrome (CRPS). He stated that the fuel center allowed him to stand when needed and sit when needed. When asked how long he thought he could stand, he was unable to give any exact time. He stated that he could only work with the service dog present at this time as he was not going to leave the dog with anyone else.

David Ellis
8/12/21

EXHIBIT
7
D. Meadows
PENGAD 800-631-6989

## Gary Richards

On 08/12/21 Matt Batten met with David Ellison for a follow meeting regarding Mr. Batten having a service animal at the workplace. Mr. Ellison informed Mr. Batten that after review the decision was made that at this point in time the request for the service animal has been denied. Mr. Ellison asked if there were any jobs within the store to better accommodate his current needs suggesting U-scan attendant as it would allow him to be around others. Mr. Batten stated that there wasn't any position in the store that he would be able to perform his duties as he wasn't able to stand for short/long periods of time that Gas N Go was the only position that was suitable as it allowed him to sit and stand as needed and that he was not leaving his dog with anyone, that where he goes she goes.

Gary Richard

8/12/21

EXHIBIT
8
D. Meadows
PENGAD 800-631-6989



K-VA-T
000141

On 8/18/21, I met with Matthew Batten at 214 with Bryan Wattenbarger as my witness. I explained to Matthew again that the request for his service animal to be present with him at work has still been denied at this time. I asked him again about the consideration of reassignment to a USCAN Cashier. He once again denied that accommodation stating he could not perform that duty. At this time, I explained that another accommodation I could present him is with a leave of absence. I handed him paperwork for FMLA and a personal leave of absence. I explained to him that if it was medically related that would be covered under FMLA, he would need medical certification with his paperwork. However, if he wanted to take some personal time, he could be eligible for up to 90 days of a personal leave of absence. He stated that regardless of how long of a leave of absence he may be eligible for or takes, he will only work in the future with his service animal present. He once again stated that he would not do anything without his service animal present in the future. He stated he had a vested interest in this company after working for the past two years and he was not quitting. He thanked me for the opportunity I gave him for employment two years ago. I explained to him that we would need the paperwork back to the Store Manager, Gary Richards, by the end of next week. I stated that should he fail to return paperwork to us, we would consider him to be on a personal leave of absence at that time. He stated he would personally bring it back to Gary next week.

David Elliott
8/18/21

EXHIBIT
9
D. Meadows
PENGAD 800-631-6989

EXHIBIT
10
D. Meadows
PENGAD 800-631-6989

# Graduation Certificate

## Class of July 2021

This certifies that

**Mellow Joy**

Has successfully completed teaching at

**Canine Assistants, Inc.**

*As of this day July 20th in the year 2021*

Certificate is awarded as a

**Service Dog**

Jennifer Arnold, Executive Director

Bruner, CSM, Managing Director

I hereby attest that the named individual has successfully completed the required training course in accordance with Canine Assistants, Inc. guidelines respective to service dog training, is a recipient in good standing, and should be granted all rights and privileges under the applicable state code (attached) pertaining to service dogs in training and/or in service.

In accordance with applicable Federal & State laws, any person, firm, corporation, or the agent of any person, firm or corporation who denies or interferes with admittance to or otherwise interferes with the rights of a physically disabled person, or person engaged in the training of a guide or service dog shall be guilty of a misdemeanor and, upon conviction subject to the penalty as set forth in the appropriate state code (attached).

Jennifer Arnold, Executive Director

Canine Assistants, Inc.
3160 Francis Road - Alpharetta, GA 30004
(770) 664-7178 www.canineassistants.org


Canine Assistants
Educating the Dogs Who Change the World
Legal Access Provided by ADA
Matthew Batten
& Mellow Joy
I.D. #: CSD008291TN
Issue Date: July 2021

# TENNESSEE
## STATE HAS LAWS REGARDING
## GUIDE: YES HEARING: YES SERVICE: YES

STATUE REGARDING ACCESSIBILITY: Title 62, Chapter 7, 62-7-112 (1996) and 66-7-104 (1972) and 66-7-106 (1989)
LOCATIONS ALLOWED: Any public accommodation, amusement or recreation, including but not limited to any inn, hotel, restaurant, eating house, barber shop, billiard parlor, store, public conveyance on land or water, theater, motion picture house, public educational institution or elevator.
STATUTE REGARDING INTERFERENCE: 62-7-112 (1996)
INTERFERENCE INCLUDES: No proprietor, employee, or other person in charge of any public accommodation shall refuse to permit a blind, physically disabled or hearing-impaired person to enter such place or to make use of the accommodations therein provided.
STATUE REGARDING HOUSING: 66-7-104 (1972) & 66-7-106 (1989) (Guide Dogs)
HOUSING INCLUDES: Any real property or portion thereof which is used to occupy or is inteded, arranged or designed to be used or occupied, as the home, residence or sleeping place of one (1) or more human beings, but does not include any single family residence, the occupants of which rent, lease or furnish for compensation not more than one (1) room therein.
STATUTE REGARDING OWNER LICENSES AND FEES: No Mention
LICENSES OR FEE REQUIREMENTS: N/A
IDENTIFICATION REQUIREMENTS: The Guide Dog and Service Dog must wear a harness and on leash. A Hearing Dog must be on leash. A Hearing Dog user may apply for an identification card in lieu training center ID from the Tennessee Council for the Hearing Impaired
MISREPRESENTATION OF DISABILITY: 55-8-179 (1989) Unless disabled no person can use a leash blaze orange in color.


