A Yes, sir.
Q Okay. And let me ask you, I want to kind of get an outline of your job history with Food City. Do you remember when you first started with Food City?
A I started there in 2001.
Q All right. Do you remember what your starting position was?
A Vice president human resources.
Q Oh, okay. Had you had any prior experience in that area?
A Yes, I had.
Q All right. Well, let's -- let's back up, then, a little bit and go back to after you graduated with your bachelor's and your graduate degree in industrial relations, where did you first land career-wise?
A Initially I was with another supermarket chain. And once I completed my graduate degree, I was there first in a human resources capacity. Later I merged over into overseeing the operations.
After that service I was employed at Walmart corporate on they're -- in their people division on a labor team. And from there I joined

I'm not sure.
Q Okay. It's at least possible that those decisions could have been made without your direct involvement. Is that what you're saying?
A Yes. That's possible.
Q Okay. But on some occasions you would be asked to advise on those?
A Yes.
Q Okay. And then on some, correct me if I'm wrong, you would -- you would actually make the final decision.
A Yes. That's correct on some.
Q Can you give us any insight into what would -- what would make an ADA compliance question, what would necessitate your direct involvement on one of those versus one that you could let someone in operations decide?
A The nature of the accommodation requested I think would be the best way to describe that.
Q Right. Can you flesh that out a little.
A No. I can't give you a specific one, no.
Q In August of 2021, I know that's

close to the transition period, but in August of 2021, were you the one in charge of the HR department at Food City?

A I was until August 27th. That's -- that was my retirement day.

Q Okay. So as of -- at least up until August 27, 2021, would you have been the one responsible for making sure that Food City is in compliance with federal laws and regulations?

A Yes, sir. I would have reviewed those requests.

Q All right. Did Food City ever provide you with any training or education on how to ensure compliance with federal laws and regulations?

A So Food City provided me an opportunity to -- to have resources for that education. So I've over the years attended a number of WA conferences, several of those provided by Howard's organization. I also attended some of the more regional or local firms.

As well I attended EEO compliance training and I believe that was in Charlotte, North Carolina, a couple of times. I completed online courses or more like a Zoom-type of

recommendation that we place him on leave after he refused to consider the accommodation that we served up.

Q Okay. Who made the decision to deny Mr. Batten's request for the use of a service dog?

A That would have been -- I made the decision to Mr. Ellison. My recommendation was that we not move forward with the service dog, but we move forward with a different accommodation.

Q Okay. I'm not trying to -- I'm not trying to beat a dead horse. I just want to make sure I understand who the decision-makers were. Did you make the decision and relay that to Mr. Ellison or did you and Mr. Ellison make the decision together?

A I made the decision based off of information provided to me from Mr. Ellison.

Q Okay. Did anyone else provide information to assist in your making that decision?

A General counsel.

Q Okay. Do you remember, if you can, when the decision was made to deny Mr. Batten's request?

A No. I don't remember.

save his job, give him a chance to reconsider either going the current role or accepting the assignment as the Uscan cashier.

Q Based off of the training material in Exhibit 2, would you agree that it would have been Food City's position that Mr. Batten was a qualified employee?

A Mr. Batten was a satisfactory employee performing essential functions of his job without any accommodation and we were willing to give him an accommodation, but different than his request.

Q Let me ask a better question. Referring to Exhibit 2, specifically the definition of qualified employee, since you've said Mr. Batten was able to perform the essential functions of his job without accommodation, would he still be considered a qualified employee?

A Yes. There was no question about whether he was a qualified employee.

Q Okay. And I mean a qualified employee specifically with regard to Food City's ADA compliance.

A I'm not sure I follow the clarification you're seeking there.

Q Well, what I'm referring to is the ADA training material in Exhibit 2 where it says that "A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question." And what I'm trying to understand is if, to your knowledge, it was Food City's position that Mr. Batten was a qualified employee because he could do the job without reasonable accommodation?

A He certainly was a qualified employee, yes.

Q And to your knowledge, was a qualified employee who could perform the job without reasonable accommodation, were they ineligible for reasonable accommodation?

A Any qualified employee would be eligible for a reasonable accommodation if there was a need. That's part of the process to determine the need being requested and if there's another way to satisfy that need.

Q Okay. We'll talk some more and I want to look at some statements and emails regarding the conversations with Mr. Batten, but with regard to your decision to deny the use of

the service dog and instead suggest the alternate position in the store, did you do that because you made the determination that the allowance of the service dog would be an undue burden on Food City?
A I did not. I just was trying to find an accommodation.
Q What was the reason for denying the use of the service dog, then?
A We could meet the need that Mr. Batten had requested assistance to through another accommodation.
Q Okay. But if you could meet the need with the requested accommodation and it wasn't an undue burden, then why not just provide that requested accommodation?
A We were in our informal discussion and exchange. Isn't that the purpose to -- to explore alternatives? And that's as we did.
Q Okay.
A So we felt we had a reasonable alternative assignment that would meet his need without the specific accommodation he requested.
Q Did you in your capacity of the VP of HR, did you have some problem with the use -- with Mr. Batten's use of his service dog?

