think is what he asked me.

**Q Do you know why he asked that?**

A I don't know.

**Q Okay. But that was not -- that response you received, that wasn't on July 23rd? That wasn't the same day, was it?**

A It was the same day -- I couldn't tell you the date. Just the day that Mr. Batten came in.

**Q Was Mr. Batten sitting there waiting while you were trying to sort all this out?**

A We waited for a little bit. We waited for a response. Then he went home because, like I said, he was there before his shift started.

**Q Did he ultimately get to work his shift that day?**

A He did.

**Q I'm going to -- we want to talk about the details a little bit more, but ultimately did you make the decision to at least temporarily allow Mr. Batten to use his service animal?**

A I did.

**Q Do you think that was a reasonable decision to make?**

A I think so at the time, yes.

**Q At that time, could you think of any**

**reason why it would be a problem for Mr. Batten, as the fuel clerk, to have his service animal in the kiosk?**

A Not at the time, no.

**Q Sitting here today, have you changed your mind on that?**

A I have not.

MR. HARGRAVES: Okay. All right. I want to show you another document. Let's mark this Exhibit 2.

(Whereupon, the document, as referred to above, was marked and subsequently attached hereto as Exhibit No. 2.)

BY MR. HARGRAVES:

**Q All right. Looking at Exhibit 2, Bates number 000132, do you recognize this document?**

A Yes.

**Q What is it?**

A It's a statement that I made.

**Q Did you draft this?**

A I did.

**Q Do you remember when you drafted it?**

A I'm assuming on November 30th.

**Q Okay. And this at least initially describes the events that occurred on July 23rd of**

Q But you don't recognize the other pages?
A It was over a year ago. Sorry.
Q That's fine. To your recollection, did Mr. Batten give you any other paperwork?
A I can't remember.
Q During the period of time -- let me ask you this: How long was Mr. Batten permitted to work with his service animal?
A I can't remember.
Q Okay. Was it approximately a week?
A Probably about that. It was -- because David was on vacation. When he got back.
Q During that week were there any issues with Mr. Batten using his service animal?
A Not that I'm aware.
Q Have you since become aware of any issues during that period of time --
A No.
Q -- of Mr. Batten using his service animal?
A No.
Q You got a call from David Ellison on this issue on July 30th at around 4:00; is that right?

A No.
Q Okay. Do you know why you would have had those two additional phone calls on August 2nd and August 5th?
A I don't know.
Q Is there any record of those phone calls anywhere?
A Not that I'm aware.
Q Ultimately, you set up a meeting with Mr. Batten on August 6th; is that right?
A If that's what it states, then yes.
Q Do you remember how that was communicated to Mr. Batten?
A I don't remember.
Q Okay. Do you remember if Mr. Batten was told ahead of time that David Ellison, the senior HR specialist, was going to be there?
A I can't remember.
Q Is there any reason you would not tell Mr. Batten --
A No.
Q -- that Mr. Ellison was going to be there?
A No.
Q And you indicated that Mr. Batten

worked July 23rd, 24th, 25th, 27th, 30th, 31st, and August 1st. Does that sound right?

A Yes.

Q That's one, two, three, four, five, six -- that's seven days. So that's the week we talked about.

A Okay.

Q So he worked all of those days, as far as you know, with his service animal?

A Yes.

Q Before we get into the August 6th meeting, was there anything else about the July 23rd meeting between you and Mr. Batten that is significant that you remember?

A Not that I can remember.

Q Do you remember talking with Amber Grindle on that day?

A No.

Q Do you remember who Amber --

A I know who Amber is, but --

Q She didn't come into your office to make a complaint?

A I can't remember.

Q Do you remember Mr. -- when Mr. Batten came to see you, he had a service animal with him?

formally denied; is that right?
A If that's in the statement, then yes.
Q And that was after he had -- Mr. Batten had already worked for a week with the service animal without incident; is that right?
A Yes.
Q Do you have any idea when the decision to deny the request for a service animal was made?
A I do not.
Q Okay. So this was -- was this the first time that you were hearing about the result of the decision?
A I don't remember.
Q Okay. Had you had any discussion with anyone prior to this meeting regarding the offer of the USCAN position to Mr. Batten?
A I don't remember.
Q What is the USCAN position?
A The USCAN attendant?
Q Yes, sir.
A They oversee self-check.
Q That's the -- if you're at the self-checkout, that's the associate who is kind of hanging around in the middle, will help you if you have any issues?

A Correct.
**Q In your experience, that's a standing and moving position; is that right?**
A Correct.
**Q That's not a "you can sit down" position?**
A Correct.
**Q Do you have any idea of why the USCAN position was offered to Mr. Batten?**
A From what you read, it was to provide so he wouldn't be alone. Is that what the statement said?
**Q "Suggesting USCAN attendant as it would allow him to be around others." Is that -- was that your understanding of why that was being offered to him?**
A Yes.
**Q Did you have any understanding of how the USCAN position was going to accommodate Mr. Batten's stability issues?**
A I didn't make the decision.
**Q Okay. And I understand that, but my question is, did you have any idea or insight into --**
A No.
**Q -- how or why the USCAN position would**

accommodate his stability issues?

A No.

Q Sitting here today, can you think of any ways that the USCAN position would have accommodated Mr. Batten's stability issues?

A No.

Q As you wrote, the Gas 'N Go position was the only position that allowed him to sit and stand as needed; is that fair?

A Fair.

Q Do you recall that although Mr. Batten was offered the USCAN attendant position, he -- he was told that he would not be allowed to bring the dog into the store with him in that position?

A I don't remember.

Q Okay. Do you remember if Mr. Ellison offered Mr. Batten the use of a stool or a chair in the USCAN position?

A I don't remember.

Q Would the -- would the use of a stool or a chair in the USCAN position potentially cause a safety hazard?

A No.

Q No. It wouldn't -- it couldn't potentially be a tripping hazard for customers?

A Not that I -- I don't see one.

Q Okay. But nevertheless, the USCAN attendant position is not one that utilizes a chair or a stool?

A No.

Q In the narrative that you wrote regarding your meeting on August 12, 2021, as I read it to you, there was nothing in there about Mr. Batten talking about his history of falls, correct?

A Correct.

Q Do you remember Mr. Batten in that meeting talking about his history of falls?

A I don't remember.

Q You don't remember Mr. Batten saying that the last time I fell, I knocked myself out?

A I do not.

Q Do you understand how a service animal can help someone who has gait instability or difficulty maintaining --

A I do not.

Q -- balance? You don't understand that?

A No.

Q Do you remember Mr. Batten at any

A Yes. We had to fill the position, but I don't think there was anybody hired.

**Q Outside of communications with Food City's attorney, are there any other communications that you had with anyone regarding Mr. Batten's request for the use of his service animal that we haven't already talked about?**

A None that I'm aware.

**Q Okay. When Mr. Batten -- this is going back to July 2021. When was the first time you became aware of Mr. Batten's desire to go to a training camp for his service animal?**

A I think he had actually went on vacation, and they told me -- I was informed that the reason he was going, he was getting a dog. I didn't know it was a service dog.

**Q Do you remember when you were informed of that?**

A I couldn't tell you.

**Q Do you remember who informed you of that?**

A No, I do not.

**Q Mr. Batten was part time at that time, correct?**

A I don't remember.