MR. JACKSON: Same objection.
A Yes.
Q Is it Food City's policy to provide a reasonable accommodation to disabled employees when it does not cause any undue hardship on the company?
A Yes.
Q Do you know when Food City first became aware of Mr. Batten's disabilities?
A I don't know an exact date, no.
Q To your knowledge, would that have been when they hired him?
A Again, my assumption would be yes, but I don't know.
Q Okay. And your assumption would be yes because Mr. Batten's disabilities are fairly obvious. Is that fair?
A That's correct.
Q I mean, you can look at him and see that he's missing his right arm.
A Correct.
Q All right. Would you agree that you can look at him and you might also see him limping?
A I would -- I would say yes, but,

or away, you would leave the fuel center unattended. And typically there's only one person working down there. So if something needed to happen quickly, you know, he would have to get someone from the store to come down. So it could be an undue hardship.
Q Okay. I've got to be clear. Was Mr. Batten ever told by Food City we're denying your request for the use of a service animal because it might be an undue hardship if you have to take the animal out?
A Not that I'm aware of, no, sir.
Q Okay. So he was never told that the reason for the denial was that there was any undue hardship on Food City?
A Not that I'm aware of, no, sir.
Q Okay. And, to your knowledge, Food City never made the determination that it would be an undue hardship?
A From what I've read, no.
Q Okay. Did you have -- did Food City have any reason to suspect that Mr. Batten's use of a service animal would not address his needs related to his disability?
A Could you repeat that. I'm sorry.

Q Yes, sir. Did Food City have any reason to believe that Mr. Batten's use of a service animal would not address his needs related to his disability?
A I'm sorry. Could you rephrase it.
Q Let me ask it this way. Mr. Batten asserted to Food City that the service animal would help with his disability. Is that fair?
A Yes, he did.
Q All right. Did Food City have any reason to doubt that statement from Mr. Batten?
A No.
Q Okay. So as far as Food City was concerned, Mr. Batten says he needs the service animal for his disability, we accept that, we believe that.
A That he -- that he said that he needs an accommodation to perform his job.
Q Okay. Did you have any reason to believe that the service animal would not -- was not an appropriate accommodation for Mr. Batten?
A If he -- if he says it's an appropriate accommodation, then certainly I would think it would be an appropriate accommodation for him.

Q So someone can work a job, can do all the things that they're supposed to do, but still have a need for an accommodation.
A Sure.
Q And I don't think this is the case, but I want to -- I need to hear it from you. Did Food City think that Mr. Batten was just making this up, that he was not being truthful about his need for an accommodation?
A No.
Q Okay.
A Absolutely not.
Q Did the fact that he had worked the job for over two years without any accommodation, did that make him ineligible for an accommodation?
A Absolutely not.
Q So why was that given as the reason that the accommodation request was being denied?
A I don't -- I don't think that that's the reason that it was being denied.
Q Okay. If that's not a reason that it was being denied, why is -- why did you mention it today and why is it mentioned here by Mr. Ellison?
A Again, I think it's just a statement that he's been doing the job for two years and

Mr. Batten's request for accommodation related to his disability specifically pertained to anxiety, isolation, and stability?
A You said -- what was your question again?
Q Did Food City understand that Mr. Batten's request for accommodation related to -- as it pertains to his disability related to anxiety, isolation, and stability?
A Yes.
Q Okay. So in engaging in the interactive exchange to come up with an accommodation that works, it would need to address those three things; right?
A Yes.
Q Okay. How would the Uscan attendant position aid with Mr. Batten's anxiety? Rather how would it meet his needs with regard to the anxiety?
A Well, again, it was a proposed accommodation in order for us to discuss what could work and what might not work.
Q Okay. But this position was selected out of many other possible positions as the one to propose to Mr. Batten; is that right?

A Yes. It was one that was selected for Mr. Batten.
Q Do you know if Food City considered how this particular position would aid Mr. Batten with regard to anxiety?
A I don't necessarily think that specific job is going to provide someone relief from anxiety.
Q Okay. How did the Uscan attendant position meet Mr. Batten's needs with regard to stability?
A Well, because it -- there's a counter there and you can -- if you need to lean on the counter, you can. And I've already told you that oftentimes there's folks at the Uscan if they -- if they need to sit and we even provide that and, like I said, we've had associates that are in wheelchairs that work the Uscan.
Q The Uscan attendant position without modification is a standing only job; right?
A Again, like I said, it is one that is very easily modified and we do it all the time.
Q And my question was without modification, the Uscan attendant position is a standing only job; right?

