**Q On this Exhibit 1 are there any retail businesses listed here?**
A I mean, if you're talking about like banks, retail, is that what you're asking?
**Q (Moves head up and down.)**
A Yes.
**Q So banks?**
A Yeah. Things of that nature, yes, sir.
**Q Okay.**
A Like financial services you see in there.
**Q What about like a grocery store or a drugstore?**
A Huh-uh.
**Q Nothing like that?**
A No, sir.
**Q Or even like a Best Buy or a Wal-Mart?**
A No, sir. I have to take my situation into full consideration, and my situation being physical limitations. All of these inside retail positions, every single one of these has a desk.
**Q So you want to be in a job where you have a desk and a chair?**

A I need a job that -- I need a chair at any job that I come into. I have a titanium femur. I have a plate and 16 screws in my right ankle. I have a plate and 19 screws in my right hip. And my right leg, as a result of this, is a little bit longer now because of the exterior hardware. My gait is altered. It's not exactly the most stable. It's like walking with one shoe on is how it feels. I know that that's a dramatic explanation to it. Not quite as much, but it's very close.

So I want to be mobile. I physically cannot be mobile, as in on my feet for three, four, five, six, seven, eight hours, however long it is.

**Q All right. So you need a desk --**

A (Moves head up and down.)

**Q -- in whatever sort of work you're going to do?**

A Yes, sir.

**Q Is there any other sort of physical requirement besides a desk that you would be aware of?**

A I mean, I can't speculate to the amount of other things that I need until I get to it. When -- since I'm missing my right arm I have

**position?**

A Yes, sir.

**Q Number 3, receive and be accountable for funds; you did that?**

A Yes, sir.

**Q Number 4, keep workstation and area around fuel station neat and clean. Did you do a little bit of cleaning?**

A I did, to the best of my ability, whether -- if it be in pain. I don't want to be as vague to say as this applies to every single one, but it does. I'm a day-by-day person when you add the totality of all the injuries I have. Cleaning, reaching up, specifically, is painful. Squeegeeing is nearly impossible, and that store, for whatever reason, the kiosk floods, and I had quite a bit of difficulty with that, with that difficulty being able to try to stay ahead as much as I can. That's how I completed the function, but it was not easy.

**Q Did you get any help from others doing that or did you just sort of do what you could?**

A At times. And at other times I just did what I could.

**Q Did you ever get any complaints about**

multiple areas, and if I -- one in particular, if it didn't come off in time, as being cleaned off in time, you would see where it had eaten -- left its mark, very acidic. Things like that were difficult to get done in time because I am a good bit slower than I would assume the normal average fuel clerk.

**Q Did you do some of those cleaning duties sort of as able?**

A I tried, yes.

**Q Did others give you some assistance with cleaning, as far as you can recall?**

A You know, I don't recall how Ms. Reba broke things down. At that store specifically it was broken down into three shifts. Some things would have covered -- would have been covered throughout the day, some things at open, some things also at close. So I can't give a definitive as to what I was helped with, how much help I received per job function.

**Q Number 3 says cleaning the concrete area around the pumps. Did you do some of the concrete cleaning?**

A That was extremely difficult because it required a deck brush, you know, a coarse-haired brush, long stick around the pumps and specifically

the speed bumps.

**Q Not easy to do?**

A Not easy to do with one hand. And that's just the scrubbing. The other part is the hose, pulling the hose around from one side to the other. I have stumbled, and I can say without question one of the scariest things that I go through is falling and watching the ground come and I can't do anything to stop it.

So moving a hose around, stumbling over the speed bump, those are all fears, and I tried to do what I could without compromising myself physically.

**Q Did you actually do some of this concrete cleaning?**

A Some.

**Q To the extent you thought you could safely do it?**

A Some, yes.

**Q All right. Collect trash as needed.**

A Did not.

**Q You didn't do that?**

A No. It goes back to I can't put a trash bag in the trash can.

**Q Were you in essence excused from**

A Yes, sir.

**Q What did she say?**

A She would take me to a pump and do it in front of me, and it wasn't pleasant. I mean, if it wasn't done to her satisfaction when she came in, then she'd -- there was a need to show me over and over, regardless of my explanation of how I could do what I could do or what I could not do, didn't matter. Do it faster. I can't do faster.

**Q She never understood that?**

A I'm not sure what -- I can't speculate what she was thinking at all times.

**Q She continued to give you some feedback on that subject, though?**

A In a negative manner she did it, and she did it publicly.

