**Q Okay. In this meeting that you had with Mr. Batten and Mr. Richards did Mr. Batten mention that he needed the dog for help with companionship, anxiety, and isolation?**

A Yes, sir.

**Q Okay. To your recollection, are those the only three things that he mentioned?**

A He did also mention about how he had previously fallen and could help with -- help him steady on his feet, but, yes.

**Q Okay. So he did mention stability or being a fall risk?**

A Uh-huh.

**Q Is that a yes?**

A Yes, sir.

**Q That's fine. All right. See, I told you it would happen. That's okay.**

**Do you recall him telling you that the dog would assist with stability?**

A He may have mentioned that that could be a function of the dog. I'm -- I can't exactly recall that, yes, he specifically stated those exact words.

**Q Okay. Looking at the, if you count that last word, the fourth line up from the bottom**

**starting with, "He also stated," do you see where I'm at on the right side?**

A Yes, sir.

**Q "He also stated that he has fallen about five times and the dog helps him steady on his feet." Is that what you wrote?**

A Yes, sir.

**Q All right. So he did indicate that the dog helped him steady on his feet?**

A Could help him, yes.

**Q Okay. Was it your understanding that that was at least in part because of the many surgeries that he had had related to his accident?**

A I'm sure that's what he would revert to, but I can't specifically state that, yes, that is why.

**Q Okay. Did he indicate that that was why?**

A He did make mention of the car accident and the multiple surgeries that he had had.

**Q Okay. Now, at one point you asked him if there had been any change in anything -- and just looking at the third line down from the top.**

A Uh-huh.

**Q "During this exchange I asked Batten**

A Yeah.

**Q -- is there any reference in that statement regarding the meeting on August 12th, 2021, that Mr. Batten indicated he had fallen in the past?**

A No, sir, I don't believe there is.

**Q Okay. Do you recall Mr. Batten telling you that he had fallen before in this meeting?**

A I do not recall that.

**Q Do you recall him stating, the last time I fell I knocked myself out?**

A No, sir.

**Q Now, in this meeting you informed Mr. Batten that the decision had been made that the service dog would not be approved; is that right?**

A That is correct.

**Q When had that decision been made?**

A I cannot give you an exact date. I know I met with Mr. Batten the first time on August the 6th. I would have taken that information back to Donnie Meadows on that particular day, and it would have been sometime before the 12th but I cannot give you an exact date.

**Q Okay. Forgetting about an exact**

**or something they'll come over and help you out?**

A Yes, sir.

**Q Okay. It's fair to say that's a job that has that associate on their feet?**

A Yes, sir.

**Q Okay. Do you remember what Mr. Batten said when you floated the idea of him working the USCAN position?**

A He immediately stated that he could not do that because he could not stand for prolonged periods of time. When trying to ask him as to, you know, gauge how long he might be able to sit or stand, he could not give me any definite time frame to even try to, you know, accommodate that matter. He just immediately shot it down and said, no, I can't do that.

**Q Okay. Well, did you advise Mr. Batten that he might be able to sit down for some period of time in that position?**

A Unfortunately, we never got to that --

**Q Okay. So you never --**

A -- discussion.

**Q Okay. You never offered, hey, we can give you a stool, we can give you a chair?**

A No, sir.

**Q Okay.**

A Outside of him just, you know, immediately shooting it down.

**Q Okay. Was it your intent to offer him a chair?**

A No. I mean, we can't speculate as to, you know, what other accommodations could have been offered.

**Q Okay. Well, let me just ask you this: At the time you what were meeting with Mr. Batten on August 12th, 2021, you say he shot the USCAN position down. At the time you had the meeting did you intend to offer him the accommodation of a chair in the USCAN position?**

A That would have been a discussion that I would have had to have with Donnie Meadows at that point.

**Q Okay. So you did not intend at that time to offer him the use of a chair in the USCAN position?**

A I am not saying that I did or did not.

**Q Was there --**

A I would have to, you know, converse

with Donnie Meadows again on all accommodations or actions being offered.

**Q Okay. Fair enough. You couldn't just offer it without first talking to Donnie Meadows?**

A That is correct.

