UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

CHRISTOPHER MATTHEW BATTEN,

Plaintiff,

vs.

K-VA-T FOOD STORES, INC. d/b/a FOOD CITY,

Defendant.

CIVIL ACTION FILE NO. 4:22-CV-00179

ORIGINAL

MARCH 3, 2023

**ZOOM DEPOSITION OF SHERRELL LYON, JR.**

APPEARING FOR THE PLAINTIFF:

R. ETHAN HARGRAVES, ESQUIRE
MASSEY & ASSOCIATES
6400 LEE HIGHWAY, SUITE 101
CHATTANOOGA, TENNESSEE 37421

APPEARING FOR THE DEFENDANT:

HOWARD B. JACKSON, ESQUIRE
WIMBERLY LAWSON WRIGHT DAVES & JONES
550 MAIN STREET, SUITE 900
KNOXVILLE, TENNESSEE 37902

**CATHY H. KERLEY, RPR**
**HALL & ASSOCIATES**
**POST OFFICE BOX 428**
**CHATTANOOGA, TENNESSEE 37401**
**423-267-4328**

## INDEX


| | | Page |
|---|---|---|
| Deposition of SHERRELL LYON, JR. Direct Examination by Mr. Hargraves | | 4 |


### EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | Second Amended Notice to Take Deposition of K-VA-T Food Stores, Inc. d/b/a Food City | 4 |
| 2 | Equal Employment Opportunity Training Document | 11 |
| 3 | VTA Training Detail Report for Christopher Batten | 20 |
| 4 | Statement by Emily Hobbs, 11/29/21 | 43 |
| 5 | Statement of Gary Richards, 11/30/21 | 44 |
| 6 | Statement of David Ellison, 8/6/21 | 44 |
| 7 | Statement of Gary Richards, 8/6/21 | 45 |
| 8 | Statement of David Ellison, 8/12/21 | 46 |
| 9 | Statement of Gary Richards, 8/12/21 | 52 |
| 10 | Statement by David Ellison, 8/18/21 | 65 |
| 11 | Service Animal Documentation | 66 |

The Zoom deposition of SHERRELL LYON, JR., called as a witness at the instance of the Plaintiff, for use pursuant to the Federal Rules of Civil Procedure, taken by notice and agreement on the 3rd day of March, 2023, via Zoom.

S T I P U L A T I O N S

Deposition is being taken by agreement of counsel for the plaintiff and the defendant. It is agreed that the deposition shall be taken in machine shorthand by Cathy H. Kerley, Notary Public and Court Reporter, that the signature of the witness to the completed deposition is waived, and that the witness may be sworn by the said Notary Public.

It is further agreed that all formalities as to caption, notice, certificate and mode of transmission are waived, and that the deposition is taken subject to the usual exceptions as to irrelevancy, incompetency and immateriality, which are reserved to the hearing of the cause, except as to the form of the question.

SHERRELL LYON, JR.,

called as a witness at the instance of the Plaintiff, having been first duly sworn, was examined and deposed as follows:

MR. HARGRAVES: State on the record that this is the Federal Rule of Civil Procedure 30(b)(6) deposition of K-VA-T Food Stores, Inc. d/b/a Food City. I served a notice of deposition regarding this deposition. I'd like to make that Exhibit 1.

(Thereupon, Exhibit No. 1, Second Amended Notice to Take Deposition of K-VA-T Food Stores, Inc. d/b/a Food City, was marked to the deposition of Sherrell Lyon and filed herein.)

MR. HARGRAVES: And for the record this deponent is being designated to testify with regard to items 20 through 33 and 36 through 53. Did I get that right, Howard?

MR. JACKSON: I believe.

