that without his dog, that we -- he wouldn't work. So I don't -- I don't think we ever got to a point to even discuss what -- what other accommodation would work that would be considered reasonable by both.

Q So without -- without finding that it would be an undue hardship, Food City denied his request for the use of a service animal?

A I don't -- I don't think that was the case. I honestly feel like that we were honestly trying to find a reasonable accommodation that would work for Mr. Batten.

Q Prior to Food City's denial of his request for the use of the service animal, did Food City make any determination that it would be an undue hardship?

A I think at the time it could have been an undue hardship, yes, for Mr. Batten being alone outside in the fuel center.

Q I need to make sure you understood my question. Prior to denying Mr. Batten's request for the use of a service animal, did Food City make the determination that his use of a service animal would be an undue hardship on Food City?

A Honestly I don't know the answer to

that question.
Q You just testified that it could have been an undue hardship. I want to make sure I understand what you meant by that. Did you mean that it could have been an undue hardship on Food City?
A I mean it could have been an undue hardship on Mr. Batten.
Q How so?
A Well, caring for an animal and I just could see how that could be difficult, but, again, I don't -- I don't have the answer to as to why.
Q As to why the request for a service animal was denied?
A No. As to why it might be considered undue hardship.
Q On Food City?
A For Food City, yes.
Q Okay. Sitting here today, do you think that it would have been an undue hardship on Food City?
A I think it could be, yes.
Q How so?
A If something happened where Mr. Batten might need to take the animal outside

or away, you would leave the fuel center unattended. And typically there's only one person working down there. So if something needed to happen quickly, you know, he would have to get someone from the store to come down. So it could be an undue hardship.

Q Okay. I've got to be clear. Was Mr. Batten ever told by Food City we're denying your request for the use of a service animal because it might be an undue hardship if you have to take the animal out?

A Not that I'm aware of, no, sir.

Q Okay. So he was never told that the reason for the denial was that there was any undue hardship on Food City?

A Not that I'm aware of, no, sir.

Q Okay. And, to your knowledge, Food City never made the determination that it would be an undue hardship?

A From what I've read, no.

Q Okay. Did you have -- did Food City have any reason to suspect that Mr. Batten's use of a service animal would not address his needs related to his disability?

A Could you repeat that. I'm sorry.

Q Yes, sir. Did Food City have any reason to believe that Mr. Batten's use of a service animal would not address his needs related to his disability?
A I'm sorry. Could you rephrase it.
Q Let me ask it this way. Mr. Batten asserted to Food City that the service animal would help with his disability. Is that fair?
A Yes, he did.
Q All right. Did Food City have any reason to doubt that statement from Mr. Batten?
A No.
Q Okay. So as far as Food City was concerned, Mr. Batten says he needs the service animal for his disability, we accept that, we believe that.
A That he -- that he said that he needs an accommodation to perform his job.
Q Okay. Did you have any reason to believe that the service animal would not -- was not an appropriate accommodation for Mr. Batten?
A If he -- if he says it's an appropriate accommodation, then certainly I would think it would be an appropriate accommodation for him.

Q Okay. So then -- just one moment. Sorry about that. Were any documents relied upon in the decision to deny Mr. Batten the use of his service animal?
A Not that I'm aware of.
Q What was relied upon in the decision to deny Mr. Batten the use of a service animal?
A Donnie, I'm sure, reached out to our attorney and discussed it.
Q Okay. Mr. Meadows ultimately made that decision is what you said; right?
A Yes.
Q Do you know -- aside from the advice of counsel, do you know what Mr. Meadows based that decision on?
A I do not.
Q Okay. Do you know if he based that decision on any of the witness statements that were provided in this case?
A I do not.
Q Do you know if those witness statements were even reviewed in the context of the decision to deny Mr. Batten the use of his service animal?
A I was not -- I was not there when

that happened. So my assumption is Mr. Meadows would have reviewed the statements before he made a decision.

Q Okay. Mr. Lyon, I understand that you weren't necessarily there for all of this stuff. Do you understand that your testimony today is with regard to not just stuff you would have been there for, but with regard to Food City's knowledge?

A I do. And I'm sorry.

Q I've just got to make sure that that's clear. I understand that this can be confusing.

