UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

---

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN, | ) | |
| Plaintiff, | ) | |
| vs. | ) | CIVIL ACTION FILE NO. 4:22-CV-00179 |
| K-VA-T FOOD STORES, INC. d/b/a FOOD CITY, | ) | |
| Defendant. | ) | |

---

JANUARY 27, 2023

**ZOOM DEPOSITION OF DONNIE MEADOWS**

APPEARING FOR THE PLAINTIFF:

R. ETHAN HARGRAVES, ESQUIRE
MASSEY & ASSOCIATES
6400 LEE HIGHWAY, SUITE 101
CHATTANOOGA, TENNESSEE 37421

APPEARING FOR THE DEFENDANT:

HOWARD B. JACKSON, ESQUIRE
WIMBERLY LAWSON WRIGHT DAVES & JONES
550 MAIN STREET, SUITE 900
KNOXVILLE, TENNESSEE 37902

ALSO PRESENT: CHRISTOPHER BATTEN

**CATHY H. KERLEY, RPR**
**HALL & ASSOCIATES**
**POST OFFICE BOX 428**
**CHATTANOOGA, TENNESSEE 37401**
**423-267-4328**

EXHIBIT 3 DOC 50

the service dog and instead suggest the alternate position in the store, did you do that because you made the determination that the allowance of the service dog would be an undue burden on Food City?
A I did not. I just was trying to find an accommodation.
Q What was the reason for denying the use of the service dog, then?
A We could meet the need that Mr. Batten had requested assistance to through another accommodation.
Q Okay. But if you could meet the need with the requested accommodation and it wasn't an undue burden, then why not just provide that requested accommodation?
A We were in our informal discussion and exchange. Isn't that the purpose to -- to explore alternatives? And that's as we did.
Q Okay.
A So we felt we had a reasonable alternative assignment that would meet his need without the specific accommodation he requested.
Q Did you in your capacity of the VP of HR, did you have some problem with the use -- with Mr. Batten's use of his service dog?

A Absolutely not.
Q Then what I'm trying to understand is if you didn't have a problem with it, why would you suggest an alternative?
A How -- just simply exploring how could we meet the need as he requested for the stability. So that's the only reason.
Q Did you believe that Mr. Batten's use of the service dog would not meet his need?
A I did not make any assessment of that.
Q Did you or anyone else at Food City ever make the determination that Mr. Batten's use of the service dog would constitute an undue burden on Food City?
A No, sir.
Q Did you think it would constitute any type of burden on Food City?
A No, sir.
Q Can you tell me anything else to explain why, then, you would have offered an alternative instead of just granting the requested accommodation?
A Simply trying to meet his need for stability and the job that was proposed to him

allowed for that, but it was simply, you know, an open discussion that he was very close-minded to.
Q He would only accept the use of the service dog as an accommodation; is that right?
A That's what was conveyed to me that he -- he served it up as an ultimatum, dog or not work.
Q Did Food City not give him an ultimatum, Uscan position or not work?
A That's not true. We served that up. He did not accept it and did not explore further with us what other type of accommodation might make it feasible for him. So no, sir.
Q All right. Well, Food City didn't accept his request for the use of a service dog; did they?
A We had not fully explored alternatives.
Q Why didn't Food City further explore the use of his service dog?
A Mr. Batten -- Mr. Batten wouldn't engage in discussion with us for any other alternatives.
Q After Mr. Batten left Food City's employment, do you know if anyone filled the fuel