# EXHIBIT B
# DEPOSITION TRANSCRIPTS

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
AT ROME

---

CHRISTOPHER MATTHEW BATTEN, *
*
Plaintiff, *
*
-vs- * No. 4:22-cv-00179
*
K-VAT-FOOD STORES, INC., *
d/b/a FOOD CITY, *
*
Defendant. *
*

---

THE DEPOSITION OF
CHRISTOPHER MATTHEW BATTEN
January 11, 2023

---

Diane R. Angel, RPR, TN LCR #246
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

A I need a job that -- I need a chair at any job that I come into. I have a titanium femur. I have a plate and 16 screws in my right ankle. I have a plate and 19 screws in my right hip. And my right leg, as a result of this, is a little bit longer now because of the exterior hardware. My gait is altered. It's not exactly the most stable. It's like walking with one shoe on is how it feels. I know that that's a dramatic explanation to it. Not quite as much, but it's very close.

So I want to be mobile. I physically cannot be mobile, as in on my feet for three, four, five, six, seven, eight hours, however long it is.

**Q All right. So you need a desk --**

A (Moves head up and down.)

**Q -- in whatever sort of work you're going to do?**

A Yes, sir.

**Q Is there any other sort of physical requirement besides a desk that you would be aware of?**

A I mean, I can't speculate to the amount of other things that I need until I get to it. When -- since I'm missing my right arm I have

multiple areas, and if I -- one in particular, if it didn't come off in time, as being cleaned off in time, you would see where it had eaten -- left its mark, very acidic. Things like that were difficult to get done in time because I am a good bit slower than I would assume the normal average fuel clerk.

**Q Did you do some of those cleaning duties sort of as able?**

A I tried, yes.

**Q Did others give you some assistance with cleaning, as far as you can recall?**

A You know, I don't recall how Ms. Reba broke things down. At that store specifically it was broken down into three shifts. Some things would have covered -- would have been covered throughout the day, some things at open, some things also at close. So I can't give a definitive as to what I was helped with, how much help I received per job function.

**Q Number 3 says cleaning the concrete area around the pumps. Did you do some of the concrete cleaning?**

A That was extremely difficult because it required a deck brush, you know, a coarse-haired brush, long stick around the pumps and specifically

the speed bumps.

**Q Not easy to do?**

A Not easy to do with one hand. And that's just the scrubbing. The other part is the hose, pulling the hose around from one side to the other. I have stumbled, and I can say without question one of the scariest things that I go through is falling and watching the ground come and I can't do anything to stop it.

So moving a hose around, stumbling over the speed bump, those are all fears, and I tried to do what I could without compromising myself physically.

**Q Did you actually do some of this concrete cleaning?**

A Some.

**Q To the extent you thought you could safely do it?**

A Some, yes.

**Q All right. Collect trash as needed.**

A Did not.

**Q You didn't do that?**

A No. It goes back to I can't put a trash bag in the trash can.

**Q Were you in essence excused from**

A Yes, sir.

**Q What did she say?**

A She would take me to a pump and do it in front of me, and it wasn't pleasant. I mean, if it wasn't done to her satisfaction when she came in, then she'd -- there was a need to show me over and over, regardless of my explanation of how I could do what I could do or what I could not do, didn't matter. Do it faster. I can't do faster.

**Q She never understood that?**

A I'm not sure what -- I can't speculate what she was thinking at all times.

**Q She continued to give you some feedback on that subject, though?**

A In a negative manner she did it, and she did it publicly.

**Q Did she ever stop doing that while you were at 773?**

A No, sir.

**Q So these tasks that we've been talking about, did your ability to do them, or in some cases the difficulty doing them in other cases, did that remain fairly constant during your employment?**

A Yes, sir. I mean, that's my life.

you're always having to call me in early, why don't you just schedule it this way. And I guess that hit a nerve with Ms. Reba and --

**Q So she cut your --**

A -- so my hours -- oh, they went down to 10 to 13.

**Q Is that why you ended up transferring to another store?**

A Yes, sir.

**Q Where did you transfer to?**

A Store 701.

**Q Where is that?**

A East Brainerd Road.

**Q Who was the manager there?**

A Calvin Johnson.

**Q How did you end up getting a transfer?**

A I called -- or stopped in and I spoke with Mandy Hester and I asked -- she was the head cashier. I asked if there was any opportunity at that store. I'm not -- I'm working ten hours, you know. And she said, absolutely.