Graduation Certificate
Class of July 2021
This certifies that
Mellow Joy
Has successfully completed teaching at
Canine Assistants, Inc.
As of this day July 20th in the year 2021
Certificate is awarded as a
Service Dog

**From:** Archie Skeens <skeensa@FoodCity.com>
**Sent:** Monday, July 26, 2021 8:44 AM
**To:** Donnie Meadows <MeadowsD@FoodCity.com>
**Cc:** Charlie Fugate <fugatec@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** RE: Christopher Batten

I will as soon as I can speak to Charlie about this issue.

Archie

**From:** Donnie Meadows <MeadowsD@FoodCity.com>
**Sent:** Monday, July 26, 2021 8:17 AM
**To:** Archie Skeens <skeensa@FoodCity.com>
**Cc:** Charlie Fugate <fugatec@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Archie:
Will you advise David on this service dog request?
Thanks,
Donnie

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Monday, July 26, 2021 8:07 AM
**To:** Donnie Meadows <MeadowsD@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Please advise on associate requesting to bring service dog to work at Gas n Go at 214.

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** Donny Rector <donny.rector@foodcity.com>
**Sent:** Monday, July 26, 2021 8:02 AM
**To:** David Ellison <David.Ellison@foodcity.com>
**Cc:** Sarah Spahr <spahrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Welcome back! Got this one late last week, associate with a service animal I thought you might want to take a look at.

**From:** Gary Richards
**Sent:** Friday, July 23, 2021 2:17 PM

EXHIBIT
11
D. Meadows
PENGAD 800-631-6989

**To:** Donny Rector <donny.rector@foodcity.com>
**Subject:** FW: Christopher Batten

**From:** Emily Hobbs
**Sent:** Friday, July 23, 2021 2:15 PM
**To:** Gary Richards <Gary.Richards@FoodCity.com>
**Subject:** Christopher Batten

*Emily J. Hobbs*
*Store #214*
*Human Relations Coordinator*
*150 Highway 41*
*Ringgold, GA 30736*
*706-891-2606*

**Emily Hobbs | Human Relations Coordinator | Food City 214**

**Gary Richards | Store Manager | Food City 214**

**From:** Archie Skeens <skeensa@FoodCity.com>
**Sent:** Monday, July 26, 2021 8:44 AM
**To:** Donnie Meadows <MeadowsD@FoodCity.com>
**Cc:** Charlie Fugate <fugatec@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** RE: Christopher Batten

I will as soon as I can speak to Charlie about this issue.

Archie

**From:** Donnie Meadows <MeadowsD@FoodCity.com>
**Sent:** Monday, July 26, 2021 8:17 AM
**To:** Archie Skeens <skeensa@FoodCity.com>
**Cc:** Charlie Fugate <fugatec@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Archie:
Will you advise David on this service dog request?
Thanks,
Donnie

**From:** David Ellison <David.Ellison@foodcity.com>
**Sent:** Monday, July 26, 2021 8:07 AM
**To:** Donnie Meadows <MeadowsD@FoodCity.com>; Sherrell Lyon <lyonjrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Please advise on associate requesting to bring service dog to work at Gas n Go at 214.

David Ellison
Human Resources Specialist
Chattanooga Division
T: 423.910.6055 ext. 3553

FOOD CITY

**From:** Donny Rector <donny.rector@foodcity.com>
**Sent:** Monday, July 26, 2021 8:02 AM
**To:** David Ellison <David.Ellison@foodcity.com>
**Cc:** Sarah Spahr <spahrs@FoodCity.com>
**Subject:** FW: Christopher Batten

Welcome back! Got this one late last week, associate with a service animal I thought you might want to take a look at.

**From:** Gary Richards
**Sent:** Friday, July 23, 2021 2:17 PM

PENGAD 800-631-6989 EXHIBIT 11 D.Meadows

**To:** Donny Rector <donny.rector@foodcity.com>
**Subject:** FW: Christopher Batten

**From:** Emily Hobbs
**Sent:** Friday, July 23, 2021 2:15 PM
**To:** Gary Richards <Gary.Richards@FoodCity.com>
**Subject:** Christopher Batten

*Emily J. Hobbs*
*Store #214*
*Human Relations Coordinator*
*150 Highway 41*
*Ringgold, GA 30736*
*706-891-2606*

**Emily Hobbs | Human Relations Coordinator | Food City 214**

**Gary Richards | Store Manager | Food City 214**