A Absolutely not.
Q Then what I'm trying to understand is if you didn't have a problem with it, why would you suggest an alternative?
A How -- just simply exploring how could we meet the need as he requested for the stability. So that's the only reason.
Q Did you believe that Mr. Batten's use of the service dog would not meet his need?
A I did not make any assessment of that.
Q Did you or anyone else at Food City ever make the determination that Mr. Batten's use of the service dog would constitute an undue burden on Food City?
A No, sir.
Q Did you think it would constitute any type of burden on Food City?
A No, sir.
Q Can you tell me anything else to explain why, then, you would have offered an alternative instead of just granting the requested accommodation?
A Simply trying to meet his need for stability and the job that was proposed to him

allowed for that, but it was simply, you know, an open discussion that he was very close-minded to.
Q He would only accept the use of the service dog as an accommodation; is that right?
A That's what was conveyed to me that he -- he served it up as an ultimatum, dog or not work.
Q Did Food City not give him an ultimatum, Uscan position or not work?
A That's not true. We served that up. He did not accept it and did not explore further with us what other type of accommodation might make it feasible for him. So no, sir.
Q All right. Well, Food City didn't accept his request for the use of a service dog; did they?
A We had not fully explored alternatives.
Q Why didn't Food City further explore the use of his service dog?
A Mr. Batten -- Mr. Batten wouldn't engage in discussion with us for any other alternatives.
Q After Mr. Batten left Food City's employment, do you know if anyone filled the fuel

A Yes.
Q Whereas, the Uscan position has a podium; is that right?
A It does. It could still have a stool or, you know, some other aid, whether that would be a wheelchair or a cane or walker, whatever appropriate for the individual to be able to provide the stability needed to perform the job.
Q Okay. But we've got to be clear. The Uscan position without any modification is a standing only position, yes?
A Routinely it's without a stool or a chair.
Q Okay. Now, you mentioned a few things that could be done to change that, stool, wheelchair, cane. None of those things were ever suggested or even offered to Mr. Batten; were they?
A According to this document that was not discussed, but, again, my call with Mr. Ellison, Mr. Batten wasn't open to discuss it any further, so.
Q Well, let me ask you this. When Mr. Batten said I can't do the Uscan position because that's a standing position, don't you

perhaps continue.
A Yes.
Q Did anybody at any point during this leave of absence that Mr. Batten was placed on reach out to Mr. Batten and say, hey, we know you said you couldn't stand in the Uscan position, well, we can offer you a stool?
A So you remember I retired and I don't know what took place after Mr. Batten took the leave of absence. So I can't speak to that.
Q Okay. As far as you're aware, did that happen?
A Again, I retired. So I don't have any knowledge of it.
Q Okay. That answers my question.
All right. I'm going to share my screen again. All right. I'm going to ask you if you recognize this document and there's a signature down below. So I'm going to scroll down to it. Do you recognize this document?
A I don't. I'm not going to declare it wasn't an exhibit, but I don't recall a document from the assistant manager.
Q Okay. Do you recall whether you reviewed this particular document in the context

A Typically, no. If it were -- if it were any type of safety issue involved in the request as far as need for a piece of equipment or etc., then would possibly consult with them, but routinely, no.
Q Okay. Is an employee who is a fall risk, is that a potential safety issue?
A Well, absolutely.
Q I know these sound like dumb questions, but I've got to ask them. Can an employee who falls down, can that prevent that employee from doing their job?
A As a result of an injury from falling down might prevent them, but no. We all fall from time to time, I think, so no.
Q Well, during the context of the fall, can that interfere with your ability to do your job?
A Short of an injury, no.
Q If you're injured when you fall, can that interfere with your ability to do your job?
A Certainly.
REPORTER: Did you want that to be 11?
MR. HARGRAVES: I thought that was

preferred solution. It doesn't mean it's the only solution.
Q Did you understand that the service dog was specifically trained to meet multiple of Mr. Batten's needs?
A I don't recall. No, I don't recall that.
Q Did you or anybody else at your direction ever ask Mr. Batten what it was about the service dog that he needed?
A I believe that's in one of the discussions that he and Mr. Ellison had.
Q And Mr. Batten indicated that the dog helped with anxiety, isolation, and stability; right?
A Yes.
Q So Mr. Batten maintained that the dog helped with all three of those. Is that fair?
A According to the statement.
Q Right. Did you have any reason to doubt that?
A No.
Q Okay. And was Mr. Batten ever offered any accommodation that similarly addressed all three: Anxiety, isolation and stability?

A I think the discussion for alternative accommodations was cut short by Mr. Batten.
Q So it's Mr. Batten's fault that Food City didn't offer him a more appropriate accommodation. Is that what you're saying?
MR. JACKSON: Objection. Go ahead and answer.
A It's a dual responsibility to explore those alternatives. He wasn't willing to do so.
Q Did he say that?
A When he ended the session.
Q Oh, how did Mr. Batten end the session?
A I'm going to work with my dog or I'm not going to work. I'm paraphrasing, but in essence, that was his ultimatum.
Q Well, he responded to the proposal of the Uscan position; didn't he?
A According to the document.
Q He responded that the Uscan position wasn't appropriate because it made him stand and he physically couldn't stand all the time; isn't that right?
A Yes. That's what the document said.

Q And nobody ever responded to that by offering any solution that would allow Mr. Batten to address that aspect of his disability; is that right?
A I think the discussions were cut short before we got to that level, yes.
Q Is it your testimony that Mr. Batten prevented Food City from offering him a modification to the Uscan position?
A Prevented him?
Q Is it your testimony that Mr. Batten prevented Food City from offering him a modification to the Uscan position that would address his stated stability concerns?
A No.
MR. HARGRAVES: I think I'm done, but can we just take a brief recess, about five minutes, and let me just look over my notes and then we can come back.
MR. JACKSON: Sure.
(Thereupon, a brief recess was taken.)
BY MR. HARGRAVES:
Q Mr. Meadows, has everything you've said here today been true to the best of your abilities?