A If it's -- if it's -- if the position is not modified, that's correct.
Q And that was my question. So you're saying here today it could be modified; right?
A Because we do it all the time.
Q Okay. Mr. Batten was never told that the Uscan attendant position could be modified to accommodate him; was he?
A I don't think we had the opportunity to tell him.
Q Why is that?
A Because he made it very clear that if he didn't have this dog, then he wasn't going to work.
Q Okay. Well, let's look back at Exhibit 9. It should still be up there for you.
A Okay.
Q It's talking about the August 12 meeting between David Ellison, Mr. Batten, and Gary Richards. It says -- about the middle of the paragraph do you see where it's my cursor Mr. Batten?
A Yes, sir.
Q "Mr. Batten stated that there wasn't any position in the store that he would be able to

account of that August 12, 2021, meeting; right?
A Yes.
Q So Mr. Batten made it abundantly clear that he had a physical condition that would prevent him from standing for long periods of time in the Uscan attendant position; right?
A Yes, sir.
Q And in response to Mr. Batten saying I can't do that position because it would make me stand too long, nobody told Mr. Batten that the position could be modified to allow him to sit; did they?
A Again, it is something that we do all the time. It is a modification that we do all the time.
Q Mr. Lyon, I did not ask you that question. I asked you if it was ever told to Mr. Batten that the position could be modified to allow him to sit?
A To my knowledge, no.
Q No. Nobody ever offered Mr. Batten the use of a stool in the Uscan position; did they?
A To my knowledge, no.
Q Nobody offered Mr. Batten the use

of a cane in the Uscan attendant position; did they?

A To my knowledge, no.

Q Nobody offered Mr. Batten the use of any assistive device in the Uscan attendant position; did they?

A To my knowledge, no.

Q All right. And you would agree that without modification, the Uscan attendant position would not address Mr. Batten's stability concerns; would it?

A It would -- it would not.

Q All right. Because without modification, it's standing and walking; right?

A Well, and leaning.

Q Right. You've got that podium there with the Uscan attendant. That's kind of their home base; is that right?

A Right.

Q And then they've got the self-checkout registers that they're responsible for; is that right?

A Yes.

Q So if anybody needs help with those registers, the Uscan attendant, they've got to

walk over to that register to help out the customer; is that right?
A If someone needs assistance, yes.
Q Okay. But, again, without modification, unlike the fuel clerk position, the Uscan attendant position would not allow Mr. Batten to sit down as needed.
A Without modification.
Q I've asked you about what was communicated to Mr. Batten with regard to -- rather what was not communicated to Mr. Batten with regard to a stool or a chair or other assistive device. Was there any communication internally not with Mr. Batten about the potential to supply Mr. Batten with a stool, chair, cane, or other assistive device in the Uscan attendant position?
A To my knowledge, no.
Q All right. So that wasn't -- that wasn't some plan of Food City's that they just never got around to.
A To my knowledge, no, like I said, because it is such a very common modification of that job. It's almost a given.
Q Okay. Well, but Mr. Batten indicated

A Yes.
Q Does that appear to be a fair and accurate copy of that statement?
A Yes.
MR. HARGRAVES: All right. We'll make that Exhibit 10.

(Thereupon, Exhibit No. 10, Statement by David Ellison, 8/18/21, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:

Q In this meeting it says here on the third line, "I asked him again about the consideration of reassignment to a Uscan cashier. He once again denied that accommodation stating that he could not perform that duty."
Did I read that correctly?
A You did.
Q Okay. So Mr. Batten was clear that the reason he was denying the Uscan attendant position primarily is because he could not perform it.
A That's what it says, yes.
Q Okay. All right. Mr. Lyon, do you recognize this document Bates numbered 1068

Q And are there any other reasons for offering Mr. Batten the Uscan attendant position that we have not discussed?
A No, sir.
Q Are you aware of whether another employee or new hire was selected to fill Mr. Batten's position as the fuel clerk after he was terminated?
A It was filled internally.
Q Okay. Do you know who filled it?
A No, sir.
Q Do you know whether that employee who filled the fuel clerk position for Mr. Batten has a disclosed disability?
A Not that I'm aware of, no.
Q So as far as you know, the person who filled Mr. Batten's position does not have a disability?
A As far as I know, that's correct.
Q All right. Mr. Lyon, I think that's all that I've got for you. Just one final question. Has everything you've said here today been true to the best of your abilities?
A Yes.