**Q Did she ever stop doing that while you were at 773?**

A No, sir.

**Q So these tasks that we've been talking about, did your ability to do them, or in some cases the difficulty doing them in other cases, did that remain fairly constant during your employment?**

A Yes, sir. I mean, that's my life.

Standing, whether if it's at home, my mom's house, the park for any extended period of time -- I don't have a great distance. I cannot make it very far due to the shape, discomfort, whatever the case may be. So, yeah, things, to this day, are difficult.

**Q When you were working in the fuel kiosk were you able to sit fairly often?**

A I was. That was the number one drive to that -- or number one thing about this job. I didn't care what the job was. I just had an opportunity to sit if I couldn't stand and stand when I could stand.

**Q If a customer came in the kiosk to buy something could you ring them up while you were sitting?**

A I don't think so. Whatever they needed, if I had to scan a card, whatever, I'd get to the window and I'd stand up for that, getting up and down.

**Q Was that usually a pretty short period of time when you had to stand to do a transaction?**

A There's -- for one transaction it's not much, but when you add multiple transactions on top of it, to where there is no getting back to a

chair -- that store is, from what I understand, fairly busy in comparison to the others because it has more pumps. I mean, there was times where I was stuck standing up, having a line. Yeah, so each individual one would be short, but added together is a game changer, yes, especially if somebody is hitting the call button, they need help. I can't be in two places at once, so...

**Q So at some point you -- well, let me do this.**

**(Whereupon, Exhibit Number 4 was marked to said deposition and will be subsequently attached hereto.)**

BY MR. JACKSON:

**Q Exhibit 4 is a receipt for associate handbook and the second page has an electronic signature. Do you agree that you got a handbook and you signed that you received it?**

A By handbook I think it means Fast Tracks, which are computer testing. They will walk through, this is how you do in this situation, and then at the end of whatever presentation it was there would be a test behind it. That's what I recall as a handbook.

**Q You don't recall getting actually --**

A I do not recall a physical handbook.
**Q Do they have an online resource for employees?**
A It's an in-store system. You can't go home and do these. This is at the store.
**Q That in-store system, do you know if you could access documents such as a handbook?**
A From -- I do not recall a handbook. I recall these Fast Tracks, these tests, as an ongoing thing that they -- you would get every few months; five, ten, 15 would pop up and you just clear them as you go. They try to keep it current.
**Q I don't know if you said this, but you were hired in the fuel clerk position and that was part time?**
A Yes, sir.
**Q Roughly 28 hours a week?**
A Yes, sir.
**Q Did that stay consistent during your time at Food City?**
A No, sir.
**Q How did it change?**
A It changed -- are we still talking about store --
**Q Let's stay with 773 for now.**

same response, because I never thought I would have another job. I never thought I'd be independent again, and I made it clear that I was pissed, I was hurt, but I didn't want to cause somebody else what I had just gained, which was my independence and a job.

You know, I was angry at Vince. I never got over it with him. I don't think I've talked to him. I let him know I was angry. But that was -- that was the first of two issues: One, Vince doing that.

And then the second was back to this whole never stop hiring, because they were -- at 701 one day they were short. They did not have enough people working on an extraordinarily busy day, for whatever reason it was, and the person that worked in the kiosk that day worked inside and asked me if I would come in. Actually, I think it was they realized it the day before. So I got there, I wasn't scheduled to work that Saturday and I came in and I worked. I was just going to do exactly what they asked, if I would come in and help them out, yes.

So I came in, worked up until my lunchtime and I was walking out to go to lunch, and

at this store, being two shifts a day, the shifts are longer. It was agreed upon, I mean, from day one with Mandy Hester that when I took my lunch breaks I'd take an hour. I need that hour. I go home and -- I lived a mile from that store. I'd go home and lay down, charge my TENS unit, whatever the case may be. I need that time.

I'm walking out and Linda Santana, the HRC at 701 said, I need you back in 15, 20 minutes.

And I said -- I stopped and said to her, I said, I always take an hour and y'all asked me to come in.

And she's standing at the front, for whatever reason -- I don't even know why she was there -- panicking, but she stopped whatever she had going on and looked straight at me and said, you don't have a choice, and walked off.

And so I went on lunch. I mean, I took my hour and I came back, and within a couple of days of that happening I went in to see Mr. Johnson and Ms. Hester and I asked them, I said, I can't do this, because there was a lot of this pulling and a lot more dysfunction, and it just got too much.