**Q Did you talk to Donnie Meadows about potentially offering Mr. Batten a chair for the USCAN position?**

A After the fact of having this conversation with him, I advised Donnie that, you know, he had turned down that position and there was really no further discussion surrounding that.

**Q Did you inform Mr. Meadows of Mr. Batten's reason for turning down the USCAN position?**

A Yes, sir.

**Q That it -- because it was a fully standing position?**

A Because he stated he could not be on his feet for prolonged periods of time and he could not give us an accurate, you know, time frame as to how long he felt he might be able to be on his feet.

**Q Okay. Did you and Mr. Meadows have any discussion at that point about whether to supply**

**Mr. Batten with a chair or a stool or something to sit on in the USCAN position?**

A No, sir. Once again, after he had turned down that accommodation request there was really no further communication surrounding ideas around that.

**Q Did you at any point have any discussion with anyone outside of privileged communications about potentially offering Mr. Batten a chair or a stool in the USCAN position?**

A No, sir.

**Q Okay. Don't you think that might have been something that could have made a difference?**

A If we had gotten to that point to be able to discuss the specifics of the position, we can only speculate.

**Q All right. Was Mr. Batten preventing you from having that discussion?**

A Preventing me from talking with him?

**Q Yes.**

A No. Once again, I mean, all of my communication was coming from Donnie Meadows as far as, you know, the accommodations and the communication with him.

ahead and answer.

A I'm not sure -- I mean, he had been performing all essential functions of that job for two years, so, I mean, it was an accommodation to be able to allow him to continue employment.

**Q (By Mr. Hargraves) Let me ask it this way: It was never communicated to Mr. Batten that the offer of the USCAN position was intended as an accommodation of his gait instability; is that fair?**

A I'm not sure that that was discussed, no.

**Q Okay. It's certainly not mentioned here in your signed statement, is it?**

A No, sir.

**Q Okay. And Mr. Batten declined the USCAN position; is that right?**

A That is correct.

**Q He told you he couldn't physically do it; is that right?**

A That is correct.

MR. HARGRAVES: I believe this will be Exhibit 6.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 6.)

leave, a personal leave for up to -- two personal leaves back to back up to 90 days apiece. Once those leaves are, you know, exhausted and someone does not return to work they are, you know, terminated. And so, Mr. Lyon advised me to get with Gary Richards and go ahead and have him terminated in the system.

**Q Were you aware that Mr. Batten had reached out to Gary Richards following the August 18 meeting?**

A Following our last conversation where he called Mr. Richards on the phone and asked him if he could return to work at that point, yes.

**Q Were you aware of that phone call?**

A Yes. After the fact, yes.

**Q Did Mr. Richards come speak to you about that?**

A He called me on the phone, I believe.

**Q All right. What do you remember about that conversation?**

A Him just stating that Mr. Batten had called him asking him if he could return to work, you know, with his service animal and Mr. Richards says that he told him no, and that's all that I was aware of.

Exhibit 8.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 8.)

BY MR. HARGRAVES:

**Q Do you recognize this document marked Exhibit 8?**

A Yes.

**Q What is this?**

A Just a summary of the termination information for Mr. Batten.

**Q And this indicates -- on status it says "terminated;" is that right?**

A That is correct.

**Q It says terminated February 14, 2022; is that right?**

A That is correct.

**Q It also has that as the last day worked; is that right?**

A I'm going to say that would not be his last physical day worked but that would be his last day in our system.

**Q Is the last day worked just the last day they're employed?**

A Typically, yes.

**Q Isn't that the same as their termination date?**

A Typically, yes.

**Q All right. He wasn't physically at Food City on February 14, 2022?**

A No, sir.

**Q The termination reason is "Failed to return from leave;" is that right?**

A That is correct.

**Q And, again, that's the leave that Mr. Batten never requested, Food City just placed him on; is that right?**

A That is correct.

**Q And so he was terminated for failing to return from that leave?**

A That is correct.

**Q Okay.**

MR. HARGRAVES: Let's mark that Exhibit 9.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 9.)

BY MR. HARGRAVES:

**Q All right. You've been handed what's marked as Exhibit 9. Do you recognize this**