DIRECT EXAMINATION

BY MR. HARGRAVES:

Q Mr. Lyon, I know we've done this before in a somewhat different capacity, but for the record if you could state your name for us,

full name.
A It's Sherrell E. Lyon, Jr.
Q And we've met before because we've done a deposition, but for the record my name is Ethan Hargraves. I represent the plaintiff in this case, Mr. Matthew Batten.
Do you remember the last time we did this, we talked about some kind of ground rules for the deposition?
A Yes.
Q I'll just go over those real quick because it hadn't been too long, but just for the sake of clarity. We've got a court reporter making a record. Let's try not to talk over each other, especially given the Zoom component. And if you say uh-huh or huh-uh, I'm going to try to get a clarification on it because I want to make sure that I understand your answer.
If you don't understand a question, please let me know and I will try to rephrase it so that you can understand it. And I'm going to try to wrap up before 5:00, but if you need a break, just let me know. Okay?
A Okay.
Q Again, any issues with those rules?

A No.
Q Okay. Now, obviously you've testified in this matter before in your individual capacity. Do you understand that today you have been designated to testify on behalf of Food City?
A Yes.
Q Okay. And specifically with regard to items 20 through 33 and items 36 through 53 in Exhibit 1, the deposition notice. Is that your understanding?
A Yes.
Q And I will go ahead and share that with you on my screen. All right. Do you recognize this document?
A I do.
Q We're looking here at Exhibit 1. Have you reviewed this Exhibit 1 before?
A Yes.
Q Okay. And when did you first review it?
A Goodness gracious, I guess Tuesday.
Q Okay. Would that be Tuesday of this week?
A Look at my calendar. I believe it was Tuesday of this week, yes.

Q Okay. So February 28th?
A Yes. Correct.
Q Okay. All right. This notice requires Food City to designate an individual or multiple individuals to testify on its behalf concerning a list of topics. Do you understand that?
A Yes.
Q And Food City must fully prepare that person or persons designated to provide Food City's position with respect to information known by Food City or reasonably available to Food City. Do you understand that?
A Yes.
Q And with regard to those designated topics that we mentioned, you are that designated person; is that right?
A Yes.
Q You understand that although much like last time, I'm asking you questions, the answers that you give today are the answers of Food City at least insofar as they pertain to those designated topics. Is that understood?
A Yes.
Q Okay. And are you fully prepared to

give Food City's truthful answers with regard to those designated topics?
A Yes.
Q Okay. Aside from reviewing the deposition notice, Exhibit 1, on Tuesday of this week, what else did you do to prepare for today's deposition?
A I read back through the EEOC response that we drafted.
Q Okay. Did you review anything else?
A The questions in this particular document, yes.
Q Oh, in Exhibit 1?
A Yes.
Q Okay. And aside from Exhibit 1 and the EEOC position statement, did you review any other documents?
A The other documents that I reviewed is the answer to the charge.
Q Okay. Did you review any deposition testimony in this case?
A No.
Q Okay. So you didn't review the deposition testimony of Donnie Meadows?
A I did not.

Q Okay. Aside from Mr. Jackson or any attorney of Food City, did you speak with anyone in preparation for today's deposition?
A I did not.
Q Okay. As I best I can, I'm going to try not to retread old ground, but it's important that I get Food City's answers on some of these things. So bear with me. Does Food City have policies or procedures on disability accommodation?
A Our policy is not to discriminate against anyone. If someone has some sort of need and assistance in performing their job function, it's our responsibility to sit down and meet with them and try to find something to help them to perform their job.
Q Okay. Thank you. So Food City does have policies as it relates to disability accommodation?
A That is our policy.
Q Okay. And is that policy written down?
A To my knowledge, no.
Q Okay. Does Food City have written policies with regard to disability accommodation?