You indicated that Emily Hobbs on July 23rd of 2021, that was the first time that Food City became aware of Mr. Batten's request for a service animal; is that right?

A Yes.

Q Okay. All right. Do you recognize the document that I've just shared?

A Yes, sir.

Q And this is a statement written by Emily Hobbs?

A Yes, sir.

Q And does it appear to be a fair and

accurate copy of that statement?

A It does.

MR. HARGRAVES: Okay. Let's make that Exhibit 4.

(Thereupon, Exhibit No. 4, Statement by Emily Hobbs, 11/29/21, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:

Q And this is -- it pertains to events that occurred on July 23rd of 2021; is that right?

A Yes.

Q But it appears to have been signed by Ms. Hobbs on November 29 of 2021; is that right?

A Yes, sir.

Q That's some months later.

A Yes.

Q I'm going to show you another document here. Do you recognize this document?

A Yes, sir.

Q Is this a statement from Gary Richards with regard to -- initially with regard to events that occurred on July 23rd of 2021?

A Yes.

Q Okay. Does it appear to be a fair

and accurate copy of that statement?
A It is.
MR. HARGRAVES: I'll make that Exhibit 5.

(Thereupon, Exhibit No. 5, Statement of Gary Richards, 11/30/21, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:

Q All right. Do you see this document dated August 6th, 2021?
A Yes, sir.
Q Is that a statement from David Ellison?
A It is.
Q And does it appear to be a fair and accurate copy of that statement?
A Yes, sir.
MR. HARGRAVES: Okay. Let's make that Exhibit 6.

(Thereupon, Exhibit No. 6, Statement of David Ellison, 8/6/21, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:

Q Sorry. My computer is giving me a little bit of trouble here.
All right. Do you see this document also dated August 6, 2021?
A Yes.
Q Is this a statement from Gary Richards?
A Yes.
Q Does it appear to be a fair and accurate copy of that statement?
A Yes, sir.
MR. HARGRAVES: Okay. Let's make that Exhibit 7.

(Thereupon, Exhibit No. 7, Statement of Gary Richards, 8/6/21, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:
Q Do you recognize this document? It's dated August 12, 2021.
A Yes.
Q Okay. Is this a statement from David Ellison regarding the meeting that occurred on August 12, 2021?
A Yes.

Q Okay. Does it appear to be a fair and accurate copy of that?
A Yes.
MR. HARGRAVES: Okay. Let's make that Exhibit 8.
(Thereupon, Exhibit No. 8, Statement of David Ellison, 8/12/21, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:
Q I'm going to slow down on this one a little bit. It notes that Mr. Ellison met with Mr. Batten at store 214 along with Gary Richards; is that right?
A Yes.
Q It says on the second sentence, "I informed Batten that his request for a service animal in the workplace had been reviewed and denied at this time."
Did I read that correctly?
A You did.
Q Do you know why Mr. Ellison told him that it had been denied?
Mr. Lyon, I think something may have happened to your microphone because I can't hear

you. Oh, are you reading the document?
A Sorry. It's kind of small on the screen.
Q That's all right. I thought you had gotten muted.
A I was reading.
Q Let me ask you a better question. The very next sentence after he said that he told Mr. Batten the request was denied, the very next sentence says, "I stated that he had been performing the job for over two years without any accommodations."
Did I read that right?
A You did.
Q Okay. It looks to me like that's kind of -- that's what's given by Mr. Ellison as the reason for the decision to deny the request. Is that fair?
A To me he's stating that he had been performing the job for over two years without any accommodations.
Q Right.
A And now he's saying that he needs some and that he asked him for ideas or suggestions for some accommodations that may be

available to him.

Q I need to know why that matters because you've mentioned it here today. Mr. Ellison mentioned it. I need to know why that matters to Food City that Mr. Batten had been performing the job for over two years without any accommodations.

A Because nothing -- he said that nothing had changed, that everything -- everything was still the same. Nothing had changed and he had been doing the job before and now he's saying that he needs an accommodation. So we're trying to help him find one that will work for him.

Q Okay.

A I guess it's there because, you know, he's done a good job for the past two years and had no issues whatsoever and we wanted to continue that and try to find a way to make that happen.

Q Would you agree that somebody can work a job, but have pain because of a disability?

A Yes.