And so I came in and met with her and Calvin, and it was -- I don't know how it was worked out, but then I had to have a conversation with

**Q All right. On that day did you have any discussion with anyone about whether or not the dog could be present?**

A It was -- there was never -- there was never a conversation that said "you cannot bring your dog to work" until I had been back to work with my dog for a couple of days.

Now, for me to have these personal, you know, scales, the references, whatever the charts were, every single one but one was filled out by a Food City employee. The only reason why I say that is because I'm -- this is not a secret. Like I said, I'm not going to a service dog camp to bring home a house dog that I leave at the house. This was an open discussion and understood until I came back.

**Q All right. So when you came back after a couple of days did you have sort of an in-person discussion with Ms. Hobbs or Mr. Richards?**

A A couple of days -- I came back a couple days what? I'm sorry, I didn't understand the question.

**Q I'm trying to understand, when you had some discussion with Ms. Hobbs and Mr. Richards are we talking about an in-person discussion at the**

**Q Do you recall a second meeting with Mr. Ellison and Mr. Richards somewhere in the ballpark of a week later?**
A I believe so.
**Q So we're still in August of 2021, correct?**
A Correct.
**Q Did you record that meeting?**
A I believe I did.
**Q Any particular reason?**
A When I came in for the first meeting I honestly thought that this was about the accommodation for me to leave my stuff there, and I did that so I could take it to Mr. Ellison, who I understood is now the new HRC for the area. I recorded this for something to give him, but he was the one in the room. That's why I recorded this. I had been asking to leave my stuff, just a milk crate with my stuff in it. It hurts to sit. I need something -- shades, and I couldn't get a chair, couldn't get anything. I just wanted something to take to Mr. Ellison. Mr. Ellison just happened to be in the room.
**Q Oh, so you recorded the first meeting also?**

MR. JACKSON: I'm done, subject to any questions I might have after your attorney has asked.

EXAMINATION

BY MR. HARGRAVES:

**Q Mr. Batten, I just have a few questions. Did any of your job duties at Food City in your opinion put you at greater risk of falling down?**

A Yes.

**Q Like what?**

A Especially the curbs, using the cleaner and spraying all this outside at 774 that's slick, fall there. At 701, it is on a raised platform, and I actually fell into that kiosk a couple of times when I first got there because it is raised. Getting tobacco from the customer service and getting it ready for transfer I tripped over a toolbox twice. So it has happened so I know that it can.

**Q And had you communicated to Food City that you had fallen before?**

A No.

**Q In your conversations with David Ellison did you communicate that you had had falls**

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :
:
COUNTY OF HAMILTON :

I, Diane R. Angel, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. CHRISTOPHER MATTHEW BATTEN was duly sworn by me; that pages 1 to 88, inclusive, were reduced to typewriting under my direction and supervision and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This the 17th day of January, 2023.

Diane R. Angel

DIANE R. ANGEL, RPR, TN LCR #246
Registered Professional Reporter
and Notary Public.
My Commission Expires: 3/10/2025

NDTCA Signed Electronic Transcript

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| CHRISTOPHER MATTHEW BATTEN,<br><br>Plaintiff,<br><br>vs.<br><br>K-VA-T FOOD STORES, INC. d/b/a FOOD CITY,<br><br>Defendant. | CIVIL ACTION FILE NO. 4:22-CV-00179 |

MARCH 3, 2023

**ZOOM DEPOSITION OF SHERRELL LYON, JR.**

APPEARING FOR THE PLAINTIFF:

R. ETHAN HARGRAVES, ESQUIRE
MASSEY & ASSOCIATES
6400 LEE HIGHWAY, SUITE 101
CHATTANOOGA, TENNESSEE 37421

APPEARING FOR THE DEFENDANT:

HOWARD B. JACKSON, ESQUIRE
WIMBERLY LAWSON WRIGHT DAVES & JONES
550 MAIN STREET, SUITE 900
KNOXVILLE, TENNESSEE 37902

**CATHY H. KERLEY, RPR**
**HALL & ASSOCIATES**
**POST OFFICE BOX 428**
**CHATTANOOGA, TENNESSEE 37401**
**423-267-4328**

his service animal? And I can have the court reporter read it back to you if you like.

A If that's what I said, I certainly apologize.