**Q How did Mr. Johnson and Ms. Hester**

**respond?**

A They said, okay. That was it.

**Q How long after that was it before you transferred to 214, just roughly?**

A I would say within a month, maybe. Now, I had had a conversation with some -- with the fuel coordinator back at 774, a store I'm familiar with, and I went straight to the fuel coordinator and asked if they needed help and this lady said, yes, yes, we do. But I had already reached out to store 214, and I believe it was -- I think it had to have been Emily Hobbs. And in the discussions leading up to this -- I worked four days a week here. They -- we've come to an agreement to where I'm working four days in a row. I have my hour off for my lunch, and I have the three days off, which helps me physically. And Emily Hobbs, yeah, no problem, we need the help. You know, somebody was leaving.

So I get there and it was -- it was three days a week and every time I tried to ask, you know, what happened, why is this -- why did you tell me four days when they're only now letting me work three, I didn't get anywhere. But that is the 701 to 214, and that was the sequence of events that led

me there, up to getting started there.

**Q So Gary Richards is the store manager at 214?**

A Yes, sir.

**Q Who was your supervisor at 214?**

A For the life of me, I cannot remember her name. She was a fuel coordinator; I do know that.

**Q Female?**

A Yes.

**Q And you were again working in the fuel kiosk?**

A Yes, sir.

**Q Were things about the same?**

A Yes, sir.

**Q Still part time?**

A Yes. Yes, sir. It was less hours.

**Q While you were at Food City did you apply for any of the jobs that are inside the store?**

A No, sir.

**Q Any particular reason?**

A I physically cannot do them. Stocking is something -- if I'm putting something on the bottom shelf and I'm putting stuff on the top shelf, everything in between, I -- that's just

A Yes, sir.
**Q Who did you talk to?**
A I don't recall how those conversations worked out but there was advance notice with the fuel coordinator and -- I would assume Emily Hobbs had to have been, but I don't -- actually, I don't want to assume that. I know the fuel coordinator was, but outside of that I don't recall.
**Q You got the time away, correct?**
A Yes, sir.
**Q At that time were you using any kind of assistive devices at work before you left for training, like a cane or any kind of device that you used?**
A The only device that I use is an implant and it's a neurostimulator.
**Q What does that do for you?**
A It sends a signal. The implant is above -- in my lower left back. The cord goes up my spine, and it sends an electrical signal that is -- it's basically tricking my brain that the pain that I feel in my hand -- I turn it on and it covers it up.
There's no physical tool or anything

like that that I'm using that's external. That's just a pain -- and that's the only -- and I've had that for -- oh, years before Food City.

**Q That helps you deal with pain?**

A Yeah. When you said devices I didn't want to leave anything out.

**Q Thank you. Who was the first person at Food City after you returned from the camp that you spoke to about coming back to work?**

A I am not sure. How do you mean?

**Q Did you talk to your coordinator, to Emily, to somebody and say, hey, I'm ready to come back to work now, I have this dog?**

A Oh no, no, no, no. It was -- I was scheduled off for two weeks and then right back on. There was no conversation about me coming back to work; I never left. I was out of town for two weeks, and that was abundantly clear.

**Q Who is the first person at Food City that you recall having any kind of discussion with about having a dog with you at work?**

A And so I need a little more clarification. So I was approved for a service dog almost six years ago today at this point. It's a long waiting list. I don't know if it's more than

**supervise a fuel clerk; is that correct?**

A No.

**Q Who's the first person that you recall in supervision at 214 having some discussion about, I'm going to bring a dog to work now?**

A So that's -- this question is -- I don't want to get it muddy. When I was approved, my time off to go get my service dog, my service dog was always coming back with me. That's what they're there for. She does not -- I did not get her to leave her at home. She is certified hearing, seeing, service, alleviating some of my personal issues, and it's not that, oh, by the way, when I come back home from this service dog camp I'm going to be bringing my service dog with me. I was always coming back with the dog. To say that I went down there and didn't tell anybody that I was bringing a service dog back is wholly inaccurate.

**Q I'm just asking if you have a recall of having some discussion with someone in management at 214 about, I'm going to get this service dog and be bringing it to work?**

A Emily Hobbs would have been a point person for this. I believe that her and the fuel coordinator would have gotten together on this.

**the reasons for wanting the service dog?**

A There were three meetings with -- two meetings with myself and Mr. Richardson and Mr. Ellison, and I'm not sure as to what happened in what order.

**Q Okay. So there was a first meeting?**

A Uh-huh.