A Our policy is what I just said is that if someone has some sort of disability that we want to sit down and meet with them and help them find some sort of accommodation if they're having trouble with some function of their job, to do an exchange with them and try to find something that would allow them to do their job.
Q Is that the interactive exchange?
A Yes.
Q Okay. Where you have a conversation with the employee and you try to figure out what can be done to accommodate their needs?
A Yes.
Q Does Food City have any policies specifically on employees using service animals?
A No specific policy on use of service animals.
Q Okay. I want to share my screen with you. Do you recognize this document I'm showing you? The Bates number is 001086 through 001088, so three pages. Do you recognize that?
A Yes.
Q Okay. And what is that?
A It appears to be training material.
Q Okay. Is this training material that

is utilized by Food City?
A It appears to be, yes.
MR. HARGRAVES: Okay. Let's mark that as Exhibit 2.
(Thereupon, Exhibit No. 2, Equal Employment Opportunity Training Document, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:

Q Is Exhibit 2 reflective of Food City's policy with regard to the things that are listed in Exhibit 2?
A This is training material that we use to train new managers.
Q Okay. And does this training material train the new managers based on Food City's policies?
A This is training material that the human resources specialists would use to train new managers.
Q Okay. If it's in a training material, you would expect that it would be consistent with Food City's policies and procedures; right?
A I would say yes.

Q Okay. You wouldn't expect to see something in the training material training a manager in a way that is inconsistent with Food City's policies and procedures.
A I would say yes.
Q Okay. So let me ask you this. In that way can the training material be reflective of policies and procedures?
A Well, it's not a policy and procedure, but it can be reflective of the training that we provide new managers on how to handle these types of situations.
Q Okay. Yes. I think I understand what you're --
A It's not a written drafted policy that we have in any of our policy and procedure manuals.
Q Right. So if you go to pull up the policies and procedures, you wouldn't necessarily see this document; right?
A Yes, sir. That is correct.
Q Okay. But you would expect that whatever is in the training material is going to be consistent with policies and procedures?
A It should not be inconsistent.

That's correct.
Q Okay. What employees are trained using this document?
A This would be for all new members of management at the retail -- at the distribution center and also the corporate support center.
Q Okay.
A And when I say managers, that's typically a salaried manager of the store, assistant store manager, store manager, that type of role.
Q Okay. Looking at page two, top of the page, it says Americans with Disabilities Act. Do you see where I'm at?
A Yes.
Q It says, "The Americans with Disabilities Act (ADA) of 1990 states that a qualified person with a disability is one who can perform the essential duties of the job with or without reasonable accommodation, has the required skills and experience for the job, and meets other job-related requirements."
Did I read that right?
A Yes.
Q Okay. And is it Food City's policy

to follow the law and regulations related to the ADA?

A Yes.

Q Looking at page three, the second paragraph begins under the ADA. Do you see that?

A Yes.

Q It says, "Under the ADA, an individual with a disability is a person: Has a physical or mental impairment that substantially limits one or more major life activities. Major life activities include: Self care, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working; has a record of such an impairment; or is regarded as having such an impairment."

Did I read that right?

A Yes.

Q Okay. The next paragraph says, "A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question."

Did I read that right?

A Yes.

Q And then it says, "A reasonable

accommodation is the requirement that employers take steps that are not an undue hardship to make employment possible for persons with disabilities."

Did I read that right?

A Yes.

Q Okay. In that part of this training material it doesn't say anything about whether an employee has been able to do the job in the past; does it?

A In that statement there, no, it does not.

Q Okay. Does it state anywhere on Exhibit -- we're on Exhibit --

REPORTER: 2.

Q -- 2. Thank you, Cathy.

Anywhere on Exhibit 2 does it say anything about an exception for employees who have been able to do their job in the past?

A Not in that training material.

Q Okay. Are you aware of any such exception in any of Food City's policies or procedures?

A Not that I'm aware.

Q Are you aware of any such exception

in the ADA?

MR. JACKSON: Objection to the extent it calls for a legal conclusion, but go ahead and answer.

A Not that I'm aware of.

Q Okay. Does Food City take steps to comply with the ADA?

A Yes.

Q And as part of Food City's actions to comply with the Americans with Disabilities Act, does Food City apprise itself of what is actually required under the ADA?