Q Would you agree that somebody can work a job, but be a fall risk because of a disability?

A Yes.

Q So someone can work a job, can do all the things that they're supposed to do, but still have a need for an accommodation.
A Sure.
Q And I don't think this is the case, but I want to -- I need to hear it from you. Did Food City think that Mr. Batten was just making this up, that he was not being truthful about his need for an accommodation?
A No.
Q Okay.
A Absolutely not.
Q Did the fact that he had worked the job for over two years without any accommodation, did that make him ineligible for an accommodation?
A Absolutely not.
Q So why was that given as the reason that the accommodation request was being denied?
A I don't -- I don't think that that's the reason that it was being denied.
Q Okay. If that's not a reason that it was being denied, why is -- why did you mention it today and why is it mentioned here by Mr. Ellison?
A Again, I think it's just a statement that he's been doing the job for two years and

been doing it very well.
Q Why does that matter?
A Because he -- he -- we had -- again, like I say, he's been doing the job for two years and been doing it well and we want him to continue to do it. So I think we were trying to find an accommodation to help him do that. As to why Mr. Ellison put it in his -- his statement, because -- because that -- that's just -- that's just part of the facts.
Q Were you aware that Mr. Batten had been on a waiting list for his service animal for several years?
A No, sir, not until he provided that information.
Q And when did he provide that information?
A I believe he provided it to Ms. -- to Ms. Emily, I believe.
Q Okay. That would have been earlier in late July?
A July, yes.
Q Okay. So Food City didn't doubt that Mr. Batten had a legitimate need for this service animal. Is that what I'm hearing?

A A legitimate need for an accommodation, not necessarily a service animal.
Q Okay. Did Food City have any reason to believe that Mr. Batten did not need the service animal?
A Will you restate that for me.
Q Yes, sir. Oh, you mean state it a different way?
A Restate the question or repeat it.
Q Did Food City have any reason to believe that Mr. Batten did not actually need the service animal?
A I think Mr. -- I think Mr. Batten needed an accommodation because that's -- that's what he requested.
Q Okay. I'm going to show you another document. Do you recognize this document?
A Yes, sir.
Q Okay. Is this a statement from Gary Richards dated August 12, 2021?
A Yes, sir.
Q Does it appear to be a fair and accurate copy of that statement?
A Yes, sir.
MR. HARGRAVES: All right. Let's

make that Exhibit 9.

(Thereupon, Exhibit No. 9, Statement of Gary Richards, 8/12/21, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:

Q The second sentence here says, "Mr. Ellison informed Mr. Batten after review, the decision was made that at this point in time the request for the service animal had been denied."

Did I read that right?

A Yes.

Q "Mr. Ellison asked if there were any jobs within the store to better accommodate his current needs, suggesting Uscan attendant as it would allow him to be around others."

Did I read that right?

A Yes, sir.

Q It says, "Mr. Batten stated that there wasn't any position in the store that he would be able to perform his duties as he wasn't able to stand for short/long periods of time, that Gas N Go was the only position that was suitable as it allowed him to sit and stand as needed and that he was not leaving his dog with anyone, that

where he goes, she goes."
Did I read that right?
A Yes, sir.
Q So the decision was made to offer Mr. Batten an alternate accommodation in the form of the Uscan attendant position; is that right?
A Yes, sir.
Q Okay. I need you to help me understand this. Did Food City just think that the service dog was not necessarily an appropriate accommodation and that's why they offered an alternate accommodation?
A I think we were trying to find an accommodation that would help Mr. Batten perform his job.
Q Okay. If you were trying to find an accommodation that would help Mr. Batten perform his job, then it begs the question why move on from the service animal accommodation if that one is an appropriate accommodation that will help him do his job?
A I feel like we had some other accommodations that we were trying to offer Mr. Batten.
Q Why?

A Because we were trying to find an accommodation that would work well for both of us.
Q Okay. If you were trying to find an accommodation that would work well for both of you, was the service animal an accommodation that would not work well for both of you?
A It could be potentially -- it could cause some potential hardships in the workplace.
Q Okay.
A So we were trying to identify what wouldn't.
Q Okay. But you've already testified that Food City did not make a determination about any undue hardship of the service animal before it denied the request?
A I said it could provide an undue hardship in the workplace.
Q Yes. I asked you sitting here today, if you could think whether it could cause a hardship; is that right?
A I said it could.
Q Yes. But my questions is with regard to Food City's decision and you've testified here today that they denied the decision and at the time they denied the decision, they had not made a

determination about whether it would cause an undue hardship. Do you remember that?