Q Okay. Because you'll agree that item number 41 on Exhibit 1, one of the topics that you're supposed to be able to testify to today is all defendant's reasons for defendant's decision to deny plaintiff's request for the use of his service dog. Isn't that right?

A I think we were still trying to explore other options. Again, it was not our intent to end the two-way exchange.

Q Did Food City ever intend to grant Mr. Batten the use of his service animal?

A I don't think we ever finished the exchange. I think -- I don't think we -- I don't think we offered up or even had the chance to offer up the other items. I think that the communication did not remain open because Mr. Batten didn't allow it to remain open. I think that there could have been many other accommodations that could have been reached.

Q Was Mr. Batten's request for the use of his service animal denied by Food City?

A Yes, sir.
Q Why was it denied?
A Because we had not finished with the exchange of finding an accommodation that would work.
Q Mr. Lyon, I'm not asking you about other accommodations. I'm asking you why you denied in the first place his request for the use of his service animal.
A Because the exchange was still open. We were trying to find some sort of accommodation that would work for Mr. Batten.
Q Is it Food City's policy to just deny the first request no matter what and then look for other alternate accommodations?
A Absolutely not. The exchange had not -- had not been finished.
Q So if Mr. --
A We felt like -- I'm sorry. I was going to say we felt like we could find a reasonable accommodation for Mr. Batten if we could continue the exchange.
Q I want to -- I want to stop there.
A Okay.
Q Was the request for the use of a

of a cane in the Uscan attendant position; did they?
A To my knowledge, no.
Q Nobody offered Mr. Batten the use of any assistive device in the Uscan attendant position; did they?
A To my knowledge, no.
Q All right. And you would agree that without modification, the Uscan attendant position would not address Mr. Batten's stability concerns; would it?
A It would -- it would not.
Q All right. Because without modification, it's standing and walking; right?
A Well, and leaning.
Q Right. You've got that podium there with the Uscan attendant. That's kind of their home base; is that right?
A Right.
Q And then they've got the self-checkout registers that they're responsible for; is that right?
A Yes.
Q So if anybody needs help with those registers, the Uscan attendant, they've got to

REPORTER'S CERTIFICATION

STATE OF TENNESSEE :
:
COUNTY OF HAMILTON :

I, Cathy H. Kerley, LCR No. 95, RPR, licensed court reporter and notary public, in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing 71 pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of March, 2023.

______________________________
CATHY H. KERLEY, RPR, LCR #95
Expiration Date 6/30/2024
Notary Public in and for the
State of Tennessee.
My commission expires
June 7, 2026

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
AT ROME

---

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | No. 4:22-cv-00179 |
| | * | |
| K-VAT-FOOD STORES, INC., | * | |
| d/b/a FOOD CITY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

---

THE VIDEOTAPED DEPOSITION OF
DAVID GARY ELLISON
January 11, 2023

---

Diane R. Angel, RPR, TN LCR #246
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

**Q Okay. In this meeting that you had with Mr. Batten and Mr. Richards did Mr. Batten mention that he needed the dog for help with companionship, anxiety, and isolation?**

A Yes, sir.

**Q Okay. To your recollection, are those the only three things that he mentioned?**

A He did also mention about how he had previously fallen and could help with -- help him steady on his feet, but, yes.

**Q Okay. So he did mention stability or being a fall risk?**

A Uh-huh.

**Q Is that a yes?**

A Yes, sir.

**Q That's fine. All right. See, I told you it would happen. That's okay.**

**Do you recall him telling you that the dog would assist with stability?**

A He may have mentioned that that could be a function of the dog. I'm -- I can't exactly recall that, yes, he specifically stated those exact words.

**Q Okay. Looking at the, if you count that last word, the fourth line up from the bottom**

**starting with, "He also stated," do you see where I'm at on the right side?**

A Yes, sir.

**Q "He also stated that he has fallen about five times and the dog helps him steady on his feet." Is that what you wrote?**

A Yes, sir.

**Q All right. So he did indicate that the dog helped him steady on his feet?**

A Could help him, yes.

**Q Okay. Was it your understanding that that was at least in part because of the many surgeries that he had had related to his accident?**

A I'm sure that's what he would revert to, but I can't specifically state that, yes, that is why.

**Q Okay. Did he indicate that that was why?**

A He did make mention of the car accident and the multiple surgeries that he had had.

**Q Okay. Now, at one point you asked him if there had been any change in anything -- and just looking at the third line down from the top.**

A Uh-huh.