**Q And then -- I'm talking about the first meeting now.**

A Okay.

**Q To the best of your recollection, in that first meeting do you recall Mr. Ellison asking you about your ability to do the job?**

A Yes.

**Q And how did you respond?**

A That I could do my job, but I do have limitations. I, again, am a fall risk. I'm always worrying about that. I do have PTSD. My stability and my gait and moving -- one thing that shields me, if I fall she comes to help stabilize me to help me get up.

**Q Do you recall whether you gave Mr. Ellison and Mr. Richards any sort of explanation to that effect in this meeting?**

A I believe that was the explanation.

A Yes, sir.

**Q And the second?**

A Yes, sir.

**Q Did you tell them you were recording?**

A I'm not sure.

**Q In the second meeting this was also Mr. Ellison and Mr. Richards, correct?**

A I -- one was with...

**Q The last one was with Mr. Wattenberger?**

A That's who -- that's who that was, yeah. So you're telling me it's the second. Okay.

**Q Yeah. I want to talk about the second meeting. There was a second meeting with Mr. Ellison and Mr. Richards, correct?**

A Okay.

**Q Do you recall --**

A I believe so, yes.

**Q And you recorded that one also?**

A Yes, sir.

**Q And your attorneys gave that to me?**

A Yes.

**Q In the second meeting was there some discussion of you perhaps being a USCAN coordinator or a USCAN cashier?**

A There were -- there was an alternate scenario that was put up, but to be clear, this was the -- I hope this isn't a crude expression, but it was a dead-on-arrival solution because for me to stand inside at the USCAN, at that USCAN desk, it did nothing for me standing for an entire shift, and that was just for isolation, is the way that that was framed, if I remember correctly. "What if we brought you inside around other people."

Okay. Well, that might help a little with the isolation, but it does nothing for me physically. It's actually much worse. I can't have a stool there. I have nothing -- I could do nothing but stand right there. That was my option.

**Q Just for the record, what is a USCAN cashier? What are their duties generally?**

A I have never done that job. As in passing, I think that it is making sure that people get checked out right, and if somebody is buying alcohol to check an ID. I think that that's the main deal with it.

**Q Suppose that Mr. Richards had agreed to let you have a chair in that position, would that have helped physically?**

A No. No, it would not. A chair

MR. JACKSON: I'm done, subject to any questions I might have after your attorney has asked.

EXAMINATION

BY MR. HARGRAVES:

**Q Mr. Batten, I just have a few questions. Did any of your job duties at Food City in your opinion put you at greater risk of falling down?**

A Yes.

**Q Like what?**

A Especially the curbs, using the cleaner and spraying all this outside at 774 that's slick, fall there. At 701, it is on a raised platform, and I actually fell into that kiosk a couple of times when I first got there because it is raised. Getting tobacco from the customer service and getting it ready for transfer I tripped over a toolbox twice. So it has happened so I know that it can.

**Q And had you communicated to Food City that you had fallen before?**

A No.

**Q In your conversations with David Ellison did you communicate that you had had falls**

**before?**

A Oh, yeah, I believe so.

**Q Okay. And is -- I don't know if we covered this, but your service dog's name is Mellow Joy?**

A It is.

**Q She goes by Mellow?**

A That's correct.

**Q Is Mellow trained to help you with your fall issue?**

A Yes.

**Q What does she do?**

A She is, for lack of a better term, a stabilizer. She will come to me, allow me to use her to push onto to gain whatever leverage I can, far short of putting my entire body weight on her, to be able to get back to my feet.

**Q What other kinds of tasks is she trained to perform for you?**

A She is certified in seeing and hearing. She's also -- she can retrieve. I've had -- when we walk I can lean into her. She leans back, which is a bit of a stability. When she's ahead and I'm pulling her leash she will keep it taught unless she's pulled back for stabilization.

**Q When did you first start the process to get a service dog?**
A I believe it was in 2017.
**Q So it was before you started working for Food City?**
A Yes, sir.
**Q In your conversations with David Ellison did he ever offer to provide you a chair in the USCAN position?**
A No, sir.
**Q In the time that you worked at Food City had you ever seen anybody else in the USCAN position using a chair?**
A No, sir.
MR. HARGRAVES: Nothing further.
MR. JACKSON: I don't have any follow-up. Thank you.
MR. HARGRAVES: I think we'll read and sign.
FURTHER THIS DEPONENT SAITH NOT.
(Signature reserved.)