A We have training classes that are presented by our human resources specialists. We have an anti-discrimination policy which I repeated earlier. And we have human resources specialists that are in the field. They're there as resources when questions arise.

Q Okay. As part of Food City's actions to comply with the ADA, does it train any of its employees that you can deny an accommodation if an employee has been working without it?

A Not to my knowledge.

Q Okay. Is there any other training that is provided to managers or up and coming

managers with regard to ADA compliance that is not reflected in Exhibit 2?
A Only the material that might be presented by the human resources specialists when they conduct the training session.
Q And where is that material kept?
A That would be from -- it's a classroom-style training. So it will be kept in their minds.
Q Okay. So there's not any -- there's not any standardized or formal training materials maintained by Food City on this topic?
A Other than what's been provided, correct.
Q Okay. So the individual HR specialists might conduct their own research or have their own notes or presentation on this?
A I wouldn't say conduct their own research. They take training classes with actually Howard's law firm and we conduct regular training sessions with them.
Q Okay.
A That's where their background really comes from.
Q Okay. So the HR specialists who

perform the training based on Exhibit 2, those HR specialists are themselves trained by Mr. Jackson's law firm?
A I wouldn't say trained by Mr. Jackson's law firm. I would say attended training sessions or attended sessions regarding ADA and many other employment law issues.
Q Okay. It's a training session?
A More of a presentation, I guess, than a training session.
Q Okay. If you would not call that training, then how are the HR specialists who train on Exhibit 2, how are they trained?
A Other HR specialists.
Q Okay. And when they're trained, what materials are used to train them?
A Again, this document and any other training classes and/or presentations that they've attended.
Q Does Food City maintain a copy of any of those training materials?
A Not that I'm aware of.
Q Okay. And those outside courses, those sessions, those would not necessarily be reflective of Food City's policies or consistent

with Food City's policies?
A I would say that's correct.
Q Okay. Are you familiar with the substance of Food City's training on ADA guidelines service animals?
A Do you have a document or something I could refer to or --
Q Well, let me do this. Are you familiar at all with Mr. Batten's training file?
A I have reviewed some training documents that Mr. Batten may have taken, yes, because they're similar to what most all associates would take, very generalized course listing for new associates.
Q Okay. All right. Do you recognize this document?
A Yes.
Q Is this --
A It's a training detail report.
Q Okay. And this is specifically with regard to Mr. Batten; is that right?
A It is.
Q And does it appear to be a fair and accurate copy? There's 16 pages.
A Yes. That appears to be correct.

MR. HARGRAVES: Okay. Let's make that Exhibit 3.

(Thereupon, Exhibit No. 3, VTA Training Detail Report for Christopher Batten, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:

Q Looking at Bates No. 1052, third entry from the top, do you see where it says ADA guidelines service animals?

A I do.

Q Okay. Are you familiar with the substance of that training course?

A I have taken that training course and I would say -- I'm not going to say familiar, but I have taken that training course.

Q That training course relates to the ADA guidelines on service animals specifically with respect to customers who enter a Food City; is that right?

A That is correct.

Q All right. It does not pertain to guidelines with regard to employees.

A It does not.

Q Okay. That said, do you remember

anything about the substance of that training?
A I know from -- and, again, it's been quite some time since I reviewed that material. It's service animals, like you said, that the customer may bring in the store and some of the questions that you as an associate could or could not ask the customer based upon the animal that they bring in with them in order to be respectful of the ADA and then also other customers inside the store, trying to balance that, and make sure we're treating our customers very fairly and very consistently and not discriminating against someone who has a service animal.
Q Do you remember what are the things that you could or could not say to a customer with a service dog?
A Not specifically, no.
Q So the items listed on this training detail report, each of these listed items is a training course. Is that fair?
A Each -- each one of the ones that have a course code is a training course. And then the numbers inside of there with the one or two could be a session inside of that training course or it could be a test at the completion of the