A And, again, understand I was a little confused with Donnie's testimony versus mine, and I apologize for that, because Donnie was the one that made the decision. So, like I said, pardon me for my confusion.

Q Okay. You're confused because of Mr. Meadows's testimony on this issue?

A Because you said Mr. Meadows, he was the one that made the decision.

Q Right. Are you confused about the reason for the denial because of Mr. Meadows's testimony?

A I was not there when the decision was made with Mr. Meadows to deny the accommodation.

Q But today you're Food City and Food City was there; right?

A Yes.

Q Mr. Meadows worked for Food City.

A Yes, sir.

Q Okay. Regardless, the decision was made to move forward with a different accommodation than the one that Mr. Batten had requested; is that right?

A Yes, sir.
Q Okay. Do you know whose idea was it to offer Mr. Batten the Uscan attendant position?
A That would have been Donnie Meadows.
Q Okay. Is there a record of Mr. Meadows having discussed that decision with anybody?
A Not that I'm aware of.
Q Do you know if he spoke with anybody about that decision?
A He would have sought counsel.
Q Why did Food City offer Mr. Batten the Uscan attendant position specifically?
A Because it was one that was inside the store around other associates, other customers. It's one that you can accommodate many different types of disabilities, including someone sitting in a wheelchair, which I mentioned before. It's one of those positions that's very, very easy to accommodate for someone, for them and the company because there is not a lot of physical activity. There's not a lot of -- it's one of those jobs that you can do with many different types of disabilities.
Q Okay. Did Food City understand that

Mr. Batten's request for accommodation related to his disability specifically pertained to anxiety, isolation, and stability?

A You said -- what was your question again?

Q Did Food City understand that Mr. Batten's request for accommodation related to -- as it pertains to his disability related to anxiety, isolation, and stability?

A Yes.

Q Okay. So in engaging in the interactive exchange to come up with an accommodation that works, it would need to address those three things; right?

A Yes.

Q Okay. How would the Uscan attendant position aid with Mr. Batten's anxiety? Rather how would it meet his needs with regard to the anxiety?

A Well, again, it was a proposed accommodation in order for us to discuss what could work and what might not work.

Q Okay. But this position was selected out of many other possible positions as the one to propose to Mr. Batten; is that right?

A Yes. It was one that was selected for Mr. Batten.
Q Do you know if Food City considered how this particular position would aid Mr. Batten with regard to anxiety?
A I don't necessarily think that specific job is going to provide someone relief from anxiety.
Q Okay. How did the Uscan attendant position meet Mr. Batten's needs with regard to stability?
A Well, because it -- there's a counter there and you can -- if you need to lean on the counter, you can. And I've already told you that oftentimes there's folks at the Uscan if they -- if they need to sit and we even provide that and, like I said, we've had associates that are in wheelchairs that work the Uscan.
Q The Uscan attendant position without modification is a standing only job; right?
A Again, like I said, it is one that is very easily modified and we do it all the time.
Q And my question was without modification, the Uscan attendant position is a standing only job; right?

A If it's -- if it's -- if the position is not modified, that's correct.
Q And that was my question. So you're saying here today it could be modified; right?
A Because we do it all the time.
Q Okay. Mr. Batten was never told that the Uscan attendant position could be modified to accommodate him; was he?
A I don't think we had the opportunity to tell him.
Q Why is that?
A Because he made it very clear that if he didn't have this dog, then he wasn't going to work.
Q Okay. Well, let's look back at Exhibit 9. It should still be up there for you.
A Okay.
Q It's talking about the August 12 meeting between David Ellison, Mr. Batten, and Gary Richards. It says -- about the middle of the paragraph do you see where it's my cursor Mr. Batten?
A Yes, sir.
Q "Mr. Batten stated that there wasn't any position in the store that he would be able to

perform his duties as he wasn't able to stand for short/long periods of times, that Gas N Go was the only position that was suitable that allowed him to sit and stand as needed."

Did I read that part correct?

A You did.

Q Okay.