**Q "During this exchange I asked Batten**

**or something they'll come over and help you out?**

A Yes, sir.

**Q Okay. It's fair to say that's a job that has that associate on their feet?**

A Yes, sir.

**Q Okay. Do you remember what Mr. Batten said when you floated the idea of him working the USCAN position?**

A He immediately stated that he could not do that because he could not stand for prolonged periods of time. When trying to ask him as to, you know, gauge how long he might be able to sit or stand, he could not give me any definite time frame to even try to, you know, accommodate that matter. He just immediately shot it down and said, no, I can't do that.

**Q Okay. Well, did you advise Mr. Batten that he might be able to sit down for some period of time in that position?**

A Unfortunately, we never got to that --

**Q Okay. So you never --**

A -- discussion.

**Q Okay. You never offered, hey, we can give you a stool, we can give you a chair?**

with Donnie Meadows again on all accommodations or actions being offered.

**Q Okay. Fair enough. You couldn't just offer it without first talking to Donnie Meadows?**

A That is correct.

**Q Did you talk to Donnie Meadows about potentially offering Mr. Batten a chair for the USCAN position?**

A After the fact of having this conversation with him, I advised Donnie that, you know, he had turned down that position and there was really no further discussion surrounding that.

**Q Did you inform Mr. Meadows of Mr. Batten's reason for turning down the USCAN position?**

A Yes, sir.

**Q That it -- because it was a fully standing position?**

A Because he stated he could not be on his feet for prolonged periods of time and he could not give us an accurate, you know, time frame as to how long he felt he might be able to be on his feet.

**Q Okay. Did you and Mr. Meadows have any discussion at that point about whether to supply**

ahead and answer.

A I'm not sure -- I mean, he had been performing all essential functions of that job for two years, so, I mean, it was an accommodation to be able to allow him to continue employment.

**Q (By Mr. Hargraves) Let me ask it this way: It was never communicated to Mr. Batten that the offer of the USCAN position was intended as an accommodation of his gait instability; is that fair?**

A I'm not sure that that was discussed, no.

**Q Okay. It's certainly not mentioned here in your signed statement, is it?**

A No, sir.

**Q Okay. And Mr. Batten declined the USCAN position; is that right?**

A That is correct.

**Q He told you he couldn't physically do it; is that right?**

A That is correct.

MR. HARGRAVES: I believe this will be Exhibit 6.

(Whereupon, the document, as referred to above, was marked and will be subsequently attached hereto as Exhibit Number 6.)

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :
:
COUNTY OF HAMILTON :

I, Diane R. Angel, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. DAVID GARY ELLISON was duly sworn by me; that pages 1 to 83, inclusive, were reduced to typewriting under my direction and supervision and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This the 17th day of January, 2023.

______________________________

DIANE R. ANGEL, RPR, TN LCR #246
Registered Professional Reporter
and Notary Public.
My Commission Expires: 3/10/2025

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

---

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN, Plaintiff, | ) | |
| vs. | ) | CIVIL ACTION FILE NO. 4:22-CV-00179 |
| K-VA-T FOOD STORES, INC. d/b/a FOOD CITY, Defendant. | ) | |

---

JANUARY 27, 2023

**ZOOM DEPOSITION OF DONNIE MEADOWS**

APPEARING FOR THE PLAINTIFF:

R. ETHAN HARGRAVES, ESQUIRE
MASSEY & ASSOCIATES
6400 LEE HIGHWAY, SUITE 101
CHATTANOOGA, TENNESSEE 37421

APPEARING FOR THE DEFENDANT:

HOWARD B. JACKSON, ESQUIRE
WIMBERLY LAWSON WRIGHT DAVES & JONES
550 MAIN STREET, SUITE 900
KNOXVILLE, TENNESSEE 37902

ALSO PRESENT: CHRISTOPHER BATTEN

**CATHY H. KERLEY, RPR**
**HALL & ASSOCIATES**
**POST OFFICE BOX 428**
**CHATTANOOGA, TENNESSEE 37401**
**423-267-4328**

save his job, give him a chance to reconsider either going the current role or accepting the assignment as the Uscan cashier.
Q Based off of the training material in Exhibit 2, would you agree that it would have been Food City's position that Mr. Batten was a qualified employee?
A Mr. Batten was a satisfactory employee performing essential functions of his job without any accommodation and we were willing to give him an accommodation, but different than his request.
Q Let me ask a better question. Referring to Exhibit 2, specifically the definition of qualified employee, since you've said Mr. Batten was able to perform the essential functions of his job without accommodation, would he still be considered a qualified employee?
A Yes. There was no question about whether he was a qualified employee.
Q Okay. And I mean a qualified employee specifically with regard to Food City's ADA compliance.
A I'm not sure I follow the clarification you're seeking there.