lessons inside of the training course.
Q Okay. All right. Up here next to the title of the training course where it gives a time, it says -- on this one it says three minutes or three min. Does that indicate how long the course lasts?
A That's an approximation of how long it would take someone to -- some of the courses are animated. Some of them are -- have audio behind them. Some of them are just documents that you have to read. So it's just an estimate of how long it would take for someone to complete that training course. So, like I said, and it may depend on the person actually that's reading it if it's not one that has audio behind it.
Q Okay. Sure. It's not an exact time, but it's an estimate of how long it should take to get through the materials?
A Yes, sir.
Q All right. So if there's more materials on a topic, it's probably going to take more time?
A Yes.
Q Okay.
A Or if there's audio behind it. Some

people will read faster than the audio. So it really just depends.

Q Okay. So on this page we have three minutes for the service animal issue and some various other training sessions. On the next page, Bates No. 1053, there's one down here that says loss prevention video. Is that right?

A It is.

Q And that's a ten-minute subject?

A That one is actually a video. So there will be more sound, music. It's truly like watching an informational video.

Q Okay. What is loss prevention?

A It's actions that one might take in order to prevent loss.

Q Okay. Specifically is that referring to like theft?

A Without watching the course, but it could be theft, it could be shrink in any form, but if I remember correctly, I believe that one directly relates to theft.

Q Okay. All right. That's an important topic in retail and grocery stores.

A I would say yes.

Q Are you aware of -- are you aware

that there are rules to govern how employers treat their disabled employees?
A What rules are you speaking of?
Q Are you familiar with the ADA?
A Yes.
Q Do you understand that that's a set of rules that relates to how employers -- that in part relates to how employers treat their disabled employees?
A Yes. I just generally refer to that as a law. I just --
Q Sure. Would you agree that one of those rules is that where a disabled employee requests an accommodation, the employer must provide an accommodation if it would not cause an undue hardship on the company?
MR. JACKSON: I'm going to object to the extent it calls for a legal conclusion, but go ahead and answer.
A Could you repeat the question.
Q Yes, sir. Would you agree that one of those rules is that where a disabled employee requests an accommodation, the employer must provide an accommodation if it would not cause an undue hardship on the company?

MR. JACKSON: Same objection.
A Yes.
Q Is it Food City's policy to provide a reasonable accommodation to disabled employees when it does not cause any undue hardship on the company?
A Yes.
Q Do you know when Food City first became aware of Mr. Batten's disabilities?
A I don't know an exact date, no.
Q To your knowledge, would that have been when they hired him?
A Again, my assumption would be yes, but I don't know.
Q Okay. And your assumption would be yes because Mr. Batten's disabilities are fairly obvious. Is that fair?
A That's correct.
Q I mean, you can look at him and see that he's missing his right arm.
A Correct.
Q All right. Would you agree that you can look at him and you might also see him limping?
A I would -- I would say yes, but,

again, without -- I mean, I've seen Mr. Batten before. So I would say yes. Had I not seen Mr. Batten before, I would not know that, but yes.
Q Okay. Does Food City receive any tax benefit from employing people with disabilities?
A We participate in a program offered by Maximus and they ask certain questions during onboarding in regard to several categories and then based on their responses, then there is opportunity for us to receive certain types of tax credit.
Q And one of those tax credits is with regard to having employees who have disabilities.
A Again, I would have to pull out a full list of items from Maximus. So I don't know for certain the answer to that question.
Q So you're not aware one way or the other of an existence of any tax benefit to Food City employing persons with disabilities?
A I'm not aware of a tax credit. Like I said, without looking at what Maximus truly provides us, I can't say that for sure.
Q Okay. Do you understand that item number 32 on the deposition notice specifically pertain to the existence of any tax or other

benefits to defendant from the employment of persons with disabilities?

A I just -- like I said, we use Maximus and all that happens on the back end. There's a list of so many questions that are asked when someone is onboarded.