A And he also -- and he also said that he was not leaving his dog with anyone. Where she goes, he goes.

Q Right. But he said he had a physical condition that would not allow him to stand for long periods of time; didn't he?

A He did.

Q And we can look back at Exhibit 8 where he says -- oh, about, you know, a little more than halfway down, you see here he stated. "He stated he could not work any position that mandated that he stand for prolonged periods of time as he has complex regional pain syndrome, CRPS. He stated that the fuel center allowed him to stand when needed and sit when needed."

Did I read that correctly?

A Yes.

Q Okay. And that's David Ellison's

account of that August 12, 2021, meeting; right?
A Yes.
Q So Mr. Batten made it abundantly clear that he had a physical condition that would prevent him from standing for long periods of time in the Uscan attendant position; right?
A Yes, sir.
Q And in response to Mr. Batten saying I can't do that position because it would make me stand too long, nobody told Mr. Batten that the position could be modified to allow him to sit; did they?
A Again, it is something that we do all the time. It is a modification that we do all the time.
Q Mr. Lyon, I did not ask you that question. I asked you if it was ever told to Mr. Batten that the position could be modified to allow him to sit?
A To my knowledge, no.
Q No. Nobody ever offered Mr. Batten the use of a stool in the Uscan position; did they?
A To my knowledge, no.
Q Nobody offered Mr. Batten the use

of a cane in the Uscan attendant position; did they?

A To my knowledge, no.

Q Nobody offered Mr. Batten the use of any assistive device in the Uscan attendant position; did they?

A To my knowledge, no.

Q All right. And you would agree that without modification, the Uscan attendant position would not address Mr. Batten's stability concerns; would it?

A It would -- it would not.

Q All right. Because without modification, it's standing and walking; right?

A Well, and leaning.

Q Right. You've got that podium there with the Uscan attendant. That's kind of their home base; is that right?

A Right.

Q And then they've got the self-checkout registers that they're responsible for; is that right?

A Yes.

Q So if anybody needs help with those registers, the Uscan attendant, they've got to

walk over to that register to help out the customer; is that right?
A If someone needs assistance, yes.
Q Okay. But, again, without modification, unlike the fuel clerk position, the Uscan attendant position would not allow Mr. Batten to sit down as needed.
A Without modification.
Q I've asked you about what was communicated to Mr. Batten with regard to -- rather what was not communicated to Mr. Batten with regard to a stool or a chair or other assistive device. Was there any communication internally not with Mr. Batten about the potential to supply Mr. Batten with a stool, chair, cane, or other assistive device in the Uscan attendant position?
A To my knowledge, no.
Q All right. So that wasn't -- that wasn't some plan of Food City's that they just never got around to.
A To my knowledge, no, like I said, because it is such a very common modification of that job. It's almost a given.
Q Okay. Well, but Mr. Batten indicated

that he couldn't do the job physically because it would make him stand; right?
A He did.
Q So fair to say if it was a common modification, it doesn't appear he was aware of it. Fair?
A It would appear that way.
MR. HARGRAVES: Okay. Do y'all need a break? I don't think I'll be going too much longer, but I know we've been going for a little while here.
MR. JACKSON: It's up to you, Sherrell. If you're not going to be all that much longer, I'm okay.
THE WITNESS: If it's not much longer, yes.
BY MR. HARGRAVES:
Q Okay. I'll try. I'll do my best.
All right. I'm going to share my screen with you. Do you recognize this document dated August 18, 2021?
A Yes.
Q Is it a statement from David Ellison regarding a meeting between him, Matthew Batten, and Brian Wattenbarger.

A Yes.

Q Does that appear to be a fair and accurate copy of that statement?

A Yes.

MR. HARGRAVES: All right. We'll make that Exhibit 10.

(Thereupon, Exhibit No. 10, Statement by David Ellison, 8/18/21, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:

Q In this meeting it says here on the third line, "I asked him again about the consideration of reassignment to a Uscan cashier. He once again denied that accommodation stating that he could not perform that duty."

Did I read that correctly?

A You did.

Q Okay. So Mr. Batten was clear that the reason he was denying the Uscan attendant position primarily is because he could not perform it.

A That's what it says, yes.