Q Well, what I'm referring to is the ADA training material in Exhibit 2 where it says that "A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question." And what I'm trying to understand is if, to your knowledge, it was Food City's position that Mr. Batten was a qualified employee because he could do the job without reasonable accommodation?
A He certainly was a qualified employee, yes.
Q And to your knowledge, was a qualified employee who could perform the job without reasonable accommodation, were they ineligible for reasonable accommodation?
A Any qualified employee would be eligible for a reasonable accommodation if there was a need. That's part of the process to determine the need being requested and if there's another way to satisfy that need.
Q Okay. We'll talk some more and I want to look at some statements and emails regarding the conversations with Mr. Batten, but with regard to your decision to deny the use of

preferred solution. It doesn't mean it's the only solution.

Q Did you understand that the service dog was specifically trained to meet multiple of Mr. Batten's needs?

A I don't recall. No, I don't recall that.

Q Did you or anybody else at your direction ever ask Mr. Batten what it was about the service dog that he needed?

A I believe that's in one of the discussions that he and Mr. Ellison had.

Q And Mr. Batten indicated that the dog helped with anxiety, isolation, and stability; right?

A Yes.

Q So Mr. Batten maintained that the dog helped with all three of those. Is that fair?

A According to the statement.

Q Right. Did you have any reason to doubt that?

A No.

Q Okay. And was Mr. Batten ever offered any accommodation that similarly addressed all three: Anxiety, isolation and stability?

REPORTER'S CERTIFICATION

STATE OF TENNESSEE :
:
COUNTY OF HAMILTON :

I, Cathy H. Kerley, LCR No. 95, RPR, licensed court reporter and notary public, in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing 102 pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 13th day of February, 2023.

CATHY H. KERLEY STATE OF TENNESSEE NOTARY PUBLIC COUNTY OF HAMILTON

Cathy H. Kerley

CATHY H. KERLEY, RPR, LCR #95
Expiration Date 6/30/2024
Notary Public in and for the
State of Tennessee.
My commission expires
June 7, 2026

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA AT ROME

---

| | | |
|---|---|---|
| CHRISTOPHER MATTHEW BATTEN, | : | |
| | : | ORIGINAL |
| Plaintiff, | : | |
| -vs- | : | NO. 4:22-CV-00179 |
| K-VAT-FOOD STORES, INC., d/b/a FOOD CITY, | : | |
| Defendant. | : | |

---

THE VIDEOTAPED DEPOSITION OF
GARY RICHARDS
January 12, 2023

---

Whitney A. Vaughn, TN LCR# 418
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee 37343
(423) 876-4435 and 800-298-DEPO (3376)

accommodate his stability issues?

A No.

Q Sitting here today, can you think of any ways that the USCAN position would have accommodated Mr. Batten's stability issues?

A No.

Q As you wrote, the Gas 'N Go position was the only position that allowed him to sit and stand as needed; is that fair?

A Fair.

Q Do you recall that although Mr. Batten was offered the USCAN attendant position, he -- he was told that he would not be allowed to bring the dog into the store with him in that position?

A I don't remember.

Q Okay. Do you remember if Mr. Ellison offered Mr. Batten the use of a stool or a chair in the USCAN position?

A I don't remember.

Q Would the -- would the use of a stool or a chair in the USCAN position potentially cause a safety hazard?

A No.

Q No. It wouldn't -- it couldn't potentially be a tripping hazard for customers?

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :
COUNTY OF HAMILTON :

I, Whitney A. Vaughn, Court Reporter and Notary Public, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption. GARY RICHARDS was duly sworn by me; that pages 1 to 78, inclusive, were reduced to typewriting under my direction and supervision, and the deposition is a true and correct record, to the best of my ability, of the testimony/evidence given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rights charged are usual and customary.

This is the 23rd day of January, 2023.

Whitney Vaughn

Whitney Vaughn, TN LCR #418
Court Reporter and Notary Public
My Commission Expires 07/30/25