Q Okay. So you're aware that there are potential tax benefits related to employing persons with disabilities?

A Yes.

Q Okay. My next question is are you aware of whether Food City took advantage isn't the right phrase, but whether they utilized that tax credit?

A If it was there and it was captured during Maximus and it was available, then I feel certain we would use it, yes.

Q Okay. When did Food City first become aware of Mr. Batten's request for an accommodation in the form of a service dog?

A That was July 21, I believe, with Emily, the human relations coordinator at the location that Mr. Batten was working at.

Q Emily Hobbs?

A Yes.

Q Okay. Who ultimately made the decision to deny Mr. Batten's request for the use of his service dog?
A That would be Donnie Meadows.
Q Did you have any role in making that decision?
A I did not.
Q Do you know when exactly the decision was made by Donnie Meadows to deny Mr. Batten's accommodation request?
A I believe it was August the 12th.
Q And that would have been 2021?
A Yes.
Q And I want to ask you about the reasons for the denial. What was the reason or the reasons for the denial of Mr. Batten's request for the use of his service dog?
A Based on the interactive exchange that Mr. Ellison had with Mr. Batten, I think they offered up an accommodation of a Uscan operator. And when Mr. Ellison did so, I think Mr. Batten said he could only work with his service animal and that he was not going to leave the dog with anyone else.
Q Okay. And I will talk to you about

the offering of the Uscan position, but I first want to know why the decision was made to in the first place deny the request of a service animal. Why was that decision made?
A Again, I think during the interactive process, the interactive exchange, they were trying to identify something that -- an accommodation that would help Mr. Batten perform his job. He had already been performing his job for two years and then he told Mr. Ellison that nothing had changed.
And so they offered an accommodation of the Uscan because one of his concerns was isolation in the fuel area, which could be easily accommodated inside the store.
Q Okay. I think I understand what you're saying about why they offered the Uscan position. And, like I said, we'll talk about that in a minute, but the Uscan position was not offered to Mr. Batten immediately; was it?
A It was offered when Mr. Ellison met with him on August the 12th.
Q Okay. Mr. Batten requested the use of his service dog before that; didn't he?
A On August the 6th I guess when

Mr. Ellison originally met with Mr. Batten and prior to that with the store manager and the store manager, I guess, then reached out to Mr. Ellison.

Q I understand that a decision was made to deny the request for the service animal and then to offer Mr. Batten the alternate accommodation of the Uscan position. Is that fair?

A Yes.

Q And we will talk about the Uscan position in a minute.

A Okay.

Q But my question is why was the decision made in the first place to deny rather than to grant the request for Mr. Batten to use his service animal?

A Because he had been previously doing the job and nothing had changed. And when -- when he expressed to Mr. Ellison that he needed an accommodation, then Mr. Ellison tried to find something to accommodate him.

Q Why does it matter that an employee, a disabled employee, had been doing the job before requesting the accommodation?

A Because he was requesting an

additional accommodation that he had requested. We had never had an accommodation request before and we were aware of Mr. Batten's disability and had been very pleased with Mr. Batten's service. And, again, couldn't understand since nothing had changed and that he could do the job and had been doing the job very well. You know, we were just trying to find something to accommodate Mr. Batten that would work well for both of us.

Q Okay. Did Food City make the determination that allowing Mr. Batten to use his service animal would not work well for both of us, for both parties?

A I don't think that was the reasoning. I think it was he was able to do the job without a service animal. He was able to do the job very well for two years and was a great associate and that he said that he needed an accommodation for him to perform his job due to isolation and I think Mr. Ellison tried to help him find one.

Q You keep mentioning isolation, but you concede, don't you, that Mr. Batten also said that he had stability issues? Isn't that right?

A I don't think they ever got to that second issue with Mr. Ellison -- I mean, with

Mr. Batten. When they started the conversation to try to identify an accommodation, Mr. Batten pretty much told Mr. Ellison that if he couldn't work with the dog, that he wasn't going to be able to work.