Q Okay. All right. Mr. Lyon, do you recognize this document Bates numbered 1068

through 1072?
A Yes, sir.
Q Is this the documentation that Mr. -- or rather pictures of the documentation that Mr. Batten provided to Food City regarding his service animal certification?
A Yes. That appears to be the documents that he gave to Emily or a copy.
Q Do these pictures fairly and accurately depict those documents?
A Yes, sir.
MR. HARGRAVES: Okay. Let's make that Exhibit 11.

(Thereupon, Exhibit No. 11, Service Animal Documentation, was marked to the deposition of Sherrell Lyon and filed herein.)

BY MR. HARGRAVES:

Q Were these documents considered in the decision to deny Mr. Batten the use of a service animal?
A I'm assuming, yes. Again, I'm not sure. I know they were presented to Mr. Meadows. So I would assume he would have reviewed those and any other documents when he made his

decision.

Q Okay. How do you know they were presented to Mr. Meadows?

A I had a copy of them that were sent to me. So I'm assuming they were sent to him.

Q Okay. With regard to disability accommodation requests from employees, would you say that it's routine or high frequency for Food City to receive those?

A I wouldn't say high frequency, no, but we do receive them.

Q How do you become aware of those requests?

A Sometimes we never hear of the request. Oftentimes it's something that the store manager can work out with the associate based upon their need and accommodating them at store level. And if it's something that they have questions about or maybe they can't seem to figure it out, then, of course, they'll reach out to the specialists. And if the specialists has some concerns or need some guidance, they'll reach out to -- to I guess now myself.

Q Is it --

A Prior to that it would have been -- they would have been reporting them to Donnie.
Q So would all employee disability accommodation requests generally be reported to the director of HR?
A No.
Q Okay.
A Like I said, oftentimes they never make it past the store manager.
Q So oftentimes the store manager is the one who resolves that?
A Sure.
Q And does Food City have any database for recording or tracking those requests?
A We do not.
Q Okay. But is it fair to say that Mr. Batten was not the first employee to request a disability accommodation?
A I'm assuming no.
Q I think I know the answer, but I've got to ask. Do you know how many employees requested a disability accommodation in the five years prior to August 1st, 2021?
A I do not.
Q Do you know how many requests for

disability accommodation Food City approves versus how many they deny?
A I do not.
Q Because Food City doesn't track that; right?
A No, sir.
Q In the past five years have there been any reports from employees claiming harassment, discrimination, or retaliation related to their filing of a request for ADA accommodation?
A Not that I'm aware of.
Q Are you aware of any employees between 2015 and now who have requested disability accommodations and who no longer work for Food City?
A Not that I'm aware of.
Q Are you aware of any internal communications regarding the decision to offer Mr. Batten the Uscan attendant position?
MR. JACKSON: Other than what's been discussed?
Q Other than what we've already discussed here today, sir.
A No, sir.

Q And are there any other reasons for offering Mr. Batten the Uscan attendant position that we have not discussed?
A No, sir.
Q Are you aware of whether another employee or new hire was selected to fill Mr. Batten's position as the fuel clerk after he was terminated?
A It was filled internally.
Q Okay. Do you know who filled it?
A No, sir.
Q Do you know whether that employee who filled the fuel clerk position for Mr. Batten has a disclosed disability?
A Not that I'm aware of, no.
Q So as far as you know, the person who filled Mr. Batten's position does not have a disability?
A As far as I know, that's correct.
Q All right. Mr. Lyon, I think that's all that I've got for you. Just one final question. Has everything you've said here today been true to the best of your abilities?
A Yes.

Q All right. That's all I've got. Mr. Jackson might have some questions for you.

MR. JACKSON: No, I don't.

FURTHER THIS DEPONENT SAITH NOT.

(Signature waived.)

REPORTER'S CERTIFICATION

STATE OF TENNESSEE :
:
COUNTY OF HAMILTON :

I, Cathy H. Kerley, LCR No. 95, RPR, licensed court reporter and notary public, in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing 71 pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of March, 2023.

CATHY H. KERLEY, RPR, LCR #95
Expiration Date 6/30/2024
Notary Public in and for the
State of Tennessee.
My commission expires
June 7, 2026

CATHY H. KERLEY
STATE OF TENNESSEE
NOTARY PUBLIC
COUNTY OF HAMILTON