Q Is it your testimony that Mr. Batten did not communicate that he had stability issues?

A That is not my testimony. That was -- that was included in his two-way exchange with Mr. Ellison.

Q Okay. So Mr. Batten did mention to Food City that he had stability issues related to his disability.

A He did.

Q Okay. And he at least asserted that the dog would help with those stability issues; is that right?

A He did.

Q Okay. You mentioned that -- it sounds like you're saying the reason the dog was denied, and tell me if I'm wrong, the reason that the use of the service animal was denied was because Mr. Batten had done the job for two years without the dog. Is that what you're saying?

A I don't know exactly why it was -- it

was denied. I just -- I'm just -- to me based on the documents in front of me, that Mr. Ellison was trying to find an accommodation that would work for Mr. Batten.

Q Do you have the Exhibit 1 there where you can look at it? If you don't, I'll pull it up. I'll just go ahead and pull it up. That's fine. You just said you don't know why the decision was made to deny Mr. Batten the use of his service animal?

MR. JACKSON: I'm going to interpose an asked and answered. I think his earlier answered stated it.

Q That's what you just testified to, Mr. Lyon; is that right?

A That it was denied because we were trying to find an accommodation that would work for Mr. Batten. When Mr. Ellison met with Mr. Batten, Mr. Batten pretty much said without the dog, he wasn't going to work. So I think that kind of paused the exchange.

Q Mr. Lyon, I appreciate that, but that's not my question. I very clearly asked you did you just testify that you don't know why the decision was made to deny Mr. Batten the use of

his service animal? And I can have the court reporter read it back to you if you like.
A If that's what I said, I certainly apologize.
Q Okay. Because you'll agree that item number 41 on Exhibit 1, one of the topics that you're supposed to be able to testify to today is all defendant's reasons for defendant's decision to deny plaintiff's request for the use of his service dog. Isn't that right?
A I think we were still trying to explore other options. Again, it was not our intent to end the two-way exchange.
Q Did Food City ever intend to grant Mr. Batten the use of his service animal?
A I don't think we ever finished the exchange. I think -- I don't think we -- I don't think we offered up or even had the chance to offer up the other items. I think that the communication did not remain open because Mr. Batten didn't allow it to remain open. I think that there could have been many other accommodations that could have been reached.
Q Was Mr. Batten's request for the use of his service animal denied by Food City?

A Yes, sir.
Q Why was it denied?
A Because we had not finished with the exchange of finding an accommodation that would work.
Q Mr. Lyon, I'm not asking you about other accommodations. I'm asking you why you denied in the first place his request for the use of his service animal.
A Because the exchange was still open. We were trying to find some sort of accommodation that would work for Mr. Batten.
Q Is it Food City's policy to just deny the first request no matter what and then look for other alternate accommodations?
A Absolutely not. The exchange had not -- had not been finished.
Q So if Mr. --
A We felt like -- I'm sorry. I was going to say we felt like we could find a reasonable accommodation for Mr. Batten if we could continue the exchange.
Q I want to -- I want to stop there.
A Okay.
Q Was the request for the use of a

service animal not a reasonable request for accommodation?
A I think we had additional accommodations that would work that would be considered reasonable.
Q Did the dog not work?
A I feel like there were things that could work for Mr. Batten and that we could reasonably accommodate Mr. Batten based on the options that we were going to present to him.
Q Mr. Lyon, I need you to answer my question. I know that you're telling me there are other things that would work. I need you to answer the question with regard to the service animal. Would the accommodation for the use of a service animal not work?
A I would say yes, it could work, but I think there's many things that could work.
Q Okay. Let's start there. Did Food City ever make the determination that it would have been an undue hardship of Food City to allow Mr. Batten to work as a fuel clerk with his service animal?
A I don't think we ever got to that point. I think -- I think once Mr. Batten said